## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

**KELLI SMITH,**

        **Plaintiff,**

**v.**                                 **Case No.:  2:23-CV-840-JES-KCD**

**THE FLORIDA GULF COAST
UNIVERSITY BOARD OF TRUSTEES,**

        **Defendant.**

_____/

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, THE FLORIDA GULF COAST UNIVERSITY BOARD OF TRUSTEES ("the University," or "FGCU"), moves for summary judgment on Plaintiff's claims of discriminatory termination based on gender and retaliation.[1] (Pl. 265:1-10).[2]  As detailed below, Plaintiff cannot marshal sufficient evidence to create any genuine dispute of material fact, and Defendant is entitled to judgment as a matter

---

[1] Plaintiff's Complaint and Demand for Jury Trial asserts five counts. (Compl. (Dkt. No. 1) at 1; PX83).  Plaintiff confirmed her Complaint was true, accurate, complete, and did not require any amendment.  (Pl. 288:3-13).  In the first two counts, Plaintiff alleges a claim of disparate treatment based on gender in violation of Title VII and the FCRA.  (Compl. ¶¶ 53-72; see also  id. ¶¶ 57, 67). Plaintiff admits that the only adverse employment action she is complaining of is her termination.  (Pl. 265:16-22).  In counts three and four, Plaintiff alleges a claim of retaliation in violation of Title VII and the FCRA, asserting that her alleged "protected activity was the proximate cause of the Defendant's negative employment actions."  (Compl. ¶¶ 73-98; see also id. ¶¶ 79, 92).  Plaintiff identified the negative employment action as her termination.  (Pl. 265:16-22; PX77: Interrog. #3). Finally, in count five, Plaintiff alleges a claim of retaliation in violation of Title IX, asserting that "[s]aid protected activity was the proximate cause of the Defendant's negative employment actions." (Compl. ¶¶ 99-100; see also id. ¶ 105).  She defines the negative employment action as her termination. (Pl. 265:16-22, 279:8-10; PX77: Interrog. #6).

[2] Defendant's supporting materials are attached along with an index.  Defendant cites to the declaration or depositions by using the declarant's or deponent's last name along with a pinpoint citation, except for Plaintiff who is referred to as "Pl." or "PX" for exhibits.

of law on all counts of Plaintiff's Complaint.[3]

## MEMORANDUM OF LAW

Plaintiff Kelli Smith ("Smith" or "Plaintiff") was hired as the FGCU police chief in May 2021, after search process whereby she was selected over three male candidates. President Martin, who made the decision to terminate her employment, also ultimately concurred with and was responsible for the decision to hire Smith.

Plaintiff understood that it was important to have a collaborative leadership style and that she could be terminated if her management or communication style was not effective. Plaintiff admits that she had a different management style than her predecessor in the position. Plaintiff does not and cannot dispute that Martin and others who recommended her termination viewed her as not having a collaborative or effective management or communication style. Martin has terminated other male administrators when he determined that they did not have an effective management or communication style. As a result, because of her ineffective management and communication style, her employment was terminated. Plaintiff has not and cannot adduce any evidence that the decision, made less than a year after she was hired by the same decision-maker, was because of her gender.

Likewise, Plaintiff cannot establish her employment was terminated because of her alleged complaints of sex or gender discrimination. Plaintiff admits that she did

---

[3] Understanding that the Court already has ruled on Defendant's arguments of res judicata and collateral estoppel asserted in its Motion to Dismiss, Defendant does not re-assert those arguments herein. However, this motion should not be construed as an intent by Defendant to waive those arguments.

not follow the University's policy in making any complaint of discrimination. Moreover, she failed to establish that Martin had any knowledge of any complaint of discrimination. To the extent that Plaintiff's retaliation claims are based on her alleged complaints of Clery compliance,[4] in addition to Plaintiff's inability to show knowledge, Plaintiff's claims fail as that assertion is not protected activity as a matter of law nor can Plaintiff show sufficient temporal proximity or causation to establish a claim of retaliation. Indeed, she admits that, prior to her termination, she did not have any reason to believe that Martin or the other employees who recommended her termination were biased against her. As a result, she has failed to adduce any evidence of retaliation, and her claims fail as a matter of law. Plaintiff's claims under the FCRA also fail as they are barred by the Eleventh Amendment.

The undisputed facts show that Plaintiff cannot establish a claim of discrimination or retaliation, and summary judgment must be granted in favor of Defendant on all claims.

## I.    STATEMENT OF MATERIAL FACTS[5]

### A.    Plaintiff Was Selected over Male Candidates for the Chief Position

1.    In 2021, Steven Moore, the long-time police chief of the FGCU police department, decided to retire. (Martin 22:4-8).

---

[4] The Clery Act, 20 U.S.C. § 1092(f), requires federally-funded universities to report certain crimes committed on university property. It is not limited to reporting crimes against women. (Pl. 87:4-17); see also 20 U.S.C. § 1092(f)(1)(F) (requiring the reporting of murder, sex offenses, robbery, aggravated assault, burglary, motor vehicle theft, manslaughter, arson, liquor-law violations, drug-related violations, and weapons possession).

[5] The facts recited herein are for purposes of summary judgment only. Defendant reserves the right to challenge Plaintiff's assertions should this motion be denied.

2.      As a result, FGCU engaged in a search process to find a new police chief. (Pl. 64:10-13).  That process included a first-round interview by a search committee. (Stensrud Decl. Ex. 13).  One of the committee members was Anthony Rispoli, a captain in the police department.  (Stensrud Decl. Ex. 13 & C).

3.      The search committee interviewed 6 candidates – 3 female, 3 male. (Stensrud Decl. Ex. 13 & ¶ 4).  James Slapp, a current captain, was one of the male candidates, and Smith was one of the female candidates.  (Stensrud Decl. Ex. 13). Rispoli rated Plaintiff the highest candidates of the 6 candidates, ranking her over the 3 male candidates.  (Stensrud Decl. Ex. 13).

4.      Ultimately, two candidates – both female – were identified as the finalists. (Martin 13:17-25, 16:22-23).  One of those two finalists was Smith.  (Id.).

5.      Michael Martin, the FGCU president, was involved in the hiring process for the Chief position, which was a collective decision considering the recommendations of the committee and the president's cabinet.[6]  (Martin 12:20-14:2). The president listened to the input and interviewed the two finalists.  (Id.).  Martin did not consider gender in making this decision.  (Martin 25:22-26:7).  Martin agreed with the shared decision to select Smith over the other 5 candidates, including 3 male candidates.  (Martin 13:19-14:2).  Martin was ultimately responsible for this hiring

---

[6] President Martin selected his cabinet.  (Martin 12:23-25, 24:14-15).  He described his cabinet as follows:  "And so the cabinet was made up of a core group of people. I think you know that the general counsel is an African American woman, the director of compliance is an African American woman, the vice president for philanthropy is a white woman. We had a pretty diverse group. We also had -- let's see -- two Hispanics. So we didn't set out necessarily to pursue diversity. We set out to pursue good solid people who could serve the institution, and it turned out that way, and I thought that was a benefit to us." (Martin 23:6-15).

decision as he was the termination decision.  (Martin 35:3-19; Pl. 63:3-5).

6.      As a result, on May 3, 2021, Plaintiff began her employment as the police chief at FGCU. (Pl. 83:10-12, 23-25; PX17).  Her supervisor was Sara Stensrud, Senior Associate Vice President and Chief Human Resources Officer.  (Pl. 95:4-6).

7.      Plaintiff was employed at-will and served at the pleasure of President Martin. (Pl. 89:18-23, 97:21-25, 99:11-13, 138:1-4; PX35).  She was hired at the top-end of the pay range for the position, even though she had only been a police chief for three years.  (Pl. 79:10-15, 20-23).

8.      Pursuant to FGCU policy, during her first year of employment, Plaintiff could be separated without cause and would only receive a one-month severance payment.  (PX33; Pl. 99:16-100:3).  President Martin viewed this as a probationary period for new administrators, including the chief of police.[7]  (Martin 54:3-10, 59:23-60:12).  This was a period of time to determine whether the employee's performance and management style were effective.  (Martin 60:7-12).

9.      When Plaintiff began her employment, several colleagues in other departments expressed their excitement that Smith had been hired.  (Pl. 91:1-4).

**B.   Plaintiff Was Required to Work Collaboratively, Build Relationships with Her Colleagues, and Utilize an Effective Management Style**

10.     The job leading the police department at FGCU is more than just policing. (PX19).   Plaintiff acknowledges that the police chief must foster an

---

[7] Smith admitted that, for FGCU police officers, there was a twelve-month probationary period, which is common among police departments.  (Pl. 97:21-98:12, 99:7-10).

environment of collaboration, outreach, and professional services for the community. (Pl. 54:16-55:4, 87:18-22, 67:7-16; PX19).

11.     Plaintiff further acknowledges that the police chief must work effectively as a team and communicate effectively. (Pl. 87:23-88:2; 100:4-9). And she admitted the importance of developing and maintaining partnerships and building relationships throughout the University. (Pl 61:15-62:12, 65:5-66:3, 76:10-14, 76:23-77:9). She also admitted that having a collaborative leadership style was important to the police chief role.   (Pl. 87:18-22).   Indeed, the need for a collaborative leadership style was emphasized during the police chief selection process.  (Stensrud Decl. Ex. B: 001350).

12.     Plaintiff recognizes there is accountability for failing to meet these job requirements. (Pl. 67:7-16, 101:2-6).  She knew that she could be terminated for her management or communication style, including failing to maintain an effective management or communication style. (Pl. 90:7-12).

## C.   Plaintiff's Colleagues and Others Complained about Her Management Style

13.     Smith admits that she had a different management style than Chief Moore – the previous chief.  (Pl. 88:3-8).  Moore's style was laizzez-faire.  (Pl. 88:3-6).

14.     Moore's style was very effective.  (Martin 49:1-18).  Based on his style, he was viewed as "a constructive member of the community that transcended just the role of police chief."  (Id.).  This was President Martin's expectation for the police chief.  (Id.).

15.     While Smith viewed herself as collaborating and being a good partner, she does not know if her colleagues and direct reports viewed her the same way.  (Pl.

211:3-24; see also id. 81:5-10).  She cannot dispute that she was viewed as difficult to get along with, not a team player, and not collaborative.  (Id.; see also Pl. 81:8-10, 89:10-13, 213:25-214:10).  Nor can she dispute that her colleagues and others on campus made complaints about her management and communication style.  (Id.).

16.     President Martin received many complaints about Smith's management and communication style.  (Martin 46:2-8, 46:14-48:9).  He had an open-door policy and had coffee every day in the Student Union at 7:30 a.m.  (Martin 46:24-47:24).  People knew that they could stop by and talk to him about anything, and they did.  (Martin 47:1-7).  The complaints about Smith's style were louder outside of the police department than internal to the department.  (Pl. 43:1-5).

17.     Martin recalled that Plaintiff's style was viewed as "[s]ort of an in-your-face, 'I'm an expert.  You're not.  I don't need to hear from you.  I'm going to do this my way' kind of attitude."  (Martin 43:9-12).  This was not a good position to take with her colleagues who included other female leaders.  (Martin 43:12-14).  As a result of her style, she hurt her relationships with other departments, which, in turn, hurt the credibility and effectiveness of the police department.  (Martin 43:21-25, 44:8-14).

18.     Martin heard complaints from many different aspects of campus regarding Plaintiff's management and communication style, including students, faculty, student affairs, academic core, facilities, and people in various colleges.  (Martin 46:2-8, 48:8-9).  There was a broad-base of complaints on campus about Plaintiff's management and communication style, including her lack of collegiality.  (Martin 46:2-8, 48:10-15, 49:1-6, 57:18-25).

19.     Police officers within the department also made complaints about Plaintiff's leadership. (Martin 44:1-2; Stensrud Decl. X64). On February 28, 2022, officers complained that Smith was requiring officers to work off-the-clock and talking negatively about officers. (Stensrud Decl. X64).

20.     Thereafter, on March 9, 2022, pursuant to the president's open-door policy, President Martin met with five officers[8] who reported complaints about Plaintiff's management and communication style. (Pl. 164:14-20, 166:15-22, 168:3-6; Martin 56:2-19). All of these officers supported Plaintiff's hire, but raised complaints about her management style. (Martin 57:7-14). At this point, President Martin already had received other complaints from those outside of the department about Smith's management style. (Martin 57:18-25).

21.     After this meeting, Stensrud and her supervisor, David Vasquez, met with Plaintiff to discuss her performance. (Pl. 164:17-19). According to Plaintiff, Stensrud advised her that there were complaints about low morale in the department. (Pl. 167:14-24). Plaintiff contends that she was told not to worry, but she was not told that by President Martin, Vee Leonard, or Precious Gunter. (Pl. 165:11-16). After the meeting, Plaintiff admits that she thought she was in trouble, she recognized that there

---

[8] Plaintiff contends that one of these officers was Captain Rispoli, but she admits that she does not have any personal knowledge of who was present in the meeting. (Pl. 166:15-22, 168:20-25, 169:4-6). She also admitted that she has no personal knowledge of what information was conveyed. (Pl. 168:20-25). While she contends that the officers' complaint to President Martin is part of the basis of her claim (Pl. 231:4-232:2), she is not able to identify any evidence to support a claim of gender bias or retaliation. (Pl. 168:20-25, 231:4-232:2). Moreover, her own evaluations of Captain Rispoli belie this assertion where she rated him overall as "Exceeds Expectations" and "Exceeds Expectations" on valuing diversity, including demonstrating an understanding and valuing people of all races, ethnicities, religions, abilities, genders, and sexual orientations. (Stensrud Decl. Ex. A & B).

was a concern, and she thought she could be terminated, but she did not make any changes to her management or communication style. (Pl. 165:11-16, 214:11-215:14).

22.     After receiving all of these complaints about Plaintiff, Martin decided to consult David Thomas, a professor who he turned to for advice on campus security. (Martin 36:11-25). He wanted Dr. Thomas to perform an assessment of the department. (Martin 36:11-37:16).

23.     Martin wanted the assessment to include more than just an evaluation of the department based on the complaints that Martin had received outside of the department. (PX71 ("It seems the new chief has bruised a few relationships beyond UPD so we may need a somewhat more holistic perspective."); PX75: 001749).

24.     President Martin continued with the assessment even after he made the decision to terminate Plaintiff's employment. (PX75). It also encompassed a holistic assessment, including relationships with other departments, and confirmed the complaints Martin had received from outside of the police department regarding Smith's ineffective management and communication style. (PX75:001749, 001774).

### D. Plaintiff Did Not Change Her Management or Communication Style and Martin Made the Decision to End Her Employment

25.     On March 28, 2022, another complaint was submitted about Plaintiff to the hotline stating that since the March 9 complaint, Plaintiff has not changed her management style, and the environment remains toxic. (Pl. 245:10-21; Stensrud Decl. X72).

26.     The complaint alleges that one person has already left, and seven others

are considering leaving. (Id.).  If eight out of nineteen officers leave, that would be 40 percent of the sworn officers.  (Id.).

27.    Plaintiff admits that she was responsible for retention and hiring in the department.   (Pl. 101:7-12).   During her employment, FGCU, like other law enforcement agencies, had difficulty filling vacant law enforcement positions.  (Pl. 101:13-102:8, 102:13-16).  If forty percent of the officers resigned in the department, it would have had an impact on the department's ability to function.  (Pl. 102:17-103:8).

28.    Plaintiff is not aware of any other University administrator who was faced with threatened resignations from 40 percent of the department. (Pl. 103:18-25).

29.    Leonard (female), general counsel, and Gunter (female), Title IX coordinator, brought the report to President Martin's attention and recommended that he move forward with separation without cause.  (Pl. 60:20-61:1, 84:16-85:12; Martin 60:13-25).  Leonard and Gunter had personal observations of Smith and were aware of the complaints regarding Smith's ineffective management and communication style. (Martin 35:20-36:10, 46:9-13).  Plaintiff admits that she has no reason to believe that Leonard or Gunter were biased against her.  (Pl. 97:15-20).

30.    Martin agreed with the recommendation and made the decision to terminate Plaintiff's employment without cause. (Martin 35:3-19, 60:13-61:1).  At the time of this decision, Plaintiff did not believe that Martin was biased against her.[9]  (Pl.

---

[9] Plaintiff contends that, after her termination, she performed Google searches and found that Dr. Martin had been involved in other lawsuits at different universities.  (Pl. 96:16-20).  As a result, she concluded that he was biased against her.  (Id.; Pl. 96:25-97:3).  This was the sole basis for her conclusion.  (Pl. 96:25-97:3).  However, none of these lawsuits involved any judgment against Martin or any determination that he had acted wrongfully.  (Martin 64:4-67:19).  Plaintiff admits that, just

96:13-15).

31.    President Martin, who hired Plaintiff, explained the reasons he believed that terminating her employment was in the best interests of FGCU:

> [It was] largely style and personal interactions, the sense that there was not a respectful relationship meaning from the interactions by the chief. And, as I say, it sort of - it violates the collegiality of the culture of the university. And I have worked with chiefs at other places, and so I came to understand how important that kind of relationship is to the credibility and the effectiveness of the police department. And so when you fracture relationships with the other major leaders across the campus, I just don't believe you can be as effective. And when you can't be optimally effective, you can no longer fully serve the mission and the people of the institution, and that's where it came down in the end.

(Martin 58:20-59:14).

32.    Plaintiff admits that she does not know how or why she was terminated and thus cannot dispute Martin's testimony as to the reason for her termination.  (Pl. 215:19-23).   She also concedes that he has no knowledge that Martin, Leonard, Gunter, or any employee of FGCU ever made derogatory remarks about her or her gender.  (Pl. 257:8-20).

33.    Plaintiff was not aware of any other employees who President Martin believed had an ineffective management or communication style.  (Pl. 215:24-216:2). President Martin terminated male employees for the same reason – for not having an effective management or communication style.  (Martin Decl. ¶ 3).

34.    Stensrud was not involved in the decision to terminate Plaintiff's

---

because an employee makes an allegation, does not mean that the allegation is true.  (Pl. 98:21-23). She had "no idea" whether any of the allegations about President Martin were true.  (98:24-99:2). Thus, the sole reason that Plaintiff later concluded that President Martin was biased is not evidence of gender discrimination or retaliation.

employment.  (Stensrud Decl. ¶ 3).

35.    Instead of terminating Plaintiff with cause, which would have deprived her of any severance, Martin elected to terminate Smith's employment without cause, which resulted in her receiving severance pay.  (Pl. 82:1-8, 134:25-135:14; PX33).  This separation without cause also allowed her to be classified as eligible for rehire. (Pl. 135:15-20).  In addition, as Smith acknowledged, she did not view a separation without cause to be discipline, which also benefited her when she submitted subsequent applications for employment.  (Pl. 280:20-24).

36.    At the time of her separation, Plaintiff was paid a salary of $135,000.00.  (Pl. 80:9-12).  The interim chief, James Slapp, appointed after Plaintiff's separation was only paid a salary of $100,000.00.  (Stensrud Decl. Ex. D).

## E.  Plaintiff Contends She Raised Concerns about Clery Compliance and Certain Employees to Sara Stensrud

37.    As a condition of her employment, Plaintiff knew that she was required to review and follow the University policies and procedures.  (Pl. 83:2-6, 104:21-24, 145:17-21; PX17).  She also was responsible for enforcing the University's policies and procedure in the police department.  (Pl. 104:25-105:2).

38.    The University has policies and a regulation explaining the procedure for filing a complaint of discrimination, harassment, or retaliation.  (Pl. 107:10-13; PX22; PX24; PX31).  Complaints of discrimination were required to be submitted to Gunter, either directly or via a hotline complaint. (Pl. 107:14-108:7, 110:7-14; PX22; PX24).  Plaintiff admits that she never utilized this procedure during her employment.  (Pl.

108:15-17, 110:15-18).

39.    The regulation also explains the responsibility of supervisors and managers with respect to reports of discrimination.  (PX31:002106; Pl. 120:8-12).  It provides:  "Any University supervisory or managerial employee who receives a report, observes, or learns of an alleged violation of this Regulation has an absolute and unqualified duty to immediately report the alleged violation to the Director of the Office of Institutional Equity and Compliance/Title IX Coordinator as soon as possible." (PX31:002106).  Plaintiff understood that this was part of her obligation as the police chief.  (Pl. 120:21-23, 121:8-10).  Plaintiff admits that she never made any report to OIEC or Title IX Coordinator during her employment, even though she had meetings with Gunter.  (Pl. 121:11-122:7, 133:5-7, 147:13-20).

40.    Additionally, as the police chief, Plaintiff was the highest-ranking officer in the police department and all of the officers were required to follow her direction and orders.  (Pl. 91:9-92:5).  She had the ability to revise or publish any general order that she wanted.  (Pl. 92:18-92:25).  She had the obligation to initiate an internal affairs investigation when an officer failed to comply with a policy, which could result in the termination of an officer.  (Pl. 93:2-94:1, 14-16).  She also had the ability to place an employee on leave pending an investigation.  (Pl. 113:10-21; PX27).

41.    Plaintiff understood that Clery compliance was an important responsibility of the police chief.  (Pl. 86:19-22).  The University was always "attuned to making sure that we were Clery-compliant and we had solid people managing

13

that."[10]  (Martin 33:13-15).  Indeed, knowledge and experience with Clery were factors considered by the search committee in seeking to fill the police chief position. (Stensrud Decl. Ex. B).

42.    Plaintiff contends that she only raised complaints of discrimination to Sara Stensrud.  (Pl. 147:21-24).

43.    Plaintiff asserts that, on her first day of employment on May 3, 2021, Plaintiff raised an issue to Stensrud about one of her subordinates (Jones) who she claimed was "borderline insubordinate and disrespectful" and "very abrasive in any conversation." (Pl. 148:6-18).  She admits that she did not know "what his issue was" and never claimed or suggested it was discrimination based on her gender. (Pl. 149:6-10, 152:17-153:9).

44.    She also contends that she complained to Stensrud about an issue with the women's bathroom, but admits she never complained that it was discrimination or harassment.  (Pl. 153:14-25, 156:2-8).

45.    Specifically, she alleges that, after initiating an internal affairs investigation regarding two of her direct reports, she found feces and urine on the toilet in the women's restroom when she arrived in the morning.  (Id.).  She did not know who was doing it or why, and she never opened an investigation to determine those facts.  (Pl. 155:9-19).  The incidents ceased after she spoke with the sergeants and the

---

[10] Indeed, after Plaintiff's termination, the University created an emergency alert and notification policy (PX28) as well as a Clery policy (PX29), which were signed by President Martin.  (Pl. 114:21-23, 115:10-16, 116:6-11).

captains and advised the officers it must stop. (Id.; Pl. 153:10-156:8).

46.     Plaintiff's interaction with Jones and the bathroom incident were the only issues she reported to Stensrud that involved her.  (Pl. 157:5-7).  These reports to Stensrud were made in the fall of 2021.  (Pl. 156:25-157:1).

47.     Plaintiff also contends that she reported two instances to Stensrud in the same time frame involving Dianna Sandora and Deontre Whitaker.  (Pl. 157:12-159:3).

48.     With respect to Sandora, Dianna Sandora complained to Plaintiff about disparate and sexist treatment of dispatchers and the "all boys club."  (Pl. 122:13-18). Plaintiff admits that she took no action to investigate this claim and made no report of this complaint as required by University policy.  (Pl. 122:22-123:4, 124:8-12).  She had the ability to take action and initiate an investigation, and she never did so.  (Pl. 126:17-18).   Sandora made this complaint within Plaintiff's first couple of weeks of employment, Plaintiff told her to come back to her if problems continued, and Sandora never did.  (Pl. 122:22-123:4, 125:22-24).  Plaintiff told Stensrud about the issues with dispatch during her first week of employment.  (Pl. 122:1-3).

49.     With respect to Whitaker, he worked in student affairs, and she contends he reported to her that officers were engaging in selective enforcement based on gender, attractiveness, and race.  (Pl. 128:13-16).  Plaintiff contends that she requested he provided specific information, but he refused to do so.  (Pl. 128:21-22).  According to Plaintiff, he merely indicated that "he knew that FGCU PD was sexist, and FGCU was sexist and racist."  (Pl. 128:20-24).  Plaintiff contends that she shared this

information with Stensrud. (Pl. 129:1). She admits that she did not report it to OIEC as required by University regulation. (Pl. 129:2-3). She also admits that she conducted no investigation of his claim, asserting that it was too ambiguous. (Pl. 129:9-15).

50.    Plaintiff admits that there was no one else in the university that she complained to about discrimination. (Pl. 159:4-6).

51.    While Plaintiff contends that she raised concerns about Clery compliance to Stensrud, she admits that she did not raise those concerns to Martin. (Pl. 173:21-24).

52.    Early in her employment, Plaintiff requested that the University hire a Clery compliance coordinator to report to her. (Pl. 175:13-21, 182:8-10). This request was granted, even though it had been denied to Chief Moore during his employment. (Pl. 174:12-17, 182:2-4; PX52).

53.    Diania Tsenekos was hired as the Clery compliance coordinator, and Tsenekos also raised concerns about Clery compliance. (PX67; Pl. 201:23-202:1). Tsenekos continued to be employed by the University, she freely raised her concerns about Clery compliance, and no action was taken against her employment. (Pl. 201:12-19, 202:7-23).

54.    Martin was not aware of any complaint of sex or gender discrimination made by Smith during her employment. (Martin Decl. ¶ 4). Plaintiff admits that she made no complaint of discrimination to Martin, Leonard, or Gunter. (Pl. 108:15-17, 110:15-18, 173:11-16).

## II.    LEGAL ARGUMENT

**A.  Plaintiff's FCRA Claims Are Barred by the Eleventh Amendment**

The Eleventh Amendment prohibits federal courts from exercising subject matter jurisdiction in suits brought against a state by a citizen of that state. <u>Pan–Am Tobacco Corp. v. Dep't of Corr.</u>, 471 So.2d 4, 5 (Fla. 1984).  The Eleventh Amendment extends to state agencies and other arms of the state, which includes FGCU. <u>Univ. of S. Fla. Bd. of Trustees v. CoMentis, Inc.</u>, 861 F.3d 1234, 1235 (11th Cir. 2017).  Although the state of Florida has waived sovereign immunity from FCRA suits brought in Florida courts, it has not consented to being sued in federal court for monetary damages brought under the FCRA. <u>See</u> Fla. Stat. § 768.28 ("No provision of this section, or of any other section of the Florida Statutes . . . shall be construed to waive the immunity of the state or any of its agencies from suit in federal court, as such immunity is guaranteed by the Eleventh Amendment to the Constitution of the United States...."); <u>see also</u> <u>Gould v. Fla. Atl. Univ. Bd. of Trs.</u>, 2011 U.S. Dist. LEXIS 165909, *9 (S.D. Fla June 24, 2011) (holding that a FCRA retaliation claim for money damages, brought against a state agency in federal court, was barred by the Eleventh Amendment).

Because Florida has not waived its Eleventh Amendment immunity for Plaintiff's FCRA claims, this Court lacks subject matter jurisdiction over Counts II & IV of Plaintiff's Complaint and those counts must be dismissed.

**B.  Plaintiff Cannot State a Gender Discrimination Claim**

At all times, Plaintiff bears the ultimate burden of establishing intentional discrimination and retaliation. <u>See</u> <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir.

1997). As Plaintiff cannot present any direct evidence of discrimination, in order to defeat this motion, she must satisfy the <u>McDonnell Douglas</u> burden-shifting analysis. <u>See</u> <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d 1079, 1086 (11th Cir. 2004). In order to establish a prima facie case, Plaintiff must demonstrate that Defendant treated similarly situated employees outside of her protected class more favorably or other evidence of gender discrimination. <u>Lewis v. City of Union City, Ga.</u>, 918 F.3d 1213, 1220-21 (11th Cir. 2019).

Plaintiff cannot establish a prima facie case of gender discrimination. It is undisputed that Plaintiff was hired and terminated (less than 10 months later) by the same person (Martin). As a result, she cannot establish a prima facie case of discrimination as there is an inference, which she cannot rebut, against discrimination. <u>See</u> <u>Williams v. Vitro Servs. Corp.</u>, 144 F.3d 1438, 1442 (11th Cir. 1997); <u>Smith v. Integrated Cmty. Oncology Network, LLC</u>, 2010 U.S. Dist. LEXIS 110096 *14 (citing <u>Bradley v. Harcourt Brace & Co.</u>, 104 F. 3d 267, 270-71 (9th Cir.1996) (accepting inference against discrimination and holding that, "[i]f [the supervisor] had preferred to place a man in the position, we can see no reason why she would have hired a woman only a year earlier."). Indeed, in this case, Plaintiff attempts to rely on the fact that Slapp was appointed as the interim chief after her termination. However, less than 10 months before, Martin selected Plaintiff over Slapp for the position. Thus, the only inference that can be drawn is that there was no gender discrimination. Plaintiff also failed to establish any disparate treatment. Indeed, it is undisputed that Martin terminated male administrators, including prior to Plaintiff's termination, for the same

reasons that he terminated Plaintiff. Plaintiff also admits that she is not aware of any FGCU administrator where 40% of the department's employees threatened to resign and the administrator was not terminated. (Pl. 103:18-25). As a result, Plaintiff cannot establish a prima facie case of gender discrimination. Even if Plaintiff could overcome these substantial and undisputed bars, Plaintiff still cannot establish a claim of gender discrimination.

If Plaintiff can establish a prima facie case, then Defendant must articulate a legitimate business reason. At that point, Plaintiff bears the burden to establish pretext for discrimination. Plaintiff must rebut head on each and every reason for action. See Shultz v. Sec'y of U.S. Air Force, 522 F. App'x 503, 504-05 (11th Cir. 2013); Chapman v. AI Transport, 229 F.3d 1012, 1037 (11th Cir. 2000). Subjective belief of discrimination is insufficient to defeat a motion for summary judgment. See Wallace v. Teledyne Cont'l Motors, 138 F. App'x 139, 143 (11th Cir. 2005). Plaintiff must show "*both* that the [legitimate, nondiscriminatory] reason [for the termination] was false, and that discrimination was the real reason." Siddiqui v. NetJets Aviation, Inc., ___ F. App'x ___, 2019 WL 2323785, at *1 (11th Cir. 2019); Ware v. City of Panama City, Fla., 762 F. App'x 949, 952 (11th Cir. 2019). Plaintiff bears the burden to "advance sufficient evidence of . . . discrimination to create a triable factual dispute." Flowers v. Troup County, Ga., 803 F.3d 1327, 1338 (11th Cir. 2015). Granting a motion for summary judgment is proper when "the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989).

Martin articulated legitimate business reasons for his decision to terminate Plaintiff's employment. (SOF ¶ 31). Plaintiff admits that she does not know why her employment was terminated, and she cannot dispute Martin's reason for termination. In particular, she cannot dispute that Martin believed that she had an ineffective management and communication style and that it warranted her termination. Indeed, she admits that she knew that she could be terminated for her management style, that she was required to be collegial and collaborate with her colleagues, and that her colleagues complained to Martin about her management and communication style. She cannot rebut that Martin and her colleagues viewed her as difficult to get along with, not a team player, and not collaborative. She admits that she had a different management style than the previous chief. She also admits that she made no change to her management or communication style after the March 9th meeting where she knew that she was in trouble and her employment could be terminated. She acknowledged that she served at the pleasure of President Martin and still made no change to her performance. She cannot show, or create a genuine dispute, that the reason for her termination was false.

Furthermore, Plaintiff cannot adduce any evidence of gender discrimination. Plaintiff admits that no one made any derogatory remarks about her or her gender. When she was hired, she was selected over three male candidates. She was paid at the highest end of the pay scale. In fact, she was paid far more than Slapp was when he was appointed as the interim chief. Martin terminated Plaintiff without cause, which is further evidence of the lack of discrimination. This designation allowed her to report

20

that she was eligible for hire and paid her a severance. Indeed, Plaintiff did not view this decision as discipline, which was beneficial when she was reporting it on subsequent applications. As further evidence of the lack of discrimination, Martin terminated male employees for the same reason as he terminated Plaintiff. He also hired Plaintiff, over male candidates, ten months before her termination as well as selected many women to be part of his cabinet, including Leonard, Gunter, and the future (now current) president of FGCU. Plaintiff further admitted that there was no reason to believe that Leonard and Gunter, who recommended her termination, were biased against her. Plaintiff also admitted that she did not believe Martin was biased against her at the time of her termination. The only reason she later asserted that he was biased was because he had been involved in other lawsuits – that reason, however, is not evidence of gender discrimination.

In short, Plaintiff has not and cannot adduce any evidence of gender discrimination and cannot establish pretext. At best, Plaintiff's claim is based on a subjective belief, which she did not even articulate when asked if she knew the reason for her termination. (SOF ¶ 32). That is not enough. Plaintiff's gender discrimination claim fails as a matter of law.

**C.    Plaintiff Cannot State a Retaliation Claim under Title VII**

"In order to prove retaliation under Title VII, a 'plaintiff must show that (1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities.'" Gregory v. Georgia Dep't of Human Res.,355 F.3d 1277, 1279 (11th Cir. 2004).

First, Plaintiff cannot show that she engaged in protected activity. Title VII prohibits an employer from discriminating against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); see also EEOC v. Total Sys. Servs., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000). To the extent that Plaintiff's claim is based on her assertion that she raised concerns about Clery compliance, it is not protected activity under Title VII.

Additionally, Plaintiff's complaints to Sara Stensrud were of a vague or general nature and insufficient to establish that Plaintiff engaged in protected activity under Title VII. (Pl. 147:21-25, 152:23-153:25); see also Blow v. Va. Coll., 619 F. App'x 859, 863 (11th Cir. 2015); Slater v. Progress Energy Serv. Co., LLC, No. 8:09-cv-208-T-24EAJ, 2010 U.S. Dist. LEXIS 101060, at *27 (M.D. Fla. Sep. 24, 2010) ("Such a statement, however, is too vague and does not include any objection to a violation of law, and therefore does not qualify as a protected activity."); Bicknell v. City of St. Petersburg, No. 8:03-CV-1045-T-27MAP, 2006 U.S. Dist. LEXIS 8789, at *21 (M.D. Fla. Mar. 6, 2006) ("An employee's opposition to an act of discrimination or harassment by a co-worker does not fall within the protection of Title VII unless the discrimination can be attributed to the employer, because Title VII only prohibits unlawful employment practices or acts on the part of the employer, not its employees.").

Even if Plaintiff could show that she engaged in protected activity in her

statements to Stensrud, she has failed to establish causation for her claim.  The degree of causation required to prove retaliation is elevated.  A retaliation plaintiff must prove that his protected activity was the "but-for" cause of adverse action against him. University of Texas Southwestern Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013) and 42 U.S.C. § 2000e-3(a).  Moreover, causation in the retaliation context requires knowledge as a factual predicate.  An employee's protected activity cannot be the but-for cause of adverse action against the employee if the pertinent decision-makers did not know about it.  Martin v. Financial Asset Mgmt. Sys., 959 F.3d 1048, 1053 (11th Cir. 2020) ("As a starting point for any retaliation claim, a plaintiff needs to show (among other things) that the decisionmaker actually knew about the employee's protected expression … if [defendant's president and CEO] did not know about [plaintiff's] discrimination complaints, he could not have fired her because of them."); Zarza v. Tallahassee Housing Auth., 686 F. App'x 747, 754 (11th Cir. 2017); Shannon v. BellSouth Telecomms., Inc., 292 F.3d 712, 716 (11th Cir. 2002).  A decision-maker's knowledge cannot be imputed or constructive.  Zarza, 686 F. App'x at 754 ("retaliation under Title VII concerns 'actual knowledge, and real intent, not constructive knowledge and assumed intent,' which means 'we must focus on the actual knowledge and actions of the decision-maker'").

Plaintiff's claim fails because she cannot show that Martin had knowledge that she complained of discrimination.  Martin specifically asserts that he lacks knowledge, and Plaintiff admits that she does not know.  (SOF ¶ 54).

Finally, Plaintiff's claim also fails for a lack of temporal proximity.  She

contends that her alleged protected activity was, at the latest, in the fall of 2021. (Pl. 156:25-157:1). An adverse action occurring more than three months after protected activity, without more, will not permit an inference of retaliation, see Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) and Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007), and even a shorter period cannot support a claim where the decision-maker's actual knowledge is unproven. Brungart, 231 F.3d at 799-800; Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1355-56 (11th Cir. 1999); see also Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006). Plaintiff's claim also fails for the same reasons articulated above regarding the lack of pretext. Accordingly, Plaintiff has not and cannot state a claim of retaliation.

### D. Plaintiff Cannot State a Retaliation Claim under Title IX

The Eleventh Circuit has held that any retaliation claim under Title IX must be linked to a complaint of sex discrimination against student. Joseph v. Bd. of Regents of the Univ. Sys. of Ga., 121 F.4th 855, 869 (11th Cir. 2024) ("The Court linked the act of retaliation to a complaint of sex discrimination against students."). Plaintiff made no complaint of sex discrimination against students. Instead, this claim is based on her purported complaints about the University's compliance with the Clery Act.

As an initial matter, the Clery Act itself provides that it cannot be used to establish protected activity under Title IX. 20 U.S.C. § 1092(f)(14)(A) (providing that "evidence regarding compliance or noncompliance with [the Clery Act] shall not be admissible as evidence in any proceeding of any court ... except with respect to an action [by the Department of Education] to enforce this subsection"); see also

Kollias v. University of Rochester, 2023 U.S. Dist. LEXIS 153456 *12 (W.D.N.Y. Aug. 30, 2023); Matthews v. Clark Atlanta University, 2020 U.S. Dist. LEXIS 259986 *14 (N.D. Ga. Mar. 18, 2020) (dismissing a Title IX claim based on a Clery Act violation).

Plaintiff also admits that the Clery Act is not limited to acts against women, and thus, a complaint about Clery compliance is not a complaint of sex discrimination. (Pl. 87:4-17).  Furthermore, another employee (Tsenekos) raised a complaint about a Clery compliance, and Plaintiff admits that her employment was not terminated. (SOF ¶ 53).  Thus, refuting any claim of retaliation.

Furthermore, this claim of retaliation fails for the same reason as Plaintiff's claim under Title VII.  Plaintiff cannot establish that Martin had knowledge of her purported complaint.  He denies that he had knowledge, and Plaintiff admits that she does not know.  (SOF ¶ 54).  Plaintiff also failed to establish temporal proximity or causation.  Thus, Plaintiff cannot state a claim of retaliation under Title IX.[11]

Accordingly, Plaintiff's claims fail as a matter of law.

Respectfully submitted,

*s/Sacha Dyson*
Sacha Dyson
Florida Bar No. 509191
sdyson@bgrhlaw.com
Lead Counsel

BUSH GRAZIANO RICE
& HEARING, P.A.
100 S. Ashley Drive, Suite 1400
Tampa, Florida 33602
Tel: (813) 228-7000
Fax: (813) 273-0091
ATTORNEYS FOR DEFENDANT

---

[11] Plaintiff also cannot establish damages for this claim. See Cummings v. Premier Rehab Keller, P.L.L.C., 142 S. Ct. 1562, 1569 (2022) (affirming dismissal of a spending clause statutory claim for failure to allege a compensable injury and applying a contract-law analogy to such claims).