Smith vs. Florida Gulf Coast University - Kelli Smith

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 1 of 118 PageID 361

01/22/2025

**1**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

KELLI SMITH,

        Plaintiff,

    vs.                         CASE NO.:
                                2:23-CV-840-JES-KCD

THE FLORIDA GULF COAST
UNIVERSITY BOARD OF TRUSTEES,
        Defendant.
_____/

DEPOSITION OF KELLI SMITH

    DATE:        January 22, 2025
    TIME:        9:37 a.m. to 5:39 p.m.
    LOCATION:    Yormak Employment &
                 Disability Law
                 27200 Riverview Center Blvd.
                 Suite 109
                 Bonita Springs, Florida 34134
    TAKEN BY:    Counsel for the Defendant
    REPORTER:    Angela L. Klein, RPR, FPR
                 Notary Public
                 State of Florida at Large

_____

FORT MYERS COURT REPORTING
2271 McGregor Boulevard, Suite 220
Fort Myers, Florida  33901
Email: Scheduling@fmreporting.com
(239) 334-1411

Serving All of Southwest Florida

---

**2**

            A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
    Yormak Employment & Disability Law
    27200 Riverview Center Boulevard, Suite 109
    Bonita Springs, Florida 34134
    byormak@yormaklaw.com

    By:  Benjamin H. Yormak, Esquire


ON BEHALF OF THE DEFENDANT:
    Bush Graziano Rice & Hearing, P.A.
    100 South Ashley Drive, Suite 1400
    Tampa, Florida 33602
    sdyson@bgrhlaw.com

    By:  Sacha Dyson, Esquire


ALSO PRESENT:  Thomas Rinaldi, Esquire

            I N D E X

                                        PAGE
Direct Examination by Ms. Dyson           7

            E X H I B I T S

NUMBER        DESCRIPTION                  PAGE
Exhibit 1   5/1/2023 Benefit Application    26
Exhibit 2   8/10/2022 Benefit Application   28
Exhibit 3   Notices of Disqualification     29

---

**3**

NUMBER        DESCRIPTION                          PAGE
Exhibit 4   UCF Resignation Form                    40
Exhibit 5   Sarasota County Public Schools
            Application                             43
Exhibit 6   Application for Employment Longboat Key 49
Exhibit 7   September 21, 2020 Letter               50
Exhibit 8   Employee Exit Interview                 51
Exhibit 9   Resume                                  53
Exhibit 10  January 2021 Job Posting                60
Exhibit 11  February 4, 2021 Letter                 63
Exhibit 12  Resume                                  66
Exhibit 13  Search Materials Audit Checklist        69
Exhibit 14  Interview Schedule                      73
Exhibit 15  On-Site Interview Questions             75
Exhibit 16  Interview Panel Feedback                78
Exhibit 17  4/1/2021 Letter                         78
Exhibit 18  Meet & Greet Schedule                   83
Exhibit 19  Job Description                         85
Exhibit 20  Notifications of Regulations, Policies,
            Procedures and Handbook                104
Exhibit 21  Retention of External Legal Counsel    105
Exhibit 22  Non-Discrimination, Anti-Harassment
            and Sexual Misconduct policy           106
Exhibit 23  Contract Review Policy                 108
Exhibit 24  Sexual Harassment Policy               109
Exhibit 25  Shared Governance Policy               110

---

**4**

NUMBER        DESCRIPTION                          PAGE
Exhibit 26  Budget Management Policy               111
Exhibit 27  Special Leaves and Furlough            112
Exhibit 28  Emergency Alert and Notification       114
Exhibit 29  Clery Act Policy                       115
Exhibit 30  Ombuds Services for Student Concerns
            and Complaints                         116

Exhibit 31  Non-Discrimination, Anti-Harassment,
            and Sexual Misconduct Regulation       119
Exhibit 32  Sexual Harassment Under Title IX       132
Exhibit 33  Separations Regulation                 133
Exhibit 34  Organizational Structure               135
Exhibit 35  Supervisory Management                 137
Exhibit 36  Written Directives                     138
Exhibit 37  Sexual Battery                         139
Exhibit 38  General Conduct and Responsibilities   139
Exhibit 39  Obedience to Orders                    141
Exhibit 40  Police Community Relations             141
Exhibit 41  Disciplinary Procedures                142
Exhibit 42  August 31, 2018 Emails                 176
Exhibit 43  January 14, 2019 Email                 177
Exhibit 44  January 22, 2019 Email                 178
Exhibit 45  January 24, 2019 Email                 178
Exhibit 46  January 25, 2019 Email                 179
Exhibit 47  March 8, 2019 Email                    179

---

1 (Pages 1 to 4)

Smith vs. Florida Gulf Coast University    Kelli Smith

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 2 of 118 PageID 362

01/22/2025

5

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| Exhibit 48 | March 2019 Emails | 179 |
| Exhibit 49 | March 2019 Emails | 181 |
| Exhibit 50 | May 18, 2021 Memo | 182 |
| Exhibit 51 | June 9, 2021 Memo | 184 |
| Exhibit 52 | July 22, 2021 Document | 190 |
| Exhibit 53 | September 2021 Emails | 190 |
| Exhibit 54 | October 2021 Emails | 192 |
| Exhibit 55 | December 2021 Emails | 195 |
| Exhibit 56 | November 2021 Emails | 200 |
| Exhibit 57 | November 2021 Emails | 203 |
| Exhibit 58 | November 19, 2021 Calendar | 204 |
| Exhibit 59 | December 2021 Emails | 216 |
| Exhibit 60 | January 6, 2022 Document | 218 |
| Exhibit 61 | January 2022 Emails | 218 |
| Exhibit 62 | January 14, 2022 Email | 220 |
| Exhibit 63 | 1/18/21 Goals | 221 |
| Exhibit 64 | Hotline Web Complaint | 226 |
| Exhibit 65 | March 2022 Emails | 228 |
| Exhibit 66 | March 3, 2022 Email | 232 |
| Exhibit 67 | March 7, 2022 Email | 232 |
| Exhibit 68 | March 7, 2022 Email | 232 |
| Exhibit 69 | March 9, 2022 Email | 236 |
| Exhibit 70 | March 2022 Emails | 243 |

7

1  Thereupon,
2            KELLI SMITH,
3  Deponent, having first been duly sworn, upon her oath,
4  testified as follows:
5        THE WITNESS:  Yes, ma'am.
6            DIRECT EXAMINATION
7  BY MS. DYSON:
8      Q.  Good morning, Ms. Smith.
9      A.  Good morning.
10     Q.  As I mentioned, my name is Sacha Dyson, and I
11  represent Florida Gulf Coast University in the lawsuit
12  that you've brought against the university.
13     A.  Yes, ma'am.
14     Q.  Can you state your full name for the record?
15     A.  Yes.  Kelli Jeanne Smith.
16     Q.  And have you been deposed before?
17     A.  Yes.
18     Q.  And how recently?
19     A.  It's been several years.  I couldn't give you
20  an exact time frame, but probably five years ago.
21     Q.  And in what capacity were you deposed?
22     A.  I was chief of police for Northern Arizona
23  University, and there was a situation in which one of my
24  employees came to work under the influence of alcohol
25  and moved through arbitration.

6

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| Exhibit 71 | March 2022 Emails | 244 |
| Exhibit 72 | Hotline Web Complaint | 245 |
| Exhibit 73 | March 29, 2022 Letter | 261 |
| Exhibit 74 | FGCU Police Department Assessment | 262 |
| Exhibit 75 | November 10, 2021 Memo | 263 |
| Exhibit 76 | February 7, 2022 Memo | 263 |
| Exhibit 77 | Interrogatories | 266 |
| Exhibit 78 | Application | 280 |
| Exhibit 79 | Complaint and Demand for Jury Trial | 283 |
| Exhibit 80 | Request for Admissions | 284 |
| Exhibit 81 | Charge of Discrimination | 286 |
| Exhibit 82 | Charge of Discrimination | 287 |
| Exhibit 83 | Complaint and Demand for Jury Trial | 287 |
| Exhibit 84 | Plaintiff's Initial Disclosures | 288 |
| Exhibit 85 | Response to Request for Production | 290 |

8

1      Q.  And other than as either your capacity as
2  chief of police or as a police officer, either
3  investigating or responding, in terms of depositions,
4  have you been deposed in any other capacity?
5      A.  Not that I recall, to be honest with you.
6      Q.  Okay.  So I'm going to go over the ground
7  rules for the deposition today.
8      A.  Yes, ma'am.
9      Q.  So the purpose of us being here today is to
10  get an accurate and complete understanding of your
11  claims against the university.  Do you understand that?
12     A.  Yes, ma'am.
13     Q.  And your counsel is present.  You can take a
14  break at any time.  Just let me know you want to take a
15  break.  Your attorney can assert objections, mainly
16  objections to the form of the question.  Unless he
17  instructs you not to answer the question, you should go
18  ahead and answer the question on the record.
19         For the purpose of creating a good record
20  today, to the extent that you know last names, we should
21  use first and last names, for the record, so we can know
22  who you are talking about.
23         And we're going to try our best that we can to
24  speak one at a time.  Sometimes it's difficult in a
25  conversation.  But that will help create a record of

2 (Pages 5 to 8)

9

1  what we're talking about here today.
2        If you don't understand a question that I've
3  asked, please ask me to rephrase the question.  I'll be
4  glad to do that for you.  And if you have answered the
5  question, I'm going to assume you've heard it,
6  understood it, and have provided your best recollection.
7        Do you understand these ground rules?
8     A.  Yes, ma'am.
9     Q.  And are you currently under doctor's care?
10    A.  Yes.
11    Q.  For what?
12    A.  I have high blood pressure, underactive
13  thyroid, and prediabetic.
14    Q.  And have you been prescribed medication for
15  those conditions?
16    A.  Yes, I have.
17    Q.  And have you taken any medications in
18  accordance with what the doctors instructed you to take
19  here today?
20    A.  Yes.
21    Q.  And is there anything about your physical or
22  mental condition that provides you -- that prevents you
23  from providing accurate and reliable testimony?
24    A.  No.
25    Q.  Have you been known by any other names?

10

1     A.  No.
2     Q.  And where do you currently reside?
3     A.  I split my time between Venice, Florida, and
4  St. Petersburg, Florida.
5     Q.  And how long have you been doing that?
6     A.  Since -- four years.  Four years.
7     Q.  So were you doing that at the time that you
8  were employed by Florida Gulf Coast University?
9     A.  No.
10    Q.  Okay.  So when did you start splitting your
11  time between Venice and St. Pete?
12    A.  So less than that.  2022 was when that house
13  was bought, the St. Pete house was bought.  So I
14  apologize.
15    Q.  Oh, that's okay.
16        When you worked for the university, did you
17  reside in Venice?
18    A.  Yes.
19    Q.  And who resides with you?
20    A.  Dina Cooper and Michael Gennari.
21    Q.  And who are they in relation to you?
22    A.  Dina Cooper is my partner.  And Mike Gennari
23  is her brother.
24    Q.  Are they employed?
25    A.  Yes.

11

1     Q.  And where are they employed?
2     A.  Michael is employed at Publix.  And Dina is
3  employed at University of South Florida, the Tampa
4  campus.
5     Q.  And was Ms. Cooper previously employed at
6  Florida Gulf Coast University?
7     A.  Yes, she was.
8     Q.  And what period of time was that?
9     A.  She left in December of this year, and I can't
10  remember her exact start date for FGCU.  It was while I
11  was employed there.
12    Q.  And are you married?
13    A.  No.
14    Q.  And you're with Ms. Cooper.  Did you have a
15  relationship with her at the time you started working at
16  Florida Gulf Coast?
17    A.  Yes.
18    Q.  Okay.  And, then, other than splitting your
19  time between your Venice home and your St. Pete home,
20  have you resided anyplace else since you've left Florida
21  Gulf Coast University?
22    A.  No.
23    Q.  Are you currently employed?
24    A.  Yes, I am.
25    Q.  And where are you employed?

12

1     A.  The Office of the Attorney General.
2     Q.  And in what position are you employed?
3     A.  Senior financial investigator.
4     Q.  And how long have you been employed?
5     A.  Since October of '23.
6     Q.  And in what office do you work at for the
7  attorney general?
8     A.  Department of Legal Affairs, Consumer
9  Protection.
10    Q.  And where is that office?
11    A.  Tampa.
12    Q.  And what are your job duties and
13  responsibilities as a senior financial investigator?
14    A.  To evaluate consumer complaints that relate to
15  businesses under the FDUPTA chapter of 501 for unfair
16  and deceptive practices.
17    Q.  While you were employed at Florida Gulf Coast
18  University, did you use a personal email address?
19    A.  Yes.
20    Q.  And what personal email address did you use?
21    A.  I have two;                @gmail.com and
22                    @yahoo.com.
23    Q.  Did you use either of those addresses to
24  search for employment after your employment ended at
25  FGCU?

3 (Pages 9 to 12)

13

1    A. It would have solely been the Gmail account.
2    Q. Did you use either of those personal email
3 accounts to communicate about your employment at FGCU?
4    A. It's kind of a broad question, because, like,
5 during the hiring process, absolutely, so yes.
6    Q. Okay. Outside of the hiring process, while
7 you were employed at FGCU?
8    A. I don't know the answer to that.
9    Q. Do you still have access to both of those
10 email accounts?
11    A. Yes.
12    Q. Have you taken steps to retain the information
13 in those accounts?
14    A. Everything that was on the request for
15 production, I provided, as far as that goes.
16    Q. So have you taken steps to retain the
17 information to ensure it wasn't deleted?
18    A. Oh, it was saved as PDFs, I think, and
19 submitted that way.
20    Q. And do you have any social media accounts?
21    A. I do.
22    Q. And what social media accounts do you have?
23    A. Solely Facebook.
24    Q. And what name do you use on Facebook?
25    A. KJS KJS. I think there's a space between

14

1 them, but I'm not sure, because I don't type it in. So
2 I think its KJS space KJS.
3    Q. Okay. And did you communicate on social
4 media -- well, let me ask it this way.
5       During your employment at FGCU, did you
6 communicate on social media about your employment at
7 FGCU?
8    A. Never.
9    Q. During your employment at FGCU, did you use a
10 personal cell phone?
11    A. Yes.
12    Q. Were you also assigned a university cell
13 phone?
14    A. No.
15    Q. And did you use your personal cell phone to
16 communicate by text message about your employment at
17 FGCU while you were employed at FGCU?
18    A. When you say "about my employment," I'm not
19 quite sure the breadth of that.
20    Q. Sure. So during your employment at FGCU, did
21 you use your cell phone to communicate about work?
22    A. Oh, yes.
23    Q. And is it still the same device as when you
24 worked at FGCU?
25    A. I don't believe so.

15

1    Q. Did you take steps to preserve the information
2 on your cell phone that you used during your employment?
3    A. Yes.
4    Q. And what is the personal cell phone that you
5 use? What's the phone number?
6    A. ████████████.
7    Q. And how long have you used that number?
8    A. At least 20 years, I mean, give or take.
9    Q. And have you ever been arrested?
10    A. No.
11    Q. Have you ever been threatened with arrest?
12    A. No -- well, I think once when I was probably
13 19. It was a disorderly kind of thing, but I don't even
14 know if it was arrest or a threat. It was more of, Go
15 home.
16    Q. Have you filed any other lawsuits other than
17 this lawsuit?
18    A. The lawsuit was for my homeowners insurance
19 and then an auto accident.
20    Q. And when was the homeowners lawsuit?
21    A. After Hurricane Ian.
22    Q. And the auto accident?
23    A. It was probably 2013 or 2014.
24    Q. And were you deposed in either of those
25 lawsuits?

16

1    A. I don't remember if I was deposed in the
2 homeowners insurance, but not that I recall in the auto
3 accident insurance. It's possible, but I don't recall.
4    Q. Are there any other lawsuits that you have
5 filed other than those three lawsuits?
6    A. No.
7    Q. Have you made a threat of filing any other
8 lawsuit?
9    A. No.
10    Q. Other than the charge of discrimination that
11 you filed against Florida Gulf Coast University, have
12 you filed any other charges of discrimination?
13    A. None that I recall.
14    Q. Have you threatened to file any other charge
15 of discrimination?
16    A. No.
17    Q. Have you ever filed for bankruptcy?
18    A. Yes.
19    Q. And when was that?
20    A. Somewhere between 2008 and 2011. I don't
21 remember the exact year.
22    Q. And has that been dismissed?
23    A. Yes.
24    Q. Was it dismissed before you started working at
25 Florida Gulf Coast University?

Smith vs. Florida Gulf Coast University - Kelli Smith

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 5 of 118 PageID 365

01/22/2025

17

```
 1      A.  Yes.
 2      Q.  And did you receive a discharge?
 3      A.  Yes.
 4      Q.  Other than conversations that you've had with
 5  counsel, have you had any conversations with anyone else
 6  regarding your deposition today?
 7      A.  Yes.
 8      Q.  And who is that?
 9      A.  When I needed to take the day off of work, I
10  advised my supervisor.
11      Q.  Other than advising your supervisor of your
12  deposition, did you have any other substantive
13  conversations about your deposition with your
14  supervisor?
15      A.  No.
16      Q.  And who is your supervisor?
17      A.  Patricia Rossie.
18      Q.  And what is her title?
19      A.  Supervisor of investigators or something to
20  that effect.  Investigative supervisor.
21      Q.  And did you have any conversations with anyone
22  else regarding your deposition?
23      A.  My sister and I talked about the stress of it.
24      Q.  And who is your sister?
25      A.  Catherine Dorn.  It's a C.  C-A-T-H.
```

18

```
 1      Q.  And where does she live?
 2      A.  Stuart, Florida.
 3      Q.  Did you have any conversations with anyone
 4  else about your deposition?
 5      A.  No.
 6      Q.  Other than documents that were provided to you
 7  by counsel, did you review any other documents prior to
 8  the deposition today?
 9      A.  No.
10      Q.  Did you have any conversations with any
11  current or former students or employees of FGCU about
12  your deposition?
13      A.  No.
14      Q.  Have you had any conversations with any
15  current or former students or employees of FGCU about
16  your lawsuit?
17      A.  Dina is obviously aware.
18      Q.  Anyone else?
19      A.  No.  I take that back.  I saw Captain Slapp,
20  Captain Rispoli, and I believe it was Sergeant Jones in
21  Chipotle after my termination.  And they approached me
22  and acknowledged that they'd heard I'd filed a lawsuit.
23      Q.  And tell me about that conversation.
24      A.  I was sitting in Chipotle eating lunch, and
25  they walked in, and they saw me, and, obviously, it was
```

19

```
 1  uncomfortable.  And they walked up, and they said, you
 2  know, hello, and something to the effect they
 3  acknowledge that I filed a lawsuit.  And I said, Yeah.
 4  I guess I'll see you in deposition.  And that was the
 5  extent of it.
 6      Q.  Why was it uncomfortable?
 7      A.  Because I had been terminated, and I hadn't
 8  seen them since I separated from employment.
 9      Q.  Are you connected to Captain Slapp or Rispoli
10  or Jones via social media?
11      A.  No.
12      Q.  Do you communicate with them in any other way?
13      A.  No.
14      Q.  Just for the record, can you give me their
15  full names?
16      A.  James Slapp, Anthony Rispoli, and Brian Jones.
17      Q.  When was that that you saw them in Chipotle?
18      A.  I couldn't begin to guess.
19      Q.  Is it more than a year ago?
20      A.  Oh, yes.
21      Q.  Do you know if they were still employed by
22  Florida Gulf Coast University?
23      A.  They were all in uniform.  And, actually,
24  Captain Slapp had on his chief's bar and chief's badge.
25      Q.  Is there anyone else that you -- any other
```

20

```
 1  employee that you talked to about the lawsuit that you
 2  filed against FGCU?
 3      A.  No.
 4      Q.  I'm sorry?
 5      A.  No.  I said no.
 6      Q.  Okay.  Have you ever been married?
 7      A.  No.
 8      Q.  And how long have you been in a relationship
 9  with Ms. Cooper?
10      A.  2015 to present.
11      Q.  Did she reside in Arizona with you?
12      A.  Correct.
13      Q.  And do you know why she left her employment at
14  Florida Gulf Coast University?
15      A.  The residence in St. Pete leant itself to a
16  shorter commute.  It's her residence.
17      Q.  A shorter commute to the University of South
18  Florida?
19      A.  Correct.
20      Q.  Does she work at the St. Pete campus for the
21  University of South Florida?
22      A.  Tampa.
23      Q.  Okay.  Did you apply for any position at USF?
24      A.  Yes.
25      Q.  And what positions?
```

21

1    A.  From what I recall, because there have been
2  numerous, I know I applied for a lieutenant's position
3  there and possibly others, but I can't recall the
4  specifics.
5    Q.  And was this after your termination from
6  Florida Gulf Coast University?
7    A.  Correct.
8    Q.  Did you apply prior to your termination from
9  Florida Gulf Coast University?
10    A.  No.
11    Q.  And were you interviewed for any position at
12  USF?
13    A.  No.
14    Q.  And do you know why?
15    A.  No.
16    Q.  Do you have any children?
17    A.  Yes.
18    Q.  And are your children adults?
19    A.  Yes.
20    Q.  How many children do you have?
21    A.  One.
22    Q.  And where is your child employed?
23    A.  PetSmart.
24    Q.  And in what city?
25    A.  Either Sarasota or Bradenton.  I'm not sure

22

1  where it falls.
2    Q.  And how old is your child?
3    A.  22.
4    Q.  Did your child attend Florida Gulf Coast
5  University?
6    A.  No.
7    Q.  Have you ever served in the military?
8    A.  No.
9    Q.  And where did you go to high school?
10    A.  Miramar High School.
11    Q.  I assume you graduated?
12    A.  Yes, ma'am.
13    Q.  And did you attend college?
14    A.  Yes.
15    Q.  And where did you attend college?
16    A.  University of Central Florida.
17    Q.  Did you receive a degree?
18    A.  Yes.
19    Q.  And what's your degree in?
20    A.  I have a bachelor's of science in criminal
21  justice and a master's of science in criminal justice.
22    Q.  Do you hold any other degrees?
23    A.  No.
24    Q.  Did you attend any other colleges?
25    A.  So when you go to the Corrections academy or

23

1  law enforcement academy, they give you credits.  So
2  Valencia gave, I think, six credits.  No.  It was
3  Broward Community College.  I apologize.  It was in
4  Broward County.  I apologize.
5    Q.  So did you attend the correctional academy?
6    A.  Correct.
7    Q.  And then did you attend the law enforcement
8  academy?
9    A.  No.  I attended the crossover academy, and
10  that was at Mid Florida Tech.  I don't even think it
11  exists anymore.
12    Q.  And in what year was it that you attended the
13  correctional academy?
14    A.  1991.
15    Q.  And when did you attend the crossover class?
16    A.  It was a lengthy thing.  So, yeah, it lasted a
17  considerable amount of time.  I want to say '93 and '94,
18  but I'm not exactly sure.
19    Q.  And when did you obtain your bachelor of
20  science from USF?
21    A.  I don't remember the year.
22    Q.  Was it after you attended the academy?
23    A.  Yes.
24    Q.  And your master's of science, do you recall
25  the year you obtained that?

24

1    A.  I do not.
2    Q.  Are you still a certified corrections officer?
3    A.  I think that lapses after so long.  I don't
4  really know the answer.  I don't believe I am.
5    Q.  Are you still a certified law enforcement
6  officer?
7    A.  Yes.
8    Q.  As part of your current position, do you have
9  to be a certified law enforcement officer?
10    A.  No.
11    Q.  Are you sworn in your current position?
12    A.  No.
13    Q.  Do you have any other certificates or degrees?
14    A.  My law enforcement certificate and my degrees.
15  You know, I've attended executive-level courses, like
16  Southern Police Institute Command Officer Development
17  Course.  So I don't know if you consider that.
18    Q.  Since your employment ended at Florida
19  Gulf Coast University, have you applied for Social
20  Security Disability?
21    A.  No.
22    Q.  Have you applied for any type of short-term or
23  long-term disability?
24    A.  No.
25    Q.  During the -- well, let me ask you this way.

6 (Pages 21 to 24)

Smith vs. Florida Gulf Coast University    Kelli Smith

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 7 of 118 PageID 367

01/22/2025

25

1        You worked at the University of Central
2  Florida, correct?
3        A.  Yes, ma'am.
4        Q.  And did you retire from the University of
5  Central Florida?
6        A.  Yes, ma'am.
7        Q.  Is the University of Central Florida FRS?
8        A.  Yes, ma'am.
9        Q.  And so are -- did you retire under FRS?
10       A.  Yes, ma'am.
11       Q.  And did you elect the pension under FRS?
12       A.  No.
13       Q.  So you elected the contribution plan?
14       A.  Yes.
15       Q.  And so do you receive benefits under the
16  retirement plan for FRS?
17       A.  The only thing I receive is $190 a month,
18  which would be the stipend they give you for health
19  insurance.
20       Q.  Um-hum.  And during the time that you were
21  employed at Florida Gulf Coast University, were you a
22  participant in FRS?
23       A.  Yes.
24       Q.  And did you elect the pension plan through --
25       A.  You have to once you're -- yes.

26

1        Q.  And in your position at the Florida
2  Attorney General's Office, are you a participant in FRS?
3        A.  Yes.
4        Q.  And was your service at Florida's Gulf Coast
5  University bridged to the service that you have at the
6  Attorney General's Office in terms of vesting?
7        A.  I believe it was.
8        Q.  And after your termination from Florida
9  Gulf Coast University, did you apply for unemployment?
10       A.  I did.
11       Q.  Let me show you what's marked as Exhibit 1 to
12  your deposition.
13          (Exhibit 1 was marked for identification.)
14       Q.  Do you recognize this document?
15       A.  Hold on.  Let me read through it.  I'll let
16  you know.
17       Q.  Sure.
18       A.  It appears to be the document, yes.
19       Q.  So Exhibit 1 to your deposition is the
20  application for unemployment compensation that you
21  submitted after your termination from Florida Gulf Coast
22  University, correct?
23       A.  Correct.
24       Q.  And this is an application that is submitted
25  under the penalties of perjury?

27

1        A.  Is that a question?
2        Q.  Yes.
3        A.  Oh, yes.
4        Q.  And if you could turn to Bates stamp -- and
5  that's the numbers at the bottom -- 168.
6        A.  Okay.
7        Q.  500168.  And you identified Florida Gulf Coast
8  University as your previous employer, correct?
9        A.  Correct.
10       Q.  And in here you identified that your reason
11  for separation was layoff.  Is that what's reflected
12  there?
13       A.  That's correct.
14       Q.  And were you laid off from your employment at
15  Florida Gulf Coast University?
16       A.  I was separated without cause.
17       Q.  You weren't laid off, were you?
18       A.  No.
19       Q.  So that statement was not accurate, correct?
20       A.  I don't know what my choices were on that, so
21  that's what I entered.  But I don't know what the
22  choices were.
23       Q.  But the statement that's on there is not
24  accurate, correct?
25       A.  Correct.

28

1        Q.  Okay.  Let me show you what's marked as
2  Exhibit 2 to your deposition.
3          (Exhibit 2 was marked for identification.)
4        Q.  Do you recall this document?
5        A.  I'm reading through it.
6        Q.  Oh, sure.  Take your time.
7        A.  Um-hum.
8          This is a document that I had filled out, but
9  recalling specifically, no.
10       Q.  Okay.  So Exhibit 2 is a series of questions
11  that you answered as part of your application for
12  unemployment benefits, correct?
13       A.  It appears to be, yes.
14       Q.  And on this document, you were asked whether
15  you were able and available for work during certain
16  periods of time.  Do you see that?
17       A.  Which page?
18       Q.  Sure.  It's on Page 193, 195, and 197.
19       A.  Okay.  Yes.
20       Q.  And on this document on Pages 193 and 195, you
21  indicated that you were not able and available for work
22  if work had been offered.  Do you see that?
23       A.  Yes.
24       Q.  And you indicated that the reason was not a
25  reason listed above.  Do you see that?

7  (Pages 25 to 28)

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 8 of 118 PageID 368

Smith vs. Florida Gulf Coast University    Kelli Smith    01/22/2025

---

29

1    A.  I do.
2    Q.  And why were you not able to work?
3    A.  And I recall I had COVID.
4    Q.  And how long were you unable to work because
5  of COVID?
6    A.  I've had COVID a couple of times.  I believe I
7  tested positive maybe 10 days.
8    Q.  Okay.  Let me show you what's marked as
9  Exhibit 3 to your deposition.
10       (Exhibit 3 was marked for identification.)
11    Q.  Do you recognize this document?
12    A.  I don't recall it.
13    Q.  This is a series of letters from the Florida
14  Department of Commerce denying your request for
15  unemployment.  Do you see that?
16    A.  Um-hum.  I do.
17    Q.  Finding that you were -- that you were not
18  available for work as required by law and, therefore,
19  ineligible for benefits, correct?
20    A.  That's what the document says, correct.
21    Q.  And did you have to pay back these benefits?
22    A.  I did not.
23    Q.  Did you file an appeal?
24    A.  I don't recall the document, so I don't recall
25  the outcome.

---

30

1    Q.  And on this document, it says that -- on
2  Page 282 -- you were not entitled to receive benefits
3  from July 24th to July 30th.  Do you see that?
4    A.  I do.
5    Q.  And that you were not entitled to receive from
6  July 31st to August 6th?
7    A.  Um-hum.
8    Q.  Do you see that?
9    A.  I do.
10    Q.  That's on Page 129.  And from August 7th to
11  August 13th, you were also not eligible to receive
12  benefits.  It's on Page 135.
13    A.  Okay.
14    Q.  And that on Page 132, it provides that you
15  were not eligible to receive benefits from August 14th
16  to August 20th.
17    A.  I don't have a 132.  Oh, wait.  It's in the
18  back.  Okay.  Okay.
19    Q.  And that you were also ineligible to receive
20  benefits because you were unavailable for work from
21  May 14th to May 20th.  Do you see that?
22    A.  I do.
23    Q.  And you were also -- this is on Page 126.  You
24  were ineligible to receive benefits because you weren't
25  able to work from May 21st to May 27th.  Do you see

---

31

1  that?
2    A.  I do.
3    Q.  So was it during all of those periods of time
4  that you had COVID?
5    A.  I don't recall these, and I don't recall the
6  specific dates or the whys.  I can tell you May 21st,
7  2023, through May 27th, 2023, my mother was
8  hospitalized, and she had to have an ablation, and she
9  was hospitalized for that week, so I remember that
10  specifically.
11    Q.  Okay.
12    A.  The other dates, I don't know, but all of that
13  time frame of May, she was in very fragile health.
14    Q.  Okay.
15    A.  So it may all be relative to that.  She had
16  been hospitalized by ambulance three times.
17    Q.  But the other instances relate to 2022?
18    A.  Correct.  And if I'm looking at those dates,
19  it could very well be all relative to the COVID positive
20  testing.
21    Q.  Okay.  For a month that you had COVID?
22    A.  The 10 days, and I don't know how -- the weeks
23  that I tested positive, I don't know how the weeks fell.
24  But there was a period of time for COVID.  And I had to
25  take pictures of the COVID test and actually send it in

---

32

1  to DOE to prove it.
2    Q.  Okay.  So you don't dispute the documents that
3  are in Exhibit 3, do you?
4    A.  No.
5    Q.  Have you been terminated from any other
6  positions since leaving FGCU?
7    A.  No.
8    Q.  Have you made any complaints about working
9  conditions since leaving FGCU?
10    A.  No.
11    Q.  Since you obtained your position at the
12  Florida Attorney General's Office, are you still
13  searching for work?
14    A.  Yes.
15    Q.  And what's the most recent position that you
16  applied for?
17    A.  I don't recall.  I'm looking at sworn
18  positions, so that's the typical capacity that the most
19  recent positions would have been, but I don't recall
20  what the most recent is.
21    Q.  Have you been interviewed for any sworn
22  positions since you left FGCU?
23    A.  Yes.
24    Q.  And what positions have you been interviewed
25  for?

---

8  (Pages 29 to 32)

Smith vs. Florida Gulf Coast University    Kelli Smith    01/22/2025

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 9 of 118 PageID 369

33

1   A.  I provided a document.  There have been
2   numerous that I've applied for and a few that I was
3   interviewed for.
4      Q.  Yeah.  So which ones were you interviewed for?
5      A.  Specifically, I know the chief of police for
6   New College.  I think an assistant chief of police job.
7   But the rest is just not fresh in my recollection
8   without looking at documents.
9      Q.  Okay.  So the assistant chief, was that at New
10  College or someplace else?
11     A.  No.  I think that was, like, a
12  police department in Miami, but I don't remember the
13  name, or the Miami area.
14     Q.  And what documents would you need to look at
15  to refresh your recollection?
16     A.  I think I provided a printout with the RFPs of
17  all of the positions that I applied for and the status.
18     Q.  Do you know why you weren't hired at New
19  College?
20     A.  No.
21     Q.  And do you know why you weren't hired for the
22  assistant chief position in the police department in the
23  Miami area?
24     A.  No.
25     Q.  Did you apply for the chief of police position

34

1   for the City of Fort Myers?
2      A.  No.
3      Q.  And why not?
4      A.  I didn't even realize that it was open.  As
5   far as I knew, Chief Diggs, I think that was his name,
6   was the chief of police.
7      Q.  Have you made any complaint about your working
8   conditions since leaving Florida Gulf Coast University?
9      A.  No.
10     Q.  You indicated earlier you applied for a
11  lieutenant position at USF police department?
12     A.  Correct.
13     Q.  Were you interviewed for that position?
14     A.  No.
15     Q.  Did you know the police chief at USF PD?
16     A.  Yes.
17     Q.  And did you ask him why you weren't
18  interviewed?
19     A.  I haven't spoken with him since I worked at
20  FGCU.
21     Q.  And was there a separate police chief over the
22  USF St. Pete campus?
23     A.  I believe there is.
24     Q.  Did you apply for a position in his
25  department?

35

1      A.  I don't recall, to be honest.
2      Q.  If you did, it would have been in the
3   documents you provided to us?
4      A.  Yes, ma'am.
5      Q.  During your employment with Florida Gulf Coast
6   University, did you make any claim for Workers'
7   Compensation?
8      A.  No.
9      Q.  Did you make any claim for Workers'
10  Compensation after you left your employment at FGCU?
11     A.  No.
12     Q.  Did you apply for any other type of
13  governmental benefits?
14     A.  Meaning?
15     Q.  After your employment ended at FGCU, did you
16  apply for any other type of governmental benefits?
17     A.  Unemployment was the only thing.  I don't --
18  outside of the scope of that, I don't know what you
19  would be referring to.
20     Q.  Well, did you make an application for any type
21  of governmental benefit that you would receive after
22  your employment at --
23     A.  Nothing that I can recall.
24         MR. YORMAK:  Kelli, just wait one second until
25     Sacha is done with her question.

36

1         THE WITNESS:  Okay.  Sure.
2   BY MS. DYSON:
3      Q.  You mentioned earlier being employed at the
4   University of Central Florida.  Was that the first law
5   enforcement position that you held?
6      A.  Yes.
7      Q.  And what positions did you hold at UCF?
8      A.  I was hired as an officer, then promoted to
9   detective sergeant, then lieutenant, and retired as a
10  major.  And the major is when you retire, you receive
11  that next step in your title when you retire.
12     Q.  Oh, okay.  So major is not a position, it --
13     A.  You just retire, correct.  Yes, ma'am.
14     Q.  Did you ever apply for the position of police
15  chief at University of Central Florida?
16     A.  No.
17     Q.  And why not?
18     A.  When I was in the position of lieutenant, I
19  knew that the applicants that existed were not -- I
20  wouldn't be able to leverage my experience against them.
21     Q.  And why is that?
22     A.  They came from Orlando Police Department,
23  Orange County Sheriff's Office, and they held
24  significantly higher roles.  They were deputy chiefs
25  within the police department already.

9  (Pages 33 to 36)

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 10 of 118 PageID 370

Smith vs. Florida Gulf Coast University    Keith Smith                    01/22/2025

37

1    Q.  And did you seek a promotion to deputy chief
2  before leaving University of Central Florida?
3    A.  No.  That position -- I'm trying to think of
4  the timeline.  No.  Those positions weren't open.  They
5  were still occupied by those people.
6    Q.  And since leaving UCF, did you apply -- have
7  you applied for any position at UCF?
8    A.  I don't recall.  I may have, but I honestly
9  don't recall.
10   Q.  Have you been given any offer of employment at
11 UCF since you left UCF?
12   A.  No.
13   Q.  Were you ever disciplined at UCF?
14   A.  No.
15   Q.  Were you ever given any negative or critical
16 feedback of your performance at UCF?
17   A.  No.
18   Q.  Are you eligible for rehire?
19   A.  Yes.
20   Q.  And have you sought a position at UCF for any
21 openings as a sworn law enforcement officer?
22   A.  I don't recall, to be honest.
23   Q.  If you did, that would have been in the
24 documents you provided to us?
25   A.  Correct.

38

1    Q.  And why was it that you decided to retire from
2  UCF?
3    A.  I had reached my retirement benefits and
4  eligibility age.
5    Q.  When you say you reached your retirement
6  benefits and eligibility age, is that so you could start
7  collecting your retirement?
8    A.  Yeah.  I was at 27 years.  I think it was 27
9  years.
10   Q.  And did you start collecting that retirement?
11   A.  I moved that over into the pension or the --
12 yeah.  Not the pension fund but the investment fund.
13   Q.  What does that mean you moved it over?
14   A.  Instead of being in the pension fund, it was
15 moved over into the contribution side of the house.  I
16 don't know the specific words with FRS.
17   Q.  So when you left your position at UCF, were
18 you looking for another position?
19   A.  No.
20   Q.  So why is it that you sought another position
21 after leaving UCF?
22   A.  I just felt like I still had value to add into
23 the workforce, and I was still relatively young.
24   Q.  So when you applied for retirement at UCF, was
25 it your intention to retire outright at that point?

39

1    A.  No.
2    Q.  And had you procured another position at the
3  time of your retirement?
4    A.  No.
5    Q.  And where did you work after UCF?
6    A.  I was retired for several months after UCF.
7    Q.  And then where did you work?
8    A.  I was chief of police at Northern Arizona
9  University.
10   Q.  And prior to applying for that position, had
11 you relocated to Arizona?
12   A.  That's correct.
13   Q.  And why did you relocate to Arizona?
14   A.  I moved to be with my partner.
15   Q.  And how long did you live in Arizona before
16 you were seeking a position at Northern Arizona
17 University?
18   A.  I don't remember the time frame.
19   Q.  And had your -- was your partner from Arizona?
20   A.  Living there.  Not from there, but living
21 there.
22   Q.  Did she relocate first, or did you relocate
23 first to Arizona?
24   A.  I moved to Arizona from Florida.  She was
25 living there already.

40

1    Q.  Oh, she was living there already.  She was not
2  in Florida?
3    A.  No.
4    Q.  Okay.  And when did you retire from UCF?
5    A.  I think January of 2017-ish.
6    Q.  And so did you retire from UCF with a plan to
7  move to Arizona?
8    A.  Correct.
9    Q.  Because I think you told me earlier you have
10 been with your partner since 2015.
11   A.  Correct.
12   Q.  So from 2015 to '17, she was already in
13 Arizona?
14   A.  Correct.
15   Q.  Let me show you what's marked as Exhibit 4 to
16 your deposition.
17      (Exhibit 4 was marked for identification.)
18   A.  Um-hum.
19   Q.  Do you recognize this document?
20   A.  Yes.
21   Q.  And what is it?
22   A.  It was my retirement paperwork.
23   Q.  For the University of Central Florida
24 position?
25   A.  Correct.

Smith vs. Florida Gulf Coast University   Kevin Smith

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 11 of 118 PageID
371

07/22/2025

41

1    Q.  And since 2017, do you know if the chief of
2  police position has turned over at the University of
3  Central Florida?
4    A.  I know that Chief Berry retired, I don't
5  recall when, and that Chief Metzger was selected.  But I
6  don't know specifics.
7    Q.  And he's still the current chief of the
8  University of Central Florida?
9    A.  As far as I know.
10   Q.  And with respect to the structure at UCF, how
11 big was the department when you were there?
12   A.  I can't give you an exact number.
13   Q.  Um-hum.
14   A.  But between 80 and 100 sworn, but there were
15 so many divisions, that it was much larger than that
16 civilian.  But from a sworn perspective, maybe 80 to
17 100.
18   Q.  Okay.  And at the time that your -- that you
19 were retiring from UCF, how many lieutenants were there?
20   A.  Four, maybe five.
21   Q.  Okay.  And then what was the position above
22 lieutenant in terms of an active position?
23   A.  There was -- there were two major positions, I
24 believe, but I think they were retiring.  One was with
25 JTF or something.  So those positions, I think, were --

42

1  the organizational structure was being adjusted.  I
2  don't remember specifics.  And then there were the two
3  deputy chiefs and the chief.
4    Q.  Okay.  And when you say the "major positions,"
5  because you told me you retired as a major.
6    A.  Correct.
7    Q.  But you never held that position as an active
8  position?
9    A.  Correct.
10   Q.  Okay.  And did you ever seek promotion to the
11 major position while you were an employee at UCF?
12   A.  I don't remember it ever being posted.  It's
13 possible, but I don't recall that it was ever posted.
14   Q.  Okay.  Do you recall when you started working
15 at Northern Arizona University?
16   A.  Yes.
17   Q.  And when was that?
18   A.  September of 2017.
19   Q.  And at that point in time, how big was the
20 department at Northern Arizona University?
21   A.  I think sworn was 25-ish, and we had
22 communications staff.  And we also had student
23 employees, Clery compliance, emergency management, and
24 maybe another division, but I don't recall.  So specific
25 numbers, I couldn't give you.  Sometimes student

43

1  employees numbered 100.
2    Q.  Um-hum.  And what was the command structure at
3  the time that you worked at NAU?
4    A.  When I first got there, it was chief commander
5  and a lieutenant, and then there were sergeants and
6  corporals and officers.  I don't remember the numbers.
7    Q.  And did you change that structure?
8    A.  Yes, I did.
9    Q.  And how did you change it?
10   A.  It went from chief to a deputy chief, two
11 lieutenants, and then sergeants, corporals, officers.
12   Q.  I'll show you what's marked as Exhibit 5 to
13 your deposition.
14      (Exhibit 5 was marked for identification.)
15   Q.  Do you recognize this document?
16   A.  I do.
17   Q.  And what is it?
18   A.  This was an application that I completed in
19 early 2018 for the Sarasota County Public Schools, chief
20 of police job.
21   Q.  Okay.  And at the time that you submitted this
22 application, you were the chief of police at NAU,
23 correct?
24   A.  Correct.
25   Q.  And you had been the chief of police there for

44

1  about eight or nine months?
2    A.  Give or take.  I don't know the exact date on
3  this, but yes.
4    Q.  It has the application date up at the top.
5    A.  Okay.
6    Q.  Do you see that?  May 24th, 2018.
7    A.  Yes.
8    Q.  So why were you applying for this position
9  after being at NAU for about nine months?
10   A.  A couple of reasons.  Number one, one morning
11 going to work, it was negative 9 degrees and I'm from
12 Florida.  The other reasons are my mother and my
13 daughter were here, and my mother is aged in years.
14   Q.  Did you apply for any other positions in
15 Florida at that time?
16   A.  I don't recall.
17   Q.  Is there anything that would refresh your
18 recollection as to that?
19   A.  It's possible, but I really don't recall.
20   Q.  And in this application, you were applying for
21 the chief of police position?
22   A.  I'm pretty sure that's what it was.  Whatever
23 title they used for it, I believe that was the scope of
24 responsibility for it.
25   Q.  And had you applied at Sarasota Public Schools

45

1  **before May of 2018?**
2      A.  No.  I think that the creation of this police
3  department was as a result of the Parkland High School
4  shooting.  So I think this was actually the creation of
5  a new police department.
6      **Q.  Okay.  And were you interviewed for this**
7  **position?**
8      A.  Yes.
9      **Q.  And were you selected?**
10     A.  It was a Teams-type interview or Skype.  The
11  signal went down in the middle of the interview, and I
12  never heard anymore from them.  And I was not able to
13  reconnect during the interview process.
14     **Q.  So you weren't selected for the position,**
15  **then?**
16     A.  No.  The interview wasn't even completed.
17     **Q.  And do you know why the Sarasota Public**
18  **Schools decided not to move forward with you as an**
19  **applicant?**
20     A.  No.
21     **Q.  So at this time, after having lived in and**
22  **worked in Arizona for nine months, you were seeking to**
23  **return to Florida?**
24     A.  Correct.
25     **Q.  And did you?**

46

1      A.  Not at that time.  Eventually.
2      **Q.  And at NAU, did you hold any position other**
3  **than chief of police?**
4      A.  The title was actually director of public
5  safety.
6      **Q.  And was that the only position you held?**
7      A.  Yes.  It was -- and they termed it -- I was a
8  director, and then they reclassified it to associate
9  vice president.
10     **Q.  While you were there?**
11     A.  Yes.
12     **Q.  And when was it that you left your employment**
13  **at NAU?**
14     A.  Like October of 2020.
15     **Q.  So you stayed for another three years or two**
16  **years after that application to Sarasota?**
17     A.  Yeah.  I think -- in total time, I think it
18  was three years.
19     **Q.  And during the time that you were at NAU,**
20  **other than applying for the job for Sarasota schools,**
21  **did you apply for any other chief of police position?**
22     A.  If I did, it would have only been Florida.  I
23  don't recall.  I may have.
24     **Q.  Is there anything that would refresh your**
25  **recollection as to whether you did?**

47

1      A.  Seeing applications.
2      **Q.  And do you have those applications?**
3      A.  If I had had them, I would have turned them
4  over.
5      **Q.  So if you applied for another chief of police**
6  **position, it would be in documents that you've produced**
7  **in this case?**
8      A.  Yeah.  As long as I had recollection for it,
9  yes.
10     **Q.  And while you were employed at NAU, did you**
11  **interview for any other position other than Sarasota**
12  **schools?**
13     A.  Yes.
14     **Q.  And what position did you --**
15     A.  Longboat Key.  I guess I should have said
16  that.  I apologize.
17     **Q.  The City of Longboat Key?**
18     A.  The Town of.
19     **Q.  The Town of?**
20     A.  Yes.
21     **Q.  And prior to applying with the Town of**
22  **Longboat Key, had you worked in any type of municipal**
23  **law enforcement?**
24     A.  No.
25     **Q.  Had you worked for any of the county sheriff's**

48

1  **in law enforcement?**
2      A.  When I first began my career, I worked for the
3  Broward County Sheriff's Office in Corrections.  So, yes
4  is the answer, but it wasn't in law enforcement.  It
5  depends on how you characterize it.  Some people
6  categorize Corrections as law enforcement.
7      **Q.  Oh, okay.**
8      A.  Other people say, well, you're not law
9  enforcement because you're not sworn with arrest powers.
10     **Q.  I've never heard of a law enforcement officer**
11  **categorize Corrections as law enforcement.**
12     A.  Correct.  So -- but you worked for the
13  Sheriff.  And, also, when I was at Osceola County
14  Sheriff's Office, Corrections was under the sheriff, so,
15  you know...
16     **Q.  Okay.  Understood.**
17     A.  There are variables, I guess, in the
18  definitions.
19     **Q.  Sure.  Other than that, any other experience**
20  **working in a sheriff's office?**
21     A.  No.
22         MS. DYSON:  Okay.  Let's just take a brief
23  restroom break.
24         THE WITNESS:  Sure.
25         (Recess taken from 10:42 a.m. to 10:56 a.m.)

12  (Pages 45 to 48)

Smith vs. Florida Gulf Coast University   Kevin Smith                    01/22/2025

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 13 of 118 PageID
373

49

1  BY MS. DYSON:
2      Q.  Okay.  You mentioned working for the Town of
3  Longboat Key.  Let me show you what's marked as
4  Exhibit 6 to your deposition.
5          (Exhibit 6 was marked for identification.)
6      Q.  Do you recognize this document?
7      A.  I do.
8      Q.  And what is this?
9      A.  It's the application for employment for chief
10 of police.
11     Q.  And this is the application that you submitted
12 to the Town of Longboat Key?
13     A.  It appears to be, yes.
14     Q.  And this application was submitted in June of
15 2020; is that correct?
16     A.  Correct.
17     Q.  And were you hired for this position?
18     A.  Yes, I was.
19     Q.  And how many officers did the Town of Longboat
20 Key have?
21     A.  I would say right around 20 or so.
22     Q.  So 20 sworn officers?
23     A.  Approximately.
24     Q.  Let me show you what's marked as Exhibit 7 to
25 your deposition.

50

1          (Exhibit 7 was marked for identification.)
2      Q.  Do you recognize this document?
3      A.  I don't recall it, but I see it.  Yes, I
4  recognize it.
5      Q.  Okay.  Is this the offer letter that you
6  received from the Town of Longboat Key for the position
7  of chief of police?
8      A.  I guess that's what they titled it.  I don't
9  know if that's the specific title of it.
10     Q.  The specific title of what?
11     A.  I don't know if this was what the Town of
12 Longboat Key titled this document, an offer letter, but
13 yes.
14     Q.  Okay.  It says:  This letter confirms the
15 Town's final offer of employment.  Do you see that?
16 It's in the first paragraph.
17     A.  Okay.  Yep.
18     Q.  And you were an at-will police chief, correct?
19     A.  Correct.
20     Q.  And what does that mean to be at-will?
21     A.  That means that you work at the pleasure of
22 the town manager in this instance.
23     Q.  And you began your employment in October of
24 2020?
25     A.  Correct.

51

1      Q.  And did you hold any other position other than
2  chief of police for the Town of Longboat Key?
3      A.  No.
4      Q.  Were you ever disciplined or given negative
5  performance feedback during your employment at the Town
6  of Longboat Key?
7      A.  No.
8      Q.  And you ultimately resigned your position with
9  the Town of Longboat Key, correct?
10     A.  Correct.
11     Q.  And when was it that you started looking for
12 other employment after accepting this position with the
13 Town of Longboat Key?
14     A.  When FGCU posted, it had come to my attention
15 that they were hiring.  So that was the position that I
16 applied for.
17     Q.  Okay.  I'm going to show you what's marked as
18 Exhibit 8 to your deposition.
19         (Exhibit 8 was marked for identification.)
20     Q.  Do you recognize this document?
21     A.  I don't know that I saw it or not.  I don't
22 see my signature on it.  It's possible I did, but I
23 don't have specific recollection to this.
24     Q.  Okay.  The date of your termination was April
25 30th, 2021.  Do you see that?

52

1      A.  I do see that.
2      Q.  So you were employed by the Town of Longboat
3  Key for less than a year, correct?
4      A.  Correct.
5      Q.  And you started looking for a position at
6  Florida Gulf Coast University within less than six
7  months of your employment at the Town of Longboat Key,
8  correct?
9      A.  Correct.
10     Q.  And the Town of Longboat Key scheduled two
11 exit interviews with you.  Do you see that in this
12 document?
13     A.  They scheduled an exit interview?
14     Q.  Yes.  Do you see where it says:  Why are you
15 leaving?  It says:  Scheduled two exit interviews.
16     A.  Oh, yes.  Yes.
17     Q.  And you canceled both of those interviews,
18 correct?
19     A.  If that's what it says.  I don't recall, to be
20 honest with you.
21     Q.  Did you have a complaint about your employment
22 at the Town of Longboat Key?
23     A.  No.
24     Q.  Then why wouldn't you participate in an exit
25 interview?

13  (Pages 49 to 52)

Smith vs. Florida Gulf Coast University    Keith Smith    07/22/2025

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 14 of 118 PageID 374

53

1    A.  I don't recall why I didn't participate.
2    Q.  Were you resigning your position in lieu of
3  discipline?
4    A.  No.
5    Q.  Are you eligible for rehire at the Town of
6  Longboat Key?
7    A.  Yes.
8    Q.  And why is it that you were looking for a
9  different position then?
10    A.  The university atmosphere was something that,
11  at the time, I felt I could provide a bigger benefit to
12  than what I could do at Longboat Key.
13    Q.  Then why did you apply at the Town of Longboat
14  Key to begin with?
15    A.  I thought that I could be a benefit there and
16  help the agency advance.
17    Q.  Are you still connected with any of the people
18  who worked at the Town of Longboat Key?
19    A.  Over the years, I've spoken with people, but
20  nothing with consistency.
21    Q.  Let me show you what's been marked as
22  Exhibit 9.
23       (Exhibit 9 was marked for identification.)
24    Q.  Do you recognize this document?
25    A.  It appears to be my resume.

54

1    Q.  And this is part of your application for chief
2  of police with the Town of Longboat Key, correct?
3    A.  Correct.
4    Q.  And in this application, you didn't indicate
5  that you were looking for a position in higher
6  education, correct?
7    A.  Correct.
8    Q.  And you didn't indicate that you would
9  continue looking for a position in higher education when
10  you accepted the position of chief of police, correct?
11    A.  That's correct.
12    Q.  In this application, you state that you foster
13  an environment of collaboration, outreach, and
14  professional services for the community, correct?
15    A.  Correct.
16    Q.  And you understood as part of being the chief
17  of police, that collaboration was important, correct?
18    A.  Yes.
19    Q.  And you understood as being chief of police
20  for any department, that outreach was important as well,
21  correct?
22    A.  Correct.
23    Q.  And you also said in this application that you
24  believe in building relationships before crisis.  Do you
25  see that?

55

1    A.  Yes, I do.
2    Q.  And you understood as being chief of police
3  that it was an important part of your role to build
4  relationships, correct?
5    A.  Yes.
6    Q.  And did you work for the Florida Department of
7  Corrections?
8    A.  Yes.  I had to think.
9    Q.  And when did you work for the Florida
10  Department of Corrections?
11    A.  Some time in the '90s.
12    Q.  So is this before you became a law enforcement
13  officer?
14    A.  Correct.
15    Q.  What type of position did you hold?
16    A.  So for Florida Department of Corrections, I
17  worked as a correction officer.
18    Q.  This is before you worked for Broward?
19    A.  No.  Well, we could probably see it here in my
20  resume.  Oh, no.  It starts in '97 with patrol.  I was
21  sent to the academy by the Broward County Sheriff's
22  Office in '91.  I worked for them for a few years.  Then
23  I worked at Tomoka Correctional Institution for the
24  Florida Department of Corrections.
25    Q.  Okay.

56

1    A.  So that was when I worked for Florida
2  Department of Corrections.
3    Q.  And were you terminated?
4    A.  No.
5    Q.  Were you eligible to rehire?
6    A.  Yes.
7    Q.  And did you seek a position with the Florida
8  Department of Corrections after your termination from
9  Florida Gulf Coast University?
10    A.  Yes.
11    Q.  And were you interviewed?
12    A.  Yes.
13    Q.  And were you given an offer?
14    A.  No.
15    Q.  What position did you seek?
16    A.  It was under the inspector general.  I
17  think -- I'm not quite sure how their organizational
18  structure works, but it was an investigator in relation
19  to criminal acts that occur in correctional
20  institutions.
21    Q.  Okay.  And do you know why you weren't given
22  an offer of employment?
23    A.  No.
24    Q.  And you earlier mentioned the Broward County
25  Sheriff's Office.  Were you terminated from your

14  (Pages 53 to 56)

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 15 of 118 PageID 375

Smith vs. Florida Gulf Coast University    Keith Smith    01/22/2025

57

1  position there?
2    A.  No.
3    Q.  Were you eligible for rehire?
4    A.  Yes.
5    Q.  After your termination from FGCU, did you seek
6  a position with the Broward County Sheriff's Office?
7    A.  No.
8    Q.  Why not?
9    A.  I'm not in proximity where I would be wanting
10  to reside.
11    Q.  But earlier you told me that you sought a
12  position as an assistant chief in the Miami area.
13    A.  Correct.
14    Q.  So why were you willing to seek a position in
15  the Miami area but not Broward?
16    A.  Because I had a resource for housing down
17  there.
18    Q.  Okay.  But you didn't have one in Broward
19  County?
20    A.  No.
21    Q.  And you previously worked at the Osceola
22  County Sheriff's Office, too, as well, correct?
23    A.  Correct.
24    Q.  Was that in corrections?
25    A.  Yes.

58

1    Q.  And were you terminated from that position?
2    A.  No.
3    Q.  Were you eligible for rehire?
4    A.  Yes.
5    Q.  And after your termination from Florida
6  Gulf Coast University, did you seek a position with the
7  Osceola County Sheriff's Office?
8    A.  No, not that I recall.
9    Q.  And why not?
10    A.  I don't know that there were jobs posted.  I
11  don't have a specific answer for that.
12    Q.  Have you operated your own company?
13    A.  No.
14    Q.  At the time that you applied for the position
15  at Florida Gulf Coast University as the chief of
16  police -- well, let me ask you this.
17       Other than applying for the job as chief of
18  police at Florida Gulf Coast University, did you apply
19  for any other positions at Florida Gulf Coast?
20    A.  Not that I recall.
21    Q.  And at the time of your application to Florida
22  Gulf Coast University for the chief of police position,
23  did you know any employees of Florida Gulf Coast
24  University?
25    A.  No.

59

1    Q.  When you came back to Florida and worked at
2  the Town of Longboat Key, where did your partner work?
3    A.  She was still in Arizona at the time.
4    Q.  Oh, okay.  And when was it that she came to
5  Florida?
6    A.  When I got the job.  I want to say November of
7  '21, specifically in that late fall time frame.
8    Q.  Okay.  And was it at that time that she was
9  hired by FGCU as well?
10    A.  Correct.
11    Q.  And do you know who hired her?
12    A.  I don't know specifically.
13    Q.  And did you recommend her for the position?
14    A.  Yes.
15    Q.  And who did you give that recommendation to?
16    A.  Sara Stensrud.
17    Q.  And did -- it's Ms. Cooper, right?
18    A.  Yes, ma'am.
19    Q.  Did Ms. Cooper report up to Sara Stensrud when
20  she was hired?
21    A.  No.  I don't think they were in the same food
22  chain.
23    Q.  Did she report up to David Vazquez?
24    A.  No.  I'm not sure of the hierarchy, if it fell
25  under his purview or her purview.  "Her" being Sara.

60

1    Q.  Okay.
2    A.  I don't know their organizational structure.
3    Q.  I'll show you what's marked as Exhibit 10 to
4  your deposition.
5       (Exhibit 10 was marked for identification.)
6    Q.  Do you recognize this document?
7    A.  I see what it says, but I don't specifically
8  recognize it.
9    Q.  Do you recognize this as the job posting for
10  the chief of police that was open in '21?
11    A.  It may have been.  I'm sorry.  I'm talking at
12  the same time.  It may have been.  I apologize.
13    Q.  Okay.  Is this the time frame of January of
14  2021 that you applied for the position as chief of
15  police?
16    A.  I believe so.
17    Q.  And this job posting includes a job summary
18  for the chief of police, which is also the director of
19  public safety.  Do you see that?
20    A.  I do.
21    Q.  And it includes a job description for the
22  duties of the chief of police, correct?
23    A.  Yes.
24    Q.  And one of those job duties is responsible for
25  formulating and administering the annual operating

15 (Pages 57 to 60)

61

1　budget.  Do you see that?
2　　A.  I do.
3　　Q.  And during the time that you worked at FGCU,
4　were you responsible for that?
5　　A.  I actually became responsible for creating and
6　operating the budget.  FGCU PD did not have one.
7　　Q.  So then you were also responsible for
8　formulating and administering it, correct?
9　　A.  Correct.
10　　Q.  Okay.  And during the time that you were at
11　FGCU, was it also part of your job duties to provide
12　leadership and direction in policy development and
13　implementation?
14　　A.  Correct.
15　　Q.  And were you also responsible, as the chief of
16　police at FGCU, for developing and maintaining
17　partnerships throughout the university in order to
18　attain departmental goals and objectives?
19　　A.  Correct.
20　　Q.  And this job posting identifies some
21　knowledge, skills, and abilities.  Do you see that?
22　　A.  Yes.
23　　Q.  And it required that you have excellent
24　interpersonal, verbal and written communication skills,
25　correct?

62

1　　A.  Yes.
2　　Q.  And that was your experience as the chief of
3　police that that was an important part of your job
4　duties, correct?
5　　A.  Correct.
6　　Q.  And it also required that you work
7　collaboratively and build strategic relations with
8　colleagues, vendors, and other stakeholders, correct?
9　　A.  Correct.
10　　Q.  And that was an important part of your job
11　duties as the chief of police for Florida Gulf Coast
12　University, correct?
13　　A.  Correct.
14　　Q.  And it also required you to have the ability
15　to develop and manage a budget with fiscal allocations,
16　correct?
17　　A.  And in this case, create a budget, but yes.
18　　Q.  And that was an important part of your job
19　duties, to have the ability to develop and manage a
20　budget, correct?
21　　A.  Yes.
22　　Q.  And it provided in this job posting a salary
23　range of 115 to 125 annually, correct?
24　　A.  Correct.
25　　Q.  And you were hired at the top end of that

63

1　range, correct?
2　　A.  Correct.
3　　Q.  And do you know who made the decision to hire
4　you?
5　　A.  I do not.  I believe it was President Martin.
6　　Q.  And President Mike Martin was the president of
7　the university at the time you applied for the position,
8　correct?
9　　A.  Yes, ma'am.
10　　Q.  And he was the president of the university at
11　the time that you were terminated from your position,
12　correct?
13　　A.  Yes, ma'am.
14　　Q.  Let me show you what's marked as Exhibit 11 to
15　your deposition.
16　　　(Exhibit 11 was marked for identification.)
17　　Q.  Do you recognize this document?
18　　A.  I do.
19　　Q.  And what is it?
20　　A.  This would be my cover letter.
21　　Q.  And this is the cover letter that you sent to
22　Florida Gulf Coast University in applying for the
23　position of chief of police, correct?
24　　A.  Yes.
25　　Q.  And this application would have been in

64

1　February of 2021?
2　　A.  I don't see a date on it, but -- yeah,
3　February 4th.  Yes.
4　　Q.  Yes.  You see the date at the top of that?
5　　A.  Yeah, I do now.  I was looking at the blacked
6　out part.
7　　Q.  No.  No.  No.  I think that's your address,
8　right?
9　　A.  Redacted, yeah.
10　　Q.  And in applying for this position, did you
11　understand that there would be a search committee
12　process?
13　　A.  Yes.
14　　Q.  And that's who this letter is directed to is
15　the search committee, correct?
16　　A.  Correct.
17　　Q.  Did you understand that this was a nationwide
18　search that was being conducted by Florida Gulf Coast
19　University to fill the position?
20　　A.  I don't know if I knew it was nationwide.
21　　Q.  But you knew it was a search process, correct?
22　　A.  Yes, ma'am.
23　　Q.  And at the point in time that you submitted
24　this letter, you had been employed at the Town of
25　Longboat Key for about six months, correct?

16 (Pages 61 to 64)

Smith vs. Florida Gulf Coast University    Keith Smith

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 17 of 118 PageID 377

01/22/2025

65

1    A.  Correct.
2    Q.  Did you tell anyone at the Town of Longboat
3  Key you were applying for this position?
4    A.  No.
5    Q.  In this cover letter that you sent to the
6  search committee, you indicated in here at the end of
7  the second paragraph that you understood the importance
8  of building relationships and community engagement in
9  working at a university, correct?
10    A.  Correct.
11    Q.  And so you understood that was an important
12  part of the job of the chief of police, to build
13  relationships and have community engagement, correct?
14    A.  Correct.
15    Q.  And at the bottom of this -- the first page of
16  the document, the last paragraph, you also said that
17  you're committed to be a leader that strives to repair
18  and enhance civic relationships.  Do you see that?
19    A.  Yes.
20    Q.  And you understood that was an important part
21  of your job as the chief of police at Florida Gulf Coast
22  University, correct?
23    A.  Correct.
24    Q.  And you were held accountable for your ability
25  to build relationships and community engagement as the

66

1  chief of police at Florida Gulf Coast University,
2  correct?
3    A.  Correct.
4    Q.  Let me show you what's marked as Exhibit 12.
5       (Exhibit 12 was marked for identification.)
6    Q.  Do you recognize this document?
7    A.  It appears to be my resume.
8    Q.  And this was submitted to the search committee
9  along with Exhibit 11, correct?
10    A.  I believe so.
11    Q.  In the first paragraph of this resume, you
12  talk about what your objective is.  Do you see that,
13  where it says "objective"?
14    A.  Yes.
15    Q.  And you said that your objective was to be
16  selected as the chief of police for Florida Gulf Coast
17  University.  Do you see that?
18    A.  I do.
19    Q.  And did you tell anyone at the Town of
20  Longboat Key that your objective was to be selected as
21  the chief of police of Florida Gulf Coast University?
22    A.  While going through the hiring process?
23    Q.  Yes, ma'am.
24    A.  No.
25    Q.  Okay.  And you said in here that you utilize

67

1  innovative leadership designed to enhance community
2  partnerships within the industry, correct?
3    A.  Correct.
4    Q.  And you also noted that community policing is
5  centric to your philosophy, correct?
6    A.  Yes.
7    Q.  And you understood that community policing was
8  important at Florida Gulf Coast University, correct?
9    A.  Correct.
10    Q.  And you also emphasize that you foster an
11  environment of collaboration, outreach, and professional
12  services for the community, correct?
13    A.  Yes.
14    Q.  And you also knew that was an important part
15  of the job at Florida Gulf Coast University, correct?
16    A.  Correct.
17    Q.  You identify in this resume your work history
18  on the second page, which is Bates Number 8 of the
19  document.
20    A.  Um-hum.
21    Q.  You indicate in here that you retired from UCF
22  in January of '17 and started working at Northern
23  Arizona in September of 2017.  And I think we covered
24  that earlier.  That period of time of January to
25  September was the time that you were retired?

68

1    A.  Yes.
2    Q.  And if you could turn to Bates stamp Number
3  11, Page 7 of the document, if that helps.  You indicate
4  on this resume that you have served as an adjunct
5  professor at UCF teaching these three courses that are
6  listed here.  Do you see that?
7    A.  Yes.
8    Q.  And after your termination from Florida
9  Gulf Coast University, did you seek a position as an
10  adjunct professor?
11    A.  I did, but I don't recall where.  I know there
12  were various educational institutes that I applied to.
13    Q.  And would there be anything that would refresh
14  your recollection as to what they were?
15    A.  No.  I mean, I can't recall specifically but
16  any adjunct-type opportunity that I was aware of.
17    Q.  Were you offered any of those positions?
18    A.  No.
19    Q.  And do you know why?
20    A.  No.
21    Q.  During the time that you were at Florida
22  Gulf Coast University, did you serve as an adjunct
23  professor?
24    A.  No.
25    Q.  Did you seek to serve as an adjunct professor

17  (Pages 65 to 68)

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 18 of 118 PageID 378

Smith vs. Florida Gulf Coast University    Kevin Smith                    01/22/2025

69

1  at Florida Gulf Coast University?
2      A.  No.
3      Q.  And the adjunct positions that you referenced
4  after your termination, would those be reflected in the
5  documents you produced, if they exist?
6      A.  They could be.  I can't say that I recall one
7  versus another.
8      Q.  Is there any other document that would
9  identify those positions that you haven't produced to
10 us?
11     A.  Nothing that I'm aware of.
12     Q.  Let me show you what's marked as Exhibit 13 to
13 your deposition.
14        (Exhibit 13 was marked for identification.)
15     Q.  Do you recognize this document?
16     A.  I've never seen it.
17     Q.  Okay.  You understood that at the time that
18 you applied at Florida Gulf Coast University, that there
19 was a search committee process, correct?
20     A.  Correct.
21     Q.  That there were other applicants for the
22 position other than you?
23     A.  Correct.
24     Q.  And did you -- do you know who was on that
25 search committee?

70

1      A.  Looking at the names now, I recognize the
2  names -- well, some of the names; some I don't.
3      Q.  Okay.  So this document reflects the names of
4  the search committee and panel members?
5      A.  Okay.
6      Q.  And you recognize that some of these -- you
7  recall some of these people being on the search
8  committee?
9      A.  I don't recall them being on the search
10 committee, but I know their names.  And if they're on
11 here, then they were on the search committee.
12     Q.  Okay.  Did you interview with the search
13 committee?
14     A.  It was a one full-day process where you did
15 round tables and you did a public forum.  So at times, I
16 would be sitting at an interview table like this with
17 six people, and then another time 10 people.
18     Q.  Okay.
19     A.  And then in a big forum in an auditorium.  So
20 that's why I can't speak specifically.
21     Q.  Okay.  Did you know any of the other
22 candidates for the chief of police position?
23     A.  I did not.
24     Q.  And do you have any basis to dispute the
25 accuracy of this document?

71

1      A.  No.
2      Q.  And James Slapp is on here, and you referred
3  to him earlier, correct?  That's the same person?
4      A.  Correct.
5      Q.  The other people, had you worked with any of
6  them in the past?
7      A.  No.  And at the time of this document, I did
8  not know James Slapp.  I obviously know him now,
9  clarifying your question previously.
10     Q.  Sure.  I appreciate that.
11        So at the time that you interviewed, you
12 didn't know any of these people.  You now know James
13 Slapp?
14     A.  Correct.
15     Q.  Do you now know any of these other people that
16 are listed here?
17     A.  Yes, I do.
18     Q.  And which ones do you know?
19     A.  Sherrelle Findley, Anthony Rispoli, Eric
20 Balmer.
21     Q.  Oh, I meant -- let me clarify that.  Sorry.
22        I'm looking at the candidate names.
23     A.  Oh, the candidate names?  No, I don't know any
24 of them.
25     Q.  Okay.

72

1      A.  I met Lisa Barnes once at a chiefs conference,
2  but I wouldn't say I know her.
3      Q.  Okay.  And you were selected among these
4  candidates to be the chief of police, correct?
5      A.  If these were them and I was the one chosen,
6  yes.
7      Q.  Okay.  But you don't have knowledge of who the
8  other candidates were, then, other than looking at the
9  records for FGCU, correct?
10     A.  Correct.
11     Q.  Okay.  And one of the committee members is
12 Anthony Rispoli.  Do you recall interviewing with him?
13     A.  I think he was on one of the big panels.  I
14 don't think it was an individual interview.
15     Q.  And he was the one that you mentioned that you
16 saw in the Chipotle?
17     A.  Yes, ma'am.
18     Q.  And he reported to you when you were chief of
19 police, correct?
20     A.  Correct.
21     Q.  And do you know if he -- what his opinion was
22 of you in terms of your application for chief of police?
23     A.  I don't.
24     Q.  Do you know how he ranked you among the
25 candidates for chief of police?

18  (Pages 69 to 72)

73

1    A.  I don't.
2    Q.  And do you recall interviewing with President
3  Martin?
4    A.  I do.
5    Q.  And did you understand that he was going to be
6  making the decision on who to hire?
7    A.  That's what I believe was the case.
8    Q.  Did you interview with Sara Stensrud?
9    A.  Yes.
10    Q.  And do you know what her role was in the
11  search process?
12    A.  According to this document, hiring manager.
13    Q.  But do you know what her role was?
14    A.  Not at the time.  You know, no, other than she
15  was part of it.  She told me that Mr. Magiera was
16  retiring, and she would be -- the chief of police would
17  be responding directly to her.  The chief of police
18  would be her direct report.
19    Q.  And do you know what her opinion was in terms
20  of how she ranked you among the other candidates?
21    A.  I never saw anything formally.
22    Q.  Let me show you what's marked as Exhibit 14.
23    (Exhibit 14 was marked for identification.)
24    Q.  Do you recall this document?
25    A.  I believe I've seen it, but I don't -- I

74

1  actually don't think I managed the document.  It was
2  managed by whoever was assigned to get me from place to
3  place.
4    Q.  Okay.  Is this reflecting the day that you
5  referenced, the day-long interview process that you
6  participated in?
7    A.  I'm going to assume it's accurate and say yes.
8    Q.  And do you recall meeting with Chief Moore as
9  part of the interview process?
10    A.  I do.
11    Q.  And who is Chief Moore?
12    A.  He was the retiring chief of police.
13    Q.  Did you know him?
14    A.  No.
15    Q.  And it reflects on here that you started your
16  day with the search committee.  Do you see that, the
17  panel, at the student union Room 214?
18    A.  I do see that.
19    Q.  And then you had an open forum.  Do you see
20  that?
21    A.  I do.
22    Q.  And that's what you were referring to earlier
23  that there was a forum of various different people who
24  would come and ask questions?
25    A.  Correct.  It was an auditorium-style thing.

75

1  And then I think it was also broadcast on some type of
2  login for campus community members.
3    Q.  Let me show you what's marked as Exhibit 15.
4    (Exhibit 15 was marked for identification.)
5    Q.  Have you seen this document before?
6    A.  No.
7    Q.  Do you know who Captain A. Rispoli is?
8    A.  I do.
9    Q.  And do you know if he rated you the highest
10  here with the four and a half?
11    A.  I have no idea.
12    Q.  Okay.  In the interview, do you recall that
13  the search committee did ask you questions during the
14  interview?
15    A.  I do recall they asked questions, yes.
16    Q.  Okay.  And do you know if the same questions
17  were asked of all of the candidates?
18    A.  I have no idea.
19    Q.  If you could turn to Page 1364, Bates Number
20  1364.  Do you see Question Number 6 there?
21    A.  I do.
22    Q.  And was one of the questions asked of you
23  whether you believe that community policing models are
24  effective on university campuses?
25    A.  I don't recall.

76

1    Q.  And do you have any basis to dispute this
2  document that's Exhibit 15 to your deposition?
3    A.  No.
4    Q.  And if you could go to the next page to
5  Question Number 8, do you recall being asked the
6  question about how you would build relationships and
7  establish trust with your direct reports and key
8  stakeholders across the landscape of the university?
9    A.  I don't recall the question.
10    Q.  Did you understand that it was important, as
11  the chief of police, to build relationships and
12  establish trust with your direct reports and key
13  stakeholders across the landscape of the university?
14    A.  Yes.
15    Q.  And in Question Number 9, do you recall being
16  asked about your familiarity with Title IX and the Clery
17  Act?
18    A.  I don't recall.
19    Q.  Do you know if that was important to the
20  university to hire someone who was familiar with the
21  Clery Act and Title IX?
22    A.  I don't know.
23    Q.  Do you know if it was important to the
24  university to hire someone who could build relationships
25  and establish trust?

19  (Pages 73 to 76)

77

1    A.  I would say yes.
2    Q.  If you could go to Question Number 12, it's
3 the last page of the document.  And this question, the
4 search committee members said:  Leadership is a critical
5 trait for the chief of police at FGCU to hold.  Do you
6 see that.
7    A.  I do.
8    Q.  And did you agree with that?
9    A.  Yes.
10   Q.  And they asked you to describe your leadership
11 style, correct?
12   A.  Correct.
13   Q.  And specifically wanted examples of how you
14 have built strong, trusting leadership teams, correct?
15   A.  That's what the question says.  I don't recall
16 being asked it.
17   Q.  Okay.  Now, do you know if that was an
18 important part of the search committee's determination
19 is the answers to these questions?
20   A.  I don't know how they weighted things.
21   Q.  Do you know if Captain Rispoli rated you
22 higher than he did James Slapp for the position?
23   A.  I don't know.
24   Q.  Do you know if Captain Rispoli rated you
25 higher than Scott Dunning for the position?

78

1    A.  I don't know.
2    Q.  Let me show you what's marked as Exhibit 16 to
3 your deposition.
4        (Exhibit 16 was marked for identification.)
5    Q.  Do you recognize this document?
6    A.  No.
7    Q.  Have you ever seen it before?
8    A.  No.
9    Q.  Do you have any basis to dispute the accuracy
10 of this document?
11   A.  I don't really know what it is, so no.
12   Q.  Let me show you what's marked as Exhibit 17.
13       (Exhibit 17 was marked for identification.)
14   Q.  Do you recall this document?
15   A.  I do.
16   Q.  Okay.  So after the interview process that was
17 reflected in Exhibit 14, that day-long interview
18 process, were you then made an offer of employment?
19   A.  At some point in time.  I don't know the
20 distance in between the two events.
21   Q.  Okay.  And do you know why you were selected?
22   A.  I don't know specifics.
23   Q.  Do you have any idea of why you were selected?
24   A.  No specifics.
25   Q.  What does that mean "no specifics"?

79

1    A.  I can't assume.  I just know I was offered the
2 position.  There were other candidates, so that's what I
3 know.
4    Q.  Okay.  And when you were offered the job, did
5 you ask for a greater salary than 125?
6    A.  I did.
7    Q.  And tell me about that conversation?
8    A.  I asked for what Chief Moore was receiving at
9 135, and I was told that that was not possible.
10   Q.  And the job posting itself reflected that the
11 top end of the range was 125, correct?
12   A.  Correct.
13   Q.  Okay.  And so you were offered the salary at
14 125, correct?
15   A.  Correct.
16   Q.  Okay.  And at the time that Chief Moore
17 retired, do you know how long he had been the chief of
18 police?
19   A.  I do not.
20   Q.  And at the time that you applied for this
21 position, you had been the chief of police at a
22 university for three years?
23   A.  Give or take, yes.
24   Q.  And a chief of police at a municipality for
25 six months?

80

1    A.  Correct.
2    Q.  And do you know why your request to be paid
3 135 was denied?
4    A.  No.
5    Q.  And, ultimately, that request was granted,
6 correct?
7    A.  Ultimately, I received a $10,000-a-year
8 increase, yes.
9    Q.  Which brought you to 135, correct?
10   A.  Yes, ma'am.
11   Q.  And that was in March of 2022, correct?
12   A.  Correct.
13   Q.  So you had been employed at the university for
14 less than a year at that point in time, correct?
15   A.  Correct.
16   Q.  And do you know why that decision was made?
17   A.  To give me the increase?
18   Q.  Yes.
19   A.  It was based, as far as I understood, on my
20 performance and being reassigned parking services.  I
21 was given another division to run.
22   Q.  And who told you it was based on your
23 performance?
24   A.  Sara.
25   Q.  And what did she tell you about your

81

1  performance?
2      A.  In particular, I can't recall.  But there had
3  been no areas of concern brought to my attention about
4  poor performance.
5      Q.  Do you know if other employees had complained
6  about your performance at that point in time?
7      A.  No.
8      Q.  Do you know if President Martin shared the
9  view of your performance that Sara did in March of 2022?
10     A.  No.
11     Q.  Do you who made that decision to provide you
12 the raise in March of '22?
13     A.  I don't know.
14     Q.  Do you know if President Martin was aware of
15 that decision?
16     A.  I don't know.
17     Q.  Do you know if Vee Leonard was aware of that
18 decision?
19     A.  I don't know.
20     Q.  Do you know if Precious Gunter was aware of
21 that decision?
22     A.  I don't know.
23     Q.  So at the time of the separation of your
24 employment, you were making 135, correct?
25     A.  Correct.

82

1      Q.  And you were paid a severance at the time of
2  your separation as well, correct?
3      A.  It was policy driven, so I was paid something.
4  I don't know if it's considered severance.  I don't know
5  how it's worded in HR language.
6      Q.  Okay.  And a payment was made based on your
7  salary of 135, correct?
8      A.  Correct.
9      Q.  In addition -- we're on 17.  You still have
10 that in front of you?
11     A.  Yes.
12     Q.  So 17, which is the offer letter --
13     A.  Yes.
14     Q.  -- in addition to offering you the position at
15 the salary of 125, you were also given a moving
16 allowance?
17     A.  Correct.
18     Q.  And did you have to pay that moving allowance
19 back?
20     A.  Not that I recall.
21     Q.  And this offer letter also provided that you
22 would be attending new employee orientation, correct?
23     A.  Yes.
24     Q.  That's in the third paragraph -- fourth
25 paragraph.

83

1      A.  Yes, ma'am.
2      Q.  And it also provided that your employment and
3  terms are subject to the state and federal laws, the
4  university regulations and policies and general
5  instructions given to you, correct?
6      A.  Yes.
7      Q.  And you understood that it was an at-will
8  position, correct?
9      A.  As long as it was lawful termination, yes.
10     Q.  And you served at the pleasure of the
11 president, correct?
12     A.  Correct.
13     Q.  Let me show you what's marked as Exhibit 18.
14         (Exhibit 18 was marked for identification.)
15     Q.  Do you recognize this document?
16     A.  I don't recall it.
17     Q.  Do you recall there being a schedule for the
18 beginning days of your employment?
19     A.  Yes.
20     Q.  Do you have any basis to dispute the accuracy
21 of Exhibit 18?
22     A.  No.
23     Q.  And May 3rd, 2021, is that when you officially
24 started at the university?
25     A.  Yes, ma'am.

84

1      Q.  And part of this schedule included you meeting
2  with Dr. Mike Martin, the president of the university,
3  correct?  That's on Page 2.
4      A.  Correct.  That's what it says.
5      Q.  And you also met with Dr. Mark Rieger, the
6  executive vice president and provost?
7      A.  I don't recall.
8      Q.  Okay.  Did you understand that Dr. Rieger was
9  part of the president's cabinet?
10     A.  I see that it's on here.  I don't recall.  I
11 don't even recall who he is.
12     Q.  Okay.  You don't have any basis to dispute
13 that he was the provost at the time that you were
14 employed?
15     A.  No.
16     Q.  And it also has Vee Leonard on here.  Do you
17 see that?
18     A.  I do.
19     Q.  And she was the legal counsel, general counsel
20 for the university, correct?
21     A.  Correct.
22     Q.  Do you know if she reported to the president?
23     A.  I don't know the organizational structure, if
24 she was his direct report.
25     Q.  Okay.  And do you know what her race is?

21  (Pages 81 to 84)

85

1    A.   Yes.
2        Q.   What is it?
3    A.   A black female.
4        Q.   And Precious Gunter, do you see that she's
5    listed on here?
6    A.   I do.
7        Q.   Do you know if she reported to the president?
8    A.   I don't know.
9        Q.   Do you know what her race is?
10   A.   Yes.
11       Q.   And what is it?
12   A.   Black female.
13       Q.   Let me show you what's marked as Exhibit 19.
14   A.   Thank you.
15       (Exhibit 19 was marked for identification.)
16       Q.   Do you recognize this document?
17   A.   I see what it says, but I don't know -- it
18   does not have familiarity to me.
19       Q.   Okay.  Did you ever review the job description
20   for the chief of police, director of public safety
21   during your employment?
22   A.   I did.
23       Q.   And is this consistent with your recollection
24   of that document?
25   A.   It looks like what it should say.  I don't

86

1    know if it's the exact same document.
2        Q.   Okay.  That's fine.
3        Is there anything on here that wasn't part of
4    your job duties and responsibilities when you were the
5    chief of police at Florida Gulf Coast University?
6    A.   Let me read it.
7        Q.   Sure.
8    A.   Can you repeat your question for me, please?
9        Q.   Sure.  Is there anything on this document
10   that's Exhibit 19 to your deposition that was not a job
11   duty and responsibility during the time that you were
12   chief of police, director of public safety at Florida
13   Gulf Coast University?
14   A.   I don't recall if this was the document, but
15   Clery compliance was part of the responsibility, and I
16   don't see that identified here.
17       Q.   Okay.  Anything else?
18   A.   Nothing that I see offhand.
19       Q.   Okay.  And you understood that Clery
20   compliance was an important responsibility for the chief
21   of police, correct?
22   A.   Yes.
23       Q.   And that was a question that was asked of you
24   during your interview process, correct?
25   A.   I don't recall.

87

1        Q.   Okay.  The Clery compliance you're referring
2    to is the Clery Act?
3    A.   Yes, ma'am.
4        Q.   And what is the Clery Act?
5    A.   The Jeanne Clery Act is a federal piece of
6    legislation; it falls under the Department of Education,
7    that covers -- encompasses many things.  But in
8    particular, timely warnings, emergency notifications,
9    and services to students who have been affected under
10   the crimes identified under the Clery Act, the Jeanne
11   Clery Act.
12       Q.   And it requires reporting and notification for
13   certain crimes, correct?
14   A.   Correct.
15       Q.   And those crimes are not limited to crimes
16   against women, correct?
17   A.   Correct.
18       Q.   And you understood that as part of the role of
19   chief of police at Florida Gulf Coast University, having
20   a collaborative leadership of style was important to
21   that role, correct?
22   A.   Correct.
23       Q.   And you also understood that being the chief
24   of police at Florida Gulf Coast University, that being
25   able to communicate effectively was important to

88

1    performing the role of chief of police, correct?
2    A.   That's correct.
3        Q.   Do you know what type of management style
4    Chief Moore had?
5    A.   By his own language with me, he called himself
6    laissez-faire.
7        Q.   And did you have that same management style?
8    A.   I would not say so.
9        Q.   Do you know what type of communication style
10   Chief Moore had?
11   A.   No.
12       Q.   Do you know if Chief Moore had any difficulty
13   getting along with others?
14   A.   I'm not aware.
15       Q.   Do you know if Chief Moore had any tense
16   relationships with other administrators or direct
17   reports?
18   A.   He outlined that his department and he had a
19   difficult relationship with Title IX.
20       Q.   Anything else?  Any other administrators?
21   A.   No.
22       Q.   Do you know if the Title IX administrator ever
23   made any complaint about Chief Moore?
24   A.   I do not.
25       Q.   Do you know if any administrators complained

22  (Pages 85 to 88)

Smith vs. Florida Gulf Coast University    Kevin Smith

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 23 of 118 PageID 383

07/22/2025

89

1  to Dr. Martin about the way Chief Moore interacted with
2  them?
3      A.  In my interview with Dr. Martin, he expressed
4  that there had been challenges with the police
5  department and its reputation.  He did not go into
6  detail, but he said my job was to help try and address
7  the police department's reputation, but he did mention
8  Chief Moore.  He didn't go into detail.  It did not
9  become a bashing-type thing.
10     Q.  And do you know if Dr. Martin believed that
11 you were successful in trying to address the reputation
12 issue with the police department?
13     A.  I do not know.
14     Q.  And so are you aware of any other
15 administrators complaining to Dr. Martin about the way
16 Chief Moore interacted with them?
17     A.  No.
18     Q.  In your position as chief of police, you
19 understood it was at-will, correct?
20     MR. YORMAK:  Object to form.
21     You still answer.
22     THE WITNESS:  Okay.  Yes.  As long as it's
23 lawful, yes.
24 BY MS. DYSON:
25     Q.  And that you could be separated without cause

90

1  at any time and without notice, correct?
2      A.  As long as it's lawful, yes.
3      Q.  And when you say "as long as it's lawful,"
4  what do you mean by that?
5      A.  That it doesn't fall under any violations of
6  federal legal rights.
7      Q.  So you understood that you could be separated
8  because of your management style, correct?
9      A.  Yes.
10     Q.  And you understood you could be separated
11 because of your communication style, correct?
12     A.  Yes.
13     Q.  And you weren't employed for any specific
14 period of time by the university in terms of a guaranty
15 that you would be employed for a specific period of
16 time, correct?
17     A.  No.
18     Q.  You understood you were employed for a
19 specific period of time?
20     A.  I understood there were no specifics.
21     Q.  Okay.  Great.
22     And it was the same type of at-will employment
23 that other senior leaders have within the university,
24 correct?
25     A.  I don't know what they had.

91

1      Q.  Okay.  And when you began your employment on
2  May 3rd, 2021, several departments had expressed
3  excitement that you were there, correct?
4      A.  Um-hum.  Yes.
5      Q.  And at the time -- before you were hired,
6  during the time of the interview process, do you know
7  who the interim police chief was?
8      A.  I don't know if there was -- I don't know.
9      Q.  Now, within the police department itself, is
10 it a paramilitary structure?
11     A.  Yes, ma'am.
12     Q.  And can you explain what that means?
13     A.  That there are policies and procedures that
14 lay in place operational objectives and requirements,
15 and that there is a ranking structure.
16     Q.  And that being said, those that report up to
17 you were required to follow your orders, correct?
18     A.  Correct.
19     Q.  But the university itself was not a
20 paramilitary organization, correct?
21     A.  I can't speak to that.  There's definitely an
22 org chart.
23     Q.  Okay.  But was it run as a paramilitary
24 organization?
25     A.  I don't know.

92

1      Q.  Okay.  And you were the highest-ranking
2  officer in the police department, correct?
3      A.  Correct.
4      Q.  All of the officers reported up to you?
5      A.  Correct.
6      Q.  And they were required to follow your
7  direction and orders, correct?
8      A.  As long as it was lawful.
9      Q.  And, otherwise, it would be insubordination,
10 correct?
11     A.  Yes.  As long as it was lawful and ethical,
12 yes, ma'am.
13     Q.  And insubordination in the context of law
14 enforcement is a terminable offense, correct?
15     A.  It depends, because they're union.  So there
16 was also a process -- a grievance process.  So it's not
17 really a yes or a no.
18     Q.  Okay.  Now, you had -- you were responsible
19 for publishing general orders within the department,
20 correct?
21     A.  Approving them, yes.
22     Q.  And you had the ability to change any general
23 order that you wanted to change, correct?
24     A.  I had the authority to, but it was
25 collaborative.  Many things needed to go through the

23  (Pages 89 to 92)

Smith vs. Florida Gulf Coast University    Keith Smith    07/22/2025

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 24 of 118 PageID 384

93

1  union.
2      Q.  And you had the ability and obligation to
3  initiate internal affairs investigations, correct?
4      A.  That's correct.
5      Q.  So for any officer who failed to comply with
6  policy, general order, or the law, you had the ability
7  to order an internal affairs investigation, correct?
8      A.  If it rose to the level, yes.
9      Q.  What do you mean "if it rose to the level"?
10     A.  Some things did not rise to the level.  Some
11  acts or actions could have been addressed with
12  counseling, discussion.  The idea of mentoring and
13  molding behavior was something that I encouraged.
14     Q.  It would be your decision as to whether it
15  rose to a level of an internal affairs investigation,
16  correct?
17     A.  I took the recommendations of the supervisors,
18  because some supervisors felt like, you know, this
19  person called in sick, for example, but I'm just going
20  to talk to them.  So in many ways, depending upon the
21  situation, I took counsel from my team.
22     Q.  But it was your decision, correct?
23     A.  Correct.
24     Q.  And an internal affairs investigation could
25  result in the termination of an officer, correct?

94

1      A.  Correct.
2      Q.  And internal affairs investigations, sustained
3  internal affairs investigations are required to be
4  reported to FDLE as well, correct?
5      A.  I don't recall, to be honest with you.
6      Q.  Okay.  Did you understand that a sustained
7  internal affairs investigation has implications for a
8  law enforcement officer's certification?
9      A.  Only certain categories.
10     Q.  And what are those categories?
11     A.  I don't know specifically offhand.  I would
12  refer to the FDLE handbook or their website, or we had a
13  liaison.
14     Q.  Did you know that one of those categories is
15  the violation of someone's civil rights?
16     A.  Yes.
17     Q.  Did you understand that one of those
18  categories would be discrimination based on a protected
19  characteristic?
20     A.  Offhand, I can't tell you the exact language.
21     Q.  If an officer is engaging in discrimination
22  based on protected characteristics, that was a violation
23  of university policy, correct?
24     A.  Correct.
25     Q.  It's also an offense that was required to be

95

1  reported to the FDLE?
2      A.  I would have to see the language to know
3  exactly.
4      Q.  Now, during the time that you were employed at
5  FGCU, you reported to Sara Stensrud?
6      A.  Correct.
7      Q.  And she reported to David Vazquez?
8      A.  Correct.
9      Q.  And do you know what David Vazquez's title is?
10     A.  I don't.  I really don't know specifically.
11     Q.  Okay.  And did you understand that David
12  Vazquez reported to President Martin?
13     A.  I believe so, yes.
14     Q.  Did you understand that he was part of the
15  president's cabinet?
16     A.  I knew there were numerous members of the
17  cabinet, but I never had a firm understanding as to who
18  was in the cabinet.  It was not a level that I
19  functioned at.
20     Q.  Did you understand that the president was the
21  one who selected the members of his cabinet?
22     A.  I did not know that.
23     Q.  Did you know -- do you know how many women sat
24  on President Martin's cabinet?
25     A.  I didn't know who was on it.

96

1      Q.  Do you know how many women President Martin
2  hired during his tenure as president?
3      A.  I have no idea.
4      Q.  Do you know how many women President Martin
5  promoted during his tenure as president?
6      A.  I have no idea.
7      Q.  Did you have any reason to believe Sara
8  Stensrud was biased against you?
9      A.  No.
10     Q.  Did you have any reason to believe David
11  Vazquez was biased against you?
12     A.  No.
13     Q.  Did you have any reason to believe that
14  President Martin was biased against you?
15     A.  Not until my termination.
16     Q.  And then what does that mean?
17     A.  Well, it felt like there was a shift in
18  things, and then as I later did my research and learned
19  of the multiple cases of litigation against him, that
20  shifted my perspective.
21     Q.  In any of the litigation that you learned of
22  involving President Martin, was there any judgment
23  entered against him?
24     A.  I don't know the answer to that.
25     Q.  Other than the litigation that you found, was

24  (Pages 93 to 96)

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 25 of 118 PageID 385

Smith vs. Florida Gulf Coast University   Kevin Smith                    01/22/2025

97

1 there anything else that caused you to believe that
2 President Martin was biased against you?
3     A.   No.
4     Q.   Do you know in that litigation involving --
5 whether President Martin was individually sued in the
6 litigation?
7     A.   I don't know.
8     Q.   Do you know if any of that litigation involved
9 gender discrimination?
10     A.   Yes.
11     Q.   Was there any order involving that litigation
12 that found President Martin responsible or that he had
13 engaged in gender discrimination?
14     A.   I don't know the answer.
15     Q.   Did you have any reason to believe that
16 Precious Gunter was biased against you?
17     A.   No.
18     Q.   Did you have any reason to believe that Vee
19 Leonard was biased against you?
20     A.   No.
21     Q.   Now, within the department, officers that you
22 hired in, is there a probationary period?
23     A.   Yes.
24     Q.   And what is that probationary period?
25     A.   Typically, one year.

98

1     Q.   And when you say "typically," what do you mean
2 by that?
3     A.   So I can't recall specifics, but officers are
4 hired, and they go through a field training period,
5 which depending on their experience, depending if
6 they're fresh out of the academy, depending if they
7 accelerate in field training, there's a 12- to 16-week
8 training period.  I don't recall by union contract what
9 defined their probationary period.  Was it from date of
10 hire or date of completion of FTO?  And did that start
11 the probationary period?  It would be something to look
12 at the contract on.
13     Q.   Okay.  You mentioned earlier that while you
14 were employed at NAU, that you testified in an
15 arbitration --
16     A.   Um-hum.
17     Q.   -- because an employee made a complaint that
18 you had acted improperly?
19     A.   She was demoted because she was DUI'ing on
20 duty, yes.  So she filed a complaint on that.
21     Q.   And because an employee made an allegation
22 about you, did that make it true?
23     A.   No.
24     Q.   And do you know whether any of the allegations
25 made about President Martin in other litigation were

99

1 true?
2     A.   I have no idea.
3     Q.   Now the probationary period for law
4 enforcement officers, why is it 12 months?
5     A.   I don't know.  It's an HR/union thing.  I
6 don't know.
7     Q.   And in your experience with other law
8 enforcement, isn't it also 12 months?
9     A.   I almost think that's probably an employment
10 industry norm in government work.  I don't have the why.
11     Q.   Did you understand that you had a probationary
12 period at the university as the chief of police?
13     A.   I think that I did.
14     Q.   And did you understand that was 12 months?
15     A.   I thought it was six months.
16     Q.   When we talked earlier -- and we're going to
17 review policies in a couple of minutes, but when we
18 talked earlier about you said there was a policy that
19 when you were separated without cause, that you were
20 paid for 30 days.
21     A.   Correct.
22     Q.   Do you know if that depended on whether you
23 were employed for a year or less than a year?
24     A.   I do recall that it did, but I don't know if
25 it defines probationary time.

100

1     Q.   Okay.  So if you were employed for more than a
2 year, the severance amount would be larger, correct?
3     A.   If I recall correctly, yes, ma'am.
4     Q.   Going back to Exhibit 19, the job description,
5 did you understand that as part of your job duties as
6 the chief of police, that you were required to work
7 effectively as a team?
8     A.   I don't know that it says it in here.  I can
9 re-read it.  But I do know that was a requirement.
10     Q.   Okay.  And did you understand that in your job
11 duties as the chief of police, that you were held
12 accountable for the morale of the department?
13     A.   I don't know that I agree with that, because
14 morale is a shifting land.  You can't make everyone
15 happy all the time.  So morale has an ebb and a flow.
16     Q.   But you understand as the leader of the
17 department, that you were responsible for the morale of
18 the department if it was always down?
19     A.   That has to be looked at more narrowly.  It
20 could be a supervisory issue.  It could be a number of
21 things.  It's very ambiguous.
22     Q.   But those are changes you would have had the
23 authority to make, correct?
24     A.   As long as they were within union and HR
25 guidelines and supervisory guidelines for my leadership,

25  (Pages 97 to 100)

101

1  yes.
2     Q.  Okay.  And you understood that you were held
3  accountable for the relationship between UPD and the
4  other departments in the university, correct?
5     A.  I was the agency head, so, yes, but that
6  relationship fostering came at all levels.
7     Q.  And you knew that you were responsible for
8  retention and hiring in the department, correct?
9     A.  The retention and hiring issues were solely
10  related to salary, yes, but, ultimately, yes.
11     Q.  And you were responsible for that, right?
12     A.  Correct.
13     Q.  Okay.  And during your tenure, FGCU had
14  difficulty filling vacant law enforcement positions,
15  correct?
16     A.  We were $10,000 less a year than everyone
17  else, so yes.
18     Q.  But at that time and still exists today,
19  filling law enforcement positions is difficult for
20  agencies, correct?
21     A.  Yes.
22     Q.  Okay.  That wasn't unique to FGCU?
23     A.  No, it was not.
24     Q.  In fact, that's a nationwide issue in terms of
25  filling law enforcement positions, correct?

102

1     A.  Correct.
2     Q.  And based on your knowledge, in the time frame
3  of ' 21 -- 2021 and 2022, were all police departments in
4  Southwest Florida, did they have vacancies?
5     A.  I would say yes.  Because when we had our
6  chief's meetings, it was a routine topic of conversation
7  and agency hopping.  Going from one hired paid agency to
8  another.
9     Q.  And it was and continues to be difficult to
10  recruit employees to law enforcement positions, correct?
11     A.  I'm out of the industry, so I don't know the
12  answer to that.
13     Q.  Okay.  During the time that you were the chief
14  of the police, it was difficult to recruit employees for
15  law enforcement positions, correct?
16     A.  Correct.
17     Q.  And if 40 percent of the officers resigned, it
18  would have had an impact on UPD's ability to function,
19  correct?
20     A.  I think during my tenure, about 20 percent
21  were scheduled to retire already.  So we had already
22  talked about that prior to my arrival.
23     Q.  Um-hum.
24     A.  Dr. Martin was aware, I guess, and Sara,
25  because we had a lot of impending retirements and no

103

1  funds to pay out their leave.
2     Q.  Um-hum.  And if the employees -- additional
3  employees resigned on top of that, that would have
4  impacted the ability to function as a department,
5  correct?
6     A.  If you're including the 20 percent and then
7  another 20 percent, absolutely, then those number
8  losses, but you find a way.
9     Q.  And other than the employment decisions that
10  were made in the police department during your tenure,
11  do you have knowledge of how other employment decisions
12  were made within the university?
13     A.  Nothing specific, no.
14     Q.  Were you involved in any other employment
15  decisions outside of those involving the police
16  department?
17     A.  No.
18     Q.  And are you aware of any other administrator
19  where 40 percent of the department employees threatened
20  to resign and the administrator was not terminated?
21     A.  I'm not aware that 40 percent threatened to
22  resign from FGCU and what that 40 percent consists of.
23     Q.  So you're not aware of any other administrator
24  where 40 percent of the department threatened to resign?
25     A.  No.

104

1     MR. YORMAK:  Object to form.
2  BY MS. DYSON:
3     Q.  Let me show you what's marked as Exhibit 20.
4     (Exhibit 20 was marked for identification.)
5     Q.  Okay.  Do you recognize this document?
6     A.  I do not.
7     Q.  Do you recall that at the time of your hire,
8  that you were provided with access to the University's
9  regulations, policies, and procedures?
10     A.  Repeat that question.
11     Q.  Sure.  Do you recall at the time of your hire,
12  the time you began your employment with the university,
13  that you were given access on how -- that you were told
14  how to access the university's regulations and policies?
15     A.  I imagine I was.  I don't recall it
16  specifically.
17     Q.  Okay.  You knew that those were available on
18  the Internet, correct?
19     A.  If they were posted on the Internet.  I don't
20  recall how the university provided this.
21     Q.  Okay.  Did you understand it was your
22  responsibility to review the policies and procedures and
23  regulations of the university?
24     A.  Yes.
25     Q.  And did you understand it was your obligation

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 27 of 118 PageID 387

Smith vs. Florida Gulf Coast University   Kevin Smith                    01/22/2025

105

1  to enforce the policies, regulations in your department?
2      A. Yes.
3          MS. DYSON: Can we go off the record for a
4  second?
5          MR. YORMAK: Um-hum.
6          (Discussion held off the record.)
7  BY MS. DYSON:
8      Q. Let me show you what's marked as Exhibit 21.
9          (Exhibit 21 was marked for identification.)
10     Q. Do you recognize this document?
11     A. I do not.
12     Q. Did you ever review the FGCU policy on
13  retention of external legal counsel?
14     A. I may or may not have.
15     Q. Do you have any basis to dispute the accuracy
16  of this policy that applied during your employment?
17     A. I don't recognize it, so I don't know whether
18  it existed, where it existed at the time of my
19  employment.
20     Q. Right. So my question to you is, do you have
21  any basis to dispute the accuracy of this document?
22     A. No.
23     Q. And did you understand that the general
24  counsel of the university was responsible for providing
25  all legal advice, counsel, and representation in matters

106

1  involving the university?
2      A. I don't think I understood the depth of that.
3  But, yes, now that I -- looking at this language, I
4  understand what you're saying.
5      Q. Did you ever have a conversation with Vee
6  Leonard about what her role is within the university?
7      A. I don't recall specifically.
8      Q. And this policy also requires that all contact
9  with external counsel shall be under the direction of
10  the general counsel, correct?
11     A. Correct.
12     Q. Let me show you what's marked as Exhibit 22.
13         (Exhibit 22 was marked for identification.)
14     Q. Do you recognize this document?
15     A. I recognize it, yes.
16     Q. And is this a true and correct copy of the
17  university's policy of non-discrimination,
18  anti-harassment, and sexual misconduct that applied
19  during your employment?
20     A. I can't testify to that, because it's 12 pages
21  long, but it appears to be.
22     Q. Do you have any basis to dispute the accuracy
23  of this document?
24     A. No.
25     Q. And this policy provided that members of the

107

1  university community have the right to file complaints
2  of discrimination, harassment, or sexual misconduct,
3  correct?
4      A. Correct.
5      Q. And that the university strictly prohibits and
6  will not tolerate retaliation due to participation in
7  this process or other protected activity, correct?
8      A. That's what the document says.
9      Q. And if we could go to Page 5, which is
10  Bates-stamped 2142. Did you understand that there was a
11  procedure for filing a complaint of discrimination,
12  harassment, or retaliation?
13     A. I see that here, yes.
14     Q. And it had both a formal and informal
15  component to it?
16     A. I was unaware of the informal, but yes.
17     Q. So if you turn to the next page, it has the
18  informal procedure.
19     A. I see that.
20     Q. And so an individual can make a request for
21  informal resolution by making a request to the OIEC
22  director, correct?
23     A. That's what it says.
24     Q. And any individual alleging any type of
25  discrimination, harassment, or retaliation can file a

108

1  complaint with the OIEC director, correct?
2      A. That's what it says, yes.
3      Q. And the OIEC director at the time of your
4  employment was Precious Gunter?
5      A. Yes.
6      Q. And you were familiar with her, correct?
7      A. Yes.
8      Q. And the -- in addition to filing a complaint
9  with the OIEC director, the employee could also file a
10  complaint through the EthicsPoint Hotline, correct?
11     A. I wasn't aware of that, but I see that.
12     Q. And did you review this policy during your
13  employment?
14     A. I may have.
15     Q. Okay. And did you ever utilize the procedures
16  set forth in this policy?
17     A. No.
18     Q. Okay. If you could go to Exhibit 23.
19         (Exhibit 23 was marked for identification.)
20     A. Thank you.
21     Q. Do you recognize this document?
22     A. I see what it says, but it's nothing that I'm
23  familiar with.
24     Q. Do you have any basis to dispute that this is
25  the policy of FGCU that applied during your employment

27 (Pages 105 to 108)

Smith vs. Florida Gulf Coast University    Kevin Smith

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 28 of 118 PageID 388

07/22/2025

109

1  related to contract review?
2      A.  No.
3      Q.  And did you understand that all contracts or
4  engagements must be approved by the general counsel's
5  office?
6      A.  I see that in the policy.  It was my
7  understanding that my supervisor could be involved in
8  those discussions, and then as somebody who worked
9  closely with general counsel would coordinate those
10  conversations.
11      Q.  And did you ever review the policy to ensure
12  that your understanding was compliant with the policy?
13      A.  I deferred it to my supervisor, so not me
14  particularly.
15      Q.  I'll show you what's marked as Exhibit 24.
16      (Exhibit 24 was marked for identification.)
17      Q.  Do you recognize this document?
18      A.  I see what it says.  I mean, it's a 19-page
19  document.  So granular detail, I don't know.
20      Q.  Is this a true and correct copy of the sexual
21  harassment under Title IX policy in effect during your
22  employment at the university?
23      A.  I don't recall that it is.  I don't know if
24  it's been changed.
25      Q.  Do any have basis to dispute the accuracy of

110

1  this document?
2      A.  No.
3      Q.  If you could go to Bates stamp Number 1997,
4  and at the bottom, it talks about report of sexual
5  harassment.  Do you see that?
6      A.  I do.
7      Q.  And it says that any person may report sex
8  discrimination, including sexual harassment, to the
9  Title IX coordinator or designee in person, by mail,
10  telephone, electronic mail, through the EthicsPoint
11  Hotline, or by any means that results in the Title IX
12  coordinator receiving the person's verbal or written
13  report.  Do you see that?
14      A.  I do see that.
15      Q.  And did you ever use any -- utilize any of
16  those methods during your employment to make any type of
17  complaint?
18      A.  I did not.
19      Q.  I'll show you what's marked as Exhibit 25 to
20  your deposition.
21      (Exhibit 25 was marked for identification.)
22      Q.  Do you recognize this document?
23      A.  No, I don't.
24      Q.  Do you have any basis to dispute that this is
25  a true and correct copy of the shared governance policy

111

1  that was in effect during your employment at the
2  university?
3      A.  I do not.
4      Q.  Did you understand that FGCU's policy was one
5  of shared governance that required collaborative efforts
6  by its administrators?
7      A.  I can't tell you what this document means.  I
8  can certainly read it.
9      Q.  Let me show you what's marked as Exhibit 26 to
10  your deposition.
11      (Exhibit 26 was marked for identification.)
12      Q.  Do you recognize this document?
13      A.  Yes.
14      Q.  And what is it?
15      A.  It is the document based on budget management
16  policy.
17      Q.  And is this a true and correct copy of the
18  budget management policy applicable during your
19  employment at FGCU?
20      A.  It's dated 2010.  So unless there were
21  revisions, it was the one in effect.
22      Q.  Do you have any basis to dispute the accuracy
23  of this document and that it applied during your
24  employment?
25      A.  No.

112

1      Q.  And this document required that employees have
2  responsible management -- that administrators have
3  responsible management of university funds, correct?
4      A.  Correct.
5      Q.  And that included you in your role as chief of
6  police?
7      A.  I didn't have access to funds.  Everything was
8  approved through my supervisor.  And Chief Moore never
9  had a documented budget.  They always told me it was
10  stored in his head.  So upon my employment, I tasked
11  Smitty Rounsifer with pulling all of the POs that
12  existed to help me create a budget.
13      Q.  And you understood that those expenditures
14  needed to be budgeted and identified and justified,
15  correct?
16      A.  Everything had to go through Sara, because it
17  didn't exist.
18      Q.  I'll show you what's marked as Exhibit 27.
19      (Exhibit 27 was marked for identification.)
20      Q.  Do you recognize this document?
21      A.  It's familiar, yes, ma'am.
22      Q.  And is this a true and correct copy of the
23  special leaves and furlough policy that applied during
24  your employment at FGCU?
25      A.  Based on the date, I would say so.

113

1    Q.   And if we could turn to Page 2163, under
2  formal investigation, did you understand that this
3  policy allowed an administrator to place an employee on
4  administrative leave during an investigation?
5    A.   If it was a formal investigation.
6    Q.   Does it say formal in this policy?
7    A.   9(a) under where it falls, it says, a formal
8  investigation in play, yes.  So that's how I interpret
9  it.
10    Q.   During your employment, did you ever place any
11  employee on an administrative leave in accordance with
12  this policy?
13    A.   No.
14    Q.   But you had the ability to initiate a formal
15  investigation, correct?
16    A.   Correct.
17    Q.   And you had the ability to place an employee
18  on leave, correct?
19    A.   That would have had to go through HR and Sara.
20    Q.   And did you ever ask to do that?
21    A.   No.  And probably Vee because of the contract.
22    Q.   I'll show you what's marked as Exhibit 28.
23        Well, you said the contract.  Are you
24  referring to the collective bargaining agreement?
25    A.   Yes, ma'am.

114

1    Q.   Were all of your direct reports under the
2  collective bargaining agreement?
3    A.   All of the sworn officers were except for
4  Rispoli and Slapp.
5    Q.   Okay.
6    A.   I think they fell under exempt, but I don't
7  remember.
8    Q.   Okay.
9    A.   I don't recall.
10    Q.   You would rely on the collective bargaining
11  agreement to reflect that?
12    A.   Yes.
13    Q.   Okay.  I think this is Exhibit 28 in front of
14  you, correct?
15        (Exhibit 28 was marked for identification.)
16    A.   Correct.
17    Q.   So are you familiar with the emergency alert
18  and notification policy?
19    A.   I don't recall it, but I am familiar with it.
20  I don't recall specifics.
21    Q.   This policy was created after your
22  termination, correct?
23    A.   It appears to have been, yes.
24    Q.   And it wasn't drafted by you, correct?
25    A.   I may have had a role in adding language or

115

1  getting language from other institutions to support the
2  efforts in this, but I don't recall specifically.
3    Q.   Okay.  Is there any documentation that would
4  refresh your recollection on that?
5    A.   I'm sure there would be emails.
6    Q.   And President Martin signed this document,
7  correct?
8    A.   I guess that's his electronic signature, so
9  yes.
10    Q.   So he created a policy after your termination
11  in accordance with the Clery Act, correct?
12    A.   I don't know.
13    Q.   And if you look at the authority on the last
14  page of this document, Bates stamp 2077, do you see it
15  references the Clery Act in there?
16    A.   I do see that.
17    Q.   I'll show you what's marked as Exhibit 29.
18        (Exhibit 29 was marked for identification.)
19    Q.   Do you recognize this document?
20    A.   I don't in perspective, no.
21    Q.   If this is a policy that -- do you have any
22  basis to dispute this policy?
23    A.   No.
24    Q.   And do you have any basis to dispute the
25  policy that's in Exhibit 28?

116

1    A.   No.
2    Q.   And this is a policy under the Clery Act that
3  was created by the university after your termination,
4  correct?
5    A.   I don't know the answer.
6    Q.   It's signed by President Martin, correct?
7    A.   If that's his electronic signature, yes.
8    Q.   And you weren't involved in drafting this
9  policy, correct?
10    A.   I don't recall if I had any involvement or
11  not.
12    Q.   Let me show you what's marked as Exhibit 30.
13        (Exhibit 30 was marked for identification.)
14    Q.   Do you recognize this document?
15    A.   Not in particular.
16    Q.   Do you have any basis to dispute that this was
17  a policy of FGCU for ombud services during your
18  employment?
19    A.   It's signed June 14, 2022, which is past my
20  termination.
21    Q.   Did you understand that there was a policy for
22  ombuds during your employment?
23    A.   There may have been.  I don't know.
24    Q.   Did you understand that the office of ombuds
25  was available to assist any employee or student with any

117

1  complaint?
2      A.  If I recall correctly, the ombuds had been
3  terminated or reassigned to home, so I don't know that
4  there was an ombuds person when I was there.
5      Q.  And who's the ombuds that you say --
6      A.  It was Monique McKay.
7      Q.  Okay.  And what knowledge do you have of her
8  termination?
9      A.  I don't have specific knowledge.  All I knew
10  was that she was there one day and gone the next.
11      Q.  And do you know why that was?
12      A.  I do not.  I had heard there was a
13  whistleblower complaint.  I don't know the specifics.
14      Q.  And do you know whether she was still employed
15  at the time your employment was terminated?
16      A.  I have no idea.
17      Q.  Did you ever make any complaints to the ombuds
18  office during your employment?
19      A.  I don't know that there was an ombuds.  I
20  don't remember when she was there or if there was a gap
21  in services.  So, no, but I don't know that the resource
22  was there.
23      Q.  Okay.  And would you rely on the university
24  records to reflect if there was an ombuds during the
25  time of your employment?

118

1      A.  Yes.
2      Q.  And if there was an ombuds, did you make any
3  complaint?
4      A.  No.
5      Q.  And you don't have knowledge of whether
6  Monique McKay was even terminated, correct?
7      A.  I had actually done a public records request,
8  and I was denied it.
9      Q.  Denied what?
10      A.  The public records, the content of the
11  complaint on the whistleblower.
12      Q.  I didn't ask about the whistleblower
13  complaint.  I asked, do you know whether she was
14  terminated or not?
15      A.  No.
16      Q.  Do you have any personal knowledge of that?
17      A.  No.
18      Q.  And do you have any knowledge of this
19  whistleblower complaint that you're referencing?
20      A.  I don't know the specifics.  I just know that
21  there was one based on what documentation I did obtain.
22      Q.  It wasn't any type of complaint that you
23  brought, correct?
24      A.  No, ma'am.
25      Q.  And do you know what decisions Dr. Martin made

119

1  with respect to Monique McKay?
2      A.  No.
3      Q.  Let me show you what's marked as Exhibit 31.
4          (Exhibit 31 was marked for identification.)
5      Q.  Do you recognize this document?
6      A.  It's not one of the ones you've already
7  provided, right?
8      Q.  Correct.  No, it's not.  This is a regulation.
9      A.  Okay.
10      Q.  Do you see that at the top?
11      A.  I do see that at the top.
12      Q.  So the policy I provided, if you need to
13  reference it, was --
14      A.  I'm fine.  I just wanted to make sure it
15  wasn't the same document or --
16      Q.  It's Exhibit 22, if you want to reference it.
17      A.  No.  I'm good.  Thank you.
18      Q.  And you understood that university has
19  policies and regulations, correct?
20      A.  Yes.
21      Q.  And this is the regulation that applied during
22  your employment related to non-discrimination,
23  anti-harassment, and sexual misconduct?
24      A.  I don't see an effect date on it.  It says:
25  Approved by the trustees in September 2019.  So if

120

1  that's how the regulations were done, then I would say
2  yes.
3      Q.  Do you have any basis to dispute that this
4  document -- do you have any basis to dispute the
5  accuracy of this document or that it applied during your
6  employment?
7      A.  No.
8      Q.  Okay.  Now, going to Exhibit 31, and if we
9  could go to Page 2106, Bates Number 2106.  And
10  under the responsibility of supervisors and managers
11  under reporting, do you see that?
12      A.  Yes.
13      Q.  Okay.  And it provides in here that whenever
14  an employee, student, or non-employee makes an
15  allegation of discrimination, harassment, or sexual
16  misconduct that may violate the regulation, supervisors
17  and managers are required to take prompt and appropriate
18  action to report the alleged violations.
19          Do you see that?
20      A.  I do.
21      Q.  And did you understand that was part of your
22  obligation during your employment at FGCU?
23      A.  Correct.
24      Q.  And it also provides that any supervisory or
25  managerial employee who receives a report, observes, or

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 31 of 118 PageID 391

Smith vs. Florida Gulf Coast University    Kevin Smith                    01/22/2025

121

1  learns of an alleged violation of this regulation has an
2  absolute and unqualified duty to immediately report the
3  alleged violation to the director of the office of
4  institutional equity and compliance, the Title IX
5  coordinator, as soon as possible.
6         Do you see that?
7     A.  I do.
8     Q.  And was that a requirement during your
9  employment?
10    A.  Yes.
11    Q.  And during your employment, did you ever make
12 any report to the director of the office of
13 institutional equity and compliance with respect to any
14 discrimination, harassment, or retaliation?
15    A.  When there were issues where employees had
16 experienced things, those were always in concert with
17 Sara Stensrud.  So are you talking about me being on the
18 end of it or an employee that I supervised?
19    Q.  I'm asking during your employment, did --
20 regardless of who was the subject of it, did you make
21 any report to the director of the office of
22 institutional equity and compliance and the Title IX
23 coordinator regarding discrimination, harassment, or
24 retaliation?
25    A.  No, at the direction of my supervisor.

122

1     Q.  Did Sara Stensrud direct you not to report it?
2     A.  She said she would mull things over.  They
3  were within the first week of my employment.
4     Q.  Was there any other time that you had a
5  conversation with her where she directed you not to
6  report it?
7     A.  No, not that I recall.
8     Q.  And with respect to this conversation that you
9  had with Sara Stensrud, what was it about?
10    A.  I initiated one-on-ones with all of the
11 university PD staff, and I asked them a series of three
12 questions.  And when meeting with the communications
13 manager, Dianna Sandora, she indicated that the
14 treatment that the dispatchers received from the
15 officers was disparate and sexist.  She referred to it
16 as an "all boys club."  I advised her of her ability to
17 go to Title IX and other resources in HR.  And she said,
18 I feel like it will change with you being here.
19    Q.  And did she ever make any other complaint
20 after that?
21    A.  No.
22    Q.  Did she say that things did change?
23    A.  We never had a follow-up question on that, a
24 conversation.  It was left with, if the problems
25 continue, come to me directly.  And during that

123

1  conversation, I specifically asked her had she talked to
2  Captain Slapp, and she replied, He's one of them.
3     Q.  And did she ever come to you directly again?
4     A.  No.
5     Q.  And did you ever see Captain Slapp treat her
6  differently?
7     A.  I didn't have a basis of comparison, but I was
8  very clear in my directives that the communication
9  center was equal partners, that they were equal in value
10 as the sworn officers.  And so I began including Dianna
11 in sergeant meetings and in supervisor meetings so that
12 she could be informed.
13    Q.  Okay.  And did you ever see Captain Slapp
14 treat her in any discriminatory manner?
15    A.  Not directly.
16    Q.  Well, did you see it indirectly?
17    A.  You don't see something indirectly, but there
18 was never any more conversation on it.
19    Q.  Well, you qualified it by saying not directly,
20 so I wanted to know why you were qualifying it.
21    A.  Okay.
22    Q.  Okay.  So this conversation you had with
23 Dianna -- what was her name again?
24    A.  Sandora.  And her first name is spelled -- I
25 can't remember if it's like D-I-A-N-N-A.  I'm sorry.

124

1  And I think the last name is S-A-N-D-O-R-A.  The first
2  name is spelled very funny.
3     Q.  Okay.  So this conversation you had with
4  Dianna Sandora was within the first week of your
5  employment?
6     A.  First few weeks, because I was meeting
7  everyone that I could.
8     Q.  And you never brought that complaint to the
9  OIEC, correct?
10    A.  No.  To Sara.
11    Q.  It's correct you never brought it to OIEC?
12    A.  Correct.
13    Q.  And Ms. Sandora never came back to you after
14 those first few weeks and said things were continuing?
15    A.  Correct.
16    Q.  And you never observed anyone treat
17 Ms. Sandora or anyone in the communications department
18 differently, correct?
19    A.  I had to address overtime issues specifically
20 with Captain Slapp and Captain Rispoli.  Most of the
21 dispatchers were women.  When overtime would arise,
22 rather than offer it to the dispatchers at a dispatcher
23 salary, they would offer it to the sworn officers, most
24 of whom were male.  So from a budget standpoint, we were
25 incurring higher overtime costs, and Captain Slapp and

31 (Pages 121 to 124)

Smith vs. Florida Gulf Coast University    Kelli Smith    07/22/2025

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 32 of 118 PageID 392

125

1  Captain Rispoli seemed to funnel it to specific
2  officers. So I issued a mandate that dispatchers would
3  have first right of refusal.
4      Q.  Do you know if they offered that because that
5  was required under the collective bargaining agreement?
6      A.  No.  It was not part of it.
7      Q.  But were they offering it to the officers to
8  give them more overtime?
9      A.  I don't know the why; I just know what was
10 happening.
11     Q.  And you never reported that to the office of
12 institutional equity, correct?
13     A.  I reported it to Sara, but not OIEC.
14     Q.  And you resolved it through your mandate,
15 correct?
16     A.  Ultimately, yes.
17     Q.  And did Ms. Sandora or anyone else complain
18 that the assignment of overtime -- about the assignment
19 of overtime?
20     A.  Sandora was the complainant as the supervisor
21 of the division.
22     Q.  Was this something she raised to you within
23 those first couple of weeks?
24     A.  Yes.
25     Q.  Okay.  And so this issue with the mandate was

126

1  something you issued within the first couple of weeks of
2  your employment?
3      A.  It was probably a little bit later than that.
4  Because if I recall correctly, I wanted to kind of
5  observe how things were going to see what kind of
6  substance there was to it.
7      Q.  Okay.
8      A.  But I don't have specific dates on that.
9      Q.  And your mandate with respect to that issue
10 was followed, correct?
11     A.  As far as I know.
12     Q.  Do you know if the officers had asked to be
13 assigned that overtime?
14     A.  I don't know.  I knew that part of the
15 complaint was it was always specific officers that got
16 the overtime.
17     Q.  Did you investigate that?
18     A.  No.
19     Q.  And the issue that Ms. Sandora reported to
20 you, you reported to Sara Stensrud.  Do you know if she
21 did anything with that information?
22     A.  I don't know.
23     Q.  And you said that you reported to Sara this
24 issue with the overtime.  Do you know if she did
25 anything with that information?

127

1      A.  I don't know.
2      Q.  Were there any male dispatchers?
3      A.  There was one at the time of my hire, and he
4  was new, so he wasn't allowed to be on his own.  He had
5  not completed training.  There was just one.
6      Q.  And how long was his training?
7      A.  I don't remember.
8      Q.  And do you know how long the assignment of
9  overtime had been that way?
10     A.  I don't understand.
11     Q.  Sure.  The assignment of overtime to the
12 officers as opposed to the dispatchers?
13     A.  I don't know how long it had been occurring.
14     Q.  Okay.  And do you know why it was occurring?
15     A.  I have no idea.
16     Q.  Do you know what past practice is --
17     A.  Yes.
18     Q.  -- under a labor agreement?
19     A.  Um-hum.
20     Q.  Do you know if that was considered a past
21 practice by the union?
22     A.  I don't know the answer.  It was never raised
23 during negotiations.
24     Q.  Okay.  So other than those two incidents, I
25 think that what my question was, and I'm not sure I have

128

1  an answer to it yet, so I'm going to ask it again, is
2  did you make any report, regardless of who was the
3  subject of it, of discrimination, harassment, or
4  retaliation to the office of institutional equity and
5  compliance.
6      A.  No.
7      Q.  And other than Ms. Sandora's report to you in
8  the first few weeks, was there any other employee who
9  reported discrimination to you?
10     A.  April Palmer, I don't remember what her role
11 was, indicated that -- and I can't remember department
12 names.  You're going to have to forgive me.  It's been
13 years now.  But somebody in student conduct, Deontre
14 Whitaker, I think was his name, had some type of
15 knowledge that the officers would do disparate treatment
16 on students based on gender, attractiveness, and race.
17     Q.  Okay.  And what did you do with that
18 information?
19     A.  I reached out to Mr. Whitaker, and I told him
20 that that was a serious allegation and to please provide
21 me any information he had.  He refused to provide me
22 information.  There may even be emails on it.  Because
23 he said he knew that FGCU PD was sexist, and FGCU was
24 sexist and racist.  And I redirected him to his
25 supervisor, Dr. Palmer, and I did tell him about

---

**129**

1  Title IX.  And I shared the information with Sara.
2  **Q.  Did you share it with the OIEC?**
3  A.  No, I did not.
4  **Q.  Did you do any review of reports to determine**
5  **whether there was any validity to what he was saying?**
6  A.  Sadly, our report writing system did not
7  capture the data that we would have needed, so I was
8  unable to do that.
9  **Q.  Did you conduct any investigation of the**
10 **officers?**
11 A.  The complaint was so ambiguous, there was no
12 way to do that.  And I reached out to Mr. Whitaker
13 several times, but he was afraid to provide me
14 information.  And Dr. Palmer, I think, resigned shortly
15 thereafter.
16 **Q.  How do you know he was afraid?**
17 A.  He told me.
18 **Q.  Is that the only basis of your knowledge that**
19 **he was afraid?**
20 A.  That was enough.
21 **Q.  And that wasn't something you thought you**
22 **should bring to the OIEC director?**
23 A.  I brought that to my boss Sara Stensrud, and
24 she was going to bring it to David.  I don't know what
25 happened with it after that.

---

**130**

1  **Q.  But you didn't think that that was important**
2  **to bring to the OIEC director in accordance with this**
3  **policy?**
4  A.  In hindsight looking at the policy, likely
5  Precious should have been involved, but I followed my
6  chain of command.
7  **Q.  And do you know what Sara did with that**
8  **information?**
9  A.  I do not.
10 **Q.  And did you share in that opinion that the**
11 **department was racist and sexist?**
12 A.  I had concerns, but I had nothing concrete at
13 the time.
14 **Q.  And what period of time was this?**
15 A.  I honestly would be guessing if I told you.  I
16 know there's emails.
17 **Q.  Emails with him?**
18 A.  Deontre -- I think his name is Deontre
19 Whitaker, W-H-I-T-T-A-K-E-R (sic).  I think the spelling
20 of the first name is D-E-O-N-T-R-E with the apostrophe.
21 **Q.  This would have been before April Palmer left**
22 **the university?**
23 A.  Correct.
24 **Q.  Do you know why she left the university?**
25 A.  I do not.

---

**131**

1  **Q.  With respect to Dianna Sandora, was she still**
2  **employed at the time of your termination?**
3  A.  Yes.
4  **Q.  Is she still employed today?**
5  A.  I don't know.
6  **Q.  And have you had any conversations with her**
7  **since your separation from the university?**
8  A.  No.
9  **Q.  And with respect to -- is it Deonte or**
10 **Deontre?**
11 A.  It's either Deonte or Deontre.  I'm not
12 entirely sure.
13 **Q.  Okay.  Deontre Whitaker, do you know if he's**
14 **still employed by the university?**
15 A.  I do not.
16 **Q.  And did you have any conversations with him**
17 **after your separation?**
18 A.  No.
19 **Q.  Did you have any conversations with him after**
20 **this one conversation that you had, where he wouldn't**
21 **identify information?**
22 A.  I don't recall.
23 **Q.  But you believe that there are emails between**
24 **you and Deonte or Deontre Whitaker?**
25 A.  Correct.  Because I reached out to him in

---

**132**

1  email and told you that these allegations were
2  important, and I needed supporting documentation to do a
3  further review.
4  **Q.  Let me show you what's marked as Exhibit 32.**
5  **(Exhibit 32 was marked for identification.)**
6  **Q.  Do you recognize this document?**
7  A.  It's the FGCU sexual harassment regulation.
8  **Q.  And this is the regulation that applied during**
9  **your employment at FGCU, correct?**
10 A.  Based upon the dates.
11 **Q.  And it provides that -- if we could go to**
12 **Page 2115.  It provides that all university employees**
13 **must report information they have about occasions of**
14 **alleged sexual harassment to the Title IX coordinator,**
15 **correct?**
16 A.  What sections are you in?
17 **Q.  Sure.  Under reporting responsibility of**
18 **employees, D(2).**
19 A.  Okay.  Yep, I see that.
20 **Q.  And it provides in Section A, all employees**
21 **must report the information.  And then in Section B, it**
22 **provides that any university employee who receives a**
23 **report, observes, or learns of an alleged violation of**
24 **this regulation has an absolute and unqualified duty to**
25 **immediately report it to the Title IX coordinator.**

---

Case 2:23-cv-00840-JES-KCD     Document 37     Filed 03/28/25     Page 34 of 118 PageID 394

Smith vs. Florida Gulf Coast University     Keith Smith     01/22/2025

133

1    A.  I see that.
2    Q.  And that if you fail to report it, you may be
3  subject to disciplinary action, correct?
4    A.  I see that.
5    Q.  And you didn't report anything to the Title IX
6  coordinator during your employment, correct?
7    A.  I did not.
8    Q.  If we can go to Exhibit 33.
9      (Exhibit 33 was marked for identification.)
10   Q.  Do you recognize this document?
11   A.  It is the separations regulation.
12   Q.  And is this the regulation you were referring
13 to earlier about the severance period that's provided
14 upon separation without cause?
15   A.  I believe so.
16   Q.  Is this a true and correct copy of the
17 regulation that was in effect during your employment at
18 FGCU?
19   A.  I believe so.
20   Q.  And it provides in Section 5, on separation
21 with written notice?
22   A.  Correct.
23   Q.  That employees in their initial year of
24 employment shall be given a lump sum severance payment
25 equal to 30 days of their current salary upon separation

134

1  without cause.  Do you see that?
2    A.  That's what it says.
3    Q.  And that's what you were provided upon your
4  separation, correct?
5    A.  Not initially.
6    Q.  Not initially what?
7    A.  Initially, they gave me what was equivalent of
8  20 days, because they said that was one month's salary.
9  And so I had to redirect Ms. Garcia, Ms. Stensrud, and
10 the other HR team to say that the policy said 30 days,
11 not one month.  So they had to issue me the additional
12 10 days, because they did not understand the policy.
13   Q.  Okay.  You don't think that was any form of
14 retaliation against you, do you?
15   A.  I have no idea.
16   Q.  Okay.  Do you know if that's how they applied
17 the policy as it relates to other employees?
18   A.  I have no idea.
19   Q.  Okay.  And if you were -- you could be
20 terminated with cause, correct?
21   A.  Could I have been or --
22   Q.  Um-hum.
23   A.  Not that I'm aware of.  I don't know of a
24 reason.
25   Q.  Well, the university would have the ability to

135

1  terminate you with cause, correct?
2    A.  If one existed.
3    Q.  Okay.  And if they terminated you with cause,
4  you wouldn't have received any severance, correct?
5    A.  If that's what the policy says.  I mean, it --
6    Q.  Well, it only provides for severance on a
7  termination without cause, correct?
8    A.  That's what this looks like, yes.
9    Q.  Sure.  And if you go to Paragraph 6, it says,
10 Dismissal for Cause.
11   A.  Okay.  Correct.
12   Q.  So if you were dismissed with cause, you're
13 prohibited from receiving severance pay, correct?
14   A.  Correct.
15   Q.  And a dismissal without cause also allowed you
16 to be eligible for rehire, correct?
17   A.  Correct.
18   Q.  But a dismissal for cause, you would not be
19 eligible for rehire, correct?
20   A.  Correct.
21   Q.  Let me show you what's marked as Exhibit 34 to
22 your deposition.
23     (Exhibit 34 was marked for identification.)
24   Q.  Do you recognize this document?
25   A.  I see the document.  And when I got hired,

136

1  Rispoli was already a captain, and there weren't
2  lieutenants, if I recall correctly.  So I do recognize
3  the document.
4    Q.  Did you revise this general order then?
5    A.  I don't recall.
6    Q.  Do you have any basis to dispute the
7  authority -- any basis to dispute that this is a true
8  and correct copy of the general orders that applied
9  during your employment?
10   A.  I don't know if this policy was in effect then
11 or not.
12   Q.  On the second page of the document, it relates
13 to all personnel?
14   A.  All personnel, yes.
15   Q.  And it says:  All personnel shall be held
16 fully accountable for the application or failure to
17 apply the authority delegated to them.
18     Do you see that?
19   A.  Yes.
20   Q.  And you were responsible for enforcing the
21 general orders, correct?
22   A.  Correct.
23   Q.  And you were responsible for reviewing the
24 general orders, correct?
25   A.  Correct.

34  (Pages 133 to 136)

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 35 of 118 PageID 395

Smith vs. Florida Gulf Coast University    Kelly Smith                           07/22/2025

137

1    Q.  And you were responsible for creating any
2  general orders that were created during your employment,
3  correct?
4    A.  Solely not creation.  That was more of a
5  collaborative effort.
6    Q.  Well, you ultimately were responsible for it,
7  right?
8    A.  I approved them, yes.
9        Will we be able to go to the bathroom soon?
10       MS. DYSON:  Oh, sure.  We can take a break.
11       (Discussion held off the record.)
12       (Recess taken from 12:57 p.m. to 2:00 p.m.)
13  BY MS. DYSON:
14    Q.  Ms. Smith, I've handed what's marked as
15  Exhibit 35 to your deposition.
16       (Exhibit 35 was marked for identification.)
17    Q.  Do you recognize this document?
18    A.  I do.
19    Q.  Is this a true and correct copy of General
20  Orders 005 that was applicable during your employment?
21    A.  As far as I know.
22    Q.  Do you have any basis to dispute that this
23  document is a true and correct copy of the general order
24  that applied?
25    A.  No, I don't.

138

1    Q.  It provides in this general order that the
2  director of police shall be appointed by the university
3  president.  Do you see that under Direction?
4    A.  I do.
5    Q.  And then on the next page, it provides that
6  lawful orders, compliance, and execution with lawful
7  orders is a paramount concern for the police mission,
8  correct?
9    A.  Under which section, ma'am?
10    Q.  Multiple or Conflicting Orders.
11    A.  I see that.
12    Q.  I'll show you what's marked as Exhibit 36 to
13  your deposition.
14       (Exhibit 36 was marked for identification.)
15    Q.  Do you recognize this document?
16    A.  It appears to be the written orders directive
17  from FGCU PD.
18    Q.  Is this a true and correct copy of General
19  Order 006 that applied during your employment?
20    A.  I believe so.
21    Q.  Do you have any basis to dispute it?
22    A.  I do not.
23    Q.  And this provides that written directives are
24  required -- by the chief of police are required to be
25  followed by the rank and file, correct?

139

1    A.  Where does it -- the first sentence?
2    Q.  The second sentence.
3    A.  Yes.
4    Q.  I'll show you what's marked as Exhibit 37.
5       (Exhibit 37 was marked for identification.)
6    Q.  Do you recognize that document?
7    A.  It's the sexual battery policy.
8    Q.  Is this a true and correct copy of the General
9  Order Number 010 that applied during your employment?
10    A.  As far as I know.
11    Q.  Do you have any basis to dispute that it's a
12  true and accurate copy?
13    A.  No, I don't.
14    Q.  And if you go to the page Bates-stamped Number
15  903, which is Page 10 of the document.
16    A.  Okay.
17    Q.  It provides that allegations of sexual battery
18  will be communicated to the dean of students and
19  Title IX office in order to provide information to base
20  decisions, correct?
21    A.  Correct.
22    Q.  I'll show you what's marked as Exhibit 38 to
23  your deposition.
24       (Exhibit 38 was marked for identification.)
25    Q.  Do you recognize this document?

140

1    A.  It's the general conduct and responsibilities.
2    Q.  Is this the General Order 014 that applied
3  during your employment?
4    A.  I believe that it is.
5    Q.  Do you have any basis to dispute it's a true
6  and accurate copy?
7    A.  No.
8    Q.  And this provides that under the first page,
9  duty responsibilities, that it requires the employees of
10  the police department to follow the lawful orders of the
11  chief, correct?
12    A.  Of the superiors.
13    Q.  And you would have been a superior, correct?
14    A.  Correct.  Overall, but also reflects patrol
15  sergeants or anyone that's in their chain of command.
16    Q.  And all of them would have been in your chain
17  of command, correct?
18    A.  Correct.
19    Q.  And so all of them were required to follow
20  your directives, correct?
21    A.  Correct.  As long as they were lawful and
22  ethical.
23    Q.  And you had the ability to discipline anyone
24  who failed to do so, correct?
25    A.  Not unilateral discipline.  It would have been

141

1  a process, but the ability to do so existed.
2      Q.  And that was your ability to do so, correct?
3      A.  Correct.
4      Q.  Okay.  And if you go to Page 2, Bates stamp
5  Number 928, it requires all members to cooperate in
6  inter- and intradepartmental activities, correct?
7      A.  Correct.
8      Q.  Let me show you what's marked as Exhibit
9  Number 39.
10        (Exhibit 39 was marked for identification.)
11     Q.  Do you recognize this document?
12     A.  Obedience to orders FGCU policy.
13     Q.  Is this a true and correct copy of the General
14  Order 017 that applied during your employment?
15     A.  I believe so.
16     Q.  And do you have any basis to dispute that it's
17  a true and correct copy of it?
18     A.  No.
19     Q.  And this requires obedience to all lawful
20  orders and instructions by a superior, correct?
21     A.  Correct.  I'm glad we went to the bathroom.
22     Q.  Okay.  I'll show you Exhibit 40.
23        (Exhibit 40 was marked for identification.)
24     A.  Thank you.
25     Q.  Do you recognize Exhibit 40?

142

1      A.  I do.
2      Q.  And what is it?
3      A.  It is the police community relations.
4      Q.  Is this a true and correct copy of the General
5  Order 018 that applied during your employment at FGCU?
6      A.  I believe it to be.  We had been having
7  discussion about revising this.  But I don't remember
8  where it was left off or how it came to fruition.
9      Q.  Do you have any basis to dispute that this is
10  a true and correct copy of the general order that
11  applied?
12     A.  No.
13     Q.  And this order requires that supervisors shall
14  cultivate avenues of communication with citizens or
15  groups?
16     A.  Um-hum.
17     Q.  And that there is a spirit of police community
18  cooperation that can be maintained through open channels
19  of communication, correct?
20     A.  Correct.
21     Q.  I'll show you what's marked as Exhibit 41 to
22  your deposition.
23        (Exhibit 41 was marked for identification.)
24     Q.  Do you recognize this document?
25     A.  I do.

143

1      Q.  And what is it?
2      A.  It is the disciplinary procedures.
3      Q.  And is this the true and correct copy of the
4  General Order 030 that applied during your employment?
5      A.  As I see it, yes, but this was also another
6  policy that was subject to be revised.
7      Q.  Do you have any basis to dispute that this is
8  a true and correct copy of what was in effect during
9  your employment?
10     A.  At the time of my separation, it probably was.
11  We were revising several policies, and this was one.
12     Q.  Okay.  And this is the policy that applied to
13  the rank and file members of the department.
14     A.  Correct.
15     Q.  And it provided a disciplinary process that
16  started with verbal counseling?
17     A.  Correct.
18     Q.  And it requires all verbal counselings to be
19  documented by the disciplining supervisor, correct?
20     A.  So the understanding that I had with that and
21  that was past practice, was that a verbal was in
22  supervisors' notes and documented in that and then
23  removed after six months.  So that is the answer.
24     Q.  Who would remove the documents?
25     A.  The supervisor would remove it from the files

144

1  if there was no replication in policy violation.
2      Q.  And does that -- is that provided for in this
3  policy?
4      A.  I don't see that it is.
5      Q.  And, in fact, the policy says that each
6  instance of disciplinary action shall be documented by
7  the disciplining supervisor, correct?
8      A.  Well, the interpretation of documentation was
9  it was in that supervisor's file based on their office
10  or that they maintain in their own individual
11  supervisory folders.  So it was documented, but it would
12  stay in the supervisor's folder.  It did not go to the
13  personnel file unless it became a permanent violation.
14     Q.  And you're saying that the document was then
15  destroyed?
16     A.  The verbal after, yes.  After a six-month
17  period, because it was not part of a permanent
18  discipline.
19     Q.  And you approved of that?
20     A.  I don't have proof of that.
21     Q.  No.  You approved that?
22     A.  That was preexisting prior to my arrival, and
23  it was continued.
24     Q.  During the time that you were chief of police?
25     A.  Yes, ma'am.

36  (Pages 141 to 144)

145

1    Q.  Did you ever have any conversations with the
2    general counsel's office about the destruction of public
3    records?
4        A.  No, I didn't.  Actually, I didn't have a
5    direct line to general counsel.  Typically, everything
6    was vetted through Sara.  But this was never a
7    conversation.  And there may even be -- I don't know.
8    But there could even be conflicting language in the
9    bargaining agreement.
10       Q.  What do you mean "conflicting language"?
11       A.  In regards to what verbal warnings are and how
12   discipline is.  So I can't speak to what I would have
13   referred to then.
14       Q.  But it was a practice that you allowed to
15   continue, correct?
16       A.  Correct.
17       Q.  Now, with respect to the policies and
18   regulations of the university, you knew that you were
19   required to follow all of them as a condition of your
20   continued employment, correct?
21       A.  Correct.
22       Q.  And you attended orientation at the beginning
23   of your employment?
24       A.  I don't recall, to be honest, because some
25   things at the level of which I was hired, I was exempt

146

1    from.  So it's possible, but I don't recall
2    specifically.
3        Q.  And with respect -- well, would you rely on
4    the university's records with respect to that?
5        A.  Sure.  Yes.
6        Q.  With respect to the general orders, you were
7    responsible for enforcing them as the top ranking
8    officer in the department, correct?
9        A.  Correct.
10       Q.  And we went through the non-discrimination
11   policy.  And you understood that the OIEC department
12   investigates complaints of discrimination, correct?
13       A.  Correct.
14       Q.  And you also had biweekly meetings with the
15   chief equity officer and Title IX coordinator, correct?
16       A.  That is not correct.  They did not start until
17   probably late 2021, maybe early 2022.
18       Q.  But beginning at that time, you did have
19   biweekly meetings with the chief equity officer and
20   Title IX coordinator, correct?
21       A.  I would not say regular with regularity.  They
22   would be scheduled, but oftentimes there would be
23   schedule interruptions or a break in between our
24   calendars that created a conflict, and they were not
25   dually held every time.

147

1    Q.  So how often did you meet with her during that
2    period of time until your termination?
3        A.  I couldn't begin to tell you, but it was not
4    with any degree of regularity even if it was calendared.
5        Q.  You had at least one of those meetings,
6    correct?
7        A.  I would say so, yes.
8        Q.  Did you have 10 of them?
9        A.  I don't know the number, to be honest with
10   you.  I mean, we had Christmas break.  That lasts two
11   weeks.  We had Thanksgiving, which lasts a week.  So I
12   couldn't begin to guess.
13       Q.  In these one-on-one meetings that you had with
14   the Title IX coordinator, you didn't raise any issues of
15   discrimination or retaliation or harassment, correct?
16       A.  They were typically focused on Clery and those
17   type of concerns, but the answer is no.
18       Q.  The answer is no what?  You didn't raise any
19   of those issues, correct?
20       A.  Correct.
21       Q.  Did you make any complaint of discrimination
22   throughout your employment to anyone?
23       A.  Things that arose, I shared with Sara
24   Stensrud, trusting that she was the VP or AVP of human
25   resources and my immediate supervisor and traveled at

148

1    the executive level and directly with Title IX and Vee
2    Leonard.
3        Q.  And are you aware of Sara raising any of those
4    issues to anyone else?
5        A.  I have no idea.
6        Q.  And what issues did you raise to Sara?
7        A.  The first issue I raised was on my very first
8    day of employment -- and it wasn't really raising an
9    issue, it was creating an awareness is that during my
10   orientation with the officers, Sergeant Brian Jones'
11   interaction with me was what I would call borderline
12   insubordinate and disrespectful, so much so that Captain
13   Slapp and Captain Rispoli stepped him outside to have a
14   conversation with him.
15       Q.  Why?  What did he do?
16       A.  He was very abrasive in any conversation.  It
17   was more tone and demeanor and bearing than anything
18   that was overt.
19       Q.  And after that conversation, did it continue
20   to occur?
21       A.  He always remained -- he remained within
22   respect of rank, but there was definitely something
23   where he had issue with.
24       Q.  And did you discipline him for that?
25       A.  No.

149

1  Q.  Did you send him to training?
2  A.  I directed Captain Rispoli and Captain Slapp
3  to work with him to address it.
4  Q.  And did they?
5  A.  He was a constant work in progress.
6  Q.  And do you know why -- what his issue was?
7  A.  I never got to the bottom of it, but it was
8  always directed towards me specifically.  He was also
9  one of the people, you know, that at times seemed to
10  have the overtime call in communications.
11  Q.  Do you know if he treated you any differently
12  than he treated Chief Moore?
13  A.  I can't speak to that.
14  Q.  Was his behavior improving through this
15  direction that you gave to Captain Rispoli and Captain
16  Slapp?
17  A.  We did not have enough day-to-day interaction
18  for him and I, because there were layers of chain of
19  command for me to engage with him to monitor that.  We
20  could go weeks without seeing each other.
21  Q.  And so you raised this issue with Sara when?
22  A.  When I had, like, my first one-on-one with
23  her.  The question was, How's everything going?  And,
24  you know, I shared with her what occurred with him.
25  Q.  And how many conversations did you have with

150

1  Sara about Sergeant Jones?
2  A.  Over the course of the year, there were
3  probably a few because he was on the bargaining
4  committee.  So I couldn't guess, but there were at least
5  a few.
6  Q.  So he represented the union and the bargaining
7  team?
8  A.  He played a role.  I don't know what his role
9  was.
10  Q.  Do you know if his reaction to you or his tone
11  or his demeanor had anything to do with negotiations?
12  A.  I had only met him that first time, and there
13  had been no negotiations.  He, probably the second week,
14  maybe the third week, took me to the range to qualify.
15  I tried to build rapport with him on the drive there,
16  but he was, I would say, abrasive.  And it was apparent
17  that for whatever reason, that was not going to happen
18  with him.  But I continued to try.
19  Q.  But do you know if his abrasiveness related to
20  the tension that can sometimes exist between labor and
21  management?
22  A.  I was brand new there, so there was no tension
23  with me.  I had just walked in the door that day with
24  the first exchange.  So I can only speak about my --
25  there were no precursors.

151

1  Q.  But my point is that you understand that
2  occasionally there are disagreements between the rank
3  and file and the management of an organization in the
4  context of a labor dispute, correct?
5  A.  That would have existed before I got there, I
6  don't know.  I don't know.
7  Q.  Okay.  So other than having those few
8  conversations with Sara Stensrud about Sergeant Jones,
9  when was -- well, I guess, tell me when were those
10  conversations you had with Sara Stensrud about Sergeant
11  Jones?
12  A.  The first conversation was within the first
13  couple of weeks, because it was probably whenever that
14  first one-on-one was.
15  Q.  Okay.
16  A.  And her response was, It's not going to be
17  easy for you.  The boys aren't happy.
18  The second conversation was probably shortly
19  after I went to the range.
20  Q.  Who were "the boys"?
21  A.  I'm assuming the officers.  I think
22  there was only one other female in the department
23  besides me at the time of my hire.
24  Q.  Well, one of those boys was on the search
25  committee that selected you, correct?

152

1  A.  I would guess so, yes.  I don't know who the
2  boys were.  I didn't ask her specifically.
3  Q.  Okay.  What's the next conversation you had
4  with Sara Stensrud about --
5  A.  Going to the range.  We spoke about it.
6  Q.  When was that?
7  A.  I don't remember when I qualified.  It would
8  have been the first few weeks of my employment.
9  Q.  Okay.
10  A.  And then during the negotiations, which I
11  don't remember when they were, we -- the conversations
12  when Brian was involved would typically be about where
13  the negotiations landed and whatever the case was in
14  terms of monetary offers and benefit changes and policy
15  changes.  Those would be the conversations where
16  Sergeant Jones was the subject of conversation.
17  Q.  Okay.  And did you ever tell Sara that you
18  believe Sergeant Jones was discriminating against you
19  because of your gender?
20  A.  I did not use that word, and I did not make a
21  connection of that based upon the hierarchical position
22  that I held.
23  Q.  Okay.  So my question to you was when did you
24  make complaints to -- of discrimination?  You said
25  you -- there were comments you made to Sara Stensrud.

38  (Pages 149 to 152)

153

1  So I'm trying to understand when those were and what you
2  said.
3      A.  I've given you that, to the best that I can.
4      Q.  Okay.  When did you make a complaint to Sara
5  Stensrud of discrimination?
6      A.  I don't think that it was discrimination if
7  you're looking at the Merriam-Webster definition, but
8  certainly the context that there seemed to be some
9  issues from Sergeant Jones directed at me.
10     Q.  Okay.  Any other complaints that you made to
11 Sara Stensrud about discrimination?
12     A.  As it relates to Sergeant Jones or in general?
13     Q.  Any other complaints.
14     A.  Sure.  When there was an internal affairs
15 investigation that had been opened, almost immediately
16 after, when I would come in in the mornings, I would be
17 the first person typically in our building.  And when I
18 went to the restroom, there would be urine on the seats,
19 on the floors, and in the bowl and feces.  And
20 initially, I dismissed it, that building services wasn't
21 there.  And then as I began to follow the timeline, it
22 aligned with the two officers who were under
23 investigation for what was perceived as a discriminatory
24 comment.  And it was only the women's restroom that this
25 was happening in.  And I informed Sara of that.

154

1      Q.  Did you conduct an investigation?
2      A.  I did not conduct a formal investigation, no.
3      Q.  Why not?
4      A.  I spoke with the supervisors; I spoke at the
5  sergeants meeting, and that was the route I chose to
6  take.
7      Q.  Okay.  But as chief, you could have done an
8  investigation, correct?
9      A.  I could have ordered one, yeah.
10     Q.  And so what happened after you spoke to the
11 sergeants and the captains about this issue?
12     A.  When I spoke to the captains directly, I
13 pointed out that it corresponded with Officer Palmer and
14 Officer Winning's days on, days off, and the timing that
15 they would go off shift.  I also had them check the
16 men's rooms, and they weren't finding anything.
17 Simultaneously, I actually bought cleaning supplies and
18 a bucket and put a sign up in the women's restroom
19 saying:  Cleanliness is all of our responsibility.
20     Simultaneously, we had a supervisors meeting,
21 and that night, whatever night it was, I don't remember
22 the date, that conversation came forward, and it was
23 going to be, It needs to stop.  Sergeants, you're going
24 to inspect the restrooms, the women's restrooms before
25 you go off shift to make sure.  So you'll inspect them

155

1  when you come on.  You'll inspect them when you go off.
2  And this will narrow down, and if it stops, then it
3  stops.  And it stopped immediately after that.
4      Q.  And how long did it go on for?
5      A.  Maybe a couple of weeks.  The first time or
6  two, I thought, okay, this is weird, and maybe somebody
7  was sick.  We were in the COVID era, so I kind of
8  dismissed it.  But then when it became a pattern...
9      Q.  Do you know who was doing it?
10     A.  Never factually.  I have my beliefs.
11     Q.  Do you know why they were doing it?
12     A.  I believe I know why.  I don't know
13 specifically.
14     Q.  Okay.  But you didn't conduct an investigation
15 to determine factually who was doing it or why they were
16 doing it, correct?
17     A.  Correct.
18     Q.  And after you took the action, it stopped?
19     A.  Correct.
20     Q.  And so what were you telling Sara Stensrud.
21     A.  In regards to?
22     Q.  This incident.
23     A.  I told her exactly what was happening.
24     Q.  And do you know if she did anything with that
25 information?

156

1      A.  I do not.
2      Q.  Did you express to Sara Stensrud that they
3  were doing it because of your gender?
4      A.  I didn't give her a why.  I just told her who
5  I thought it was, and that it was horribly gross,
6  unsanitary, potentially a health concern.  And that once
7  I issued the directives, it stopped.  I kept her abreast
8  of the status.
9      Q.  And you didn't discipline anyone for it,
10 correct?
11     A.  No.
12     Q.  Isn't that correct?
13     A.  Yes.  That's correct.
14     Q.  Okay.  Any other complaints of discrimination
15 you -- well, when was it that you had this conversation
16 with Sara Stensrud?
17     A.  Which one?
18     Q.  This conversation that we're just talking
19 about.
20     A.  It was once there had been what felt like a
21 pattern, I notified her whenever our weekly meetings
22 were, our one-on-ones.  Sometimes they were biweekly
23 depending on her schedule or a conflict.  And then I
24 kept her abreast of it.
25     Q.  What time of year was that?

157

1     A.  It was fall probably of 2021.
2     Q.  Okay.  Did you make any other complaints of
3  discrimination to Ms. Stensrud?
4     A.  Actions of discrimination towards me or --
5     Q.  In any way which you were complaining about
6  employment discrimination?
7     A.  Nothing as it relates to me that I saw.  I
8  kept her abreast of all of the complaints that I fielded
9  in terms of the officers.  She was always in the loop on
10  that, and in many instances because of her position with
11  HR, she was the guidance and the direction.
12     Q.  When you say "all of the complaints," what are
13  you talking about?
14     A.  Like the complaint where the individual from
15  student conduct, or whatever the division is, alleged --
16     Q.  Okay.
17     A.  Right, I brought that forward to Sara.  So
18  those kind of things I would always bring forward to
19  Sara, because she was the chief HR officer.  She was
20  actively involved in negotiations.  She worked directly
21  with Precious and Vee and Dr. Martin and David Vazquez.
22  So I would always keep her informed and defer to her.
23     Q.  Okay.  So when you said you told her about all
24  of the complaints involving the officers, you're talking
25  about what you told me about with either Deonte or

158

1  Deontre?
2     A.  Correct.
3     Q.  And also the issue with Dianna Sandora?
4     A.  Correct.
5     Q.  Is there anything else that you told her?
6     A.  There may be others, but nothing that I recall
7  at this moment.
8     Q.  Is there anything that would refresh your
9  recollection as to what the "may be others" is?
10     A.  If there was documentation, a story, a
11  timeline, sure.
12     Q.  Do you have that documentation, story, or
13  timeline?
14     A.  Everything I have would have been provided
15  with the RFPs.
16     Q.  Okay.  So if there is something that you then
17  remember after reviewing documents or otherwise after
18  you leave this room today, will you commit to telling
19  your attorney?
20     A.  Absolutely.
21     Q.  Okay.  Because there is an obligation to
22  supplement your answers today if they're not complete.
23     A.  Understood.
24     Q.  Okay.  So have you told me about all of the
25  instances in which you complained to Ms. Stensrud about

159

1  any form of discrimination?
2     A.  Like I said, anything that I recall, I have
3  shared with you what I recall.
4     Q.  Is there anyone else in the university that
5  you complained to about discrimination?
6     A.  No.
7     Q.  And do you have any knowledge that President
8  Martin was aware of these conversations that you had
9  with Ms. Stensrud?
10     A.  I have no idea.
11        Let me add this:  Because I don't know if it
12  falls under the purview, so I'd rather just -- when it
13  came to my attention that the five white male officers
14  went to Dr. Martin to complain about me and that Dr.
15  Thomas was going to be brought in to do an assessment,
16  he and I had just seen each other at an event.  And he
17  told me, I'm so glad we hired you.  I knew you were the
18  real deal.  I reached out to him to say there's this
19  thing going on, and I understand you may be doing an
20  assessment.  And he said to me -- I did not get into
21  specifics, because we talked about him being able to
22  have integrity in his conversations with Dr. Martin.
23  But he said to me, FGCU PD is notorious for this shit.
24     Q.  Do you know what he was referring to?
25     A.  I can -- based on the fact that we were

160

1  talking about five white male officers had complained
2  about me, I think he was referencing perhaps racism or
3  gender discrimination or something to that effect.  We
4  kept our conversation short, because I respected the
5  fact that he was being tasked with this, and I was
6  blindsided by it.
7     Q.  So when you say that he might have been
8  referring to racism or gender, that's your guess?
9     A.  That's the inference I made.
10     Q.  And so you made no complaint about
11  discrimination to him, correct?
12     A.  I just was having that general conversation
13  with him that he was going to be tasked with this role,
14  and I was blindsided, and I really just sought to reach
15  out to him to gain a better understanding.
16     Q.  Okay.  And you're not aware of Dr. Thomas
17  relaying that information or even his opinion to
18  Dr. Martin, are you?
19     A.  Through a public records request, I saw that
20  he communicated with Dr. Martin that this is a routine
21  response.  I don't remember the exact language.  I'm
22  sure you probably have it.  But, basically, he cautioned
23  him from doing anything rash.
24     Q.  There is nothing in that email that relates to
25  discrimination, though, is there?

161

1    A.  I don't know off the top of my head.  I would
2  have to look at it.
3    Q.  And do you know if Dr. Thomas was aware of all
4  of the other administrators who are complaining about
5  you?
6    A.  I wasn't aware they were complaining about me.
7  I don't know what he was aware of.  I'm still unaware.
8    Q.  Okay.  Is there anyone else in the university
9  that you complained to about discrimination?
10    A.  No.  If something comes to mind, I'll
11  certainly interject.
12    Q.  Thank you.
13       You referenced the issue with the bathroom and
14  that you had directed an IA investigation be opened with
15  respect to two officers.
16    A.  Correct.
17    Q.  After the incidents happened with the
18  bathroom, did you direct the IA investigator to include
19  an investigation of retaliation?
20    A.  The IA investigator at some point, I don't
21  remember the timeline, had -- he was assigned as the IA
22  investigator, because the one, Captain Slapp was
23  typically responsible for it.  Captain Slapp -- one of
24  those officers was doing, you know, a very expensive
25  pool job for Captain Slapp, his family's construction

162

1  company, in excess of $50,000.  So due to that
2  relationship, I assigned Captain Rispoli, who did not
3  have a personal relationship with one of the officers,
4  to do the IA.
5       Captain Rispoli had never done an IA.  So I
6  had him register specifically for a course in Orlando to
7  take.  Unbeknownst to me, he withdrew from it.  He never
8  notified me.  And then at some time thereafter, he
9  actually wound up going out on FMLA without any notice
10  to me.  I got notified from HR.  And I had to reassign
11  Captain Slapp, who had this personal relationship, to
12  pick up where the IA left off.  And that was -- shortly
13  after, I was terminated, some time there, in close
14  proximity of time.
15    Q.  Why did you have to reassign Captain Slapp?
16    A.  He was the only one who had been through IA
17  training, and there is a 180-day timeline that has to be
18  completed.  So there wasn't anybody that could have done
19  it internally.  So I had to go back to Captain Slapp,
20  because Captain Rispoli had not gone to the class, and
21  he was out on FMLA.
22    Q.  Why didn't you reach out to one of the other
23  agencies and ask them for help?
24    A.  It didn't occur to me at the time, and I don't
25  remember the specific timeline.  But I know that 180

163

1  days was very important.
2    Q.  Well, you're also familiar under the police
3  officer bill of rights that if there is a conflict,
4  another agency can conduct the IA investigation?
5    A.  Yes, ma'am.
6    Q.  But you didn't reach out to any other agency
7  to do that?
8    A.  No.  And this might have been, quite honestly,
9  if there are any notes, this may have been shortly after
10  the officers filed their complaint with Dr. Martin and
11  spoke with him off record.  And so at that point, I --
12  quite honestly, I don't know the timeline.  That may
13  have impacted my thought process then.
14    Q.  Why would that impact your thought process in
15  terms of having someone from another agency do an
16  investigation?
17    A.  I don't know specifically why.  I don't know
18  that that's the case.  I would have to look at the
19  timeline.  And then the timeline would certainly be able
20  to give me a better substantive answer.
21    Q.  Okay.  And you referenced a couple of times
22  these white males who went to Dr. Martin.  How do you
23  know who went to Dr. Martin?
24    A.  I was able to have a pretty good synopsis, and
25  then David Vazquez and Sara seemingly confirmed.  Then

164

1  I -- when this happened, I was directed to interview
2  officers in the department to see if I could get my own
3  climate test.  And in interviewing those officers, they
4  indicated who went.
5    Q.  When you said you had "a pretty good
6  synopsis," what does that mean?
7    A.  Basically, I had a good idea of who it may
8  have been and who it wasn't.
9    Q.  And when is it that you learned that the
10  officers had gone to President Martin?
11    A.  I think the date was March 9th.  I'm not
12  entirely sure.  But I think it was actually the
13  morning -- the afternoon of the morning that they went.
14    Q.  And how was it that you learned about it?
15    A.  I was actually at human resources presenting
16  what was a five-year plan and a build-out for the police
17  department.  And while I was there, Sara called me and
18  asked me to report to her office, which was located in
19  the admin.  She had two offices.  This was located in
20  the admin building, not in HR.
21    Q.  Do you have any notes of that meeting?
22    A.  Everything I have would have been provided.
23    Q.  Okay.  If there are no notes in there, then
24  there's no notes of that meeting, correct?
25    A.  No.  I think I memorialized it in all of the

165

1 documents I submitted.
2    Q. Okay. Are they handwritten notes?
3    A. No. I don't recall. I think I typed
4 everything once I walked away. I was trying to catch my
5 breath, because it wasn't -- I didn't think I was in
6 trouble. So I walked in like, What's going on? Hey,
7 today's a great day. So I don't believe I took
8 handwritten notes. I think I went back afterwards and
9 began typing, never having dealt with anything like this
10 before.
11    Q. So after the meeting, did you think you were
12 in trouble?
13    A. Definitely. I was told not to worry. So that
14 gave me a sense of security, but I felt like, Okay.
15 Let's see what this shakes out to be. I've never been
16 subject to any of this before.
17    Q. Okay. So you think you have typewritten notes
18 of that meeting?
19    A. No. I think what you have is what I have,
20 because it all became part of my case file to Ben.
21    Q. Okay. And I don't want to know what your
22 communications were with Mr. Yormak. But if there were
23 no notes in those documents, there are no notes,
24 correct?
25    A. I don't think we're speaking the same

166

1 language. Whatever I had, when I created the timeline
2 for Mr. Yormak, was a cut and paste.
3    Q. Oh, okay. So where is the actual notes that
4 were taken at the time?
5    A. There were no notes taken at the time. I did
6 not have pen and paper. When I went back to my
7 computer, I synopsized it.
8    Q. Yeah.
9    A. It was on my work computer, which I don't have
10 access to.
11    Q. Okay.
12    A. And then when I left, I printed documents out,
13 and it became part of the synopsis. But everything I
14 have, I have provided.
15    Q. Okay. Now you said that you had a pretty good
16 synopsis of who might have been in the meeting. Who was
17 it that you thought was in the meeting?
18    A. Sergeant Kittleson, Sergeant Jones, Detective
19 Interim Sergeant Anderson. I was surprised to learn
20 later that it was Slapp, because he was actually due to
21 retire in two weeks or three weeks. And Captain
22 Rispoli.
23    Q. So the two officers who you directed for the
24 IA investigation, neither of those officers were there,
25 correct?

167

1    A. Not to my knowledge.
2    Q. And you said that Sara and David seemingly
3 confirmed who was present. How did they seemingly
4 confirm that?
5    A. In the meeting, I asked them who did this.
6 And they said, We don't know. We haven't been given
7 definites. And I said, Was it Sergeant Kittleson and
8 Sergeant Jones? And they both nodded their head yes,
9 and they said but they don't know who all it was. They
10 thought it was three people. And then later, they
11 advised me that it had been five.
12    Q. Did they identify those people for you?
13    A. No.
14    Q. Okay. And so then you said that you learned
15 who it was when you interviewed the officers?
16    A. Correct. So Sara suggested that I go and talk
17 to the officers and tell them that I had been informed
18 that there was low morale and to have conversations with
19 them, not an authoritarian thing but in more of a
20 position of let me know how we can fix this. And so
21 when I interviewed those officers, several of them, in
22 fact, said they didn't agree with what was happening.
23 And then a few told me who they understood to be the
24 ones to go there.
25    Q. A few admitted they went there or they --

168

1    A. No. They said who went. In particular, a
2 couple actually said, I am so sorry I am part of this.
3    Q. Okay. Who told you that they went to
4 President Martin?
5    A. Sara told me that they went to President
6 Martin.
7    Q. No. Which officer admitted to you that they
8 went to President Martin?
9    A. No officer admitted to me. I was told not to
10 interview those five in particular.
11    Q. Okay. So you didn't talk to the five officers
12 you thought were in the meeting. You talked to the rest
13 of the officers, and they told you who they thought were
14 in the meeting?
15    A. Correct.
16    Q. So you don't have any personal knowledge of
17 who was actually in that meeting with the president?
18    A. I had no personal knowledge the meeting
19 occurred.
20    Q. So you had no personal knowledge of who was in
21 the meeting?
22    A. Correct.
23    Q. And you don't know what information they
24 conveyed in that meeting?
25    A. No.

42  (Pages 165 to 168)

169

1  Q.  And none of those officers who you identified
2  told you that they were in the meeting?
3  A.  No.
4  Q.  So you don't know that Rispoli and Slapp were
5  actually in the meeting with the president?
6  A.  Not factually.
7  Q.  And this climate survey that you did after the
8  fact was of the officers who weren't those five
9  officers?
10  A.  Correct.
11  Q.  And who said that they were sorry they went?
12  A.  Officer -- he didn't say he was sorry he went.
13  He said he was sorry it happened.  Officer Pineda and
14  Officer -- I think his name was Page, but I don't
15  remember.
16  Q.  And any information they have, they weren't
17  present for the meeting, though?
18  A.  I don't know.
19  Q.  Okay.  And who said they didn't agree with it?
20  A.  It would have been Page and Pineda.  Their
21  names are escaping me now.  I'm sorry.  I don't remember
22  who the officers' names were.  It's been a long time
23  and...
24  Q.  Did you talk to Palmer and Winning?
25  A.  I don't remember if I talked to them or not.

170

1  I think I did talk to Palmer, but I don't remember what
2  he said.
3  Q.  With respect to the IA investigation of Palmer
4  and Winning, you did not place Palmer or Winning on
5  administrative leave pending that investigation,
6  correct?
7  A.  Correct.
8  Q.  Why not?
9  A.  There was no particular need at that moment.
10  The complaint didn't lead me to believe that there was a
11  public safety issue.  And they had immediate
12  supervisors.  And if I'm correct, I think we had
13  deployed our own body cameras, which would have afforded
14  us the ability to monitor their citizen engagement.
15  Q.  And did you monitor their citizen engagement?
16  A.  I was terminated sometime thereafter, so I
17  don't know what happened.  I wasn't even there for the
18  findings of the IA.
19  Q.  Well, the IA investigation was opened back in
20  November, correct?
21  A.  Correct.
22  Q.  So did you have body cameras then?
23  A.  They didn't get -- they didn't get
24  implemented, I don't think, until -- COVID pushed delays
25  back with supply chain issues.  So I don't remember when

171

1  they got implemented.
2  Q.  But November, when you ordered the
3  investigation, you didn't place them on leave?
4  A.  No.
5  Q.  And you had the ability to place them on
6  leave, correct?
7  A.  That would have been a conversation that would
8  have taken place with Sara as to whether or not to do
9  that.  And we would have probably looked heavily at the
10  contract and HR guidelines and budget, because that
11  certainly would have created a budgetary issue.
12  Q.  Did you have that conversation with Sara?
13  A.  I probably did.  I honestly don't remember.
14  She was well aware of the complaint.  And she was aware
15  that I had opened the investigation.  I don't remember
16  if we had those specifics, but I did not place them on
17  administrative leave.
18  Q.  But my question is, did you have a
19  conversation with Sara about placing them on
20  administrative leave?
21  A.  I don't know.
22  Q.  And you believed that Palmer and Winning had
23  smeared urine and feces in the ladies room?
24  A.  Correct.
25  Q.  Because it happened -- you believed it

172

1  happened at the same time as their shift change?
2  A.  Explain what you're asking.
3  Q.  Sure.  Sure.
4  So why do you believe Palmer and Winning were
5  the ones who did that?
6  A.  Okay.  So in most instances, there were only
7  three officers on shift, sometimes two.  It would be a
8  supervisor and a patrol officer or two patrol officers
9  and a supervisor.  Based upon their days off rotation,
10  because they would be on a schedule of like two days on,
11  two days off; two days on, three days off; three days
12  on, like it was like every other weekend.  So in looking
13  at that schedule, and they were on midnights, the
14  instances of feces and urine in the women's restroom
15  aligned with their schedules.  And it only happened on
16  the days in which they were on shift and would be coming
17  off when I would be coming on.
18  Q.  And is that the only basis that you formed
19  this belief from?
20  A.  It's a secure bathroom.  It's not an area
21  where -- the only people who had -- when the building is
22  locked, because the building got locked during
23  non-business hours, so it would have been locked at
24  night, the only people who would have had access to the
25  restroom would have been PD staff or building services.

43  (Pages 169 to 172)

Smith vs. Florida Gulf Coast University    Keith Smith

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 44 of 118 PageID 404

01/22/2025

173

1 And I certainly couldn't see building services doing it.
2    **Q.  But did you know if they did?**
3    A.  No.  I just know that when I brought it
4 forward, it stopped.
5    **Q.  And other than the conversation that you told**
6 **me about with Dr. Thomas and the conversations that you**
7 **told me about Sara Stensrud, is there any other**
8 **conversations you had with anyone about discrimination**
9 **at the university during your employment?**
10    A.  Not that I can recall.
11    **Q.  Did you make any report of discrimination to**
12 **President Martin?**
13    A.  No.
14    **Q.  Did you make any report of discrimination to**
15 **Vee Leonard?**
16    A.  No.
17    **Q.  Did you make any report about Clery compliance**
18 **to President Martin?**
19    A.  I didn't interact with him with any degree of
20 regularity, so no.
21    **Q.  So just to make sure the answer to that is**
22 **clear, did you make any report of any complaint about**
23 **Clery compliance to President Martin?**
24    A.  No.
25    **Q.  Do you know whether President Martin had any**

174

1 **knowledge that you had raised a concern about Clery**
2 **compliance?**
3    A.  No.
4    **Q.  Now, with respect to Clery compliance, you**
5 **testified earlier that that was part of your job**
6 **responsibilities as police chief, correct?**
7    A.  Correct.
8    **Q.  And it wasn't only part of your**
9 **responsibilities, it was part of Chief Moore's**
10 **responsibilities when he was the police chief, correct?**
11    A.  Correct.
12    **Q.  And he didn't have a Clery compliance officer,**
13 **did he?**
14    A.  No.
15    **Q.  He handled the Clery compliance himself?**
16    A.  He did.  He pushed for a Clery compliance
17 officer, and he was told no.
18    **Q.  And how do you know that?**
19    A.  That conversation that I had with him.  I
20 believe I had two conversations with him.  One during
21 the interview process, and maybe one before -- I don't
22 remember.  But there were two.  And he indicated to me
23 that he was not able to keep up with the requirements of
24 Clery.  That after the young lady had been abducted by
25 the individual who pretended to be an Uber driver and

175

1 was assaulted, that -- the Department of Education
2 utilizes web crawlers.  So when that made some degree of
3 national news, there was an audit that was done, because
4 DOE learned this happened.  And they -- a
5 conversation -- I don't know the specifics -- took place
6 with DOE and Chief Moore.  And as a result, their annual
7 safety report did not rise to the level that it should.
8 I don't know including what information.  And so he had
9 been requesting from Mr. Magiera, this is what Chief
10 Moore told me -- a Clery compliance person.  And he
11 encouraged me to strongly advocate for Clery because the
12 university was not in compliance.
13    **Q.  And when you pushed for a Clery compliance**
14 **person, it was granted, correct?**
15    A.  Eventually.
16    **Q.  Well, it was granted fairly quickly, wasn't**
17 **it?**
18    A.  I think probably a couple of months, yes.
19    **Q.  And by July, you were trying -- you had**
20 **already posted the position to be hired, correct?**
21    A.  I don't remember the date that it was posted.
22    **Q.  Okay.  And we'll go through some of that.**
23    **Now, this issue about prior Clery -- the**
24 **Department of Education and a prior Clery review, did**
25 **you look at the documents surrounding that to see what**

176

1 he was talking about?
2    A.  I didn't have any of those documents, and they
3 weren't left for me.
4    **Q.  Did you ask to have an email pull done of**
5 **Chief Moore so that you could learn about this prior**
6 **issue involving Clery?**
7    A.  No, I did not.
8    **Q.  I'll show you what's marked as Exhibit 42.**
9    (Exhibit 42 was marked for identification.)
10    **Q.  Do you recognize this document?**
11    A.  No, I've never seen it.  If I have, I don't
12 recall it.
13    **Q.  In this email, Chief Moore is explaining to**
14 **Steve Magiera that there is a call from DOE about doing**
15 **an audit, correct?  Do you see that?**
16    A.  I can read it.
17    **Q.  Sure.  Go ahead.**
18    A.  Okay.
19    **Q.  Okay.  So Chief Moore is explaining that there**
20 **is going to be a review by the Department of Education**
21 **related to Clery, correct?**
22    A.  Correct.
23    **Q.  And that there was a previous review five**
24 **years ago?**
25    A.  I see that.

44  (Pages 173 to 176)

177

```
 1    Q.  And there was no findings from that review,
 2  correct?  You're not aware of any, are you?
 3    A.  I wasn't even aware there was that.
 4    Q.  Okay.  And you said that Chief Moore expressed
 5  to you his belief that the university wasn't in Clery
 6  compliance?
 7    A.  Correct.
 8    Q.  And did he express that to anyone else in the
 9  university?
10    A.  I don't know.
11    Q.  I'll show you what's marked as Exhibit 43.
12      (Exhibit 43 was marked for identification.)
13    Q.  Have you reviewed this email before?
14    A.  No.
15    Q.  And this is an email from Janet Pearlman of
16  the Department of Education to Steve Moore.  Do you see
17  that?
18    A.  I do.
19    Q.  And so when Steve Moore told you about this
20  prior issue, you didn't ask to see any of the documents?
21    A.  No.
22    Q.  In this letter, though, the Department of
23  Education is saying that they are doing a technical
24  assistance to the university, correct?
25    A.  I can read it.  I don't know.  I've never seen
```

178

```
 1  it.
 2    Q.  Sure.  Go ahead.
 3    A.  So if you'd like me to read it, I can.
 4    Q.  Yeah, please.
 5    A.  Okay.
 6    Q.  Okay.  So in that email, is there anything in
 7  there that's saying that the university failed an audit?
 8    A.  Nothing that I see.
 9    Q.  I'll show you what's marked as Exhibit 44.
10      (Exhibit 44 was marked for identification.)
11    Q.  Have you reviewed this email before?
12    A.  No, I've not.
13    Q.  And this is an email from Chief Moore to Steve
14  Magiera.  In the fourth paragraph, do you see where he
15  says:  During the call, the three primary issues,
16  "timely warning notifications," were cleared up easily,
17  and they agreed we acted properly?
18    A.  I do see that.
19    Q.  Did you ask Chief Moore in this conversation
20  if he had done training or guidance to the university on
21  what was required for Clery compliance?
22    A.  No, I did not.
23    Q.  Let me show you what's marked as Exhibit 45.
24      (Exhibit 45 was marked for identification.)
25    Q.  Do you recognize this document?
```

179

```
 1    A.  I do not.
 2    Q.  Do you have any basis to dispute that it was
 3  sent?
 4    A.  No.
 5    Q.  Let me show you what's marked as Exhibit 46.
 6      (Exhibit 46 was marked for identification.)
 7    Q.  Do you recognize this document?
 8    A.  No, I do not.
 9    Q.  Do you have any basis to dispute that it was
10  sent?
11    A.  No.
12    Q.  Let me show you what's marked as Exhibit 47.
13      (Exhibit 47 was marked for identification.)
14    Q.  Do you recognize this document?
15    A.  No, I don't.
16    Q.  This is an email from Chief Moore back to
17  Janet Pearlman at the Department of Education providing
18  a revised ASR.  Do you see that?
19    A.  I do.
20    Q.  And do you have any basis to dispute that this
21  was sent?
22    A.  No, I don't.
23    Q.  I'll show you what's marked as Exhibit 48.
24      (Exhibit 48 was marked for identification.)
25    Q.  Do you recognize this document?
```

180

```
 1    A.  No, I don't.
 2    Q.  This is an email from Janet Pearlman of the
 3  Department of Education to Chief Moore.  Do you see
 4  that?
 5    A.  I do.
 6    Q.  And upon receipt of this email, she is saying
 7  that the university is in compliance, and the matter is
 8  closed, correct?
 9    A.  I don't see that it says it's in compliance.
10  I think she is concluding that they're done working
11  together.
12    Q.  Sure.  If you go back to Exhibit 43, she says
13  in that document that the purpose of technical
14  assistance is to establish a baseline of compliance,
15  correct?
16    A.  That's what she says here, yes.
17    Q.  Okay.  And in here, Exhibit 48, she is saying
18  that the technical assistance provided is considered
19  completed, correct?
20    A.  That's correct.  That's what it says, yes,
21  ma'am.
22    Q.  Which means that they found that there were no
23  further issues, correct?
24      MR. YORMAK:  Object to form.
25    A.  I don't know what that means.
```

45  (Pages 177 to 180)

181

BY MS. DYSON:
Q. I'll show you what's marked as Exhibit 49.
(Exhibit 49 was marked for identification.)
Q. Do you recognize this document?
A. I do not.
Q. This is an email from Chief Moore to Precious Gunter. Do you see that?
A. I'm just making sure where the chain starts, because sometimes they start from the bottom up.
Q. Sure. Yeah.
A. So Chief Moore -- so Ms. Pearlman starts on March 14th, yes, I see that on the back.
Q. So this is an email from Chief Moore to Precious Gunter on March 19th, 2019. Do you see that?
A. I do see that part, yes, ma'am.
Q. And he is explaining to her that there was technical assistance from the Department of Education with respect to Clery. Do you see that?
A. We had another media review with DOE, yes.
Q. And he said, and now everything is good, correct?
A. I see that.
Q. And this was the second media review in five years, so now I think we're in good graces for several years. Do you see that?

182

A. I do see that.
Q. And he says, Happy to get it done with no fines, correct?
A. I do see that.
Q. And he doesn't express any opinion that the university is out of compliance with Clery, correct?
A. Not that I see.
Q. Now when you started, you requested a separate Clery compliance coordinator, correct?
A. Correct.
Q. Let me show you what's marked as Exhibit 50.
(Exhibit 50 was marked for identification.)
Q. Do you recognize this document?
A. I authored it, yes.
Q. This is a memo that you sent to Sara Stensrud?
A. Correct.
Q. And in this you were seeking to add one position to the department, correct?
A. Correct.
Q. That would be both Clery compliance as well as records manager and inventory control, correct?
A. Correct. As I recall, yeah.
Q. And you proposed separating the Clery compliance duties from your position and creating this new position at a cost to the university, correct?

183

A. Correct.
Q. And the university agreed to fund this, correct?
A. They did.
Q. And there was no other university the same size as FGCU that had a Clery coordinator, correct?
A. I don't know that that's true.
Q. Well, I think you provide a chart on the next page.
A. So if you can show it to me, I'll be happy to --
Q. Sure. It's on the next page.
A. Oh, on the back page. There we go. Correct.
Q. And, ultimately, the university not only approved a Clery compliance officer but as well as a records manager to add to the department?
A. Later on, yes.
Q. This is Exhibit 51.
A. Actually, let me go back. I apologize. Looking at the chart, University of West Florida had 13,000 students, they had a Clery Act compliance officer, the University of West Florida did. And then FAMU had a dedicated police lieutenant whose sole responsibility was to manage Clery Act compliance.
Q. Okay. But --

184

A. That was the only job that person had. And there were approximately the same volume of students.
Q. And New College didn't, correct?
A. Correct. They have 2,000 students.
Q. And USF St. Pete did not, correct?
A. They had their records manager who did it.
Q. Who was not dedicated Clery compliance, correct?
A. No.
Q. Isn't that correct?
A. Yes, ma'am. That's correct.
Q. Okay. And you asked not only for a Clery compliance but also a records manager as well, correct?
A. Later, I did, because we had lost our support staff. When parking services was removed from under the police department and placed under business services, all of the support staff was taken and moved with that division. So there was no support staff at FGCU PD. Captain Rispoli functioned as a clerical administrator for much of his day.
Q. Okay. So Exhibit 51 in front of you.
(Exhibit 51 was marked for identification.)
A. Sure.
Q. So when you say "later," you mean three weeks later?

185

1    A.  As I began to understand with a greater
2 breadth of understanding what each person was doing,
3 yes, ma'am.
4    Q.  And you wanted to increase from adding one
5 person to three people in this memo on June 9th, 2021,
6 correct?
7    A.  I don't think it was increase as much as
8 regain resources we lost with a divestment of parking
9 services.  Parking services was an entity that had a lot
10 of administrative support staff before I arrived.  And
11 when they moved parking services under business
12 services, all of that support staff went with them.
13    Q.  But it would have been increasing staff that
14 didn't otherwise exist, correct?
15    A.  Replacing staff that we once had.
16    Q.  So the university has a certain number of
17 employees when parking services was there, right?
18    A.  Um-hum.
19    Q.  Those employees still all existed, correct?
20    A.  But we did not have the support that we did.
21 Because they had dual duties; parking services duty, PD
22 duty.  So, technically, it's the addition of positions
23 to fulfill responsibilities that there was no one to do.
24 There was no person to do the jobs they left voided.
25    Q.  Well, the parking services didn't have any

186

1 Clery responsibilities?
2    A.  What happened with parking services was they
3 handled the records and all of the various assignments
4 in terms of administrative support.  That then fell to
5 Captain Rispoli who was responsible for doing daily logs
6 and supporting the Clery data.  He was unable to
7 maintain his workload.
8    Q.  But the parking services had no role with
9 respect to Clery, correct?
10    A.  Their support staff provided functions that
11 allowed Captain Rispoli to focus on Clery.  Once they
12 left, there was no redundancy.  So everything had to be
13 realigned.  And we quickly learned that we were
14 under-resourced.  We lost resources we had.
15    Q.  Okay.  But it would cost the university two
16 more full-time positions and one part-time position if
17 your request was granted, correct?
18    A.  Correct.
19    Q.  Okay.  And all of these requests were, in
20 fact, granted, correct?
21    A.  No.
22    Q.  You did not get a Clery person?
23    A.  We did not get a part-time accreditation
24 person.
25    Q.  Okay.  So you got two full-time positions

187

1 added to your department, correct?
2    A.  Correct.
3    Q.  Okay.  And you also made requests for new
4 equipment at the same time.  Do you recall that?
5    A.  Yes.  Sara had given me a directive to make
6 assessments in the police department and come back with
7 what she called a wish list.  And she said, Make sure
8 you include everything, because you're only going to get
9 one bite at the apple.
10    Q.  Okay.  And that included new guns, correct?
11    A.  Correct.
12    Q.  New tasers, correct?
13    A.  They were all out of service, and they were no
14 longer serviceable, nor were they under warranty.  So
15 they had surpassed their technological lifeline.  So had
16 we had a bad deployment, it would have left the
17 university in a position of liability.  So, yes, new
18 tasers were on there as well.
19    Q.  So you were provided with new tasers, correct?
20    A.  I don't remember if they actually ever came in
21 while I was there or not, to be honest.
22    Q.  You were approved to purchase new tasers,
23 correct?
24    A.  Yes.
25    Q.  And you were approved to repair vehicles,

188

1 correct?
2    A.  I'm not seeing the list that you're -- is it
3 on this document?
4    Q.  No.  I'm just asking you questions, ma'am.
5    A.  Oh, okay.  Then I'm sorry.  I was trying to
6 refer to the document.  Okay.  Go ahead, then.  I
7 apologize.
8    Q.  You were also approved to repair vehicles,
9 correct?
10    A.  To repair vehicles?  Yes.
11    Q.  And you were also approved for records
12 management software, correct?
13    A.  The records management software system we had
14 was -- and it was not my area of expertise, but it was
15 basically obsolete and no longer being supported on a
16 platform.  And so we were going to go dark, as I
17 understand it.  So it was a need, because we did not
18 have a means to continue operating and know that we
19 would be able to retain our data.  Something was
20 approved, but I don't remember what.
21    Q.  Okay.  And you were also approved to purchase
22 Clery software, correct?
23    A.  To join a Clery membership with the Clery
24 Center, which was a resource that, actually, I brought
25 Title IX into, so that they could have access to it as

47  (Pages 185 to 188)

Smith vs. Florida Gulf Coast University    Kenneth Smith                07/22/2025

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 48 of 118 PageID 408

189

1  well, the office of student conduct.  It was one of
2  those things where I collaborated with my campus
3  partners to make sure that they could have the breadth
4  of Clery and that resource available to them.  So they
5  were included in memberships as well.
6      Q.  That was a cost to the university that the
7  university agreed to incur based on your request,
8  correct?
9      A.  Correct.
10     Q.  And there was also a new evidence system,
11 correct?
12     A.  No, ma'am.  That never was purchased.
13     Q.  Was that approved, ma'am?
14     A.  No.
15     Q.  And in this memo that's Exhibit 51, you're
16 talking about this records manager, and you say that the
17 records manager would fulfill a number of roles,
18 including disseminating arrest reports to student
19 conduct and general counsel, correct?
20     A.  I want to look at which line you're talking
21 about.
22     Q.  Sure.  It's the first bullet on the first
23 page.
24     A.  Yes, ma'am.
25     Q.  And on the second page, you relate that the

190

1  Clery Act frequently undergoes changes, modifications,
2  and reporting requirement changes.  Do you see that?
3      A.  Yes, ma'am.
4      Q.  And that -- those changes were monitored
5  previously by the former police chief, correct?
6      A.  In tandem with Captain Rispoli, yes.
7      Q.  And Captain Rispoli was still available to
8  you, correct?
9      A.  Well, he was basically functioning in the
10 parking services role of administrative support.
11     Q.  Okay.
12     A.  He was in the same building but had his hands
13 full.
14     Q.  Okay.  And so this request was made on
15 June 9th, 2021, correct?
16     A.  Yes, ma'am.
17     Q.  I'll show you what's marked as Exhibit 52.
18     (Exhibit 52 was marked for identification.)
19     A.  Sure.
20     Q.  And by July 22nd, the Clery compliance
21 position had been posted, correct?
22     A.  That's what the bullet says, yes, ma'am.
23     Q.  Let me show you what I'll mark as Exhibit 53.
24     (Exhibit 53 was marked for identification.)
25     Q.  Do you recall this document?

191

1      A.  I do.
2      Q.  And this is an email from Precious Gunter to
3  you on September 8th, 2021, correct?
4      A.  Yes.
5      Q.  And she reminded you that Title IX is still
6  not receiving reports UPD, correct?
7      A.  Correct.
8      Q.  And you said in here -- so she suggested to
9  have some training for those officers, correct?
10     A.  Yep.
11     Q.  And you said that you would welcome training,
12 but it can't be done until next year, correct?
13     A.  I think there was more language than just
14 that, but do I -- can I see that?  Is that on here?
15     Q.  Sure.  Yeah.
16     A.  Okay.
17        Oh, yeah.  Because I go on to explain in the
18 same email that we don't have the same resources we did,
19 talking about our PD structure.  And that I was trying
20 to get a dedicated manager.  Because Precious had also
21 emailed me prior that there had -- that whatever the
22 breakdown between the police department and Title IX
23 was, it existed prior to my arrival.  So there had been
24 dialogue about that, but yes.
25     Q.  Where do you see in this email that you

192

1  reference that you don't have the same resources?
2      A.  I think what it says here is:  I think the gap
3  in notification to your office about these types of
4  incidents is exacerbated in the PD structure.  I am
5  hoping to identify a solution of a dedicated person to
6  manage our police records and routing of documents.
7  Because I didn't have anybody at the time.  Captain
8  Rispoli -- the person who had been doing that was Nancy
9  Rispoli.  She was with parking services and had been
10 reallocated with them, so I didn't have a resource at
11 the time.
12     Q.  So there's no reference to a lack of resources
13 in this email, correct?
14     A.  No, not in this email.  But Precious was
15 aware.
16     Q.  I'll show you what's marked as Exhibit 54.
17     (Exhibit 54 was marked for identification.)
18     Q.  Do you recall this email?
19     A.  I do.
20     Q.  Okay.  And earlier you testified that you
21 didn't have direct communication with Vee Leonard, but
22 that wasn't accurate, correct?
23     A.  That came at the direction of Sara.  Sara was
24 the one who told me to request this, and she was the
25 person who told me who to put on the invite list.

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 49 of 118 PageID 409

Smith vs. Florida Gulf Coast University    Kevin Smith                    01/22/2025

193

1    Q.  Okay.
2    A.  So it wasn't that I reached out to Vee
3  arbitrarily.  It was with the direction of the vice
4  president of human resources and my immediate
5  supervisor, Sara Stensrud.
6    Q.  And that's the only time you ever reached out
7  to Vee Leonard?
8    A.  There may have been instances where she called
9  me directly, and there would be reciprocal
10  conversations.  But I would always loop Sara in to say:
11  Heads-up.  Vee called me.  Or if I was going to have
12  direct outreach with Vee, I would contact Sara first and
13  say, Sara, this has happened.  Do you want to call Vee,
14  or do you want me to?  And I would lean heavily on
15  whatever she said.
16    Q.  And was it around this time that you decided
17  to reach out to a lawyer at Saul Ewing?
18    A.  Actually, I didn't know she was a lawyer.  I
19  knew her as a trainer.  And so I reached out to her as a
20  trainer.
21    Q.  Do you know what Saul Ewing is?
22    A.  I did not at the time.
23    Q.  Did you look -- do any research on them before
24  you reached out to her?
25    A.  I had known her from when I worked at Northern

194

1  Arizona University.  And so we had very good success
2  with her with some Clery compliance issues.  And based
3  on that history was why I reached out to her.  I did not
4  know she was lawyer.
5    Q.  And you didn't do any research to see that her
6  website clearly reflects that she's a lawyer?
7    A.  I went based on personal knowledge and
8  experience with a situation she handled for the
9  institution in the past.
10    Q.  And do you know how she came to handle that
11  for NAU?
12    A.  Yes, actually I do.  The president of the
13  university contacted her immediately.  I don't know if
14  it was general counsel.  We had a victim advocate on
15  campus who was paid by a grant, but she also worked
16  off-campus with a victim advocacy group.  And we needed
17  clarification because we funded the victim advocacy
18  group $40,000 a year.  We needed clarification if she
19  was, in fact, the campus security agent.
20            And so Ms. McLaren had worked for the
21  Department of Education as an investigator.  So however
22  she was chosen, I don't know.  But she brought in and
23  evaluated and assessed whether the advocate that was
24  not -- was or was not a CSA, she, in fact, determined
25  she was simply because she had a desk on campus and had

195

1  an email that ended in EDU.  And if she did not provide
2  her Clery statistics, it would have left the university
3  in a position for noncompliance.  So that's how I
4  learned of Candace.  I didn't know she was a lawyer.
5    Q.  And you didn't realize that that was a legal
6  interpretation as to whether someone is a CSA?
7    A.  I thought of it as a Clery compliance thing.
8  I did not...
9    Q.  And you don't know whether the general counsel
10  of NAU was the one who reached out and arranged for Ms.
11  McLaren to provide those services, correct?
12    A.  I do not.  But I didn't reach out to McLaren
13  arbitrarily.  I spoke with Sara about it, and Sara
14  concurred and supported it.
15    Q.  And that outreach was in violation of policy,
16  correct?
17    A.  Unknowingly.
18    Q.  Did you review the policies before you made
19  that outreach attempt?
20    A.  I didn't think she was a lawyer, so I thought
21  I was contacting a trainer.  Had I known she was a
22  lawyer, then it would have been a different
23  conversation.
24    Q.  I'll show you what's marked as Exhibit 55.
25        (Exhibit 55 was marked for identification.)

196

1    Q.  Do you recognize this document?
2    A.  I do.
3    Q.  And Ms. McLaren's signature block is on this
4  email that she sent to you, correct?
5    A.  Correct.
6    Q.  And it references that she's a partner at Saul
7  Ewing Arnstein & Lher, correct?
8    A.  Correct.
9    Q.  And you didn't know what a partner was at a
10  law firm?
11    A.  I did not honestly make the connection that
12  she was a lawyer or that it was a policy violation.  And
13  considering Sara had been involved in every
14  conversation, I assumed that she would have certainly
15  been aware or vetted it with anyone who needed to give
16  approval.
17    Q.  Okay.  And in this quote that she is giving
18  you, it was for $15,000 for the university to pay for
19  her services, correct?
20    A.  Correct.
21    Q.  But, also, if her time exceeded that amount,
22  then she was going to bill at the reduced hourly rate of
23  550 an hour?
24    A.  I see that.
25    Q.  And that didn't raise a question as to whether

197

1  she was a lawyer to you?
2      A.  Like I said, it was not -- we were -- Sara was
3  involved.  You see she's cc'd here.  She was involved in
4  all of the communications.  So I assumed if Sara was
5  approving it and involved and engaged with it, that it
6  had been vetted to the levels it needed to be.
7      Q.  But you knew that Sara hadn't reached out to
8  Vee Leonard, correct?
9      A.  I had no idea.
10     Q.  And Vee Leonard is not copied anywhere on any
11  of these emails, correct?
12     A.  Not that I see.
13     Q.  And do you know if Vee Leonard was upset by
14  the way that this was handled?
15     A.  Based on the email, I'm sure you have it, her
16  response was quite terse.
17     Q.  Okay.  Going back to Exhibit 54, which should
18  still be in front of you, hopefully.
19     A.  Yes, ma'am.
20     Q.  Okay.  So this is an email where Vee Leonard
21  was copied on, and you were coordinating a meeting to
22  talk about some off-campus reports.  Do you see that?
23     A.  I think they were sexual assault reports,
24  right?  Yes.
25     Q.  So these were reports about things that were

198

1  happening not at Florida Gulf Coast University, correct?
2      A.  As far as I knew, yes.  Correct.
3      Q.  And these were off-campus reports, correct?
4      A.  Yes.  They were tied to the university based
5  that the allegations were on fraternities.
6      Q.  Were they on fraternities or members of the
7  fraternities?
8      A.  Okay.  Members of the fraternities.  I don't
9  know if they were sanctioned events.  I don't know the
10  status of the events.
11     Q.  And for purposes of Clery, do you know whether
12  that makes a difference?
13     A.  It depends.  It's one of those things where
14  you would consult with the Clery Center or your Clery
15  subject matter expert.  But you have to have the facts
16  and the information.  And so we didn't have that
17  information.  All we knew is that there were reports
18  coming in to members of the community who would have
19  been likely CSAs, and we were not getting the
20  information in a manner to evaluate the timely warnings
21  or emergency notifications the university had already
22  been under a review for.
23          So I don't know if they were
24  university-sanctioned events.  I don't know if they met
25  a Clery requirement, and that was the objective was to

199

1  determine if we were getting the information we needed
2  to make these timely warnings and emergency
3  notifications.
4      Q.  And in these -- in this meeting, didn't Vee
5  Leonard tell you that you were wrong in your
6  interpretation of Clery?
7      A.  Vee Leonard never said that.  And I think this
8  was tied in and collaborated, because I wanted to bring
9  in the partners, as Sara and I talked about, to get some
10  buy-in because of the gravity of the situation.
11     Q.  So Clery only applies to on campus in terms of
12  reporting and notification or those that are campus
13  events, correct?
14     A.  It also varies.  Because like if you're -- you
15  have to report -- it's a very complex piece of
16  legislation.  For instance, you have to send out
17  requests anywhere an athletic team travels to and ask
18  for their crime stats for that particular area to report
19  it in your annual safety report.  So what that means is,
20  the basketball team goes to Kansas and stays in
21  Manhattan, Kansas, you have to request their crime
22  information to report it.
23          So it's not an easy piece of legislation, and
24  it requires much collaboration from everybody.  So it's
25  not specifically germane to campus.

200

1      Q.  But the fact that a student who happens to be
2  a fraternity member is involved in sexual assault off
3  campus has no Clery implications; isn't that accurate?
4      A.  More than one student with the same fraternity
5  could.  I don't know.  I didn't have all of the details,
6  because we weren't being notified.  That was what the
7  objective was.
8      Q.  And Vee Leonard didn't agree with your
9  position on that, correct?
10     A.  I was never told that.
11     Q.  And Vee Leonard, as the general counsel of the
12  university, would have been the one charged with making
13  that legal interpretation, correct?
14     A.  When that meeting ended, there was no
15  decision, so I don't know what decision she ever arrived
16  at.  But it was never a decision that was passed down to
17  me.
18     Q.  Vee Leonard, as general counsel of the
19  university, you understood that she was charged with
20  making the legal interpretations for the university,
21  correct?
22     A.  Absolutely.  Yes.
23     Q.  Okay.  Going on to 56.
24     (Exhibit 56 was marked for identification.)
25     Q.  Do you recognize this document?

201

1    A.  I do.
2    Q.  And this is information -- well, these are
3 email exchanges with the Title IX office, correct?
4    A.  Yes.
5    Q.  And at this point in time on November 2nd, you
6 had hired -- the university had hired Diana Tsenekos as
7 the Clery compliance officer, right?
8    A.  Yes, ma'am.
9    Q.  And so in this email, Title IX is providing
10 information to you for the Clery reporting, correct?
11    A.  Correct.
12    Q.  Now, Diana Tsenekos, she continued to be
13 employed as the Clery compliance officer even after your
14 separation from the university, correct?
15    A.  As far as I know.
16    Q.  And she continued to be employed in that
17 position throughout your tenure as well, correct?
18    A.  Did she hold that while I still worked there?
19 Yes, ma'am.
20    Q.  And do you know if she continues to be
21 employed by the university to this day?
22    A.  I don't.  No.
23    Q.  Do you know if she expressed an opinion on the
24 university's Clery compliance?
25    A.  Yes.  It was actually in a follow-up email

202

1 that I thought you might have.
2    Q.  And what was that position?
3    A.  She identified with Emily, that Emily was not
4 providing enough information in this particular
5 reporting capacity.  And that she needed to provide more
6 information.
7    Q.  And no action was taken against Ms. Tsenekos
8 with respect to her employment, correct?
9    A.  Well, there was -- no.  No.
10    Q.  I'm sorry?
11    A.  No, not that I'm aware of.  That wasn't her
12 only concerns with Clery, but in this instance, it was.
13    Q.  And she freely expressed those concerns with
14 respect to Clery, correct, Ms. Tsenekos did?
15    A.  Yes.
16    Q.  And she never experienced any adverse
17 employment action, correct?
18    A.  She was brought in to bring us compliance, so
19 no.
20    Q.  She never expressed any adverse employment
21 action, correct?
22    A.  Not that I'm -- I don't know.  Not while I was
23 there.
24    Q.  Okay.  I'll show you what's marked as
25 Exhibit 57.

203

1    (Exhibit 57 was marked for identification.)
2    Q.  Do you recognize this document?
3    A.  I do.
4    Q.  So earlier you said that -- well, first, let
5 me ask, who is Monique McKay?
6    A.  The university ombudsman.
7    Q.  Okay.  And earlier, when we were going over
8 the policy, you said you didn't know whether she was
9 employed during your employment.
10    A.  I didn't recall.  Correct.
11    Q.  Okay.  So does this email refresh your
12 recollection that she was employed during your
13 employment?
14    A.  Yes.
15    Q.  And she's, in fact, communicating with you
16 about no trespass orders, correct?
17    A.  Correct.
18    Q.  And you never raised any concern to her with
19 respect to discrimination, harassment, or retaliation,
20 correct?
21    A.  No.
22    Q.  Isn't that correct?
23    A.  Yes.
24    Q.  Okay.  Now, in this email about trespass
25 warnings, she's asking for information if you could

204

1 provide some information so that the people who interact
2 with students could ensure that there's not a violation
3 of a no trespass order.  Do you see that?
4    A.  Yes, ma'am.
5    Q.  And you're saying that you can't provide that
6 to her, correct?
7    A.  There was a reason, yes.
8    Q.  Now, there was a meeting held on
9 November 19th, 2021, correct?
10    A.  Correct.
11    Q.  Let's look at Exhibit 58.
12    (Exhibit 58 was marked for identification.)
13    Q.  And this meeting was held at 2:00 on
14 November 19th, 2021, correct?
15    A.  Yes.
16    Q.  And what was the purpose of the meeting?
17    A.  The purpose of this meeting was to talk about
18 the lack of information sharing within the university to
19 the Clery Compliance Division as it related to sexual
20 assault, sexual harassment, and those types of crimes
21 and concerns that were being reported elsewhere in the
22 university environment.
23    Q.  And were there also concerns raised in this
24 meeting about the police department's refusal to share
25 information?

51 (Pages 201 to 204)

205

1   A.  No.
2   Q.  No one raised any complaints about the police
3  department's refusal to share information?
4   A.  Not that I recall.
5   Q.  And was President Martin in this meeting?
6   A.  No, I don't believe so.
7   Q.  And in this meeting, isn't it true that Vee
8  Leonard advised you that you were not interpreting Clery
9  correctly?
10   A.  No, she did not.
11   Q.  She was present, correct?
12   A.  I believe she was.
13   Q.  Did anyone raise to you that you weren't
14  interpreting Clery correctly?
15   A.  Precious.  Yes.
16   Q.  And you disagreed with her interpretation,
17  correct?
18   A.  We both saw it through a different lens, yes.
19   Q.  What does that mean?
20   A.  I think Precious did not have the familiarity
21  with Clery, as well versed as she was in Title IX, and
22  so we had a differing of where it fell.  For example,
23  there was a victim advocate in that meeting, and
24  Precious maintained that the victim advocate was not a
25  CSA, which is actually what led to deciding, Okay, we

206

1  need training.  Because I had already learned at my
2  previous employment that the interpretation was, if
3  you're on campus, you're in an office, you're employed,
4  you have an EDU email, you are, in fact, a CSA if you're
5  a victim advocate.  And so Precious was adamant that the
6  victim advocate in there was not a CSA.
7   Q.  Do you know if the victim advocate in FGCU's
8  structure is a confidential resource?
9   A.  Confidential resource does not alleviate the
10  responsibility of a CSA, and the information that's
11  gleaned from a CSA does not identify the victim.
12   Q.  And do you know if the university agreed with
13  your interpretation?
14   A.  I don't know what the -- at that meeting, the
15  answer was no.  We discussed, Sara and I, we need to
16  educate, because this could be a potential costly
17  interpretation under an audit situation.
18   Q.  But it wasn't your job to make that
19  interpretation, correct?
20   A.  No.
21   Q.  Isn't it correct?
22   A.  Yes.  That's correct.
23   Q.  Okay.  Now, was there a discussion at a point
24  in time about public records and the university police
25  department not sharing public records with the Title IX

207

1  and student conduct?
2   A.  That had been an ongoing thing that Precious
3  actually emailed me about early on in my employment.  I
4  think you have those as well.  So, yes, that had been,
5  apparently, something that was occurring before I got
6  there.
7   Q.  Isn't it true you advised your staff not to
8  provide police records to the Title IX office and
9  student conduct?
10   A.  That is categorically untrue.
11   Q.  Isn't it true that you said that they had to
12  make a public records request for the information?
13   A.  That is untrue.
14   Q.  Isn't it true that you said you wanted those
15  records redacted before providing them?
16   A.  I had contacted the other universities to find
17  out how they were handling it.  And so part of the
18  challenge was Title IX was asking for CAD notes and live
19  information that was still under active investigation.
20  In some instances, officers were still on scene.  And so
21  I was trying to find a way, understanding Title IX's
22  need and the need to make sure accurate information got
23  out and was correct, and I was trying to find a balance.
24       So what I actually did was reached out to
25  other agencies to figure out how we could meet those

208

1  needs.  So Precious was never -- or Title IX was never
2  denied.  Emily, Precious, anyone who -- we had to come
3  up with a criteria.
4   Q.  What do you mean "a criteria"?
5   A.  Well, in some instances, for example, when
6  officers would go off, let's say they worked Thursday,
7  and they were off Friday, Saturday, Sunday, it would be
8  Monday before we could get documents.  And in some
9  instances, the reports were inaccurate.  The reports
10  were not completed.  Sometimes supervisors allowed the
11  officers to go home midway through a report.  There were
12  a lot of breakdowns internally, coupled with, I did not
13  have supporting records staff to even process the
14  documents to get them to court in time for first
15  appearance, let alone Title IX.
16       So there were measures and steps that I was
17  trying to implement to make sure that we could meet
18  Title IX's needs while also being mindful of state
19  statute requirements under Megan's Law and a host of
20  other things to make it collaborative so everybody could
21  meet their own objectives.  It was never a black or
22  white thing.  We were always trying to flesh it out for
23  a best practice.
24   Q.  And you think that there's a law that
25  prohibits you from sharing that information within the

209

1  university?
2      A.  We were trying to find out, because some of
3  the state law seemed to conflict with federal law.  And
4  so the other universities that were older than us and
5  had a greater breadth of experience -- I don't have the
6  document; you may.  But I presented a document to Sara
7  that said, Hey, we will get Precious the information no
8  later than 48 hours.  And that was going -- and if it
9  was an imminent threat or an imminent danger, she would
10  be notified immediately by phone by one of my team
11  members.  And that was where we landed on, and that was
12  my recommendation before my termination.
13      Q.  And when you said before your termination,
14  what point in time did you make that recommendation?
15      A.  You should have a document that I provided.  I
16  don't remember the exact date on it.  But it was --
17      Q.  Who did you provide the document to?
18      A.  Sara and Precious.
19      Q.  Was it an email?
20      A.  It was -- I don't remember if it was an email,
21  but I created, basically -- I think it was just a bullet
22  list of how a couple of the institutions handled their
23  documents.  For example, if my memory serves me
24  correctly, University of South Florida would never
25  create their police department an electronic paper

210

1  trail.  They would actually redact information and carry
2  it over in a sealed envelop and give it to their
3  Title IX.  Another university would do it a different
4  way.
5          So there were various ways, because nobody
6  really had an identifiable sturdy process to meet
7  everyone's needs.  So I was doing my very best to try
8  and figure out how we could accommodate Precious's needs
9  and also be mindful of putting out accurate information
10  and being a good partner.
11      Q.  Well, you said that you provided a
12  recommendation in a document.  Was it an email to Sara
13  and Precious?
14      A.  I don't remember if it was an email or
15  something I gave them directly.
16      Q.  Okay.  But you're saying that has a
17  recommendation in it from you on what you're going to
18  do?
19      A.  Precious and I landed on that we would --
20  within 48 hours, she would get all reports -- and it may
21  even be on an agenda.  I don't know.  She would get all
22  reports that were pertinent to her department in
23  Title IX.  And then beyond that, if it was a report
24  where there was an imminent threat or risk or something
25  involving campus safety and security that she needed to

211

1  know immediately, she would be immediately notified, and
2  the paperwork would be delivered.
3      Q.  And you said that you were trying to
4  collaborate and be a good partner.  Do you recall that?
5      A.  Yes, ma'am.
6      Q.  Do you know if others viewed you the same way?
7      A.  I don't.  I was never told differently.
8      Q.  Do you know if others viewed you as difficult
9  to work with?
10      A.  I don't.
11      Q.  And did you have a tense relationship with
12  other administrators or staff?
13      A.  Not that I'm aware of.
14      Q.  Do you know if any of these employees reported
15  their interactions with you to Dr. Martin in the form of
16  a concern about your ability to lead UPD?
17      A.  Can you be more specific?
18      Q.  Sure.  Do you know if any of the other
19  administrators or staff reported to Dr. Martin that the
20  way in which you interacted with them caused them
21  concerns about your ability to lead UPD?
22      A.  I never heard anything like that.
23      Q.  So you don't know; is that correct?
24      A.  No.
25      Q.  Now, you made a number of changes to the

212

1  department in the time that you were there, correct?
2      A.  It depends on what you're describing as a
3  number.
4      Q.  Sure.  We went through adding staff, changing
5  the guns, changing the tasers, changing some of the
6  equipment out.  You made all of those changes, correct?
7      A.  (Witness nods head.)
8      Q.  And you mentioned a minute ago that you didn't
9  think the reports were well done?
10      A.  Correct.
11      Q.  Did you discipline officers for that?
12      A.  So, apparently, that had been an ongoing
13  thing, and Captain Rispoli and Captain Slapp were
14  working on that.  And I deferred to their familiarity
15  with the staff, their responsibility as captains, and I
16  trusted my team that they would remedy it if it needed
17  to be remedied in a more formal manner.
18      Q.  Did you review the reports yourself?
19      A.  No.
20      Q.  Well, if the reports were not well done and
21  you didn't review them yourself, then how did you know
22  they weren't well done?
23      A.  I had two captains that I relied on.
24      Q.  And if they weren't making improvement, did
25  you discipline the captains?

53 (Pages 209 to 212)

213

1     A.  I wasn't aware that they weren't making
2  improvement.  I trusted them and their judgment.
3     Q.  Did the reports get better?
4     A.  I don't know what the status of the reports
5  were at my termination or now.
6     Q.  Well, if there were concerns about the
7  reports, it would have been within your ability to
8  review those reports, correct?
9     A.  Correct.
10     Q.  And it would have been within your ability to
11  discipline officers for that, correct?
12     A.  I think that would have been micromanaging.  I
13  think I trusted the two captains and then their
14  sergeants.  So there's ultimately two layers of
15  supervisory ranks below me.  And I expected that they
16  would have brought it forward if it continued to be a
17  problem.
18     Q.  It would have been within your ability to
19  discipline the officers for that, correct?
20     A.  Their supervisors would have disciplined them,
21  yes.  And I would have supported it.
22     Q.  And it would have been within your ability to
23  discipline them, correct?
24     A.  Yes.
25     Q.  Okay.  And do you have any knowledge of what

214

1  other employees told Vee Leonard about your ability to
2  manage and communicate?
3     A.  No.
4     Q.  Do you have any knowledge of what other
5  employees told Precious Gunter about your ability to
6  manage and communicate?
7     A.  No.
8     Q.  Do you know if Dr. Martin believed that you
9  had difficulty getting along with others?
10     A.  No.
11     Q.  Now, you knew you could be terminated by
12  Dr. Martin if he believed you did have difficulty
13  getting along with others, correct?
14     A.  It wasn't something that occurred to me until
15  the March 9th meeting, because I had never heard
16  otherwise.  I had merely gotten six days before a
17  $10,000 pay increase, so that blindsided me.  Obviously,
18  after that meeting, I recognized there was concern.
19     Q.  And what did you do to remedy those concerns?
20     A.  Well, I listened to what Sara and David
21  Vazquez had to say.  They assured me that everything was
22  fine.  David Vazquez told me that he was sure I was
23  still the person for the job, and that this all involved
24  negative attrition and a change of philosophy from the
25  good old boy network.

215

1     Q.  And so what changes did you make after that
2  March 9th meeting?
3     A.  After the March 9th meeting, Sara told me to
4  just sit down tight and let this play out.  She told me
5  to talk to the other officers to kind of gauge a climate
6  test, and so that's what I did.  I didn't do anything
7  differently.  If anything, I tried to make sure that I
8  flew under the radar, because I really didn't understand
9  what happened.  I was blindsided.
10     Q.  And you knew that you could be terminated if
11  President Martin believed that you did not have an
12  effective communication or management style, correct?
13     A.  I learned that March 9th, and then it was
14  punctuated March 29th.
15     Q.  And isn't it true that President Martin
16  believed that your communication and management style
17  was not effective and warranted termination?
18     A.  I was never told that.
19     Q.  Do you know why the decision was made to
20  terminate you?
21     A.  I do not.  I just know that I was told I was
22  separated without cause, eligible for rehire, and given
23  a $10,000 pay increase a short time before.
24     Q.  Are you aware of any other employees who
25  President Martin believed did not have an effective

216

1  communication or management style?
2     A.  No.
3        MS. DYSON:  Do we want to take a break?
4        MR. YORMAK:  Sure.
5        (Recess taken from 3:51 p.m. to 3:58 p.m.)
6  BY MS. DYSON:
7     Q.  Let me show you Exhibit 59.
8        (Exhibit 59 was marked for identification.)
9     Q.  Do you recognize this document?
10     A.  Yes, ma'am.
11     Q.  And this is another email from Candace McLaren
12  Lanham at Saul Ewing, correct?
13     A.  Yes, ma'am.
14     Q.  And she notes in here her legal interpretation
15  about who's included in the CSA for deans, correct, or
16  whether deans are CSAs under Clery?
17     A.  Correct.
18     Q.  And she says that that's a decision to be made
19  by the university?
20     A.  Correct.
21     Q.  And so who did you bring that to to make that
22  decision?
23     A.  We actually just drafted -- "we" being Diana
24  Tsenekos, Patricia, and myself -- a kind of
25  quasi-structure.  It was never a final thing.  Because

54  (Pages 213 to 216)

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 55 of 118 PageID 415

Smith vs. Florida Gulf Coast University    Kevin Smith    07/22/2025

217

1  we were trying to figure out how to be cost effective if
2  we brought this training in and how it would benefit the
3  university the most.  So it was more of a, Hey, here's a
4  rough draft of thoughts.  Here you go.  So it was never
5  vetted with anybody for approval.  It was a conversation
6  piece and a jumpoff point.
7      Q.  And so when you received this email from
8  Candace McLaren, you didn't -- that didn't cause you to
9  realize that this needed to be brought to Vee Leonard?
10     A.  So if I recall correctly, if you look at the
11 date, it was December 14th.  I think that was moving
12 towards when the university closes for a couple of
13 weeks.
14     Q.  Um-hum.
15     A.  And so I think this was all tabled, and then
16 circling back around, I think this was -- may have been
17 part of the conversation Sara brought to Vee.  I don't
18 know.
19     Q.  Okay.
20     A.  Your stack is getting smaller.
21     Q.  Yes.
22     A.  Mine is getting bigger.
23        (Discussion held off the record.)
24     Q.  So this is -- I've skipped Exhibit 60 for a
25 minute.  So I've put Exhibit 61 in front of you right

218

1  now.
2        (Exhibit 61 was marked for identification.)
3      A.  Um-hum.
4      Q.  And you were copied on the email that Sara
5  sent to Vee Leonard about the communication with Candace
6  McLaren, correct?
7      A.  Correct.
8      Q.  And there's no reference in there to the deans
9  and whether they should be a CSA?
10     A.  I don't see one.  I just see that it's titled
11 FGCU Clery training indicating that that's what the
12 objective was with Ms. McLaren and that outside counsel.
13     Q.  And Vee Leonard's response was not to agree
14 with you, correct?
15     A.  Correct.  Like I said, it never occurred to
16 me.
17     Q.  Okay.  Going to Exhibit 60 now, if we can.
18        (Exhibit 60 was marked for identification.)
19     Q.  This is an agenda from January 6, 2022, with a
20 meeting with Sara Stensrud, right?
21     A.  Correct.
22     Q.  Okay.  And there's a reference at the top of
23 this to Moore and 133K.  Do you see that?
24     A.  I do.
25     Q.  Is that when you asked for a raise?

219

1      A.  It could have been in or around that time.  I
2  don't know.  It had been a conversation.  So I don't --
3  that would be something that Sara would have to speak
4  to.
5      Q.  Okay.  And you were actually raised to 135,
6  not 133, correct?
7      A.  Correct.
8      Q.  And you also list on here Monique McKay and
9  Rispoli.  Do you see that at the bottom?
10     A.  Um-um.
11     Q.  And why were they listed?
12     A.  As I recall, I think there had been
13 conversation; you had referenced one of the exhibits
14 before, about trespasses.  And if my memory serves me
15 correctly, Monique had asked me something.  Maybe it was
16 that.  And Sara had actually -- now that I'm talking
17 about it, I recall.  Sara had told me hit pause on that.
18 So I never responded to whatever it was Monique asked
19 me.  And in that meeting, Sara informed me Monique was
20 no longer either with the university; she was on leave.
21 I don't know what it was.  But she just told me Monique
22 is not part of the conversation anymore.
23     Q.  But the email that you had with her about the
24 trespass order was back in November?
25     A.  Yeah.  But I don't remember if there was a

220

1  subsequent email that, like, had another question.  I
2  don't remember what, but there was something that
3  prompted me to ask Sara about Monique, and I do remember
4  at one point Sara had told me hit pause on that and
5  circle back around.  So that's what I was circling back
6  around on.
7      Q.  Okay.  Let me show you what's marked as
8  Exhibit 62.
9        (Exhibit 62 was marked for identification.)
10     Q.  What about Rispoli?  Why is he listed there?
11     A.  If I looked at the timeline, I could probably
12 tell you better than I submitted.  I don't remember
13 offhand at this moment why he's on there.
14     Q.  Okay.  I've handed you Exhibit 62.
15     A.  Okay.
16     Q.  Do you recognize this document?
17     A.  Yes.  I don't recall it, but I recognize it.
18     Q.  And what did you do with this document?
19     A.  I would tell you that I don't recall what I
20 did with the document.  I don't recall it.
21     Q.  Okay.
22     A.  If subsequent agendas, it may have gone to
23 Sara.  I really don't know.  It would likely have gone
24 to Sara.
25     Q.  So you would just be guessing?

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 56 of 118 PageID 416

Smith vs. Florida Gulf Coast University   Kevin Smith                    01/22/2025

221

1    A.   Yeah.  It would likely have gone to her.  That
2  was typically my normal protocol of things.
3    Q.   Okay.  And do you know if Sara shared it with
4  anyone?
5    A.   I do not.
6    Q.   I'll show you what's marked as Exhibit 63 to
7  your deposition.
8       (Exhibit 63 was marked for identification.)
9    Q.   Do you recognize this document?
10    A.   I do.
11    Q.   And what is it?
12    A.   It is goals.
13    Q.   These are goals you created?
14    A.   I believe they are.  I mean, I am not entirely
15  sure if I created them or if Sara did.
16    Q.   Okay.  So it references here a citizen survey.
17  Do you see that?
18    A.   Which one.
19    Q.   Under -- it's in the middle of the page.  It's
20  under Mid-Year Status.
21    A.   So then if that's on there, yes, these are the
22  goals that I created.
23    Q.   And is attached the survey that you created?
24    A.   This was the potential of surveys.  I was
25  going to go back -- and I even think that that also is

222

1  in documents I submitted.  I went back to my team, and I
2  asked the end users to come up with community survey
3  questions that we could put together for the campus to
4  submit out.  So I don't remember specifically what these
5  questions are.  I think these are only questions
6  possibly submitted by Sergeant Kittleson.  There were
7  others by other members in the department.
8    Q.   So you weren't proposing to take a survey of
9  your direct reports, were you?
10    A.   No.  This was going to be a campus climate
11  survey, because, like I said, looking at the timeline of
12  this, this looks like Sara's writing, January.  I came
13  that May.  And one of the things that both Sara and
14  Dr. Martin told me is that the university police
15  department did not necessarily have a reputation of
16  approachability.  I don't know the exact word, but
17  basically there were some issues.
18    Q.   Do you know if Dr. Martin's opinion of that
19  changed through the time that you were employed there?
20    A.   I was never told otherwise.
21    Q.   Were you told that he did view it as having
22  changed?
23    A.   No.  I was never told one way or the other.
24    Q.   Okay.  And this survey, was it to go out to
25  your -- the other administrators?

223

1    A.   This was not the approved survey.  This is
2  something that someone provided, not me.  But the survey
3  was going to be going out to student, staff, and
4  faculty.  We really wanted a litmus test on students,
5  because those are typically the front-end people who the
6  officers come in contact with.  And given the climate of
7  law enforcement at the time post-George Floyd, I really
8  wanted to make sure that the officers were approachable,
9  that students felt safe, that they felt like we were a
10  resource and part of the fabric.  So there was going to
11  be a heavy emphasis placed on how the students felt with
12  engagement with law enforcement.
13    Q.   When did you decide to move Sergeant Kittleson
14  out of his position of community engagement?
15    A.   He was never moved.
16    Q.   When did you propose moving him?
17    A.   He was actually being utilized to cover shift
18  as a shift sergeant, because we had so many people with
19  COVID, that he -- in an effort to minimize overtime, to
20  give people days off who are now becoming fatigued and
21  exhausted, he became part of that rotation.  I don't
22  remember when it was, but it was sometime in fall.  And
23  he actually had -- his schedule was such that he could
24  adjust his schedule so that he could be home with his
25  wife and kids at dinnertime.  And so there was a

224

1  conversation to say, you know, other people need those
2  same accommodations, and we really have to get through
3  these leaner times of COVID effects so that we can have
4  a well-rested department and let people get healthy.
5       So he was never moved.  The other thing was,
6  he mentioned that he wanted to be a lieutenant.  And so
7  in my direct conversations with him was he had never
8  been on patrol.  He -- even as an officer, Dr. Martin
9  promoted him directly to sergeant, to community
10  relations.  And if he wanted the opportunity for
11  promotion, he had to learn personnel management and
12  shift management.  So he was never moved, but he was
13  given what should have been viewed as career or growth
14  opportunities.  He still maintained his community
15  relations position.  But it was giving him the
16  opportunity to be a supervisor, which he was ranked as a
17  sergeant.
18    Q.   And when did that occur?
19    A.   That started happening around late fall, and
20  he continued in community relations while I was there.
21  Only as a fill-in for patrol during, you know, when
22  somebody needed vacation, like I said, or whatever.
23  Because one of the benefits was he understood that
24  because he could have a flexible schedule to meet his
25  personal needs and his family needs, that part of that

56 (Pages 221 to 224)

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 57 of 118 PageID 417

Smith vs. Florida Gulf Coast University    Keith Smith    01/22/2025

225

1  was an understanding that you also have to kind of
2  accommodate the university's needs. And that arbitrary
3  flexible schedule was something that was in place before
4  I got there.
5      Q.  And did Kittleson object to the way that you
6  had assigned him?
7      A.  His supervisor did, Captain Rispoli and
8  Captain Slapp. I don't remember which one he directly
9  reported to at the time.
10     Q.  Did Kittleson object to it as well?
11     A.  They didn't object to it, Rispoli and Slapp.
12  I don't know if Kittleson objected to it or not.
13     Q.  Okay. And the survey that -- you said that
14  this wasn't the approved survey. Was there a survey
15  approved?
16     A.  I was terminated before all of that went into
17  effect. It was part of my goals. So I don't know if
18  there was a survey or not.
19     Q.  Well, the goal was to have a citizen survey to
20  evaluate citizen perception, engagement, and experience
21  with UPD personnel?
22     A.  Correct.
23     Q.  None of these questions were about your
24  leadership, though, correct?
25     A.  I don't know where these questions came from,

226

1  so I don't know. It doesn't appear to be.
2      Q.  Did you create any survey that would have
3  sought feedback from your colleagues about your
4  leadership style?
5      A.  No. I was unaware that there were concerns.
6      Q.  Let me show you what's marked as Exhibit 64.
7          (Exhibit 64 was marked for identification.)
8      Q.  Do you recognize this document?
9      A.  Only having seen it through, I guess, what you
10  shared. I don't really know how it came, but I got it
11  through my counsel's office.
12     Q.  Did you know that this complaint had been made
13  about you?
14     A.  The only thing that I had any indication there
15  was a complaint was in the EEOC complaint, Precious
16  Gunter's reply that there was some type of hotline
17  complaint. That was the first of my knowledge that it
18  existed. And the first I saw this was in the last few
19  weeks.
20     Q.  Okay. And do you know who made the complaint?
21     A.  Based on the language of it, I could probably
22  surmise who made it.
23     Q.  Yeah. I was asking if you know.
24     A.  No. I don't know factually.
25     Q.  Okay. And do you know who received this

227

1  complaint?
2      A.  Well, if it's got Emily Nanna on there, I
3  would figure she received it.
4      Q.  No. But I was asking do you know. Do you
5  know who received it?
6      A.  No, I don't know. Emily is on here
7  responding.
8      Q.  Do you know if this complaint ever went to
9  Sara Stensrud or David Vazquez?
10     A.  I do not.
11     Q.  Do you know if this complaint was brought to
12  the president's attention, President Martin's attention?
13     A.  Let me read this one. Because one of them
14  says after our meeting with the president. So I -- if
15  this is that one or not, I don't know. No.
16     Q.  Do you have any reason to dispute the
17  authenticity or accuracy of Exhibit 64?
18     A.  The accuracy is categorically untrue and
19  incorrect.
20     Q.  I don't mean the content. Other than what it
21  says?
22     A.  Oh, no.
23     Q.  You dispute what the allegations are that are
24  being made in the complaint about you. Do I have that
25  correct?

228

1      A.  Absolutely.
2      Q.  Okay. You don't dispute whether the complaint
3  was made?
4      A.  No.
5      Q.  Let me show you what's marked as Exhibit 65.
6          (Exhibit 65 was marked for identification.)
7      A.  Okay.
8      Q.  Have you seen Exhibit 65 before?
9      A.  I think this came in some of my public records
10  requests. It may -- I mean, there's hundreds of
11  documents. So, yes, I probably have.
12     Q.  Okay. This relates to your pay increase,
13  correct?
14     A.  Correct.
15     Q.  And this is the increase that took you from
16  125 to 135, correct?
17     A.  Correct.
18     Q.  And does it reflect in here anything related
19  to your performance?
20     A.  After some evaluations of Chief Smith's role
21  and responsibilities, we would like to increase her base
22  salary by 10,000. No.
23     Q.  And did you ever receive an evaluation of your
24  performance?
25     A.  I signed what I believed to be an

57 (Pages 225 to 228)

229

1  evaluation --
2      Q.  And who created that --
3      A.  -- electronically.
4      Q.  -- evaluation?
5      A.  Sara Stensrud.
6      Q.  And did President Martin have any role in that
7  evaluation, to your knowledge?
8      A.  I have no idea.
9      Q.  And do you know whether President Martin was
10  aware of Exhibit 65?
11     A.  I have no idea.
12     Q.  The meeting that occurred with the president
13  and the, you said, five officers, do you know if it was
14  five officers or four officers?
15     A.  I was always -- it was always indicated to me
16  that it was five.
17     Q.  Okay.  And you said earlier it was Kittleson,
18  Rispoli, Anderson, Jones, and Slapp based on other
19  information that you received, not direct knowledge of
20  that?
21     A.  Correct.
22     Q.  Okay.  Do you have any reason to believe that
23  these officers would be biased against you?
24     A.  I do now.
25     Q.  And what is that reason?

230

1      A.  There were mechanisms in place that if they
2  felt that my performance needed to be addressed or
3  remedied, they certainly could have gone and followed
4  the chain of command in our organization.  I think Brian
5  Jones displayed some type of issue with my scope of
6  authority, and that it was, in my exposure to him, based
7  on gender.
8      Q.  How was it based on gender?
9      A.  He certainly didn't act like that with anybody
10  else.
11     Q.  How do you know whether he acted like that
12  with Chief Moore?
13     A.  There was never any indication that he did.
14     Q.  Okay.  So you don't know one way or the other,
15  correct?
16     A.  No.  Based on my own experience.
17     Q.  Did he ever make any comment about your
18  gender?
19     A.  I don't think he would have done that based on
20  positional authority.
21     Q.  Did he make any comments about females, people
22  of the female gender in any way?
23     A.  We did not have small talk or conversation.
24  It was always business related.  He kind of formed the
25  boundaries of our engagement.

231

1      Q.  Okay.  And I think you've already told me
2  about Brian Jones.  I don't want to cover that again.
3      A.  Sure.
4      Q.  So if there's something else that you want to
5  tell me, please feel free to do that.  But what about
6  the others?
7      A.  To be honest with you, I cannot understand for
8  the life of me why Sara Stensrud and David Vazquez were
9  bypassed.  These are -- it's a paramilitary structure.
10  Captain Slapp was in the military.  Captain Rispoli has
11  worked in public service for two and a half decades.
12  Sergeant Anderson -- if these are, in fact, the people
13  who went -- understood he was retired from NYPD.  So
14  there was a clear understanding of rank structure and a
15  hierarchy.  And I can't figure out why they bypassed the
16  white female chief, the white female AVP, who is the
17  head of human resources, who would be able to address
18  any HR issues, the Hispanic male AVP, to go directly to
19  the white male president.
20     Q.  Do you know if the president invited all
21  employees to have those types of conversations with him?
22     A.  I don't.
23     Q.  Any other reason that you believe that these
24  five individuals who you think were involved were biased
25  against you?

232

1      A.  Nothing that I can characterize in words at
2  this moment.
3      Q.  Let me show you what's marked as Exhibit 66.
4          (Exhibit 66 was marked for identification.)
5      Q.  Do you recognize this document?
6      A.  I don't remember this.  I don't remember this,
7  because this was March 3rd, six days before the
8  president's meeting, so I have no recollection of this,
9  to be honest with you.
10     Q.  Okay.
11     A.  Did I see it?  Quite possibly.  But based on
12  the time frame...
13     Q.  Okay.  Let me show you what's marked as
14  Exhibit 67.
15         (Exhibit 67 was marked for identification.)
16     Q.  Do you recognize this document?
17     A.  I do.
18     Q.  And what did you do with this document?
19     A.  Again, I don't recall.  Looking at the time
20  frame, it's March 7th, so I don't recall.  March 9th was
21  the meeting with the president, and I was notified that
22  afternoon.
23     Q.  Okay.  Let me show you what's marked as
24  Exhibit 68.
25         (Exhibit 68 was marked for identification.)

58  (Pages 229 to 232)

Smith vs. Florida Gulf Coast University    Keith Smith    07/22/2025

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 59 of 118 PageID 419

233

1   Q. Do you recognize this document?
2   A. I do.
3   Q. And what are you relaying in this document?
4   A. So this was part of the five-year plan that I
5   had presented to human resources that was going to be
6   slated with impending changes. And it was a speaking
7   point and projection of potential possibilities to what
8   the police department would look like.
9   Q. And does this organizational chart
10  reflect the sergeant over outreach?
11  A. That would have been with this projected plan,
12  again, a five-year plan. Nothing immediate. It would
13  have been a community relations officer, and then there
14  would have been -- that sergeant position would have
15  been reclassified to accreditation and training. One of
16  our challenges in exit interviews was that officers felt
17  there was no opportunity for them to diversify. So
18  because you're a small department with very central and
19  specific responsibilities, certain positions that were
20  held by certain people all of the time, they didn't have
21  a chance for career growth.
22      So this was one of the models that was
23  developed to give officers who are entry level an
24  opportunity to get away from just patrol and have a
25  chance to do something different. Because they didn't.

234

1   All they could do is either do patrol or hope for a
2   promotion.
3   Q. Okay.
4   A. So that's what this is.
5   Q. I'm sorry. I didn't mean to interrupt.
6   A. No. No, ma'am. I understand.
7   Q. At the time of -- at the time the organization
8   that you had had a community relations sergeant?
9   A. Correct.
10  Q. And your proposal was to eliminate that
11  position and make it an accreditation and training
12  sergeant, correct?
13  A. Some time in the next five years.
14  Q. Okay. When did you communicate this proposed
15  change to the organization to the police department?
16  A. This had not been proposed to the
17  organization. This had been a conversation with the
18  captains, if I recall correctly. So because I got their
19  input, we had a conversation, and I wanted their buy-in
20  and input, as it says here, and this is probably some of
21  that 40 percent number that you had talked about
22  leaving. We had Captain Slapp retiring. We had Smitty
23  retiring. We had Captain Rispoli slated to retire.
24  Sergeant Kuenzi was slated to retire. So a lot of those
25  positions that I think may have been included in your

235

1   numbers were people who were already going to punch
2   their ticket and leave in the next 12 months. It wasn't
3   that they were seeking employment elsewhere. They were
4   retiring, because they had paid their time and wanted
5   their FRS. But this was going to be a five-year plan.
6   Q. So you shared this chart with the captains,
7   correct?
8   A. Correct. Yes.
9   Q. And the chart would show that there is no
10  longer a community outreach sergeant, correct?
11  A. Within the next five years, correct.
12  Q. And where does it say within the next five
13  years?
14  A. This was part of the conversation that I had
15  with Sara and the captains and human resources, because
16  this would not be something that would be implemented
17  quickly. It would have been a conversation with human
18  resources in greater breadth, reviewing the contract,
19  talking with the union, and looking at it from not just
20  a line view but a 30,000-foot view. Something like this
21  would never just be a broad sweep. It would be
22  something that took a slow implementation with a plan
23  out.
24  Q. So you said in this email that you spoke to
25  Sara about doing a larger reorganization within PD?

236

1   A. Correct.
2   Q. It doesn't say in five years, does it?
3   A. It doesn't mean that wasn't the plan.
4   Q. And you also say here: Here's the org chart
5   that I would like to institute, correct?
6   A. Correct.
7   Q. Okay. Do you know if the captains who
8   reviewed that viewed you as eliminating the community
9   outreach sergeant?
10  A. Actually, the communication with them was
11  that's a great plan because we have to give officers a
12  chance to do something different. It was about creating
13  career paths for people who were entry level and giving
14  them something other than driving around a 2-mile radius
15  for 12 hours at a time.
16  Q. Do you know if those captains shared the
17  proposed organizational chart with the sergeants?
18  A. I don't know.
19  Q. Exhibit 69, I'll place that in front of you.
20      (Exhibit 69 was marked for identification.)
21  Q. Do you recognize this document?
22  A. I don't remember it. I mean, I see that it's
23  there. Yeah. I mean, I don't remember it. But I see
24  my response that the justification is the coordinator
25  made $56,000 a year and a Clery violation is 59,000.

59 (Pages 233 to 236)

237

1    Q.   And are you aware of FGCU ever being fined by
2  the Department of Education?
3    A.   I'm sorry.  Say that again.
4    Q.   Are you aware of the Department of Education
5  ever fining FGCU regarding Clery?
6    A.   Oh, I'm not, no.
7    Q.   Now, after the meeting on March 9th that you
8  had with Sara Stensrud and David Vazquez, in that
9  meeting, did they talk about an assessment that would be
10  done by Dr. Thomas?
11    A.   Yes.  That's how I learned of it.
12    Q.   Okay.  And what were you told about that
13  assessment?
14    A.   And to be honest with you, I don't remember if
15  it was that meeting or a subsequent meeting.  That
16  meeting may simply have been, to be quite frank, Holy
17  shit.  This just -- this conversation just happened, and
18  we don't know.  So I don't know if that was that
19  meeting.  That feels more like what that meeting was,
20  because David and Sara both felt very blindsided as
21  well.  But there was meetings and conversations over the
22  course of the next two weeks that talked about Dr.
23  Thomas.
24    Q.   Okay.  And what was it that you understood
25  that Dr. Thomas was going to do?

238

1    A.   From whom?  Dr. Thomas?  Or Sara and David?
2    Q.   Well, let's start with how did you first learn
3  about it?
4    A.   Sara and David told me about it.
5    Q.   So what did they tell you about what Dr.
6  Thomas was going to do?
7    A.   They told me that there had been some dialogue
8  about hiring Dr. Thomas as a researcher to come in and
9  evaluate the police department and do what they called a
10  climate survey.  And the intention and the purpose of
11  that was to see if, as Sara put it, and David concurred,
12  is this the good old boy network who doesn't want to
13  change and take direction from a female, or if this was
14  my management style and my leadership, or if it was a
15  combination, and what next steps could be done to flesh
16  it out and make everything better for the institution,
17  the organization, and the police department.
18    Q.   Who said that the officers didn't want to take
19  direction from a female?
20    A.   Sara said it, and David concurred.  And that
21  was actually when David said, I absolutely believe you
22  are the right person for the job.  We expect negative
23  attrition.  And those were the words he used.
24    Q.   Do you know if President Martin concurred with
25  that assessment?

239

1    A.   I don't know.
2    Q.   Okay.  And then did you have a conversation
3  with Dr. Thomas about the assessment?
4    A.   I did.
5    Q.   And have you already told me about that?
6    A.   I don't remember.  It's been a long day.
7    Q.   Okay.  That's fine.  So if you want to tell
8  me, when did you have this conversation with him?
9    A.   I think that I called him once it was
10  mentioned to me.  I had seen him like a few weeks prior
11  to pancake cookoff.  We were both in a competition to
12  cook the best-looking FGCU pancakes.  And he walked up
13  to me; I had not seen him, I don't think, since my hire
14  earlier that May.  And he and I actually talked about
15  collaborating.  He knew I had been an adjunct
16  instructor.  He knew my work background.  And we talked
17  about collaborating on some projects.  And he said, I've
18  heard nothing but great things about you.  I knew you
19  were the real deal when you got hired.  That was when I
20  saw him at the pancake cookout.
21    Q.   In February?
22    A.   In February.  Then when I talked to him, his
23  words were something along the lines of, This is
24  bullshit.  And he said that they had called him about
25  doing a climate assessment.  He told me not to worry

240

1  because -- and I can't remember the exact language, but
2  it was something to the effect of police officers are
3  the worst to accept change.  They don't want to take
4  direction from women.  That, historically, it's a
5  male-dominated profession.  And then he sent me an
6  article or he referred to an article -- I don't remember
7  if that was when he sent me the article or if it was
8  sometime later.  But he sent me an article or a paper he
9  wrote called "We Be."
10            And what that refers to is we be here when the
11  new chief comes, and we be here when the new chief goes.
12  And it was indicative of resistance to change when you
13  bring in somebody who's going to modernize things and
14  change the hierarchical structure.  And that was a
15  document he shared.  I can't remember if it's a paper, a
16  research document.  I don't remember the gist, but that
17  was what it was.  And he told me, he said, And I shared
18  it with Mike.  And I took that as meaning Mike Martin.
19  And he said he told Mike don't do anything rash.  And he
20  was on a first-name basis with Dr. Martin; I was not.
21    Q.   Was there anything in that paper about gender?
22    A.   I don't remember.
23    Q.   So you would rely on what the paper says?
24    A.   Not solely, no.
25    Q.   In terms of --

60  (Pages 237 to 240)

Smith vs. Florida Gulf Coast University    Kevin Smith

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 61 of 118 PageID 421

07/22/2025

241

1    A.  I think it's just a resource where he -- you
2  know, you would have to ask him what he meant about
3  that.  I'm just telling you what he shared with me.
4    Q.  Oh, okay.  But the We Be paper, did it
5  reference gender at all?
6    A.  I don't recall.
7    Q.  Okay.  So you would rely on the paper itself
8  to reflect whether it references gender?
9    A.  Again, I don't think I understand what you're
10  actually asking.
11    Q.  Sure.  So you don't recall whether it
12  references gender.  What would refresh your
13  recollection?
14    A.  I would have to read it.
15    Q.  Okay.  And after your separation from the
16  university, did you understand that the university went
17  forward with the assessment of the department?
18    A.  I did.
19    Q.  And do you know why?
20    A.  I don't.
21    Q.  Do you know if Dr. Martin expanded the
22  assessment of the department beyond looking at the
23  officers and the department itself?
24    A.  I received a copy of it from a public records
25  request, but I actually never read it.  So I don't know

242

1  the scope of the assessment.
2    Q.  Do you know when -- do you have any knowledge
3  of when Dr. Martin and Dr. Thomas talked about the
4  assessment?
5    A.  Can you be more specific?
6    Q.  Sure.  Do you have any knowledge of when
7  Dr. Martin and Dr. Thomas talked about the assessment?
8    A.  Doing the assessment?  The results of the
9  assessment?
10    Q.  Any part of the assessment.
11    A.  The only thing I know is the emails, and I
12  provided them.
13    Q.  Okay.  You have no personal knowledge of any
14  of those conversations, correct?
15    A.  Only what Dr. Thomas told me was he told Mike,
16  Don't make a rash decision.
17    Q.  Okay.
18    A.  And that it's bullshit.
19    Q.  And do you know if Dr. Thomas had reviewed the
20  hotline complaint that was filed about you?
21    A.  I do not.
22    Q.  Do you know if Dr. Thomas had reviewed what
23  the other administrators had said about you?
24    A.  I do not.
25    Q.  Do you know what Dr. Thomas was tasked with

243

1  doing by Dr. Martin?
2    A.  I may have seen it in the proposal or
3  something as part of my public records request, but I
4  don't remember specifically.
5    Q.  That would be the only basis for your
6  knowledge of that?
7    A.  Yes, ma'am.
8    Q.  Let me show you what's marked as Exhibit 70.
9      (Exhibit 70 was marked for identification.)
10    A.  Thank you.
11    Q.  Do you recognize this document?
12    A.  I see it, but I honestly don't specifically
13  recall it.  I do see it says, We've never had an
14  official budget.  So, yes, I mean, that would be my
15  language.
16    Q.  And do you know who Chris Daniel is?
17    A.  Yes.
18    Q.  And who is he?
19    A.  He is the chief of police for the University
20  of South Florida, Tampa.
21    Q.  Okay.  Do you have any basis to dispute
22  Exhibit 70?
23    A.  No.
24    Q.  And he says in his first email on March 18th
25  that he is doing a budget proposal, and he wants to

244

1  contrast New College Police and Florida Gulf Coast with
2  the St. Pete campus as good comparators.
3    A.  I see that.
4    Q.  Did you agree with him on that?
5    A.  I don't know what reference he was making.  I
6  don't know if it was geographical.  I don't know if it
7  was the size of the institution.  I didn't know where he
8  was going with that to agree nor disagree.  I just
9  wanted to be a good collaborator and give him the data
10  he was seeking.
11    Q.  And do you know if you had been given more
12  resources than New College and St. Pete USF?
13    A.  I do not.
14    Q.  Let me show you what's marked as Exhibit 71.
15      (Exhibit 71 was marked for identification.)
16    Q.  Do you recognize this document?
17    A.  I had seen this in the public records request.
18    Q.  And do you have any basis to dispute this
19  document?
20    A.  No.
21    Q.  And do you see where Mike Martin is saying on
22  March 28th at 8:05 a.m. that it seems the new chief has
23  bruised a few relationships beyond UPD, so we might need
24  a somewhat more holistic perspective?
25    A.  I see that.

Smith vs. Florida Gulf Coast University   Kent Smith

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 62 of 118 PageID 422

07/22/2025

245

1    Q.   Did you agree with that statement?
2    A.   No.  I was unaware.  And it was -- it's vague
3 and ambiguous.
4    Q.   You don't know what Dr. Martin meant by that?
5    A.   I have no idea.
6    Q.   But you don't dispute this document that was
7 sent, correct?
8    A.   I don't dispute that it is a document that was
9 sent.  The content, I have no idea what's factual.
10    Q.   Let me show you what's marked as Exhibit 72.
11       (Exhibit 72 was marked for identification.)
12    Q.   Do you recognize this document.
13    A.   I do.
14    Q.   And is this a hotline complaint that was made
15 about you?
16    A.   It looks to be.
17    Q.   And did you receive a copy of this complaint
18 at the time it was filed?
19    A.   No.
20    Q.   Do you know who did?
21    A.   No.
22    Q.   It says in this document that after the
23 meeting with the president, nothing has changed.
24    A.   After we met with the president, correct.
25    Q.   Do you know who authored this?

246

1    A.   Based on that, it would have been the parties
2 who met with the president.
3    Q.   Okay.  And we've already gone through that.
4       So you don't know who wrote this, correct?
5    A.   Not specifically.
6    Q.   Okay.  And it says:  We used to like coming to
7 work.  Now we hate coming to work.  Do you see that?
8 It's in the third paragraph under Details.
9    A.   Yes.
10    Q.   Okay.  And it says:  One person already left.
11 Do you see that?
12    A.   I do.
13    Q.   Do you know who that was?
14    A.   I don't.  I don't know who left.
15    Q.   Okay.  And it says:  Seven others are looking
16 at leaving.  Do you see that?
17    A.   I do.
18    Q.   Do you know who those seven were?
19    A.   Sure.  They're part of the people who were
20 retiring.  So there were only two command staff
21 captains; one was James Slapp, who was slated to retire
22 in May, had he not been selected as interim chief and
23 not been part of that meeting.  The other was Captain
24 Rispoli who was slated to retire in December, had he not
25 been part of that meeting.  Because based on this, of

247

1 the seven looking to leave with those two, the other is
2 Interim Sergeant Detective Anderson.  And the two
3 supervisors and sergeants would likely be Brian Jones
4 and Myles Kittleson.  So of that seven -- or of those
5 five there, four of them have left even post my
6 separation.  The only one that remains is Brian Jones.
7    Q.   And who are the other two of the seven?  Do
8 you know?
9    A.   I don't know.  Sergeant Kuenzi was getting
10 ready to retire.  So he could very well have been lumped
11 in those numbers.  And Smitty Rounsifer was retiring, so
12 she could have been lumped in those numbers.  So this
13 could be very misrepresentative of the why they were
14 leaving, and these people could have just been
15 categorically lumped in.  Because the captains were
16 slated to retire no matter what.  They only changed
17 their plans post my termination and their promotions.
18    Q.   Well, they weren't slated to leave in March,
19 though, correct?
20    A.   Slapp was slated to leave in May, and Rispoli
21 in December.  And that had been common conversation long
22 before I got there.  Steve Moore told me that.
23    Q.   But they weren't slated to leave in March,
24 correct?
25    A.   Correct.

248

1    Q.   And what they're saying -- whoever wrote this
2 is saying that they -- that all of these people are
3 going to leave right now?
4    A.   That's not my interpretation.  It says:  Seven
5 others are looking at leaving.  So it doesn't say right
6 now.
7    Q.   Plus other officers, so it wasn't just seven,
8 correct?
9    A.   I don't know.  I mean, I can't -- all I'm
10 doing is looking at the numbers as I see them, and my
11 personal, intimate knowledge of what the conversation
12 was before the March 9th meeting and who was going the
13 leave and what reasons.  These were people who were
14 already planning to leave.  Upon my separation, they all
15 got promoted and salary increases and stayed.
16    Q.   It says:  They all got promoted?
17    A.   Correct.
18    Q.   All seven of these people?
19    A.   There's not seven.  There's five identified;
20 two, one, and two.
21    Q.   Okay.  But it says:  Seven people are looking
22 to leave.
23    A.   We don't know who the other two are, because
24 it doesn't delineate who they are.
25    Q.   It says:  If something isn't done in a timely

62  (Pages 245 to 248)

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 63 of 118 PageID 423

Smith vs. Florida Gulf Coast University    Kevin Smith                    07/22/2025

249

```
 1  manner, we are leaving.  Correct?
 2      A.  I see that.
 3      Q.  And it says that:  We can't fill the positions
 4  we have open.  We are 19 people total.  Is that
 5  accurate?
 6      A.  I don't remember if we were 19 at the time, if
 7  they were all full.  Retention and recruitment were
 8  serious issues, as we've already discussed, so -- and
 9  turnover was horrible, especially with the
10  $10,000-a-year difference between local agencies.
11      Q.  And it says:  If you lose eight people, the
12  department goes to 11, which is critical to the safety
13  of the university due to staffing?
14      A.  I think the safety of the university would
15  have not been put in jeopardy.  We had relationships
16  with our local law enforcement partners as well as we
17  had relationships with other university police
18  departments.  So there would have been mechanisms in
19  place, and, to me, this just seems a little inflated,
20  just looking at two plus one plus two is five, but
21  they're saying seven.  So I don't know the veracity, and
22  I certainly doubt the accuracy of this.
23      Q.  Okay.  So I understand that you dispute it.
24      A.  Correct.
25      Q.  But do you know how President Martin viewed
```

250

```
 1  this complaint?
 2      A.  I do not.
 3      Q.  Do you know whether President Martin viewed
 4  eight people leaving as critical to the safety of the
 5  university?
 6      A.  I do not.  I don't know if he saw it as
 7  accurate when it doesn't appear to be.
 8      Q.  And it doesn't appear to be accurate, because
 9  they haven't identified the seven people; is that what
10  you're saying?
11      A.  Just based on my personal knowledge at the
12  time and looking at the numbers now.  Because even they
13  say seven and then if you lose eight.  So I'm still
14  trying to understand the mathematics of it.
15      Q.  Okay.  And you thought it made a difference
16  between seven and eight to the staffing of the agency?
17      A.  I think what it reflects is the accuracy of
18  the document and the honesty of it.
19      Q.  Okay.  And are you aware of any other
20  department or senior leader who had a complaint filed
21  where eight people were saying they were going to leave
22  or seven people said they were going to leave?
23      A.  No.
24      Q.  And you said that Captain Slapp was promoted
25  after your separation from the university?
```

251

```
 1      A.  That's correct.
 2      Q.  Do you know if he had previously filled the
 3  position of interim chief and was just returning to it?
 4      A.  I don't recall.  I don't think there was a gap
 5  between Steve Moore and I.  There may have been.  But I
 6  don't recall.
 7      Q.  Do you know how Captain Slapp was selected?
 8      A.  No.
 9      Q.  Do you know why Captain Slapp was selected?
10      A.  No.
11      Q.  Do you know what Captain Slapp was paid --
12      A.  No.
13      Q.  -- to fill that position?
14      A.  No.
15      Q.  Do you know if he was paid $35,000 less than
16  you were?
17      A.  No.
18      Q.  Was there a time that you gave Captain Rispoli
19  a verbal warning?
20      A.  Yes.
21      Q.  And do you have any documentation of that?
22      A.  No.  Like I said, verbal warnings would have
23  been part of the, you know, the supervisor's personnel
24  file.  And I would have left that when I got terminated.
25  So if it was there, I don't know what happened to it.
```

252

```
 1      Q.  When did you give it to him?
 2      A.  When he made the comment, I called him in.
 3      Q.  When was that?
 4      A.  I don't remember the date.
 5      Q.  Do you know if it was six months before you
 6  left?
 7      A.  I don't recall.
 8      Q.  Do you know if this was one of those documents
 9  that would have been destroyed pursuant to the practice
10  in the department?
11      A.  I don't know.  I would have left it there,
12  so...
13      Q.  But how do you know you would have left it
14  there, or it would have been destroyed under the
15  practice of the department?
16      A.  I don't know what -- like when I left stuff
17  there when I got fired, it was literally, Come to my
18  office, and I was told I was fired.  And so I was done.
19  So I don't know what happened to the files I left there.
20      Q.  Do you know if it was in that file when you
21  left?
22      A.  I don't recall.  Captain Slapp immediately
23  took over, so he would have had access to it as would
24  Rispoli.
25      Q.  Assuming it was there, correct?
```

63  (Pages 249 to 252)

Smith vs. Florida Gulf Coast University    Kevin Smith

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 64 of 118 PageID
424

07/22/2025

253

1    A.  Correct.
2    Q.  And did the coworker complain about the
3 comment?
4    A.  I actually brought him in and had a
5 conversation with him, told him I heard it, and he said
6 he understood, and he didn't want to make a big deal
7 about it.  I told him about Title IX and what his
8 options were, and I told him that he could also go to
9 human resources.  And he said, I don't want to make a
10 big deal about it.  It's all good.
11    Q.  Did you ever hear Captain Rispoli make another
12 comment like that?
13    A.  I did not.  And, again, at some point in time,
14 he went out on FMLA and was gone and didn't return until
15 I was no longer employed.  So I don't know what
16 happened.
17    Q.  Well, how could he have had a meeting with the
18 president if he was on FMLA leave?
19    A.  I can't answer that.
20    Q.  Okay.  But you believe he was on FMLA leave at
21 the time?
22    A.  I don't remember.  I don't remember him coming
23 back.  And just because he was on FMLA didn't preclude
24 him from going to the president and having a
25 conversation.

254

1    Q.  Okay.  Did you open an IA investigation on
2 Captain Rispoli?
3    A.  No.
4    Q.  Did you place him on administrative leave?
5    A.  No.
6    Q.  And you didn't report it to OIEC either,
7 correct?
8    A.  No.  I reported it to Sara Stensrud, chief HR
9 officer.
10    Q.  Well, that wasn't one of the ones you listed
11 earlier.  Are there any others that you're now
12 remembering that you told her about?
13    A.  No.  I thought I listed it, but if I didn't,
14 then I stand corrected.
15    Q.  Did Captain Rispoli complain about the verbal
16 warning?
17    A.  No.  He actually said, Oh, shit, Chief, I
18 know.
19    Q.  Did it have any impact on his employment?
20    A.  No.
21    Q.  During your employment, did Sara Stensrud
22 counsel you about being more collaborative?
23    A.  Never.
24    Q.  In that meeting that you had with her either
25 on March 9th or 10th, her and David, did you ask to

255

1 participate in any type of formal coaching program?
2    A.  She said that she would bring that forward and
3 would I be willing to do it, and I said absolutely.  I
4 would be happy to participate in anything.  If I can get
5 better, no matter how it comes about, I want to get
6 better.  I want to be a better employee and a better
7 leader.
8    Q.  Did you believe you needed to change the way
9 in which you were communicating and leading the
10 department at that point?
11    A.  I was willing to do some self-reflection, but
12 this blindsided me so much that, quite frankly, that was
13 my first thing was where did this come from.  Because
14 there weren't incidents or issues that I could pinpoint.
15 And Sara and David were blindsided.
16    Q.  Did they tell you they were blindsided?
17    A.  Not their exact words, but the conversation
18 certainly lent itself to say, wow, we did not see this
19 coming.
20    Q.  And what is "this"?
21    A.  Complaints about me.  As a matter of fact, at
22 one point, I introduced what's called the Pink Patch
23 Campaign.  I don't know if you're familiar with what
24 that is.  But, basically, in the months of October, law
25 enforcement departments don pink patches and breast

256

1 cancer awareness.  My sister passed away from it.  My
2 mom is a survivor.  I have another sister fighting.  So
3 when I came on board, I asked if we could participate.
4 And I partnered with different groups across campus.
5 And it was actually funded by donations from one of the
6 departments on campus.
7    And we did the Pink Patch Campaign.  We
8 partnered with athletics.  I had them involved.  And we
9 sold the patches, and we made a donation to Moffitt
10 Cancer Institute.  And David Vazquez actually wrote to
11 Sara, in that instance, Man, Chief nailed it.  She got
12 it right.  I don't remember the exact language, but
13 there's an email in there, something to that effect.
14    Q.  Would that have been in October of '21?
15    A.  It probably would have been later, because I
16 don't think we donated the money until maybe January.
17 Because I think we had to get approval on how to move
18 the money from FGCU to Moffitt and it being part of USF,
19 and, you know, there were things that were beyond the
20 scope of me that dealt with finance and accounting and
21 Megan Clipse and those kind of people.
22    Q.  And do you know if President Martin agreed
23 with his assessment in that email?
24    A.  I don't.  I don't even know if he was part of
25 that email, but...

257

1    Q.  Do you know who made the decision to terminate
2  your employment?
3    A.  Mike Martin.
4    Q.  Do you know how that decision was made?
5    A.  I do not.
6    Q.  Do you know why the decision was made?
7    A.  I do not.
8    Q.  Do you have any knowledge of Dr. Martin making
9  derogatory remarks about you or your gender?
10   A.  I do not.
11   Q.  Do you have any knowledge of Vee Leonard
12 making any derogatory remarks about you or your gender?
13   A.  I do not.
14   Q.  Do you have any knowledge of Precious Gunter
15 making any derogatory remarks about you or your gender?
16   A.  I do not.
17   Q.  Do you have any knowledge of any employee at
18 the university making any derogatory remarks about you
19 or your gender?
20   A.  I do not.
21   Q.  Other than your counsel, who have you
22 discussed your termination with?
23   A.  Well, my family knows.
24   Q.  Anyone at the university?
25   A.  No.  I mean, when Dina was there, she

258

1  obviously knew, my partner.
2    Q.  Okay.  Other than your partner or your counsel
3  or your family, anyone employed by the university that
4  you discussed the decision to terminate your employment?
5    A.  Oh, I received phone calls after I was
6  terminated with people who were taken aback by it --
7    Q.  And who was that?
8    A.  -- and expressed surprise.
9        Oh, gosh.  I can't give you a complete list,
10 but Marianne -- she worked in the university.  She
11 actually was like, This is so wrong.  You need to sue.
12 There was a guy in physical plant and facilities, a
13 couple of the officers called me.
14   Q.  Who was that?
15   A.  Oh, gosh.  Pineda.  I think two of the
16 sergeants.  I can't remember their names.  I had
17 conversations with some of the human resources people in
18 terms of correcting my salary discrepancies and those
19 things.  And they all acknowledged and just said, you
20 know, we're so sorry this happened.  And Heather, who I
21 was meeting with when I got the call to go to David, she
22 was like, Oh, my God.  I can't believe this.  I'm so
23 sorry.
24   Q.  Do you know any of them to have personal
25 knowledge of why you were terminated?

259

1    A.  Not that I know of.
2    Q.  Do you --
3    A.  And Kirsten.  There was another person who
4  worked in HR that, again, was all part of -- I can't
5  think of -- there was another lady Amy.  So when you ask
6  if I've talked to people since then, it was all in the
7  early stages of my termination trying to separate, get
8  my separation pay correct, because there was
9  discrepancies, my 401(k) stuff, those kind of things.
10 And every time I talked to them, they all expressed
11 surprise, dismay.  You know, no one seemed like, Oh,
12 yeah, we saw this coming.
13   Q.  Did any of them -- were any of them involved
14 in the decision?
15   A.  I don't know.
16   Q.  Did any of them speak to President Martin?
17   A.  No.
18   Q.  And the separation that the university did
19 without cause, did it have any impact on your law
20 enforcement certification?
21   A.  No.  I mean, it's expiring.  If I don't secure
22 law enforcement employment here relatively soon, my
23 certification will expire.
24   Q.  But I meant in terms of -- well, let me ask it
25 this way:  Normally, when a police officer separates,

260

1  you have to report to FDLE how they separated?
2    A.  Correct.
3    Q.  And how they separate can have an impact on
4  your certification, correct?
5    A.  Correct.
6    Q.  And reporting a separation without cause has
7  no impact?
8    A.  Correct.
9    Q.  FDLE didn't do any investigation on you,
10 correct?
11   A.  No.
12   Q.  With respect to the assessment that Dr. Thomas
13 did, do you know how much he was paid to conduct that
14 assessment?
15   A.  I saw it in the contract, but I don't remember
16 how much.
17   Q.  And do you know what happened as a result of
18 the assessment?
19   A.  I don't.
20   Q.  Do you know how the next police chief was
21 selected in the department?
22   A.  Slapp was the next police chief, so I don't
23 know.  I mean, I assume he was assigned it.
24   Q.  Do you know if that was temporary?
25   A.  I don't.

65  (Pages 257 to 260)

261

1    Q.   Do you know what the discussions were had with
2 Captain Slapp?
3    A.   No.
4    Q.   And do you know who made the decision?
5    A.   No.
6    Q.   Do you know who was considered for that
7 position?
8    A.   No.
9    Q.   I'll show you what's marked as Exhibit 73.
10       (Exhibit 73 was marked for identification.)
11   Q.   Do you recognize this document?
12   A.   I do.
13   Q.   And what is it?
14   A.   Well, I don't know which one it is.  They
15 originally gave me a different document, because they
16 had errors in it, and so while I was sitting with Sara,
17 the original document they gave me, they took back, and
18 then they gave me a second document that -- so I don't
19 know which of those two documents it is.  But it was a
20 document outlining my separation of my employment.
21   Q.   And you said there were errors.  Were those
22 intentional errors?
23   A.   I don't know what errors they even were.  Like
24 I said, I was reeling.  I was completely blown away.
25 The night before I was told everything is fine.

262

1    Q.   Who told you the night before that everything
2 was fine?
3    A.   Sara and David.  They told me that they got
4 the go-ahead on the assessment and that we would see
5 what the assessment yielded.  And then after, we would
6 have a strategy.
7    Q.   And do you know whether they were involved in
8 the decision to terminate?
9    A.   I don't.
10   Q.   I'll show you what's marked as Exhibit 74.
11       (Exhibit 74 was marked for identification.)
12   Q.   Do you recognize this document?
13   A.   This was, I'm assuming, the assessment from
14 Dr. Thomas.  Like I said, I got a copy of it, but I
15 never read it.
16   Q.   Okay.  Do you know whether it addressed Clery
17 compliance?
18   A.   I don't.
19   Q.   Do you know whether it addressed the
20 relationship with the university partners?
21   A.   I don't.
22   Q.   You got a copy through the public records
23 request?
24   A.   Yes, ma'am.
25   Q.   I'll show you what's marked as Exhibit 75.

263

1       (Exhibit 75 was marked for identification.)
2    Q.   Do you recognize this document?
3    A.   I do.
4    Q.   And this is the IA investigation that I think
5 you referenced earlier?
6    A.   Correct.  And I had even forgot Sergeant
7 McGowan was part of it, to be honest with you.
8    Q.   And who is Sergeant McGowan?
9    A.   He was the supervisor of Officer Palmer and
10 Officer Winning.
11   Q.   And did he go to the president?
12   A.   I don't know.
13   Q.   And it references a complaint.  Who made the
14 complaint?
15   A.   It came from -- you've got to forgive me,
16 because I don't remember the titles of departments, and
17 they often change in universities.  It was office of
18 student conduct.  There's student rights and
19 responsibilities or one of those entities that during a
20 disciplinary hearing, they heard information that they
21 felt was offensive.  So they filed a report with me.
22 Not a report.  They filed a verbal complaint.
23   Q.   Let me show you what's marked as Exhibit 76.
24       (Exhibit 76 was marked for identification.)
25   A.   Yes.

264

1    Q.   And what is Exhibit 76?
2    A.   It is the background investigation of an
3 individual who was hired for records clerk
4 administrator.  I'm not sure of the title.
5    Q.   And did you hire him?
6    A.   I did.
7    Q.   And on the background report, it reflects --
8 this is at 1838 -- that he didn't disclose a prior
9 conviction?
10   A.   Correct.  From 30 years ago.
11   Q.   And you excused that in hiring him?
12   A.   I did.
13   Q.   And he was a white male?
14   A.   Yes.
15   Q.   And do you know if he was terminated after
16 your employment was terminated?
17   A.   I had heard that he was, but I don't know
18 specifics.
19   Q.   Do you know who terminated him?
20   A.   I do not.
21   Q.   And as I mentioned at the beginning of your
22 deposition, the purpose here is to understand the basis
23 for the complaints and the basis and the evidence that
24 supports the claims that you're bringing.
25   A.   Yes, ma'am.

66 (Pages 261 to 264)

Smith vs. Florida Gulf Coast University    Keith Smith

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 67 of 118 PageID 427

01/22/2025

265

1    Q.   As I understand your complaint, you're
2  bringing three separate claims.  One claim of gender
3  discrimination, both under Title VII as well as the
4  Florida Civil Rights Act; one claim of retaliation under
5  Title VII and the Florida Civil Rights Act; and one
6  claim of retaliation under of Title IX.
7    A.   Yes, ma'am.
8    Q.   Are you aware of any other claims that you're
9  bringing in this lawsuit?
10    A.   No.
11    Q.   So with respect to the gender discrimination,
12  what is the basis of that claim?
13    A.   I think it's supported by all of the
14  documentation I've provided and the testimony I've
15  given.
16    Q.   Other than your termination, do you contend
17  that the university took any action against you because
18  of your gender?
19    A.   I think the termination is enough.
20    Q.   Okay.  But is that the only thing that you're
21  alleging?
22    A.   Yes.
23    Q.   Okay.  And do you contend that any other
24  employees were treated differently than you?
25    A.   I think I gave you names and instances.  It

266

1  might have been in the 'rogs or the RFPs.  I'm not sure
2  which ones.  I can't recall them specifically off the
3  top of my head, but yes.
4    Q.   Okay.  Well, we can put those in front of you?
5    A.   Sure.  And it might have been -- I don't
6  remember which document it was.
7    Q.   I'll put in front of you Exhibit 77 to your
8  deposition.
9        (Exhibit 77 was marked for identification.)
10    Q.   Do you recognize this document?
11    A.   Yes, ma'am, I do.
12    Q.   And what is it?
13    A.   It is the responses to the interrogatories.
14    Q.   Okay.  These are your answers to the
15  interrogatories that have been given in this case?
16    A.   Yes, ma'am.
17    Q.   And you've reviewed this document?
18    A.   I have.
19    Q.   And you verified these answers under the
20  penalty of perjury?
21    A.   Yes.
22    Q.   And verified that they're true and correct and
23  complete?
24    A.   Yes, ma'am.
25    Q.   And having reviewed the document, is there

267

1  anything that you believe needs to be added to make it
2  true, correct, and complete?
3    A.   Nothing that I can think of at this moment.
4    Q.   Okay.  And that goes with the same direction
5  that if you think of something later, then you would
6  tell your counsel, correct?
7    A.   Yes, ma'am.
8    Q.   Okay.  So the question I had asked you was, do
9  you believe other people were treated differently than
10  you?
11    A.   Yes.
12    Q.   And who is it that you believe was treated
13  differently?
14    A.   Well, for instance, Rispoli, Slapp, Jones,
15  Kittleson, Anderson, or the five that went to the
16  president's office.  I do not believe that would have
17  occurred under Chief Moore.
18    Q.   Do you know whether they ever complained about
19  him?
20    A.   I do not.
21    Q.   And did anyone ever complain that those
22  five -- well, first of all, only two of those were in
23  leadership positions, correct?
24    A.   No.  Rispoli and Slapp were captains.  Jones
25  and Kittleson were sergeants.  And Anderson was an

268

1  interim sergeant.
2    Q.   Okay.  And they were all under your direction
3  and authority, correct?
4    A.   Correct.
5    Q.   Okay.  And their job duties and
6  responsibilities were different than your job duties and
7  responsibilities, correct?
8    A.   Correct.
9    Q.   Okay.  Is there anyone else that you contend
10  has been treated differently than you?
11    A.   Sure.  Do you want me to itemize the names on
12  there?
13    Q.   Where are you?
14    A.   Oh, I'm on Page 17.
15    Q.   Okay.
16    A.   I mean, in particular, Coach Pat Chambers was
17  hired the same week I was fired.  He had been fired from
18  Penn State for using the term "noose" in reference to a
19  black basketball player.  This created much negative
20  media attention, and this was the same week that I was
21  fired.  And he was hired despite that and despite his
22  termination and what was seen as at least in part by
23  Penn State, whatever their investigation yielded, enough
24  to terminate him.
25    Q.   Do you have personal knowledge of why he was

67  (Pages 265 to 268)

269

1  hired?
2      A.  I do not.
3      Q.  Do you know who made the decision to hire him?
4      A.  I do not.
5      Q.  Do you know who recommended that he be hired?
6      A.  I do not.
7      Q.  Do you know who made the decision to retain
8  him?
9      A.  I do not.
10     Q.  Okay.
11     A.  As it states here Brian Fisher, he apparently
12  had been the subject of numerous complaints.  Actually,
13  Sara is the person who shared this information with me.
14  And that they gave him a coaching-type situation that
15  she had actually shared with me when the complaints came
16  forward.  And they invested in him with this coaching
17  program or mentorship or whatever.
18         Mitch Cordova is currently there, and he's on
19  a one-year sabbatical.
20     Q.  Wait.  Hold on.  So Brian Fisher, do you know
21  who he reported to?
22     A.  I don't know.  I don't remember his exact food
23  chain.  I think it was Mitch Cordova, but I don't
24  remember.
25     Q.  Do you know who made the decision to give him

270

1  coaching?
2      A.  I don't, but I know that Sara and human
3  resources were heavily involved.
4      Q.  And do you know when that was?
5      A.  It was while I was employed there.  I don't
6  remember dates or times.  And I did get a copy of the
7  contract with the coaching firm in a public records
8  request.
9      Q.  And do you know if that coaching was
10  completed?
11     A.  I don't know -- I believe it was.  I don't
12  know specifics from an HR standpoint.
13     Q.  And you would only know any information about
14  the coaching through information that you obtained from
15  Sara?
16     A.  And from the contract that I received in the
17  public records request.
18     Q.  But did the contract relate that it had been
19  completed?
20     A.  I don't remember.
21     Q.  Okay.  And do you know who made the decision
22  to offer him coaching?
23     A.  I don't.
24     Q.  And do you know whether Brian Fisher was
25  fired?

271

1      A.  I believe he was.
2      Q.  And do you know who made the decision to fire
3  him?
4      A.  I don't.
5      Q.  And do you know why the decision was made to
6  fire him?
7      A.  I don't.
8      Q.  And was he fired before you were fired?
9      A.  Yes.
10     Q.  And is he a white male?
11     A.  Yes, he is.
12     Q.  Okay.  Now, you were saying Mitchell Cordova.
13     A.  Correct.  He's a white male.  He's currently
14  there.  And as I understand it, he's on a one-year
15  sabbatical with pay and benefits despite FGCU metrics
16  dropping in higher ed.
17     Q.  And how is it that you understand that?
18     A.  Actually, I was researching in papers and
19  online FGCU information, and I believe that's how I came
20  about it.  I'm not entirely sure.
21     Q.  Okay.  So you have no personal knowledge of
22  that?
23     A.  No.
24     Q.  And you don't know why he was placed on a
25  one-year sabbatical.

272

1      A.  From -- one of the things that I saw was FGCU
2  metrics are dropping, and that is a direct area under
3  his purview.  And if I understand it correctly, it also
4  affects funds that are allocated to the university.  The
5  metrics where the universities land determines how
6  funding occurs from the state level.
7      Q.  Okay.  Did anyone complain about Mitchell
8  Cordova's ability to communicate?
9      A.  I don't know.
10     Q.  Do you know if anyone complained about
11  Mitchell Cordova's management style?
12     A.  I don't know.
13     Q.  Okay.  And then you have listed Ronald Toll on
14  here.
15     A.  Um-hum.
16     Q.  Ronald Toll was not the provost at the time
17  that you were hired?
18     A.  Correct.
19     Q.  And you have no personal knowledge of his
20  employment, do you?
21     A.  No, I don't.
22     Q.  Do you even know what president he worked
23  under?
24     A.  I sure don't.
25     Q.  So when you say he was given a one-year

273

1 sabbatical, you don't have any personal knowledge of
2 that, correct?
3     A. No, I don't.
4     Q. Okay. And then you relate the form athletic
5 director Ken Kavanaugh.
6     A. Yes.
7     Q. And what does that relate to?
8     A. That made local news and state news, his
9 separation. And I was aware of the complaints that
10 surrounded him while I was there. And that he --
11 seemingly, the accountability was different for him
12 based on the conversations that were taking place across
13 campus. You know, there's dialogue that happens.
14     Q. Do you know who he reported to?
15     A. I don't. As the athletic director, I don't
16 know who he reported to.
17     Q. Do you know who made the decision with respect
18 to his employment?
19     A. I do not.
20     Q. Do you know who if he was terminated?
21     A. I do not.
22     Q. Do you know who made the decision to terminate
23 him?
24     A. All I know is that it said he was separating
25 six months prior or something like that. I don't know

274

1 how it came to fruition.
2     Q. And that's information you gathered from the
3 news media?
4     A. Correct.
5     Q. And you said that you were aware of
6 complaints. How is it that you're aware of complaints?
7     A. When I worked at the police department, there
8 would be conversations. Some people -- and I cannot
9 recall specifics -- would call and ask if things rose to
10 the level of the police department, and they would be
11 redirected. But I don't remember specifics. But a lot
12 of it was just water cooler conversation amongst people.
13     Q. Okay. So no personal knowledge of that?
14     A. No.
15     Q. And do you know if anyone complained about
16 Mr. Kavanaugh's ability to communicate?
17     A. No.
18     Q. Do you know if anyone complained about his
19 leadership style?
20     A. No.
21     Q. And then you have listed Chief Moore on here.
22     A. Correct.
23     Q. And what is it that he -- did anyone complain
24 about him?
25     A. No. I have listed that his chain of command

275

1 was respected by university officials. I don't believe
2 that had Chief Moore been in place, even if these
3 officers had gone to complain, I think they would have
4 been redirected through the chain of command and through
5 the chief human resources officer of the university.
6     Q. And that's your subjective belief, correct?
7     A. That is correct.
8     Q. And then you have listed here other FGCU
9 employees subject to complaints about performance. Who
10 are you referring to?
11     A. I don't have specifics on that. I think I'm
12 actually listing Brian Fisher twice, and maybe it's a
13 spelling error.
14     Q. Oh, okay. So are there any other individuals
15 that you believe were treated differently than you?
16     A. None that I'm aware of.
17     Q. With respect to Brian Fisher, do you know how
18 long Brian Fisher had been employed with FGCU?
19     A. I do not.
20     Q. Do you know if this was his first
21 administrator role?
22     A. I do not.
23     Q. This obviously wasn't your first role as chief
24 of police. We've gone through that.
25          Do you know if President Martin was aware of

276

1 the coaching?
2     A. Whose coaching?
3     Q. Brian Fisher.
4     A. Oh, I don't.
5     Q. Do you know if any of the individuals listed
6 in your interrogatory on Page 17, that we just went
7 through, had made any type of complaint of
8 discrimination?
9     A. I do not. It being white males, I wouldn't
10 assume, but it's possible, but I do not.
11     Q. And you have no knowledge of their employment
12 with the -- no personal knowledge of decisions related
13 to their employment, correct?
14     A. No, ma'am.
15     Q. Isn't that correct, you have not personal
16 knowledge?
17     A. Yes. That's correct. I'm sorry.
18     Q. And are you aware that President Martin
19 terminated male employees?
20     A. I don't know specifically.
21     Q. Are you aware that President Martin hired the
22 female administrator who became the next president of
23 the university?
24     A. I don't know specifically.
25     Q. And are you aware that President Martin did

69 (Pages 273 to 276)

Smith vs. Florida Gulf Coast University   Keith Smith

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 70 of 118 PageID 430

07/22/2025

277

1  not terminate other female administrators when
2  complaints were made about them?
3      A.  I don't know.
4      Q.  Is there any other basis for your claim of
5  discrimination?
6      A.  Everything that's outlined.
7      Q.  What's everything that's outlined?
8      A.  All of the documents you have in my
9  complaints, that's what I'm presenting.
10     Q.  Okay.  You mean in the interrogatories?
11     A.  Everything, from the complaint to all of the
12  data.  Maybe I misunderstood your question.
13     Q.  So I was asking if there are any other bases
14  for your claim for which you've complained of being
15  discriminated against?
16     A.  No.
17     Q.  Is there any other evidence that you contend
18  supports your claim?
19     A.  None that I can think of.
20     Q.  Okay.  And you've made a claim of retaliation.
21     A.  Correct.
22     Q.  And have you told me all of the ways in which
23  you have complained of employment discrimination?
24     A.  I believe that I have.
25     Q.  Is there any other basis for your claim of

278

1  retaliation, other than what you've told me about today?
2      A.  No.
3      Q.  Is there any other evidence that you contend
4  supports your complain, other than what you've told me
5  about today?
6      A.  None that I can think of.
7      Q.  And then you've also brought a retaliation
8  claim under Title IX.  And have you told me -- well, let
9  me ask it this way.
10         What do you contend is the protected activity
11  under Title IX?
12     A.  I don't understand your question.
13     Q.  So your retaliation claim is that you were
14  retaliated against under Title IX for engaging in
15  protected activity, right?
16     A.  Um-hum.
17     Q.  What do you contend is the activity that was
18  protected by Title IX?
19     A.  I still am not understanding what you're
20  asking me.  I'm sorry.
21     Q.  Sure.  Did you make any complaint under
22  Title IX?
23     A.  Yes.
24     Q.  Okay.  When did you complain under Title IX?
25     A.  I don't have the legal background to

279

1  understand where it's falling in terms of Title IX
2  versus Title VII versus this, versus that.  So I don't
3  know that I have the breadth of understanding of what
4  specifics you're asking me.
5      Q.  Sure.  Let me just do it this way:  Have you
6  told me all of the ways in which you have complained?
7      A.  I believe I have.
8      Q.  Okay.  And is there any other basis for your
9  claim of retaliation under Title IX?
10     A.  No, not that I'm aware of.
11     Q.  After your termination from FGCU, did you
12  apply for employment at Eckerd College?
13     A.  I did.
14     Q.  And what position was it for?
15     A.  I don't remember the specific title.  It might
16  have been director of security, director of public
17  safety, something along those lines.
18     Q.  And were you selected?
19     A.  I was initially told I was selected, and they
20  were moving forward.
21     Q.  And did you get an offer of employment?
22     A.  I did not.
23     Q.  And do you know why?
24     A.  It was rescinded.  I received a phone call
25  from, I think his name was Adam Colby, and he explained

280

1  that they were going to go in a different direction
2  based on what FGCU did and did not say.
3      Q.  And do you know what FGCU did or did not say?
4      A.  I do not.
5      Q.  Let me show you what's marked as Exhibit 78.
6         (Exhibit 78 was marked for identification.)
7      Q.  Do you recognize this document?
8      A.  I do.
9      Q.  Is this an application that you made to the
10  Florida Department of Corrections?
11     A.  It is.
12     Q.  And in this application, you were asked if you
13  had ever had any type of disciplinary action taken
14  against you while employed as a corrections officer,
15  probation officer, and law enforcement officer.  It's on
16  Page 2, and it's Question Number 9.
17     A.  Correct.
18     Q.  And you wrote no?
19     A.  Correct.
20     Q.  So you didn't view your separation without
21  cause to be disciplinary action, correct?
22     A.  Wait minute.  What number is it?
23     Q.  Nine.
24     A.  I didn't see it as discipline, no.
25     Q.  You applied for a position as chief of police

Smith vs. Florida Gulf Coast University    Keith Smith                    07/22/2025

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 71 of 118 PageID 431

281

```
 1   for the City of Naples?
 2       A.  I did.
 3       Q.  Were you selected for that position?
 4       A.  No.
 5       Q.  Do you know why?
 6       A.  No.
 7       Q.  Did you apply for a position with the Florida
 8   Department of Agriculture and Consumer Services?
 9       A.  I might have.  They had so many under the
10   State of Florida.  So if it was sworn, I did.  I don't
11   remember specifics.
12       Q.  Do you know why you weren't selected for the
13   position?
14       A.  I don't.
15       Q.  Did you apply for a position with the Tampa
16   Bay Rays?
17       A.  I did.
18       Q.  And were you interviewed for the position?
19       A.  A phone interview, yes.
20       Q.  And were you selected?
21       A.  No.
22       Q.  Do you know why?
23       A.  No.
24       Q.  Did you apply for a chief of police position
25   at the New College of Florida?
```

282

```
 1       A.  I did.
 2       Q.  And were you interviewed for that position?
 3       A.  I was.
 4       Q.  And were you selected?
 5       A.  No.
 6       Q.  Do you know why?
 7       A.  No.
 8       Q.  Is there any position that you were offered
 9   employment and you didn't accept it?
10       A.  No.
11       Q.  And do you have any limitations on your
12   ability to work?
13       A.  No.
14       Q.  And in this complaint, in this lawsuit that
15   you've brought, are you bringing a claim for emotional
16   distress?
17       A.  It will be included.
18       Q.  Have you ever been diagnosed with any physical
19   or mental condition during or after your employment with
20   FGCU?
21       A.  Physical condition, I have hypertension,
22   hypothyroidism, and prediabetic.
23       Q.  Do you contend those are related to your
24   employment at FGCU?
25       A.  I don't know.
```

283

```
 1       Q.  Has any doctor ever opined that they're
 2   related to your employment at FGCU?
 3       A.  No.
 4       Q.  Let me show you what's marked as Exhibit 79.
 5       (Exhibit 79 was marked for identification.)
 6       Q.  Do you recognize Exhibit 79?
 7       A.  I do.
 8       Q.  And what is it?
 9       A.  It looks like a complaint for a traffic crash
10   in which I was hit, and it's the lawsuit filed against
11   the other driver.
12       Q.  And is this the auto accident case that you
13   referenced at the beginning of your deposition today?
14       A.  That's correct.
15       Q.  And in this complaint, you allege that you
16   suffered bodily injury and resulting pain and suffering,
17   disability, disfigurement, mental anguish,
18   inconvenience, loss of capacity for the enjoyment of
19   life, expensive hospitalization, medical and nursing
20   care and treatment, loss of earnings, loss of ability to
21   earn money, and aggravation of a previously existing
22   condition.
23       Do you see that?
24       A.  Yes, ma'am.
25       Q.  And you were alleging a permanent injury as a
```

284

```
 1   result of this accident, correct?
 2       A.  Correct.
 3       Q.  And do you still have that injury today?
 4       A.  I do.
 5       Q.  And does it limit your ability to work?
 6       A.  No.
 7       Q.  And does it cause you emotional distress?
 8       A.  Not feeling good sure does, but I don't know
 9   that it's tied to that.
10       Q.  And you received a settlement as a result of
11   this lawsuit, correct?
12       A.  I did.
13       Q.  And you received a settlement to compensate
14   you for your future injuries, correct?
15       A.  No.  It was like $6,000.
16       Q.  It was for the mental anguish that you --
17       A.  I don't remember what the -- what the language
18   of the settlement was.  I just know it was like $6,000.
19       I'm going to need a bathroom break in a few.
20       MS. DYSON:  Sure.  You can go ahead.
21       (Recess taken from 5:25 p.m. to 5:28 p.m.)
22   BY MS. DYSON:
23       Q.  Here is Exhibit 80.
24       (Exhibit 80 was marked for identification.)
25       Q.  Do you recognize Exhibit 80?
```

71 (Pages 281 to 284)

285

 1    A.  I don't recall it, but I know what it is.
 2    Q.  Okay.  And these are your responses to request
 3  for admissions, correct?
 4    A.  I don't understand.
 5    Q.  Your responses to request for admissions that
 6  were sent to you.
 7    A.  Yes, I guess.
 8    Q.  Do you see that?
 9    A.  Yes, ma'am.  I mean, this is 12 years ago, so
10  it's a little fuzzy.
11    Q.  You don't dispute these documents, correct?
12    A.  No.
13    Q.  And have you sought any treatment for any
14  mental or physical condition that you contend is related
15  to your employment at FGCU?
16    A.  No.  I didn't have health insurance, but I did
17  not.
18    Q.  Did you seek any type of psychological
19  treatment -- have you sought any type of psychological
20  treatment since your employment ended at FGCU?
21    A.  I had no health insurance, so, no, I couldn't.
22    Q.  You do now, though, correct?
23    A.  Yes.  And I have not.
24    Q.  And did you keep any type of diary related to
25  what you contend is the emotional distress that you have

286

 1  suffered?
 2    A.  No.
 3    Q.  Did you inform any doctor that you were
 4  suffering from any condition related to your employment
 5  at FGCU?
 6    A.  I hadn't seen any doctors during that time.  I
 7  had no insurance, and then since then, I've just gotten
 8  back on my regular medications, so no.
 9    Q.  Let me show you what's marked as Exhibit 81.
10      (Exhibit 81 was marked for identification.)
11    Q.  Do you recognize this document?
12    A.  I do.
13    Q.  What is it?
14    A.  It is titled the Florida Commission on Human
15  Resources Discrimination Statement.
16    Q.  Is this a charge of discrimination that you
17  filed under the penalty of perjury?
18    A.  I agree, yes.
19    Q.  Is it a true, correct, and complete copy of
20  that document?
21    A.  I believe so.
22    Q.  Is the information in here true, correct, and
23  complete?
24    A.  As far as I know, yes.
25    Q.  Is there any need to amend it to make it true,

287

 1  correct, and complete?
 2    A.  Not that I'm aware of.
 3    Q.  This is Exhibit 82.
 4      (Exhibit 82 was marked for identification.)
 5    Q.  Do you recognize this document?
 6    A.  It's a charge of discrimination.
 7    Q.  That you filed?
 8    A.  Yes.  I mean, I don't remember the document
 9  specifically.  There have been so many, and it's been
10  years, so it's obviously something, yes.
11    Q.  And did you file it under the penalty of
12  perjury?
13    A.  Yes.
14    Q.  You signed it, correct?
15    A.  Correct.
16    Q.  And it's a true, correct, and complete copy of
17  it?
18    A.  As far as I know, yes.
19    Q.  And is there any need to amend it to make it
20  true, correct, and complete?
21    A.  Not that I'm aware of.
22    Q.  I'll show you what's marked as Exhibit 83 to
23  your deposition.
24      (Exhibit 83 was marked for identification.)
25    Q.  Do you recognize this document?

288

 1    A.  Yes.
 2    Q.  And what is it?
 3    A.  It is the Complaint and Demand for Jury Trial.
 4    Q.  And this is the complaint that you filed in
 5  this lawsuit, correct?
 6    A.  That's correct.
 7    Q.  Is this a true and correct and complete copy
 8  of your complaint?
 9    A.  Yes.
10    Q.  And is there any need to amend it to make the
11  allegations true, correct, and complete?
12    A.  Not that I'm aware of.  I've not read it in
13  some time, but not that I'm aware of.
14    Q.  This is 84.
15      (Exhibit 84 was marked for identification.)
16    Q.  Do you recognize this document?
17    A.  I don't know what this document is.  I mean, I
18  don't know it.
19    Q.  Okay.  Do you recall being asked to identify
20  individuals that you would list as witnesses in this
21  lawsuit?
22    A.  Vaguely, yes.
23    Q.  Okay.  And so you've identified on this list a
24  number of different people from on the second page going
25  on to the top of the third page in addition to yourself.

72  (Pages 285 to 288)

289

1 Have you had any conversations with any of these
2 individuals after your termination?
3     A.   None that haven't already been disclosed.  I
4 mean, we've already talked about much of this.
5     Q.   Sure.  So other than the conversations we've
6 already talked about, is there any other conversations
7 that you've had with any of these individuals since your
8 termination?
9     A.   Nothing other than what we've talked about,
10 no.
11     Q.   Is there any other individual that you think
12 needs to be added to identify -- as an individual that
13 you may use to support your claims?
14     A.   Not off the top of my head, no.  I don't see
15 Lisa Jones on here.
16     Q.   Okay.
17     A.   She is one of the general counsel.  So she
18 could -- I see they have Todd and Vee on there.  Lisa
19 Jones, and Jessica is on here.
20     Q.   Jessica who?
21     A.   Holmer.  She was in some of the meetings.
22     Q.   Okay.  And do you know which, if any, of these
23 individuals were involved in your termination?
24     A.   I do not.
25     Q.   Do you know which any of these individuals

290

1 made complaints about you?
2     A.   I do not.
3     Q.   After your termination, did you contact any of
4 these individuals to ask if they had made any complaints
5 about you?
6     A.   No.
7     Q.   Are there any other changes that you think
8 need to be made to your initial disclosures to make them
9 true, correct, and complete?
10     A.   No.
11     Q.   I'll show you what's marked as Exhibit 85.
12         (Exhibit 85 was marked for identification.)
13     A.   Thank you.
14     Q.   Do you recognize this document?
15     A.   I do.
16     Q.   And is this a true and correct and complete
17 copy of your response to the first request for
18 production?
19     A.   It is.
20     Q.   Is there any -- do you need to amend this
21 document in any way to make it true, correct, and
22 complete?
23     A.   No.
24     Q.   Going back to Exhibit 84.
25     A.   Yes, ma'am.

291

1     Q.   Are all of these individuals on Pages 2 to 3
2 individuals that you encountered during your employment
3 at FGCU?
4     A.   Not all of the people I encountered, but these
5 are people that I encountered while at FGCU.
6     Q.   Okay.  Maybe I'm not understanding what your
7 answer was, though.
8     A.   Maybe I didn't understand your question.
9     Q.   Okay.  Do you know these people because you
10 worked at FGCU?
11     A.   Yes.
12     Q.   Okay.  And do you know them to all have at
13 some point in time been employees of FGCU?
14     A.   Candace McLaren is not.
15     Q.   Okay.  And have you had any conversations with
16 her since she -- since your employment was terminated?
17     A.   No.  And since her final email.
18     Q.   Okay.  And, to your knowledge, do you know if
19 any of these employees would know why you were
20 terminated?
21     A.   I don't know.
22     Q.   Or let me ask it this way:  Do you know
23 whether any of the individuals listed on Exhibit 84
24 would know why you were terminated?
25     A.   I don't know.

292

1     Q.   Is there any other evidence that you have to
2 support your claims of discrimination and retaliation?
3     A.   Nothing I'm aware of.
4     Q.   And have you told me all of the bases for
5 these claims?
6     A.   Yes, ma'am.
7     Q.   And is there any need to change any of the
8 testimony that you've provided today?
9     A.   Not that I'm aware of.
10     Q.   And have you provided complete and accurate
11 testimony in response to my questions?
12     A.   Yes, ma'am.
13         MS. DYSON:  I have no further questions.
14         MR. YORMAK:  I have no cross, but she will
15     read.
16         THE COURT REPORTER:  Are you ordering?
17         MS. DYSON:  Not right now.
18             - - -
19         (Thereupon, at 5:39 p.m., the deposition was
20     concluded.)
21             - - -
22
23
24
25

73 (Pages 289 to 292)

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 74 of 118 PageID 434

Smith vs. Florida Gulf Coast University   Kelli Smith                    01/22/2025

293

```
1                    ERRATA SHEET
2    IN RE:  Kelli Smith vs. The Florida Gulf Coast
     University Board of Trustees
3    DATE TAKEN:  January 22, 2025
4    PAGE & LINE NUMBER                    REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21
                  Under penalties of perjury, I
22   declare that I have read my deposition in this matter
     and that it is true and correct, subject to any changes
23   in form or substance as reflected above.
24   DATED:_____ SIGNED:_____
                    KELLI SMITH
25
```

294

```
1                CERTIFICATE OF OATH
2    STATE OF FLORIDA  )
3    COUNTY OF LEE    )
4         I, Angela L. Klein, RPR, FPR,
5    Notary Public, State of Florida at Large, certify that
6    the Witness, KELLI SMITH, personally appeared before me
7    on the 22nd day of January, 2025, and was duly sworn.
8         WITNESS my hand and official seal
9    this 5th day of February, 2025.
10
       (This transcript has been digitally signed.)
11
12
13
14        _____
          Angela L. Klein, RPR, FPR
15        Notary Public, State of Florida
          My Commission Expires 3/19/2027
16        Commission Number HH358656

     *  *  *  *  *  *  *  *  *  *  *
17   STATE OF FLORIDA  )
     COUNTY OF LEE    )
18
         I,              , (production manager) do
19   hereby certify that Kelli Smith was notified via U.S.
     mail, email, and/or telephone that the transcript of the
20   deposition was available for reading and signing; that
     as of this date, the deponent has not read and signed
21   the transcript for the following reason:
     _____
22   Dated this _____ day of _____, 2025.
23        _____
24
25
```

295

```
1              CERTIFICATE OF REPORTER
2    STATE OF FLORIDA    )
3    COUNTY OF LEE       )
4
5         I, Angela L. Klein, RPR, FPR, and
6    Notary Public in and for the State of Florida at
7    Large, do hereby certify that I was authorized to and
8    did stenographically report the deposition of KELLI
9    SMITH; that a review of the transcript was requested;
10   and that the foregoing transcript, pages 1 through
11   292, is a true record of my stenographic notes.
12        I further certify that I am not a
13   relative, employee, attorney, or counsel of any of the
14   parties, nor am I a relative or employee of any of the
15   parties' attorneys or counsel connected with the
16   action, nor am I financially interested in the action.
17        DATED this 5th day of February, 2025,
18   at Fort Myers, Lee County, Florida.
19
         (This transcript has been digitally signed.)
20
21
22
23        _____
             Angela L. Klein, RPR, FPR
24
25
```

74  (Pages 293 to 295)

Smith vs. Florida Gulf Coast University Kelli Smith                                01/22/2025

Page 296

**A**

**a.m** 1:14 48:25
  48:25 244:22
**aback** 258:6
**abducted** 174:24
**abilities** 61:21
**ability** 62:14,19
  65:24 92:22
  93:2,6 102:18
  103:4 113:14
  113:17 122:16
  134:25 140:23
  141:1,2 170:14
  171:5 211:16
  211:21 213:7
  213:10,18,22
  214:1,5 272:8
  274:16 282:12
  283:20 284:5
**ablation** 31:8
**able** 28:15,21
  29:2 30:25
  36:20 45:12
  87:25 137:9
  159:21 163:19
  163:24 174:23
  188:19 231:17
**abrasive** 148:16
  150:16
**abrasiveness**
  150:19
**abreast** 156:7,24
  157:8
**absolute** 121:2
  132:24
**absolutely** 13:5
  103:7 158:20
  200:22 228:1
  238:21 255:3
**academy** 22:25
  23:1,5,8,9,13
  23:22 55:21
  98:6
**accelerate** 98:7
**accept** 240:3
  282:9

**accepted** 54:10
**accepting** 51:12
**access** 13:9 104:8
  104:13,14
  112:7 166:10
  172:24 188:25
  252:23
**accident** 15:19,22
  16:3 283:12
  284:1
**accommodate**
  210:8 225:2
**accommodations**
  224:2
**account** 13:1
**accountability**
  273:11
**accountable**
  65:24 100:12
  101:3 136:16
**accounting**
  256:20
**accounts** 13:3,10
  13:13,20,22
**accreditation**
  186:23 233:15
  234:11
**accuracy** 70:25
  78:9 83:20
  105:15,21
  106:22 109:25
  111:22 120:5
  227:17,18
  249:22 250:17
**accurate** 8:10
  9:23 27:19,24
  74:7 139:12
  140:6 192:22
  200:3 207:22
  210:9 249:5
  250:7,8 292:10
**acknowledge**
  19:3
**acknowledged**
  18:22 258:19
**act** 4:5 76:17,21

**87:**2,4,5,10,11
  115:11,15
  116:2 183:21
  183:24 190:1
  230:9 265:4,5
**acted** 98:18
  178:17 230:11
**action** 120:18
  133:3 144:6
  155:18 202:7
  202:17,21
  265:17 280:13
  280:21 295:16
  295:16
**actions** 93:11
  157:4
**active** 41:22 42:7
  207:19
**actively** 157:20
**activities** 141:6
**activity** 107:7
  278:10,15,17
**acts** 56:19 93:11
**actual** 166:3
**Adam** 279:25
**adamant** 206:5
**add** 38:22 159:11
  182:17 183:16
**added** 187:1
  267:1 289:12
**adding** 114:25
  185:4 212:4
**addition** 82:9,14
  108:8 185:22
  288:25
**additional** 103:2
  134:11
**address** 12:18,20
  64:7 89:6,11
  124:19 149:3
  231:17
**addressed** 93:11
  230:2 262:16
  262:19
**addresses** 12:23
**adjunct** 68:4,10

**68:**22,25 69:3
  239:15
**adjunct-type**
  68:16
**adjust** 223:24
**adjusted** 42:1
**admin** 164:19,20
**administering**
  60:25 61:8
**administrative**
  113:4,11 170:5
  171:17,20
  185:10 186:4
  190:10 254:4
**administrator**
  88:22 103:18
  103:20,23
  113:3 184:19
  264:4 275:21
  276:22
**administrators**
  88:16,20,25
  89:15 111:6
  112:2 161:4
  211:12,19
  222:25 242:23
  277:1
**admissions** 6:11
  285:3,5
**admitted** 167:25
  168:7,9
**adults** 21:18
**advance** 53:16
**adverse** 202:16
  202:20
**advice** 105:25
**advised** 17:10
  122:16 167:11
  205:8 207:7
**advising** 17:11
**advocacy** 194:16
  194:17
**advocate** 175:11
  194:14,23
  205:23,24
  206:5,6,7

**affairs** 12:8 93:3
  93:7,15,24 94:2
  94:3,7 153:14
**afforded** 170:13
**afraid** 129:13,16
  129:19
**afternoon** 164:13
  232:22
**age** 38:4,6
**aged** 44:13
**agencies** 101:20
  162:23 207:25
  249:10
**agency** 53:16
  101:5 102:7,7
  163:4,6,15
  250:16
**agenda** 210:21
  218:19
**agendas** 220:22
**agent** 194:19
**aggravation**
  283:21
**ago** 7:20 19:19
  176:24 212:8
  264:10 285:9
**agree** 77:8
  100:13 167:22
  169:19 200:8
  218:13 244:4,8
  245:1 286:18
**agreed** 178:17
  183:2 189:7
  206:12 256:22
**agreement**
  113:24 114:2
  114:11 125:5
  127:18 145:9
**Agriculture**
  281:8
**ahead** 8:18
  176:17 178:2
  188:6 284:20
**alcohol** 7:24
**alert** 4:4 114:17
**aligned** 153:22

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 76 of 118 PageID
436

Smith vs. Florida Gulf Coast University Kelli Smith                                    01/22/2025

Page 297

172:15
**allegation** 98:21
  120:15 128:20
**allegations** 98:24
  132:1 139:17
  198:5 227:23
  288:11
**allege** 283:15
**alleged** 120:18
  121:1,3 132:14
  132:23 157:15
**alleging** 107:24
  265:21 283:25
**alleviate** 206:9
**allocated** 272:4
**allocations** 62:15
**allowance** 82:16
  82:18
**allowed** 113:3
  127:4 135:15
  145:14 186:11
  208:10
**ambiguous**
  100:21 129:11
  245:3
**ambulance** 31:16
**amend** 286:25
  287:19 288:10
  290:20
**amount** 23:17
  100:2 196:21
**Amy** 259:5
**and/or** 294:19
**Anderson** 166:19
  229:18 231:12
  247:2 267:15
  267:25
**Angela** 1:19
  294:4,14 295:5
  295:23
**anguish** 283:17
  284:16
**annual** 60:25
  175:6 199:19
**annually** 62:23
**answer** 8:17,18

13:8 24:4 48:4
  58:11 89:21
  96:24 97:14
  102:12 116:5
  127:22 128:1
  143:23 147:17
  147:18 163:20
  173:21 206:15
  253:19 291:7
**answered** 9:4
  28:11
**answers** 77:19
  158:22 266:14
  266:19
**Anthony** 19:16
  71:19 72:12
**anti-harassment**
  3:21 4:7 106:18
  119:23
**anybody** 162:18
  192:7 217:5
  230:9
**anymore** 23:11
  45:12 219:22
**anyplace** 11:20
**apologize** 10:14
  23:3,4 47:16
  60:12 183:19
  188:7
**apostrophe**
  130:20
**apparent** 150:16
**apparently** 207:5
  212:12 269:11
**appeal** 29:23
**appear** 226:1
  250:7,8
**appearance**
  208:15
**appeared** 294:6
**appears** 26:18
  28:13 49:13
  53:25 66:7
  106:21 114:23
  138:16
**apple** 187:9

**applicable**
  111:18 137:20
**applicant** 45:19
**applicants** 36:19
  69:21
**application** 2:23
  2:24 3:3,4 6:9
  26:20,24 28:11
  35:20 43:18,22
  44:4,20 46:16
  49:9,11,14 54:1
  54:4,12,23
  58:21 63:25
  72:22 136:16
  280:9,12
**applications** 47:1
  47:2
**applied** 21:2
  24:19,22 32:16
  33:2,17 34:10
  37:7 38:24
  44:25 47:5
  51:16 58:14
  60:14 63:7
  68:12 69:18
  79:20 105:16
  106:18 108:25
  111:23 112:23
  119:21 120:5
  132:8 134:16
  136:8 137:24
  138:19 139:9
  140:2 141:14
  142:5,11 143:4
  143:12 280:25
**applies** 199:11
**apply** 20:23 21:8
  26:9 33:25
  34:24 35:12,16
  36:14 37:6
  44:14 46:21
  53:13 58:18
  136:17 279:12
  281:7,15,24
**applying** 39:10
  44:8,20 46:20

47:21 58:17
  63:22 64:10
  65:3
**appointed** 138:2
**appreciate** 71:10
**approachability**
  222:16
**approachable**
  223:8
**approached**
  18:21
**appropriate**
  120:17
**approval** 196:16
  217:5 256:17
**approved** 109:4
  112:8 119:25
  137:8 144:19
  144:21 183:15
  187:22,25
  188:8,11,20,21
  189:13 223:1
  225:14,15
**approving** 92:21
  197:5
**approximately**
  49:23 184:2
**April** 51:24
  128:10 130:21
**arbitrarily** 193:3
  195:13
**arbitrary** 225:2
**arbitration** 7:25
  98:15
**area** 33:13,23
  57:12,15
  172:20 188:14
  199:18 272:2
**areas** 81:3
**Arizona** 7:22
  20:11 39:8,11
  39:13,15,16,19
  39:23,24 40:7
  40:13 42:15,20
  45:22 59:3
  67:23 194:1

**Arnstein** 196:7
**arose** 147:23
**arranged** 195:10
**arrest** 15:11,14
  48:9 189:18
**arrested** 15:9
**arrival** 102:22
  144:22 191:23
**arrived** 185:10
  200:15
**article** 240:6,6,7
  240:8
**Ashley** 2:10
**asked** 9:3 28:14
  75:15,17,22
  76:5,16 77:10
  77:16 79:8
  86:23 118:13
  122:11 123:1
  126:12 164:18
  167:5 184:12
  218:25 219:15
  219:18 222:2
  256:3 267:8
  280:12 288:19
**asking** 121:19
  172:2 188:4
  203:25 207:18
  226:23 227:4
  241:10 277:13
  278:20 279:4
**ASR** 179:18
**assault** 197:23
  200:2 204:20
**assaulted** 175:1
**assert** 8:15
**assessed** 194:23
**assessment** 6:5
  159:15,20
  237:9,13
  238:25 239:3
  239:25 241:17
  241:22 242:1,4
  242:7,8,9,10
  256:23 260:12
  260:14,18

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 77 of 118 PageID 437

Smith vs. Florida Gulf Coast University Kelli Smith                    01/22/2025

Page 298

262:4,5,13
**assessments**
187:6
**assigned** 14:12
74:2 126:13
161:21 162:2
225:6 260:23
**assignment**
125:18,18
127:8,11
**assignments**
186:3
**assist** 116:25
**assistance** 177:24
180:14,18
181:17
**assistant** 33:6,9
33:22 57:12
**associate** 46:8
**assume** 9:5 22:11
74:7 79:1
260:23 276:10
**assumed** 196:14
197:4
**assuming** 151:21
252:25 262:13
**assured** 214:21
**at-will** 50:18,20
83:7 89:19
90:22
**athletic** 199:17
273:4,15
**athletics** 256:8
**atmosphere**
53:10
**attached** 221:23
**attain** 61:18
**attempt** 195:19
**attend** 22:4,13,15
22:24 23:5,7,15
**attended** 23:9,12
23:22 24:15
145:22
**attending** 82:22
**attention** 51:14
81:3 159:13

227:12,12
268:20
**attorney** 8:15
12:1,7 26:2,6
32:12 158:19
295:13
**attorneys** 295:15
**attractiveness**
128:16
**attrition** 214:24
238:23
**audit** 3:11 175:3
176:15 178:7
206:17
**auditorium**
70:19
**auditorium-style**
74:25
**August** 4:19 30:6
30:10,11,15,16
**authenticity**
227:17
**authored** 182:14
245:25
**authoritarian**
167:19
**authority** 92:24
100:23 115:13
136:7,17 230:6
230:20 268:3
**authorized** 295:7
**auto** 15:19,22
16:2 283:12
**available** 28:15
28:21 29:18
104:17 116:25
189:4 190:7
294:20
**avenues** 142:14
**AVP** 147:24
231:16,18
**aware** 18:17
68:16 69:11
81:14,17,20
88:14 89:14
102:24 103:18

103:21,23
108:11 134:23
148:3 159:8
160:16 161:3,6
161:7 171:14
171:14 177:2,3
192:15 196:15
202:11 211:13
213:1 215:24
229:10 237:1,4
250:19 265:8
273:9 274:5,6
275:16,25
276:18,21,25
279:10 287:2
287:21 288:12
288:13 292:3,9
**awareness** 148:9
256:1

**B**

**B** 2:21 132:21
**bachelor** 23:19
**bachelor's** 22:20
**back** 18:19 29:21
30:18 59:1
82:19 100:4
124:13 162:19
165:8 166:6
170:19,25
179:16 180:12
181:12 183:13
183:19 187:6
197:17 217:16
219:24 220:5,5
221:25 222:1
253:23 261:17
286:8 290:24
**background**
239:16 264:2,7
278:25
**bad** 187:16
**badge** 19:24
**balance** 207:23
**Balmer** 71:20
**bankruptcy**

16:17
**bar** 19:24
**bargaining**
113:24 114:2
114:10 125:5
145:9 150:3,6
**Barnes** 72:1
**base** 139:19
228:21
**based** 80:19,22
82:6 94:18,22
102:2 111:15
112:25 118:21
128:16 132:10
144:9 152:21
159:25 172:9
189:7 194:2,7
197:15 198:4
226:21 229:18
230:6,8,16,19
232:11 246:1
246:25 250:11
273:12 280:2
**baseline** 180:14
**bases** 277:13
292:4
**bashing-type**
89:9
**basically** 160:22
164:7 188:15
190:9 209:21
222:17 255:24
**basis** 70:24 76:1
78:9 83:20
84:12 105:15
105:21 106:22
108:24 109:25
110:24 111:22
115:22,24
116:16 120:3,4
123:7 129:18
136:6,7 137:22
138:21 139:11
140:5 141:16
142:9 143:7
172:18 179:2,9

179:20 240:20
243:5,21
244:18 264:22
264:23 265:12
277:4,25 279:8
**basketball**
199:20 268:19
**Bates** 27:4 67:18
68:2 75:19
110:3 115:14
120:9 141:4
**Bates-stamped**
107:10 139:14
**bathroom** 137:9
141:21 161:13
161:18 172:20
284:19
**battery** 4:14
139:7,17
**Bay** 281:16
**bearing** 148:17
**becoming** 223:20
**began** 48:2 50:23
91:1 104:12
123:10 153:21
165:9 185:1
**beginning** 83:18
145:22 146:18
264:21 283:13
**BEHALF** 2:3,9
**behavior** 93:13
149:14
**belief** 172:19
177:5 275:6
**beliefs** 155:10
**believe** 14:25
18:20 24:4 26:7
29:6 34:23
41:24 44:23
54:24 60:16
63:5 66:10 73:7
73:25 75:23
95:13 96:7,10
96:13 97:1,15
97:18 131:23
133:15,19

Case 2:23-cv-00840-JES-KCD     Document 37     Filed 03/28/25     Page 78 of 118 PageID 438

Smith vs. Florida Gulf Coast University    Kelli Smith                    01/22/2025

Page 299

138:20 140:4
141:15 142:6
152:18 155:12
165:7 170:10
172:4 174:20
205:6,12
221:14 229:22
231:23 238:21
253:20 255:8
258:22 267:1,9
267:12,16
270:11 271:1
271:19 275:1
275:15 277:24
279:7 286:21
**believed** 89:10
171:22,25
214:8,12
215:11,16,25
228:25
**Ben** 165:20
**benefit** 2:23,24
35:21 53:11,15
152:14 217:2
**benefits** 25:15
28:12 29:19,21
30:2,12,15,20
30:24 35:13,16
38:3,6 224:23
271:15
**Benjamin** 2:6
**Berry** 41:4
**best** 8:23 9:6
153:3 208:23
210:7
**best-looking**
239:12
**better** 160:15
163:20 213:3
220:12 238:16
255:5,6,6,6
**beyond** 210:23
241:22 244:23
256:19
**biased** 96:8,11,14
97:2,16,19

229:23 231:24
**big** 41:11 42:19
70:19 72:13
253:6,10
**bigger** 53:11
217:22
**bill** 163:3 196:22
**bit** 126:3
**bite** 187:9
**biweekly** 146:14
146:19 156:22
**black** 85:3,12
208:21 268:19
**blacked** 64:5
**blindsided** 160:6
160:14 214:17
215:9 237:20
255:12,15,16
**block** 196:3
**blood** 9:12
**blown** 261:24
**Blvd** 1:16
**board** 1:7 256:3
293:2
**bodily** 283:16
**body** 170:13,22
**Bonita** 1:17 2:5
**borderline**
148:11
**boss** 129:23
**bottom** 27:5
65:15 110:4
149:7 181:9
219:9
**bought** 10:13,13
154:17
**Boulevard** 1:22
2:4
**boundaries**
230:25
**bowl** 153:19
**boy** 214:25
238:12
**boys** 122:16
151:17,20,24
152:2

**Bradenton** 21:25
**brand** 150:22
**breadth** 14:19
185:2 189:3
209:5 235:18
279:3
**break** 8:14,15
48:23 137:10
146:23 147:10
216:3 284:19
**breakdown**
191:22
**breakdowns**
208:12
**breast** 255:25
**breath** 165:5
**Brian** 19:16
148:10 152:12
230:4 231:2
247:3,6 269:11
269:20 270:24
275:12,17,18
276:3
**bridged** 26:5
**brief** 48:22
**bring** 129:22,24
130:2 157:18
199:8 202:18
216:21 240:13
255:2
**bringing** 264:24
265:2,9 282:15
**broad** 13:4
235:21
**broadcast** 75:1
**brother** 10:23
**brought** 7:12
80:9 81:3
118:23 124:8
124:11 129:23
157:17 159:15
173:3 188:24
194:22 202:18
213:16 217:2,9
217:17 227:11
253:4 278:7

282:15
**Broward** 23:3,4
48:3 55:18,21
56:24 57:6,15
57:18
**bruised** 244:23
**bucket** 154:18
**budget** 4:2 61:1,6
62:15,17,20
111:15,18
112:9,12
124:24 171:10
243:14,25
**budgetary**
171:11
**budgeted** 112:14
**build** 55:3 62:7
65:12,25 76:6
76:11,24
150:15
**build-out** 164:16
**building** 54:24
65:8 153:17,20
164:20 172:21
172:22,25
173:1 190:12
**built** 77:14
**bullet** 189:22
190:22 209:21
**bullshit** 239:24
242:18
**Bush** 2:10
**business** 184:16
185:11 230:24
**businesses** 12:15
**buy-in** 199:10
234:19
**byormak@yor...**
2:5
**bypassed** 231:9
231:15

---
**C**

**C** 2:1 17:25
**C-A-T-H** 17:25
**cabinet** 84:9

95:15,17,18,21
95:24
**CAD** 207:18
**Calendar** 5:12
**calendared** 147:4
**calendars** 146:24
**call** 148:11
149:10 176:14
178:15 193:13
258:21 274:9
279:24
**called** 88:5 93:19
164:17 187:7
193:8,11 238:9
239:9,24 240:9
252:2 255:22
258:13
**calls** 258:5
**cameras** 170:13
170:22
**Campaign**
255:23 256:7
**campus** 11:4
20:20 34:22
75:2 189:2
194:15,19,25
199:11,12,25
200:3 206:3
210:25 222:3
222:10 244:2
256:4,6 273:13
**campuses** 75:24
**canceled** 52:17
**cancer** 256:1,10
**Candace** 195:4
216:11 217:8
218:5 291:14
**candidate** 71:22
71:23
**candidates** 70:22
72:4,8,25 73:20
75:17 79:2
**capacity** 7:21 8:1
8:4 32:18 202:5
283:18
**captain** 18:19,20

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 79 of 118 PageID
439
Smith vs. Florida Gulf Coast University Kelli Smith                    01/22/2025

Page 300

19:9,24 75:7
77:21,24 123:2
123:5,13
124:20,20,25
125:1 136:1
148:12,13
149:2,2,15,15
161:22,23,25
162:2,5,11,15
162:19,20
166:21 184:19
186:5,11 190:6
190:7 192:7
212:13,13
225:7,8 231:10
231:10 234:22
234:23 246:23
250:24 251:7,9
251:11,18
252:22 253:11
254:2,15 261:2
**captains** 154:11
154:12 212:15
212:23,25
213:13 234:18
235:6,15 236:7
236:16 246:21
247:15 267:24
**capture** 129:7
**care** 9:9 283:20
**career** 48:2
224:13 233:21
236:13
**carry** 210:1
**case** 1:5 47:7
62:17 73:7
152:13 163:18
165:20 266:15
283:12
**cases** 96:19
**catch** 165:4
**categorically**
207:10 227:18
247:15
**categories** 94:9
94:10,14,18

**categorize** 48:6
48:11
**Catherine** 17:25
**cause** 27:16
89:25 99:19
133:14 134:1
134:20 135:1,3
135:7,10,12,15
135:18 215:22
217:8 259:19
260:6 280:21
284:7
**caused** 97:1
211:20
**cautioned** 160:22
**cc'd** 197:3
**cell** 14:10,12,15
14:21 15:2,4
**center** 1:16 2:4
123:9 188:24
198:14
**central** 22:16
25:1,5,7 36:4
36:15 37:2
40:23 41:3,8
233:18
**centric** 67:5
**certain** 28:15
87:13 94:9
185:16 233:19
233:20
**certainly** 111:8
153:8 161:11
163:19 171:11
173:1 196:14
230:3,9 249:22
255:18
**certificate** 24:14
294:1 295:1
**certificates** 24:13
**certification** 94:8
259:20,23
260:4
**certified** 24:2,5,9
**certify** 294:5,19
295:7,12

**chain** 59:22
130:6 140:15
140:16 149:18
170:25 181:8
230:4 269:23
274:25 275:4
**challenge** 207:18
**challenges** 89:4
233:16
**Chambers**
268:16
**chance** 233:21,25
236:12
**change** 43:7,9
92:22,23
122:18,22
172:1 214:24
234:15 238:13
240:3,12,14
255:8 263:17
292:7
**changed** 109:24
222:19,22
245:23 247:16
**changes** 100:22
152:14,15
190:1,2,4
211:21 212:6
215:1 233:6
290:7 293:22
**changing** 212:4,5
212:5
**channels** 142:18
**chapter** 12:15
**characteristic**
94:19
**characteristics**
94:22
**characterize** 48:5
232:1
**charge** 6:12,13
16:10,14
286:16 287:6
**charged** 200:12
200:19
**charges** 16:12

**chart** 91:22 183:8
183:20 233:9
235:6,9 236:4
236:17
**check** 154:15
**Checklist** 3:11
**chief** 7:22 8:2
33:5,6,9,22,25
34:5,6,15,21
36:15 37:1 39:8
41:1,4,5,7 42:3
43:4,10,10,19
43:22,25 44:21
46:3,21 47:5
49:9 50:7,18
51:2 54:1,10,16
54:19 55:2
57:12 58:15,17
58:22 60:10,14
60:18,22 61:15
62:2,11 63:23
65:12,21 66:1
66:16,21 70:22
72:4,18,22,25
73:16,17 74:8
74:11,12 76:11
77:5 79:8,16,17
79:21,24 85:20
86:5,12,20
87:19,23 88:1,4
88:10,12,15,23
89:1,8,16,18
91:7 99:12
100:6,11
102:13 112:5,8
138:24 140:11
144:24 146:15
146:19 149:12
154:7 157:19
174:6,9,10
175:6,9 176:5
176:13,19
177:4 178:13
178:19 179:16
180:3 181:6,11
181:13 190:5

228:20 230:12
231:16 240:11
240:11 243:19
244:22 246:22
251:3 254:8,17
256:11 260:20
260:22 267:17
274:21 275:2,5
275:23 280:25
281:24
**chief's** 19:24,24
102:6
**chiefs** 36:24 42:3
72:1
**child** 21:22 22:2
22:4
**children** 21:16
21:18,20
**Chipotle** 18:21
18:24 19:17
72:16
**choices** 27:20,22
**chose** 154:5
**chosen** 72:5
194:22
**Chris** 243:16
**Christmas**
147:10
**circle** 220:5
**circling** 217:16
220:5
**citizen** 170:14,15
221:16 225:19
225:20
**citizens** 142:14
**city** 21:24 34:1
47:17 281:1
**civic** 65:18
**civil** 94:15 265:4
265:5
**civilian** 41:16
**claim** 35:6,9
265:2,4,6,12
277:4,14,18,20
277:25 278:8
278:13 279:9

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 80 of 118 PageID 440

Smith vs. Florida Gulf Coast University    Kelli Smith    01/22/2025

Page 301

282:15
**claims** 8:11
  264:24 265:2,8
  289:13 292:2,5
**clarification**
  194:17,18
**clarify** 71:21
**clarifying** 71:9
**class** 23:15
  162:20
**cleaning** 154:17
**Cleanliness**
  154:19
**clear** 123:8
  173:22 231:14
**cleared** 178:16
**clearly** 194:6
**clerical** 184:19
**clerk** 264:3
**Clery** 4:5 42:23
  76:16,21 86:15
  86:19 87:1,2,4
  87:5,10,11
  115:11,15
  116:2 147:16
  173:17,23
  174:1,4,12,15
  174:16,24
  175:10,11,13
  175:23,24
  176:6,21 177:5
  178:21 181:18
  182:6,9,20,23
  183:6,15,21,24
  184:7,12 186:1
  186:6,9,11,22
  188:22,23,23
  189:4 190:1,20
  194:2 195:2,7
  198:11,14,14
  198:25 199:6
  199:11 200:3
  201:7,10,13,24
  202:12,14
  204:19 205:8
  205:14,21

216:16 218:11
  236:25 237:5
  262:16
**climate** 164:3
  169:7 215:5
  222:10 223:6
  238:10 239:25
**Clipse** 256:21
**close** 162:13
**closed** 180:8
**closely** 109:9
**closes** 217:12
**club** 122:16
**Coach** 268:16
**coaching** 255:1
  269:16 270:1,7
  270:9,14,22
  276:1,2
**coaching-type**
  269:14
**Coast** 1:6 7:11
  10:8 11:6,16,21
  12:17 16:11,25
  19:22 20:14
  21:6,9 22:4
  24:19 25:21
  26:4,9,21 27:7
  27:15 34:8 35:5
  52:6 56:9 58:6
  58:15,18,19,22
  58:23 62:11
  63:22 64:18
  65:21 66:1,16
  66:21 67:8,15
  68:9,22 69:1,18
  86:5,13 87:19
  87:24 198:1
  244:1 293:2
**Colby** 279:25
**collaborate** 211:4
**collaborated**
  189:2 199:8
**collaborating**
  239:15,17
**collaboration**
  54:13,17 67:11

199:24
**collaborative**
  87:20 92:25
  111:5 137:5
  208:20 254:22
**collaboratively**
  62:7
**collaborator**
  244:9
**colleagues** 62:8
  226:3
**collecting** 38:7,10
**collective** 113:24
  114:2,10 125:5
**college** 22:13,15
  23:3 33:6,10,19
  184:3 244:1,12
  279:12 281:25
**colleges** 22:24
**combination**
  238:15
**come** 51:14 74:24
  122:25 123:3
  153:16 155:1
  187:6 208:2
  222:2 223:6
  238:8 252:17
  255:13
**comes** 161:10
  240:11 255:5
**coming** 172:16
  172:17 198:18
  246:6,7 253:22
  255:19 259:12
**command** 24:16
  43:2 130:6
  140:15,17
  149:19 230:4
  246:20 274:25
  275:4
**commander** 43:4
**comment** 153:24
  230:17 252:2
  253:3,12
**comments** 152:25
  230:21

**Commerce** 29:14
**Commission**
  286:14 294:15
  294:15
**commit** 158:18
**committed** 65:17
**committee** 64:11
  64:15 65:6 66:8
  69:19,25 70:4,8
  70:10,11,13
  72:11 74:16
  75:13 77:4
  150:4 151:25
**committee's**
  77:18
**common** 247:21
**communicate**
  13:3 14:3,6,16
  14:21 19:12
  87:25 214:2,6
  234:14 272:8
  274:16
**communicated**
  139:18 160:20
**communicating**
  203:15 255:9
**communication**
  61:24 88:9
  90:11 123:8
  142:14,19
  192:21 215:12
  215:16 216:1
  218:5 236:10
**communications**
  42:22 122:12
  124:17 149:10
  165:22 197:4
**community** 4:17
  23:3 54:14 65:8
  65:13,25 67:1,4
  67:7,12 75:2,23
  107:1 142:3,17
  198:18 222:2
  223:14 224:9
  224:14,20
  233:13 234:8

235:10 236:8
**commute** 20:16
  20:17
**company** 58:12
  162:1
**comparators**
  244:2
**comparison**
  123:7
**compensate**
  284:13
**compensation**
  26:20 35:7,10
**competition**
  239:11
**complain** 125:17
  159:14 253:2
  254:15 267:21
  272:7 274:23
  275:3 278:4,24
**complainant**
  125:20
**complained** 81:5
  88:25 158:25
  159:5 160:1
  161:9 267:16
  272:10 274:15
  274:18 277:14
  277:23 279:6
**complaining**
  89:15 157:5
  161:4,6
**complaint** 5:18
  6:3,10,14 34:7
  52:21 88:23
  98:17,20
  107:11 108:1,8
  108:10 110:17
  117:1,13 118:3
  118:11,13,19
  118:22 122:19
  124:8 126:15
  129:11 147:21
  153:4 157:14
  160:10 163:10
  170:10 171:14

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 81 of 118 PageID 441

Smith vs. Florida Gulf Coast University Kelli Smith                01/22/2025

Page 302

173:22 226:12
226:15,15,17
226:20 227:1,8
227:11,24
228:2 242:20
245:14,17
250:1,20
263:13,14,22
265:1 276:7
277:11 278:21
282:14 283:9
283:15 288:3,4
288:8
**complaints** 4:6
12:14 32:8
107:1 117:1,7
146:12 152:24
153:10,13
156:14 157:2,8
157:12,24
205:2 255:21
264:23 269:12
269:15 273:9
274:6,6 275:9
277:2,9 290:1,4
**complete** 8:10
158:22 258:9
266:23 267:2
286:19,23
287:1,16,20
288:7,11 290:9
290:16,22
292:10
**completed** 43:18
45:16 127:5
162:18 180:19
208:10 270:10
270:19
**completely**
261:24
**completion** 98:10
**complex** 199:15
**compliance**
42:23 86:15,20
87:1 121:4,13
121:22 128:5

138:6 173:17
173:23 174:2,4
174:12,15,16
175:10,12,13
177:6 178:21
180:7,9,14
182:6,9,20,24
183:15,21,24
184:7,13
190:20 194:2
195:7 201:7,13
201:24 202:18
204:19 262:17
**compliant** 109:12
**comply** 93:5
**component**
107:15
**computer** 166:7
166:9
**concern** 81:3
138:7 156:6
174:1 203:18
211:16 214:18
**concerns** 4:6
130:12 147:17
202:12,13
204:21,23
211:21 213:6
214:19 226:5
**concert** 121:16
**concluded**
292:20
**concluding**
180:10
**concrete** 130:12
**concurred**
195:14 238:11
238:20,24
**condition** 9:22
145:19 282:19
282:21 283:22
285:14 286:4
**conditions** 9:15
32:9 34:8
**conduct** 4:15
128:13 129:9

140:1 154:1,2
155:14 157:15
163:4 189:1,19
207:1,9 260:13
263:18
**conducted** 64:18
**conference** 72:1
**confidential**
206:8,9
**confirm** 167:4
**confirmed**
163:25 167:3
**confirms** 50:14
**conflict** 146:24
156:23 163:3
209:3
**conflicting**
138:10 145:8
145:10
**connected** 19:9
53:17 295:15
**connection**
152:21 196:11
**consider** 24:17
**considerable**
23:17
**considered** 82:4
127:20 180:18
261:6
**considering**
196:13
**consistency**
53:20
**consistent** 85:23
**consists** 103:22
**constant** 149:5
**construction**
161:25
**consult** 198:14
**consumer** 12:8
12:14 281:8
**contact** 106:8
193:12 223:6
290:3
**contacted** 194:13
207:16

**contacting**
195:21
**contend** 265:16
265:23 268:9
277:17 278:3
278:10,17
282:23 285:14
285:25
**content** 118:10
227:20 245:9
**context** 92:13
151:4 153:8
**continue** 54:9
122:25 145:15
148:19 188:18
**continued** 144:23
145:20 150:18
201:12,16
213:16 224:20
**continues** 102:9
201:20
**continuing**
124:14
**contract** 3:22
98:8,12 109:1
113:21,23
171:10 235:18
260:15 270:7
270:16,18
**contracts** 109:3
**contrast** 244:1
**contribution**
25:13 38:15
**control** 182:21
**conversation**
8:25 18:23 79:7
102:6 106:5
122:5,8,24
123:1,18,22
124:3 131:20
145:7 148:14
148:16,19
151:12,18
152:3,16
154:22 156:15
156:18 160:4

160:12 171:7
171:12,19
173:5 174:19
175:5 178:19
195:23 196:14
217:5,17 219:2
219:13,22
224:1 230:23
234:17,19
235:14,17
237:17 239:2,8
247:21 248:11
253:5,25
255:17 274:12
**conversations**
17:4,5,13,21
18:3,10,14
109:10 131:6
131:16,19
145:1 149:25
151:8,10
152:11,15
159:8,22
167:18 173:6,8
174:20 193:10
224:7 231:21
237:21 242:14
258:17 273:12
274:8 289:1,5,6
291:15
**conveyed** 168:24
**conviction** 264:9
**cook** 239:12
**cookoff** 239:11
**cookout** 239:20
**cooler** 274:12
**Cooper** 10:20,22
11:5,14 20:9
59:17,19
**cooperate** 141:5
**cooperation**
142:18
**coordinate** 109:9
**coordinating**
197:21
**coordinator**

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 82 of 118 PageID 442

Smith vs. Florida Gulf Coast University Kelli Smith                                01/22/2025

Page 303

110:9,12 121:5
121:23 132:14
132:25 133:6
146:15,20
147:14 182:9
183:6 236:24
**copied** 197:10,21
218:4
**copy** 106:16
109:20 110:25
111:17 112:22
133:16 136:8
137:19,23
138:18 139:8
139:12 140:6
141:13,17
142:4,10 143:3
143:8 241:24
245:17 262:14
262:22 270:6
286:19 287:16
288:7 290:17
**Cordova** 269:18
269:23 271:12
**Cordova's** 272:8
272:11
**corporals** 43:6,11
**correct** 20:12,19
21:7 23:6 25:2
26:22,23 27:8,9
27:13,19,24,25
28:12 29:19,20
31:18 34:12
36:13 37:25
39:12 40:8,11
40:14,25 42:6,9
43:23,24 45:24
48:12 49:15,16
50:18,19,25
51:9,10 52:3,4
52:8,9,18 54:2
54:3,6,7,10,11
54:14,15,17,21
54:22 55:4,14
57:13,22,23
59:10 60:22

61:8,9,14,19,25
62:4,5,8,9,12
62:13,16,20,23
62:24 63:1,2,8
63:12,23 64:15
64:16,21,25
65:1,9,10,13,14
65:22,23 66:2,3
66:9 67:2,3,5,8
67:9,12,15,16
69:19,20,23
71:3,4,14 72:4
72:9,10,19,20
74:25 77:11,12
77:14 79:11,12
79:14,15 80:1,6
80:9,11,12,14
80:15 81:24,25
82:2,7,8,17,22
83:5,8,11,12
84:3,4,20,21
86:21,24 87:13
87:14,16,17,21
87:22 88:1,2
89:19 90:1,8,11
90:16,24 91:3
91:17,18,20
92:2,3,5,7,10
92:14,20,23
93:3,4,7,16,22
93:23,25 94:1,4
94:23,24 95:6,8
99:21 100:2,23
101:4,8,12,15
101:20,25
102:1,10,15,16
102:19 103:5
104:18 106:10
106:11,16
107:3,4,7,22
108:1,6,10
109:20 110:25
111:17 112:3,4
112:15,22
113:15,16,18
114:14,16,22

114:24 115:7
115:11 116:4,6
116:9 118:6,23
119:8,19
120:23 124:9
124:11,12,15
124:18 125:12
125:15 126:10
130:23 131:25
132:9,15 133:3
133:6,16,22
134:4,20 135:1
135:4,7,11,13
135:14,16,17
135:19,20
136:8,21,22,24
136:25 137:3
137:19,23
138:8,18,25
139:8,20,21
140:11,13,14
140:17,18,20
140:21,24
141:2,3,6,7,13
141:17,20,21
142:4,10,19,20
143:3,8,14,17
143:19 144:7
145:15,16,20
145:21 146:8,9
146:12,13,15
146:16,20
147:6,15,19,20
151:4,25 154:8
155:16,17,19
156:10,12,13
158:2,4 160:11
161:16 164:24
165:24 166:25
167:16 168:15
168:22 169:10
170:6,7,12,20
170:21 171:6
171:24 174:6,7
174:10,11
175:14,20

176:15,21,22
177:2,7,24
180:8,15,19,20
180:23 181:21
182:3,6,9,10,16
182:18,19,21
182:22,25
183:1,3,6,13
184:3,4,5,8,10
184:11,13
185:6,14,19
186:9,17,18,20
187:1,2,10,11
187:12,19,23
188:1,9,12,22
189:8,9,11,19
190:5,8,15,21
191:3,6,7,9,12
192:13,22
195:11,16
196:4,5,7,8,19
196:20 197:8
197:11 198:1,2
198:3 199:13
200:9,13,21
201:3,10,11,14
201:17 202:8
202:14,17,21
203:10,16,17
203:20,22
204:6,9,10,14
205:11,17
206:19,21,22
207:23 211:23
212:1,6,10
213:8,9,11,19
213:23 214:13
215:12 216:12
216:15,17,20
218:6,7,14,15
218:21 219:6,7
225:22,24
227:25 228:13
228:14,16,17
229:21 230:15
234:9,12 235:7

235:8,10,11
236:1,5,6
242:14 245:7
245:24 246:4
247:19,24,25
248:8,17 249:1
249:24 251:1
252:25 253:1
254:7 259:8
260:2,4,5,8,10
263:6 264:10
266:22 267:2,6
267:23 268:3,4
268:7,8 271:13
272:18 273:2
274:4,22 275:6
275:7 276:13
276:15,17
277:21 280:17
280:19,21
283:14 284:1,2
284:11,14
285:3,11,22
286:19,22
287:1,14,15,16
287:20 288:5,6
288:7,11 290:9
290:16,21
293:22
**corrected** 254:14
**correcting**
258:18
**correction** 55:17
**correctional** 23:5
23:13 55:23
56:19
**corrections** 22:25
24:2 48:3,6,11
48:14 55:7,10
55:16,24 56:2,8
57:24 280:10
280:14
**correctly** 100:3
117:2 126:4
136:2 205:9,14
209:24 217:10

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 83 of 118 PageID 443

Smith vs. Florida Gulf Coast University Kelli Smith                    01/22/2025

Page 304

219:15 234:18
272:3
**corresponded**
154:13
**cost** 182:25
186:15 189:6
217:1
**costly** 206:16
**costs** 124:25
**couldn't** 7:19
150:4
**counsel** 1:18 3:20
8:13 17:5 18:7
84:19,19 93:21
105:13,24,25
106:9,10 109:9
145:5 189:19
194:14 195:9
200:11,18
218:12 254:22
257:21 258:2
267:6 289:17
295:13,15
**counsel's** 109:4
145:2 226:11
**counseling** 93:12
143:16
**counselings**
143:18
**county** 3:3 23:4
36:23 43:19
47:25 48:3,13
55:21 56:24
57:6,19,22 58:7
294:3,17 295:3
295:18
**couple** 29:6
44:10 99:17
125:23 126:1
151:13 155:5
163:21 168:2
175:18 209:22
217:12 258:13
**coupled** 208:12
**course** 24:17
150:2 162:6

237:22
**courses** 24:15
68:5
**court** 1:1,21
208:14 292:16
**cover** 63:20,21
65:5 223:17
231:2
**covered** 67:23
**covers** 87:7
**COVID** 29:3,5,6
31:4,19,21,24
31:25 155:7
170:24 223:19
224:3
**coworker** 253:2
**crash** 283:9
**crawlers** 175:2
**create** 8:25 62:17
112:12 209:25
226:2
**created** 114:21
115:10 116:3
137:2 146:24
166:1 171:11
209:21 221:13
221:15,22,23
229:2 268:19
**creating** 8:19
61:5 137:1
148:9 182:24
236:12
**creation** 45:2,4
137:4
**credits** 23:1,2
**crime** 199:18,21
**crimes** 87:10,13
87:15,15
204:20
**criminal** 22:20
22:21 56:19
**crisis** 54:24
**criteria** 208:3,4
**critical** 37:15
77:4 249:12
250:4

**cross** 292:14
**crossover** 23:9,15
**CSA** 194:24
195:6 205:25
206:4,6,10,11
216:15 218:9
**CSAs** 198:19
216:16
**cultivate** 142:14
**current** 18:11,15
24:8,11 41:7
133:25
**currently** 9:9
10:2 11:23
269:18 271:13
**cut** 166:2

**D**

**D** 2:18
**D-E-O-N-T-R-E**
130:20
**D-I-A-N-N-A**
123:25
**D(2)** 132:18
**daily** 186:5
**danger** 209:9
**Daniel** 243:16
**dark** 188:16
**data** 129:7 186:6
188:19 244:9
277:12
**date** 1:13 11:10
44:2,4 51:24
64:2,4 98:9,10
112:25 119:24
154:22 164:11
175:21 209:16
217:11 252:4
293:3 294:20
**dated** 111:20
293:24 294:22
295:17
**dates** 31:6,12,18
126:8 132:10
270:6
**daughter** 44:13

**David** 59:23 95:7
95:9,11 96:10
129:24 157:21
163:25 167:2
214:20,22
227:9 231:8
237:8,20 238:1
238:4,11,20,21
254:25 255:15
256:10 258:21
262:3
**day** 17:9 74:4,16
117:10 148:8
150:23 165:7
184:20 201:21
239:6 294:7,9
294:22 295:17
**day-long** 74:5
78:17
**day-to-day**
149:17
**days** 29:7 31:22
83:18 99:20
133:25 134:8
134:10,12
154:14,14
163:1 172:9,10
172:11,11,11
172:11,16
214:16 223:20
232:7
**deal** 159:18
239:19 253:6
253:10
**dealt** 165:9
256:20
**dean** 139:18
**deans** 216:15,16
218:8
**decades** 231:11
**December** 5:9,13
11:9 217:11
246:24 247:21
**deceptive** 12:16
**decide** 223:13
**decided** 38:1

45:18 193:16
**deciding** 205:25
**decision** 63:3
73:6 80:16
81:11,15,18,21
93:14,22
200:15,15,16
215:19 216:18
216:22 242:16
257:1,4,6 258:4
259:14 261:4
262:8 269:3,7
269:25 270:21
271:2,5 273:17
273:22
**decisions** 103:9
103:11,15
118:25 139:20
276:12
**declare** 293:22
**dedicated** 183:23
184:7 191:20
192:5
**Defendant** 1:8,18
2:9
**defer** 157:22
**deferred** 109:13
212:14
**defined** 98:9
**defines** 99:25
**definitely** 91:21
148:22 165:13
**definites** 167:7
**definition** 153:7
**definitions** 48:18
**degree** 22:17,19
147:4 173:19
175:2
**degrees** 22:22
24:13,14 44:11
**delays** 170:24
**delegated** 136:17
**deleted** 13:17
**delineate** 248:24
**delivered** 211:2
**Demand** 6:10,14

Smith vs. Florida Gulf Coast University Kelli Smith    01/22/2025

Page 305

288:3
**demeanor** 148:17
150:11
**demoted** 98:19
**denied** 80:3
118:8,9 208:2
**denying** 29:14
**Deonte** 131:9,11
131:24 157:25
**Deontre** 128:13
130:18,18
131:10,11,13
131:24 158:1
**department** 6:5
12:8 29:14
33:12,22 34:11
34:25 36:22,25
41:11 42:20
45:3,5 54:20
55:6,10,16,24
56:2,8 87:6
88:18 89:5,12
91:9 92:2,19
97:21 100:12
100:17,18
101:8 103:4,10
103:16,19,24
105:1 124:17
128:11 130:11
140:10 143:13
146:8,11
151:22 164:2
164:17 175:1
175:24 176:20
177:16,22
179:17 180:3
181:17 182:18
183:16 184:16
187:1,6 191:22
194:21 206:25
209:25 210:22
212:1 222:7,15
224:4 233:8,18
234:15 237:2,4
238:9,17
241:17,22,23

249:12 250:20
252:10,15
255:10 260:21
274:7,10
280:10 281:8
**department's**
89:7 204:24
205:3
**departmental**
61:18
**departments**
91:2 101:4
102:3 249:18
255:25 256:6
263:16
**depended** 99:22
**depending** 93:20
98:5,5,6 156:23
**depends** 48:5
92:15 198:13
212:2
**deployed** 170:13
**deployment**
187:16
**deponent** 7:3
294:20
**deposed** 7:16,21
8:4 15:24 16:1
**deposition** 1:11
8:7 17:6,12,13
17:22 18:4,8,12
19:4 26:12,19
28:2 29:9 40:16
43:13 49:4,25
51:18 60:4
63:15 69:13
76:2 78:3 86:10
110:20 111:10
135:22 137:15
138:13 139:23
142:22 221:7
264:22 266:8
283:13 287:23
292:19 293:22
294:20 295:8
**depositions** 8:3

**depth** 106:2
**deputy** 36:24
37:1 42:3 43:10
**derogatory** 257:9
257:12,15,18
**describe** 77:10
**describing** 212:2
**description** 2:22
3:1,17 4:1 5:1
6:1 60:21 85:19
100:4
**designed** 67:1
**designee** 110:9
**desk** 194:25
**despite** 268:21,21
271:15
**destroyed** 144:15
252:9,14
**destruction**
145:2
**detail** 89:6,8
109:19
**details** 200:5
246:8
**detective** 36:9
166:18 247:2
**determination**
77:18
**determine** 129:4
155:15 199:1
**determined**
194:24
**determines** 272:5
**develop** 62:15,19
**developed** 233:23
**developing** 61:16
**development**
24:16 61:12
**device** 14:23
**diagnosed** 282:18
**dialogue** 191:24
238:7 273:13
**Diana** 201:6,12
216:23
**Dianna** 122:13
123:10,23

124:4 131:1
158:3
**diary** 285:24
**didn't** 145:4
155:14 170:10
170:23 171:3
200:8 217:8
233:25 253:14
282:9
**difference** 198:12
249:10 250:15
**different** 53:9
74:23 195:22
205:18 210:3
233:25 236:12
256:4 261:15
268:6 273:11
280:1 288:24
**differently** 123:6
124:18 149:11
211:7 215:7
265:24 267:9
267:13 268:10
275:15
**differing** 205:22
**difficult** 8:24
88:19 101:19
102:9,14 211:8
**difficulty** 88:12
101:14 214:9
214:12
**Diggs** 34:5
**digitally** 294:10
295:19
**Dina** 10:20,22
11:2 18:17
257:25
**dinnertime**
223:25
**direct** 2:19 7:6
73:18 76:7,12
84:24 88:16
114:1 122:1
145:5 161:18
192:21 193:12
222:9 224:7

229:19 272:2
**directed** 64:14
122:5 149:2,8
153:9 161:14
164:1 166:23
**direction** 61:12
92:7 106:9
121:25 138:3
149:15 157:11
192:23 193:3
238:13,19
240:4 267:4
268:2 280:1
**directive** 138:16
187:5
**directives** 4:13
123:8 138:23
140:20 156:7
**directly** 73:17
122:25 123:3
123:15,19
148:1 154:12
157:20 193:9
210:15 224:9
225:8 231:18
**director** 46:4,8
60:18 85:20
86:12 107:22
108:1,3,9 121:3
121:12,21
129:22 130:2
138:2 273:5,15
279:16,16
**disability** 1:15
2:4 24:20,23
283:17
**disagree** 244:8
**disagreed** 205:16
**disagreements**
151:2
**discharge** 17:2
**disciplinary** 4:18
133:3 143:2,15
144:6 263:20
280:13,21
**discipline** 53:3

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 85 of 118 PageID 445

Smith vs. Florida Gulf Coast University Kelli Smith                                01/22/2025

Page 306

140:23,25
144:18 145:12
148:24 156:9
212:11,25
213:11,19,23
280:24
**disciplined** 37:13
51:4 213:20
**disciplining**
143:19 144:7
**disclose** 264:8
**disclosed** 289:3
**disclosures** 6:15
290:8
**discrepancies**
258:18 259:9
**discriminated**
277:15
**discriminating**
152:18
**discrimination**
6:12,13 16:10
16:12,15 94:18
94:21 97:9,13
107:2,11,25
110:8 120:15
121:14,23
128:3,9 146:12
147:15,21
152:24 153:5,6
153:11 156:14
157:3,4,6 159:1
159:5 160:3,11
160:25 161:9
173:8,11,14
203:19 265:3
265:11 276:8
277:5,23
286:15,16
287:6 292:2
**discriminatory**
123:14 153:23
**discussed** 206:15
249:8 257:22
258:4
**discussion** 93:12

105:6 137:11
142:7 206:23
217:23
**discussions** 109:8
261:1
**disfigurement**
283:17
**dismay** 259:11
**dismissal** 135:10
135:15,18
**dismissed** 16:22
16:24 135:12
153:20 155:8
**disorderly** 15:13
**disparate** 122:15
128:15
**dispatcher**
124:22
**dispatchers**
122:14 124:21
124:22 125:2
127:2,12
**displayed** 230:5
**dispute** 32:2
70:24 76:1 78:9
83:20 84:12
105:15,21
106:22 108:24
109:25 110:24
111:22 115:22
115:24 116:16
120:3,4 136:6,7
137:22 138:21
139:11 140:5
141:16 142:9
143:7 151:4
179:2,9,20
227:16,23
228:2 243:21
244:18 245:6,8
249:23 285:11
**Disqualification**
2:25
**disrespectful**
148:12
**disseminating**

189:18
**distance** 78:20
**distress** 282:16
284:7 285:25
**DISTRICT** 1:1,1
**diversify** 233:17
**divestment** 185:8
**division** 1:2
42:24 80:21
125:21 157:15
184:18 204:19
**divisions** 41:15
**doctor** 283:1
286:3
**doctor's** 9:9
**doctors** 9:18
286:6
**document** 5:6,14
26:14,18 28:4,8
28:14,20 29:11
29:20,24 30:1
33:1 40:19
43:15 49:6 50:2
50:12 51:20
52:12 53:24
60:6 63:17
65:16 66:6
67:19 68:3 69:8
69:15 70:3,25
71:7 73:12,24
74:1 75:5 76:2
77:3 78:5,10,14
83:15 85:16,24
86:1,9,14 104:5
105:10,21
106:14,23
107:8 108:21
109:17,19
110:1,22 111:7
111:12,15,23
112:1,20 115:6
115:14,19
116:14 119:5
119:15 120:4,5
132:6 133:10
135:24,25

136:3,12
137:17,23
138:15 139:6
139:15,25
141:11 142:24
144:14 176:10
178:25 179:7
179:14,25
180:13 181:4
182:13 188:3,6
190:25 196:1
200:25 203:2
209:6,6,15,17
210:12 216:9
220:16,18,20
221:9 226:8
232:5,16,18
233:1,3 236:21
240:15,16
243:11 244:16
244:19 245:6,8
245:12,22
250:18 261:11
261:15,17,18
261:20 262:12
263:2 266:6,10
266:17,25
280:7 286:11
286:20 287:5,8
287:25 288:16
288:17 290:14
290:21
**documentation**
115:3 118:21
132:2 144:8
158:10,12
251:21 265:14
**documented**
112:9 143:19
143:22 144:6
144:11
**documents** 18:6
18:7 32:2 33:8
33:14 35:3
37:24 47:6 69:5
143:24 158:17

165:1,23
166:12 175:25
176:2 177:20
192:6 208:8,14
209:23 222:1
228:11 252:8
261:19 277:8
285:11
**DOE** 32:1 175:4
175:6 176:14
181:19
**doing** 10:5,7
155:9,11,15,16
156:3 159:19
160:23 161:24
173:1 176:14
177:23 185:2
186:5 192:8
210:7 235:25
239:25 242:8
243:1,25
248:10
**don** 255:25
**don't** 9:2 60:7
72:23 127:10
137:25 139:13
174:21 188:20
219:2 231:2
243:4 246:14
**donated** 256:16
**donation** 256:9
**donations** 256:5
**door** 150:23
**Dorn** 17:25
**doubt** 249:22
**Dr** 84:2,5,8 89:1
89:3,10,15
102:24 118:25
128:25 129:14
157:21 159:14
159:14,22
160:16,18,20
161:3 163:10
163:22,23
173:6 211:15
211:19 214:8

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 86 of 118 PageID 446

Smith vs. Florida Gulf Coast University Kelli Smith                    01/22/2025

Page 307

214:12 222:14
222:18 224:8
237:10,22,25
238:1,5,8 239:3
240:20 241:21
242:3,3,7,7,15
242:19,22,25
243:1 245:4
257:8 260:12
262:14
**draft** 217:4
**drafted** 114:24
216:23
**drafting** 116:8
**drive** 2:10 150:15
**driven** 82:3
**driver** 174:25
283:11
**driving** 236:14
**dropping** 271:16
272:2
**dual** 185:21
**dually** 146:25
**due** 107:6 162:1
166:20 249:13
**DUI'ing** 98:19
**duly** 7:3 294:7
**Dunning** 77:25
**duties** 12:12
60:22,24 61:11
62:4,11,19 86:4
100:5,11
182:24 185:21
268:5,6
**duty** 86:11 98:20
121:2 132:24
140:9 185:21
185:22
**Dyson** 2:12,19
7:7,10 36:2
48:22 49:1
89:24 104:2
105:3,7 137:10
137:13 181:1
216:3,6 284:20
284:22 292:13

292:17

**E**

**E** 2:1,1,18,21
**earlier** 34:10
36:3 40:9 56:24
57:11 67:24
71:3 74:22
98:13 99:16,18
133:13 174:5
192:20 203:4,7
229:17 239:14
254:11 263:5
**early** 43:19
146:17 207:3
259:7
**earn** 283:21
**earnings** 283:20
**easily** 178:16
**easy** 151:17
199:23
**eating** 18:24
**ebb** 100:15
**Eckerd** 279:12
**ed** 271:16
**EDU** 195:1 206:4
**educate** 206:16
**education** 54:6,9
87:6 175:1,24
176:20 177:16
177:23 179:17
180:3 181:17
194:21 237:2,4
**educational**
68:12
**EEOC** 226:15
**effect** 17:20 19:2
109:21 111:1
111:21 119:24
133:17 136:10
143:8 160:3
225:17 240:2
256:13
**effective** 75:24
215:12,17,25
217:1

**effectively** 87:25
100:7
**effects** 224:3
**effort** 137:5
223:19
**efforts** 111:5
115:2
**eight** 44:1 249:11
250:4,13,16,21
**either** 8:1,2 12:23
13:2 15:24
21:25 131:11
157:25 219:20
234:1 254:6,24
**elect** 25:11,24
**elected** 25:13
**electronic** 110:10
115:8 116:7
209:25
**electronically**
229:3
**eligibility** 38:4,6
**eligible** 30:11,15
37:18 53:5 56:5
57:3 58:3
135:16,19
215:22
**eliminate** 234:10
**eliminating**
236:8
**email** 1:23 4:20
4:21,22,23,24
5:16,20,21,22
5:23 12:18,20
13:2,10 132:1
160:24 176:4
176:13 177:13
177:15 178:6
178:11,13
179:16 180:2,6
181:6,13 191:2
191:18,25
192:13,14,18
195:1 196:4
197:15,20
201:3,9,25

203:11,24
206:4 209:19
209:20 210:12
210:14 216:11
217:7 218:4
219:23 220:1
235:24 243:24
256:13,23,25
291:17 294:19
**emailed** 191:21
207:3
**emails** 4:19 5:2,3
5:7,8,9,10,11
5:13,15,19,24
6:2 115:5
128:22 130:16
130:17 131:23
197:11 242:11
**emergency** 4:4
42:23 87:8
114:17 198:21
199:2
**Emily** 202:3,3
208:2 227:2,6
**emotional** 282:15
284:7 285:25
**emphasis** 223:11
**emphasize** 67:10
**employed** 10:8
10:24 11:1,2,3
11:5,11,23,25
12:2,4,17 13:7
14:17 19:21
21:22 25:21
36:3 47:10 52:2
64:24 80:13
84:14 90:13,15
90:18 95:4
98:14 99:23
100:1 117:14
131:2,4,14
201:13,16,21
203:9,12 206:3
222:19 253:15
258:3 270:5
275:18 280:14

**employee** 3:6
20:1 42:11
82:22 98:17,21
108:9 113:3,11
113:17 116:25
120:14,25
121:18 128:8
132:22 255:6
257:17 295:13
295:14
**employees** 7:24
18:11,15 42:23
43:1 58:23 81:5
102:10,14
103:2,3,19
112:1 121:15
132:12,18,20
133:23 134:17
140:9 185:17
185:19 211:14
214:1,5 215:24
231:21 265:24
275:9 276:19
291:13,19
**employer** 27:8
**employment** 1:15
2:4 3:4 12:24
12:24 13:3 14:5
14:6,9,16,18,20
15:2 19:8 20:13
24:18 27:14
35:5,10,15,22
37:10 46:12
49:9 50:15,23
51:5,12 52:7,21
56:22 78:18
81:24 83:2,18
85:21 90:22
91:1 99:9 103:9
103:11,14
104:12 105:16
105:19 106:19
108:4,13,25
109:22 110:16
111:1,19,24
112:10,24

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 87 of 118 PageID 447

Smith vs. Florida Gulf Coast University    Kelli Smith    01/22/2025

Page 308

113:10 116:18
116:22 117:15
117:18,25
119:22 120:6
120:22 121:9
121:11,19
122:3 124:5
126:2 132:9
133:6,17,24
136:9 137:2,20
138:19 139:9
140:3 141:14
142:5 143:4,9
145:20,23
147:22 148:8
152:8 157:6
173:9 202:8,17
202:20 203:9
203:13 206:2
207:3 235:3
254:19,21
257:2 258:4
259:22 261:20
264:16 272:20
273:18 276:11
276:13 277:23
279:12,21
282:9,19,24
283:2 285:15
285:20 286:4
291:2,16
**encompasses**
87:7
**encountered**
291:2,4,5
**encouraged**
93:13 175:11
**ended** 12:24
24:18 35:15
195:1 200:14
285:20
**enforce** 105:1
**enforcement**
23:1,7 24:5,9
24:14 36:5
37:21 47:23

48:1,4,6,9,10
48:11 55:12
92:14 94:8 99:4
99:8 101:14,19
101:25 102:10
102:15 223:7
223:12 249:16
255:25 259:20
259:22 280:15
**enforcing** 136:20
146:7
**engage** 149:19
**engaged** 97:13
197:5
**engagement** 65:8
65:13,25
170:14,15
223:12,14
225:20 230:25
**engagements**
109:4
**engaging** 94:21
278:14
**enhance** 65:18
67:1
**enjoyment**
283:18
**ensure** 13:17
109:11 204:2
**entered** 27:21
96:23
**entirely** 131:12
164:12 221:14
271:20
**entities** 263:19
**entitled** 30:2,5
**entity** 185:9
**entry** 233:23
236:13
**envelop** 210:2
**environment**
54:13 67:11
204:22
**equal** 123:9,9
133:25
**equipment** 187:4

212:6
**equity** 121:4,13
121:22 125:12
128:4 146:15
146:19
**equivalent** 134:7
**era** 155:7
**Eric** 71:19
**ERRATA** 293:1
**error** 275:13
**errors** 261:16,21
261:22,23
**escaping** 169:21
**especially** 249:9
**Esquire** 2:6,12
2:15
**establish** 76:7,12
76:25 180:14
**ethical** 92:11
140:22
**EthicsPoint**
108:10 110:10
**evaluate** 12:14
198:20 225:20
238:9
**evaluated** 194:23
**evaluation**
228:23 229:1,4
229:7
**evaluations**
228:20
**event** 159:16
**events** 78:20
198:9,10,24
199:13
**Eventually** 46:1
175:15
**everybody**
199:24 208:20
**everyone's** 210:7
**evidence** 189:10
264:23 277:17
278:3 292:1
**Ewing** 193:17,21
196:7 216:12
**exacerbated**

192:4
**exact** 7:20 11:10
16:21 41:12
44:2 86:1 94:20
160:21 209:16
222:16 240:1
255:17 256:12
269:22
**exactly** 23:18
95:3 155:23
**Examination**
2:19 7:6
**example** 93:19
205:22 208:5
209:23
**examples** 77:13
**exceeded** 196:21
**excellent** 61:23
**excess** 162:1
**exchange** 150:24
**exchanges** 201:3
**excitement** 91:3
**excused** 264:11
**execution** 138:6
**executive** 84:6
148:1
**executive-level**
24:15
**exempt** 114:6
145:25
**exhausted** 223:21
**Exhibit** 2:23,24
2:25 3:2,3,4,5,6
3:7,8,9,10,11
3:12,13,14,15
3:16,17,18,20
3:21,22,23,24
4:2,3,4,5,6,7,9
4:10,11,12,13
4:14,15,16,17
4:18,19,20,21
4:22,23,24 5:2
5:3,4,5,6,7,8,9
5:10,11,12,13
5:14,15,16,17
5:18,19,20,21

5:22,23,24 6:2
6:3,4,5,6,7,8,9
6:10,11,12,13
6:14,15,16
26:11,13,19
28:2,3,10 29:9
29:10 32:3
40:15,17 43:12
43:14 49:4,5,24
50:1 51:18,19
53:22,23 60:3,5
63:14,16 66:4,5
66:9 69:12,14
73:22,23 75:3,4
76:2 78:2,4,12
78:13,17 83:13
83:14,21 85:13
85:15 86:10
100:4 104:3,4
105:8,9 106:12
106:13 108:18
108:19 109:15
109:16 110:19
110:21 111:9
111:11 112:18
112:19 113:22
114:13,15
115:17,18,25
116:12,13
119:3,4,16
120:8 132:4,5
133:8,9 135:21
135:23 137:15
137:16 138:12
138:14 139:4,5
139:22,24
141:8,10,22,23
141:25 142:21
142:23 176:8,9
177:11,12
178:9,10,23,24
179:5,6,12,13
179:23,24
180:12,17
181:2,3 182:11
182:12 183:18

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 88 of 118 PageID 448

Smith vs. Florida Gulf Coast University   Kelli Smith                           01/22/2025

Page 309

184:21,22
189:15 190:17
190:18,23,24
192:16,17
195:24,25
197:17 200:24
202:25 203:1
204:11,12
216:7,8 217:24
217:25 218:2
218:17,18
220:8,9,14
221:6,8 226:6,7
227:17 228:5,6
228:8 229:10
232:3,4,14,15
232:24,25
236:19,20
243:8,9,22
244:14,15
245:10,11
261:9,10
262:10,11,25
263:1,23,24
264:1 266:7,9
280:5,6 283:4,5
283:6 284:23
284:24,25
286:9,10 287:3
287:4,22,24
288:15 290:11
290:12,24
291:23
**exhibits** 219:13
**exist** 69:5 112:17
150:20 185:14
**existed** 36:19
105:18,18
112:12 135:2
141:1 151:5
185:19 191:23
226:18
**existing** 283:21
**exists** 23:11
101:18
**exit** 3:6 52:11,13

52:15,24
233:16
**expanded** 241:21
**expect** 238:22
**expected** 213:15
**expenditures**
112:13
**expensive** 161:24
283:19
**experience** 36:20
48:19 62:2 98:5
99:7 194:8
209:5 225:20
230:16
**experienced**
121:16 202:16
**expert** 198:15
**expertise** 188:14
**expire** 259:23
**Expires** 294:15
**expiring** 259:21
**explain** 91:12
172:2 191:17
**explained** 279:25
**explaining**
176:13,19
181:16
**exposure** 230:6
**express** 156:2
177:8 182:5
**expressed** 89:3
91:2 177:4
201:23 202:13
202:20 258:8
259:10
**extent** 8:20 19:5
**external** 3:20
105:13 106:9

---

**F**

**fabric** 223:10
**Facebook** 13:23
13:24
**facilities** 258:12
**fact** 101:24 144:5
159:25 160:5

167:22 169:8
186:20 194:19
194:24 200:1
203:15 206:4
231:12 255:21
**facts** 198:15
**factual** 245:9
**factually** 155:10
155:15 169:6
226:24
**faculty** 223:4
**fail** 133:2
**failed** 93:5
140:24 178:7
**failure** 136:16
**fairly** 175:16
**fall** 59:7 90:5
157:1 223:22
224:19
**falling** 279:1
**falls** 22:1 87:6
113:7 159:12
**familiar** 76:20
108:6,23
112:21 114:17
114:19 163:2
255:23
**familiarity** 76:16
85:18 205:20
212:14
**family** 224:25
257:23 258:3
**family's** 161:25
**FAMU** 183:23
**far** 13:15 34:5
41:9 80:19
126:11 137:21
139:10 198:2
201:15 286:24
287:18
**fatigued** 223:20
**FDLE** 94:4,12
95:1 260:1,9
**FDUPTA** 12:15
**February** 3:9 6:7
64:1,3 239:21

239:22 294:9
295:17
**feces** 153:19
171:23 172:14
**federal** 83:3 87:5
90:6 209:3
**feedback** 3:14
37:16 51:5
226:3
**feel** 122:18 231:5
**feeling** 284:8
**feels** 237:19
**fell** 31:23 59:24
114:6 186:4
205:22
**felt** 38:22 53:11
93:18 96:17
156:20 165:14
223:9,9,11
230:2 233:16
237:20 263:21
**female** 85:3,12
151:22 230:22
231:16,16
238:13,19
276:22 277:1
**females** 230:21
**FGCU** 6:5 11:10
12:25 13:3,7
14:5,7,9,17,17
14:20,24 18:11
18:15 20:2 32:6
32:9,22 34:20
35:10,15 51:14
57:5 59:9 61:3
61:6,11,16 72:9
77:5 95:5
101:13,22
103:22 105:12
108:25 111:19
112:24 116:17
120:22 128:23
128:23 132:7,9
133:18 138:17
141:12 142:5
159:23 183:6

184:18 218:11
237:1,5 239:12
256:18 271:15
271:19 272:1
275:8,18
279:11 280:2,3
282:20,24
283:2 285:15
285:20 286:5
291:3,5,10,13
**FGCU's** 111:4
206:7
**field** 98:4,7
**fielded** 157:8
**fighting** 256:2
**figure** 207:25
210:8 217:1
227:3 231:15
**file** 16:14 29:23
107:1,25 108:9
138:25 143:13
144:9,13 151:3
165:20 251:24
252:20 287:11
**filed** 15:16 16:5
16:11,12,17
18:22 19:3 20:2
98:20 163:10
242:20 245:18
250:20 263:21
263:22 283:10
286:17 287:7
288:4
**files** 143:25
252:19
**filing** 16:7 107:11
108:8
**fill** 64:19 249:3
251:13
**fill-in** 224:21
**filled** 28:8 251:2
**filling** 101:14,19
101:25
**final** 50:15
216:25 291:17
**finance** 256:20

Smith vs. Florida Gulf Coast University Kelli Smith                           01/22/2025

Page 310

financial 12:3,13
financially
  295:16
find 103:8 207:16
  207:21,23
  209:2
finding 29:17
  154:16
findings 170:18
  177:1
Findley 71:19
fine 86:2 119:14
  214:22 239:7
  261:25 262:2
fined 237:1
fines 182:3
fining 237:5
fire 271:2,6
fired 252:17,18
  268:17,17,21
  270:25 271:8,8
firm 95:17
  196:10 270:7
first 7:3 8:21
  36:4 39:22,23
  43:4 48:2 50:16
  65:15 66:11
  122:3 123:24
  124:1,4,6,14
  125:3,23 126:1
  128:8 130:20
  139:1 140:8
  148:7,7 149:22
  150:12,24
  151:12,12,14
  152:8 153:17
  155:5 189:22
  189:22 193:12
  203:4 208:14
  226:17,18
  238:2 243:24
  255:13 267:22
  275:20,23
  290:17
first-name
  240:20

fiscal 62:15
Fisher 269:11,20
  270:24 275:12
  275:17,18
  276:3
five 7:20 41:20
  159:13 160:1
  167:11 168:10
  168:11 169:8
  176:23 181:23
  229:13,14,16
  231:24 234:13
  235:11,12
  236:2 247:5
  248:19 249:20
  267:15,22
five-year 164:16
  233:4,12 235:5
fix 167:20
flesh 208:22
  238:15
flew 215:8
flexible 224:24
  225:3
floors 153:19
Florida 1:1,6,17
  1:20,22,24 2:5
  2:11 7:11 10:3
  10:4,8 11:3,6
  11:16,20 12:17
  16:11,25 18:2
  19:22 20:14,18
  20:21 21:6,9
  22:4,16 23:10
  24:18 25:2,5,7
  25:21 26:1,8,21
  27:7,15 29:13
  32:12 34:8 35:5
  36:4,15 37:2
  39:24 40:2,23
  41:3,8 44:12,15
  45:23 46:22
  52:6 55:6,9,16
  55:24 56:1,7,9
  58:5,15,18,19
  58:21,23 59:1,5

62:11 63:22
64:18 65:21
66:1,16,21 67:8
67:15 68:8,21
69:1,18 86:5,12
87:19,24 102:4
183:20,22
198:1 209:24
243:20 244:1
265:4,5 280:10
281:7,10,25
286:14 293:2
294:2,5,14,17
295:2,6,18
Florida's 26:4
flow 100:15
Floyd 223:7
FMLA 162:9,21
  253:14,18,20
  253:23
focus 186:11
focused 147:16
folder 144:12
folders 144:11
follow 91:17 92:6
  140:10,19
  145:19 153:21
follow-up 122:23
  201:25
followed 126:10
  130:5 138:25
  230:3
following 294:21
follows 7:4
food 59:21
  269:22
foregoing 295:10
forgive 128:12
  263:15
forgot 263:6
form 3:2 8:16
  89:20 104:1
  134:13 159:1
  180:24 211:15
  273:4 293:23
formal 107:14

113:2,5,6,7,14
154:2 212:17
255:1
formally 73:21
formed 172:18
  230:24
former 18:11,15
  190:5
formulating
  60:25 61:8
Fort 1:2,21,22
  34:1 295:18
forth 108:16
forum 70:15,19
  74:19,23
forward 45:18
  154:22 157:17
  157:18 173:4
  213:16 241:17
  255:2 269:16
  279:20
foster 54:12
  67:10
fostering 101:6
found 96:25
  97:12 180:22
four 10:6,6 41:20
  75:10 229:14
  247:5
fourth 82:24
  178:14
FPR 1:19 294:4
  294:14 295:5
  295:23
fragile 31:13
frame 7:20 31:13
  39:18 59:7
  60:13 102:2
  232:12,20
frank 237:16
frankly 255:12
fraternities 198:5
  198:6,7,8
fraternity 200:2
  200:4
free 231:5

freely 202:13
frequently 190:1
fresh 33:7 98:6
Friday 208:7
front 82:10
  114:13 184:21
  197:18 217:25
  236:19 266:4,7
front-end 223:5
FRS 25:5,7,9,11,16
  25:22 26:2
  38:16 235:5
fruition 142:8
  274:1
FTO 98:10
fulfill 185:23
  189:17
full 7:14 19:15
  190:13 249:7
full-day 70:14
full-time 186:16
  186:25
fully 136:16
function 102:18
  103:4
functioned 95:19
  184:19
functioning
  190:9
functions 186:10
fund 38:12,12,14
  183:2
funded 194:17
  256:5
funding 272:6
funds 103:1
  112:3,7 272:4
funnel 125:1
funny 124:2
furlough 4:3
  112:23
further 132:3
  180:23 292:13
  295:12
future 284:14
fuzzy 285:10

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 90 of 118 PageID 450

Smith vs. Florida Gulf Coast University    Kelli Smith    01/22/2025

Page 311

**G**

gain 160:15
gap 117:20 192:2
  251:4
Garcia 134:9
gathered 274:2
gauge 215:5
gender 97:9,13
  128:16 152:19
  156:3 160:3,8
  230:7,8,18,22
  240:21 241:5,8
  241:12 257:9
  257:12,15,19
  265:2,11,18
general 4:15 12:1
  12:7 56:16 83:4
  84:19 92:19,22
  93:6 105:23
  106:10 109:4,9
  136:4,8,21,24
  137:2,19,23
  138:1,18 139:8
  140:1,2 141:13
  142:4,10 143:4
  145:2,5 146:6
  153:12 160:12
  189:19 194:14
  195:9 200:11
  200:18 289:17
General's 26:2,6
  32:12
Gennari 10:20,22
geographical
  244:6
germane 199:25
getting 88:13
  115:1 198:19
  199:1 214:9,13
  217:20,22
  247:9
gist 240:16
give 7:19 15:8
  19:14 23:1
  25:18 41:12
  42:25 44:2

59:15 79:23
  80:17 125:8
  156:4 163:20
  196:15 210:2
  223:20 233:23
  236:11 244:9
  252:1 258:9
  269:25
given 37:10,15
  51:4 56:13,21
  80:21 82:15
  83:5 104:13
  133:24 153:3
  167:6 187:5
  215:22 223:6
  224:13 244:11
  265:15 266:15
  272:25
giving 196:17
  224:15 236:13
glad 9:4 141:21
  159:17
gleaned 206:11
Gmail 13:1
go 8:6,17 15:14
  22:9,25 76:4
  77:2 89:5,8
  92:25 98:4
  105:3 107:9
  108:18 110:3
  112:16 113:19
  120:9 122:17
  132:11 133:8
  135:9 137:9
  139:14 141:4
  144:12 149:20
  154:15,25
  155:1,4 162:19
  167:16,24
  175:22 176:17
  178:2 180:12
  183:13,19
  188:6,16
  191:17 208:6
  208:11 217:4
  221:25 222:24

231:18 253:8
  258:21 263:11
  280:1 284:20
go-ahead 262:4
goal 225:19
goals 5:17 61:18
  221:12,13,22
  225:17
God 258:22
goes 13:15
  199:20 240:11
  249:12 267:4
going 8:6,23 9:5
  44:11 51:17
  66:22 73:5 74:7
  93:19 99:16
  100:4 102:7
  120:8 126:5
  128:1,12
  129:24 149:23
  150:17 151:16
  152:5 154:23
  154:23 159:15
  159:19 160:13
  162:9 165:6
  176:20 187:8
  188:16 193:11
  196:22 197:17
  200:23 203:7
  209:8 210:17
  218:17 221:25
  222:10 223:3,3
  223:10 233:5
  235:1,5 237:25
  238:6 240:13
  244:8 248:3,12
  250:21,22
  253:24 280:1
  284:19 288:24
  290:24
good 7:8,9 8:19
  119:17 163:24
  164:5,7 166:15
  181:20,24
  194:1 210:10
  211:4 214:25

238:12 244:2,9
  253:10 284:8
gosh 258:9,15
gotten 214:16
  286:7
governance 3:24
  110:25 111:5
government
  99:10
governmental
  35:13,16,21
graces 181:24
graduated 22:11
grant 194:15
granted 80:5
  175:14,16
  186:17,20
granular 109:19
gravity 199:10
Graziano 2:10
great 90:21 165:7
  236:11 239:18
greater 79:5
  185:1 209:5
  235:18
Greet 3:16
grievance 92:16
gross 156:5
ground 8:6 9:7
group 194:16,18
groups 142:15
  256:4
growth 224:13
  233:21
guaranty 90:14
guess 19:4,18
  47:15 48:17
  50:8 102:24
  115:8 147:12
  150:4 151:9
  152:1 160:8
  226:9 285:7
guessing 130:15
  220:25
guidance 157:11
  178:20

guidelines 100:25
  100:25 171:10
Gulf 1:6 7:11
  10:8 11:6,16,21
  12:17 16:11,25
  19:22 20:14
  21:6,9 22:4
  24:19 25:21
  26:4,9,21 27:7
  27:15 34:8 35:5
  52:6 56:9 58:6
  58:15,18,19,22
  58:23 62:11
  63:22 64:18
  65:21 66:1,16
  66:21 67:8,15
  68:9,22 69:1,18
  86:5,13 87:19
  87:24 198:1
  244:1 293:2
guns 187:10
  212:5
Gunter 81:20
  85:4 97:16
  108:4 181:7,14
  191:2 214:5
  257:14
Gunter's 226:16
guy 258:12

**H**

H 2:6,21
half 75:10 231:11
hand 294:8
handbook 3:19
  94:12
handed 137:14
  220:14
handle 194:10
handled 174:15
  186:3 194:8
  197:14 209:22
handling 207:17
hands 190:12
handwritten
  165:2,8

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 91 of 118 PageID
451

Smith vs. Florida Gulf Coast University Kelli Smith                    01/22/2025

Page 312

**happen** 150:17
**happened** 129:25
  154:10 161:17
  164:1 169:13
  170:17 171:25
  172:1,15 175:4
  186:2 193:13
  215:9 237:17
  251:25 252:19
  253:16 258:20
  260:17
**happening**
  125:10 153:25
  155:23 167:22
  198:1 224:19
**happens** 200:1
  273:13
**happy** 100:15
  151:17 182:2
  183:10 255:4
**harassment** 3:23
  4:9 107:2,12,25
  109:21 110:5,8
  120:15 121:14
  121:23 128:3
  132:7,14
  147:15 203:19
  204:20
**hate** 246:7
**head** 101:5
  112:10 161:1
  167:8 212:7
  231:17 266:3
  289:14
**Heads-up** 193:11
**health** 25:18
  31:13 156:6
  285:16,21
**healthy** 224:4
**hear** 253:11
**heard** 9:5 18:22
  45:12 48:10
  117:12 211:22
  214:15 239:18
  253:5 263:20
  264:17

**hearing** 2:10
  263:20
**Heather** 258:20
**heavily** 171:9
  193:14 270:3
**heavy** 223:11
**held** 36:5,23 42:7
  46:6 65:24
  100:11 101:2
  105:6 136:15
  137:11 146:25
  152:22 204:8
  204:13 217:23
  233:20
**hello** 19:2
**help** 8:25 53:16
  89:6 112:12
  162:23
**helps** 68:3
**Hey** 165:6 209:7
  217:3
**HH358656**
  294:15
**hierarchical**
  152:21 240:14
**hierarchy** 59:24
  231:15
**high** 9:12 22:9,10
  45:3
**higher** 36:24
  54:5,9 77:22,25
  124:25 271:16
**highest** 75:9
**highest-ranking**
  92:1
**hindsight** 130:4
**hire** 63:3 73:6
  76:20,24 98:10
  104:7,11 127:3
  151:23 239:13
  264:5 269:3
**hired** 33:18,21
  36:8 49:17 59:9
  59:11,20 62:25
  91:5 96:2 97:22
  98:4 102:7

  135:25 145:25
  159:17 175:20
  201:6,6 239:19
  264:3 268:17
  268:21 269:1,5
  272:17 276:21
**hiring** 13:5,6
  51:15 66:22
  73:12 101:8,9
  238:8 264:11
**Hispanic** 231:18
**historically** 240:4
**history** 67:17
  194:3
**hit** 219:17 220:4
  283:10
**hold** 22:22 26:15
  36:7 46:2 51:1
  55:15 77:5
  201:18 269:20
**holistic** 244:24
**Holmer** 289:21
**Holy** 237:16
**home** 11:19,19
  15:15 117:3
  208:11 223:24
**homeowners**
  15:18,20 16:2
**honest** 8:5 35:1
  37:22 52:20
  94:5 145:24
  147:9 187:21
  231:7 232:9
  237:14 263:7
**honestly** 37:8
  130:15 163:8
  163:12 171:13
  196:11 243:12
**honesty** 250:18
**hope** 234:1
**hopefully** 197:18
**hoping** 192:5
**hopping** 102:7
**horrible** 249:9
**horribly** 156:5
**hospitalization**

  283:19
**hospitalized** 31:8
  31:9,16
**host** 208:19
**hotline** 5:18 6:3
  108:10 110:11
  226:16 242:20
  245:14
**hour** 196:23
**hourly** 196:22
**hours** 172:23
  209:8 210:20
  236:15
**house** 10:12,13
  38:15
**housing** 57:16
**How's** 149:23
**HR** 82:5 100:24
  113:19 122:17
  134:10 157:11
  157:19 162:10
  164:20 171:10
  231:18 254:8
  259:4 270:12
**HR/union** 99:5
**human** 147:24
  164:15 193:4
  231:17 233:5
  235:15,17
  253:9 258:17
  270:2 275:5
  286:14
**hundreds** 228:10
**Hurricane** 15:21
**hypertension**
  282:21
**hypothyroidism**
  282:22

---

## I

**I'll** 9:3 19:4
  26:15 43:12
  112:18 113:22
  138:12 139:4
  139:22 141:22
  161:10 176:8

  177:11 181:2
  190:23 192:16
  195:24 202:24
  221:6 261:9
  262:10,25
  287:22 290:11
**IA** 161:14,18,20
  161:21 162:4,5
  162:12,16
  163:4 166:24
  170:3,18,19
  254:1 263:4
**Ian** 15:21
**idea** 75:11,18
  78:23 93:12
  96:3,6 99:2
  117:16 127:15
  134:15,18
  148:5 159:10
  164:7 197:9
  229:8,11 245:5
  245:9
**identifiable**
  210:6
**identification**
  26:13 28:3
  29:10 40:17
  43:14 49:5 50:1
  51:19 53:23
  60:5 63:16 66:5
  69:14 73:23
  75:4 78:4,13
  83:14 85:15
  104:4 105:9
  106:13 108:19
  109:16 110:21
  111:11 112:19
  114:15 115:18
  116:13 119:4
  132:5 133:9
  135:23 137:16
  138:14 139:5
  139:24 141:10
  141:23 142:23
  176:9 177:12
  178:10,24

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 92 of 118 PageID
452

Smith vs. Florida Gulf Coast University Kelli Smith                    01/22/2025

Page 313

179:6,13,24
181:3 182:12
184:22 190:18
190:24 192:17
195:25 200:24
203:1 204:12
216:8 218:2,18
220:9 221:8
226:7 228:6
232:4,15,25
236:20 243:9
244:15 245:11
261:10 262:11
263:1,24 266:9
280:6 283:5
284:24 286:10
287:4,24
288:15 290:12
**identified** 27:7
27:10 86:16
87:10 112:14
169:1 202:3
248:19 250:9
288:23
**identifies** 61:20
**identify** 67:17
69:9 131:21
167:12 192:5
206:11 288:19
289:12
**imagine** 104:15
**immediate**
147:25 170:11
193:4 233:12
**immediately**
121:2 132:25
153:15 155:3
194:13 209:10
211:1,1 252:22
**imminent** 209:9
209:9 210:24
**impact** 102:18
163:14 254:19
259:19 260:3,7
**impacted** 103:4
163:13

**impending**
102:25 233:6
**implement**
208:17
**implementation**
61:13 235:22
**implemented**
170:24 171:1
235:16
**implications** 94:7
200:3
**importance** 65:7
**important** 54:17
54:20 55:3 62:3
62:10,18 65:11
65:20 67:8,14
76:10,19,23
77:18 86:20
87:20,25 130:1
132:2 163:1
**improperly**
98:18
**improvement**
212:24 213:2
**improving**
149:14
**inaccurate** 208:9
**incident** 155:22
**incidents** 127:24
161:17 192:4
255:14
**include** 161:18
187:8
**included** 84:1
112:5 187:10
189:5 216:15
234:25 282:17
**includes** 60:17,21
**including** 103:6
110:8 123:10
175:8 189:18
**inconvenience**
283:18
**incorrect** 227:19
**increase** 80:8,17
185:4,7 214:17

215:23 228:12
228:15,21
**increases** 248:15
**increasing**
185:13
**incur** 189:7
**incurring** 124:25
**indicate** 54:4,8
67:21 68:3
**indicated** 28:21
28:24 34:10
65:6 122:13
128:11 164:4
174:22 229:15
**indicating** 218:11
**indication** 226:14
230:13
**indicative** 240:12
**indirectly** 123:16
123:17
**individual** 72:14
107:20,24
144:10 157:14
174:25 264:3
289:11,12
**individually** 97:5
**individuals**
231:24 275:14
276:5 288:20
289:2,7,23,25
290:4 291:1,2
291:23
**industry** 67:2
99:10 102:11
**ineligible** 29:19
30:19,24
**inference** 160:9
**inflated** 249:19
**influence** 7:24
**inform** 286:3
**informal** 107:14
107:16,18,21
**information**
13:12,17 15:1
126:21,25
128:18,21,22

129:1,14 130:8
131:21 132:13
132:21 139:19
155:25 160:17
168:23 169:16
175:8 198:16
198:17,20
199:1,22 201:2
201:10 202:4,6
203:25 204:1
204:18,25
205:3 206:10
207:12,19,22
208:25 209:7
210:1,9 229:19
263:20 269:13
270:13,14
271:19 274:2
286:22
**informed** 123:12
153:25 157:22
167:17 219:19
**initial** 6:15
133:23 290:8
**initially** 134:5,6,7
153:20 279:19
**initiate** 93:3
113:14
**initiated** 122:10
**injuries** 284:14
**injury** 283:16,25
284:3
**innovative** 67:1
**input** 234:19,20
**inspect** 154:24,25
155:1
**inspector** 56:16
**instance** 50:22
144:6 199:16
202:12 256:11
267:14
**instances** 31:17
157:10 158:25
172:6,14 193:8
207:20 208:5,9
265:25

**institute** 24:16
236:5 256:10
**institutes** 68:12
**institution** 55:23
194:9 238:16
244:7
**institutional**
121:4,13,22
125:12 128:4
**institutions** 56:20
115:1 209:22
**instructed** 9:18
**instructions** 83:5
141:20
**instructor** 239:16
**instructs** 8:17
**insubordinate**
148:12
**insubordination**
92:9,13
**insurance** 15:18
16:2,3 25:19
285:16,21
286:7
**integrity** 159:22
**intention** 38:25
238:10
**intentional**
261:22
**inter-** 141:6
**interact** 173:19
204:1
**interacted** 89:1
89:16 211:20
**interaction**
148:11 149:17
**interactions**
211:15
**interested** 295:16
**interim** 91:7
166:19 246:22
247:2 251:3
268:1
**interject** 161:11
**internal** 93:3,7
93:15,24 94:2,3

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 93 of 118 PageID 453

Smith vs. Florida Gulf Coast University Kelli Smith                    01/22/2025

Page 314

94:7 153:14
**internally** 162:19
  208:12
**Internet** 104:18
  104:19
**interpersonal**
  61:24
**interpret** 113:8
**interpretation**
  144:8 195:6
  199:6 200:13
  205:16 206:2
  206:13,17,19
  216:14 248:4
**interpretations**
  200:20
**interpreting**
  205:8,14
**interrogatories**
  6:8 266:13,15
  277:10
**interrogatory**
  276:6
**interrupt** 234:5
**interruptions**
  146:23
**interview** 3:6,12
  3:13,14 45:10
  45:11,13,16
  47:11 52:13,25
  70:12,16 72:14
  73:8 74:5,9
  75:12,14 78:16
  78:17 86:24
  89:3 91:6 164:1
  168:10 174:21
  281:19
**interviewed**
  21:11 32:21,24
  33:3,4 34:13,18
  45:6 56:11
  71:11 167:15
  167:21 281:18
  282:2
**interviewing**
  72:12 73:2

164:3
**interviews** 52:11
  52:15,17
  233:16
**intimate** 248:11
**intradepartme...**
  141:6
**introduced**
  255:22
**inventory** 182:21
**invested** 269:16
**investigate**
  126:17
**investigates**
  146:12
**investigating** 8:3
**investigation**
  93:7,15,24 94:7
  113:2,4,5,8,15
  129:9 153:15
  153:23 154:1,2
  154:8 155:14
  161:14,19
  163:4,16
  166:24 170:3,5
  170:19 171:3
  171:15 207:19
  254:1 260:9
  263:4 264:2
  268:23
**investigations**
  93:3 94:2,3
**Investigative**
  17:20
**investigator** 12:3
  12:13 56:18
  161:18,20,22
  194:21
**investigators**
  17:19
**investment** 38:12
**invite** 192:25
**invited** 231:20
**involved** 97:8
  103:14 109:7
  116:8 130:5

152:12 157:20
  196:13 197:3,3
  197:5 200:2
  214:23 231:24
  256:8 259:13
  262:7 270:3
  289:23
**involvement**
  116:10
**involving** 96:22
  97:4,11 103:15
  106:1 157:24
  176:6 210:25
**isn't** 99:8 207:14
**issue** 89:12
  100:20 101:24
  125:25 126:9
  126:19,24
  134:11 148:7,9
  148:23 149:6
  149:21 154:11
  158:3 161:13
  170:11 171:11
  175:23 176:6
  177:20 230:5
**issued** 125:2
  126:1 156:7
**issues** 101:9
  121:15 124:19
  147:14,19
  148:4,6 153:9
  170:25 178:15
  180:23 194:2
  222:17 231:18
  249:8 255:14
**itemize** 268:11
**IX** 4:9 76:16,21
  88:19,22
  109:21 110:9
  110:11 121:4
  121:22 122:17
  129:1 132:14
  132:25 133:5
  139:19 146:15
  146:20 147:14
  148:1 188:25

191:5,22 201:3
  201:9 205:21
  206:25 207:8
  207:18 208:1
  208:15 210:3
  210:23 253:7
  265:6 278:8,11
  278:14,18,22
  278:24 279:1,9
**IX's** 207:21
  208:18

_____
              **J**
**James** 19:16 71:2
  71:8,12 77:22
  246:21
**Janet** 177:15
  179:17 180:2
**January** 1:13 3:8
  4:20,21,22,23
  5:14,15,16 40:5
  60:13 67:22,24
  218:19 222:12
  256:16 293:3
  294:7
**Jeanne** 7:15 87:5
  87:10
**jeopardy** 249:15
**Jessica** 289:19,20
**job** 3:8,17 12:12
  33:6 43:20
  46:20 58:17
  59:6 60:9,17,17
  60:21,24 61:11
  61:20 62:3,10
  62:18,22 65:12
  65:21 67:15
  79:4,10 85:19
  86:4,10 89:6
  100:4,5,10
  161:25 174:5
  184:1 206:18
  214:23 238:22
  268:5,6
**jobs** 58:10
  185:24

**join** 188:23
**Jones** 18:20
  19:10,16 150:1
  151:8,11
  152:16,18
  153:9,12
  166:18 167:8
  229:18 230:5
  231:2 247:3,6
  267:14,24
  289:15,19
**Jones'** 148:10
**JTF** 41:25
**judgment** 96:22
  213:2
**July** 5:6 30:3,3,6
  175:19 190:20
**jumpoff** 217:6
**June** 5:5 49:14
  116:19 185:5
  190:15
**Jury** 6:10,14
  288:3
**justice** 22:21,21
**justification**
  236:24
**justified** 112:14

_____
              **K**
**Kansas** 199:20
  199:21
**Kavanaugh**
  273:5
**Kavanaugh's**
  274:16
**keep** 157:22
  174:23 285:24
**Kelli** 1:3,11 7:2
  7:15 12:22
  35:24 293:2,24
  294:6,19 295:8
**Ken** 273:5
**kept** 156:7,24
  157:8 160:4
**key** 3:4 47:15,17
  47:22 49:3,12

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 94 of 118 PageID 454

Smith vs. Florida Gulf Coast University Kelli Smith                    01/22/2025

Page 315

49:20 50:6,12
51:2,6,9,13
52:3,7,10,22
53:6,12,14,18
54:2 59:2 64:25
65:3 66:20 76:7
76:12
**kids** 223:25
**kind** 13:4 15:13
126:4,5 155:7
157:18 215:5
216:24 225:1
230:24 256:21
259:9
**Kirsten** 259:3
**Kittleson** 166:18
167:7 222:6
223:13 225:5
225:10,12
229:17 247:4
267:15,25
**KJS** 13:25,25
14:2,2
@...
12:21
**Klein** 1:19 294:4
294:14 295:5
295:23
**knew** 34:5 36:19
64:20,21 67:14
95:16 101:7
104:17 117:9
126:14 128:23
145:18 159:17
193:19 197:7
198:2,17
214:11 215:10
239:15,16,18
258:1
**know** 8:14,20,21
13:8 15:14 19:2
19:21 20:13
21:2,14 24:4,15
24:17 26:16
27:20,21 31:12
31:22,23 33:5

33:18,21 34:15
35:18 38:16
41:1,4,6,9 44:2
45:17 48:15
50:9,11 51:21
56:21 58:10,23
59:11,12 60:2
63:3 64:20
68:11,19 69:24
70:10,21 71:8,8
71:12,12,15,18
71:23 72:2,21
72:24 73:10,13
73:14,19 74:13
75:7,9,16 76:19
76:22,23 77:17
77:20,21,23,24
78:1,11,19,21
78:22 79:1,3,17
80:2,16 81:5,8
81:13,14,16,17
81:19,20,22
82:4,4 84:22,23
84:25 85:7,8,9
85:17 86:1 88:3
88:9,12,15,22
88:25 89:10,13
90:25 91:6,8,8
91:25 93:18
94:11,14 95:2,9
95:10,22,23,23
95:25 96:1,4,24
97:4,7,8,14
98:24 99:5,6,22
99:24 100:8,9
100:13 102:11
105:17 109:19
109:23 115:12
116:5,23 117:3
117:11,13,14
117:19,21
118:13,20,20
118:25 123:20
125:4,9,9
126:11,12,14
126:20,22,24

127:1,8,13,14
127:16,20,22
129:16,24
130:7,16,24
131:5,13
134:16,23
136:10 137:21
139:10 145:7
147:9 149:6,9
149:11,24
150:8,10,19
151:6,6 152:1
155:9,11,12,12
155:24 159:11
159:24 161:1,3
161:7,24
162:25 163:12
163:17,17,23
165:21 167:6,9
167:20 168:23
169:4,18
170:17 171:21
173:2,3,25
174:18 175:5,8
177:10,25
180:25 183:7
188:18 193:18
193:21 194:4
194:10,13,22
195:4,9 196:9
197:13 198:9,9
198:11,23,24
200:5,15
201:15,20,23
202:22 203:8
206:7,12,14
210:21 211:1,6
211:8,14,18,23
212:21 213:4
214:8 215:19
215:21 217:18
219:2,21
220:23 221:3
222:16,18
224:1,21
225:12,17,25

226:1,10,12,20
226:23,24,25
227:4,5,6,8,11
227:15 229:9
229:13 230:11
230:14 231:20
236:7,16,18
237:18,18
238:24 239:1
241:2,19,21,25
242:2,11,19,22
242:25 243:16
244:5,6,6,7,11
245:4,20,25
246:4,13,14,18
247:8,9 248:9
248:23 249:21
249:25 250:3,6
251:2,7,9,11,15
251:23,25
252:5,8,11,13
252:16,19,20
253:15 254:18
255:23 256:19
256:22,24
257:1,4,6
258:20,24
259:1,11,15
260:13,17,20
260:23,24
261:1,4,6,14,19
261:23 262:7
262:16,19
263:12 264:15
264:17,19
267:18 269:3,5
269:7,20,22,25
270:2,4,9,11,12
270:13,21,24
271:2,5,24
272:9,10,12,22
273:13,14,16
273:17,20,22
273:24,25
274:15,18
275:17,20,25

276:5,20,24
277:3 279:3,23
280:3 281:5,12
281:22 282:6
282:25 284:8
284:18 285:1
286:24 287:18
288:17,18
289:22,25
291:9,12,18,19
291:21,22,24
291:25
**knowledge** 61:21
72:7 102:2
103:11 117:7,9
118:5,16,18
128:15 129:18
159:7 167:1
168:16,18,20
174:1 194:7
213:25 214:4
226:17 229:7
229:19 242:2,6
242:13 243:6
248:11 250:11
257:8,11,14,17
258:25 268:25
271:21 272:19
273:1 274:13
276:11,12,16
291:18
**known** 9:25
193:25 195:21
**knows** 257:23
**Kuenzi** 234:24
247:9

**L**
**L** 1:19 294:4,14
295:5,23
**labor** 127:18
150:20 151:4
**lack** 192:12
204:18
**ladies** 171:23
**lady** 174:24

Smith vs. Florida Gulf Coast University Kelli Smith                                01/22/2025

Page 316

259:5
laid 27:14,17
laissez-faire 88:6
land 100:14
  272:5
landed 152:13
  209:11 210:19
landscape 76:8
  76:13
language 82:5
  88:5 94:20 95:2
  106:3 114:25
  115:1 145:8,10
  160:21 166:1
  191:13 226:21
  240:1 243:15
  256:12 284:17
Lanham 216:12
lapses 24:3
Large 1:20 294:5
  295:7
larger 41:15
  100:2 235:25
lasted 23:16
lasts 147:10,11
late 59:7 146:17
  224:19
law 1:15 2:4 23:1
  23:7 24:5,9,14
  29:18 36:4
  37:21 47:23
  48:1,4,6,8,10
  48:11 55:12
  92:13 93:6 94:8
  99:3,7 101:14
  101:19,25
  102:10,15
  196:10 208:19
  208:24 209:3,3
  223:7,12
  249:16 255:24
  259:19,22
  280:15
lawful 83:9 89:23
  90:2,3 92:8,11
  138:6,6 140:10

140:21 141:19
laws 83:3
lawsuit 7:11
  15:17,18,20
  16:8 18:16,22
  19:3 20:1 265:9
  282:14 283:10
  284:11 288:5
  288:21
lawsuits 15:16,25
  16:4,5
lawyer 193:17,18
  194:4,6 195:4
  195:20,22
  196:12 197:1
lay 91:14
layers 149:18
  213:14
layoff 27:11
lead 170:10
  211:16,21
leader 65:17
  100:16 250:20
  255:7
leaders 90:23
leadership 61:12
  67:1 77:4,10,14
  87:20 100:25
  225:24 226:4
  238:14 267:23
  274:19
leading 255:9
lean 193:14
leaner 224:3
leant 20:15
learn 166:19
  176:5 224:11
  238:2
learned 96:18,21
  164:9,14
  167:14 175:4
  186:13 195:4
  206:1 215:13
  237:11
learns 121:1
  132:23

leave 103:1 113:4
  113:11,18
  158:18 170:5
  171:3,6,17,20
  219:20 235:2
  247:1,18,20,23
  248:3,13,14,22
  250:21,22
  253:18,20
  254:4
leaves 4:3 112:23
leaving 32:6,9
  34:8 37:2,6
  38:21 52:15
  234:22 246:16
  247:14 248:5
  249:1 250:4
led 205:25
Lee 294:3,17
  295:3,18
left 11:9,20 20:13
  32:22 35:10
  37:11 38:17
  46:12 122:24
  130:21,24
  142:8 162:12
  166:12 176:3
  185:24 186:12
  187:16 195:2
  246:10,14
  247:5 251:24
  252:6,11,13,16
  252:19,21
legal 3:20 12:8
  84:19 90:6
  105:13,25
  195:5 200:13
  200:20 216:14
  278:25
legislation 87:6
  199:16,23
lengthy 23:16
lens 205:18
lent 255:18
Leonard 81:17
  84:16 97:19

106:6 148:2
  173:15 192:21
  193:7 197:8,10
  197:13,20
  199:5,7 200:8
  200:11,18
  205:8 214:1
  217:9 218:5
  257:11
Leonard's
  218:13
let's 48:22 165:15
  204:11 208:6
  238:2
letter 3:5,9,15 6:4
  50:5,12,14
  63:20,21 64:14
  64:24 65:5
  82:12,21
  177:22
letters 29:13
level 93:8,9,10,15
  95:18 145:25
  148:1 175:7
  233:23 236:13
  272:6 274:10
levels 101:6
  197:6
leverage 36:20
Lher 196:7
liability 187:17
liaison 94:13
lieu 53:2
lieutenant 34:11
  36:9,18 41:22
  43:5 183:23
  224:6
lieutenant's 21:2
lieutenants 41:19
  43:11 136:2
life 231:8 283:19
lifeline 187:15
limit 284:5
limitations
  282:11
limited 87:15

line 145:5 189:20
  235:20 293:4
lines 239:23
  279:17
Lisa 72:1 289:15
  289:18
list 187:7 188:2
  192:25 209:22
  219:8 258:9
  288:20,23
listed 28:25 68:6
  71:16 85:5
  219:11 220:10
  254:10,13
  272:13 274:21
  274:25 275:8
  276:5 291:23
listened 214:20
listing 275:12
literally 252:17
litigation 96:19
  96:21,25 97:4,6
  97:8,11 98:25
litmus 223:4
little 126:3
  249:19 285:10
live 18:1 39:15
  207:18
lived 45:21
living 39:20,20
  39:25 40:1
local 249:10,16
  273:8
located 164:18,19
LOCATION
  1:15
locked 172:22,22
  172:23
login 75:2
logs 186:5
long 10:5 12:4
  15:7 20:8 24:3
  29:4 39:15 47:8
  79:17 83:9
  89:22 90:2,3
  92:8,11 100:24

Smith vs. Florida Gulf Coast University    Kelli Smith                    01/22/2025

Page 317

106:21 127:6,8
127:13 140:21
155:4 169:22
239:6 247:21
275:18
**long-term** 24:23
**Longboat** 3:4
47:15,17,22
49:3,12,19 50:6
50:12 51:2,6,9
51:13 52:2,7,10
52:22 53:6,12
53:13,18 54:2
59:2 64:25 65:2
66:20
**longer** 187:14
188:15 219:20
235:10 253:15
**look** 33:14 98:11
115:13 161:2
163:18 175:25
189:20 193:23
204:11 217:10
233:8
**looked** 100:19
171:9 220:11
**looking** 31:18
32:17 33:8
38:18 51:11
52:5 53:8 54:5
54:9 64:5 70:1
71:22 72:8
106:3 130:4
153:7 172:12
183:20 222:11
232:19 235:19
241:22 246:15
247:1 248:5,10
248:21 249:20
250:12
**looks** 85:25 135:8
222:12 245:16
283:9
**loop** 157:9
193:10
**lose** 249:11

250:13
**loss** 283:18,20,20
**losses** 103:8
**lost** 184:14 185:8
186:14
**lot** 102:25 185:9
208:12 234:24
274:11
**low** 167:18
**lump** 133:24
**lumped** 247:10
247:12,15
**lunch** 18:24

**M**

**ma'am** 7:5,13 8:8
8:12 9:8 22:12
25:3,6,8,10
35:4 36:13
59:18 63:9,13
64:22 66:23
72:17 80:10
83:1,25 87:3
91:11 92:12
100:3 112:21
113:25 118:24
138:9 144:25
163:5 180:21
181:15 184:11
185:3 188:4
189:12,13,24
190:3,16,22
197:19 201:8
201:19 204:4
211:5 216:10
216:13 234:6
243:7 262:24
264:25 265:7
266:11,16,24
267:7 276:14
283:24 285:9
290:25 292:6
292:12
**Magiera** 73:15
175:9 176:14
178:14

**mail** 110:9,10
294:19
**maintain** 144:10
186:7
**maintained**
142:18 205:24
224:14
**maintaining**
61:16
**major** 36:10,10
36:12 41:23
42:4,5,11
**making** 73:6
81:24 107:21
181:8 200:12
200:20 212:24
213:1 244:5
257:8,12,15,18
**male** 124:24
127:2 159:13
160:1 231:18
231:19 264:13
271:10,13
276:19
**male-dominated**
240:5
**males** 163:22
276:9
**Man** 256:11
**manage** 62:15,19
183:24 192:6
214:2,6
**managed** 74:1,2
**management** 4:2
4:12 42:23 88:3
88:7 90:8
111:15,18
112:2,3 150:21
151:3 188:12
188:13 215:12
215:16 216:1
224:11,12
238:14 272:11
**manager** 50:22
73:12 122:13
182:21 183:16

184:6,13
189:16,17
191:20 294:18
**managerial**
120:25
**managers** 120:10
120:17
**mandate** 125:2
125:14,25
126:9
**Manhattan**
199:21
**manner** 123:14
198:20 212:17
249:1
**March** 4:24 5:2,3
5:19,20,21,22
5:23,24 6:2,4
80:11 81:9,12
164:11 181:12
181:14 214:15
215:2,3,13,14
232:7,20,20
237:7 243:24
244:22 247:18
247:23 248:12
254:25
**Marianne** 258:10
**mark** 84:5
190:23
**marked** 26:11,13
28:1,3 29:8,10
40:15,17 43:12
43:14 49:3,5,24
50:1 51:17,19
53:21,23 60:3,5
63:14,16 66:4,5
69:12,14 73:22
73:23 75:3,4
78:2,4,12,13
83:13,14 85:13
85:15 104:3,4
105:8,9 106:12
106:13 108:19
109:15,16
110:19,21

111:9,11
112:18,19
113:22 114:15
115:17,18
116:12,13
119:3,4 132:4,5
133:9 135:21
135:23 137:14
137:16 138:12
138:14 139:4,5
139:22,24
141:8,10,23
142:21,23
176:8,9 177:11
177:12 178:9
178:10,23,24
179:5,6,12,13
179:23,24
181:2,3 182:11
182:12 184:22
190:17,18,24
192:16,17
195:24,25
200:24 202:24
203:1 204:12
216:8 218:2,18
220:7,9 221:6,8
226:6,7 228:5,6
232:3,4,13,15
232:23,25
236:20 243:8,9
244:14,15
245:10,11
261:9,10
262:10,11,25
263:1,23,24
266:9 280:5,6
283:4,5 284:24
286:9,10 287:4
287:22,24
288:15 290:11
290:12
**married** 11:12
20:6
**Martin** 63:5,6
73:3 81:8,14

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 97 of 118 PageID 457

Smith vs. Florida Gulf Coast University Kelli Smith                    01/22/2025

Page 318

84:2 89:1,3,10
89:15 95:12
96:1,4,14,22
97:2,5,12 98:25
102:24 115:6
116:6 118:25
157:21 159:8
159:14,22
160:18,20
163:10,22,23
164:10 168:4,6
168:8 173:12
173:18,23,25
205:5 211:15
211:19 214:8
214:12 215:11
215:15,25
222:14 224:8
229:6,9 238:24
240:18,20
241:21 242:3,7
243:1 244:21
245:4 249:25
250:3 256:22
257:3,8 259:16
275:25 276:18
276:21,25
**Martin's** 95:24
222:18 227:12
**master's** 22:21
23:24
**Materials** 3:11
**mathematics**
250:14
**matter** 180:7
198:15 247:16
255:5,21
293:22
**matters** 105:25
**McGowan** 263:7
263:8
**McGregor** 1:22
**McKay** 117:6
118:6 119:1
203:5 219:8
**McLaren** 194:20

195:11,12
216:11 217:8
218:6,12
291:14
**McLaren's** 196:3
**mean** 15:8 38:13
50:20 68:15
78:25 90:4 93:9
96:16 98:1
109:18 135:5
145:10 147:10
164:6 184:24
205:19 208:4
221:14 227:20
228:10 234:5
236:3,22,23
243:14 248:9
257:25 259:21
260:23 268:16
277:10 285:9
287:8 288:17
289:4
**meaning** 35:14
240:18
**means** 50:21
91:12 110:11
111:7 180:22
180:25 188:18
199:19
**meant** 71:21
151:21 241:2
245:4 259:24
**measures** 208:16
**mechanisms**
230:1 249:18
**media** 13:20,22
14:4,6 19:10
181:19,23
268:20 274:3
**medical** 283:19
**medication** 9:14
**medications** 9:17
286:8
**meet** 3:16 147:1
207:25 208:17
208:21 210:6

224:24
**meeting** 74:8
84:1 122:12
124:6 154:5,20
164:21,24
165:11,18
166:16,17
167:5 168:12
168:14,17,18
168:21,24
169:2,5,17
197:21 199:4
200:14 204:8
204:13,16,17
204:24 205:5,7
205:23 206:14
214:15,18
215:2,3 218:20
219:19 227:14
229:12 232:8
232:21 237:7,9
237:15,15,16
237:19,19
245:23 246:23
246:25 248:12
253:17 254:24
258:21
**meetings** 102:6
123:11,11
146:14,19
147:5,13
156:21 237:21
289:21
**Megan** 256:21
**Megan's** 208:19
**member** 200:2
**members** 70:4
72:11 75:2 77:4
95:16,21
106:25 141:5
143:13 198:6,8
198:18 209:11
222:7
**membership**
188:23
**memberships**

189:5
**memo** 5:4,5 6:6,7
182:15 185:5
189:15
**memorialized**
164:25
**memory** 209:23
219:14
**men's** 154:16
**mental** 9:22
282:19 283:17
284:16 285:14
**mention** 89:7
**mentioned** 7:10
36:3 49:2 56:24
72:15 98:13
212:8 224:6
239:10 264:21
**mentoring** 93:12
**mentorship**
269:17
**merely** 214:16
**Merriam-Web...**
153:7
**message** 14:16
**met** 72:1 84:5
150:12 198:24
245:24 246:2
**methods** 110:16
**metrics** 271:15
272:2,5
**Metzger** 41:5
**Miami** 33:12,13
33:23 57:12,15
**Michael** 10:20
11:2
**micromanaging**
213:12
**Mid** 23:10
**Mid-Year** 221:20
**middle** 1:1 45:11
221:19
**midnights** 172:13
**midway** 208:11
**Mike** 10:22 63:6
84:2 240:18,18

240:19 242:15
244:21 257:3
**military** 22:7
231:10
**mind** 161:10
**mindful** 208:18
210:9
**Mine** 217:22
**minimize** 223:19
**minute** 212:8
217:25 280:22
**minutes** 99:17
**Miramar** 22:10
**misconduct** 3:21
4:8 106:18
107:2 119:23
120:16
**misrepresentat...**
247:13
**mission** 138:7
**misunderstood**
277:12
**Mitch** 269:18,23
**Mitchell** 271:12
272:7,11
**models** 75:23
233:22
**modernize**
240:13
**modifications**
190:1
**Moffitt** 256:9,18
**molding** 93:13
**mom** 256:2
**moment** 158:7
170:9 220:13
232:2 267:3
**Monday** 208:8
**monetary** 152:14
**money** 256:16,18
283:21
**Monique** 117:6
118:6 119:1
203:5 219:8,15
219:18,19,21
220:3

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 98 of 118 PageID 458

Smith vs. Florida Gulf Coast University Kelli Smith                    01/22/2025

Page 319

monitor 149:19
  170:14,15
monitored 190:4
month 25:17
  31:21 134:11
month's 134:8
months 39:6 44:1
  44:9 45:22 52:7
  64:25 79:25
  99:4,8,14,15
  143:23 175:18
  235:2 252:5
  255:24 273:25
Moore 74:8,11
  79:8,16 88:4,10
  88:12,15,23
  89:1,8,16 112:8
  149:12 175:6
  175:10 176:5
  176:13,19
  177:4,16,19
  178:13,19
  179:16 180:3
  181:6,11,13
  218:23 230:12
  247:22 251:5
  267:17 274:21
  275:2
Moore's 174:9
morale 100:12,14
  100:15,17
  167:18
morning 7:8,9
  44:10 164:13
  164:13
mornings 153:16
mother 31:7
  44:12,13
move 40:7 45:18
  223:13 256:17
moved 7:25
  38:11,13,15
  39:14,24
  184:17 185:11
  223:15 224:5
  224:12

moving 82:15,18
  217:11 223:16
  279:20
mull 122:2
multiple 96:19
  138:10
municipal 47:22
municipality
  79:24
Myers 1:2,21,22
  34:1 295:18
Myles 247:4

**N**

N 2:1,18
nailed 256:11
name 7:10,14
  13:24 33:13
  34:5 123:23,24
  124:1,2 128:14
  130:18,20
  169:14 279:25
names 8:20,21
  9:25 19:15 70:1
  70:2,2,3,10
  71:22,23
  128:12 169:21
  169:22 258:16
  265:25 268:11
Nancy 192:8
Nanna 227:2
Naples 281:1
narrow 155:2
narrowly 100:19
national 175:3
nationwide 64:17
  64:20 101:24
NAU 43:3,22
  44:9 46:2,13,19
  47:10 98:14
  194:11 195:10
necessarily
  222:15
need 33:14
  119:12 170:9
  188:17 206:1

206:15 207:22
  207:22 224:1
  244:23 258:11
  284:19 286:25
  287:19 288:10
  290:8,20 292:7
needed 17:9
  92:25 112:14
  129:7 132:2
  194:16,18
  196:15 197:6
  199:1 202:5
  210:25 212:16
  217:9 224:22
  230:2 255:8
needs 154:23
  208:1,18 210:7
  210:8 224:25
  224:25 225:2
  267:1 289:12
negative 37:15
  44:11 51:4
  214:24 238:22
  268:19
negotiations
  127:23 150:11
  150:13 152:10
  152:13 157:20
neither 166:24
network 214:25
  238:12
never 14:8 42:7
  45:12 48:10
  69:16 73:21
  95:17 112:8
  122:23 123:18
  124:8,11,13,16
  125:11 127:22
  145:6 149:7
  155:10 162:5,7
  165:9,15
  176:11 177:25
  189:12 199:7
  200:10,16
  202:16,20
  203:18 208:1,1

208:21 209:24
  211:7,22
  214:15 215:18
  216:25 217:4
  218:15 219:18
  222:20,23
  223:15 224:5,7
  224:12 230:13
  235:21 241:25
  243:13 254:23
  262:15
new 33:6,9,18
  45:5 82:22
  127:4 150:22
  182:25 184:3
  187:3,10,12,17
  187:19,22
  189:10 240:11
  240:11 244:1
  244:12,22
  281:25
news 175:3 273:8
  273:8 274:3
night 154:21,21
  172:24 261:25
  262:1
nine 44:1,9 45:22
  280:23
nodded 167:8
nods 212:7
non-business
  172:23
non-discrimina...
  3:21 4:7 106:17
  119:22 146:10
non-employee
  120:14
noncompliance
  195:3
noose 268:18
norm 99:10
normal 221:2
Normally 259:25
Northern 7:22
  39:8,16 42:15
  42:20 67:22

193:25
Notary 1:19
  294:5,14 295:6
noted 67:4
notes 143:22
  163:9 164:21
  164:23,24
  165:2,8,17,23
  165:23 166:3,5
  207:18 216:14
  295:11
notice 90:1
  133:21 162:9
Notices 2:25
notification 4:4
  87:12 114:18
  192:3 199:12
notifications 3:18
  87:8 178:16
  198:21 199:3
notified 156:21
  162:8,10 200:6
  209:10 211:1
  232:21 294:19
notorious 159:23
November 5:10
  5:11,12 6:6
  59:6 170:20
  171:2 201:5
  204:9,14
  219:24
number 2:22 3:1
  4:1 5:1 6:1 15:5
  15:7 41:12
  44:10 67:18
  68:2 75:19,20
  76:5,15 77:2
  100:20 103:7
  110:3 120:9
  139:9,14 141:5
  141:9 147:9
  185:16 189:17
  211:25 212:3
  234:21 280:16
  280:22 288:24
  293:4 294:15

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 99 of 118 PageID 459

Smith vs. Florida Gulf Coast University Kelli Smith                     01/22/2025

Page 320

numbered 43:1
numbers 27:5
  42:25 43:6
  235:1 247:11
  247:12 248:10
  250:12
numerous 21:2
  33:2 95:16
  269:12
nursing 283:19
NYPD 231:13

**O**
oath 7:3 294:1
obedience 4:16
  141:12,19
object 89:20
  104:1 180:24
  225:5,10,11
objected 225:12
objections 8:15
  8:16
objective 66:12
  66:13,15,20
  198:25 200:7
  218:12
objectives 61:18
  91:14 208:21
obligation 93:2
  104:25 120:22
  158:21
observe 126:5
observed 124:16
observes 120:25
  132:23
obsolete 188:15
obtain 23:19
  118:21
obtained 23:25
  32:11 270:14
obviously 18:17
  18:25 71:8
  214:17 258:1
  275:23 287:10
occasionally
  151:2

occasions 132:13
occupied 37:5
occur 56:19
  148:20 162:24
  224:18
occurred 149:24
  168:19 214:14
  218:15 229:12
  267:17
occurring 127:13
  127:14 207:5
occurs 272:6
October 5:8 12:5
  46:14 50:23
  255:24 256:14
off-campus
  194:16 197:22
  198:3
offense 92:14
  94:25
offensive 263:21
offer 37:10 50:5
  50:12,15 56:13
  56:22 78:18
  82:12,21
  124:22,23
  270:22 279:21
offered 28:22
  68:17 79:1,4,13
  125:4 282:8
offering 82:14
  125:7
offers 152:14
offhand 86:18
  94:11,20
  220:13
office 12:1,6,10
  26:2,6 32:12
  36:23 48:3,14
  48:20 55:22
  56:25 57:6,22
  58:7 109:5
  116:24 117:18
  121:3,12,21
  125:11 128:4
  139:19 144:9

145:2 164:18
189:1 192:3
201:3 206:3
207:8 226:11
252:18 263:17
267:16
officer 8:2 24:2,6
  24:9,16 36:8
  37:21 48:10
  55:13,17 92:2
  93:5,25 94:21
  146:8,15,19
  154:13,14
  157:19 163:3
  168:7,9 169:12
  169:13,14
  172:8 174:12
  174:17 183:15
  183:22 201:7
  201:13 224:8
  233:13 254:9
  259:25 263:9
  263:10 275:5
  280:14,15,15
officer's 94:8
officers 43:6,11
  49:19,22 92:4
  97:21 98:3 99:4
  102:17 114:3
  122:15 123:10
  124:23 125:2,7
  126:12,15
  127:12 128:15
  129:10 148:10
  151:21 153:22
  157:9,24
  159:13 160:1
  161:15,24
  162:3 163:10
  164:2,3,10
  166:23,24
  167:15,17,21
  168:11,13
  169:1,8,9 172:7
  172:8 191:9
  207:20 208:6

208:11 212:11
213:11,19
215:5 223:6,8
229:13,14,14
229:23 233:16
233:23 236:11
238:18 240:2
241:23 248:7
258:13 275:3
officers' 169:22
offices 164:19
official 243:14
  294:8
officially 83:23
officials 275:1
oftentimes
  146:22
Oh 10:15 13:18
  14:22 19:20
  27:3 28:6 30:17
  36:12 40:1 48:7
  52:16 55:20
  59:4 71:21,23
  137:10 166:3
  183:13 188:5
  191:17 227:22
  237:6 241:4
  254:17 258:5,9
  258:15,22
  259:11 268:14
  275:14 276:4
OIEC 107:21
  108:1,3,9 124:9
  124:11 125:13
  129:2,22 130:2
  146:11 254:6
okay 8:6 10:10
  10:15 11:18
  13:6 14:3 20:6
  20:23 27:6 28:1
  28:10,19 29:8
  30:13,18,18
  31:11,14,21
  32:2 33:9 36:1
  36:12 40:4
  41:18,21 42:4

42:10,14 43:21
44:5 45:6 48:7
48:16,22 49:2
50:5,14,17
51:17,24 55:25
56:21 57:18
59:4,8 60:1,13
61:10 66:25
69:17 70:3,5,12
70:18,21 71:25
72:3,7,11 74:4
75:12,16 77:17
78:16,21 79:4
79:13,16 82:6
84:8,12,25
85:19 86:2,17
86:19 87:1
89:22 90:21
91:1,23 92:1,18
94:6 95:11
98:13 100:1,10
101:2,13,22
102:13 104:5
104:17,21
108:15,18
114:5,8,13
115:3 117:7,23
119:9 120:8,13
123:13,21,22
124:3 125:25
126:7 127:14
127:24 128:17
131:13 132:19
134:13,16,19
135:3,11
139:16 141:4
141:22 143:12
151:7,15 152:3
152:9,17,23
153:4,10 154:7
155:6,14
156:14 157:2
157:16,23
158:16,21,24
160:16 161:8
163:21 164:23

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 100 of 118 PageID
460

Smith vs. Florida Gulf Coast University Kelli Smith                              01/22/2025

Page 321

165:2,14,17,21
166:3,11,15
167:14 168:3
168:11 169:19
172:6 175:22
176:18,19
177:4 178:5,6
180:17 183:25
184:12,21
186:15,19,25
187:3,10 188:5
188:6,21
190:11,14
191:16 192:20
193:1 196:17
197:17,20
198:8 200:23
202:24 203:7
203:11,24
205:25 206:23
210:16 213:25
217:19 218:17
218:22 219:5
220:7,14,15,21
221:3,16
222:24 225:13
226:20,25
228:2,7,12
229:17,22
230:14 231:1
232:10,13,23
233:9 234:3,14
236:7 237:12
237:24 239:2,7
241:4,7,15
242:13,17
243:21 246:3,6
246:10,15
248:21 249:23
250:15,19
253:20 254:1
258:2 262:16
265:20,23
266:4,14 267:4
267:8 268:2,5,9
268:15 269:10

270:21 271:12
271:21 272:7
272:13 273:4
274:13 275:14
277:10,20
278:24 279:8
285:2 288:19
288:23 289:16
289:22 291:6,9
291:12,15,18
**old** 22:2 214:25
238:12
**older** 209:4
**ombud** 116:17
**ombuds** 4:6
116:22,24
117:2,4,5,17,19
117:24 118:2
**ombudsman**
203:6
**On-Site** 3:13
**once** 15:12 25:25
72:1 156:6,20
165:4 185:15
186:11 239:9
**one-on-one**
147:13 149:22
151:14
**one-on-ones**
122:10 156:22
**one-year** 269:19
271:14,25
272:25
**ones** 33:4 71:18
119:6 167:24
172:5 254:10
266:2
**ongoing** 207:2
212:12
**online** 271:19
**open** 34:4 37:4
60:10 74:19
142:18 249:4
254:1
**opened** 153:15
161:14 170:19

171:15
**openings** 37:21
**operated** 58:12
**operating** 60:25
61:6 188:18
**operational**
91:14
**opined** 283:1
**opinion** 72:21
73:19 130:10
160:17 182:5
201:23 222:18
**opportunities**
224:14
**opportunity**
68:16 224:10
224:16 233:17
233:24
**opposed** 127:12
**options** 253:8
**Orange** 36:23
**order** 61:17
92:23 93:6,7
97:11 136:4
137:23 138:1
138:19 139:9
139:19 140:2
141:14 142:5
142:10,13
143:4 204:3
219:24
**ordered** 154:9
171:2
**ordering** 292:16
**orders** 4:16 91:17
92:7,19 136:8
136:21,24
137:2,20 138:6
138:7,10,16
140:10 141:12
141:20 146:6
203:16
**org** 91:22 236:4
**organization**
91:20,24 151:3
230:4 234:7,15

234:17 238:17
**organizational**
4:11 42:1 56:17
60:2 84:23
233:9 236:17
**orientation** 82:22
145:22 148:10
**original** 261:17
**originally** 261:15
**Orlando** 36:22
162:6
**Osceola** 48:13
57:21 58:7
**outcome** 29:25
**outlined** 88:18
277:6,7
**outlining** 261:20
**outreach** 54:13
54:20 67:11
193:12 195:15
195:19 233:10
235:10 236:9
**outright** 38:25
**outside** 13:6
35:18 103:15
148:13 218:12
**Overall** 140:14
**overt** 148:18
**overtime** 124:19
124:21,25
125:8,18,19
126:13,16,24
127:9,11
149:10 223:19

—————————
                    **P**
—————————
**P** 2:1,1
**P.A** 2:10
**p.m** 1:14 137:12
137:12 216:5,5
284:21,21
292:19
**page** 2:18,22 3:1
4:1 5:1 6:1
28:17,18 30:2
30:10,12,14,23

65:15 67:18
68:3 75:19 76:4
77:3 84:3 107:9
107:17 113:1
115:14 120:9
132:12 136:12
138:5 139:14
139:15 140:8
141:4 169:14
169:20 183:9
183:12,13
189:23,25
221:19 268:14
276:6 280:16
288:24,25
293:4
**pages** 28:20
106:20 291:1
295:10
**paid** 80:2 82:1,3
99:20 102:7
194:15 235:4
251:11,15
260:13
**pain** 283:16
**Palmer** 128:10
128:25 129:14
130:21 154:13
169:24 170:1,3
170:4 171:22
172:4 263:9
**pancake** 239:11
239:20
**pancakes** 239:12
**panel** 3:14 70:4
74:17
**panels** 72:13
**paper** 166:6
209:25 240:8
240:15,21,23
241:4,7
**papers** 271:18
**paperwork** 40:22
211:2
**paragraph** 50:16
65:7,16 66:11

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 101 of 118 PageID
461

Smith vs. Florida Gulf Coast University Kelli Smith                01/22/2025

Page 322

82:24,25 135:9
178:14 246:8
**paramilitary**
91:10,20,23
231:9
**paramount** 138:7
**parking** 80:20
184:15 185:8,9
185:11,17,21
185:25 186:2,8
190:10 192:9
**Parkland** 45:3
**part** 24:8 28:11
54:1,16 55:3
61:11 62:3,10
62:18 64:6
65:12,20 67:14
73:15 74:9
77:18 84:1,9
86:3,15 87:18
95:14 100:5
120:21 125:6
126:14 144:17
165:20 166:13
168:2 174:5,8,9
181:15 207:17
217:17 219:22
223:10,21
224:25 225:17
233:4 235:14
242:10 243:3
246:19,23,25
251:23 256:18
256:24 259:4
263:7 268:22
**part-time** 186:16
186:23
**participant** 25:22
26:2
**participate** 52:24
53:1 255:1,4
256:3
**participated** 74:6
**participation**
107:6
**particular** 81:2

87:8 116:15
168:1,10 170:9
199:18 202:4
268:16
**particularly**
109:14
**parties** 246:1
295:14
**parties'** 295:15
**partner** 10:22
39:14,19 40:10
59:2 196:6,9
210:10 211:4
258:1,2
**partnered** 256:4
256:8
**partners** 123:9
189:3 199:9
249:16 262:20
**partnerships**
61:17 67:2
**passed** 200:16
256:1
**paste** 166:2
**Pat** 268:16
**Patch** 255:22
256:7
**patches** 255:25
256:9
**paths** 236:13
**Patricia** 17:17
216:24
**patrol** 55:20
140:14 172:8,8
224:8,21
233:24 234:1
**pattern** 155:8
156:21
**pause** 219:17
220:4
**pay** 29:21 82:18
103:1 135:13
196:18 214:17
215:23 228:12
259:8 271:15
**payment** 82:6

133:24
**PD** 34:15 61:6
122:11 128:23
138:17 159:23
172:25 184:18
185:21 191:19
192:4 235:25
**PDFs** 13:18
**Pearlman** 177:15
179:17 180:2
181:11
**pen** 166:6
**penalties** 26:25
293:21
**penalty** 266:20
286:17 287:11
**pending** 170:5
**Penn** 268:18,23
**pension** 25:11,24
38:11,12,14
**people** 37:5 48:5
48:8 53:17,19
70:7,17,17 71:5
71:12,15 74:23
149:9 167:10
167:12 172:21
172:24 185:5
204:1 223:5,18
223:20 224:1,4
230:21 231:12
233:20 235:1
236:13 246:19
247:14 248:2
248:13,18,21
249:4,11 250:4
250:9,21,22
256:21 258:6
258:17 259:6
267:9 274:8,12
288:24 291:4,5
291:9
**perceived** 153:23
**percent** 102:17
102:20 103:6,7
103:19,21,22
103:24 234:21

**perception**
225:20
**performance**
37:16 51:5
80:20,23 81:1,4
81:6,9 228:19
228:24 230:2
275:9
**performing** 88:1
**period** 11:8
31:24 67:24
90:14,15,19
97:22,24 98:4,8
98:9,11 99:3,12
130:14 133:13
144:17 147:2
**periods** 28:16
31:3
**perjury** 26:25
266:20 286:17
287:12 293:21
**permanent**
144:13,17
283:25
**person** 71:3
93:19 110:7,9
117:4 153:17
175:10,14
184:1 185:2,5
185:24 186:22
186:24 192:5,8
192:25 214:23
238:22 246:10
259:3 269:13
**person's** 110:12
**personal** 12:18
12:20 13:2
14:10,15 15:4
118:16 162:3
162:11 168:16
168:18,20
194:7 224:25
242:13 248:11
250:11 258:24
268:25 271:21
272:19 273:1

274:13 276:12
276:15
**personally** 294:6
**personnel** 136:13
136:14,15
144:13 224:11
225:21 251:23
**perspective**
41:16 96:20
115:20 244:24
**pertinent** 210:22
**Pete** 10:11,13
11:19 20:15,20
34:22 184:5
244:2,12
**Petersburg** 10:4
**PetSmart** 21:23
**philosophy** 67:5
214:24
**phone** 14:10,13
14:15,21 15:2,4
15:5 209:10
258:5 279:24
281:19
**physical** 9:21
258:12 282:18
282:21 285:14
**pick** 162:12
**pictures** 31:25
**piece** 87:5 199:15
199:23 217:6
**Pineda** 169:13,20
258:15
**pink** 255:22,25
256:7
**pinpoint** 255:14
**place** 74:2,3
91:14 113:3,10
113:17 170:4
171:3,5,8,16
175:5 225:3
230:1 236:19
249:19 254:4
273:12 275:2
**placed** 184:16
223:11 271:24

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 102 of 118 PageID 462

Smith vs. Florida Gulf Coast University Kelli Smith                                    01/22/2025

Page 323

placing 171:19
Plaintiff 1:4 2:3
Plaintiff's 6:15
plan 25:13,16,24
  40:6 164:16
  233:4,11,12
  235:5,22 236:3
  236:11
planning 248:14
plans 247:17
plant 258:12
platform 188:16
play 113:8 215:4
played 150:8
player 268:19
please 9:3 86:3
  128:20 178:4
  231:5
pleasure 50:21
  83:10
plus 248:7
  249:20,20
point 38:25 42:19
  64:23 78:19
  80:14 81:6
  151:1 161:20
  163:11 201:5
  206:23 209:14
  217:6 220:4
  233:7 253:13
  255:10,22
  291:13
pointed 154:13
police 4:17 6:5
  7:22 8:2,2
  24:16 33:5,6,12
  33:22,25 34:6
  34:11,15,21
  36:14,22,25
  39:8 41:2 43:20
  43:22,25 44:21
  45:2,5 46:3,21
  47:5 49:10 50:7
  50:18 51:2 54:2
  54:10,17,19
  55:2 58:16,18

58:22 60:10,15
  60:18,22 61:16
  62:3,11 63:23
  65:12,21 66:1
  66:16,21 70:22
  72:4,19,22,25
  73:16,17 74:12
  76:11 77:5
  79:18,21,24
  85:20 86:5,12
  86:21 87:19,24
  88:1 89:4,7,12
  89:18 91:7,9
  92:2 99:12
  100:6,11 102:3
  102:14 103:10
  103:15 112:6
  138:2,7,24
  140:10 142:3
  142:17 144:24
  163:2 164:16
  174:6,10
  183:23 184:16
  187:6 190:5
  191:22 192:6
  204:24 205:2
  206:24 207:8
  209:25 222:14
  233:8 234:15
  238:9,17 240:2
  243:19 244:1
  249:17 259:25
  260:20,22
  274:7,10
  275:24 280:25
  281:24
policies 3:18 83:4
  91:13 99:17
  104:9,14,22
  105:1 119:19
  143:11 145:17
  195:18
policing 67:4,7
  75:23
policy 3:21,22,23
  3:24 4:2,5

61:12 82:3 93:6
  94:23 99:18
  105:12,16
  106:8,17,25
  108:12,16,25
  109:6,11,12,21
  110:25 111:4
  111:16,18
  112:23 113:3,6
  113:12 114:18
  114:21 115:10
  115:21,22,25
  116:2,9,17,21
  119:12 130:3,4
  134:10,12,17
  135:5 136:10
  139:7 141:12
  143:6,12 144:1
  144:3,5 146:11
  152:14 195:15
  196:12 203:8
pool 161:25
poor 81:4
POs 112:11
position 12:2
  20:23 21:2,11
  24:8,11 26:1
  32:11,15 33:22
  33:25 34:11,13
  34:24 36:5,12
  36:14,18 37:3,7
  37:20 38:17,18
  38:20 39:2,10
  39:16 40:24
  41:2,21,22 42:7
  42:8,11 44:8,21
  45:7,14 46:2,6
  46:21 47:6,11
  47:14 49:17
  50:6 51:1,8,12
  51:15 52:5 53:2
  53:9 54:5,9,10
  55:15 56:7,15
  57:1,6,12,14
  58:1,6,14,22
  59:13 60:14

63:7,11,23
  64:10,19 65:3
  68:9 69:22
  70:22 77:22,25
  79:2,21 82:14
  83:8 89:18
  152:21 157:10
  167:20 175:20
  182:18,24,25
  186:16 187:17
  190:21 195:3
  200:9 201:17
  202:2 223:14
  224:15 233:14
  234:11 251:3
  251:13 261:7
  279:14 280:25
  281:3,7,13,15
  281:18,24
  282:2,8
positional 230:20
positions 20:25
  32:6,18,19,22
  32:24 33:17
  36:7 37:4 41:23
  41:25 42:4
  44:14 58:19
  68:17 69:3,9
  101:14,19,25
  102:10,15
  185:22 186:16
  186:25 233:19
  234:25 249:3
  267:23
positive 29:7
  31:19,23
possibilities
  233:7
possible 16:3
  42:13 44:19
  51:22 79:9
  121:5 146:1
  276:10
possibly 21:3
  222:6 232:11
post 247:5,17

post-George
  223:7
posted 42:12,13
  51:14 58:10
  104:19 175:20
  175:21 190:21
posting 3:8 60:9
  60:17 61:20
  62:22 79:10
potential 206:16
  221:24 233:7
potentially 156:6
powers 48:9
practice 127:16
  127:21 143:21
  145:14 208:23
  252:9,15
practices 12:16
Precious 81:20
  85:4 97:16
  108:4 130:5
  157:21 181:6
  181:14 191:2
  191:20 192:14
  205:15,20,24
  206:5 207:2
  208:1,2 209:7
  209:18 210:13
  210:19 214:5
  226:15 257:14
Precious's 210:8
preclude 253:23
precursors
  150:25
prediabetic 9:13
  282:22
preexisting
  144:22
prescribed 9:14
present 2:15 8:13
  20:10 167:3
  169:17 205:11
presented 209:6
  233:5
presenting
  164:15 277:9

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 103 of 118 PageID
463

Smith vs. Florida Gulf Coast University Kelli Smith                    01/22/2025

Page 324

preserve 15:1
president 46:9
  63:5,6,6,10
  73:2 81:8,14
  83:11 84:2,6,22
  85:7 95:12,20
  95:24 96:1,2,4
  96:5,14,22 97:2
  97:5,12 98:25
  115:6 116:6
  138:3 159:7
  164:10 168:4,5
  168:8,17 169:5
  173:12,18,23
  173:25 193:4
  194:12 205:5
  215:11,15,25
  227:12,14
  229:6,9,12
  231:19,20
  232:21 238:24
  245:23,24
  246:2 249:25
  250:3 253:18
  253:24 256:22
  259:16 263:11
  272:22 275:25
  276:18,21,22
  276:25
president's 84:9
  95:15 227:12
  232:8 267:16
pressure 9:12
pretended
  174:25
pretty 44:22
  163:24 164:5
  166:15
prevents 9:22
previous 27:8
  176:23 206:2
previously 11:5
  57:21 71:9
  190:5 251:2
  283:21
primary 178:15

printed 166:12
printout 33:16
prior 18:7 21:8
  39:10 47:21
  102:22 144:22
  175:23,24
  176:5 177:20
  191:21,23
  239:10 264:8
  273:25
probably 7:20
  15:12,23 55:19
  99:9 113:21
  126:3 143:10
  146:17 150:3
  150:13 151:13
  151:18 157:1
  160:22 171:9
  171:13 175:18
  220:11 226:21
  228:11 234:20
  256:15
probation 280:15
probationary
  97:22,24 98:9
  98:11 99:3,11
  99:25
problem 213:17
problems 122:24
procedure
  107:11,18
procedures 3:19
  4:18 91:13
  104:9,22
  108:15 143:2
process 13:5,6
  45:13 64:12,21
  66:22 69:19
  70:14 73:11
  74:5,9 78:16,18
  86:24 91:6
  92:16,16 107:7
  141:1 143:15
  163:13,14
  174:21 208:13
  210:6

procured 39:2
produced 47:6
  69:5,9
production 6:16
  13:15 290:18
  294:18
profession 240:5
professional
  54:14 67:11
professor 68:5,10
  68:23,25
program 255:1
  269:17
progress 149:5
prohibited
  135:13
prohibits 107:5
  208:25
projected 233:11
projection 233:7
projects 239:17
promoted 36:8
  96:5 224:9
  248:15,16
  250:24
promotion 37:1
  42:10 224:11
  234:2
promotions
  247:17
prompt 120:17
prompted 220:3
proof 144:20
properly 178:17
proposal 234:10
  243:2,25
propose 223:16
proposed 182:23
  234:14,16
  236:17
proposing 222:8
protected 94:18
  94:22 107:7
  278:10,15,18
Protection 12:9
protocol 221:2

prove 32:1
provide 53:11
  61:11 81:11
  128:20,21
  129:13 139:19
  183:8 195:1,11
  202:5 204:1,5
  207:8 209:17
provided 9:6
  13:15 18:6 33:1
  33:16 35:3
  37:24 62:22
  82:21 83:2
  104:8,20
  106:25 119:7
  119:12 133:13
  134:3 143:15
  144:2 158:14
  164:22 166:14
  180:18 186:10
  187:19 209:15
  210:11 223:2
  242:12 265:14
  292:8,10
provides 9:22
  30:14 120:13
  120:24 132:11
  132:12,20,22
  133:20 135:6
  138:1,5,23
  139:17 140:8
providing 9:23
  105:24 179:17
  201:9 202:4
  207:15
provost 84:6,13
  272:16
proximity 57:9
  162:14
psychological
  285:18,19
public 1:19 3:3
  43:19 44:25
  45:17 46:4
  60:19 70:15
  85:20 86:12

118:7,10 145:2
  160:19 170:11
  206:24,25
  207:12 228:9
  231:11 241:24
  243:3 244:17
  262:22 270:7
  270:17 279:16
  294:5,14 295:6
publishing 92:19
Publix 11:2
pull 176:4
pulling 112:11
punch 235:1
punctuated
  215:14
purchase 187:22
  188:21
purchased
  189:12
purpose 8:9,19
  180:13 204:16
  204:17 238:10
  264:22
purposes 198:11
pursuant 252:9
purview 59:25,25
  159:12 272:3
pushed 170:24
  174:16 175:13
put 154:18
  192:25 217:25
  222:3 238:11
  249:15 266:4,7
putting 210:9

───────────
        Q
───────────
qualified 123:19
  152:7
qualify 150:14
qualifying
  123:20
quasi-structure
  216:25
question 8:16,17
  8:18 9:2,3,5

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 104 of 118 PageID 464

Smith vs. Florida Gulf Coast University Kelli Smith                    01/22/2025

Page 325

13:4 27:1 35:25
71:9 75:20 76:5
76:6,9,15 77:2
77:3,15 86:8,23
104:10 105:20
122:23 127:25
149:23 152:23
171:18 196:25
220:1 267:8
277:12 278:12
280:16 291:8
**questions** 3:13
28:10 74:24
75:13,15,16,22
77:19 122:12
188:4 222:3,5,5
225:23,25
292:11,13
**quickly** 175:16
186:13 235:17
**quite** 14:19 56:17
163:8,12
197:16 232:11
237:16 255:12
**quote** 196:17

**R**

**R** 2:1
**race** 84:25 85:9
128:16
**racism** 160:2,8
**racist** 128:24
130:11
**radar** 215:8
**radius** 236:14
**raise** 81:12
147:14,18
148:6 196:25
205:13 218:25
**raised** 125:22
127:22 148:7
149:21 174:1
203:18 204:23
205:2 219:5
**raising** 148:3,8
**range** 62:23 63:1

79:11 150:14
151:19 152:5
**rank** 138:25
143:13 148:22
151:2 231:14
**ranked** 72:24
73:20 224:16
**ranking** 91:15
146:7
**ranks** 213:15
**rapport** 150:15
**rash** 160:23
240:19 242:16
**rate** 196:22
**rated** 75:9 77:21
77:24
**Rays** 281:16
**re-read** 100:9
**reach** 160:14
162:22 163:6
193:17 195:12
**reached** 38:3,5
128:19 129:12
131:25 159:18
193:2,6,19,24
194:3 195:10
197:7 207:24
**reaction** 150:10
**read** 26:15 86:6
111:8 176:16
177:25 178:3
227:13 241:14
241:25 262:15
288:12 292:15
293:22 294:20
**reading** 28:5
294:20
**ready** 247:10
**real** 159:18
239:19
**realigned** 186:13
**realize** 34:4
195:5 217:9
**reallocated**
192:10
**really** 24:4 44:19

78:11 92:17
95:10 148:8
160:14 210:6
215:8 220:23
223:4,7 224:2
226:10
**reason** 27:10
28:24,25 96:7
96:10,13 97:15
97:18 134:24
150:17 204:7
227:16 229:22
229:25 231:23
293:4 294:21
**reasons** 44:10,12
248:13
**reassign** 162:10
162:15
**reassigned** 80:20
117:3
**recall** 8:5 16:2,3
16:13 21:1,3
23:24 28:4 29:3
29:12,24,24
31:5,5 32:17,19
35:1,23 37:8,9
37:22 41:5
42:13,14,24
44:16,19 46:23
50:3 52:19 53:1
58:8,20 68:11
68:15 69:6 70:7
70:9 72:12 73:2
73:24 74:8
75:12,15,25
76:5,9,15,18
77:15 78:14
81:2 82:20
83:16,17 84:7
84:10,11 86:14
86:25 94:5 98:3
98:8 99:24
100:3 104:7,11
104:15,20
106:7 109:23
114:9,19,20

115:2 116:10
117:2 122:7
126:4 131:22
136:2,5 145:24
146:1 158:6
159:2,3 165:3
173:10 176:12
182:22 187:4
190:25 192:18
203:10 205:4
211:4 217:10
219:12,17
220:17,19,20
232:19,20
234:18 241:6
241:11 243:13
251:4,6 252:7
252:22 266:2
274:9 285:1
288:19
**recalling** 28:9
**receipt** 180:6
**receive** 17:2
22:17 25:15,17
30:2,5,11,15,19
30:24 35:21
36:10 228:23
245:17
**received** 50:6
80:7 122:14
135:4 217:7
226:25 227:3,5
229:19 241:24
258:5 270:16
279:24 284:10
284:13
**receives** 120:25
132:22
**receiving** 79:8
110:12 135:13
191:6
**Recess** 48:25
137:12 216:5
284:21
**reciprocal** 193:9
**reclassified** 46:8

233:15
**recognize** 26:14
29:11 40:19
43:15 49:6 50:2
50:4 51:20
53:24 60:6,8,9
63:17 66:6
69:15 70:1,6
78:5 83:15
85:16 104:5
105:10,17
106:14,15
108:21 109:17
110:22 111:12
112:20 115:19
116:14 119:5
132:6 133:10
135:24 136:2
137:17 138:15
139:6,25
141:11,25
142:24 176:10
178:25 179:7
179:14,25
181:4 182:13
196:1 200:25
203:2 216:9
220:16,17
221:9 226:8
232:5,16 233:1
236:21 243:11
244:16 245:12
261:11 262:12
263:2 266:10
280:7 283:6
284:25 286:11
287:5,25
288:16 290:14
**recognized**
214:18
**recollection** 9:6
33:7,15 44:18
46:25 47:8
51:23 68:14
85:23 115:4
158:9 203:12

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 105 of 118 PageID 465

Smith vs. Florida Gulf Coast University    Kelli Smith                    01/22/2025

Page 326

232:8 241:13
**recommend**
  59:13
**recommendation**
  59:15 209:12
  209:14 210:12
  210:17
**recommendati...**
  93:17
**recommended**
  269:5
**reconnect** 45:13
**record** 7:14 8:18
  8:19,21,25
  19:14 105:3,6
  137:11 163:11
  217:23 295:11
**records** 72:9
  117:24 118:7
  118:10 145:3
  146:4 160:19
  182:21 183:16
  184:6,13 186:3
  188:11,13
  189:16,17
  192:6 206:24
  206:25 207:8
  207:12,15
  208:13 228:9
  241:24 243:3
  244:17 262:22
  264:3 270:7,17
**recruit** 102:10,14
**recruitment**
  249:7
**redact** 210:1
**redacted** 64:9
  207:15
**redirect** 134:9
**redirected**
  128:24 274:11
  275:4
**reduced** 196:22
**redundancy**
  186:12
**reeling** 261:24

**refer** 94:12 188:6
**reference** 119:13
  119:16 192:1
  192:12 218:8
  218:22 241:5
  244:5 268:18
**referenced** 69:3
  74:5 161:13
  163:21 219:13
  263:5 283:13
**references**
  115:15 196:6
  221:16 241:8
  241:12 263:13
**referencing**
  118:19 160:2
**referred** 71:2
  122:15 145:13
  240:6
**referring** 35:19
  74:22 87:1
  113:24 133:12
  159:24 160:8
  275:10
**refers** 240:10
**reflect** 114:11
  117:24 228:18
  233:10 241:8
**reflected** 27:11
  69:4 78:17
  79:10 293:23
**reflecting** 74:4
**reflects** 70:3
  74:15 140:14
  194:6 250:17
  264:7
**refresh** 33:15
  44:17 46:24
  68:13 115:4
  158:8 203:11
  241:12
**refusal** 125:3
  204:24 205:3
**refused** 128:21
**regain** 185:8
**regarding** 17:6

17:22 121:23
  237:5
**regardless**
  121:20 128:2
**regards** 145:11
  155:21
**register** 162:6
**regular** 146:21
  286:8
**regularity** 146:21
  147:4 173:20
**regulation** 4:8,10
  119:8,21
  120:16 121:1
  132:7,8,24
  133:11,12,17
**regulations** 3:18
  83:4 104:9,14
  104:23 105:1
  119:19 120:1
  145:18
**rehire** 37:18 53:5
  56:5 57:3 58:3
  135:16,19
  215:22
**relate** 12:14
  31:17 189:25
  270:18 273:4,7
**related** 101:10
  109:1 119:22
  150:19 176:21
  204:19 228:18
  230:24 276:12
  282:23 283:2
  285:14,24
  286:4
**relates** 134:17
  136:12 153:12
  157:7 160:24
  228:12
**relation** 10:21
  56:18
**relations** 4:17
  62:7 142:3
  224:10,15,20
  233:13 234:8

**relationship**
  11:15 20:8
  88:19 101:3,6
  162:2,3,11
  211:11 262:20
**relationships**
  54:24 55:4 65:8
  65:13,18,25
  76:6,11,24
  88:16 244:23
  249:15,17
**relative** 31:15,19
  295:13,14
**relatively** 38:23
  259:22
**relaying** 160:17
  233:3
**reliable** 9:23
**relied** 212:23
**relocate** 39:13,22
  39:22
**relocated** 39:11
**rely** 114:10
  117:23 146:3
  240:23 241:7
**remained** 148:21
  148:21
**remains** 247:6
**remarks** 257:9
  257:12,15,18
**remedied** 212:17
  230:3
**remedy** 212:16
  214:19
**remember** 11:10
  16:1,21 23:21
  31:9 33:12
  39:18 42:2,12
  43:6 114:7
  117:20 123:25
  127:7 128:10
  128:11 142:7
  152:7,11
  154:21 158:17
  160:21 161:21
  162:25 169:15

169:21,25
  170:1,25
  171:13,15
  174:22 175:21
  187:20 188:20
  209:16,20
  210:14 219:25
  220:2,3,12
  222:4 223:22
  225:8 232:6,6
  236:22,23
  237:14 239:6
  240:1,6,15,16
  240:22 243:4
  249:6 252:4
  253:22,22
  256:12 258:16
  260:15 263:16
  266:6 269:22
  269:24 270:6
  270:20 274:11
  279:15 281:11
  284:17 287:8
**remembering**
  254:12
**reminded** 191:5
**remove** 143:24
  143:25
**removed** 143:23
  184:15
**reorganization**
  235:25
**repair** 65:17
  187:25 188:8
  188:10
**repeat** 86:8
  104:10
**rephrase** 9:3
**Replacing** 185:15
**replication** 144:1
**replied** 123:2
**reply** 226:16
**report** 59:19,23
  73:18 84:24
  91:16 110:4,7
  110:13 120:18

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 106 of 118 PageID
466

Smith vs. Florida Gulf Coast University Kelli Smith                    01/22/2025

Page 327

120:25 121:2
121:12,21
122:1,6 128:2,7
129:6 132:13
132:21,23,25
133:2,5 164:18
173:11,14,17
173:22 175:7
199:15,18,19
199:22 208:11
210:23 254:6
260:1 263:21
263:22 264:7
295:8
**reported** 72:18
84:22 85:7 92:4
94:4 95:1,5,7
95:12 125:11
125:13 126:19
126:20,23
128:9 204:21
211:14,19
225:9 254:8
269:21 273:14
273:16
**REPORTER**
1:19 292:16
295:1
**reporting** 1:21
87:12 120:11
132:17 190:2
199:12 201:10
202:5 260:6
**reports** 76:7,12
88:17 114:1
129:4 189:18
191:6 197:22
197:23,25
198:3,17 208:9
208:9 210:20
210:22 212:9
212:18,20
213:3,4,7,8
222:9
**represent** 7:11
**representation**

105:25
**represented**
150:6
**reputation** 89:5,7
89:11 222:15
**request** 6:11,16
13:14 29:14
80:2,5 107:20
107:21 118:7
160:19 186:17
189:7 190:14
192:24 199:21
207:12 241:25
243:3 244:17
262:23 270:8
270:17 285:2,5
290:17
**requested** 182:8
295:9
**requesting** 175:9
**requests** 186:19
187:3 199:17
228:10
**required** 29:18
61:23 62:6,14
91:17 92:6 94:3
94:25 100:6
111:5 112:1
120:17 125:5
138:24,24
140:19 145:19
178:21
**requirement**
100:9 121:8
190:2 198:25
**requirements**
91:14 174:23
208:19
**requires** 87:12
106:8 140:9
141:5,19
142:13 143:18
199:24
**rescinded** 279:24
**research** 96:18
193:23 194:5

240:16
**researcher** 238:8
**researching**
271:18
**reside** 10:2,17
20:11 57:10
**resided** 11:20
**residence** 20:15
20:16
**resides** 10:19
**resign** 103:20,22
103:24
**Resignation** 3:2
**resigned** 51:8
102:17 103:3
129:14
**resigning** 53:2
**resistance** 240:12
**resolution** 107:21
**resolved** 125:14
**resource** 57:16
117:21 188:24
189:4 192:10
206:8,9 223:10
241:1
**resources** 122:17
147:25 164:15
185:8 186:14
191:18 192:1
192:12 193:4
231:17 233:5
235:15,18
244:12 253:9
258:17 270:3
275:5 286:15
**respect** 41:10
119:1 121:13
122:8 126:9
131:1,9 145:17
146:3,4,6
148:22 161:15
170:3 174:4
181:18 186:9
202:8,14
203:19 260:12
265:11 273:17

275:17
**respected** 160:4
275:1
**responded**
219:18
**responding** 8:3
73:17 227:7
**response** 6:16
151:16 160:21
197:16 218:13
236:24 290:17
292:11
**responses** 266:13
285:2,5
**responsibilities**
4:15 12:13 86:4
140:1,9 174:6,9
174:10 185:23
186:1 228:21
233:19 263:19
268:6,7
**responsibility**
44:24 86:11,15
86:20 104:22
120:10 132:17
154:19 183:24
206:10 212:15
**responsible**
60:24 61:4,5,7
61:15 92:18
97:12 100:17
101:7,11
105:24 112:2,3
136:20,23
137:1,6 146:7
161:23 186:5
**rest** 33:7 168:12
**restroom** 48:23
153:18,24
154:18 172:14
172:25
**restrooms** 154:24
154:24
**result** 45:3 93:25
175:6 260:17
284:1,10

**resulting** 283:16
**results** 110:11
242:8
**resume** 3:7,10
53:25 55:20
66:7,11 67:17
68:4
**retain** 13:12,16
188:19 269:7
**retaliated** 278:14
**retaliation** 107:6
107:12,25
121:14,24
128:4 134:14
147:15 161:19
203:19 265:4,6
277:20 278:1,7
278:13 279:9
292:2
**retention** 3:20
101:8,9 105:13
249:7
**retire** 25:4,9
36:10,11,13
38:1,25 40:4,6
102:21 166:21
234:23,24
246:21,24
247:10,16
**retired** 36:9 39:6
41:4 42:5 67:21
67:25 79:17
231:13
**retirement** 25:16
38:3,5,7,10,24
39:3 40:22
**retirements**
102:25
**retiring** 41:19,24
73:16 74:12
234:22,23
235:4 246:20
247:11
**return** 45:23
253:14
**returning** 251:3

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 107 of 118 PageID
467

Smith vs. Florida Gulf Coast University Kelli Smith                    01/22/2025

Page 328

review 3:22 18:7
  85:19 99:17
  104:22 105:12
  108:12 109:1
  109:11 129:4
  132:3 175:24
  176:20,23
  177:1 181:19
  181:23 195:18
  198:22 212:18
  212:21 213:8
  295:9
reviewed 177:13
  178:11 236:8
  242:19,22
  266:17,25
reviewing 136:23
  158:17 235:18
revise 136:4
revised 143:6
  179:18
revising 142:7
  143:11
revisions 111:21
RFPs 33:16
  158:15 266:1
Rice 2:10
Rieger 84:5,8
right 49:21 59:17
  64:8 101:11
  105:20 107:1
  119:7 125:3
  137:7 157:17
  185:17 197:24
  201:7 217:25
  218:20 238:22
  248:3,5 256:12
  278:15 292:17
rights 90:6 94:15
  163:3 263:18
  265:4,5
Rinaldi 2:15
rise 93:10 175:7
risk 210:24
Rispoli 18:20
  19:9,16 71:19

72:12 75:7
  77:21,24 114:4
  124:20 125:1
  136:1 148:13
  149:2,15 162:2
  162:5,20
  166:22 169:4
  184:19 186:5
  186:11 190:6,7
  192:8,9 212:13
  219:9 220:10
  225:7,11
  229:18 231:10
  234:23 246:24
  247:20 251:18
  252:24 253:11
  254:2,15
  267:14,24
Riverview 1:16
  2:4
rogs 266:1
role 55:3 73:10
  73:13 87:18,21
  88:1 106:6
  112:5 114:25
  128:10 150:8,8
  160:13 186:8
  190:10 228:20
  229:6 275:21
  275:23
roles 36:24
  189:17
Ronald 272:13
  272:16
room 74:17
  158:18 171:23
rooms 154:16
rose 93:8,9,15
  274:9
Rossie 17:17
rotation 172:9
  223:21
rough 217:4
round 70:15
Rounsifer 112:11
  247:11

route 154:5
routine 102:6
  160:20
routing 192:6
RPR 1:19 294:4
  294:14 295:5
  295:23
rules 8:7 9:7
run 80:21 91:23

_____

**S**
_____

S 2:1,21
S-A-N-D-O-R-A
  124:1
sabbatical
  269:19 271:15
  271:25 273:1
Sacha 2:12 7:10
  35:25
Sadly 129:6
safe 223:9
safety 46:5 60:19
  85:20 86:12
  170:11 175:7
  199:19 210:25
  249:12,14
  250:4 279:17
salary 62:22 79:5
  79:13 82:7,15
  101:10 124:23
  133:25 134:8
  228:22 248:15
  258:18
sanctioned 198:9
Sandora 122:13
  123:24 124:4
  124:13,17
  125:17,20
  126:19 131:1
  158:3
Sandora's 128:7
Sara 59:16,19,25
  73:8 80:24 81:9
  95:5 96:7
  102:24 112:16
  113:19 121:17

122:1,9 124:10
  125:13 126:20
  126:23 129:1
  129:23 130:7
  145:6 147:23
  148:3,6 149:21
  150:1 151:8,10
  152:4,17,25
  153:4,11,25
  155:20 156:2
  156:16 157:17
  157:19 163:25
  164:17 167:2
  167:16 168:5
  171:8,12,19
  173:7 182:15
  187:5 192:23
  192:23 193:5
  193:10,12,13
  195:13,13
  196:13 197:2,4
  197:7 199:9
  206:15 209:6
  209:18 210:12
  214:20 215:3
  217:17 218:4
  218:20 219:3
  219:16,17,19
  220:3,4,23,24
  221:3,15
  222:13 227:9
  229:5 231:8
  235:15,25
  237:8,20 238:1
  238:4,11,20
  254:8,21
  255:15 256:11
  261:16 262:3
  269:13 270:2
  270:15
Sara's 222:12
Sarasota 3:3
  21:25 43:19
  44:25 45:17
  46:16,20 47:11
sat 95:23

Saturday 208:7
Saul 193:17,21
  196:6 216:12
saved 13:18
saw 18:19,25
  19:17 51:21
  72:16 73:21
  157:7 160:19
  205:18 226:18
  239:20 250:6
  259:12 260:15
  272:1
saying 106:4
  123:19 129:5
  144:14 154:19
  177:23 178:7
  180:6,17 204:5
  210:16 244:21
  248:1,2 249:21
  250:10,21
  271:12
says 29:20 30:1
  50:14 52:14,15
  52:19 60:7
  66:13 77:15
  84:4 85:17
  100:8 107:8,23
  108:2,22
  109:18 110:7
  113:7 119:24
  134:2 135:5,9
  136:15 144:5
  178:15 180:9
  180:12,16,20
  182:2 190:22
  192:2 216:18
  227:14,21
  234:20 240:23
  243:13,24
  245:22 246:6
  246:10,15
  248:4,16,21,25
  249:3,11
scene 207:20
schedule 3:12,16
  83:17 84:1

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 108 of 118 PageID 468

Smith vs. Florida Gulf Coast University Kelli Smith                                01/22/2025

Page 329

146:23 156:23
172:10,13
223:23,24
224:24 225:3
**scheduled** 52:10
52:13,15
102:21 146:22
**schedules** 172:15
**Scheduling@f...**
1:23
**school** 22:9,10
45:3
**schools** 3:3 43:19
44:25 45:18
46:20 47:12
**science** 22:20,21
23:20,24
**scope** 35:18
44:23 230:5
242:1 256:20
**Scott** 77:25
**sdyson@bgrhl...**
2:11
**seal** 294:8
**sealed** 210:2
**search** 3:11 12:24
64:11,15,18,21
65:6 66:8 69:19
69:25 70:4,7,9
70:11,12 73:11
74:16 75:13
77:4,18 151:24
**searching** 32:13
**seats** 153:18
**second** 35:24
65:7 67:18
105:4 136:12
139:2 150:13
151:18 181:23
189:25 261:18
288:24
**section** 132:20,21
133:20 138:9
**sections** 132:16
**secure** 172:20
259:21

**security** 24:20
165:14 194:19
210:25 279:16
**see** 19:4 28:16,22
28:25 29:15
30:3,8,21,25
44:6 50:3,15
51:22,25 52:1
52:11,14 54:25
55:19 60:7,19
61:1,21 64:2,4
65:18 66:12,17
68:6 74:16,18
74:19 75:20
77:6 84:10,17
85:4,17 86:16
86:18 95:2
107:13,19
108:11,22
109:6,18 110:5
110:13,14
115:14,16
119:10,11,24
120:11,19
121:6 123:5,13
123:16,17
126:5 132:19
133:1,4 134:1
135:25 136:18
138:3,11 143:5
144:4 164:2
165:15 173:1
175:25 176:15
176:25 177:16
177:20 178:8
178:14,18
179:18 180:3,9
181:7,12,14,15
181:18,22,25
182:1,4,7 190:2
191:14,25
194:5 196:24
197:3,12,22
204:3 218:10
218:10,23
219:9 221:17

232:11 236:22
236:23 238:11
243:12,13
244:3,21,25
246:7,11,16
248:10 249:2
255:18 262:4
280:24 283:23
285:8 289:14
289:18
**seeing** 47:1
149:20 188:2
**seek** 37:1 42:10
56:7,15 57:5,14
58:6 68:9,25
285:18
**seeking** 39:16
45:22 182:17
235:3 244:10
**seemingly** 163:25
167:2,3 273:11
**seen** 19:8 69:16
73:25 75:5 78:7
159:16 176:11
177:25 226:9
228:8 239:10
239:13 243:2
244:17 268:22
286:6
**selected** 41:5
45:9,14 66:16
66:20 72:3
78:21,23 95:21
151:25 246:22
251:7,9 260:21
279:18,19
281:3,12,20
282:4
**self-reflection**
255:11
**send** 31:25 149:1
199:16
**senior** 12:3,13
90:23 250:20
**sense** 165:14
**sent** 55:21 63:21

65:5 179:3,10
179:21 182:15
196:4 218:5
240:5,7,8 245:7
245:9 285:6
**sentence** 139:1,2
**separate** 34:21
182:8 259:7
260:3 265:2
**separated** 19:8
27:16 89:25
90:7,10 99:19
215:22 260:1
**separates** 259:25
**separating**
182:23 273:24
**separation** 27:11
81:23 82:2
131:7,17
133:14,20,25
134:4 143:10
201:14 241:15
247:6 248:14
250:25 259:8
259:18 260:6
261:20 273:9
280:20
**separations** 4:10
133:11
**September** 3:5
5:7 42:18 67:23
67:25 119:25
191:3
**sergeant** 18:20
36:9 123:11
148:10 150:1
151:8,10
152:16,18
153:9,12
166:18,18,19
167:7,8 222:6
223:13,18
224:9,17
231:12 233:10
233:14 234:8
234:12,24

235:10 236:9
247:2,9 263:6,8
268:1
**sergeants** 43:5,11
140:15 154:5
154:11,23
213:14 236:17
247:3 258:16
267:25
**series** 28:10
29:13 122:11
**serious** 128:20
249:8
**serve** 68:22,25
**served** 22:7 68:4
83:10
**serves** 209:23
219:14
**service** 26:4,5
187:13 231:11
**serviceable**
187:14
**services** 4:6
54:14 67:12
80:20 87:9
116:17 117:21
153:20 172:25
173:1 184:15
184:16 185:9,9
185:11,12,17
185:21,25
186:2,8 190:10
192:9 195:11
196:19 281:8
**Serving** 1:24
**set** 108:16
**settlement**
284:10,13,18
**seven** 246:15,18
247:1,4,7 248:4
248:7,18,19,21
249:21 250:9
250:13,16,22
**severance** 82:1,4
100:2 133:13
133:24 135:4,6

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 109 of 118 PageID
469

Smith vs. Florida Gulf Coast University    Kelli Smith                01/22/2025

Page 330

135:13
**sex** 110:7
**sexist** 122:15
  128:23,24
  130:11
**sexual** 3:21,23
  4:8,9,14 106:18
  107:2 109:20
  110:4,8 119:23
  120:15 132:7
  132:14 139:7
  139:17 197:23
  200:2 204:19
  204:20
**shakes** 165:15
**share** 129:2
  130:10 204:24
  205:3
**shared** 3:24 81:8
  110:25 111:5
  129:1 147:23
  149:24 159:3
  221:3 226:10
  235:6 236:16
  240:15,17
  241:3 269:13
  269:15
**sharing** 204:18
  206:25 208:25
**SHEET** 293:1
**sheriff** 48:13,14
**sheriff's** 36:23
  47:25 48:3,14
  48:20 55:21
  56:25 57:6,22
  58:7
**Sherrelle** 71:19
**shift** 96:17
  154:15,25
  172:1,7,16
  223:17,18
  224:12
**shifted** 96:20
**shifting** 100:14
**shit** 159:23
  237:17 254:17

**shooting** 45:4
**short** 160:4
  215:23
**short-term** 24:22
**shorter** 20:16,17
**shortly** 129:14
  151:18 162:12
  163:9
**show** 26:11 28:1
  29:8 40:15
  43:12 49:3,24
  51:17 53:21
  60:3 63:14 66:4
  69:12 73:22
  75:3 78:2,12
  83:13 85:13
  104:3 105:8
  106:12 109:15
  110:19 111:9
  112:18 113:22
  115:17 116:12
  119:3 132:4
  135:21 138:12
  139:4,22 141:8
  141:22 142:21
  176:8 177:11
  178:9,23 179:5
  179:12,23
  181:2 182:11
  183:10 190:17
  190:23 192:16
  195:24 202:24
  216:7 220:7
  221:6 226:6
  228:5 232:3,13
  232:23 235:9
  243:8 244:14
  245:10 261:9
  262:10,25
  263:23 280:5
  283:4 286:9
  287:22 290:11
**sic** 130:19
**sick** 93:19 155:7
**side** 38:15
**sign** 154:18

**signal** 45:11
**signature** 51:22
  115:8 116:7
  196:3
**signed** 115:6
  116:6,19
  228:25 287:14
  293:24 294:10
  294:20 295:19
**significantly**
  36:24
**signing** 294:20
**simply** 194:25
  237:16
**Simultaneously**
  154:17,20
**sister** 17:23,24
  256:1,2
**sit** 215:4
**sitting** 18:24
  70:16 261:16
**situation** 7:23
  93:21 194:8
  199:10 206:17
  269:14
**six** 23:2 52:6
  64:25 70:17
  79:25 99:15
  143:23 214:16
  232:7 252:5
  273:25
**six-month** 144:16
**size** 183:6 244:7
**skills** 61:21,24
**skipped** 217:24
**Skype** 45:10
**Slapp** 18:19 19:9
  19:16,24 71:2,8
  71:13 77:22
  114:4 123:2,5
  123:13 124:20
  124:25 148:13
  149:2,16
  161:22,23,25
  162:11,15,19
  166:20 169:4

212:13 225:8
225:11 229:18
231:10 234:22
246:21 247:20
250:24 251:7,9
251:11 252:22
260:22 261:2
267:14,24
**slated** 233:6
  234:23,24
  246:21,24
  247:16,18,20
  247:23
**slow** 235:22
**small** 230:23
  233:18
**smaller** 217:20
**smeared** 171:23
**Smith** 1:3,11 7:2
  7:8,15 137:14
  293:2,24 294:6
  294:19 295:9
**Smith's** 228:20
  ████ 12:22
**Smitty** 112:11
  234:22 247:11
**social** 13:20,22
  14:3,6 19:10
  24:19
**software** 188:12
  188:13,22
**sold** 256:9
**sole** 183:23
**solely** 13:1,23
  101:9 137:4
  240:24
**solution** 192:5
**somebody** 109:8
  128:13 155:6
  224:22 240:13
**someone's** 94:15
**someplace** 33:10
**somewhat** 244:24
**soon** 121:5 137:9
  259:22
**sorry** 20:4 60:11

71:21 123:25
168:2 169:11
169:12,13,21
188:5 202:10
234:5 237:3
258:20,23
276:17 278:20
**sought** 37:20
  38:20 57:11
  160:14 226:3
  285:13,19
**South** 2:10 11:3
  20:17,21
  209:24 243:20
**Southern** 24:16
**Southwest** 1:24
  102:4
**space** 13:25 14:2
**speak** 8:24 70:20
  91:21 145:12
  149:13 150:24
  219:3 259:16
**speaking** 165:25
  233:6
**special** 4:3
  112:23
**specific** 31:6
  38:16 42:24
  50:9,10 51:23
  58:11 90:13,15
  90:19 103:13
  117:9 125:1
  126:8,15
  162:25 211:17
  233:19 242:5
  279:15
**specifically** 28:9
  31:10 33:5 59:7
  59:12 60:7
  68:15 70:20
  77:13 94:11
  95:10 104:16
  106:7 115:2
  123:1 124:19
  146:2 149:8
  152:2 155:13

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 110 of 118 PageID
470

Smith vs. Florida Gulf Coast University Kelli Smith                    01/22/2025

Page 331

162:6 163:17
199:25 222:4
243:4,12 246:5
266:2 276:20
276:24 287:9
**specifics** 21:4
41:6 42:2 78:22
78:24,25 90:20
98:3 114:20
117:13 118:20
159:21 171:16
175:5 264:18
270:12 274:9
274:11 275:11
279:4 281:11
**spelled** 123:24
124:2
**spelling** 130:19
275:13
**spirit** 142:17
**split** 10:3
**splitting** 10:10
11:18
**spoke** 152:5
154:4,4,10,12
163:11 195:13
235:24
**spoken** 34:19
53:19
**Springs** 1:17 2:5
**St** 10:4,11,13
11:19 20:15,20
34:22 184:5
244:2,12
**stack** 217:20
**staff** 42:22
122:11 172:25
184:15,17,18
185:10,12,13
185:15 186:10
207:7 208:13
211:12,19
212:4,15 223:3
246:20
**staffing** 249:13
250:16

**stages** 259:7
**stakeholders**
62:8 76:8,13
**stamp** 27:4 68:2
110:3 115:14
120:9 141:4
**stand** 254:14
**standpoint**
124:24 270:12
**start** 10:10 11:10
38:6,10 98:10
146:16 181:9
238:2
**started** 11:15
16:24 42:14
51:11 52:5
67:22 74:15
83:24 143:16
182:8 224:19
**starts** 55:20
181:8,11
**state** 1:20 7:14
54:12 83:3
208:18 209:3
268:18,23
272:6 273:8
281:10 294:2,5
294:14,17
295:2,6
**statement** 27:19
27:23 245:1
286:15
**states** 1:1 269:11
**statistics** 195:2
**stats** 199:18
**status** 33:17
156:8 198:10
213:4 221:20
**statute** 208:19
**stay** 144:12
**stayed** 46:15
248:15
**stays** 199:20
**stenographic**
295:11
**stenographically**

295:8
**Stensrud** 59:16
59:19 73:8 95:5
96:8 121:17
122:1,9 126:20
129:23 134:9
147:24 151:8
151:10 152:4
152:25 153:5
153:11 155:20
156:2,16 157:3
158:25 159:9
173:7 182:15
193:5 218:20
227:9 229:5
231:8 237:8
254:8,21
**step** 36:11
**stepped** 148:13
**steps** 13:12,16
15:1 208:16
238:15
**Steve** 176:14
177:16,19
178:13 247:22
251:5
**stipend** 25:18
**stop** 154:23
**stopped** 155:3,18
156:7 173:4
**stops** 155:2,3
**stored** 112:10
**story** 158:10,12
**strategic** 62:7
**strategy** 262:6
**stress** 17:23
**strictly** 107:5
**strives** 65:17
**strong** 77:14
**strongly** 175:11
**structure** 4:11
41:10 42:1 43:2
43:7 56:18 60:2
84:23 91:10,15
191:19 192:4
206:8 231:9,14

240:14
**Stuart** 18:2
**student** 4:6 42:22
42:25 74:17
116:25 120:14
128:13 157:15
189:1,18 200:1
200:4 207:1,9
223:3 263:18
263:18
**students** 18:11
18:15 87:9
128:16 139:18
183:21 184:2,4
204:2 223:4,9
223:11
**stuff** 252:16
259:9
**sturdy** 210:6
**style** 77:11 87:20
88:3,7,9 90:8
90:11 215:12
215:16 216:1
226:4 238:14
272:11 274:19
**subject** 83:3
121:20 128:3
133:3 143:6
152:16 165:16
198:15 269:12
275:9 293:22
**subjective** 275:6
**submit** 222:4
**submitted** 13:19
26:21,24 43:21
49:11,14 64:23
66:8 165:1
220:12 222:1,6
**subsequent** 220:1
220:22 237:15
**substance** 126:6
293:23
**substantive**
17:12 163:20
**success** 194:1
**successful** 89:11

**sue** 258:11
**sued** 97:5
**suffered** 283:16
286:1
**suffering** 283:16
286:4
**suggested** 167:16
191:8
**Suite** 1:16,22 2:4
2:10
**sum** 133:24
**summary** 60:17
**Sunday** 208:7
**superior** 140:13
141:20
**superiors** 140:12
**supervised**
121:18
**supervisor** 17:10
17:11,14,16,19
17:20 109:7,13
112:8 121:25
123:11 125:20
128:25 143:19
143:25 144:7
147:25 172:8,9
193:5 224:16
225:7 263:9
**supervisor's**
144:9,12
251:23
**supervisors**
93:17,18
120:10,16
142:13 154:4
154:20 170:12
208:10 213:20
247:3
**supervisors'**
143:22
**supervisory** 4:12
100:20,25
120:24 144:11
213:15
**supplement**
158:22

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 111 of 118 PageID
471

Smith vs. Florida Gulf Coast University    Kelli Smith    01/22/2025

Page 332

**supplies** 154:17
**supply** 170:25
**support** 115:1
  184:14,17,18
  185:10,12,20
  186:4,10
  190:10 289:13
  292:2
**supported**
  188:15 195:14
  213:21 265:13
**supporting** 132:2
  186:6 208:13
**supports** 264:24
  277:18 278:4
**sure** 14:1,19,20
  21:25 23:18
  26:17 28:6,18
  36:1 44:22
  48:19,24 56:17
  59:24 71:10
  86:7,9 104:11
  115:5 119:14
  127:11,25
  131:12 132:17
  135:9 137:10
  146:5 153:14
  154:25 158:11
  160:22 164:12
  172:3,3 173:21
  176:17 178:2
  180:12 181:8
  181:10 183:12
  184:23 187:7
  189:3,22
  190:19 191:15
  197:15 207:22
  208:17 211:18
  212:4 214:22
  215:7 216:4
  221:15 223:8
  231:3 241:11
  242:6 246:19
  264:4 266:1,5
  268:11 271:20
  272:24 278:21

279:5 284:8,20
  289:5
**surmise** 226:22
**surpassed** 187:15
**surprise** 258:8
  259:11
**surprised** 166:19
**surrounded**
  273:10
**surrounding**
  175:25
**survey** 169:7
  221:16,23
  222:2,8,11,24
  223:1,2 225:13
  225:14,14,18
  225:19 226:2
  238:10
**surveys** 221:24
**survivor** 256:2
**sustained** 94:2,6
**sweep** 235:21
**sworn** 7:3 24:11
  32:17,21 37:21
  41:14,16 42:21
  48:9 49:22
  114:3 123:10
  124:23 281:10
  294:7
**synopsis** 163:24
  164:6 166:13
  166:16
**synopsized** 166:7
**system** 129:6
  188:13 189:10

---

**T**

**T** 2:21
**table** 70:16
**tabled** 217:15
**tables** 70:15
**take** 8:13,14 9:18
  15:1,8 17:9
  18:19 28:6
  31:25 44:2
  48:22 79:23

120:17 137:10
  154:6 162:7
  216:3 222:8
  238:13,18
  240:3
**taken** 1:18 9:17
  13:12,16 48:25
  137:12 166:4,5
  171:8 184:17
  202:7 216:5
  258:6 280:13
  284:21 293:3
**talk** 66:12 93:20
  167:16 168:11
  169:24 170:1
  197:22 204:17
  215:5 230:23
  237:9
**talked** 17:23 20:1
  99:16,18
  102:22 123:1
  159:21 168:12
  169:25 199:9
  234:21 237:22
  239:14,16,22
  242:3,7 259:6
  259:10 289:4,6
  289:9
**talking** 8:22 9:1
  60:11 121:17
  156:18 157:13
  157:24 160:1
  176:1 189:16
  189:20 191:19
  219:16 235:19
**talks** 110:4
**Tampa** 2:11 11:3
  12:11 20:22
  243:20 281:15
**tandem** 190:6
**tasers** 187:12,18
  187:19,22
  212:5
**tasked** 112:10
  160:5,13
  242:25

**teaching** 68:5
**team** 93:21 100:7
  134:10 150:7
  199:17,20
  209:10 212:16
  222:1
**teams** 77:14
**Teams-type**
  45:10
**Tech** 23:10
**technical** 177:23
  180:13,18
  181:17
**technically**
  185:22
**technological**
  187:15
**telephone** 110:10
  294:19
**tell** 18:23 31:6
  65:2 66:19 79:7
  80:25 94:20
  111:7 128:25
  147:3 151:9
  152:17 167:17
  199:5 220:12
  220:19 231:5
  238:5 239:7
  255:16 267:6
**telling** 155:20
  158:18 241:3
**temporary**
  260:24
**tense** 88:15
  211:11
**tension** 150:20
  150:22
**tenure** 96:2,5
  101:13 102:20
  103:10 201:17
**term** 268:18
**termed** 46:7
**terminable** 92:14
**terminate** 135:1
  215:20 257:1
  258:4 262:8

268:24 273:22
  277:1
**terminated** 19:7
  32:5 56:3,25
  58:1 63:11
  103:20 117:3
  117:15 118:6
  118:14 134:20
  135:3 162:13
  170:16 214:11
  215:10 225:16
  251:24 258:6
  258:25 264:15
  264:16,19
  273:20 276:19
  291:16,20,24
**termination**
  18:21 21:5,8
  26:8,21 51:24
  56:8 57:5 58:5
  68:8 69:4 83:9
  93:25 96:15
  114:22 115:10
  116:3,20 117:8
  131:2 135:7
  147:2 209:12
  209:13 213:5
  215:17 247:17
  257:22 259:7
  265:16,19
  268:22 279:11
  289:2,8,23
  290:3
**terms** 8:3 26:6
  41:22 72:22
  73:19 83:3
  90:14 101:24
  152:14 157:9
  163:15 186:4
  199:11 240:25
  258:18 259:24
  279:1
**terse** 197:16
**test** 31:25 164:3
  215:6 223:4
**tested** 29:7 31:23

Smith vs. Florida Gulf Coast University Kelli Smith                           01/22/2025

Page 333

testified 7:4
  98:14 174:5
  192:20
testify 106:20
testimony 9:23
  265:14 292:8
  292:11
testing 31:20
text 14:16
Thank 85:14
  108:20 119:17
  141:24 161:12
  243:10 290:13
Thanksgiving
  147:11
they'd 18:22
thing 15:13 23:16
  25:17 35:17
  74:25 89:9 99:5
  159:19 167:19
  195:7 207:2
  208:22 212:13
  216:25 224:5
  226:14 242:11
  255:13 265:20
things 77:20 87:7
  92:25 93:10
  96:18 100:21
  121:16 122:2
  122:22 124:14
  126:5 145:25
  147:23 157:18
  189:2 197:25
  198:13 208:20
  221:2 222:13
  239:18 240:13
  256:19 258:19
  259:9 272:1
  274:9
think 13:18,25
  14:2 15:12 23:2
  23:10 24:3 33:6
  33:11,16 34:5
  37:3 38:8 40:5
  40:9 41:24,25
  42:21 45:2,4

46:17,17 55:8
56:17 59:21
64:7 67:23
72:13,14 74:1
75:1 99:9,13
102:20 106:2
114:6,13 124:1
127:25 128:14
129:14 130:1
130:18,19
134:13 151:21
153:6 160:2
164:11,12,25
165:3,5,8,11,17
165:19,25
169:14 170:1
170:12,24
175:18 180:10
181:24 183:8
185:7 191:13
192:2,2 195:20
197:23 199:7
205:20 207:4
208:24 209:21
212:9 213:12
213:13 217:11
217:15,16
219:12 221:25
222:5 228:9
230:4,19 231:1
231:24 234:25
239:9,13 241:1
241:9 249:14
250:17 251:4
256:16,17
258:15 259:5
263:4 265:13
265:19,25
267:3,5 269:23
275:3,11
277:19 278:6
279:25 289:11
290:7
third 82:24
  150:14 246:8
  288:25

Thomas 2:15
  159:15 160:16
  161:3 173:6
  237:10,23,25
  238:1,6,8 239:3
  242:3,7,15,19
  242:22,25
  260:12 262:14
thought 53:15
  99:15 129:21
  155:6 156:5
  163:13,14
  166:17 167:10
  168:12,13
  195:7,20 202:1
  250:15 254:13
thoughts 217:4
threat 15:14 16:7
  209:9 210:24
threatened 15:11
  16:14 103:19
  103:21,24
three 16:5 31:16
  46:15,18 68:5
  79:22 122:11
  166:21 167:10
  172:7,11,11
  178:15 184:24
  185:5 265:2
Thursday 208:6
thyroid 9:13
ticket 235:2
tied 198:4 199:8
  284:9
tight 215:4
time 1:14 7:20
  8:14,24 10:3,7
  10:11 11:8,15
  11:19 23:17
  25:20 28:6,16
  31:3,13,24 39:3
  39:18 41:18
  42:19 43:3,21
  44:15 45:21
  46:1,17,19
  53:11 55:11

58:14,21 59:3,7
59:8 60:12,13
61:3,10 63:7,11
64:23 67:24,25
68:21 69:17
70:17 71:7,11
73:14 78:19
79:16,20 80:14
81:6,23 82:1
84:13 86:11
90:1,14,16,19
91:5,6 95:4
99:25 100:15
101:18 102:2
102:13 104:7
104:11,12
105:18 108:3
117:15,25
122:4 127:3
130:13,14
131:2 143:10
144:24 146:18
146:25 147:2
150:12 151:23
155:5 156:25
162:8,13,14,24
166:4,5 169:22
172:1 187:4
192:7,11 193:6
193:16,22
196:21 201:5
206:24 208:14
209:14 212:1
215:23 219:1
222:19 223:7
225:9 232:12
232:19 233:20
234:7,7,13
235:4 236:15
245:18 249:6
250:12 251:18
253:13,21
259:10 272:16
286:6 288:13
291:13
timeline 37:4

153:21 158:11
158:13 161:21
162:17,25
163:12,19,19
166:1 220:11
222:11
timely 87:8
  178:16 198:20
  199:2 248:25
times 29:6 31:16
  70:15 129:13
  149:9 163:21
  224:3 270:6
timing 154:14
title 4:9 17:18
  36:11 44:23
  46:4 50:9,10
  76:16,21 88:19
  88:22 95:9
  109:21 110:9
  110:11 121:4
  121:22 122:17
  129:1 132:14
  132:25 133:5
  139:19 146:15
  146:20 147:14
  148:1 188:25
  191:5,22 201:3
  201:9 205:21
  206:25 207:8
  207:18,21
  208:1,15,18
  210:3,23 253:7
  264:4 265:3,5,6
  278:8,11,14,18
  278:22,24
  279:1,2,9,15
titled 50:8,12
  218:10 286:14
titles 263:16
today 8:7,9,20
  9:1,19 17:6
  18:8 101:18
  131:4 158:18
  158:22 278:1,5
  283:13 284:3

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 113 of 118 PageID
473

Smith vs. Florida Gulf Coast University Kelli Smith                              01/22/2025

Page 334

292:8
**today's** 165:7
**Todd** 289:18
**told** 40:9 42:5
57:11 73:15
79:9 80:22
104:13 112:9
128:19 129:17
130:15 132:1
155:23 156:4
157:23,25
158:5,24
159:17 165:13
167:23 168:3,5
168:9,13 169:2
173:5,7 174:17
175:10 177:19
192:24,25
200:10 211:7
214:1,5,22
215:3,4,18,21
219:17,21
220:4 222:14
222:20,21,23
231:1 237:12
238:4,7 239:5
239:25 240:17
240:19 242:15
242:15 247:22
252:18 253:5,7
253:8 254:12
261:25 262:1,3
277:22 278:1,4
278:8 279:6,19
292:4
**tolerate** 107:6
**Toll** 272:13,16
**Tomoka** 55:23
**tone** 148:17
150:10
**top** 44:4 62:25
64:4 79:11
103:3 119:10
119:11 146:7
161:1 218:22
266:3 288:25

289:14
**topic** 102:6
**total** 46:17 249:4
**town** 47:18,19,21
49:2,12,19 50:6
50:11,22 51:2,5
51:9,13 52:2,7
52:10,22 53:5
53:13,18 54:2
59:2 64:24 65:2
66:19
**Town's** 50:15
**traffic** 283:9
**trail** 210:1
**trainer** 193:19,20
195:21
**training** 98:4,7,8
127:5,6 149:1
162:17 178:20
191:9,11 206:1
217:2 218:11
233:15 234:11
**trait** 77:5
**transcript** 294:10
294:19,21
295:9,10,19
**traveled** 147:25
**travels** 199:17
**treat** 123:5,14
124:16
**treated** 149:11,12
265:24 267:9
267:12 268:10
275:15
**treatment** 122:14
128:15 283:20
285:13,19,20
**trespass** 203:16
203:24 204:3
219:24
**trespasses** 219:14
**Trial** 6:10,14
288:3
**tried** 150:15
215:7
**trouble** 165:6,12

**true** 98:22 99:1
106:16 109:20
110:25 111:17
112:22 133:16
136:7 137:19
137:23 138:18
139:8,12 140:5
141:13,17
142:4,10 143:3
143:8 183:7
205:7 207:7,11
207:14 215:15
266:22 267:2
286:19,22,25
287:16,20
288:7,11 290:9
290:16,21
293:22 295:11
**trust** 76:7,12,25
**trusted** 212:16
213:2,13
**trustees** 1:7
119:25 293:2
**trusting** 77:14
147:24
**try** 8:23 89:6
150:18 210:7
**trying** 37:3 89:11
153:1 165:4
175:19 188:5
191:19 207:21
207:23 208:17
208:22 209:2
211:3 217:1
250:14 259:7
**Tsenekos** 201:6
201:12 202:7
202:14 216:24
**turn** 27:4 68:2
75:19 107:17
113:1
**turned** 41:2 47:3
**turnover** 249:9
**twice** 275:12
**two** 12:21 41:23
42:2 43:10

46:15 52:10,15
78:20 127:24
147:10 153:22
155:6 161:15
164:19 166:21
166:23 172:7,8
172:10,11,11
174:20,22
186:15,25
212:23 213:13
213:14 231:11
237:22 246:20
247:1,2,7
248:20,20,23
249:20,20
258:15 261:19
267:22
**type** 14:1 24:22
35:12,16,20
47:22 55:15
75:1 88:3,9
90:22 107:24
110:16 118:22
128:14 147:17
226:16 230:5
255:1 276:7
280:13 285:18
285:19,24
**typed** 165:3
**types** 192:3
204:20 231:21
**typewritten**
165:17
**typical** 32:18
**typically** 97:25
98:1 145:5
147:16 152:12
153:17 161:23
221:2 223:5
**typing** 165:9

—————
**U**
**U.S** 294:19
**Uber** 174:25
**UCF** 3:2 36:7
37:6,7,11,11,13

37:16,20 38:2
38:17,21,24
39:5,6 40:4,6
41:10,19 42:11
67:21 68:5
**ultimately** 51:8
80:5,7 101:10
125:16 137:6
183:14 213:14
**Um-hum** 25:20
28:7 29:16 30:7
40:18 41:13
43:2 67:20 91:4
98:16 102:23
103:2 105:5
127:19 134:22
142:16 185:18
217:14 218:3
272:15 278:16
**Um-um** 219:10
**unable** 29:4
129:8 186:6
**unavailable**
30:20
**unaware** 107:16
161:7 226:5
245:2
**Unbeknownst**
162:7
**uncomfortable**
19:1,6
**under-resourced**
186:14
**underactive** 9:12
**undergoes** 190:1
**understand** 8:11
9:2,7 64:11,17
73:5 76:10 84:8
94:6,17 95:11
95:14,20 99:11
99:14 100:5,10
100:16 104:21
104:25 105:23
106:4 107:10
109:3 111:4
113:2 116:21

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 114 of 118 PageID 474

Smith vs. Florida Gulf Coast University Kelli Smith                    01/22/2025

Page 335

116:24 120:21
127:10 134:12
151:1 153:1
159:19 185:1
188:17 215:8
231:7 234:6
241:9,16
249:23 250:14
264:22 265:1
271:14,17
272:3 278:12
279:1 285:4
291:8
**understanding**
8:10 95:17
109:7,12
143:20 160:15
185:2 207:21
225:1 231:14
278:19 279:3
291:6
**understood** 9:6
48:16 54:16,19
55:2 65:7,11,20
67:7 69:17
80:19 83:7
86:19 87:18,23
89:19 90:7,10
90:18,20 101:2
106:2 112:13
119:18 146:11
158:23 167:23
200:19 224:23
231:13 237:24
253:6
**unemployment**
26:9,20 28:12
29:15 35:17
**unfair** 12:15
**uniform** 19:23
**unilateral** 140:25
**union** 74:17
92:15 93:1 98:8
100:24 127:21
150:6 235:19
**unique** 101:22

**UNITED** 1:1
**universities**
207:16 209:4
263:17 272:5
**university** 1:7
7:11,12,23 8:11
10:8,16 11:3,6
11:21 12:18
14:12 16:11,25
19:22 20:14,17
20:21 21:6,9
22:5,16 24:19
25:1,4,7,21
26:5,9,22 27:8
27:15 34:8 35:6
36:4,15 37:2
39:9,17 40:23
41:2,8 42:15,20
52:6 53:10 56:9
58:6,15,18,22
58:24 61:17
62:12 63:7,10
63:22 64:19
65:9,22 66:1,17
66:21 67:8,15
68:9,22 69:1,18
75:24 76:8,13
76:20,24 79:22
80:13 83:4,24
84:2,20 86:5,13
87:19,24 90:14
90:23 91:19
94:23 99:12
101:4 103:12
104:12,20,23
105:24 106:1,6
107:1,5 109:22
111:2 112:3
116:3 117:23
119:18 122:11
130:22,24
131:7,14
132:12,22
134:25 138:2
145:18 159:4
161:8 173:9

175:12 177:5,9
177:24 178:7
178:20 180:7
182:6,25 183:2
183:5,14,20,22
185:16 186:15
187:17 189:6,7
194:1,13 195:2
196:18 198:1,4
198:21 200:12
200:19,20
201:6,14,21
203:6 204:18
204:22 206:12
206:24 209:1
209:24 210:3
216:19 217:3
217:12 219:20
222:14 241:16
241:16 243:19
249:13,14,17
250:5,25
257:18,24
258:3,10
259:18 262:20
265:17 272:4
275:1,5 276:23
293:2
**university's**
104:8,14
106:17 146:4
201:24 225:2
**university-sanc...**
198:24
**Unknowingly**
195:17
**unqualified**
121:2 132:24
**unsanitary** 156:6
**untrue** 207:10,13
227:18
**UPD** 101:3 191:6
211:16,21
225:21 244:23
**UPD's** 102:18
**upset** 197:13

**urine** 153:18
171:23 172:14
**use** 8:21 12:18,20
12:23 13:2,24
14:9,15,21 15:5
110:15 152:20
289:13
**users** 222:2
**USF** 20:23 21:12
23:20 34:11,15
34:22 184:5
244:12 256:18
**utilize** 66:25
108:15 110:15
**utilized** 223:17
**utilizes** 175:2

_____

**V**

**vacancies** 102:4
**vacant** 101:14
**vacation** 224:22
**vague** 245:2
**Vaguely** 288:22
**Valencia** 23:2
**validity** 129:5
**value** 38:22
123:9
**variables** 48:17
**varies** 199:14
**various** 68:12
74:23 186:3
210:5
**Vazquez** 59:23
95:7,12 96:11
157:21 163:25
214:21,22
227:9 231:8
237:8 256:10
**Vazquez's** 95:9
**Vee** 81:17 84:16
97:18 106:5
113:21 148:1
157:21 173:15
192:21 193:2,7
193:11,12,13
197:8,10,13,20

199:4,7 200:8
200:11,18
205:7 214:1
217:9,17 218:5
218:13 257:11
289:18
**vehicles** 187:25
188:8,10
**vendors** 62:8
**Venice** 10:3,11
10:17 11:19
**veracity** 249:21
**verbal** 61:24
110:12 143:16
143:18,21
144:16 145:11
251:19,22
254:15 263:22
**verified** 266:19
266:22
**versed** 205:21
**versus** 69:7 279:2
279:2,2
**vesting** 26:6
**vetted** 145:6
196:15 197:6
217:5
**vice** 46:9 84:6
193:3
**victim** 194:14,16
194:17 205:23
205:24 206:5,6
206:7,11
**view** 81:9 222:21
235:20,20
280:20
**viewed** 211:6,8
224:13 236:8
249:25 250:3
**VII** 265:3,5 279:2
**violate** 120:16
**violation** 94:15
94:22 121:1,3
132:23 144:1
144:13 195:15
196:12 204:2

Smith vs. Florida Gulf Coast University                Kelli Smith                                    01/22/2025

Page 336

236:25
**violations** 90:5
120:18
**voided** 185:24
**volume** 184:2
**VP** 147:24
**vs** 1:5 293:2

**W**

**W-H-I-T-T-A-...**
130:19
**wait** 30:17 35:24
269:20 280:22
**walked** 18:25
19:1 150:23
165:4,6 239:12
**want** 8:14 23:17
59:6 119:16
165:21 189:20
193:13,14
216:3 231:2,4
238:12,18
239:7 240:3
253:6,9 255:5,6
268:11
**wanted** 77:13
92:23 119:14
123:20 126:4
185:4 199:8
207:14 223:4,8
224:6,10
234:19 235:4
244:9
**wanting** 57:9
**wants** 243:25
**warning** 178:16
251:19 254:16
**warnings** 87:8
145:11 198:20
199:2 203:25
251:22
**warranted**
215:17
**warranty** 187:14
**wasn't** 13:17
45:16 48:4 86:3

101:22 108:11
114:24 118:22
119:15 127:4
129:21 148:8
153:20 161:6
162:18 164:8
165:5 170:17
174:8 175:16
177:3,5 192:22
193:2 202:11
206:18 213:1
214:14 225:14
235:2 236:3
248:7 254:10
275:23
**water** 274:12
**way** 13:19 14:4
19:12 24:25
89:1,15 103:8
127:9 129:12
157:5 197:14
207:21 210:4
211:6,20
222:23 225:5
230:14,22
255:8 259:25
278:9 279:5
290:21 291:22
**ways** 93:20 210:5
277:22 279:6
**we're** 8:23 9:1
82:9 99:16
156:18 165:25
181:24 258:20
**we've** 243:13
246:3 249:8
275:24 289:4,5
289:9
**we'll** 175:22
**web** 5:18 6:3
175:2
**website** 94:12
194:6
**week** 31:9 122:3
124:4 147:11
150:13,14

268:17,20
**weekend** 172:12
**weekly** 156:21
**weeks** 31:22,23
124:6,14
125:23 126:1
128:8 147:11
149:20 151:13
152:8 155:5
166:21,21
184:24 217:13
226:19 237:22
239:10
**weighted** 77:20
**weird** 155:6
**welcome** 191:11
**well-rested** 224:4
**went** 43:10 45:11
141:21 146:10
151:19 153:18
159:14 163:22
163:23 164:4
164:13 165:8
166:6 167:25
168:1,3,5,8
169:11,12
185:12 194:7
212:4 222:1
225:16 227:8
231:13 241:16
253:14 267:15
276:6
**weren't** 27:17
30:24 33:18,21
34:17 37:4
45:14 56:21
90:13 116:8
136:1 154:16
169:8,16 176:3
200:6 205:13
212:22,24
213:1 222:8
247:18,23
255:14 281:12
**West** 183:20,22
**whistleblower**

117:13 118:11
118:12,19
**Whitaker** 128:14
128:19 129:12
130:19 131:13
131:24
**white** 159:13
160:1 163:22
208:22 231:16
231:16,19
264:13 271:10
271:13 276:9
**whys** 31:6
**wife** 223:25
**willing** 57:14
255:3,11
**Winning** 169:24
170:4,4 171:22
172:4 263:10
**Winning's**
154:14
**wish** 187:7
**withdrew** 162:7
**Witness** 7:5 36:1
48:24 89:22
212:7 294:6,8
**witnesses** 288:20
**women** 87:16
95:23 96:1,4
124:21 240:4
**women's** 153:24
154:18,24
172:14
**word** 152:20
222:16
**worded** 82:5
**words** 38:16
232:1 238:23
239:23 255:17
**work** 7:24 12:6
14:21 17:9
20:20 28:15,21
28:22 29:2,4,18
30:20,25 32:13
39:5,7 44:11
50:21 55:6,9

59:2 62:6 67:17
99:10 100:6
149:3,5 166:9
211:9 239:16
246:7,7 282:12
284:5
**worked** 10:16
14:24 25:1
34:19 43:3
45:22 47:22,25
48:2,12 53:18
55:17,18,22,23
56:1 57:21 59:1
61:3 71:5 109:8
157:20 193:25
194:15,20
201:18 208:6
231:11 258:10
259:4 272:22
274:7 291:10
**Workers'** 35:6,9
**workforce** 38:23
**working** 11:15
16:24 32:8 34:7
42:14 48:20
49:2 65:9 67:22
180:10 212:14
**workload** 186:7
**works** 56:18
**worry** 165:13
239:25
**worst** 240:3
**wouldn't** 36:20
52:24 72:2
131:20 135:4
276:9
**wound** 162:9
**wow** 255:18
**writing** 129:6
222:12
**written** 4:13
61:24 110:12
133:21 138:16
138:23
**wrong** 199:5
258:11

Case 2:23-cv-00840-JES-KCD    Document 37    Filed 03/28/25    Page 116 of 118 PageID
476

Smith vs. Florida Gulf Coast University Kelli Smith                          01/22/2025

Page 337

**wrote** 240:9
246:4 248:1
256:10 280:18

**X**

**X** 2:18,21

**Y**

**yahoo.com** 12:22
**yeah** 19:3 23:16
33:4 38:8,12
46:17 47:8 64:2
64:5,9 154:9
166:8 178:4
181:10 182:22
191:15,17
219:25 221:1
226:23 236:23
259:12
**year** 11:9 16:21
19:19 23:12,21
23:25 52:3
80:14 97:25
99:23,23 100:2
101:16 133:23
150:2 156:25
191:12 194:18
236:25
**years** 7:19,20
10:6,6 15:8
38:8,9 44:13
46:15,16,18
53:19 55:22
79:22 128:13
176:24 181:24
181:25 234:13
235:11,13
236:2 264:10
285:9 287:10
**Yep** 50:17 132:19
191:10
**yielded** 262:5
268:23
**Yormak** 1:15 2:4
2:6 35:24 89:20
104:1 105:5
165:22 166:2

180:24 216:4
292:14
**you're** 48:9 65:17
87:1 106:4
128:12 144:14
157:24 163:2
177:2 187:8
188:2 199:14
206:3 210:16
210:17 212:2
233:18 254:11
264:24 278:19
**young** 38:23
174:24

**Z**

**0**

**005** 137:20
**006** 138:19
**010** 139:9
**014** 140:2
**017** 141:14
**018** 142:5
**030** 143:4

**1**

**1** 2:23 26:11,13
26:19 295:10
**1/18/21** 5:17
**10** 3:8 6:6 29:7
31:22 60:3,5
70:17 134:12
139:15 147:8
**10,000** 101:16
214:17 215:23
228:22
**10,000-a-year**
80:7 249:10
**10:42** 48:25
**10:56** 48:25
**100** 2:10 41:14,17
43:1
**104** 3:19
**105** 3:20
**106** 3:21
**108** 3:22

**109** 1:16 2:4 3:23
**10th** 254:25
**11** 3:9 63:14,16
66:9 68:3
249:12
**110** 3:24
**111** 4:2
**112** 4:3
**114** 4:4
**115** 4:5 62:23
**116** 4:6
**119** 4:8
**12** 3:10 66:4,5
77:2 99:4,8,14
106:20 235:2
236:15 285:9
**12-** 98:7
**12:57** 137:12
**125** 62:23 79:5,11
79:14 82:15
228:16
**126** 30:23
**129** 30:10
**13** 3:11 69:12,14
**13,000** 183:21
**132** 4:9 30:14,17
**133** 4:10 219:6
**133K** 218:23
**135** 4:11 30:12
79:9 80:3,9
81:24 82:7
219:5 228:16
**1364** 75:19,20
**137** 4:12
**138** 4:13
**139** 4:14,15
**13th** 30:11
**14** 3:12 4:20 5:16
73:22,23 78:17
116:19
**1400** 2:10
**141** 4:16,17
**142** 4:18
**14th** 30:15,21
181:12 217:11
**15** 3:13 75:3,4

76:2
**15,000** 196:18
**16** 3:14 78:2,4
**16-week** 98:7
**168** 27:5
**17** 3:15 40:12
67:22 78:12,13
82:9,12 268:14
276:6
**176** 4:19
**177** 4:20
**178** 4:21,22
**179** 4:23,24 5:2
**18** 3:16 5:4 83:13
83:14,21
**180** 162:25
**180-day** 162:17
**181** 5:3
**182** 5:4
**1838** 264:8
**184** 5:5
**18th** 243:24
**19** 3:17 5:12
15:13 85:13,15
86:10 100:4
249:4,6
**19-page** 109:18
**190** 5:6,7 25:17
**192** 5:8
**193** 28:18,20
**195** 5:9 28:18,20
**197** 28:18
**1991** 23:14
**1997** 110:3
**19th** 181:14
204:9,14

**2**

**2** 2:24 28:2,3,10
84:3 141:4
280:16 291:1
**2-mile** 236:14
**2,000** 184:4
**2:00** 137:12
204:13
**2:23-CV-840-J...**

1:6
**20** 3:18 15:8
49:21,22
102:20 103:6,7
104:3,4 134:8
**200** 5:10
**2008** 16:20
**2010** 111:20
**2011** 16:20
**2013** 15:23
**2014** 15:23
**2015** 20:10 40:10
40:12
**2017** 41:1 42:18
67:23
**2017-ish** 40:5
**2018** 4:19 43:19
44:6 45:1
**2019** 4:20,21,22
4:23,24 5:2,3
119:25 181:14
**2020** 3:5 46:14
49:15 50:24
**2021** 3:8,9 5:4,5,6
5:7,8,9,10,11
5:12,13 6:6
51:25 60:14
64:1 83:23 91:2
102:3 146:17
157:1 185:5
190:15 191:3
204:9,14
**2022** 5:14,15,16
5:19,20,21,22
5:23,24 6:2,4,7
10:12 31:17
80:11 81:9
102:3 116:21
146:17 218:19
**2023** 31:7,7
**2025** 1:13 293:3
294:7,9,22
295:17
**203** 5:11
**204** 5:12
**2077** 115:14

Case 2:23-cv-00840-JES-KCD   Document 37   Filed 03/28/25   Page 117 of 118 PageID 477

Smith vs. Florida Gulf Coast University   Kelli Smith                        01/22/2025

Page 338

**20th** 30:16,21
**21** 3:5,20 59:7
  60:10 102:3
  105:8,9 256:14
**2106** 120:9,9
**2115** 132:12
**214** 74:17
**2142** 107:10
**216** 5:13
**2163** 113:1
**218** 5:14,15
**21st** 30:25 31:6
**22** 1:13 3:21 4:21
  5:6 22:3 81:12
  106:12,13
  119:16 293:3
**220** 1:22 5:16
**221** 5:17
**226** 5:18
**2271** 1:22
**228** 5:19
**22nd** 190:20
  294:7
**23** 3:22 12:5
  108:18,19
**232** 5:20,21,22
**236** 5:23
**239** 1:23
**24** 3:23 4:22
  109:15,16
**243** 5:24
**244** 6:2
**245** 6:3
**24th** 30:3 44:6
**25** 3:24 4:23
  110:19,21
**25-ish** 42:21
**26** 2:23 4:2 111:9
  111:11
**261** 6:4
**262** 6:5
**263** 6:6,7
**266** 6:8
**27** 4:3 38:8,8
  112:18,19
**27200** 1:16 2:4

**27th** 30:25 31:7
**28** 2:24 4:4
  113:22 114:13
  114:15 115:25
**280** 6:9
**282** 30:2
**283** 6:10
**284** 6:11
**286** 6:12
**287** 6:13,14
**288** 6:15
**28th** 244:22
**29** 2:25 4:5 6:4
  115:17,18
**290** 6:16
**292** 295:11
**29th** 215:14
**2nd** 201:5

---
**3**

**3** 2:25 5:20 29:9
  29:10 32:3
  291:1
**3/19/2027** 294:15
**3:51** 216:5
**3:58** 216:5
**30** 4:6 99:20
  116:12,13
  133:25 134:10
  264:10
**30,000-foot**
  235:20
**30th** 30:3 51:25
**31** 4:7,19 119:3,4
  120:8
**31st** 30:6
**32** 4:9 132:4,5
  ⬛⬛⬛⬛
  15:6
**33** 4:10 133:8,9
**334-1411** 1:23
**33602** 2:11
**33901** 1:22
**34** 4:11 135:21,23
**34134** 1:17 2:5
**35** 4:12 137:15,16

**35,000** 251:15
**36** 4:13 138:12,14
**37** 4:14 139:4,5
**38** 4:15 139:22,24
**39** 4:16 141:9,10
**3rd** 83:23 91:2
  232:7

---
**4**

**4** 3:2,9 40:15,17
**4/1/2021** 3:15
**40** 3:2 4:17
  102:17 103:19
  103:21,22,24
  141:22,23,25
  234:21
**40,000** 194:18
**401(k)** 259:9
**41** 4:18 142:21,23
**42** 4:19 176:8,9
**43** 3:3 4:20
  177:11,12
  180:12
**44** 4:21 178:9,10
**45** 4:22 178:23,24
**46** 4:23 179:5,6
**47** 4:24 179:12,13
**48** 5:2 179:23,24
  180:17 209:8
  210:20
**49** 3:4 5:3 181:2
  181:3
**4th** 64:3

---
**5**

**5** 3:3 43:12,14
  107:9 133:20
**5/1/2023** 2:23
**5:25** 284:21
**5:28** 284:21
**5:39** 1:14 292:19
**50** 3:5 5:4 182:11
  182:12
**50,000** 162:1
**500168** 27:7
**501** 12:15
**51** 3:6 5:5 183:18

**184:**21,22
  189:15
**52** 5:6 190:17,18
**53** 3:7 5:7 190:23
  190:24
**54** 5:8 192:16,17
  197:17
**55** 5:9 195:24,25
**550** 196:23
**56** 5:10 200:23,24
**56,000** 236:25
**57** 5:11 202:25
  203:1
**58** 5:12 204:11,12
**59** 5:13 216:7,8
**59,000** 236:25
**5th** 294:9 295:17

---
**6**

**6** 3:4 5:14 49:4,5
  75:20 135:9
  218:19
**6,000** 284:15,18
**60** 3:8 5:14
  217:24 218:17
  218:18
**61** 5:15 217:25
  218:2
**62** 5:16 220:8,9
  220:14
**63** 3:9 5:17 221:6
  221:8
**64** 5:18 226:6,7
  227:17
**65** 5:19 228:5,6,8
  229:10
**66** 3:10 5:20
  232:3,4
**67** 5:21 232:14,15
**68** 5:22 232:24,25
**69** 3:11 5:23
  236:19,20
**6th** 30:6

---
**7**

**7** 2:19 3:5 5:21
  5:22 6:7 49:24

**50:1** 68:3
**70** 5:24 243:8,9
  243:22
**71** 6:2 244:14,15
**72** 6:3 245:10,11
**73** 3:12 6:4 261:9
  261:10
**74** 6:5 262:10,11
**75** 3:13 6:6
  262:25 263:1
**76** 6:7 263:23,24
  264:1
**77** 6:8 266:7,9
**78** 3:14,15 6:9
  280:5,6
**79** 6:10 283:4,5,6
**7th** 30:10 232:20

---
**8**

**8** 3:6 4:24 51:18
  51:19 67:18
  76:5
**8/10/2022** 2:24
**8:05** 244:22
**80** 6:11 41:14,16
  284:23,24,25
**81** 6:12 286:9,10
**82** 6:13 287:3,4
**83** 3:16 6:14
  287:22,24
**84** 6:15 288:14,15
  290:24 291:23
**85** 3:17 6:16
  290:11,12
**8th** 191:3

---
**9**

**9** 3:7 5:5,23
  44:11 53:22,23
  76:15 280:16
**9(a)** 113:7
**9:37** 1:14
**903** 139:15
**90s** 55:11
**91** 55:22
**928** 141:5
**93** 23:17

Smith vs. Florida Gulf Coast University Kelli Smith                                01/22/2025

Page 339

**94** 23:17
**97** 55:20
**9th** 164:11 185:5
190:15 214:15
215:2,3,13
232:20 237:7
248:12 254:25