## Zablackas, Sandy

| | |
|---|---|
| **From:** | Martin, Mike |
| **Sent:** | Monday, March 28, 2022 8:05 AM |
| **To:** | Vazquez, David;Stensrud, Sara |
| **Subject:** | Fwd: Proposal |
| **Attachments:** | Final FGCU UPD Proposal.docx |

We should discuss this approach and proposal
It seems the new chief has bruised a few relationships beyond UPD so we may need a somewhat more holistic perspective
Mike

Sent from my iPhone

Begin forwarded message:

> **From:** "Thomas, Dr. David" <dthomas@fgcu.edu>
> **Date:** March 27, 2022 at 11:01:04 PM EDT
> **To:** "Stensrud, Sara" <sstensrud@fgcu.edu>, "Vazquez, David" <dvazquez@fgcu.edu>, "Martin, Mike" <mvmartin@fgcu.edu>
> **Subject: Proposal**

> Good Evening:

> I hope that this finds you well. As promised attached is the proposal that we discussed. I will be traveling this week but will be available to discuss the proposal or answer any questions that you might. Stay safe and be well!!!!

> David J. Thomas Ph.D., LMHC
> Professor, Forensic Studies
> Senior Research Fellow, National Policing Institute
> Florida Gulf Coast University
> 10401 FGCU Blvd. South
> Ft. Myers, FL 33965
> Cell: (352) 514-4048
> Office: (239) 590-7313



> \*\*\*\*\*\*\*\*\*\*\*\*\* *Confidentiality Notice* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

> *This email may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. If you are not the addressee and it appears from the context or otherwise that you have received this email in error, please advise me immediately by reply email, keep the contents confidential, and immediately delete the message and any attachments from your system. Florida has a very broad public records law. As a result, any written communication created or received by Florida Gulf Coast University employees is subject to disclosure to the public and the media, upon request, unless*

1

*otherwise exempt. Under Florida law, e-mail addresses are public records. If you do not want your email address released in response to a public records request, do not send electronic mail to this entity. Instead, contact this office by phone or in writing.*

001610

# ASSESSMENT FGCU POLICE DEPARTMENT

## PROPOSAL

Dr. David J. Thomas
dthomas@fgcu.edu/Cell (352) 514-4048

# PROPOSAL
## ASSESSMENT OF THE FGCU POLICE DEPARTMENT

**Purpose:** This proposal was developed in response to an inquiry by President Michael Martin, Vice President of Administrative Services David Vazquez, and Senior Vice President for Administrative Services Ms. Sara Stensrud concerning an organizational analysis of Florida Gulf Coast University's Police Department. In conversations with all three, they expressed a concern that since hiring the new chief the University Police Department (UPD) is: experiencing inner turmoil/morale issues and that there has been conflict between UPD interfacing with other departments university wide.

**Perspective of Organizational Change in Policing:** Policing as a whole hates organizational change more than any other profession. The resistance to change appears to be more rigid when the new chief is an outsider. The new chief usually bucks the traditions that have been in place for ten (10) or fifteen (15) years. There is an old adage in policing: **"We Be"**, meaning we be here when the new chief comes and we be here when the new chief leaves. Put that in perspective the average tenure for a police chief in the United States is between three (3) and five (5) years. If you are looking at the average officer in the *Florida State Retirement System,* over a twenty-five-year (25) career, the average officer will work for five (5) chiefs. The one constant during that entire time is policing, meaning that there will be calls for service. In many instances officers feel that the job hasn't changed so why should they. The most difficult task for a new Chief from the outside is to institute change: new ideas, new philosophies, changes to the organizational structure, and **changing the culture to move toward 21st Century Policing**, often times are a death sentence for new chief.

Based on my discussions with FGCU administrators no-one knows how UPD functions or its innerworkings. This would not be unusual because in many instances as long as there is no problem with a police department the police are left alone to do their job. The only time the need for an assessment is required is when there are a number of formal complaints filed against an

1

001612

**PROPOSAL**
**ASSESSMENT OF THE FGCU POLICE DEPARTMENT**

agency or when a new chief steps in and looks to facilitate organizational change. My experience with administrators has been, as long as there are no complaints then the police department is acting professionally. Which translates to: "I can focus my efforts on other departments where I have more pressing issues". In addition, the subject of policing is foreign to many administrators because of its unique specialty. have more pressing issues in my other departments".

**Recommended:** To fully understand where UPD has been it is recommended that you evaluate their past. Meaning that the assessment should include: policy and procedures that address the use of force; training; recruitment, retention, and hiring practices; internal affairs complaints how they are cataloged, investigated, and resolved; UPD's responsibility in regards to the Cleary Act and their past/current responses, as well as, data collection and dissemination; and examination of UPD's interaction with the university community – faculty and staff, students, and administrators; safety and wellness of the officers and civilian personnel; UPD's organizational culture; and any other area that UPD and/or FGCU administrators request be evaluated.

**Methods:**

1. Data collection concerning UPD's interaction with the university communities through an online anonymous survey portal. With a unique survey for each of the aforementioned populations. In addition to the surveys, interviews will be conducted utilizing focus groups from each of the aforementioned populations, including UPD personnel, to obtain a perspective that is beyond that which is obtained through the surveys.

2. A review of UPD's use of force policy, training records, and Internal Affairs complaint process.

2

001613

**PROPOSAL**
**ASSESSMENT OF THE FGCU POLICE DEPARTMENT**

3. A review of UPD's response and responsibility to the Cleary Act.

4. Any recommendations will be made using the guidelines set forth by the Obama Administration's report on *21st Century Policing*.

5. To assist in obtaining participation for all parties concerned, researchers will meet with and ask for the support of each of the union representatives, student government, and student organization leaders.

**Compensation:** This assessment will require two investigators the principal investigator Dr. David Thomas will be responsible for meeting with leaders of all the aforementioned groups in an attempt to gain their support for their members participating in the surveys, interviews, and focus groups. Dr. Thomas will also be responsible for the development of the surveys with Dr. Baer, conducting the focus group and individual interviews, analysis of UPD's policies, review of IA complaints and findings, review of training, and finally review of hiring practices. Dr. Baer the co-investigator will be responsible for assisting in the development of the online surveys, collating and disseminating the results of the data collected from the surveys as well as the focus groups, and reviewing and assist in editing the final report. In addition, compensation includes all travel expenses and any meetings and presentations once the report is completed and disseminated to the FGCU community.

a. Compensation for Dr. Thomas – it is estimated that the project will take approximately 40 working days at a cost of $800.00 per day = 40 x $800.00 = $32,000.00

b. Compensation for Dr. Erica Baer – it is estimated that Dr. Baer's contribution to the project will take approximately 20 days at a cost of $500.00 per day = 20 x $500.00 = $10,000.00.

c. **Total Compensation = $42,000.00**

3

001614

**Case: 233 - Hotline Web
Florida Gulf Coast University
Safety_Other Safety Matters**

## Case Snapshot
**Opened:** 03/28/2022
**Days open:** Less than 24 hours
**Last modified:** 03/29/2022 2:30 PM
**Date closed:** 03/29/2022
**Intake method:** Hotline Web
**Status:** Closed
**Alert:** Green

## General Case Info
**Case number:**
233
**Received/Reported date:**
03/28/2022
**Language:**
English
**Assigned tier:**
Florida Gulf Coast University

**Issue**
**Primary issue:**
Safety_Other Safety Matters

## Case Details
**Reported tier information**
**Case type:**
Allegation
**Intake method:**
Hotline Web

**Location**
**Organization/Building name:**
Florida Gulf Coast University
**Location name:**
FGCU Main Campus
**Location/Address:**
FGCU Main Campus



**Reporter Information**
**Reporter anonymous:**
Yes

**Case Information**
**Relationship to Institution:**
Employee
**Please identify the person(s) engaged in this behavior:**
Kelli Smith
**Do you suspect or know that a supervisor or management is involved?**
Do Not Know / Do Not Wish To Disclose

**Is management aware of this problem?**
Do Not Know / Do Not Wish To Disclose
**Where did this incident or violation occur?**
Main Campus
**Please provide the specific or approximate time this incident occurred:**
Last 10 months
**How long do you think this problem has been going on?**
3 months to a year
**How did you become aware of this violation?**
Other
**Details:**
Nothing has changed since we met with the president. She has no standards or expectations. She has no guidelines for anything she has others complete. She continuously talks behind everyone back to everyone. We all talk to each other and tell each other what she says. Toxic environment. She wants several of us gone. She is financially irresponsible, spends money on things that are not needed or not needed immediately.

People are being moved out of their positions- Kittleson is no longer going to be in outreach. Jones is no longer going to be in Training. Jones has been doing training for 10+ years. Kittleson has been doing outreach for 4 years. She's been hiring a lot of civilian staff to do what Chief Moore use to do on his own or other command staff didn't.

The overall environment is not a great working environment. We use to like coming to work, now we hate coming to work. We are all actively seeking other positions or retirement. One person already left. 7 others are looking at leaving. Of the 7 looking at leaving 2 are command staff/captains, 1 detective, and 2 supervisors/sergeants. Plus other officers. If something isn't done in a timely manner we are leaving. Some people are needing to put retirement paperwork in by mid-April because of FRS.

She bullies other departments and tries taking events over that aren't ours. She has been destroying our relationships with partners on and off campus and making it difficult for some others to do their jobs.

We can't fill positions that we have open we are 19 people total. If you lose 8 people. The department goes to 11 which is critical to the safety of the university due to staffing.

**Legacy information**

## Follow-ups

**Reporter Additional Information**
There are no additional notes for this incident.

**Questions/Comments and Reporter Responses**
There are no questions asked by the client.

## Assignments & Access
**Case assignee(s):** None
**Restricted access:** None
**Case access list:** Cajuste, Valery; Gunter, Precious; McFarlane, Waneka; Molina, Elizabeth; Molina, Liz; Nanna, Emily; Webster, Kathryn

## Participants

| Name | Job Title | Relationship | Role | Results | Notes |
|------|-----------|--------------|------|---------|-------|
| Kelli Smith | None | None | None | None | |

## Attachments
None

001340

## Synopsis

**Outcome of case**

**Primary outcome:**
- Select One -

**Secondary outcome 1:**
- Select One -

**Secondary outcome 2:**
- Select One -

**Action taken:**
- Select One -

**Additional details**

## Case Notes

None



FLORIDA
GULF COAST
UNIVERSITY

OFFICE OF THE VICE PRESIDENT
ADMINISTRATIVE SERVICES AND FINANCE

March 29, 2022

Hand Delivered

Kelli Smith
Chief of Police, University Police Department

Re: Notice of Separation

Dear Ms. Smith,

This letter serves as written notice that, pursuant to FGCU Regulation 5.023, Separations, you are being separated without cause and your employment with Florida Gulf Coast University as Chief of Police, University Police Department, will end at the close of business Friday, April 1, 2022. You will be given a lump-sum severance payment equal to thirty (30) days of your current salary. You are immediately relieved of your duties, and are placed on administrative leave with pay through April 1st.

Your current healthcare benefits will continue through May 31, 2022. You will also receive your remaining annual leave. There will be no further notice of separation.

Attached is a copy of FGCU Regulation 5.023, Separations. This regulation may also be found online at http://www.fgcu.edu/generalcounsel/regulations.

Sincerely,

David Vazquez
Vice President, Administration Services and Finance

Attachment(s)

c:    Sara Stensrud, Senior Associate Vice President, Administration Services
      Personnel File

EXHIBIT
73
1|22|25 Smith

10501 FGCU Boulevard South, Fort Myers, Florida 33965-6565 • (239) 590-1100 • Fax: (239) 590-1010 • www.fgcu.edu
An Affirmative Action Equal Opportunity Employer • A member of the State University System of Florida

000001

# FGCU POLICE DEPARTMENT
## ASSESSMENT

### Operations and Limited Policy Review



Prepared by: David J. Thomas, Ph.D., LMHC and Erica Baer, Ph.D.

1/

001747

# TABLE of CONTENTS

**1. INTRODUCTION, PURPOSE, REASON, and SOURCES**

Purpose ................................................................................................ 3

Reason ................................................................................................. 3

Sources of Information ...................................................................... 5

**2. UPD Patrol Operations 8**

Department Demographics ............................................................... 6

Staffing ................................................................................................ 7

Review of Policies and Procedures ................................................. 7

Professional Compliance General Order – 024 ............................. 8

Use of Force General Order – 11 ..................................................... 10

Pursuit Policy General Order - 066 ................................................. 10

Use of Force Reporting General Order – 012 ................................ 11

Report Writing Policy/Guidelines ................................................... 11

Law Enforcement Training ................................................................ 11

Community Policing Model ............................................................... 14

Community Engagement ................................................................... 15

Police Officer Hiring and Retention ............................................... 19

**3. Communications Center Operations** ........................................... 21

**4. University Partners and their Relationship with UPD** ................ 27

**5. Summary** ......................................................................................... 33

**6. Appendices**

Appendix A ......................................................................................... 38

Appendix B ......................................................................................... 52

Appendix C ......................................................................................... 69

Appendix D ......................................................................................... 72

001748

## CHAPTER 1: INTRODUCTION, PURPOSE, REASON, and SOURCES

The Florida Gulf Coast University Police Department (UPD) has been in existence since FGCU opened its doors in 1997, twenty-five (25) years ago. UPD is a full-service police department that has twenty (20) sworn law enforcement officers and nine (9) civilian professional employees which serve in varying support capacities to assist in UPD's Mission. UPD services approximately 16, 000 students, 4,800 live on campus, 514 faculty, and 914 staff (FGCU, 2022). UPD is currently accredited by the *Florida Law Enforcement Accreditation Commission*. UPD's original accreditation was granted June 25, 2014 and since then UPD has been reaccredited twice June 2017 and October 2020. The true purpose of accreditation is to ensure that a law enforcement agency is meeting a universal standard established by the accrediting body and by meeting this standard the agency is meeting needs of the community and its employees.

### Purpose

The purpose of the assessment was to evaluate UPD's policies, operational practices, and procedures that address the use of force, police practices, and training; recruitment, retention, and hiring practices, disciplinary process, internal affairs complaints, cataloging/categorizing of complaints, investigation, and complaint resolution; police communications/operators – policies and training; UPD's responsibility regarding the *Clery Act* -past/current responses, as well as, data collection and dissemination, and examination of UPD's interaction with the university community – faculty and staff, students, and administrators, and the safety and wellness of the officers.

### Reason:

The reason for the assessment was that some of the current UPD personnel complained to FGCU administrators that new Chief Kelli Smith who had been hired in 2021, had an abrasive personality and had been treating senior officers with little or no respect. University campus partners/colleagues also complained that Chief Smith did not respect their expertise and had created an environment that was adversarial. In response to the complaints President Martin reached out and requested that I conduct an assessment of the university police

001749

department. It is important to note that Chief Smith was dismissed prior to the beginning of this assessment.

However, FGCU administrators felt that it was important to understand the state of UPD before hiring a new chief.

Before the assessment began an email was sent to UPD personnel requesting their participation in a survey as well as requesting that UPD employees sworn and civilian participate in interviews and that their identity would be anonymous. A similar request was sent to faculty, staff and students. Participation in the surveys and interviews was completely voluntary. Examples of the letters and surveys can be found in the appendices. The requests with links to the surveys and interviews was sent to both communities, UPD Personnel and the University Community, on June 2, 2022. On June 10, 2022, I received an anonymous letter, via the *U.S. Postal Service* with a return address: *Florida Gulf Coast University Police Department* and the letter was addressed to me, *Florida Gulf Coast University, C/O Dr. David Thomas*. The letter was not signed and stated the following:

> *"There are some of us who are afraid to talk. The newly promoted supervisors want to control what we say. It has become clear who is in charge. If they can get the new chief fired just by talking to the President – we know what will happen to us. They have implied this. The chart is one of the reasons that they decided to make the move. The power was going to be broken up. We don't trust FGCU leadership."*

During the interviews with UPD administrators, the administrators described their relationship with Chief Smith as tenuous and noted the rank and file had very little if no contact with Chief Smith. Historically, police officers are very paranoid and do not trust the administration. Over the past several years there has been a trend in policing, when a new Chief is hired, officers' rebel against change and complain, these complaints have led to the termination of several promising chiefs who advocated changing an agency's culture. Rather than deal with the complaints, allow the organizational and cultural change to take place, governmental officials/administrators cave in and terminate the newly hired chiefs. The result is the agency remains stagnant, there is no growth or change and often times that means the needs of a given community are not being met.

In addition to the aforementioned complaints, in interviews with the university officials it was determined that although they are responsible for the police department, they know nothing about the profession of policing. This lack of knowledge is the same in many institutions as well as governmental entities. The adage has been: "Let the police do their job, because their job is unique. They speak a different language and who knows better than the

4/

police to handle police related matters". This type of trust is great for the police department, albeit blind, but

negligent for those who are ultimately responsible. As you move forward through this assessment there are three

(3) sayings that have been handed down over time and are particularly true when it comes to policing:

"It's not if something is going to happen but when".

"We be, we be here when the new chief comes and we be here when the new chief leaves".

"Policing without some form of oversight and understanding is dangerous"

### Sources of Information

The information in this report was gained through personal interviews of police department personnel,

faculty, staff, and students. Those who participated in the interviews were guaranteed anonymity and assured that

their story would be told as offered. It is important to note that all of the information contained herein was

corroborated with interviews, from secondary sources, documents which include police reports, emails, and FGCU

UPD policies. A secondary source of information was a series of surveys which were designed for the UPD sworn

personnel. The information from the officer surveys was taken from a national survey on officer training and safety

and modified to meet the needs of UPD sworn personnel (National Policing Institute, 2020). The findings of the

survey for sworn personnel can be found in Appendix A. A separate survey was utilized for the FGCU community

which is inclusive of faculty, staff, and students, this survey was modified to meet the needs of the FGCU community

(U.S. Department of Justice, 2020). The findings of the survey of the FGCU community can be found in Appendix B.

Finally, the interviews were conducted with open ended questions, meaning that there was no search for of any

specific information or agenda. However, the questions became focused when the interviewee presented

information that needed further clarification.

001751

## CHAPTER II: UPD PATROL OPERATIONS

Operations is an examination of agency demographics, staffing, selected policies, training, and community engagement of sworn personnel. In this section you will see a series of findings and a number of recommendations that follow the findings.

I. **Department Demographics**

   A. **Agency Size**

- The total number of employees sworn and civilian twenty-seven N=27.

   B. **Sworn Personnel Demographics**

- Total number of sworn police officers, eighteen, N = 18.
- Total number of male-sworn officers, seventeen, N = 17
- Total number of female-sworn officers, one, N = 1.

   C. **Gender/Racial Composition of Sworn Personnel**

- Gender Identity (sworn members)- Seventeen males (17) and one (1) female, N = 18
- Race/Ethnic Identity (sworn members) White/Caucasian, Sixteen (16), Black/African American one (1), Hispanic/Latina one (1), N=18

   D. **Professional Staff Demographics**

- Total Number of civilian/professional staff, N = 9

   E. **Demographics by Job Responsibility or Title**

- Total number of police dispatchers, four (4).
- Total number of civilian support personnel, two (2).
- Total number of security guards Buckingham Property, one (1).
- Total number of Parking Service Technicians, two (2).

   F. **Gender/Racial Composition of Professional Personnel**

- Gender Identity professional personnel six (6) females and three (3) males

6/

- • Race/Ethnic Identity (professional staff) White/Caucasian, six (6), Black/African American two (2), Native American (1), N = 9.

G. **Vacancies Sworn/Professional Personnel**

- • Total number of vacancies N = 7

- • Total number of sworn vacancies Police Supervisor - (Sergeant) one (1), police officers three (3), N = 4.

- • Total number of professional vacancies – police dispatchers two (2), records manager one (1), N = 3.

H. **Staffing**

**Shifts:** Patrol and dispatch work 12-hour shifts shift, day shift is 6:00 am – 6:00 pm, night shift is 6:00 pm – 6:00 am.

**Patrol:** Current staffing levels in patrol permit one (1) sergeant and two (2) officers. When patrol is fully staffed there is one (1) sergeant and three (3) officers. However, it should be noted that when a dispatcher calls out sick or is out for some reason, a patrol officer is taken from patrol to cover dispatch. With current staffing levels in patrol there is one (1) supervisor and one (1) officer to respond to calls for service when one (1) patrol officer is assigned to dispatch.

**Dispatch:** Current staffing levels in dispatch provides one (1) dispatcher per shift. The dispatch supervisor works a four-ten (4/10) schedule so that there is contact and overlap between day shift and night shift for the supervisor. Currently dispatch has two (2) vacancies. Optimal staffing for dispatch would be two (2) dispatchers per shift.

## II. Review of Policies and Procedures

### A. <u>Transparency UPD Policy and Procedure Manual</u>

The first area of review was UPD's policies and procedures. When asked if the policy manual could be accessed online, UPD advised that I would have to receive a password to be granted access or they could email me copies of the policies. As with many law enforcement agencies in the U.S., UPD utilizes a system that is known as PowerDMS, which is a record management system designed specifically for law enforcement. PowerDMS provides tools which allow an agency to update policies, manage online training,

maintain training records, assist with accreditation management, support an agencies field training program, and assist in personnel scheduling.

- **Finding**

    UPD Policy Manual is not available to the FGCU community or the public at large.

- **Recommendation**

    The choice of *PowerDMS* by UPD as a tool for records management system is excellent. However, since a law enforcement agency is a public institution and transparency is the gold standard today, UPD's entire *Policy and Procedure Manual* should be made available to the public via the UPD Website. Note, the public should not have access to PowerDMS but should have access to the UPD Policy Manual.

## B. Professional Compliance General Order – 024

General Order – 024 is the policy which outlines how Professional Conduct/Internal Affairs investigations will be conducted. The policy does an excellent job of detailing the procedures and defining the differences in an administrative investigation and a criminal investigation. As specified in the document there are certain protections granted to sworn personnel under *Police Officer Bill of Rights* which guarantees the rights of the police officer and are designed to ensure that the investigation is handled fairly and equitably.

- **Finding**

    *General Order – 024* does not offer a definition of what rises to the level of a formal complaint yet it details how formal complaints will be investigated. In addition, the definitions should offer/outline other forms of discipline that the agency utilizes such as verbal counseling and what types of infractions fall into those additional categories as examples. If UPD uses *FGCU's Human Resources Disciplinary Guidelines* outlined in *REGULATION: FGCU-PR5.016 titled: Disciplinary Actions* which details the different levels of discipline by definition and provides that discipline will be progressive in nature then that information needs to be added to GO-024 or it should be referenced so UPD employees understand the disciplinary process. *Question:* If lower forms of discipline are used by UPD, are they recorded in the form of employee notes or a notebook, so that the infractions act as a deterrent for poor behavior in the future? Or

8/

to serve as a reminder to supervisors of what occurred in the past and can be applied in the form of progressive discipline? Or addressed during annual evaluations?

Also, there is a contradiction in the complaint policy which states the following under Complaint Reception, item 2, complaints can be received anonymously. Yet in Complaint Reception, item 3 every effort is made to obtain the statement in person and have the complainant sign the statement.

➤ **Complaint Reception item 2:**

*Complaints are accepted from any source (adults, juveniles, anonymous sources, arrestees, and persons in police custody) provided the complaint contains sufficient factual data to warrant an investigation. Complaints shall be accepted by any department member to whom the complaint is brought. If the complaint is against the member receiving it, the complainant will be referred to the next level of command.*

➤ **Complaint Reception item 3:**

*When a complaint of misconduct is made against any member, the receiving member shall make every effort to ensure that the complaint, if verbal, and any statements regarding the complaint are reduced to writing, signed, and under oath. If the complaint is criminal in nature, the complaint and any statement received should also be under oath (FGCUPD 1, 2017).*

- **Recommendation**

It is impossible for the complainant to be anonymous because of the requirement that the statement be taken under oath. In addition, the complainant is made aware that if they make a false statement on the *Sworn Complaint Form* that they will be arrested for perjury under Florida State Statute 837.02, *Perjury in official proceedings* which is a felony. To many citizens, this may be seen as a form of intimidation/threat, and is unnecessary, if it is determined that the allegation/complaint is false. It is important to note that UPD has the ability to arrest the subject under Florida State Statute 837.05, *False Reports to law enforcement authorities, which is* a misdemeanor and does not require a sworn statement (Florida State Legislature, 2022). To avoid this conflict, many agencies have created an online complaint system which provides a system where complainants/victims receive some degree of comfort in telling their story, and reduces the likelihood of complainants/victims coming into contact with the officer they are making the complaint is against. UPD should consider such a system.

9/

## C. Use of Force General Order – 11

*General Order – 11* is the policy which outlines the use of force and under what circumstances officers are allowed to use force. Although not stated in UPD's policy the use of force has one primary purpose, to establish control.  Be it to stop a subject who is attacking officer and deadly force is required to stop that threat or something as simple of giving verbal commands to effect the arrest of a non-violent subject. In reviewing UPD's use of force policy it is in line with the national standard of use of force policies. The policy details the weapons, training, and under what circumstances force can be used by an officer. In reviewing *General Order – 11* concerning *Annex 1*, where provides definitions utilizing a decision matrix. The trend has been to move away from any form of decision matrix in policies. However, UPD utilizes a matrix which provides a clear set of definitions to assist officers as well as the public in understanding resistance, levels of force, and officer subject factors.

- **Recommendation**

    The language in the *Legalities Section, Number 7* referencing de-escalation match the language in *Annex 1* titled *Use of Force/Level of Resistance Matrix*. Annex 1 is very definitive in   that it states <u>must de-escalate</u> and that language should be the same in number 7.

    - ➢ *Legalities Number 7.*
    <u>*Whenever possible, de-escalation techniques shall*</u> *be utilized and use of force shall terminate when it is objectively reasonable that a subject is fully in law enforcement control.*

    - ➢ *Annex 1.*
    *....The Use of Force/Level of Resistance Matrix in the last sentence states: As soon as the point of subject compliance is reached<u>, the officer must de-escalate his/her response</u> level to the minimum force necessary to control the subject.*

## D. Pursuit Policy General Order - 066

UPD's pursuit policy meets the national standard and there are no recommendations at this time.

10

### E. Use of Force Reporting General Order – 012

In *General Order 012*, UPD does track all use of force incidents including the discharge of a

firearm as well as all vehicle pursuits. *General Order 012* requires that any use of force, pursuit, or

discharge of a firearm be reviewed by a supervisor to determine if the incidents were within UPD

policy guidelines and met the requirements established by Florida State Statutes. In addition, there is

an annual review of every incident. If there is a pattern of abuse because of the size of UPD

and the rarity of these incidents, UPD supervisors and administrators have the ability to readily

identify and address a problem officer.

- **Recommendation - None**

### F. Report Writing Policy/Guidelines

UPD has no report writing policy or report writing guide. Report writing and the quality of the

reports are an issue of concern which were expressed in the interviews with FGCU university partners. Examples

of FGCU partners that rely on information in the UPD reports are the University President's Office, Office of the

Provost, Dean of Students, Office of Institutional Equity Title IX, Housing, and CAPS Center to name a few. This

issue will be addressed in detail later in the assessment in the section titled *University Partners*.

### G. Law Enforcement Training

In today's volatile climate, the police often times, find themselves at odds with the communities that

they serve, training is the most challenged and limited of resources available to officers. In addition to limited

budgets and calls to defund the police, the first line-item in a budget to be cut is usually training. The agencies

have been required to do more with less. This is especially true for small agencies, who are attempting to meet

the officer's training needs and the demands of 21st century policing. There are certain skill sets that have to be

taught and reinforced with hands on training because they are perishable. They include, driving, firearms

training, defensive tactics, and the use of all intermediate weapons. These skill sets should be addressed at a

minimum of once a year and more often if an agency can afford to do so.  The problem for small agencies such

as UPD is this type of training requires more than one officer to participate to be effective, which can impact

overtime, equipment, and staffing shortages in patrol.  To address some of the training smaller agencies have

**11**

.begun using an online training format for such topics as criminal law, human trafficking, and bias training.

- **Findings**

Instead of the traditional classroom courses UPD utilizes an online vendor, *Police Law Institute* which provides monthly training bulletins. For the calendar year 2021 UPD received Training Bulletins from the Police Law Institute regarding the following subject matter: The Authorized Use of Force; Search and Seizure; Human Trafficking; Arrest Procedures; Elder Abuse; New Florida Laws– Riots and Affrays; Crimes in Hotels and Motels; Racial Profiling; Warrantless Arrests; New Florida Laws – Use of Force Standards and Policy Mandates; New Laws – Electric Bikes and Road Sharing; and New Laws – Protecting DNA Privacy Act. There is a quiz at the end of each training session and the officers are required to score 80% to receive credit.

In addition to the online training, UPD regularly participates in readiness or active shooter training. Sometimes that training is done in conjunction with the Lee County Sheriff's Office and Lee County Port Authority. In July 2022, UPD completed force on force active shooter training with role-players, static targets, and background noise. In 2021, when UPD completed their annual firearms training it was done in conjunction with the Lee County Sheriff's Office and included building clearing exercises which are an essential component in an active shooter response. The final component of that training was a roll call refresher on the use of long guns.

Finally, the state of *Florida Criminal Justice Training and Standards (CJSTC)* has minimum mandatory retraining requirements that must be met under *Florida State Statute 943.1395* titled: Certification for employment or appointment; concurrent certification; reemployment or reappointment; inactive status; revocation; suspension; investigation for law enforcement officers. CJSTC Training Standards other than what is specified such as firearms which is required once every two (2), other topics have to be completed once every four (4) years. UPD has met or exceeded the following requirements listed below:

\

**Mandatory Retraining Requirements for Law Enforcement Officers**

1. **Human Diversity** - There is no hour requirement for this training. Completion of Discriminatory Profiling and Professional Traffic Stops training may satisfy this training requirement at the discretion of the agency administrator.
2. **Domestic Violence** - There is no hour requirement for this training.
3. **Juvenile Sexual Offender Investigations** - There is no hour requirement for this training.
4. **Discriminatory Profiling and Professional Traffic Stops** - There is no hour requirement for this training.
5. **Use-of-Force** - There is no hour requirement for this training, but the training must include instruction in scenario-based firearms training, physiological response dynamics training, less-lethal force options available within the agency, agency use of force policies and legal aspects regarding use-of-force.
6. **Firearms Qualification** - This requirement must be completed every two years and reported every even numbered year.
7. **Misuse of Electronic Databases** – There is no hour requirement for this training, but training must include the proper use, and limitations on use, of electronic databases and the penalties associated with the misuse of electronic databases (Florida Department of Law Enforcement, 2022).

- **Recommendations**

  There is no doubt that the culture of policing needs to change to become more in tune with the communities that agencies serve. In 2015 President Obama empaneled what is known as *The President's Task Force on 21st Century Policing* with a theme or direction of developing meaningful relationships with communities. The task force outlined these six (6) pillars to serve as a blueprint for the future of policing:

  1. Pillar One: Building Trust and Legitimacy

  2. Pillar Two: Policy and Oversight

  3. Pillar Three: Technology and Social Media

  4. Pillar Four: Community Policing and Crime Reduction

  5. Pillar Five: Training and Education

  6. Pillar Six: Officer Wellness and Safety

  To expand its body of knowledge professionalism, UPD should consider expanding its training topics to those identified in the six pillars specifically, *Pillar 5, Training and Education.* Some of the topics are already mandated by CJSTC. The topics identified in *Pillar 5* are: Community policing and problem-solving principles; interpersonal and communication skills; Bias awareness; Scenario-based, situational decision making; Crisis intervention; Procedural justice and impartial policing; Trauma and victim services; Mental health issues; Analytical research and technology; Languages and cultural responsiveness.

001759

In addition to expanding their training topics, it would be beneficial for UPD to hire/create a position for a training officer who can deliver training during, Roll Call. Roll call is the time during shift change when one shift is completing their end of watch and a new shift begins. During roll call, officers are briefed on what happened during on the shift before and any agency news. By creating a training position, it will provide a training specialist to address any of the aforementioned topics in a face-to-face format. If the training can't be carried out during Roll Call, it can be scheduled when there are down times in patrol. The training officer would not necessarily be assigned to a shift, this would provide flexibility to meet officers during their respective shifts.

### H. Community Policing Model

Community Policing has many definitions. However, true community policing relies on collaborative partnerships between a law enforcement agency and the individuals and   organizations the agency serves. The goal of community policing is to develop solutions to problems and increase trust in police; the alignment of organization management, structure, personnel, and information systems to support community partnerships and proactive problem-solving efforts to be successful (Office of Community Oriented Policing Services, 2009). Community Policing is addressed in Pillar 4 identified by President Obama's Task Force on 21st Century Policing. The task force noted the following concerning Community Policing:

> "Police interventions must be implemented with strong policies and training in place, rooted in an understanding of procedural justice. To be most effective, community policing also requires collaborative partnerships with agencies beyond law enforcement. Law enforcement agencies should develop and adopt policies and strategies that reinforce the importance of community engagement in managing public safety"
>
> (Department of Justice, 2015, p. 41).

- **Findings**

During the interviews with UPD officers, when asked which model of policing UPD subscribed to, their answer was unanimous, *"Community Policing"*. During one interview the following statement was made: "We subscribe to community policing whether the officers engage or not. We are required to get out of the car and be seen visibly". This is supported by a number of interviews that were conducted with

14

faculty, staff, and students. Every person almost to a fault, agreed with the officer's statement. The interviewees stated that they see officers at events or walking on campus, but the officers do not engage with students or faculty in casual conversation, and officers separate themselves from the groups. The interviewees advised that they wanted more engagement with police when they are at events to foster a working relationship. These observations are not unique in policing, many officers feel that community policing is not real police work. It is often referred to as social work. With this said, an agency's community policing effort is often delegated to a select few in the department and the real police work is left to everyone else.

- **Recommendations**

    The philosophy of community policing must be adopted department wide. The community policing initiative must begin at the top with total department buy in. To foster the concept and adoption of such a program it should become a part of UPD's annual training. There are a number of free online courses that are offered by the COPS Portal in cooperation with the *Office of Community Oriented Policing Services, US Department of Justice*. Some of the courses offered in the catalog are: Community Policing, After-Action Review and Reporting, Community Policing Defined, De-escalation Tactics for Military Veterans in Crisis; Addressing those with Behavioral Disabilities; Police Problem Solving-SARA Model; and a number of Drug Identification Courses. The link to the COPS Portal is: eLearning - COPS Training Portal.

## I. Community Engagement

UPD offers a number of excellent programs that are informational and designed to engage the community and foster trust between UPD and the university community. The programs and services that UPD offers to the UPD Community are:

### The FGCU Community Engagement Offerings

➢ **Don't Fall Victim (Crime Prevention Course):** This program teaches methods and strategies for your students to improve their personal safety. Focusing on topics from general campus life to the dangers of sexual assault, and provides students with knowledge and strategies to help them avoid becoming a victim. This is not self-defense class. It is a seminar that will help you improve personal

15

safety strategies and will provide you with valuable information that you can apply to every area of your life. This course is open to any faculty, staff, or students. This program has been in existence since 2019, has been offered three (3) times and presented to a total of 20 participants.

➢ **Self-Defense Awareness & Familiarization Exchange (S.A.F.E.):** This course is available to <u>students, faculty, and staff</u>. S.A.F.E. is a two-hour long program that provides participants with personal safety information and an introduction to the physical aspects of self-defense. S.A.F.E. is an introduction to the R.A.D. program. This program has been in existence since 2018, has been offered twenty-three (23) times and presented to a total of 370 participants.

➢ **Operation Chill-Community Outreach Program:** UPD has partnered with 7-Eleven to reward good behavior on campus. This 7-Eleven community outreach program is designed to reduce crime and enhance relations between police and college students. It allows law enforcement officers to "ticket" students they observe doing good deeds or exhibiting positive behavior. The ticket is actually a coupon good for a free 12-oz. Slurpee® at any participating 7-Eleven store. In addition to encouraging positive behaviors, Operation Chill provides opportunities for officers to establish a rapport with students on college campuses. The reasons for being "ticketed" are varied, but the result is the same for every student: A free Slurpee drink and a smile for a good deed. This program has been in existence since 2019, with a total of 150 tickets issued to students for their good deeds.

➢ **Coffee with a Cop:** The FGCU Police Department has partnered with Campus Dining to bring the Coffee with a Cop program to FGCU. Coffee with a Cop is a community outreach event that brings members of the university police department to talk to our community members we serve over coffee to discuss issues and learn more about each other. Members of our community can ask questions, raise concerns, or just say hello and enjoy a cup of coffee with us. This program has been in existence since 2019, has been offered twelve (12) times with total of 425 participants.

➢ **Active Shooter:** The FGCU Police Department provides two different active shooter presentations that we provide to the FGCU community. We can tailor the program to fit your department or organization's needs. UPD offers a program titled: *When Lightning Strikes*, which is a nationally recognized video program. In addition, they developed a PowerPoint with data and videos, which

16

was designed to make the subject matter much more interactive. In the second program participants are introduced to different safety tactics and techniques in the classroom. UPD had moved away from the video When Lightning Strikes because the presentation is they have determined that the interactive presentation is much more beneficial and engaging to the participants. This program has been in existence since 2014, has been offered twenty-six (26) times and presented to a total of 553 participants.

➤ **Operation Identification:** This program involves marking personal property with an identifying number as a means of discouraging burglary or theft. In addition to assisting police with a way to identify property should it be stolen and then recovered. This program has been in existence since 2006, there have been a total of thirty (30) participants. This is a program that is offered nationally by every police department in this country as a form of crime prevention. Although, the numbers are few it is one that takes very little effort and personnel time to assist those who choose to have their personal items engraved.

➤ **Bicycle Registration:** This program involves collecting the bicycle owner's information along with the bicycle serial number. The officer then places a UPD bicycle decal on the bicycle, should the it be stolen. It will be easy to recover and contact the owner. This program has been in existence since 2006, there have been a total of one-hundred (100) bicycles registered.

➤ **Personal Safety Presentation:** Awareness program for students, faculty, and staff to be aware of their surroundings and safety tips for campus. This program has been in existence since 2019, has been offered sixty-eight (68) times and presented to a total of 1450 participants.

➤ **Alcohol and Marijuana Impairment Simulation:** Programs regarding the dangers and effects of drinking and driving or being high and driving. This program is enhanced by using the special designed goggles and a peddle kart to simulate different levels of intoxication while operating a motor vehicle. This program has been in existence since 2020, has been offered eighteen (18) times and presented to a total of 475 participants.

➤ **Distracted and Drowsy Driving Simulation:** Programs regarding the dangers of using a mobile device while driving and driving while drowsy. These programs can be completed utilizing several

17

different methods to enforce the importance of not driving distracted. This program has been in existence since 2020, has been offered two (2) times and presented to a total of 20 participants.

➤ **Burglary and Theft Prevention:** Program involving awareness and theft prevention techniques for homes, apartments, vehicles, and offices. This program has been in existence since 2018, has been offered five (5) times and presented to a total of 20 participants.

➤ **Traffic/Bicycle/Pedestrian Safety:** Program involving awareness and safety regarding those utilizing vehicles, bicycles, or as a pedestrian. This program has been in existence since 2018, has been offered three (3) times and presented to a total of 99 participants.

➤ **Scams / Identity Theft:** Program involving the different types of scams and how to protect your identity. This program has been in existence since 2018, has been offered four (4) times and presented to a total of 12 participants.

➤ **Digital Safety and Awareness:** Learn how to protect yourself while using various social media networks. This program has been in existence since 2018, has been offered two (2) times and presented to a total of 30 participants.

➤ **Basic Vehicle Maintenance:** Learn the absolute basics about your vehicle and checking certain systems or how to change a flat tire. This program has been in existence since 2014, has been offered one (1) time and presented to a total of 20 participants.

➤ **Q & A Sessions:** Your chance to ask an officer questions, whether it is about their vehicle, job, or a law enforcement related question. This program has been in existence since 2014, has offered five (5) times and presented to a total of 10 participants. **The numbers offered were all Pre-Covid 19 and provided by UPD.**

- **Recommendations**

    UPD has fourteen (14) community engagement programs. As the interviews were being conducted, the university community kept repeating the name of one officer. As noted in the previous findings section titled *Community Policing Model*: "Many officers feel that community policing is not real police work and it

18

is often referred to as social work. With this said, an agency's community policing effort is often delegated to a select few in the department and the real police work is left to everyone else".

Since UPD has so many programs it would be advantageous to mandate other officers actively participate in the aforementioned programs. By adding more officers as facilitators, it creates an opportunity for the FGCU community to get to know the officers individually. If the true goal is to foster relationships this becomes an excellent avenue to develop those partnerships.

UPD should consider either eliminating some of the community programs that it offers or merging them because content is similar. Eliminate the *Q & A* sessions because this is what *Coffee with a Cop* is designed to do. *Basic Vehicle Maintenance* should be removed from the classes offered. Although a great idea, UPD takes on a certain liability unless they bring a certified mechanic to offer the presentation. *Scams and Identity Theft* should be consolidated with *Digital Safety Awareness* because the subjects are one in the same.

One final note, UPD should partner with FDLE's *Southwest Fusion Center*. A fusion center is a collaborative effort of state, local, tribal territorial and federal agencies working in partnership to share resources, expertise, and/or information to better identify, detect, prevent, apprehend and respond to threats, crimes and terrorist activity utilizing an all crimes/all hazards approach. The fusion center's role is more than just terrorism but crime trends which include narcotics, and how they are being packaged and sold; trends in digital crimes and cyber-attacks. It is my understanding that FGCU was targeted last year and the fusion center reached out to UPD and there was no response. This resource is good for UPD as well as the FGCU community. A copy of the monthly newsletter can be found in Appendix C. The point of contact is: Lucy Papp, Intelligence Analyst, Region Six Information Center, phone (239) 252-0362, and email address: lucy.papp@colliersheriff.org.

## J. Police Officer Hiring and Retention

UPD is competing with local agencies that pay more and offer take home patrol cars as incentives. In addition to the pay and benefits the pool of good qualified candidates or even desirable candidates are much smaller since the George Floyd incident. It is recommended that UPD and the university consider hiring new candidates that have not attended the academy and pay their salary and benefits while attending the academy. The candidate

19

would sign a contract, upon completion of the academy the candidate agrees to stay at UPD for a minimum of two (2) years. If the candidate leaves UPD for another agency before the end of their two (2) year obligation, they must pay FGCU a prorated sum based on the remainder of their contract. The current method of recruitment and obtaining new sworn officers has been to recruit out of state trainees while they are seeking *Florida Police Certification* in a program known as *Equivalency of Training*. The benefit of hiring and training your own officers that it allows the culture of the agency to change and grow.

001766

## CHAPTER III: COMMUNICATIONS CENTER OPERATIONS

Although the nerve center of a police department and the central point of contact for community members, university and government leaders, is police dispatch, police dispatch has been one of the most neglected divisions in policing. Many communication centers are plagued by poor pay, inadequate training, poor staffing, an inability to fill vacant positions, and just a lack of respect by other divisions within the agency. The role of a police dispatcher is multi-dimensional and in many ways they should be considered a jack of all trades. Simply stated, police dispatchers respond to emergency and non-emergency calls; they determine the level and nature of police assistance required for each situation; they are a life line for officers and the community.

- **Findings**

There is a discrepancy in the findings. UPD provided information and through interviews there was a completely different perspective provided by employees. To be fair to all involved these finding will address all of the information provided. UPD was asked several questions specifically designed to address UPD dispatcher training. The dispatchers who agreed to participate in the interviews provided first hand knowledge of their experience.

1. UPDs response to police dispatch training.

   ➢ Are all UPD dispatchers certified by the state of Florida? Florida has a mandatory training program for Public Safety Telecommunicators (PST) which is 232 hours. The training can either be online or face to face. The curriculum includes content relevant to fire, medical, and police dispatch. Call classification and prioritization, roles and duties, operational skills, interpersonal and communication skills, professional ethics, and Homeland Security are among the topics covered. The candidate must pass the course with a minimum of 80%. Understand that this class has nothing to do with the actual function of dispatch, meaning that the trainees are not learning agency specific rules, nor are they obtaining any actual

21

hands-on experience in police dispatch. If the training is online some agencies intersperse some hands-on training along with the PST course.

➤ The hands-on training is completed under the supervision of a *Certified Training Officer* (CTO) and that training is approximately 360 contact hours. The *CTO Program* is modeled after the *Field Training Officer Program* where newly hired police officers are required to complete. It may vary based on the trainee's experience. The trainee's progress is monitored daily and recorded on *Daily Observation Reports* (DOR). DORs are used to evaluate some of the following job skill categories: Performance, Interpersonal Skills, Knowledge, Job Readiness, Miscellaneous Skills, and a section for Narrative Comments, which provides a discussion for the best thing a trainee did that day and the worst. An example of a DOR can be found in Appendix D. The CTO's certification is granted through the *Association of Public-Safety Communications Officials* (APCO) and is considered the gold standard of training and information for police dispatch.

➤ Do dispatchers receive any specialized training beyond what they have received when hired? Specifically, can dispatchers patch channels, can they assist officers in setting perimeters, do they participate in active shooter training? Can dispatchers use the RAVE System for alerts and can they send administrative pages when there is an incident that police and university officials need to be aware of? UPD's response to each of the questions is as follows: Dispatchers do receive specialized training online with the Lee County Sheriff's Office when available. There is a new county wide radio channel in place and the dispatchers are leaning how to use it, which will allow UPD dispatch to summon other agency assistance immediately. Dispatchers have participated in active shooter training. Neither dispatcher or police officers have the ability to send administrative pages to the university community or university officials. In addition, dispatchers nor officers have the ability to use the RAVE system which is designed as an emergency notification system for the FGCU community. The only two (2) people that can utilize the current system are the Chief of Police and the Emergency Manager. However, as of this writing UPD and

22

Emergency Management are in the process of training dispatchers and police officers to utilize the RAVE System and are in the process of developing several templates to keep the information succinct and focused to particular events.

2. Dispatchers response to the training they have received.

➤ During the interviews dispatcher made it clear that there is a minimum standard of training and they stated: "We need more training". When asked if they have received any specialized training above and beyond the basics they responded: "No". They advised they have asked for specialized training in the past and that request has been ignored. They also stated that they cannot assist officers in setting up perimeters, which would be essential in any incident where a suspect might be at large on the FGCU campus. They acknowledged that there is a new countywide radio channel, however, they have never been trained to use it. In fact, they have been instructed by their supervisor to turn the volume down because the county wide channel is too distracting. They have also been told that if they need assistance to call Lee County Dispatch on the phone which will delay response times tremendously. Unless something has changed regarding training in the last two months or pre-covid the dispatchers advised that they have not participated in active shooter training.

● **Recommendations**

Even though there are inconsistencies in the information received from UPD and through the interviews there are a number of recommendations that have been made.

➤ Currently staffing levels are at a bare minimum, even when fully staffed. It is recommended that UPD hire four (4) police dispatchers. Currently there are two (2) vacancies the recommendation is to create two (2) additional positions for a total of four (4) vacancies. Of those four (4) vacancies create two (2) new supervisor's positions and create a new position for the current supervisor. Because the current supervisor works a four-ten (4/10) schedule, it is impossible to provide much needed supervision and ongoing training to every shift. Under what is considered *span of control* there is usually a ratio of 1 supervisor per 7 or 8 subordinates when they are all working the same shift. UPD's dispatch supervisor's span of

23

control is 1 to 6 when fully staffed but there are a number of gaps in supervision especially late nights, with the four-ten (4/10) work schedule and three (3) days off.

➢ Place the two (2) new supervisors on a shift and train them as CTO's so that they are qualified to train new personnel when they are onboarded and required to rotate shifts during training. It also provides an extra hand when there is an emergency and dispatch is being overwhelmed with calls. By adding the supervision as well as the dispatchers, it should reduce officers being pulled from the road to fill dispatch positions when dispatchers are out. Having the additional supervisors provides a layer accountability and responsibility that do not exist now.

➢ UPD has been unable to fill one vacant dispatch position for over a year and the other position became vacant in the past several months. In order to hire and retain personnel the first area of concern is pay. The pay of UPD dispatchers should be competitive with other agencies in the county. One of the most notable findings in an APCO survey was the following: "Opportunities for promotion and flexible work arrangements are valued assets for employees and pay significantly correlates with retention rates" (Association of Public-Safety Communications Officials, 2017). It is recommended that UPD develop a step payroll system for dispatcher creating a system similar to Dispatcher 1, Dispatcher 2, Dispatcher 3/Supervisor. With levels one and two there should be levels of additional responsibility and expected skillset mastery, which can be evaluated based on training, job performance, and some form of test either written or oral interview. This would go a long way in in filling the vacancies, retaining those employees that are currently employed by UPD, and professionalize UPD dispatchers.

➢ Besides personnel, the greatest area of contention and concern is training. UPD should develop a command staff page and create a list of incidents where UPD and FGCU administrators are informed independent of RAVE. In addition, the training for RAVE is currently in progress should mandate practice sessions/training every thirty (30) days with different scenarios, and that training should be documented in PowerDMS. The frequency

24

of the practice sessions is necessary so that dispatchers and officers alike, do not forget how to initiate RAVE in an emergency or when there is information that needs to be pushed to the FGCU community. Since the system is not used often, due to the call volume, and number of incidents that occur on campus, repetition is the only way to ensure readiness and minimize mistakes, especially, when sending out notifications of crimes in progress or those that have just occurred.

➤ The Clery Act specifies that university police departments are responsible for sending out what are known as timely warnings. Regarding the RAVE System, it is FGCU's emergency notification system. The Handbook for Campus Safety and Security Reporting (2016) states:

➤ *The Clery Act requires you to alert the campus community to certain crimes in a manner that is timely and will aid in the prevention of similar crimes. Although the Clery Act doesn't define "timely," the intent of a warning regarding a criminal incident(s) is to enable people to protect themselves. This means that a warning should be issued as soon as pertinent information is available. You must issue a timely warning for all Clery Act crimes that occur on your Clery Act geography that are reported to campus security authorities or local police agencies; and considered by the institution to represent a serious or continuing threat to students and employees (U.S. department of Education, 2016, pp. 6-12).*

➤ UPD should develop two (2) different types of notifications:

1. A *Timely Warning* to make the university community aware of crimes which represent a serious or continuing threat to the person or wellbeing of students and employees. This information can come from other agencies or something that is discovered by UPD or a member of the University community. Some examples but are not limited to: Homicide, sex offenses, robbery, aggravated assault, burglaries, hate crimes, armed subjects, threat of violent crime, and assaults.

2. *Emergency Notifications* - these notifications are essential during critical incidents. They should be structured so that a template can be used and sent to the university community

within 90 seconds. This is essential when you consider how quickly an armed subject moves
through classrooms or a school, time is of the essence. The information that should be
contained in an emergency notification is as follows: nature of the call, location, and brief
safety tips.

➤ Although costly, it would be beneficial for UPD to invest in an agency online training
program through APCO similar to what UPD has done with the *Police Law Institute*. There
are a number of courses offered and UPD dispatch personnel should be allowed to create a
course catalog of what would be most beneficial to them.

➤ Critical incident training should be ongoing and repetitive. There is the belief in many
agencies that the larger agency will take over dispatch responsibilities. UPD should consider
the campus a city, with a geography that is unique to the FGCU Community and UPD. Any
outsiders responding will need directions, where to stage upon arrival, and where the
incident is located. UPD dispatch should be prepared to handle the first ten (10) minutes of
any of any incident since most active shooter situations are usually don't last more than ten
minutes.

➤ Whatever training that is required, if it is patching channels so that responding officers from
adjoining jurisdictions can respond and hear the radio traffic from one single source, then
that training is imperative and needs to take place. Or if it is learning how to use the new
county wide channel with the ability to request immediate assistance. The radio channel the
volume of the county wide channel <u>should not be turned down</u> because it is a distraction.
The channel should be kept at a normal volume or a slightly lower volume so that UPD
dispatchers can develop what is known as a "radio ear", which would assist dispatcher in
recognition of potential threats near the FGCU campus.  Again, this training should be
repetitive and ongoing so that dispatchers and police officers are able to use the county
wide channel without hesitation.

26

### CHAPTER IV: UNIVERSITY PARTNERS and their RELATIONSHIP with UPD

University partners are defined as different departments within the university infrastructure an have some overlapping responsibly with UPD.  The partners include: Dean of Students, Housing, Office of Institutional Equity Title IX, Emergency Management, Environmental Services, Ombudsman, and CAPS/Counseling Center. What is presented in this section are a series of observations gained through the interviews and/or supporting written documentation.

- **Findings:**
  - ➤ As noted earlier in the section on community policing, the number one complaint by the university partners is that UPD officers do not practice community policing and were not engaging with the students voluntarily although there are many opportunities daily.
  - ➤ There were several informal complaints and one formal complaint alleging racial profiling. In reviewing several of the emails and conducting interviews it was determined that UPD is very sensitive and defensive regarding any such allegations of race/bias as they should. Yet in UPDs posturing, left the partners feeling that UPD was insensitive to the complaints be they formal or informal.
    1. In 2020 there were a series of emails between Chief Moore and the Office of Institutional Equity (OIEC).  OIEC was asked to reach out to UPD concerning bias by UPD officers because they denied a student access to parking during an event. OIEC determined through a series phone calls that the student's race was not an issue and the denial was due to the event. For OIEC, this became a teachable moment for the student in that every police decision is not about race and no formal complaint was filed. In fact, the matter was closed. UPD's administration was threatening to have its officers file a countercomplaint against the student when there was no formal filed against any officers.
    2. In another incident, a faculty member was stopped while preparing to leave campus

27

on Sunday, September 16, 2018 and he was transporting his bicycle in his car from campus. The professor describes a scene where his vehicle was approached by a UPD officer and the officer had his hand on his holstered weapon. The officer questioned the professor, asking if the bicycle was registered. According to FGCU policies bicycles are not required to be registered. From a police perspective, the professor's actions appeared to be suspicious and UPD had every reason to investigate. A formal complaint was filed with OIEC and after OIEC's investigation it was determined that all UPD officers should be required to attend some form of *Implicit Bias/Diversity Training*. Somewhere/somehow it was determined that UPD should be excused from the training and instead all supervisors of FGCU faculty, staff, and police should have to attend the training. However, none of the patrol officers were required to attend.

➤ The partners stated that there had been a shift in collegial respect in formal meetings when they are present with UPD. They advised prior to Chief Smith there was respect for everyone's position and their specific expertise. They also noted that Chief Moore would assist the partners with information gathering. When Chief Smith arrived, many of the partners stated that there was no respect for the partners knowledge, expertise, or years of experience in higher education. They advised that Chief Smith was more about directing than partnering. In addition, several partners advised where the committees were designed for one (1) representative from each department to attend a meeting that Chief Smith would bring two (2) or three (3) additional staff members. In bringing the uninvited staff members the partners felt as though as Chief Smith was trying to influence committee outcomes. In fact, Chief Smith's demands were so out of step with the *Behavioral Consultation and Assessment Team* (BCAT), several members described the team as dysfunctional. It was also stated that since Chief Smith has left they feel that UPD members are still exhibiting the abrasive behavior and in doing so there is a lack of trust and openness by some of the partners.

➤ Police reports and sharing of information. Several partners use police reports as a necessary part of their role at FGCU. Two (2) offices that rely on police reports are the *Office of Student Conduct* and

OIEC *Title IX*. In interviews with both parties, they have advised that often times UPD did not write a report, reports are missing, and/or the reports that they have received are missing relevant information such as last names, improper dates, or the reports were not well written nor concise. In addition, the *Office of Student Conduct* went on to advise that they have asked for reports and the only documentation Conduct receives from UPD are the notes that officers put into the *Computer Aided Dispatch System (CAD)*. Student Conduct advised that they need the complete report or a copy of a *Notice to Appear Citation* (NTA) which is used in misdemeanor arrests. Conduct needs these documents for their proceedings. Conduct has to address a student's parents or the attorney that parents have hired to represent the student. In fact, the lack of information makes it impossible to hold a hearing concerning student conduct where UPD has been involved. UPD was given an opportunity to respond concerning this matter and advised that they did not know that Conduct needed the police reports. UPD also, advised that in the past couple of years there was a personality conflict between UPD and the *Assistant Director of Student Conduct* and as a result UPD refused to offer assistance. UPD felt that the demands and accusations were unreasonable and out of control. This personality conflict was confirmed by Student Conduct as well. Conduct did provide report numbers with an explanation of the problems they have been experiencing:

a. Case Number: 211812; original report provided did not have the number of grams. Grams provided were written in some time after investigations.

b. Case Number: 211922 – UPD documented in report that it was Grand Theft; however the students were never arrested.

c. Case Number: 212415- multiple reports- Documented by UPD that alleged persons involved were smoking marijuana with three (3) other individuals; however, UPD did not "write-up" or provide documentation that she was smoking marijuana; this is conflicting information and not consistent.

d. Case Number: 201140- UPD only provided a CAD report; student was not treated fairly in making student J.B. pick up blunt and not the other students.

e. Case Number: 210458- Decision from an officer not consistent with other students who had a DUI.

29

In reviewing the list of reports and the notes associated with the report it is impossible to make a determination of intentional wrong doing on UPD's part. There are many reasons why an arrest may not be made; there are times when items are missing from a report and after review by either a supervisor or a third party such as the *State Attorney's Office*, information is added to the report before the State Attorney can proceed with prosecution; and simply there is officer discretion. Without video or interviewing parties in this sampling of reports, it would be impossible to make a determination concerning these outcomes and/or proceed with any allegations.

- In major investigations where there is a compliance component, UPD has not met that burden, which means in many instances the case becomes unactionable by the *Office of Institutional Equity and Compliance* (OIEC). OIEC is responsible for conducting investigations as part of its role in making a determination in its findings. One major component of OIEC's investigations are UPD's police reports which should be complete. OIEC advised that often times information is missing or reports are incomplete. OIEC offered an example of child abuse that occurred at the FGCU Daycare, UPD did not interview the parents of the children who were allegedly victimized.

- Female victims of crime feel that they have been revictimized when the victims were contacted UPD concerning crimes, especially those that are of a sexual nature. It was stated that officers were dismissive and did not take crimes against women seriously. This information was offered by several of the partners during their individual interviews. This information is also supported in the FGCU Community Survey results. In essence, UPD officers lacked sensitivity when working with female victims of crime. These are considered Title IX violations.

- **Recommendations**
  - Racial profiling - in evaluating the emails and responses from UPD they have become very defensive and protective rather than showing a willingness to sit at the table and address complaints. This is

30

evidenced in statements where Chief Moore wanted to file a countercomplaint when there was no formal complaint. Concerning allegations of bias or racial profiling, the profession of policing continues to take a stance that they are not racist and their actions are not racists. What UPD and police organizations have failed to realize is that it's not the police perspective, it is the community's perspective. This perspective is shaped by a history that spans some 300 years and is repeatedly reinforced in the media and the internet. It is recommended that UPD tone down the defensive rhetoric and create an atmosphere where they are willing and open to suggestions and willing to listen to the FGCU Community's concerns. UPD and the university missed a golden opportunity to address an issue of diversity and inclusion when they were ordered to attend mandatory training after the 2018 incident. FGCU's administration made the decision, where training that was mandatory for UPD was changed and became mandatory for all supervisors in the FGCU community. By making this decision, the statement made to the minority community at FGCU, is that the university is not concerned about police/community relations, and that the concerns of the FGCU minority community have no value. Today, because of the passage of HB7, it will be impossible to make such training mandatory as a corrective measure. Although, FGCU meets the minimum mandated by FDLE, every four (4) years in the area of diversity, it is recommended that UPD complete some form of formal interactive training other than that offered in a monthly training bulletin.

➢ In addition, it is recommended, if UPD does not have an officer who is a certified instructor as a *De-escalation Instructor* that UPD send an officer to such a program where the training is interactive. It is further recommended, UPD design a curriculum where every officer is required to participate and successfully complete an interactive course in de-escalation. The purpose of such training is to provide officers with a skillset to address citizens properly and to address citizen's concerns in highly charged incidents. Often times what police consider as routine, are the incidents where citizens become upset and view police action as a form of abuse of police power. The goal of such training is to teach officers to diffuse such encounters. This form of interactive training would go long way in dispelling the fear that citizens have of police practices and interaction. In addition, to the training it

31

is important to note that UPD has been issued Body Cameras and this should eliminate any future questions of bias or other forms of misconduct.

> Police reports, throughout the findings there were a number of instances and allegations, some were verified and others could not be verified concerning police reports and police report content. In all instances, personal feelings should be removed from the issue. There should be meetings with Student Conduct and OIEC/Title IX since both offices rely on UPD investigations. There should be a protocol detailing the information needed and outlining the completeness of the reports. Since Conduct's hearings are a form of due process, similar to an employee grievance procedure, where dismissal of a case is imminent because of the requirements outlined in each step of the process, UPD should be made aware of those time constraints, and attempt to meet them whenever possible. Under no circumstance should Conduct be denied access to police reports or NTAs. It is important to note that denying access to reports which have been requested and offering CAD Notes as a substitute could be considered a violation of the Florida Sunshine Law.

> Female students feeling revictimized. It would be easy to offer as a solution to the problem as UPD hire more female officers and the female be assigned to take the sexual assault cases. However, the number of minorities entering the profession, male and female, is limited. The minorities that do enter policing have their choice of agencies because they are a commodity for any and all agencies. Female officers do not want to be the only officers with the responsibility of investigating sexual assault cases. This is a skillset that every officer should have. Every officer should have the ability to show empathy and not be accusatory during the investigation. Since this complaint came from so many venues a remedy would be to enhance the officers' training through the *FGCU Victim Advocates Office* as a reminder that words, attitudes, and demeanor have a direct impact on a victim's perception and willingness to cooperate.  Or consider a course in *Trauma Informed Policing*.

001778

## Summary

This assessment evaluated specific UPD's Patrol Operations, Dispatch Operations, a limited policy review, training for sworn personnel and dispatchers, relationships, and complaints of bias and insensitivity. In the completion of the limited evaluation of policies there are very few recommendations that were offered. However, in the areas of community policing and training there were a number of recommendations and things that UPD can do better. In making these recommendations it is clear that the agency is limited by its size and lack of personnel but many of these goals can be accomplished by creating a fulltime training position where the trainer can adjust his/her schedule to meet officers on shift as well as design and develop new courses. UPD as with many agencies have moved to an online training format to assist in managing and already strained budget. It is important to note, policing is an interactive profession where skillsets are perishable so interactive training is essential in maintaining those skillsets.

The area of greatest concern in the assessment was Police Dispatch/Communications Center.  Although UPD was able to provide and answer every question concerning training it was determined through a series of interviews that FGCU dispatchers are woefully undertrained and understaffed. What stood out most during the assessment is that dispatchers do not know how to patch channels; cannot assist officers in setting up perimeters; have not been trained in the use of the new countywide channel and have been instructed to turn the volume of the channel down because it is considered a nuisance; cannot use the RAVE system as a means of emergency notification to campus or issue timely warnings as required by the Clery Act; and finally, that FGCU does not have one point of contact in emergency situations that can disseminate information to police and university officials as a matter of best practice.

Again, the most critical area of concern is the state of UPD's police communications. Please understand that training has to be consistent and ongoing because it is a small agency and there is a lack of calls for service. Training cannot be one and done. UPD dispatchers do not get the constant repetition of larger police communications centers that is why ongoing training is so important. Most everything else can be addressed in time. Consider, communications as the lifeline for police as well as the FGCU community and it has been neglected for far too long.

33

Finally, the partners expressed their concerns and openly discussed the positives and negatives they had with Chief Moore and Chief Smith and it is important to note that Interim Chief Slapp is aware of these issues and advised that UPD needed to mend some fences. To ensure that everyone is using the same sheet of music concerning the university partners, it was recommended that there be individual meetings with each of the partners and create a set of guidelines as well as UPD defining what they can and cannot do based on Florida State Statutes.

In closing, I would like to thank everyone who participated in this process. For me as a researcher it was enlightening and I hope that the final assessment leads to some meaningful outcomes.

001780

## REFERENCES

Association of Public-Safety Communications Officials (2017). Project retains: Staffing and retention in

public safety answering points: A supplemental study. Daytona Beach, FL. Author.

Department of Justice (2015). *Final report of: Presidents task force on 21st century policing.* Washington,

DC: Office of Community Oriented Policing,

Florida Department of Law Enforcement (2022). *Mandatory Retraining Requirements for Law

Enforcement Officers.* Tallahassee, FL. Author.

Florida Gulf Coast University Police Department (2017). *General Order – 024: Professional Compliance.*

Ft. Myers, FL. Author.

Florida Gulf Coast University (2022). Fast Facts. Florida Gulf Coast University.

https://www.fgcu.edu/about/fastfacts

Florida State Legislature 1 (2022). *Florida State Statute 837.02: Perjury in official proceedings.*

Tallahassee, Fl. Author.

Florida State Legislature 2 (2022). *Florida State Statute 837.05: False Reports to law enforcement

Authorities* Tallahassee, Fl. Author.

National Policing Institute (2020). *National survey on officer safety and training.* Arlington, VA. Author.

Office of Community Oriented Policing Services, (2009). *Community policing defined.* Washington, DC.

Office of Justice Study Programs.

U.S. Department of Education (2016). The handbook for campus safety and security reporting 2016

Edition. Washington, D.C. Author

35

001781

U.S. Department of Justice (2020). Community survey on public safety and law enforcement.

Washington, DC. Author

001782

# APPENDICES

001783

## Appendix A

## UPD SWORN OFFICER SURVEY RESULTS

Of the 16 sworn officers at the University Police Department, 12 chose to participate in the survey related to the following analysis. No demographic information was collected with this survey.

**Officer Safety Risks**

Section A of the survey focused on the current officer safety environment at FGCU. The first questions asked officers to rate the potential risks of officers in the Police Department being killed or seriously injured by being assaulted (excluding gunshot wounds or an edged weapon), being shot, being assaulted with an edged weapon, being in a motor vehicle collision, being struck on the roadway while outside the vehicle, and exposure to illicit drugs or precursor chemicals. Being struck on the roadway while outside the vehicle, exposure to illicit drugs or precursor chemicals, and being in a motor vehicle collision were rated as the highest risks for the officers. Being shot, assaulted, or assaulted with an edged weapon were rated as the lowest risks. One participant noted there was one serious injury during the last three years within the department, noting an injury due to fire/smoke inhalation. Finally, officers reported current safety risks as slightly lower for being assaulted or shot in comparison to other local law enforcement agencies.

| Potential risk of officers in the dept being killed or seriously injured | | | | | | |
|---|---|---|---|---|---|---|
| Being assaulted | Being shot | Being assaulted w/edged weapon | Being in MV collision | Being struck on roadway outside MV | Exposure to illicit drugs | Average |
| M = 1.667 | M = 1.583 | M = 1.667 | M = 2.083 | M = 2.167 | M = 2.167 | M = 1.895 |

**Current Training & Future Training Needs**

Section B of the survey examined the types of officer safety training the department's officers have received, perceived officer safety training needs, and challenges to conducting training. The listed topics of training included are listed in the table below. Officers first reported the training that officers in the department gained during the academy. Except for "Balancing demonstration control and 1st amendment rights" and "recognizing and

001784

countering ambush attacks", at least half of officers received training in each of the listed training areas in the

academy. The participants also indicated whether training was received within the agency in the last three years.

Except for "High speed/pursuit driving training", "Low speed/routine driving and parking training", "Training on

driving decision-making and policy", and "recognizing and countering ambush attacks", at least 2/3 of officers

received training in the listed training areas in the last three years. A number of areas showed training for 100% of

officers.

Please identify the different types of training that new officers in your agency currently
receive in the academy or your existing officers have received in the past 3 years through
in-service.

| | ACADEMY | | | DEPARTMENT | |
|---|---|---|---|---|---|
| | Yes | No | DK | Yes | No |
| Trends in threats to officer safety | 75% | 8.3% | 16.7% | 100% | 0% |
| Officer survival training | 50% | 16.7% | 33.3% | 72.7% | 27.3% |
| Knowledge on the dynamics of police-citizen encounters | 58.3% | 8.3% | 33.3% | 81.8% | 18.2% |
| Situational indicators of potential assaults on officers | 50% | 16.7% | 33.3% | 70% | 30% |
| Characteristics of weapons concealment | 66.7% | 16.7% | 16.7% | 72.7% | 27.3% |
| Implicit bias training | 75% | 0% | 25% | 100% | 0% |
| Resiliency and wellness training | 50% | 16.7% | 33.3% | 63.6% | 36.4% |
| The principles and tactics of de- escalation | 66.7% | 8.3% | 25% | 100% | 0% |
| Scenario training for non-lethal force | 66.7% | 8.3% | 25% | 100% | 0% |
| Scenario training for deadly force | 66.7% | 8.3% | 25% | 100% | 0% |
| Case law related to use of force | 66.7% | 8.3% | 25% | 100% | 0% |
| Contacts with the mentally ill | 58.3% | 16.7% | 25% | 100% | 0% |
| The concepts of legitimacy and procedural justice | 50% | 8.3% | 41.7% | 81.8% | 18.2% |
| Safe handling of illicit drugs and precursor chemicals | 58.3% | 16.7% | 25% | 81.8% | 18.2% |
| Recognizing and countering ambush attacks | 25% | 25% | 50% | 45.5% | 54.5% |
| Field casualty medical care | 50% | 16.7% | 25% | 83.3% | 16.7% |
| Officer rescue tactics | 58.3% | 16.7% | 25% | 81.8% | 18.2% |
| Active shooter training | 66.7% | 8.3% | 25% | 90.9% | 9.1% |
| Crowd management tactics for demonstrations | 50% | 16.7% | 33.3% | 72.7% | 27.3% |

39

| | | | | | |
|---|---|---|---|---|---|
| Balancing demonstration control and 1st Amendment rights | 33.3% | 25% | 41.7% | 72.7% | 27.3% |
| High speed/pursuit driving training | 66.7% | 8.3% | 25% | 18.2% | 81.8% |
| Low speed/routine driving and parking training | 66.7% | 8.3% | 25% | 27.3% | 72.7% |
| Training on driving decision-making and policy (i.e. seatbelt use, speed) | 58.3% | 8.3% | 33.3% | 27.3% | 72.7% |

One area to note is the responses to training related to motor vehicles, "High speed/pursuit driving training", "Low speed/routine driving and parking training", and "Training on driving decision-making and policy". While motor vehicle and roadway risks were marked as having the most potential for officer safety risk, there is a significant deficit in training related to the use of motor vehicles, with only 18.2%, 27.3%, and 27.3%, of respondents noting they had training in these areas in the last three years, respectively. These areas were also listed of lower priority by officers for future training needs in comparison to most other training areas listed.

In terms of highest and lowest needs for future training, Active shooter training stood out as the highest need. Lowest needs include "Implicit bias training", "Balancing demonstration control and 1st Amendment rights", and "The concepts of legitimacy and procedural justice", in addition to the MV related training areas noted above.

| In looking forward to the next 3 years, how would you rate the need in your agency for the following officer safety training issues? | | | | | |
|---|---|---|---|---|---|
| Trends in threats to officer safety | Officer survival training | Knowledge on ... police-citizen encounters | Situational indicators of potential assaults... | Characteristics of weapons concealment | Implicit bias training |
| M = 2.417 | M = 2.417 | M = 2.333 | M = 2.417 | M = 2.25 | M = 1.833 |
| Resiliency and wellness training | The principles ... of de-escalation | Scenario training for non-lethal ... | Scenario training for deadly force | Case law related to use of force | Contacts with the mentally ill |
| M = 2.25 | M = 2.333 | M = 2.5 | M = 2.5 | M = 2.25 | M = 2.33 |
| legitimacy/ procedural justice | Safe handling of illicit drugs ... | Recognizing ... ambush attacks | Field casualty medical care | Officer rescue tactics | Active shooter training |
| M = 2.0 | M = 2.5 | M = 2.25 | M = 2.417 | M = 2.417 | M = 2.75 |

| Crowd management tactics | Balancing ... 1st Amendment rights | High speed/pursuit driving training | Low speed/routine driving | driving decision-making and policy | |
|---|---|---|---|---|---|
| M = 2.167 | M = 2.167 | M = 2.0 | M = 1.833 | M = 2.00 | |

| In looking forward to the next 3 years, how would you rate the need in your agency for the following officer safety training issues? | Low Need | Moderate Need | High Need |
|---|---|---|---|
| Trends in threats to officer safety | 16.7% | 25% | 58.3% |
| Officer survival training | 16.7% | 25% | 58.3% |
| Knowledge on the dynamics of police-citizen encounters | 16.7% | 33.3% | 50% |
| Situational indicators of potential assaults on officers | 16.7% | 25% | 58.3% |
| Characteristics of weapons concealment | 16.7% | 41.7% | 41.7% |
| Implicit bias training | 41.7% | 33.3% | 25% |
| Resiliency and wellness training | 16.7% | 41.7% | 41.7% |
| The principles and tactics of de-escalation | 8.3% | 50% | 41.7% |
| Scenario training for non-lethal force | 8.3% | 33.3% | 58.3% |
| Scenario training for deadly force | 8.3% | 33.3% | 58.3% |
| Case law related to use of force | 8.3% | 58.3% | 33.3% |
| Contacts with the mentally ill | 25% | 16.7% | 58.3% |
| The concepts of legitimacy and procedural justice | 25% | 50% | 25% |
| Safe handling of illicit drugs and precursor chemicals | 8.3% | 33.3% | 58.3% |
| Recognizing and countering ambush attacks | 16.7% | 41.7% | 41.7% |
| Field casualty medical care | 16.7% | 25% | 58.3% |
| Officer rescue tactics | 8.3% | 41.7% | 50% |
| Active shooter training | 0% | 25% | 75% |
| Crowd management tactics for demonstrations | 25% | 33.3% | 41.7% |
| Balancing demonstration control and 1st Amendment rights | 16.7% | 50% | 33.3% |
| High speed/pursuit driving training | 25% | 50% | 25% |
| Low speed/routine driving and parking training | 33.3% | 50% | 16.7% |
| Training on driving decision-making and policy (i.e. seatbelt use, speed) | 25% | 50% | 25% |

41

The biggest logistical challenges to department-wide training, noted by participants, are "Do not have enough funding to conduct department-wide officer training", "Given workload demands (i.e. shift coverage), there is limited ability to pull officers away from daily duties to engage in training" and "Do not have a sufficient number of trainers". In comparison, "Resistance to training from officers/deputies" and "Difficult to identify quality training programs" were not considered challenges.

| How would you rate the following logistical challenges to conducting department-wide officer safety training in your agency? For simplicity, consider in relation to classroom and interactive/scenario based use of force and related training, as opposed to driving related training. | | | | | |
|---|---|---|---|---|---|
| Do not have facilities to conduct training | Do not have equipment for training | Do not have sufficient number of trainers | Do not have enough funding to conduct dept-wide training | Resistance to training from officers | Difficult to identify quality training programs |
| M = 2.182 | M = 2.091 | M = 2.545 | M = 2.727 | M = 1.636 | M = 1.273 |
| | | | | | |
| Limited time for officer safety training... | Given workload demands, there is... | There are limited resources to pay... | | | |
| M = 2.364 | M = 2.727 | M = 2.818 | | | |

All participants marked that desktop/laptops were available for officer training, 66.7% marked that mobile digital terminals were available for training, and only 50% marked that mobile apps were available. This could indicate a misunderstanding of the question, or a lack of knowledge of the types of modalities available for training among officers. Logistical barriers to conducting department-wide training focused on the small size of the department and the lack of staffing as barriers to completing necessary training. Participants stated that they preferred training formats that were virtual reality simulators or scenario-based training, followed by interactive classroom training. Lecture and online trainings were ranked lowest by preference.

| What is your level of preference for different officer safety training formats? | | | | | |
|---|---|---|---|---|---|
| Classroom lecture | Classroom interactive | Scenario-based training | Virtual reality | Online | |
| M = 2.636 | M = 3.909 | M = 4.182 | M = 4.273 | M = 3.0 | |

**Final Question**

The final question of the survey was a free response question that allowed participants to provide information on

"any other critical issues on officer safety and related training, along with the challenges to conducting training, that

were not covered" in the survey. Four participants provided detailed responses to this question. One overall theme

ran through all responses, focusing on a lack of funding as a challenge to both officer safety and officer training.

Specifically, the answers included a lack of funding to pay for trainings and salaries, a lack of time to attend trainings

during shifts, a lack of incentives to attend trainings, and a lack of staffing to cover necessary roles while officers

attend training.

43

# EMAIL to UPD SWORN PERSONNEL

Dear UPD:

We have been asked to complete an assessment of UPD. The assessment is an organizational assessment of UPD and UPD's interaction with the FGCU community. In addition, we will be asking you to participate in one-on-one interviews to get an understanding of UPD and a survey that will assist us in assessing how you feel about your safety as well as your training. Please understand that your participation will be completely anonymous and no statements will be attributed to you as an individual. what you say will not be attributed

Respectfully,

David J. Thomas, Ph.D., LMHC
Erica Baer, Ph.D.

001790

**UPD BLANK SURVEY**

## SECTION A: Officer Safety Risks

This section seeks your assessment of the current officer safety environment in your community

1. How would you rate the potential risk of officers in **your department** being killed or seriously injured by the following events:

| | LOW POTENTIAL | MODERATE POTENTIAL | HIGH POTENTIAL |
|---|---|---|---|
| Being assaulted (excluding gunshot wounds or an edged weapon) | ☐ | ☐ | ☐ |
| Being shot | ☐ | ☐ | ☐ |
| Being assaulted with an edged weapon | ☐ | ☐ | ☐ |
| Being in a motor vehicle collision | ☐ | ☐ | ☐ |
| Being struck on the roadway while outside the vehicle | ☐ | ☐ | ☐ |
| Exposure to illicit drugs or precursor chemicals (e.g. Fentanyl or precursor chemicals for methamphetamine) | ☐ | ☐ | ☐ |
| Other _____ | ☐ | ☐ | ☐ |

2. In the past **3 years**, has there been a serious injury or death in your department due to any of the following? (Check all that apply.)

☐ A motor vehicle crash (officer/deputy in the vehicle at the time of collision)

☐ Being struck by a vehicle while on the roadway or shoulder (outside the vehicle)

☐ Gunshot wound (as a result of an assailant)

☐ Gunshot wound (friendly fire)

☐ Edged weapon wound

☐ Assault (excluding gunshot wound or edged weapon)

☐ Other cause (describe)_____

☐ No serious injuries or deaths have occurred in my agency in the last three years

3. Please indicate the extent to which the current safety risks for officers in your department compares to those in other

001791

'local agencies, as well as to your agency **3 years ago as follows:**

|  | MUCH LOWER | LOWER | ABOUT THE SAME | HIGHER | MUCH HIGHER |
|---|---|---|---|---|---|
| **Being assaulted (excluding gunshot wounds or an edged weapon)** | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Being shot** | ☐ | ☐ | ☐ | ☐ | ☐ |

# SECTION B: Current Officer Safety Training and Future Training Needs

This section examines the types of officer safety training your officers have received, your assessment of officer safety training needs, and challenges to conducting training.

4.  Please identify the different types of training that <u>new officers</u> in your agency <u>currently receive in the academy</u> or your existing officers have received in the **past 3 years through in-service**.

|  | ACADEMY Officers in your agency receive training in academy | | | PRIOR 3 YEARS OF IN-SERVICE Officers in your agency have received in-service training in the past 3 years | |
|---|---|---|---|---|---|
|  | YES | NO | DO NOT KNOW | YES | NO |
| **Trends in threats to officer safety** | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Officer survival training** | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Knowledge on the dynamics of police-citizen encounters** | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Situational indicators of potential assaults on officers** | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Characteristics of weapons concealment** | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Implicit bias training** | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Resiliency and wellness training** | ☐ | ☐ | ☐ | ☐ | ☐ |

46

| | ACADEMY Officers in your agency receive training in *academy* | | | PRIOR 3 YEARS OF IN-SERVICE Officers in your agency have received in-service training in the past 3 years | |
|---|---|---|---|---|---|
| | YES | NO | DO NOT KNOW | YES | NO |
| The principles and tactics of de-escalation | ☐ | ☐ | ☐ | ☐ | ☐ |
| Scenario training for non-lethal force | ☐ | ☐ | ☐ | ☐ | ☐ |
| Scenario training for deadly force | ☐ | ☐ | ☐ | ☐ | ☐ |
| Case law related to use of force | ☐ | ☐ | ☐ | ☐ | ☐ |
| Contacts with the mentally ill | ☐ | ☐ | ☐ | ☐ | ☐ |
| The concepts of legitimacy and procedural justice | ☐ | ☐ | ☐ | ☐ | ☐ |
| Safe handling of illicit drugs and precursor chemicals | ☐ | ☐ | ☐ | ☐ | ☐ |
| Recognizing and countering ambush attacks | ☐ | ☐ | ☐ | ☐ | ☐ |
| Field casualty medical care | ☐ | ☐ | ☐ | ☐ | ☐ |
| Officer rescue tactics | ☐ | ☐ | ☐ | ☐ | ☐ |
| Active shooter training | ☐ | ☐ | ☐ | ☐ | ☐ |
| Crowd management tactics for demonstrations | ☐ | ☐ | ☐ | ☐ | ☐ |
| Balancing demonstration control and 1st Amendment rights | ☐ | ☐ | ☐ | ☐ | ☐ |
| High speed/pursuit driving training | ☐ | ☐ | ☐ | ☐ | ☐ |
| Low speed/routine driving and parking training | ☐ | ☐ | ☐ | ☐ | ☐ |
| Training on driving decision-making and policy (i.e. seatbelt use, speed) | ☐ | ☐ | ☐ | ☐ | ☐ |

1. In looking forward to the next 3 years, how would you rate the need in your agency for the following officer safety training issues?

001793

| | LOW NEED | MODERATE NEED | HIGH NEED |
|---|---|---|---|
| Trends in threats to officer safety | ☐ | ☐ | ☐ |
| Officer survival training | ☐ | ☐ | ☐ |
| Knowledge on dynamics of police-citizen encounters | ☐ | ☐ | ☐ |
| Situational indicators of potential assaults on officers | ☐ | ☐ | ☐ |
| Characteristics of weapons concealment | ☐ | ☐ | ☐ |
| Implicit bias training | ☐ | ☐ | ☐ |
| Resiliency and wellness training | ☐ | ☐ | ☐ |
| The principles and tactics of de-escalation | ☐ | ☐ | ☐ |
| Scenario training for non-lethal force | ☐ | ☐ | ☐ |
| Scenario training for deadly force | ☐ | ☐ | ☐ |
| Case law related to use of force | ☐ | ☐ | ☐ |
| Contacts with the mentally ill | ☐ | ☐ | ☐ |
| The concepts of legitimacy and procedural justice | ☐ | ☐ | ☐ |
| Safe handling of illicit drugs and precursor chemicals | ☐ | ☐ | ☐ |
| Recognizing and countering ambush attacks | ☐ | ☐ | ☐ |
| Field casualty medical care | ☐ | ☐ | ☐ |
| Officer rescue tactics | ☐ | ☐ | ☐ |
| Active shooter training | ☐ | ☐ | ☐ |
| Crowd management tactics for demonstrations | ☐ | ☐ | ☐ |
| Balancing demonstration control and 1st Amendment rights | ☐ | ☐ | ☐ |
| High speed/pursuit driving training | ☐ | ☐ | ☐ |
| Low speed driving/parking training | ☐ | ☐ | ☐ |
| Training on driving decision-making and policy (i.e. seatbelt use, speed) | ☐ | ☐ | ☐ |

1.  Are there any types of officer safety training not identified above that you believe is a high need for your agency in the next 3 years? _____
_____
_____

001794

2. . How would you rate the following **logistical challenges** to conducting department-wide officer safety training in your agency? For simplicity, consider in relation to classroom and interactive/scenario based use of force and related training, as opposed to driving related training.

| | LOW CHALLENGE | MODERATE CHALLENGE | HIGH CHALLENGE |
|---|---|---|---|
| Do not have facilities to conduct training | ☐ | ☐ | ☐ |
| Do not have equipment for training | ☐ | ☐ | ☐ |
| Do not have a sufficient number of trainers | ☐ | ☐ | ☐ |
| Do not have enough funding to conduct department- wide officer training | ☐ | ☐ | ☐ |
| Resistance to training from officers/deputies | ☐ | ☐ | ☐ |
| Difficult to identify quality training programs | ☐ | ☐ | ☐ |
| There is limited time for officer safety training within the current allotment of time for in-service training given other required training. | ☐ | ☐ | ☐ |
| Given workload demands (i.e. shift coverage), there is limited ability to pull officers away from daily duties to engage in training. | ☐ | ☐ | ☐ |
| There are limited resources to pay officers overtime to engage in training. | ☐ | ☐ | ☐ |
| Other _____ | ☐ | ☐ | ☐ |
| Other _____ | ☐ | ☐ | ☐ |
| Other _____ | ☐ | ☐ | ☐ |

5. What is your level of preference for different officer safety training formats?

| | LOW PREFERENCE | | | HIGH PREFERENCE | |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) |
| Classroom lecture | ☐ | ☐ | ☐ | ☐ | ☐ |
| Classroom interactive (i.e. blend of lecture, videos, and discussion) | ☐ | ☐ | ☐ | ☐ | ☐ |
| Scenario-based training | ☐ | ☐ | ☐ | ☐ | ☐ |

001795

| | | | | | |
|---|---|---|---|---|---|
| Virtual reality (i.e. simulators or related technologies) | ☐ | ☐ | ☐ | ☐ | ☐ |
| Online | ☐ | ☐ | ☐ | ☐ | ☐ |

6. Does your department use any of the following electronic learning delivery formats to provide any type of officer training?

| | YES | NO |
|---|---|---|
| Desktop/Laptop at station or related facility | ☐ | ☐ |
| Mobile Digital Terminals in patrol and other vehicles | ☐ | ☐ |
| Mobile Apps | ☐ | ☐ |

## SECTION C: Knowledge of External Officer Safety Training Programs

This section examines your familiarity with existing officer safety training programs.

7. Prior to this survey, had you heard of the VALOR Officer Safety Initiative created by the Bureau of Justice Assistance?

YES ☐        NO ☐

8. Prior to this survey, had your heard of the following specific programs under the VALOR Officer Safety Initiative?

| | YES | NO |
|---|---|---|
| **VALOR Essentials Course for officers** - 20-hour classroom based course for field personnel that includes issues such as identifying potential threats in interactions, indicators of weapons concealment, and principles of de-escalation. | ☐ | ☐ |
| **VALOR Executive Session** - 6-8 hour classroom based session for law enforcement executives on officer safety issues, policies and creating organizational change to improve safety. | ☐ | ☐ |
| **ALERRT** – (Advanced Law Enforcement Rapid Response Training) Provides different courses geared toward active shooter training. | ☐ | ☐ |

# SECTION D: Comments

Are there any other critical issues on officer safety and related training, along with the challenges to conducting training, that were not covered in the survey above?

_____

_____

_____

_____

_____

51

## Appendix B

## FGCU COMMUNITY SURVEY RESULTS

To evaluate the FGCU community's opinions of the FGCU Police Department, a survey was sent to all faculty, staff, administrators, and students via email. The survey remained open from June 9, 2022 to July 15, 2022. During this time, 382 individuals (150 students and 232 faculty, staff, and administrators) agreed to participate in the community survey to assist with the program evaluation of the FGCU Police Department. A breakdown of survey participants by gender, race, age, and status at the university below. For student participants, the survey includes an oversampling of white students and undersampling of Hispanic students. We also received a better response rate from FGCU employees than FGCU students. This may be due to conducting the survey over the summer semester when fewer students are taking classes. Regardless, the sample received provides a robust review of the thoughts of the FGCU community regarding the FGCU Police Department.

| VARIABLE | ATTRIBUTE | N (%) |
|---|---|---|
| GENDER | Female | 256 (67%) |
| | Male | 122 (32%) |
| | Other | 4 (1%) |
| RACE | White | 284 (78.9%) |
| | Black | 20 (5.6%) |
| | Hispanic | 22 (6.1%) |
| | AAPI | 5 (1.4%) |
| | NA/AN | 1 (0.3%) |
| | Multirace | 28 (7.8%) |
| AGE | 18-24 | 117 (31.8%) |
| | 25-34 | 58 (15.6%) |
| | 35-44 | 44 (12%) |
| | 45-54 | 65 (17.7%) |
| | 55-64 | 59 (16%) |
| | 65-74 | 20 (5.4%) |
| | 75-84 | 5 (1.4%) |
| STATUS | Faculty/Staff/Administration | 232 (60.7%) |
| | Student | 150 (39.3%) |

001798

| label | variable | status | |
|---|---|---|---|
| | | Faculty, Staff, or Administration | Student |
| gender | Female | 152 (65.52%) | 104 (69.33%) |
| | Male | 79 (34.05%) | 43 (28.67%) |
| | Other | 1 (0.43%) | 3 (2.00%) |
| | Total | 232 (60.73%) | 150 (39.27%) |

| label | variable | status | |
|---|---|---|---|
| | | Faculty, Staff, or Administration | Student |
| age | 18-24 | 1 (0.45%) | 116 (78.91%) |
| | 25-34 | 33 (14.93%) | 25 (17.01%) |
| | 35-44 | 41 (18.55%) | 3 (2.04%) |
| | 45-54 | 62 (28.05%) | 3 (2.04%) |
| | 55-64 | 59 (26.70%) | 0 (0%) |
| | 65-74 | 20 (9.05%) | 0 (0%) |
| | 75-84 | 5 (2.26%) | 0 (0%) |
| | Total | 221 (60.05%) | 147 (39.95%) |

| label | variable | status | |
|---|---|---|---|
| | | Faculty, Staff, or Administration | Student |
| Race | White | 188 (87.04%) | 96 (66.67%) |
| | Black | 8 (3.70%) | 12 (8.33%) |
| | Hispanic/Latinx | 6 (2.78%) | 16 (11.11%) |
| | AAPI | 4 (1.85%) | 1 (0.69%) |
| | Native American/Alaska Native | 1 (0.46%) | 0 (0%) |
| | More than one race | 9 (4.17%) | 19 (13.19%) |
| | Total | 216 (60.00%) | 144 (40.00%) |

**Overall opinions of UPD**

Participants were asked to rate the FGCU Police Department's effectiveness. Seven areas (fighting crime; dealing with problems that concern the campus community; being visible on campus; being available when you need them; responding promptly to calls for assistance; helping victims of crime; and treating people fairly regardless of who they are) were evaluated on a 4-point scale (4: Very Good Job, 3: Good Job, 2: Poor Job, 1: Very Poor Job). Participants were given the option to mark "Don't Know" or leave an item unanswered if they did not feel they could answer a question. The mean value for these ratings ranged from 3.042 to 3.355. A composite variable was created to evaluate the overall view of effectiveness, $m = 3.073$. These data suggest that, overall, the FGCU

53

community felt that the Police Department is doing a good job in relation to effective completion of police officer duties.

Effectiveness ratings were evaluated first for differences within status, gender, age, and race. FGCU employees have a slightly higher opinion of police officer effectiveness ($m = 3.13$) than students ($m = 2.99$), but this result is not significant, $t = 1.68$, $p = .09$. Individuals listing a gender other than male or female ($m = 2.18$) rated the effectiveness of police officers lower than both males ($m = 3.1$) and females ($m = 3.07$). Given the small number of individuals in this group, the result is nonsignificant, $F = 2.95$, $p = 0.54$. There were also no significant differences in ratings of effectiveness between races, $F = .63$, $p = .68$. There were significant differences in ratings based on age. As the age of individuals increased, the overall effectiveness rating increased, $F = 2.66$, $p = .02$.

Effectiveness ratings were further evaluated to determine whether any interaction effects exist between the demographic variables within the survey. Interaction effects were found between race and gender, $F = 2.4$, $p = .049$. More variability in effectiveness scores is seen for male participants than female participants or participants stating another gender identity. No other interactions were found within overall police effectiveness for the sample.

54



Based on the analyses and graph above on the interaction between gender and race on overall police
effectiveness, it appears that not all individuals on the FGCU campus have the same experience with the Police
Department when race and gender is considered. Females, regardless of race, have similar opinions on police
effectiveness, while males have more varied opinions. While there are only a few respondents who listed another
gender other than male or female in the study, there was a consistent low rating from all on overall police
effectiveness. Age also showed a significant impact, with older participants rating police effectiveness higher than
younger participants.

Participants were next asked to rate the FGCU Police Department on factors relating to professionalism. Six
factors (stop people on campus or in cars without good reason; use excessive force; use offensive language; break
the law or break police rules; treat people differently depending on race, ethnicity gender identification, religion, or
immigration status; and act professionally [reverse scored]) were evaluated on a 4-point scale (1: Very Common, 2:
Somewhat Common, 3: Somewhat Uncommon, 4: Very Uncommon). As with police effectiveness, participants were

55

001801

given the option to mark "Don't Know" or leave an item unanswered. The mean value for these ratings ranged from 3.192 to 3.68. A composite variable was created to evaluate the overall view of professionalism, $m = 3.264$. These results suggest that the Police Department does not often act unprofessionally when interacting with the FGCU community.

Professionalism ratings were evaluated first for differences within status, gender, age, and race. FGCU employees rate the professionalism of the FGCU Police Department higher ($m = 3.39$) than students ($m = 3.09$), t = 2.75, p = .01. As with effectiveness, there is no significant relationship between gender and professionalism rating while still seeing that individuals listing a gender other than male or female ($m = 2.17$) rated the professionalism of police officers lower than both males ($m = 3.3$) and females ($m = 3.3$). There were also no significant differences in ratings of professionalism between races, F = .61, p = .7. There were significant differences in ratings based on age, F = 2.54, p = .02). As the age of individuals increased, the overall professionalism rating increased. Professionalism ratings were further evaluated to determine whether any interaction effects exist between the demographic variables within the survey. No interaction effects were found within overall police professionalism for the sample.

Based on the analyses above, individuals on the FGCU campus typically have similar experiences with the professionalism of the officers. As with overall police effectiveness, there is a significant relationship between age and perceived officer professionalism. As age increased, the higher the ratings of professionalism were.

Participants were last asked to rate the FGCU Police Department on factors relating to trust. Four factors (I trust my police department to make decisions that are good for everyone on the FGCU Campus; I have confidence that my police department can do its job well; I would feel comfortable calling the police department if I needed help; and I believe that if I complained about an officer to my police department, that the agency would take it seriously) were evaluated on a 4-point scale (1: Strongly Disagree, 2: Disagree, 3: Agree, 4: Strongly Agree). For this set of questions, participants were again able to leave items unanswered. The mean value for these ratings ranged from 2.824 to 3.315. A composite variable was created to evaluate the overall view of effectiveness, $m = 3.062$. These results suggest that the FGCU community, in general, trusts the Police Department.

56

Trust ratings were evaluated first for differences within status, gender, age, and race. FGCU employees rate
the professionalism of the FGCU Police Department higher ($m$ = 3.17) than students ($m$ = 2.89), t = 2.75, p = .001.
Similar to effectiveness and professionalism, individuals listing a gender other than male or female ($m$ = 2.17) rated
the professionalism of UPD lower than both males ($m$ = 3.32) and females ($m$ = 3.25). However, for trust, these
differences were significant, F = 7.77, p > .001. There were no significant differences in ratings of trust between
races, F = .63, p = .68. There were significant differences in ratings based on age, F = 6.23, p < .001). As the age of
individuals increased, the overall trust rating increased.

Trust ratings were further evaluated to determine whether any interaction effects exist between the
demographic variables within the survey. Interaction effects were found between race and gender, F = 3.5, p = .008.
While most races showed relatively consistent trust scores between males and females, Black females rated their
trust in UPD lower than Black males. No other interactions were found within overall police effectiveness for the
sample.



57

001803

Based on the analyses and graph above on the interaction between gender and race on overall trust in the Police Department, it appears that not all individuals on the FGCU campus have the same experience with the Police Department when race and gender is considered. Black males and females have the largest discontinuity, with Black females' level of trust being lowest of all female groups, and Black males' level of trust being highest of all the male groups. As with effectiveness above, those who listed another gender other than male or female provided consistently low ratings on overall trust in the FGCU Police Department. Also, as above, older participants rated their trust in the Police Department higher than younger participants.

## Contact with UPD, Analysis

Approximately 40% of those completing the survey indicated that they have had some kind of contact with UPD during the last 12 months. Of the 147 who had contact, the large majority felt the officer listened to them (79.2%), treated them with respect (77.2%), and treated them fairly (73.8%). Officers were less successful at showing concern for the individual's welfare (61.1%) and explaining their decisions (59.7%). In terms of overall satisfaction with their most recent contact, the majority of respondents were satisfied or very satisfied with the way the FGCU Police Department responded to the incident.

| OVERALL SATISFACTION WITH MOST RECENT CONTACT WITH UPD: | N (%) |
|---|---|
| VERY DISSATISFIED | 10 (6.7%) |
| DISSATISFIED | 21 (14.1%) |
| NEITHER SATISFIED NOR DISSATISFIED | 19 (12.8%) |
| SATISFIED | 33 (22.1%) |
| VERY SATISFIED | 66 (44.3%) |

For inferential analyses of this variable, "very dissatisfied" and "dissatisfied" were combined, as was "very satisfied" and "satisfied". No significant differences were found when evaluating satisfaction across races. No significant differences were found between male and female individuals, $X^2 = 5.9, p = .052$. Both individuals not identifying as male or female who reported contact with UPD rated their contact satisfaction as "dissatisfied" and "very dissatisfied". Significant differences were found between students and employees, with students significantly more likely to report being dissatisfied with the outcome of the contact with UPD, $X^2 = 16.92, < .001$. While the reason why there is a difference cannot be determined, this result suggests that students and employees are not

58

having similar experiences during their contact with the Police Department, leading to more negative responses from students.

Only 14 individuals reported being a victim of a crime at FGCU over the last 12 months. Of these 14 individuals, five did not report the incident, seven reported and spoke with an officer, and two reported but did not speak with an officer. Of the nine that reported, four were very dissatisfied in UPD's response to the incident, two were dissatisfied, two were neither satisfied nor dissatisfied, and one was very satisfied.

| SATISFACTION | REPORT | GENDER | RACE | AGE | STATUS |
|---|---|---|---|---|---|
| VERY SATISFIED | Reported, spoke with officer | Female | Hispanic | 45-54 | Student |
| NEITHER SATISFIED NOR DISSATISFIED | Reported, spoke with officer | Female | White | 18-24 | Student |
| | Reported, spoke with officer | Male | White | 18-24 | Student |
| DISSATISFIED | Reported, did not speak with officer | Female | Native Hawaiian/ White | 18-24 | Student |
| | Reported, spoke with officer | Male | Hispanic | 45-54 | Student |
| VERY DISSATISFIED | Reported, did not speak with officer | Male | Hispanic/Black | 18-24 | Student |
| | Reported, spoke with officer | Female | White | 35-34 | Faculty/Staff/ Administrator |
| | Reported, spoke with officer | Female | White | 18-24 | Student |
| | Reported, spoke with officer | Female | Minority (specific race not provided) | 25-34 | Student |
| NOT APPLICABLE | Did not report | NA | Not provided | 18-24 | Student |
| | Did not report | Male | White | 45-54 | Faculty/Staff/ Administrator |
| | Did not report | Male | White | 25-34 | Faculty/Staff/ Administrator |
| | Did not report | Female | White | 18-24 | Student |
| | Did not report | Female | White | 18-24 | Student |

Regarding the officers, individuals noted the following:

| | YES | NO | NA |
|---|---|---|---|
| DID THE OFFICER LISTEN TO YOU? | 5 | 2 | 2 |
| DID THE OFFICER SHOW CONCERN FOR YOUR WELFARE? | 2 | 3 | 2 |

59

| | | | |
|---|---|---|---|
| **DID THE OFFICER EXPLAIN THEIR DECISIONS?** | 2 | 4 | 1 |
| **DID THE OFFICER TREAT YOU WITH RESPECT?** | 3 | 4 | 0 |
| **DID THE OFFICER TREAT YOU FAIRLY?** | 2 | 4 | 1 |

The low satisfaction ratings among victims, along with the negative responses about the officers the victims spoke with, suggest further analysis of victim reporting and how victims are treated by UPD officers is necessary. From only 14 responses, more detailed analysis using this survey is not recommended. A targeted survey would be necessary. Given the nature of the topics any potential survey would include, this type of survey should be conducted by student services or an outside agency prepared to handle any potential medical or mental health issues that may arise.

## Participation and Use of Cameras

Respondents were asked to rate their willingness to participate in efforts to reduce crime on campus. For the statement, "How likely would you be to work with the police to identify a person who has committed a crime on campus," 90.5% of respondents stated they would be likely or very likely to participate. For the statement, "How likely would you be to attend a meeting of students to discuss crime prevention," 57.7% of respondents stated they would be likely or very likely to participate. Faculty, staff, and administrators were more likely to report they would assist police to identify a person on campus who has committed a crime, $X^2 = 21.96$, $p < .001$.

Participants were asked to rate their agreement or disagreement with statements regarding body cameras and stationary cameras on campus. For the statement, "Cameras worn by police officers make me feel safer," 83.9% of respondents either agreed or strongly agreed. A greater percentage (90.5%) agreed or strongly agreed with the statement "Video obtained in public spaces by police to solve crimes make me feel safer." Only 8.9% of respondents agreed or strongly agreed with the statement, "Cameras worn by police officers are an invasion of privacy" and only 12.9% agreed or strongly agreed with the statement "Video obtained in public spaces by police to solve crimes are an invasion of privacy."

Taken together, these results suggest that members of the FGCU community find benefit in recording police activity and using available recorded resources to keep members of the community safe. However, some differences

60

were seen in the data. Males were more likely to agree that both body cameras ($X^2 = 16.93$, $p = .01$) and video from public spaces ($X^2 = 43.78$, $p < .001$) are an invasion of privacy. In addition, faculty, staff, and administrators were more likely to agree that body cameras were an invasion of privacy, $X^2 = 11.52$, $p = .01$. Issues and concerns related to the invasion of privacy may be mitigated by the strong support of police body cameras and stationary cameras on campus.

61

001807

# EMAIL to FGCU COMMUNITY

**Dear FGCU Community:**

We have been asked to do an assessment of the FGCU Police Department. We are looking to complete an organizational assessment of the police department as well as how UPD interacts with the community. We recognize that it is the end of the semester and you have a lot to do between projects, finals, and grading. With that we are asking you to take a few minutes and complete a survey. I would not be asking if I didn't think that it was important and it really provides insight into how UPD interacts with the FGCU community. If you feel that there needs to be change now is the time to have your input and if you think UPD is fine as it is again now is the time to give them a vote of support. Your participation is completely anonymous and your comments will not be attributed to you.

David J. Thomas, Ph., LMHC

Erica Baer, Ph.D.

001808

# BLANK FGCU COMMUNITY SURVEY

**Police Effectiveness:** We would like you to think about the FGCU Police Department and their role on campus. Please rate how good a job they are doing.

## How well is the FGCU Police Department doing...

| | Very Good Job | Good Job | Poor Job | Very Poor Job | Don't Know |
|---|---|---|---|---|---|
| **Fighting Crime** | | | | | |
| **Dealing with problems that concern the campus community** | | | | | |
| **Being visible on campus** | | | | | |
| **Being available when you need them** | | | | | |
| **Responding promptly to calls for assistance** | | | | | |
| **Helping victims of crime** | | | | | |
| **Treating people fairly regardless of who they are** | | | | | |

**Police Professionalism:** Thinking about the officers who patrol campus, please rate how common the following types of police actions are.

## How common is it for the FGCU Police Department to...

| | Very Uncommon | Somewhat Uncommon | Somewhat Common | Very Common | Do Not Know |
|---|---|---|---|---|---|
| **Stop people on campus or in cars without good reason** | | | | | |
| **Use excessive force** | | | | | |
| **Use offensive language Break the law or break police rules** | | | | | |
| **Treat people differently** | | | | | |

63

001809

depending on race, ethnicity,
gender identification,
religion or immigration status

Act professionally

## How worried are you about...

| | Very Worried | Somewhat Worried | Not at All Worried |
|---|---|---|---|
| Having your car broken into or stolen | | | |
| Theft of personal Property | | | |
| Being assaulted or robbed | | | |
| Being outside on campus at night | | | |
| People selling or using drugs | | | |
| People possessing or using firearms | | | |

## Please indicate how much you agree or disagree with the following statements.

| | Strongly Agree | Agree | Disagree | Strongly Disagree |
|---|---|---|---|---|
| I trust my police department to make decisions that are good for everyone on the FGCU Campus | | | | |
| I have confidence that my police department can do its job well | | | | |
| I would feel comfortable calling the police department if I needed help | | | | |
| I believe that if I complained about an officer to my police department, that the agency would take it seriously | | | | |

64

## ˙ How likely would you be to...

|  | Very Likely | Likely | Unlikely | Very Unlikely |
|---|---|---|---|---|

**Work with the police
to identify a person who
has committed a crime
on campus**

**Attend a meeting of
students to discuss crime
prevention**

## Have you had contact with an FGCU police officer in the past 12 months? (This includes a police officer contacting you to investigate a crime, give you a warning, issue a citation, make an arrest, etc.)

Yes ( )
No ( )

|  | Yes | No | Not Applicable |
|---|---|---|---|

- **Did the officer listen to you?**

- **Did the officer show concern for your welfare?**

- **Did the officer explain their decisions?**

- **Did the officer treat you with respect?**

- **Did the officer treat you fairly?**

**Taking the whole experience into account, how satisfied are you with the way the FGCU Police Department responded to this incident?**

**Very Satisfied** _____

**Satisfied** _____

**Neither Satisfied nor dissatisfied** _____

**Very Dissatisfied** _____

**Have you been a victim of a crime at FGCU in the past 12 months?**

**Yes** _____ **(continue with the next question)**

65

No _____ (skip the next question)

*We would like to ask a few questions about the crime you just noted. If you experienced more than one crime in the past 12 months focus on just the most recent incident.*

**Was this crime reported to the FGCU Police Department and did you talk with an officer about the incident?**

The incident was reported and I talked to an officer (continue with the next question) _____

The incident was reported, but I did not talk to an officer (skip the next question) _____

The incident was not reported (skip the next question) _____

**We would like to ask a few questions about the officer you talked to about this crime.**

|  | Yes | No | Not Applicable |
|---|---|---|---|
| • Did the officer listen to you? | | | |
| • Did the officer show concern for your welfare? | | | |
| • Did the officer explain their decisions? | | | |
| • Did the officer treat you with respect? | | | |
| • Did the officer treat you fairly? | | | |

**Taking the whole experience into account, how satisfied are you with the way the FGCU Police Department responded to this incident?**

Very Satisfied  _____

Satisfied _____

Neither Satisfied nor dissatisfied _____

Very Dissatisfied _____

## Please indicate how much you agree or disagree with the following statements.

|  | Strongly Agree | Agree | Disagree | Strongly Disagree |
|---|---|---|---|---|
| Cameras worn by police officers make me feel safer | | | | |

66

Cameras worn by police
officers are an
invasion of privacy

Video obtained in
public spaces by police
to solve crimes make
me feel safer

Video obtained in public
spaces by police to solve
crimes are an invasion
of privacy

**Finally, we would like some personal and FGCU Community information so that we can better understand how different groups feel about the police. Your personal information is confidential. Only group information will be reported.**

What is your gender?

Male _____

Female _____

What pronoun do you identify as?

_____

What is your age:

Under 18 _____
18-24 _____
25-34 _____
35-44 _____
45-54 _____
55-64 _____
65-74 _____
75-84 _____
85 or older _____

What race do you consider yourself to be? (Select al that appy)

67

White _____
Black/African American ___
Hispanic/Latina ____
Asian ____
Native American _____
Other racial or ethnic group _____

What is your status at FGCU?
- Student _____
- Employee (faculty, staff, administration) _____

001814

## Appendix C

## Fusion Center Report

**(U) School Safety Bulletin – March 2022**

★ ★ ★ ★ ★ ★ ★ ★     *Southwest Florida Fusion Center*

## (U) Scope

This bulletin was developed by the Southwest Florida (Region Six) Fusion Center (RSIX) from open source information, analysis and resources to provide situational awareness on safety issues at educational facilities in Florida during the school year. It is provided to assist Florida schools and law enforcement officials in effectively recognizing, understanding, and preventing threats to Florida schools' safety.

## (U) Regional Activity

Threats of violence and weapons remain an issue for schools. Threats are primarily received from social media and through other electronic means. Social media threats spread quickly, and messages using school acronyms can appear to allude to violence at various locations. Students and school staff are reminded to be vigilant in the reporting of vocal threats, and observations of concerning behavior.

- On March 2, 2022, a Lee County high reported social media posts depicting fights between students. It is alleged that students are instigating the fights and then preventing one of the fighters from leaving so that the fight will continue. It is then all recorded and posted.[1]
- On March 2, 2022, two Lee County students were arrested. The first student was arrested after allegedly posting a bomb threat on social media to an area middle school. The second student was arrested at an area high school after a search of their backpack resulted in the alleged discovery of a knife.[2]
- On March 24, 2022, a Lee County student was arrested for allegedly threatening to conduct a shooting at an area middle school. The threat was made in a message on an online gaming platform.[3]
- On March 29, 2022, a Highlands County high school was evacuated after a telephonic bomb threat indicated a school employee's car contained a bomb. The car was inspected by bomb technicians and determined to not contain explosive material. A male suspect was arrested for allegedly calling in the threat due to a domestic situation with the school employee.[4]

## (U) State Activity

Threats of violence remain a safety concern for schools across Florida. Lockdowns, evacuations, and student arrests have resulted from these threats. Students and school staff are encouraged to handle all threats as credible and report them.

- On March 1, 2022, a Pasco County middle school student was arrested after allegedly bringing a gun to school. Another student reported hearing about the gun, the student was searched, and the gun was found in the student's backpack.[5]
- On March 9, 2022, a Polk County middle school student was arrested for allegedly carrying a firearm on campus and making threats of a school shooting. The gun was reported after another student heard the school shooting threat. The student was alleged to have the firearm tucked into his waistband. Another student reported the same student made a threat just a couple days prior stating he was going to "shoot up the school" and that "nobody will make it out alive".[6]
- On March 9, 2022, a Miami-Dade high school reported a shooting incident. The shooting was reported as

69

- a drive- by shooting with two students being injured.[7]
- On March 10, 2022, a St. Lucie County middle school student was arrested after allegedly possessing a "kill list". An anonymous tip was received by school staff on Tuesday that the student's phone contained a list of eight juveniles' names on the phone on the list.[8]
- On March 11, 2022, the arrest of five Broward County middle school students were arrested for an alleged hate crime. The incident took place on March 9, 2022 at a recreation area across from the school where students gather before class begins. The students were heard yelling racial comments, and the incident is alleged to have four victims who are all other students. While the incident did not occur on school property, school staff is reminded that local gathering areas may also be used for potential violent incidents.[9]

## (U) National Activity

Shootings, fights, and threats of violence are a safety concern for schools across the nation. While threats received may be deemed non-credible, they continue to cause a disruption to school functions.

- On March 2, 2022, a Pierce County (WA) high school student was arrested after allegedly assaulting a teacher at school. The student allegedly put a belt around the teacher's neck.[10]
- On March 4, 2022, a Johnson County (KS) high school student was allegedly involved in a school shooting. A report of shots fired in the school's main office area was received by Olathe Police Department. A school administrator and resource officer were injured during the shooting. The resource officer then returned fire, injuring the shooter. No other students were injured during the incident.[11]
- On March 7, 2022, a Polk County (IA) high school reported a shooting outside the school. Three juveniles were shot, two were students at the school, and the third victim who died, was not a student. It is unclear at this time why the victim was on campus.[12]
- On March 9, 2022, a Los Angeles County (CA) occupational school student was arrested for allegedly bringing a gun onto campus. The school went into lockdown until authorities were able to locate the student. The firearm was recovered and described as a 9mm ghost gun.[13]
  - Ghost guns have no serial numbers and are untraceable firearms that can be bought online usually in a kit, and assembled at home. Kits can be purchased online without any background check and are currently unregulated.[14]
- On March 10, 2022, a Clark County (NV) high school went into lockdown after several fights were reported during the morning hours which resulted in the arrest of 10 students and one parent.[15]
- On March 16, a Baltimore County (MD) high school reported three students were treated for illness after eating food that was laced with an unconfirmed drug substance. One student was arrested for allegedly being connected with the incident.[16]
- On March 22, 2022, a Suffolk (independent city in VA) high school was evacuated after a bomb threat. Reports indicate this was the third bomb threat to the school within the past week.[17]

## (U) Highlight Corner

- RSIX recently reported on the "Orbeez challenge". It has since been reported that an 18- year-old was arrested in Collier County after shooting a motorist in the face.[18]
- In March, Charlotte County also reported two incidents where pedestrians were hit with what is believed to be beads from an Orbee gun.
- There have been other reports from Florida and in other parts of the nation involving these types of incidents.

## (U) Resources and Reporting Methods

The FFC and RSIX strongly recommend reporting school threats to law enforcement. In the event of an emergency, 9-1-1 should be contacted for immediate assistance. Potential or perceived threats should also be reported to law enforcement. There are multiple 24/7 reporting methods for individuals to make anonymous reports to law enforcement either online or by phone.

70

- **FortifyFL:** Instantly relay suspicious activity information to appropriate law enforcement agencies and school officials via the FortifyFL mobile app or website.
- **Suspicious Activity Reporting to FDLE:** Submit information on suspicious activity on the Florida Department of Law Enforcement (FDLE) website.
- **"If You See Something, Say Something":** Report threats over the phone through the "If You See Something, Say Something" tip line by calling 1-855-352-7233

(U) WINK News. "Violent videos on social media show fights between students at East Lee County High School". *WINK News*, 2 March 2022, https://www.winknews.com/2022/03/02/violent-videos-on-social-media-show-fights- between-students-at-east-lee-county-high-school/

[2] (U) WFTX Digital Team. "Two students arrested in Lee County". *FOX 4*, 3 March 2022,

https://www.fox4now.com/news/local-news/lee-county/two-students-arrested-in-lee-county-march-2

[3] (U) WINK News. "Teen arrested for threatening to conduct a shooting at Oak Hammock Middle School." *WINK News*, 24 March 2022, https://www.winknews.com/2022/03/24/teen-arrested-for-threatening-to-conduct-a-shooting- at-oak-hammock-middle-school/

[4] (U) Winiecki, Zachary. "Highlands Co. man made bomb threat to school, deputies say". *WFLA*, 29 March 2022,

https://www.wfla.com/news/highlands-county/highlands-co-man-made-bomb-threat-to-school-deputies-say/

[5] (U) Perkins, Jeffrey. "FL Student Arrested After Bringing Gun to Middle School: Sheriff". *PATCH*, 1 March 2022, https://patch.com/florida/newportrichey/fl-student-arrested-after-bringing-gun-middle-school-police

[6] (U) Shportun, Kyra. "'Nobody will make it out alive:' Florida student arrested for bringing gun to school". *NBC2*, 14

March 2022, https://nbc-2.com/news/2022/03/10/nobody-will-make-it-out-alive-florida-student-arrested-for-bringing- gun-to-school/

[7] (U) Ramos, Roy. "2 injured in shooting near charter school in Miami Gardens". *Local 10 News*, 9 March 2022, https://www.local10.com/news/local/2022/03/09/2-injured-in-possible-shooting-in-miami-gardens/

[8] (U) Planas, Antonio. "Florida girl made 'kill list' targeting 8 students, sheriff's office says". *NBC News*, 10 March

2022, https://www.nbcnews.com/news/us-news/florida-girl-made-kill-list-targeting-8-students-sheriffs-office-says- rcna19569

[9] (U) Lenthang, Marlene. "Five students charged with hate crimes in 'racially motivated' incident, police say". *NBC*

*News*, 11 March, 2022, https://www.nbcnews.com/news/us-news/five-students-charged-hate-crimes-racially- motivated-incident-police-s-rcna19640

[10] (U) Fox 13 News Staff. "Deputies: Student wraps belt around teacher's neck at Bethel High School". *FOX 13*, 2

March 2022, https://www.q13fox.com/news/deputies-spanaway-hs-student-wraps-belt-around-teachers-neck

[11] (U) Fortino, Jodi, Moreno, Carlos, Shackelford-Nwanganga, Bek, & Rosenberg, Gabe. "Olathe East High School officer and administrator injured in shooting, student arrested". *KCUR News*, 4 March 2022,

001817

# **Appendix D**

## **CTO DAILY OBSERVATION REPORT**

**Agency:**                                          **Date:**

### Daily Observation Report - Evaluation

**Trainee:**

**Trainer:**

**Program:**

**Period:**

**Phase: Phase 1**

## Name:

Critical Performance Tasks

**1: Job Performance: Stress Conditions**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**2: Job Performance: Non-Stress Conditions**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**3: Officer Safety**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**4: Call Prioritization and Diversion**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**5: UF Alert/Timely Warning/Command Staff Notifications**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**6: Video Surveillance System**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

001818

Frequent Performance Tasks

**7: Listening and Comprehension Skills**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed

**8: Call Processing**
1    2    3    4    5    Not Observed

**9: Interviewing Skills**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed

**10: Decision Making: Problem Solving & Use of Judgment**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed

**11: Multi Tasking & Prioritizing**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed

**12: Retention Skills**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed

**13: Time Utilization**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed

**14: Self-Initiated Activity**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed

**15: Geography & Use of Maps**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed

**16: Speed/Efficiency/Accuracy & Completeness**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed

**17: FCIC/NCIC Systems**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed

**18: File Maintenance**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed

**19: Work Area: Organization & Neatness**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed

**20: Team Work**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed

**21: CAD & Computer Equipment**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed

**22: Radio Equipment**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed

**23: Telephone System**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed

73

**24: Alarm Equipment**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**25: Dispatching Skills**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**26: Instant Playback Recorder**
1    2    3    4    5    Not Observed

**27: Records Management System (RMS)**
1    2    3    4    5    Not Observed

**28: Copy/Fax/Scan Machine**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**Knowledge**

**29: Department Directives**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**30: State / Federal/Civil Law**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**31: Scenario Based Testing**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**32: Codes and Signals**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**Attitude, Relations & Appearance**

**33: Customer Service**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**34: Attitude Toward the Job**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**35: Acceptance of feedback from the CTO**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**36: Relationships: with the General Public and Co-Workers**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**37: General Appearance**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**38: Attendance**
1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

**Trainee Responsibilities**

74

**39. All trainees must take full responsibility for their own learning by asking questions to clarify misunderstandings and by providing honest and specific feedback to trainers regarding individual learning needs.**

1 ○ 2 ○ 3 ○ 4 ○ 5 ○ Not Observed ○

001821



# **Memo** *University Police Dept.*

*Police • Parking Services• Emergency Management*



TO:        Captain A. Rispoli

FROM:      Chief Kelli Smith

DATE:      November 10, 2021

SUBJECT:   IA #2021-002

Please conduct the investigation on complaint IA #2021-002 involving the following
department members:

- Sgt. Patrick McGowan
- Officer Christopher Palmer
- Officer William Winning

Please advise me of your findings as outlined by policy.



*Committed to Excellence*



# Memo *University Police Dept.*

*Police ● Parking Services● Emergency Management*



FLORIDA
GULFCOAST
UNIVERSITY

TO:        Kelli Smith, Chief of Police

FROM:    Joseph Anderson, Detective

DATE:     February 7, 2022

SUBJECT: Background Investigation

*Approved Chief HL 02 March 22*

## Applicant:

|                   |                        |
|-------------------|------------------------|
| Name:             | Geoffrey Todd Rinehart |
| Alias(es):        | N/A                    |
| DOB:              | 1966                   |
| SSN:              |                        |
| Sex:              | Male                   |
| Race:             | White                  |
| NC D/L:           | 000045023862           |
| Current Address:  | 105 James River Ct.    |
|                   | Sanford, NC 27330      |
| Phone:            | (239) 989-9154 (Cell)  |



EXHIBIT
76
1/2/25 Smith
PENGAD 800-631-6989

## Position Applied For:

Florida Gulf Coast University Police Department Records Manager

Page - 1 - of 6

001835

 

**Memo** *University Police Dept.*

*Police • Parking Services• Emergency Management*

FLORIDA GULFCOAST UNIVERSITY

**Employment History:**

04/2021 – Present       NCDPS Harnett Correction Institution
                        1210 E. McNeil St.
                        Lillington, NC. 27546
                        Phone # 910-984-8891

Geoffrey Todd Rinehart worked as a cashier for North Carolina Department of Public Safety Harnett Correction Institution from 10/2017 to 06/2018.

03/2020 -02/2021:       Americold Logistics
                        111 Imperial Drive
                        Sanford, NC. 27330
                        Phone # 919-775-4474

Geoffrey Todd Rinehart worked as a customer service representative for Americold Logistics. Geoffrey Todd Rinehart left his employment due to Geoffrey Todd Rinehart's desire to move on for better employment and more challenging.

02/2019-12/2019:        Coaches Neighborhood Grill
                        1705 S. Horner Blvd.
                        Sanford, NC. 27330
                        Phone # 919-

Rinehart worked as a General Manager for Coaches Neighborhood Grill. Rinehart left voluntarily when ownership requested he be a travelling manager.

Page - 2 - of 6

001836

 

**Memo** *University Police Dept.*

*Police • Parking Services• Emergency Management*

08/2018 to 12/2018:   Walmart Superstore
                      7016 GB Alford Hwy
                      Holy springs, NC 27540
                      Phone # 919-557-9181

Rinehart worked as a Meat Department Manager for Walmart. Rinehart voluntarily left due the job's scheduling issues.

09/2005 to 04/2018:   DCD Lee County Government
                      1500 Monroe St
                      Fort Myers, Fl. 33901
                      Phone # 239-533-8329

Rinehart worked as a Records Supervisor for Lee County. Rinehart left voluntarily because he moved to North Carolina with family.

**EMPLOYMENT GAPS:**

Rinehart had no significant laps of employment.

**FCIC / NCIC:**

Page - 3 - of 6

001837

 **Memo** *University Police Dept.* 

*Police • Parking Services• Emergency Management*

**FLORIDA GULF COAST UNIVERSITY**

## Education:

Geoffrey Todd Rinehart graduated from Mount Vernon High School located at 300 Yellow Jacket Dr., Mount Vernon Ohio, 43050. Rinehart was awarded his graduation diploma in 1985.

## Driver's License History:

Geoffrey Todd Rinehart possesses a valid Class-C North Carolina driver's license (# 000045023862). A record's check from the Lee County, NC revealed no records found. Geoffrey Todd Rinehart previously held a Florida driver's license # R563298662970. Rinehart stated he had two previous citations. The first was on 01/09 in Lee County, Fl. for driving in an unsafe condition. The second was on 10/09 in Osceola County for expired tags. Rinehart stated both cases were closed.

A record's check of from the Mount Vernon Municipal Court indicated a past conviction for DUI in 1992. Geoffrey Todd Rinehart did not disclose this on his FGCU application. Mr. Rinehart was contacted and he stated he had no recollection of this event. Mr. Rinehart previous employment application to Lee County BOCC also indicates that Mr. Rinehart made no mention of knowledge of this event.

*Note: Incidents are over 30 years old*
*FSmith*

## FDLE / ATMS Check:

Not applicable

001838



**Memo** *University Police Dept.*

*Police ● Parking Services● Emergency Management*

FLORIDA
GULFCOAST
UNIVERSITY

## Local Law Enforcement / Clerk of Courts Check:

Geffrey Todd Rinehart resided in Lee County, Florida. A check of the Lee County Clerk of Court's Office revealed no discrepancies. A record's check in Knox County Ohio revealed a past DUI as mention in the driver's history section of this report.

## Military History:

Geoffrey Todd Rinehart served honorably in the United States Navy from 1986 to 1991. Rinehart has provided a copy of his honorable discharge certificate in his application.

## Controlled Substances:

Geoffrey Todd Rinehart stated that he used marijuana when he was a teenager back in the 1980s. Rinehart stated he has not use marijuana since. Rinehart stated he does not use any other non-prescription drugs.

## Psychological Examination:

Not applicable. (Not Currently Used by Agency)

## Polygraph Examination:

Not Applicable (Not Currently Used by Agency)

## References:

Kara Lynn Stewart (Phone: 239-770-4198) was contacted. Ms. Stewart has known Geffrey Todd Rinehart for approximately 13 years.    Ms. Stewart knows Geffrey Todd Rinehart from their previous employment at the Lee County Community Development. Ms. Stewart said that Geffrey Todd

Page - 6 - of 6

001839

 **Memo** *University Police Dept.*

*Police • Parking Services• Emergency Management*



Rinehart was dependable, hardworking and determined. Ms. Stewart recommended that Geffrey Todd Rinehart be hired and said he would do an excellent job for the FGCU Police Department.

Patricia Lyles (Phone: 330-921-1795) was contacted. Ms. Lyles has known Geffrey Todd Rinehart for about 12 years. Ms. Lyles said that Geffrey Todd Rinehart is a reliable and responsible person. Ms. Lyles recommends Geffrey Todd Rinehart for the Records Manager position and is not aware of anything that would disqualify Geffrey Todd Rinehart from such a position.

Randy Simes (Phone # 239-940-5260). Randy Simes has known Geffrey Todd Rinehart for about several years while Rinehart was in charge of the records department for the Lee County Department of Community Development. Randy Simes stated that Rinehart reorganized the records department and was a major asset to their team. Randy Simes knows Geffrey Todd Rinehart to be a hard worker, persistent, and has great initiative. Randy Simes said that Geffrey Todd Rinehart would be an asset to the department.

## Summary:

After having completed the background investigation, no information was uncovered that would disqualify Geffrey Todd Rinehart from employment with the Florida Gulf Coast University Police Department as a records manager.

X Det. Wh. #4302

Joseph Anderson, Detective
Background Investigator

001840

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

KELLI SMITH,

      **Plaintiff,**

v.                               **Case No.:  2:23-CV-840-JES-KCD**

THE FLORIDA GULF COAST UNIVERSITY
BOARD OF TRUSTEES,

      **Defendant.**

_____/

## PLAINTIFF'S RESPONSE TO
## DEFENDANT'S FIRST SET OF INTERROGATORIES

    NOW COMES the Plaintiff, **KELLI SMITH,** by and through undersigned

counsel, and submits their response to Defendant's First Set of Interrogatories.

### Preliminary Statement

    Plaintiff responds to each of the Interrogatories based upon information and

documentation available as of the date of the responses and reserves the right to supplement

and amend their responses.

                                 s/ Benjamin H. Yormak
                                 Benjamin H. Yormak


EXHIBIT
77
1/22/25 Smith
PENGAD 800-531-6989

## INTERROGATORIES

1.     Please identify each and every action you contend was **protected activity**
undertaken by you and for which you contend Defendant retaliated against you in violation
of the **Title VII or the FCRA**, as alleged in the Complaint.   In response to this
interrogatory, identify the specific action taken by you; to whom you made the report; the
substance of the report; any witnesses to or individuals with knowledge of the alleged
protected activity; the date on which you took each specific acts or made the report; and
how you made the report or otherwise engaged in the protected activity.

**RESPONSE:** Per Rule 33(d), please see Plaintiff's documents served in response to
Defendant's Request for Production.

I began my employment on May 3, 2021. I immediately recognized that the Respondent
was non-compliant with the Jeanne Clery Disclosure of Campus Security Policy and Crime
Statistics Act (Clery Act) and within the first week of employment began expressing my
concern to my leadership

Between August and October 2021, there were several off campus sexual assault reports
taken by the surrounding jurisdictions alleging members of fraternities were drugging girls
and sexually assaulting them. In most instances, FGCU resident life staff and/or Title IX
staff were aware of these assaults and were not notifying the Clery Crime Collection Data
Center (FGCUPD) in a timely manner or at all. It should also be noted that in one of these
instances a juvenile reported a sexual assault to Residence Life which then reported to Title
IX.  Not only was FGCU PD not notified for evaluation of a timely warning or emergency
notification, no notification was made to Division of Children and Family Services (DCF)
as required by Florida State Statute.

This failure to notify FGCUPD created a public safety threat to any female FGCU student
attending fraternity parties, on or off campus, and being potentially drugged and assaulted.
FGCUPD could not evaluate if there was a community threat to students and female
employees without the notification. I notified the Respondent and FGCU General Counsel
that I was concerned we were not doing our part and violating Clery Compliance by failing
to have proper reporting that would protect the community, and in these instances,
particularly females – from sexual harassment, assault and violence.

At my request a meeting was held on November 19, 2021, with University Leadership
including all of FGCU General Counsel, Title IX, and members of the President's Cabinet.
My concerns about the Respondent not doing enough to prevent sexual harassment, assault
and violence against female students and employees were dismissed, even though sexual
harassment includes sexual assault, dating violence, domestic violence, or stalking as those
offenses are defined in the Clery Act, 20 U.S.C. § 1092(f), and the Violence Against
Women Act, 34 U.S.C. § 12291(a)). The failure of campus partners to report these cases

2

to FGCUPD placed FGCU in the position of non-compliance of the Jeanne Clery Act potentially violating federal mandates. The purposes of the reporting to FGCUPD was to make a determination if the crimes required an Emergency Notification or a Timely Warning to alert the campus population of safety threats.

Internally in the Police Department, I was requiring staff to become more Clery compliance focused and to begin writing reports and documenting incidents so that students and employees were protected and the law was complied with.

During the course of my 11 months of employment, I recommended that a Clery Compliance Subject Matter Expert be brought into train members of the institution since DOE had already examined the Respondent's lack of compliance in 2019. On January 21, 2022, an email was sent by Sara Stensrud to FGCU General Counsel and Presidential Cabinet Member Vee Leonard explaining my recommendation of an external Clery Compliance Subject Matter Expert for institutional training and the need to "reset our thoughts on Clery compliance." I still continued to advocate for this training and continued to keep on the 1:1 agenda for meetings with my supervisor up through my termination including my final formal agenda March 22, 2022 for discussion. At one point, my supervisor stated, "we all know about the 2019 audit and its old news."

I repeatedly expressed my concern for the University's failure to comply with the Clery Act and that it was putting female students and employees at risk. Many of my 1:1 meetings with Sara Stensrud were about the FGCU not being in compliance with the Clery Act.

Additionally, at the onset of my employment, I conducted sit down meetings with most of the employees at FGCUPD to establish rapport and provide direct input to the "Chief of Police".
They were asked (3) questions:
    1) What do you like about our team?
    2) What changes would you like to see?
    3) How can I help you be successful?

W/F Dianna Sandora, the Communications Supervisor, advised that there was a distinction between how the dispatchers were treated and there was "an all boy's club." I asked her what she meant and she said that the officers talked down to her and the other dispatchers – most of whom were female, and they were condescending. I asked if she spoke to Captain Slapp about it, she replied – he's one of them. I reported this to Sara Stensrud in one of our 1:1 meetings that occurred in the first 2 months of my employment.

During command staff meetings, I realized that all of the officers that had been attending "Train the trainer" type trainings were white males and a core group that was absorbing what I would describe as career building opportunities and benefits. I advised Captain

3

Rispoli and Captain Slapp that we would spread "Train the trainer" opportunities around to be more equitable and diversify our instructors. Those training opportunities began with offering Officer Garcia an opportunity in September/October, 2021 for February, 2022. Captain Rispoli later told Officer Garcia that he looked like an FGCU landscaper because he was wearing a lime green shirt with the implication of Garcia being a dark complexioned male. I reported this to Sara Stensrud in one of our 1:1 meetings, I do not recall the date.

During the course of employment from May 3, 2021 through April 1, 2022 I had many 1:1 meetings with Sara Stensrud, my immediate supervisor, and AVP. Each of those meetings, I drafted agendas for topics that I needed to discuss, seek authorization, inform, and advise her of. Of all of the meetings, about 23 of those meetings included Clery discussions which included lack of compliance and more specifically, FGCU lack of Clery reporting from campus partners putting our students at risk and failing to abide by federal mandates. This lack of reporting was institutional wide and included alleged sexual assaults reported to Title IX, Residence Life and Student Conduct, but excluded the Clery Crime Reporting Body which fell under the purview of FCGU PD.

**May 12, 2021** - Initial 1:1 meeting with AVP Sara Stensrud, my immediate supervisor included an agenda where I advised her that I had concerns about FGCU Clery Compliance as it relates to data capturing, reporting, and public dissemination. I explained the requirement of Clery Compliance and the need for Clery Compliance Officer. Request permission to obtain Clery Center Membership for FGCUPD and Title IX. The cost for Clery Center Membership is $3500.00 and allows for multiple FGCU entities to have access. Sara is from the private sector and did not grasp the breadth of Clery Compliance and Mandates. I explain that a single violation is in excess of $59,000.00. Stensrud advised there would be numerous things that I would find that needed "immediate" attention. She said that police department had been lax in a lot of things and did not have a very good campus reputation.

We also discussed my first week. I explained that Sgt. Jones was very unreceptive to my presence, so much so that Captain Slapp and Captain Rispoli addressed his rudeness. Additionally, Jones failed to order my uniforms, which based on his attitude towards me, I believe was intentional. I told Rispoli that I could overlook things for an adjustment period, but the atmosphere will be one of respect. I shared this with Sara and she said there were two things at play:
   (1) They had their own internal plans in the PD
   (2) I should be aware, it's the good ole boy mindset but she would help me work through it.
Within the first couple of weeks, Sgt. Jones took me to the range to qualify with my firearm; I attempted to develop some sort of rapport with him especially due to his abrasive behavior to me on my first day of employment, however every one of his responses were short and curt. Several months later, Sgt. Jones also mishandled a sexual assault complaint as a supervisor. He told the responding officer that there weren't elements of a sexual assault

4

crime even with victim presenting with numerous bruises and injuries. The patrol officer reportedly relayed that to the victim and she left the police department. This potentially "revictimized" the victim and Captain Rispoli was directed to conduct a follow-up investigation into the handling of this case.

**May 18, 2021** 1:1 Sara Stensrud - Provided Clery Data and discussed the further need for compliance. I reiterate that FGCU has not been following mandates and that it is an Institutional Responsibility, not just a police department aspect. Also continued discussion for Clery Center Membership needs.

I provided a memorandum outlining the need for Clery Reporting accuracy and the penalty fee. A table reflecting which agencies have a designated Clery Compliance Officer. A position description for a position. Sara advised that she would like to model University of North Florida since we are similar in size. I explain thoroughly that Clery Compliance is not something we can kick the can down the road on. Annotations on the agenda where Sara told me to check with Precious Gunter on whether FGCU had a membership already. I explained that the cost would include multiple licenses allowing FGCU entities with significant reporting responsibilities to seek guidance beyond FGCU PD. Those entities included (Title IX, Residence Life, Conduct and Athletics).

**June 9, 2021** 1:1 Sara Stensrud – I reiterated the need for Clery staff and Clery Training. Second written justification for Clery Compliance Officer. I explain that FGCUPD does not understand how essential Clery Compliance is and that while talking to other campus partners the only ones who understand are employees that have come from other institutions. April Palmer (Dean of Students) understands, but the others in Conduct or Residence Life seem indifferent. Internal police leadership like Captain Rispoli and Captain Slapp felt it was an over reach and too much legislation.

**June 16, 2021** – In an effort to emphasize that this is a huge risk and liability, I continue to express my concerns about non-compliance. Email to Stensrud identifying Campus Security Authority's and a link to article explaining the Clery violations for Baylor University and how far reaching the Department of Education can go when an institution is out of compliance. **https://baylorlariat.com/2020/10/09/baylor-fined-over-461000-for-clery-act-violations/**

**June 17, 2021** 1:1 Sara Stensrud – I addressed the need for a Clery Coordinator again. Seeking support and commitment. I continue to keep Clery on our 1:1 Agenda to make it a discussion point and emphasis. Stensrud says she is "working on David." I explain the Annual Safety Report and that it is coming up for publication and that we must have accuracy. We discussed development training for Captain Rispoli since Captain Slapp would be retiring in less than (1) year. Sara said this will be a good opportunity to "bring people forward."

**June 22, 2021** 1:1 Sara Stensrud – Again I talked about the need for a Clery Coordinator. During this 1:1 the issues of non-compliance and lack of collaboration with University partners is weak, but essential. She told me to work with Heather McQueen from HR for HR and personnel things.

**June 29, 2021** 1:1 Sara Stensrud - Clery Concerns – I provide Stensrud with an email to Steve Moore from the Department of Education discussing the Annual Safety Report and organizational failures. The audit was a result of a sexual assault that occurred in which an Uber Driver assaulted an FGCU student and it is believed that no Timely Warning or Emergency Notification occurred. I explain what a Timely Warning (TW) is and an Emergency Notification(EN). I explain that with the way sexual assaults are reported to housing and a disconnect after that from PD (Clery), we are out of compliance. As the Clery Crime Center Reporting Entity, lack of notification means we cannot fulfill our requirement to determine if these incidents require TW or EN. Stensrud acknowledges my concern and says that change comes slowly and I shouldn't expect it too quickly. I explain that this is not "Kelli Smith's" rule this is a federal mandate. The email content from the Department of Education was based on a Department of Education audit 2019 - as a result of the student being sexually assaulted by the Uber Driver.
1. Timely Warnings Delay
2. ASR substance

**July 7, 2021** - Clery concerns again discussed in this 1:1 and maintained a spot on the agenda. Stensrud told me that I needed a victory, so she was approving the $3500.00 membership to Clery and I was not going to be held responsible for my budget because we never had one to begin with.

DOE audit 2019 - as a result of the student being sexually assaulted by the Uber Driver.
- Timely Warnings Delay
- ASR substance

**July 13, 2021**- Clery Concerns – This was still on the agenda. I inquired as to the status of a Clery Compliance Officer. I expressed my concern about our Annual Safety Report and the accuracy of the data. I explained the lack of documented processes in the PD. Stensrud said that didn't surprise her. Chief Moore kept notes in his head and she knew this. This was one of the reasons there was no historical data for parking services. I discussed the funding source for the membership and explained that I looped Precious Gunter in from Title IX to let her know that the resource would be available to her team.

DOE audit 2019 - as a result of the student being sexually assaulted by the Uber Driver.
- Timely Warnings Delay

- ASR substance

**July 16, 2021** 1:1 Clery Position Description to HR and Stensrud outlining compliance and responsibility and emphasizing our lack of compliance with the Daily Logs and non-reporting from residence life and conduct on alcohol and drug violations.

**September 2, 2021 Email thread to Precious Bunter titled: Clery Statistics**
Addresses lack of data being provided to the police department and the completion of the Annual Security Report

**October 2, 2021**   A reported Off-campus sexual assault allegedly occurred @ fraternity party. On **October 5, 2021,** I spoke with Stensrud about the national climate of sexual assaults and how University's handle them. The recent sexual assaults that reflect a commonality of fraternities, even though they are occurring off-campus does not relieve the University of responsibility to become engaged.  I also explained that since there seems to be a pattern this could rising to the level of a Timely Warning.  We also need our campus partners to notify PD for Clery Compliance as soon as they receive reports.  All of the articles identified sexual assaults on campus.  Stensrud agreed to me calling a meeting via email with Precious Gunter Title IX, Emily Nana Title IX, April Palmer Dean of Students, Sara Stensrud – AVP and Vee Leonard – FGCU General Counsel.

Email with these links sent requesting collaboration:
- https://universitybusiness.com/sexual-assault-claims-at-9-universities-during-red-zone-spark-protests/
- https://www.yahoo.com/news/not-ok-missouri-university-let-100000775.html
- https://www.motherjones.com/politics/2021/10/nationwide-anti-rape-protests-frats-fraternies-red-zone

Deontre Whitaker – FGCU Student Conduct and Christopher Blakely – AVP were added to the invite.

**October 11, 2021** Text message to Stensrud about juvenile sexual assault off campus. FGCU residence life and Title IX informed.  UPD was not informed for Clery purposes. Title IX and Residence Life failed to meet Florida State Statutory requirements to notify DCF as mandatory reporters.

**October 12, 2021** Text message to Stensrud about juvenile sexual assault and Residence Life and Title IX failing to notify DCF.  Spoke with Stensrud and explained that there are heavy state fines when FGCU fails to notify DCF of "qualifying crimes" when a juvenile is a victim.  I also emphasized the issue with Clery Compliance.  I explained that FGCU must change its practices – we don't have a choice.

3rd case - Clery Crime Collection Unit (PD) not being notified / failure for timely warning and emergency Notification process

**October 13, 2021** Meeting with Palmer, Stensrud, Nanna, Whitaker, Blakely, Gunter, Stensrud. I expressed my concerns about our compliance with Clery. I advocated for FGCU to become more engaged regarding sexual assaults in which FGCU students are victimized including when fraternities are part of these reports – FGCU has a responsibility. I requested that PD be notified from a Clery Reporting standpoint immediately when these cases come into FGCU campus partners so that an evaluation could be made for TW or EN and Clery compliance. Palmer acknowledged that her previous institution seemed more engaged with Clery Compliance. Gunter advised that as Title IX, she knows that FGCU is proactive and committed and compliant with FGCU existing processes. I emphasized that FGCU may be Title IX compliant, but we were not Clery Compliant.

**October 22, 2021** email to Stensrud from Newsletter Daily Briefing – University of Montana and the mishandling of sexual assaults resulted in $1 Million dollar fine for Clery Violations.

**November 19, 2021** Meeting on sexual assaults and reporting to UPD. Residence Life not informing the PD or Clery Crime Collection Unit. Discussed Timely Warnings and Emergency Notifications. End Result - no changes.

| Vee Leonard | Precious Gunther (phone) | Jessica Holmer |
|---|---|---|
| Todd Caraway | Aisha l/n/u FGCU Victim Advocate | |
| Lisa Jones | Jameson Moschella (Residents Life) | |
| Sara Stensurd | Brian Fisher | |

I had sent emails to the attendees containing articles discussing how universities handle sexual assault reporting. Aisha responded with old articles that talked about victims not wanting to go to police. Aisha did not understand that she still fell under the Clery reporting requirements. Gunter and Holmer also did not understand the requirements of Clery.

I texted Sara that we needed to bring in Subject Matter Expert to explain Clery Compliance Federal Requirements and Aisha showing disagreement at being a CSA under Clery Compliance by shaking her head no.

**November 29, 2021** Intro email to Candance McClaren regarding a training opportunity for FGCU to become compliant with Clery.

**December 2, 2021** Email thread from Diania Tsenekos including Gunter, Smith and forwarded to Stensrud sharing Title IX limited information sharing on sexual assault.

Tsenekos spells out information needed from Title IX to be compliant with Clery Reporting.

**Separate email to Stensrud: Article** sent titled: Consequences of Clery Act non-compliance from police one.

**December 6, 2021** Teams Meeting with Candace McLaren and Sara Stensrud. McClaren is a Subject Matter Expert on Clery Compliance. McLaren provided Stensrud with reporting requirements. What defines a CSA and the potential concerns with FGCU not becoming more focused on Clery compliance.

**December 9, 2021** Email to Stensrud outlining who should receive Clery training and duration of training. (HIGH PRIORITY)

**December 13, 2021** Email to Candace McClaren discussing training format (Stensrud cc'd)

**1:1 AGENDA:** Clery Compliance Training - proposal submitted to educate university leadership and partners about Clery Federal mandates.Victim advocate – Working with Aisha to develop a better working relationship that is not adversarial with PD.

**December 14, 2021  Case no. 212629** - Battery (Attempted Sexual Assault) Sgt. Jones - did not believe PC existed for arrest. Pics and injuries. The victim was dismissed from the PD with no action.  Email response from McClaren further discussing the Clery Training Proposal. Stensrud cc'd. Confirmed potential training dates in February/March 2022.

**December 15, 2021** Follow-up email from McClaren cc'ing Stensrud furthering the conversation on Clery Compliance and training.

Stensrud told me "Overall, you are heading in the right direction."

**December 20, 2021 Agenda 1:1 w/ Sara Stensrud** Clery Compliance Training Proposal - follow-up emailed Candace – Sara updated

**December 21, 2021  Email from Stensrud telling me I am moving in the right direction with Clery Proposal from McClaren. See "12.15.21 email from Stensrud re Clery"**

**January 3, 2022  Agenda 1:1 w/Sara Stensrud** Clery Compliance Training - Proposal - emailed Candace - 15 proposed cost

**January 6, 2022  Agenda 1:1 w/ Sara Stensrud** Clery Training - discuss with David and seeking approval for $15,000.00 cost and how to present this to the President's cabinet.

9

**January 21, 2022**  FGCU General Counsel Vee Leonard angry that SME was contacted outside of her authorization, by Stensrud and I, regarding Clery Compliance Training. Sent email on this to Sara and I advising that we overstepped our bounds by consulting without her consent.  Stensrud identified that "now is a good time to reset our thoughts on Clery compliance."  **Email thread included Stensrud, Gunter, Tsenekos, and Vazquez.**

**February 7, 2022  Agenda** 1:1 w/Sara Stensrud  Clery Compliance training – gave Sara a proposal from the Clery SME - Stensrud advised me "enough about Clery - the audit is old news" My reply, "Sara - DOE audits are never old news.  Compliance is critical in higher education."

**February 14, 2022** Text message from Diana Tsenekos regarding University Behavioral Consultation and Assessment Team expressing frustration over the handling of students that are potential risks and what behaviors are Clery Reportable.  She described them as a "tough crowd for a new staff member". GC Lisa Jones and Dan are going to begin a policy and procedure to give BCAT a better structure.  "Touch crowd for a new staff member."

**March 7, 2022 Stensrud Calendar 2:00-3:00PM - Compliance Issues**  Clery Process and Communication Meeting Dr. Mitch Cordova  Attendees: Mitch Cordova, Kelli Smith, Sara Stensrud, Diania Tsenekos, Dan Hoover

**March 14, 2022**  President's calendar - meeting with Dr. Thomas to discuss culture climate survey.  2:00PM-3:00PM.  At 8:48 AM I send Vazquez and Stensrud comprehensive email with (7) attachments on cases mishandled by Kittleson and Jones, new check-off list.

**March 22, 2022  Agenda 1:1 Stensrud** Clery Compliance and status of Consultant/SME for training.  Based on conversations with Captain Slapp and Captain Rispoli, Title IX's frustration with FGCUPD and providing records was due to Title IX casting a wider net.  Slapp and Rispoli described Precious Gunter as unreasonable.

**March 28, 2022** Title IX training facilitated by Precious Gunter informs that FGCU has seen a significant increase in Discrimination/Harassment Complaints over the years.  Due to the lack of information sharing; it is unknown how this would affect Clery compliance.
Complaints:
2016/2017    113
2017/2018    192
2018/2019    266
2019/2020    321
2019/2020    346

.

10

2.      To the extent that you contend you have been subjected to gender discrimination in violation of Title VII or the FCRA during your employment with Defendant, please identify each act of gender discrimination. In responding to this interrogatory, please set forth each act; when the act occurred or was taken; where the act occurred or was taken; how it was communicated; and who was involved in or witnessed the act.

**RESPONSE:** See response to interrogatory no. 1 for details.

Gender discrimination due to Defendant not being Clery compliant can cause a more negative impact for females. Specifically, my concerns about the Respondent not being Clery compliant, through transparency and reporting, can have a negative effect pertaining to sexual harassment, assault and violence against female students.

W/F Dianna Sandora, the Communications Supervisor, advised that there was a distinction between how the dispatchers were treated and there was "an all boys club." I asked her what she meant and she said that the officers talked down to her and the other dispatchers – most of whom were female, and they were condescending. I asked if she spoke to Captain Slapp about it, she replied – he's one of them. Sandora told me she did not want to involve the Title IX office because she thought that with the implementation of a female chief, the culture would change. During the first few weeks of my employment during one of my 1:1s with Stensrud, I told her about what Sandora had reported.

During these supervisor meetings, I realized that all of the officers that had been attending "Train the trainer" type trainings were white males and a core group that was absorbing what I would describe as career building opportunities and benefits. I advised Captain Rispoli and Captain Slapp that we would spread "Train the trainer" opportunities around to be more equitable and diversify our instructors. Those training opportunities began with offering Officer Garcia an opportunity in September/October, 2021 for February, 2022.

On March 9, 2022, five (5) white male officers went directly to the President to complain about morale as the officers were being required to do more to ensure Clery compliance and accountability among other things. These officers went above me, the Associate Vice President (White Female), and Vice President (Hispanic Male) to the white male University President. FGCUPD is paramilitary organization. In effect, depending on the rank of those individuals, they went 3 – 4 ranks above their status by passing (2) female supervisors and (1) Hispanic male supervisor. This would not have been allowed for a male chief. It is totally unacceptable in law enforcement to jump the chain of command. Not only were they allowed to jump the chain of command but subsequently, one Captain was made interim Chief of Police and one of the other white males was promoted to interim lieutenant. Four of the five white males have been assigned more favorable shifts allowing for (3) day weekends, salary increases or both, while other department members were not afforded the same opportunities. The Respondent's sworn UPD leadership was then all white males.

It is important to note that Captain Rispoli was assigned to conduct an internal investigation on November 10, 2021 on W/M Officer William Winning and W/M Christopher Palmer for making an inappropriate comment that could have been perceived as having racial tones. Slapp and Captain Rispoli who began checking the men's room each morning. It was always found clean. I addressed this issue with the sergeants on a November 30, 2021, meeting and was synopsized in meeting notes taken by Nancy Rounsifer. The sergeants addressed their squads and were to begin checking the bathrooms before the end of the shift. Subsequent, checks of the bathroom after this meeting were met with cleanliness and no feces or urine in the toilet. I reported this to Strensud in one of our meetings; I also told her that I had purchased cleaning supplies. I do not recall which meeting it was. This behavior would never have happened in response to a male chief ordering an investigation.

In early December 2021, while Captain Rispoli was conducting the investigation, he made a biased based statement and was issued a verbal counseling. He told a dark complected Dominican Officer wearing a lime green shirt that he looked like a landscaper. This comment along with the investigation indicated that FGCUPD at minimum demonstrated implicit bias at the highest level of rank, but it appeared to be deeper than that with what was occurring in the Women's Restroom. I expressed this to Stensrud in our conversations. It should be noted that this was directed at the same officer that was provided with a Train the Trainer Instructor opportunity.

On March 29, 2022, I was terminated. I was replaced as Chief of Police by a white male. I always received good to very good performance reviews from the Respondent including a $10,000 a year pay increase and increased responsibilities 23 days prior to termination.

Due to the countless times including just prior to my termination that I expressed my concern about lack of Clery Compliance and gender based discrimination against myself and other females, I was subsequently terminated on March 29, 2022. My demands for Clery Act compliance and complaints of gender discrimination caused the Respondent to terminate my employment and was fueled by an institutional history of gender discrimination in an environment dominated by white males.

3.      To the extent that you contend that you have been retaliated against for engaging in protected activity under Title VII or the FCRA, please identify each act of retaliation. In responding to this interrogatory, please set forth each act; when the act occurred or was taken; where the act occurred or was taken; how it was communicated; and who was involved in or witnessed the act.

**RESPONSE: See response to interrogatory no. 2.**

4.      Please identify each instance in which you communicated an opinion or contention that Defendant was not in full compliance with the Clery Act during your employment.

For each, identify the time, date, location, persons communicated with, how the communication was made (verbal or in writing), and the context of the communication as to whether it was an informal discussion or formal meeting; and explain with specificity how you contended at that time that Defendant was not in full compliance with the Clery Act.

**RESPONSE:** Per Rule 33(d), please see Plaintiff's documents served in response to Defendant's Request for Production. **See response to interrogatory no. 1.**

5.    Please set forth the factual basis for your contention that "**SMITH** complained to the Defendant about its violations of Title IX," as alleged in paragraph 103 of the Complaint. In responding to this interrogatory, identify the specific action taken by you; to whom you made the report or complaint; the substance of the report or complaint; any witnesses to or individuals with knowledge of the alleged report or complaint; the date on which you took each specific acts or made the report or complaint; and how you made the report or complaint.

**RESPONSE: See response to interrogatory nos. 1 and 2.** I brought forward that students reporting sexual assaults were at risk when there were potential patterns occurring. These patterns in the fall of 2021 included reports of alleged sexual assaults at off-campus fraternity parties. The awareness of these incidents were learned in various methods, BCAT meetings, other law enforcement partners in the area, and housing and residence life. In one instance, a juvenile was the reporting victim of a sexual assault and no notification to the Florida Department of Children and Family Services (DFC) as required by State Statute.

March 28, 2022 Title IX training facilitated by Precious Gunter informs that FGCU has seen a significant increase in Discrimination/Harassment Complaints over the years. It established a culture of Discrimination/Harassment.

This presentation by Title IX Director of Equity, Ethics and Compliance, and Title IX Coordinator.

Slide depicts (OIEC Reports):
2016/2017    113
2017/2018    192
2018/2019    266
2019/2020    321
2019/2020    346
7/1/2021 – presentation 285 complaints received.

This represents a greater than 200% increase in 4 years.

13

Dr. April Palmer was notified by Deontre Whitaker of Student Conduct that officers were treating students differently based on race and gender. He specifically said that officers would elect to send attractive white female students through university conduct (administrative rather than criminal) for the same offenses that males would commit and a greater disparity existed between white males, black males, black females and white females. I spoke with Whitaker and he said that there was data that existed to support this but was afraid to provide it because it was common knowledge that the PD was racist and sexist and FGCU overall was racist and sexist. I submitted a Public records request for communication between myself and Whitaker but overall costs prohibited filling this request.

I was the first female in the Public Safety Building most mornings. Although the building was shared with other entities, it was locked down and secured at night be the officers until business hours the next morning. After assigning Captain Rispoli an Internal Investigation on Officer Plamer and Officer Winning (2 white male officers) for racist comments made on a traffic stop, the women's restroom would have feces and urine left in the toilet. Urine would also be left on the seat in the Women's Restroom. She noticed that the incidents coincided with the shift rotation in which Winning and Palmer were working. Smith spoke with Rispoli and Slapp and had them check the men's bathroom over the next few weeks and the men's rooms were unaffected. I purchased cleaning products and posted a sign in the women's restroom about cleanliness. The matter was addressed during the sergeant's meeting in November, 2021 in which I told the Seargents it would become their responsibility to inspect that bathrooms before and after their respective shifts. After this was addressed, there were no other incidents with feces or urine being in the women's restroom toilet at 7:00 AM on the rotation of Winning and Palmer.

I heard Captain Rispoli tell an officer that is of Dominican ethnicity, who was wearing a neon green wet/dri that he looked like he was an FGCU landscaper. This statement came while Captain Rispoli was conducting an internal affairs investigation into officers making comments to individuals on a traffic stop that had nun chucks – "which one is Jackie Chan". Smith immediately addressed Captain Rispoli in her office and later spoke with the officer to advise him of complaint and reporting options.

On October 6, 2024 Smith emailed and scheduled a meeting to address the University's handling of Sexual Assaults reported to various departments with the following members of University Leadership:

Vee Leonard – FGCU General Counsel
Sara Stensrud – AVP
Precious Gunter – Title IX Director
Emily Nana – Title IX
April Palmer – Dean of Students

14

See 10.29.21 Email from Nanna to Smith re Clery
See email strand – "Another one" from Emily

6.      Please set forth the factual basis for your contention that "Said protected activity was the proximate cause of the Defendant's negative employment actions against **SMITH**," as alleged in paragraph 105 of the Complaint.  In responding to this interrogatory, please set forth each "negative employment action"; when the act or action occurred or was taken; where the act or action occurred or was taken; how it was communicated; and who was involved in or witnessed the act or action.

**RESPONSE:** My direct supervisor frequently complimented my performance, my evaluation was positive and I received a large raise  and additional responsibilities  shortly before I was terminated on March 29, 2022.  However, my constant push to bring equality and compliance to the university was met with resistance.  I was replaced by a white male so the Defendant could continue with it's pattern  and practice  of gender based discrimination.

7.      Please set forth the factual basis for your contention that "Smith has exhausted her administrative remedies and this count is timely brought" as alleged in paragraph 62 of the Complaint.

**RESPONSE:**  Per Rule 33(d), please see Plaintiff's documents served in response to Defendant's Request for Production.  Specifically, please see folder labeled "EEOC."

8.      Do you contend that there is any direct evidence of retaliation as defined by the Eleventh Circuit, see Fernandez v. Trees, Inc., 961 F.3d 1148, 1156 (11th Cir. 2020), to support your claims?  If so, please provide the factual basis for this belief, including identifying the purported direct evidence, who was involved, when it occurred, and any witnesses to the statement or event.

**RESPONSE: No.**

9.      Unless identified in response to Interrogatory No. 8, please identify any discriminatory, retaliatory, or offensive comment, statement, or remark made by any current or former employee of Defendant that you contend supports your claim of discrimination or retaliation in the Complaint.  In responding to this interrogatory, please set forth each comment, statement, or remark; who made the comment, statement, or remark; when the comment, statement, or remark was made; where the comment, statement, or remark was made or how it was communicated; and any witnesses to the comment, statement, or remark.

**RESPONSE:**

I heard Captain Rispoli tell an officer that is of Dominican ethnicity, who was wearing a neon green wet/dri that he looked like he was an FGCU landscaper. This statement came while Captain Rispoli was conducting an internal affairs investigation into officers making comments to individuals on a traffic stop that had knun chucks – "which one is Jackie Chan". I immediately addressed Captain Rispoli in my office and later spoke with the officer to advise him of complaint and reporting options.

Rispoli would frequently tell me that he never worked so hard his entire life before she began working there. She expected more than he could give.

Dr. April Palmer was notified by Deontre Whitaker of Student Conduct that officers were treating students differently based on race and gender. He specifically said that officers would elect to send attractive white female students through university conduct (administrative rather than criminal) for the same offenses that males would commit and a greater disparity existed between white males, black males, black females and white females. I spoke with Whitaker and he said that there was data that existed to support this but was afraid to provide it because it was common knowledge that the PD was racist and sexist and FGCU overall was racist and sexist. I submitted a Public records request for communication between myself and Whitaker but overall costs prohibited filling this request.

W/F Dianna Sandora, the Communications Supervisor, advised that there was a distinction between how the dispatchers were treated and there was "an all boy's club." I asked her what she meant and she said that the officers talked down to her and the other dispatchers – most of whom were female, and they were condescending. I asked if she spoke to Captain Slapp about it, she replied – he's one of them. I reported this to Sara Stensrud in one of our 1:1 meetings.

Based on my positional authority as Chief of Police, there weren't any overt gender based comments made directly to me; that behavior would have been insubordination and would potentially subject the guilty party to termination. The behavior that I experienced directly was passive aggressive with an undercurrent by the (5) white males; (2) of which were the highest ranking officers within the department. These (5) white male officers operated deliberately around the Chain of Command that consisted of (2) white females and (1) Hispanic male to go directly to the President of the University.

10.    Please identify all individuals who were similarly situated in all material respects to you, as defined by the Eleventh Circuit, see Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1227–28 (11th Cir. 2019), and were treated differently than you, with respect to your termination of employment. In responding to this interrogatory, identify the individual, when the individual was employed, what conduct the individual engaged in or was alleged to have engaged in, how the individual was similarly situated in all material respects to you, and how the individual was treated differently.

**The following were allowed to divert from the chain of command, Slapp, Jones, Rispoli were all promoted. All (5) ultimately received better shifts and schedules.**
Rispoli
Slapp
Jones
Kittleson
Anderson

Slapp was promoted to Interim Chief and then Chief. He received a substantial salary increase. He had been slated to retire May, 2022 and ultimately delayed until 2024. Rispoli was named Deputy Chief and received a substantial salary increase. He was slated to retire in December, 2022 and delayed it. Sgt. Jones was promoted to Interim Lt and received a substantial pay increase. He was again promoted to Captain. Kittleson benefited through shift scheduling. Anderson benefited through shift scheduling.

Brian Fisher – he was offered career coaching despite numerous noted performance deficiencies.

Dr. Ron Toll was given a (1) year sabbatical with full pay and benefits despite his performance and reputation.

Dr. Mitchell Cordova is currently on a (1) year sabbatical with full pay and benefits despite FGCU metrics dropping in the higher education industry.

Former Athletic Director Ken Kavanuagh had been the subject of complaints and exposure to litigation. After many years of this, he was given (6) months until his mandatory retirement. He ultimately negotiated a settlement with FGCU. Basketball

Coach Pat Chambers was hired in March, 2022 despite being fired by Penn State for using the term "noose" with a black basketball player. This story made national news. FGCU continues to retain him.

Former Chief Steve Moore – his chain of command was respected by university officials.

Other FGCU employees subject to complaints (s) about performance were offered supportive measures like Bryan Fisher who a firm was paid $6000.00 to aide in his performance deficiencies.

11.    Please identify any other evidence of discriminatory or retaliatory intent not otherwise identified in response to Interrogatory Nos. 8–10 that you contend supports your claims of discrimination or retaliation in the Complaint.

**RESPONSE:**

On **January 24, 2022** I acknowledged in Workday Rising the FY 21/22 Leadership Mid Year Review completed by Sara Stensrud. There were no performance deficiencies noted and no areas marked for improvement.

**Email February 10, 2022** Emergency Manager Ruth Rodriguez emailed Sr Associate Vice President Sara Stensrud and I that the FSU Police Chief position was open.

Stensrud replied, "Yup! There are 5 HR leader (CHRO) openings as well.   :

Smith replied, "The answer for you is – No! The end, :0)"

Stensrud replied, "You toooooo!!!!"

**February 14, 2022** I participated in the Pancake cookoff and see Dr. Thomas. He tells me that he has heard good things about me. "I know you were the real deal when you interviewed." We talk about collaborating in the future.

**March 6, 2022** I received a $10,000 a year increase and the return of Parking Services assigned under the span of my control.

**March 9, 2022** Unbeknownst to me, Senior Associate Vice President Sara Stensrud (white female) and Vice President David Vazquez (Hispanic Male) Sgt. Myles Kittleson, Sgt. Brian Jones, Acting Sergeant Joseph Anderson, Captain Anthony Rispoli, and Captain James Slapp; all 5 white males went directly to W/M President Michael Martin to complain about me. FGCU PD is a para military structure with a Chain of Command. These officers effectively jumped 3 to 4 levels of command depending on rank, all of which are protected classes.

**March 10, 2022** I met with human resources to discuss a proposed Organization Chart for the Police Department. During that meeting, the Human Resources person (either Heather or Tracey) told me that it was outstanding because my plan included a legacy plan for growth and a blueprint for the organization. They said this was the first time HR had ever been brought in at such an early stage especially when the unit is under a collective bargaining agreement. During that meeting, I was called to meet with VP Vazquez and AVP Stensrud @4:30PM. I was informed that some officers spoke to the president about low morale. I identified that 2 were likely Jones and Kittleson due to addressing performance deficiencies. Stensrud and Vazquez both concurred that Kittleson shared some type of personal relationship with President Martin. Vazquez and Stensrud acknowledged how this made my job hard. She said that they had complete faith in my ability and recognized that there would be "negative attrition" due to higher expectations of policing services. Stensrud offered to have a resource brought in to assist me and coach different leadership styles. I welcomed it and asked for team building as well. She said that this was a common approach the University has taken when these things occur. She spoke of Brian Fisher and the coach for him. I discussed the attempted sexual assault case

18

that Sgt. Jones mishandled and the missing person case that Sgt. Kittleson mishandled. Vazquez said that he wanted to reassure me that he knows I was the right person for the job and that this would be resolved.

**March 14, 2022**

President's calendar - meeting with Dr. Thomas to discuss assessment. 2:00PM=3:00PM

@8:48 AM I send Vazquez and Stensrud comprehensive email with (7) attachments on cases mishandled by Kittleson and Jones, new check-off list. Etc...

At 7:14 PM Dr. David Thomas emails Dr. Martin and explains as a researcher, he should be allowed to conduct an assessment and Martin should not do anything rash:

March 22, 2022  Agenda 1:1 Stensrud Clery Compliance and status of Consultant/SME for training.

Vazquez & Stensrud Calendar - Dr. Dave Thomas @3:30PM-4:00PM

1:11 PM Vazquez emails Dr. Martin.  Email says that Thomas' recommended a comprehensive review that measures internal and external factors to assess what need to happen to go forward. Vazquez says, "his experise will be of great value". He says Thomas recommended a discussion with me to discuss what is being considered, discuss complaints and concerns and the vehicle to address them.  He says he and Stensrud would like to proceed and asks for Martin's position.

4:13 PM Martin responds, "Thanks! Yes proceed. Mike"

**March 23, 2022**  Meeting with Vazquez and Stensrud @ 0800 hours.  They informed me that FGCU was contracting with Dr. Thomas to assess FGCUPD and figure out where the challenges were: If it was my leadership, refusal to embrace new policing philosophies.  I expressed enthusiasm and that whatever Dr. Thomas had to say I would receive the message and grow from it.  They said he recently did the same for U of F PD.  They told me not to worry about anything as this was a healthy direction for the PD>

**March 28, 2022**  1:1 Stensrud - Proposal received from Dr. Thomas and just needed to massage a few things in the language but it would move forward.  Expected him to start in April and it would take a few weeks.  Told not to worry - that everything was fine and this would be a good jump off point moving forward.

**May 2, 2022** Office of VP Administrative Services and Finance announcing UPD survey retaining Dr. Thomas' services.

12.     Please identify any and all physicians (including medical doctors, doctors of osteopathy, chiropractors, or any other health care provider); psychologists, psychiatrists,

or other mental health counselors or professionals; any hospitals, clinics, or pharmacies; or ministers, counselors, or any other person with whom you consulted or sought or received treatment, or whom you contacted, because of any physical or mental condition, infirmity or harm which you allege to have been caused by any act or omission of the Defendant or for which you otherwise contend the Defendant is liable, including, but not limited to, alleged emotional distress, mental anguish, or any other injuries arising out of or relating to your allegations in this action and/or with whom you have discussed your  physical, emotional, or mental condition during the past five years.  In responding to this interrogatory for each individual, please set forth the name and business address of the individual, the dates of each contact, and the reason you contacted or met with the individual.

**RESPONSE:** I did not have health insurance and was unable to pay for mental health treatment. I was unable to even fill my blood pressure and thyroid prescriptions.  My sister Cathi Dorn, served as my biggest counsel during this difficult time.

13.    With as much specificity as possible, please set forth all injury or harm you contend you have suffered and the exact amount of damages that you claim, whether as an affirmative claim or as a setoff, and include in your answer: the act to which the item of damages relates; a statement of the elements of each claim of money damages and the amount being sought with respect to each element; the category into which each item of damages falls, i.e., lost wages and benefits, other economic damages, compensatory damages, interest, and any other relevant categories; the monetary value placed on each category of damage; the factual basis for each item of damages; and an explanation of how you computed each item of damages, including any mathematical formula used.

**RESPONSE[1]:**  My salary with the Defendant at the time of my termination was

$135,000.00.  $135,000.00.÷ 12 = $11,250.

| Description | Amount |
|---|---|
| Lost Wages- from Mar. 29, 2022  to Aug. 2025 $11,250/month x 41 months (estimated) | $461,250.00 |
| Noneconomic Damages | $300,000.00 (or statutory maximum) |
| Front Pay | $135,000.00 |
| Lost Benefits | TBD |

---

[1] This includes my salary at the time of termination, it does not include the state supplement that I obtained from the state or any raises or other remuneration that I would have received had I not been terminated.

| Attorney's Fees and Costs<br>  - EEOC/Pre-suit: $4,500.00<br>  - Pleadings: $4,500.00<br>  - Discovery: $19,250.00<br>  - Trial: $48,500.00 | $76,750.00 |
| --- | --- |

Plaintiff's emotional distress damages are not susceptible to calculation and determined by the sound conscience of the jury. *See Williams v. Trader Pub. Co.,* 218 F.3d 481, 487 n.3 (5th Cir. 2000) ( noting that "since compensatory damages for emotional distress are necessarily vague and are generally considered a fact issue for the jury, they may not be amenable to the kind of calculation contemplated by Rule 26(a)(1)(C)").

When I applied for the position of Chief of Police for Defendant, I was 1 of 70 or more applicants and was selected for the job based on my experience, work history, personal references, and other factors as determined by FGCU. My salary at separation was $135,000.00; having received a $10,000.00 pay increase days before my unexpected termination. My benefits included a contribution to a 403b account, 176.697 vacation hours annually, 104 sick hours annually, health insurance, uniform allowance and other fringe benefits. My salary and benefits were subject to improve and increase. First responders saw several state grants from the governor during 2022 and possibly other years. I had the reputation, experience, and skillset that saw me in contention for Chief of Police positions in which I applied.

Instead of continued career growth, I have applied for at least 63 jobs since April, 2022 at all levels of employment; entry level through executive level. I secured a mid-level position in October, 2023 at $61,000 annually with benefits of 104 vacation hours, 104 sick hours, and lower state level benefits. In many instances, I am not even selected for an interview.

I have had to access my 401k account for greater than $200,000.00 since my termination. My savings continues to deplete due to my inability to secure a executive level position and a salary commensurate with the (3) previous Chief of Police jobs that I have held.

> Unemployed                          April 1, 2022 – October 13, 2023
> Employed at $61,000 annually        October 13, 2023 – current

> Additional financial impacts included accessing the affordable care act which presented a tax liability of nearly $10,000.00

14.    Please identify all efforts you have made to obtain employment during the period beginning January 1, 2022, through the present date. For each job you have held during that period, set forth the name of your employer, the employer's address, the employer's telephone number, the title of the position, the duties of the position, your supervisor's

21

name, your wage or salary rate, the total amount of wages or salary earned, and, if you no longer work for that employer, the reason for your separation from employment. For each position you unsuccessfully sought or declined employment, please state the dates of contact between you and that entity regarding potential employment, the method of contact between you and that entity (i.e., e-mail, telephone, internet or electronic device, United States mail, in person), whether a written or electronic application or resume was completed or submitted by you to such entity, whether any offer of employment was made to you by such entity, and whether, if an offer was made and declined, the reason for declining such offer.

**RESPONSE:**

### Job Applications and Status

| | Date | Organization/Position | Status |
|---|---|---|---|
| 1. | June, 2022 | New College Chief of Police | Interview |
| 2. | June 7, 2022 | Correctional Probation Sr Officer | No Response |
| 3. | June 30, 2022 | FDC Law Enf Criminal Investigator | No Response |
| 4. | June 30, 2022 | Dept Legal Affairs Sr Investigator | No Response |
| 5. | June 30, 2022 | State Attorney's Office Coordinator | No Response |
| 6. | July 7, 2022 | Dept Financial Svcs Financial Inv | No Response |
| 7. | July7, 2022 | Dept Financial Svcs Investigator 1 | No Response |
| 8. | July 13, 2022 | FDLE Research and Training Specialist | No Response |
| 9. | July 27, 2022 | DFS Law Enf Investigator II | No Response |
| 10. | August 2, 2022 | State Court System Chief Deputy Marshal | No Response |
| 11. | August 24, 2022 | FDC Law Enforcement Inspector | No Response |
| 12. | August 27, 2022 | FDLE CJ Info Specialist | No Response |

13. September, 2022   Eckerd College Director of Security      Offered Job - rescinded after talking to FGCU -Voice Mails advising moving forward with background, voice mails to references)

14. January 25, 2023   State College of Florida                No Response

15. March 14, 2023   Title IX Investigator                     No Response

16. April 17, 2023   FCHR Investigation Specialist             No Response

17. May 31, 2023   OAG DLA Financial Investigator              No Response

18. June 1, 2023   St. Petersburg PD Training Specialist       No Response

19. June 7, 2023   DFS LE Investigator II                      Interview

20. June 8, 2023   Rubicon Emergency Management                No Response

21. June 8, 2023   Peragon Investigator                        No Response

22. June 8, 2023   Rubicon Emergency Management                No Response

23. June 8, 2023   Naples Police Chief                         Questionnaire

24. June 18, 2023   Inspector General Sr Inspector Detective   Interview

25. June 20, 2023   DBPR LE Investigator II                    No Interview

26. June 20, 2023   Florida Gaming Control Commission Inspector   No Interview

27. June 21, 2023   Florida Office of the Attorney General Sr. Financial Inv.
                                                              Hired 10/13/23 61k

28. June 21, 2023   Due Diligence Investigator                 No Response

29. June 21, 2023   USF Assistant Director of Emergency Mgmt   No Response

30. June 21, 2023   Wells Path Security Director               No Response

31. June 21, 2023   Inspector General State of Florida         No Response

32. June 21, 2023   Asst. Director Emergency Safety and Security   No Response

23

| | | |
|---|---|---|
| 33. June 27, 2023 | Pembroke Park Police Chief | No Response |
| 34. July 5, 2023 | ESRD Emergency Management (Haggarty Consulting) | |
| | | Interview |
| 35. July 7, 2023 | St. Petersburg Community College AVP Safety and EM | |
| | | No Response |
| 36. July 10, 2023 | Keiser University Instructor | No Response |
| 37. July 12, 2023 | Indian River State College | No Response |
| 38. July 12, 2023 | TIA Emergency Operator Manager | No Response |
| 39. July 16, 2023 | State Attorney's Office Investigator III | No Response |
| 40. July 19, 2023 | FCOR Commission Investigator | No Response |
| 41. July 19, 2023 | DACS LE Lieutenant | Interview |
| 42. July 26, 2023 | FCHR Investigation Specialist | No Response |
| 43. August 1, 2023 | Artis Naples Security Director | No Response |
| 44. August 1, 2023 | Spectrum Corporate Physical Security Director | No Response |
| 45. August 4, 2023 | FEMA Emergency Management Specialist | No Response |
| 46. August 4, 2023 | Prince George Maryland Police Chief | No Response |
| 47. August 4, 2023 | Town of Bay Harbor Deputy Chief | Interview |
| 48. August 15, 2023 | Sunrise Police Department Chief of Police | No Response |
| 49. August 15, 2023 | North Port Security Manager | No response |
| 50. August 17, 2023 | FDLE Research and Training Specialist | No Response |
| 51. August 18, 2023 | High Point Police Department Chief of Police | No Response |
| 52. August 18, 2023 | Wage and Hour Investigator | No Response |

| | | |
|---|---|---|
| 53. August 25, 2023 | Product Liability Investigator | No Response |
| 54. August 25, 2023 | Special Investigations Unit Investigator | No Response |
| 55. November 5, 2023 | Inspector General Detective Supervisor | No Response |
| 56. November 22,2023 | Deputy Director Public Safety Manatee County | Interview |
| 57. December 5, 2023 | Pinellas County School Board Police Major | Interview |
| 58. January 1, 2024 | Sarasota County Public Schools Police Chief | Interview |
| 59. February, 2024 | Tampa Bay Devil Rays Facility Security Dir. | Interview |
| 60. March 6, 2024 | FDC LE Inspector Detective | Interview |
| 61. May 5, 2023 | DLA Law Enforcement Lt | No Response |
| 62. May 8, 2024 | Punta Gorda Police Chief | No Response |
| 63. June 17, 2024 | DOC FDC LE Inspector Detective | No Response |

**Application submittal sites:**
My Florida Jobs website (print out accompanied)

Government website or agency specific website

Private employer website, Indeed or Linkedin.

15.    If you have received any income from alternate employment, self-employment, or from sources other than employment during January 1, 2022, to the present, please list the following:

a.    The name, address, and phone number of every source from which you received income, compensation, gifts, benefits, or other things of value (if the source is an entity other than a single individual, please provide the name of your principal contact at that entity);

**RESPONSE:**
Florida Office of the Attorney General
Sr Financial Investigator
3507 E Frontage Road

Tampa, Florida 33607
October 13, 2023 – current
(813)287-7111
Salary $61,000 annually

Morgan Stanley
David gross
1801 N Military TR St300
Boca Raton Florida 33431
561-620-5000
Withdrawals from 401k

Florida Department of Unemployment
Reconnect Claimant Login - FloridaJobs.org

b.   The total monetary value of the income, compensation, gifts, benefits, or other things of value that you received from each source during the specified year (please state this figure as a gross amount, *i.e.,* without adjustment for taxes or other deductions);

Annual Salary $61,000
Unemployment $3300 x 2 = $6600
Morgan Stanley greater than $200,000.00

c.   The nature of the income, compensation, gifts, benefits, or other things of value that you received from each source (*i.e.,* wages, income from self-employment, gift, etc.);

Employment compensation
401k withdrawals
Unemployment compensation

d.   The dates on which amounts were received from each such source (if multiple payments were made on a regular basis, specify the beginning and ending dates of the period, the frequency with which payments were received, *i.e.* monthly, weekly, every two weeks, and any irregularities in the payment cycle).

Every two weeks since November 3, 2023 through current my sister Cathi:
July 31, 2024        $500.00
August 25, 2024      $300.00
September 25, 2024 $250.00
September 25, 2024 $500.00

16.    Please identify each and every time from January 1, 2022, to the present, in which you applied for workers' compensation benefits; disability benefits, including social security disability benefits; unemployment benefits; and retirement benefits of any kind. For each application, list the date of the application, who you submitted the application to, and the outcome of the application.

**RESPONSE:**  Unemployment compensation benefits:

| | |
|---|---|
| 2022 – May 17, 2022 – September 9, 2022 | $3300.00 |
| 2023 – June 15, 2023 – September 7, 2023 | $3300.00 |

17.    State whether, in the last ten (10) years up through the date of your response, other than in your role as a witness in any criminal or civil proceeding in which you appeared solely as part of your duties as a law enforcement officer and not in any personal capacity, you have ever filed or been a party or witness to any civil, criminal, or administrative proceeding, any bankruptcy proceeding, internal investigation (including Internal Affairs investigations), or other proceeding, charge of discrimination, administrative or agency complaint, or any proceeding resolved in mediation and/or arbitration or by any kind of pretrial intervention program or deferred prosecution agreement.  If so, identify, as to each, when the suit, complaint, or charge was filed or investigation or proceeding initiated; the name and address of your attorney, if any; the names and addresses of all the parties thereto; the subject matter of the proceeding; and the result, outcome, verdict, sentence, or terms of any agreement of each such suit or proceeding.

**RESPONSE:**
Hurricane Ian Velocity Homeowners Insurance Plaintiff
McDonald and Barnhill P.A. Ryan Gontrum Settlement
505 S Magnolia Ave
Tampa, FL 33606
(813) 265-2020
Resulted in pre-suit settlement

Auto Accident – filed in Orange County, Florida

18.    Please identify each personal website or social networking internet site you have used or maintained since January 1, 2022, including, but not limited to, each and every account on Facebook, Twitter, LinkedIn, Instagram, Snapchat, and/or Tiktok.

**RESPONSE:**
Facebook – kjs kjs
Linkedin.com/kelli-smith-23366713
Linkedin.com/kelli-smith-8a027629a

27

19.    Please identify each e-mail address and telephone number used by you during the period of January 1, 2022, to the present. In responding to this interrogatory, please state each e-mail address and telephone number, the starting and ending dates you used each telephone number or e-mail address, the subscriber or individuals associated with the telephone number or e-mail address (if other than you), and the name of the provider, service, or company who provided, hosted, or maintained the telephone number or e-mail address.

**RESPONSE:**
321-303-5427                    Still current
Kjsmitty1569@gmail.com    Still current
Smithkelli@yahoo.com      Still current

20.    Please identify each and every person who answered any or all of these interrogatories, provided information for any answer, provided advice, or in any other way took part in the preparation of these answers, describing for each person so identified, what part he or she performed in the answering of these interrogatories.

**RESPONSE:** I responded to all interrogatories with assistance of counsel.


## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2024, I delivered the foregoing document via electronic mail to:

SACHA DYSON
sdyson@bgrhlaw.com

FRANK E. BROWN
fbrown@bgrphlaw.com

arobbins@bgrhlaw.com
Awhiteside@bgrhlaw.com
mmcleod@bgrplaw.com
eserve@bgrhlaw.com

s/ Benjamin H. Yormak
Benjamin H. Yormak

28

Florida Bar Number 71272
Trial Counsel for Plaintiff
YORMAK EMPLOYMENT &
DISABILITY LAW
27200 Riverview Center Blvd., Ste. 109
Bonita Springs, Florida 34134
Telephone: (239) 985-9691
Fax: (239) 288-2534
Email: byormak@yormaklaw.com



Florida Department of Corrections
Correctional Officer Supplemental Application and Willingness Questionnaire

Last Name:_____Smith_____First:_____Kelli_____Middle:___Jeanne___Suffix_____

### Background Investigation Information

Social Security No. _____

List all names you have ever used (include maiden, married, and nicknames)

_____Kelli J Smith_____

Physical Address:_____ County:_____

City: State:____Zip Code:_____ Email Address (REQUIRED):_____

Home Phone:_____ Cell Phone:_____ Other Phone: _____

**Yes** No I would like to receive text updates regarding my application status at the cell phone number listed above.  I
understand that standard messaging charges may apply, and I may choose to opt out at any time.

Driver License Number: State Issued By: ___FL___ Race: Sex: M F Date of Birth:_____

Place of Birth:_____
City State Country (example: Canada, Ireland, USA)  US Citizen? Yes No By Birth? Yes No By Naturalization? Yes No N/A

Military Experience: Yes No Service Branch __Type of Discharge _____ Dates of all periods of military service:

_____

Have you ever been employed as a Florida correctional, probation, or law enforcement officer? Yes No List employing agency:

__Yes___ Broward County Sheriff's Office 1992=1994; Osceola County Corrections 1994-1997; University of Central Florida Police

Department 1997-2017; Northern Arizona University Police Department 2017-2020; Longboat Key Police Department 2020-2021;

Florida Gulf Coast University 2021-2022     Fl. Dept of Corrections 1994 Tomoka CI

Institution/County of interest; enter preferred work location first. You must list at least one work location.

1._____FDC Investigator Assignment_____ / _____ 2._____ /
_____ Institution County Institution County Failure to fill this form out completely and accurately may result in the
elimination of your application from further consideration.

In accordance with section 119.071(5)(a)2 FS, your social security number is being collected for verification purposes. This collection is imperative for
the performance of this agency's duties and responsibilities as prescribed by law. Information submitted on the application must be verified prior to
appointment. Inclusion of the social security number will save staff time and result in the position being filled with prompt efficiency. The Department will
not use the social security number collected for any purpose other than the purpose provided above.



DC2-854 Revised 2/21/20 1

Florida Department of Corrections
Correctional Officer Supplemental Application and Willingness Questionnaire

Last Name:_____Smith_____First:_____Kelli_____Middle: __Jeanne_____Suffix_____

## Supplemental Application

| | |
|---|---|
| 1. Are you related to anyone presently employed with the Florida Department of Corrections? *If yes, give name, relationship, and place of their employment* | Yes/No |
| 2. Do you have a business or personal relationship with anyone presently incarcerated or under the supervision of the Florida Department of Corrections system? *If yes, give name, relationship, and place of incarceration or supervision.* | Yes/No |
| 3. Are you currently or have you ever been an approved visitor for anyone presently incarcerated by the Florida Department of Corrections? *If yes, give name, relationship, and place of incarceration.* | Yes/No |
| 4. Have you ever applied for or held a position (including internship, volunteer, contract, or OPS positions) with the Florida Department of Corrections? *If yes, give location(s), position(s), and date(s).*    1994 | Yes/No |
| 5. Have you ever worked for an entity (i.e. private contractor) that held any contractual relationship or financial interest with the Florida Department of Corrections? *If yes, provide the name of the contractor, location, and dates of employment.* | Yes/No |
| 6. Have you ever applied for or been employed by any law enforcement agency as a Correctional Officer, Probation Officer, or Law Enforcement officer? *If yes, give name of agency, position(s), and dates of employment.*  SEE   FRONT | Yes/No |
| 7. Have you ever taken a Florida Department of Law Enforcement (FDLE) officer certification examination? *If yes, what type? Correctional Officer Probation Officer Law Enforcement Officer* CORRECTION OFFICER \| LE OFFICER | Yes/No |
| 8. Has your FDLE certification ever been suspended, revoked, terminated, or expired? *If yes, explain.* | Yes/No |
| 9. Have you ever had any type of disciplinary action taken against you while employed as a Correctional Officer, Probation Officer, or Law Enforcement Officer? *If yes, explain.* | Yes/No |
| 10. Do you have any experience using a firearm? *If yes, what type of weapon(s)?* | Yes/No |
| 11. Have your driving privileges ever been canceled, suspended, or revoked? *If yes, explain.*    1989    INSURANCE REQ'S    (35 years AGO) | Yes/No |
| 12. Have you ever knowingly been investigated, arrested, or charged by any local, state, or federal agency or entity for any administrative, civil, juvenile, or criminal wrongdoing? *If yes, explain.* | Yes/No |
| 13. Have you ever committed a crime, whether arrested or not, that would constitute a felony or a misdemeanor, even if adjudication was withheld, charges were dismissed, the case was not prosecuted, records were sealed or expunged, charges occurred while a juvenile, or the case was disposed of through a pre-trial diversion or intervention program? *If yes, explain [include offense date(s), charge(s), and disposition details.]* | Yes/No |
| 14. Have you ever: | |

| a. been convicted of a felony or a misdemeanor? | | | | Yes No |
| b. pled Nolo Contendere or pled guilty to a crime which is a felony or a misdemeanor? | | | | Yes No |
| c. had the adjudication of guilt withheld for a crime which is a felony or a misdemeanor, including sealed or expunged records? | | | | Yes No |

*If you answered "Yes" to 14 a, b, or c, complete the following:*

| Date | Place | Law Enforcement Agency | Charge | Disposition Details |
|------|-------|------------------------|--------|---------------------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |



DC2-854 Revised 2/21/20 2

Florida Department of Corrections
Correctional Officer Supplemental Application and Willingness Questionnaire

Last Name: _____    First: _____    Middle: _____    Suffix _____

15. Have you ever:

| a. used or experimented with any illegal drug? | Yes No |
| b. sold, delivered, manufactured, smuggled, or trafficked in illegalsubstances or drug paraphernalia? | Yes No |
| c. possessed illegalsubstances or drug paraphernalia? | Yes No |

*If you answered "Yes" to 15 a, b, or c, explain below. List type drug or drug paraphernalia involved and date last used.* 1989-1990 I smoked marijuana approximately 6 times.

| 16. Have you ever been civilly or administratively adjudicated guilty to have engaged in any sexual abuse or sexual harassment? *If yes, explain.* | Yes No |
| 17. Have you ever had your privileges to carry a firearm revoked? | Yes No |
| 18. Do you now or have you ever had any affiliation with a known "gang" or threat group? *If yes, describe the circumstances in detail.* | Yes No |
| 19. *Do you have any "gang" or threat group related tattoos or tattoos that may appear to be "gang" or threat group related? If yes, please explain.* | Yes No |
| 20. Have you received monthly benefits under the Florida Retirement System (FRS) or taken <u>any distributions</u> under the FRS Investment Plan or optional non-FRS plans(CCORP, SUSORP, or SMSOAP)? *If yes, explain in detail.* | Yes No FRS Retiree |

21. List any special qualifications, skills, or certifications you may possess.

EXtensive  INVESTIGATIVE  EXPERIENCE

22. List all places you have lived for the <u>PAST TEN (10) YEARS</u> in chronological order. *(Begin with the present and work backwards for <u>10 years</u>. If more space is needed, attach a separate sheet of paper)*

| From | To | Street Address | City | County | State | Zip Code |
|------|-----|----------------|------|--------|-------|----------|
|      |    |                |      |        |       |          |
|      |    |                |      |        |       |          |
|      |    |                |      |        |       |          |
|      |    |                |      |        |       |          |
|      |    |                |      |        |       |          |
|      |    |                |      |        |       |          |

## Willingness Questionnaire

Please carefully read and review the following willingness questions. These questions pertain to the minimum requirements or essential functions of the Correctional Probation Officer job class. An unwillingnessto perform any of the following may cause your application to be removed from further consideration. You must explain unwillingnessto complywith any ofthese functions on Page 5.

| Are You Willing To: | | Are You Willing To: | |
|---------------------|---|---------------------|---|
| Work rotating shifts? | Yes No | Work any assigned shift? | Yes No |
| Work 12-hour shifts? | Yes No | Be present and on time when scheduled to work? | Yes No |
| Work weekends and/or holidays? | Yes No | Work overtime? | Yes No |
| Work an extended shift? | Yes No | Work on your days off when necessary? | Yes No |
| Report to duty during a natural disaster such as a hurricane, flood, or other emergency? | Yes No | Return to the institution at any hour during an emergency situation? | Yes No |



DC2-854 Revised 2/21/20 3

Florida Department of Corrections
Correctional Officer Supplemental Application and Willingness Questionnaire

Last Name: Smith    First: Kelli    Middle: JEANNE Suffix

| | | | |
|---|---|---|---|
| Be fingerprinted and for the fingerprints to be entered into a statewide automated identification system maintained by the Florida Department of Law Enforcement? | Yes No | Take a TB test annually? | Yes No |
| Notify your supervisor and Warden of any employment outside of the FDC? | Yes No | Be exposed to chemical agents such as pepper spray and tear gas? | Yes No |

Last Name: _Smith_    First: _Kelli_    Middle: _Jeanne_ Suffix____

**Section 943.17, Florida Statutes, directs the Criminal Justice Standards and Training Commission to give a test to basic recruit training graduates and candidates seeking an exemption from a Commission-approved Basic Recruit Program. The certification test provides the Commission with assurance that each person employed or appointed as a sworn officer in this State has the minimum knowledge required to perform competently. The Officer Certification test will be given at the end of a Commission-approved Basic Recruit Training Program or an approved Certification Examination Preparation Training Course. The test will be based upon an approved training exemption for out-of-state candidates.**

| AREYOUWILLINGTO: | |
|---|---|
| Reimburse the Department for Criminal Justice Standards and Training Commission approved advanced and specialized training taken for promotion consideration, mandatory retraining, salary incentive, or career development purposes if you do not successfully complete the training due to unsatisfactory performance or withdrawal for any reason other than death in the immediate family or personal illness or injury? The reimbursement will be made to the Department within 30 days in accordance with "Reimbursement for Basic Recruit Training and Related Expenses," Procedure 208.017. If you fail to make repayment within 30 days, you agree to have the repayment of the obligated amount deducted from any annual, sick, special/holiday compensation payments or any other payments due to you. | Yes No |
| Enroll in Criminal Justice Standards and Training Commission approved Basic Recruit Training Program within 180 days of initial employment and successfully complete the training within 18 months after enrollment if you are not currently a Certified Correctional Officer? (If applicable, training requires overnight travel for an extended period of time.) | Yes No |
| Pay the Florida Department of Law Enforcement Test fee (if you are not currently a Certified Correctional Officer) and take the first available test upon completion of required training? | Yes No |
| Pay an additional Florida Department of Law Enforcement test fee if you fail the first test and again take the test on the first available date? (Failure to do so will result in termination of your employment with the Department.) Additionally, if you fail the Florida Department of Law Enforcement test three times, you will be terminated from employment with the Department? | Yes No |

**How did you hear about this job?**

**Have you applied in the People First system at jobs.myflorida.com?**
Applying in People First is a required step of the process to be considered for employment.

| | | | |
|---|---|---|---|
| Participate in physical and firearms training? | Yes No | Carry a firearm? | Yes No |
| Participate in defensive tactics training? | Yes No | Maintain qualification in firearms (shotgun and handgun)? | Yes No |
| Maintain qualification in CPR and First Aid? | Yes No | Administer CPR and First Aid? | Yes No |
| Maintain all training requirements? | Yes No | Participate in additional training? | Yes No |
| Work on an outside post during extreme weather conditions, day or night? | Yes No | Work on whatever post assigned whether inside or outside? | Yes No |
| Supervise male or female inmates? | Yes No | Work with violent inmates, homosexual inmates, sex offenders, drug offenders, or inmates with AIDS? | Yes No |
| Be locked in a housing unit with male or female inmates? | Yes No | Walk through a large group of male or female inmates alone to count them? | Yes No |
| Shoot an inmate attempting to escape? | Yes No | Supervise a group of male or female inmates on work detail? | Yes No |
| Perform drug testing on inmates? | Yes No | Conduct a body search on a male or female inmate? | Yes No |
| Assist fellow officer in case of an emergency? | Yes No | Tolerate a certain amount of verbal abuse from inmates? | Yes No |
| Transport inmates statewide? | Yes No | Take short trips (100-200 miles) involving overnight travel or a few days at a time and, if appropriate, travel on a commercial airline? | Yes No |
| Stand on your feet for long periods of time? | Yes No | Sit alone for long periods of time and remain alert? | Yes No |
| Follow lawful orders of supervisors? | Yes No | Show respect to authority and rank? | Yes No |
| Obtain and maintain a valid driver license, if you do not already have one? | Yes No | Write an incident report in clear, concise language with correct grammar and spelling? | Yes No |
| Read and become familiar with institutional operating procedures and Department of Corrections directives, procedures, rules, and post orders? | Yes No | Enforce and comply with all rules and regulations governing inmates? | Yes No |
| Have your payroll warrant direct deposited in accordance with Florida Statutes and comptroller regulations? | Yes No | Keep information confidential and understand failure to do so will subject you to discipline, up to and including termination? | Yes No |
| Work in a non-smoking area? | Yes No | Comply with all FDC rules and procedures? | Yes No |
| Comply with the Agency's uniform and grooming rules and policy? | Yes No | | |



DC2-854 Revised 2/21/20 4

Florida Department of Corrections
Correctional Officer Supplemental Application and Willingness Questionnaire



Florida Department of Corrections
Correctional Officer Supplemental Application and Willingness Questionnaire

Last Name: __Smith__    First: __Kell.__    Middle: __Jeanne__ Suffix_____

## Acknowledgement of Basic Abilities Testing (BAT) Requirements

I hereby acknowledge the following:

- I understand that I am responsible for all costs associated with taking the BAT.
- I understand that I have 3 attempts to pass the BAT.
- I understand that I am required to take the first attempt within the first 30 days of employment. • I understand that my failure to achieve a passing score within 120 days of employment will result in my separation of employment from the Florida Department of Corrections.
- I understand that the BAT test is available through Pearson VUE testing labs and must be taken in the State of Florida.

_____    __24 April 2024__ Signature Date Signed

## Certification of Applicant (Read carefully before signing)

I understand that if I attend an approved Basic Recruit Training program at the expense of the Department of Corrections, I must remain employed with the department for a period of not less than two years. The obligation period begins the day after passing the state exam. I also understand that if I terminate employment onmy own initiative within two years, I shall repay the departmentforthe full cost oftuition andother course expenses paidfor me by the Department during the academy training period in accordance with chapter 943.16, Florida Statutes. I agree to have the obligated amount deducted from any annual leave payments,sick leave payments, special/holiday compensation payments or anyother payments due tome upon separation and reimburse the department for any remaining outstanding balance.

By submission of this electronic form, I hereby certify there are no misrepresentations, omissions, or falsification in the foregoing responses. I am aware that should an investigation disclose any misrepresentations, omissions, or falsifications, my application will be rejected and I will be disqualified for employment with the Florida Department of Corrections or, if aftermy acceptance for employment,subsequentinvestigationshoulddisclose misrepresentations,omissions,orfalsifications, it will be just cause for my immediate dismissal.

_____    __24 April 2024__ Signature Date Signed

DC2-854 Revised 2/21/20 6

Filing # 8649534 Electronically Filed 12/29/2013 PageID 912

IN THE CIRCUIT COURT OF THE 9th JUDICIALCIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

KELLI SMITH,                                          CASE No:

          Plaintiff,

vs.

STATE FARM MUTUAL
AUTOMOBILE INSURANCE COMPANY,

          Defendant.



---

## COMPLAINT AND DEMAND FOR JURY TRIAL

---

The Plaintiff, KELLI SMITH, by and through undersigned counsel, brings this action against the Defendant, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY (hereinafter "STATE FARM"), and allege as follows:

1.     This is an action for damages in excess of Fifteen Thousand ($15,000.00) Dollars.

2.     At all times material hereto, the Plaintiff, KELLI SMITH was a resident of Orange, Florida and is *sui juris.*

3.     At all times material hereto, Plaintiff, KELLI SMITH, operated a 2012 Buick Enclave.

4.     At all times material hereto, the Defendant, STATE FARM, issued its policy of insurance to and for the benefit of the driver, KELLI SMITH, and any person occupying a covered vehicle, such as, but not limited to, Plaintiff, KELLI SMITH, with uninsured/under insured motorist coverage, and said coverage inures to the benefit of the Plaintiff, KELLI SMITH.

*Smith vs. State Farm*
*Complaint*

5.    Policy No.: P09 5599-D17-59G and Claim No.: 59-2G23-903 provided uninsured/under insured motorist coverage in the amount of Twenty-Five Thousand ($25,000.00) Dollars, to the Plaintiff, KELLI SMITH.

6.    That on or about February 8, 2013, the Plaintiff, KELLI SMITH, was operating her motor vehicle, a 2012 Buick, Florida license plate number I291WT, at the intersection of Chuluota Road and Pickets Cove Road in Orange County, Florida.

7.    At that time and place, Casey William Hopkins, was operating a 1995 Acura, Florida license plate number BUXA55, and negligently operated or maintained her motor vehicle so that the vehicle collided with the vehicle Plaintiff, KELLI SMITH was driving.

8.    As a direct and proximate result of the foregoing negligence, Plaintiff, KELLI SMITH, suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, inconvenience, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The losses are either permanent or continuing and Plaintiff, KELLI SMITH, will suffer the losses in the future.

9.    That on or about February 13, 2013, the Plaintiff, KELLI SMITH, notified the Defendant, STATE FARM, of a formal claim being made under the uninsured motorist coverage provided to the Plaintiff under the terms of the contract or contracts of insurance between the Plaintiff, KELLI SMITH, and STATE FARM. Further, Plaintiff has performed all conditions precedent to the bringing of this action.

*Smith vs. State Farm*
*Complaint*

WHEREFORE, Plaintiff, KELLI SMITH, demands judgment against the

Defendant, STATE FARM, for compensatory damages, interest, costs, and any

other relief that this court deems just and proper, and further demands trial by

jury.

**LANE & DUCHEINE, PL**
*Counsel for the Plaintiff*
433 Plaza Real, Suite 275
Boca Raton, Florida 33432
Telephone: (561) 962-4142
Fax: (561) 218-4545
lane@rightstojustice.com


By: ___*/s/ Allison B. Lane*____
    **ALLISON B. LANE**
    Florida Bar No: 36017


**For service of pleadings:**
lane@rightstojustice.com
adam@balkanpatterson.com
tiffany@balkanpatterson.com
efile@balkanpatterson.com

**BALKAN & PATTERSON, LLP**
*Counsel for the Plaintiff*
1877 S. Federal Highway, Suite 100
Boca Raton, FL 33432
Telephone: (561) 750-9191
Fax: (561) 750-1574
adam@balkanpatterson.com
**ADAM M. BALKAN**
Florida Bar No. : 0044880

IN THE CIRCUIT COURT, OF THE NINTH
JUDICIAL CIRCUIT, IN AND FOR ORANGE
COUNTY, FLORIDA

CASE NO.: 2013-CA-015180-O
DIVISION: 33

KELLI SMITH,

        Plaintiff,

vs.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

        Defendant.

_____/



### DEFENDANT'S REQUEST FOR ADMISSIONS TO PLAINTIFF, KELLI SMITH

COME NOW the Defendant, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, by and through the undersigned attorneys, and pursuant to Rule 1.370, Florida Rules of Civil Procedure, requests the Plaintiff, KELLI SMITH, admit in this action that each of the following statements are true:

1.    Please admit that Plaintiff, KELLI SMITH, received benefits from a collateral source, as defined by §768.76, Florida Statutes, for medical bills alleged to have been incurred as a result of the incident described in the Complaint.

2.    Please admit that Plaintiff, KELLI SMITH, is entitled to receive benefits from a collateral source as defined in §768.76, Florida Statutes, for medical bills alleged to have been incurred as a result of the incident described in the Complaint.

3.    Please admit that Plaintiff, KELLI SMITH, received benefits from a collateral source, as defined by §768.76, Florida Statutes, for loss of wages or income alleged to have been sustained as a result of the incident described in the Complaint.

4.    Please admit that Plaintiff, KELLI SMITH, is entitled to receive benefits from a collateral source, as defined by §768.76, Florida Statutes, for loss of wages or income alleged to have been sustained as a result of the incident described in the Complaint.

5.    Please admit that Plaintiff, KELLI SMITH, received benefits under the Personal Injury Protection portion of an automobile policy for medical bills alleged to have been incurred as a result of the incident described in the Complaint.

6.    Please admit that Plaintiff, KELLI SMITH, is entitled to receive benefits under the Personal Injury Protection portion of an automobile policy for medical bills alleged to have been sustained as a result of the incident described in the Complaint.

7.    Please admit that Plaintiff, KELLI SMITH, received benefits under the Personal Injury Protection portion of an automobile insurance policy for loss of wages or income alleged to have been sustained as a result of the incident described in the Complaint.

8.    Please admit that Plaintiff KELLI SMITH, is entitled to receive benefits under the Personal Injury Protection portion of an automobile insurance policy for loss of wages or income alleged to have been sustained as a result of the incident described in the Complaint.

9.    Please admit that Plaintiff, KELLI SMITH, received benefits under the medical payments provisions of an automobile insurance policy for medical bills alleged to have been incurred as a result of the incident described in the Complaint.

10.   Please admit that Plaintiff, KELLI SMITH, is entitled to receive benefits under medical payments provisions of an automobile insurance policy for medical bills alleged to have been incurred as a result of the incident described in the Complaint.

11.   Please admit that Plaintiff, KELLI SMITH, is subject to a deductible under the Personal Injury Protection portion of an automobile insurance policy.

12.   Please admit that Plaintiff, KELLI SMITH, received benefits pursuant to personal or group health insurance policy, for medical bills alleged to have been incurred as a result of the incident described in the Complaint.

13.   Please admit that Plaintiff, KELLI SMITH, is entitled to receive benefits pursuant to personal or group health insurance policy, for medical bills alleged to have been incurred as a result of the incident described in the Complaint.

2

14.    Please admit that Plaintiff, KELLI SMITH, received benefits pursuant to a personal or group wage continuation plan or policy, for loss of wages or income alleged to have been sustained as a result of the incident described in the Complaint.

15.    Please admit that Plaintiff, KELLI SMITH, is entitled to receive benefits pursuant to a personal or group wage continuation plan or policy, for loss of wages or income alleged to have been sustained as a result of the incident described in the Complaint.

16.    Please admit that Plaintiff, KELLI SMITH, at the time and place of the incident described in the Complaint, had available a functional and operational seat belt/shoulder harness restraint system.

17.    Please admit that Plaintiff, KELLI SMITH, at the time and place of the incident described in the Complaint, was not wearing the available and functional and operational seat belt/shoulder harness restraint system.

18.    Please admit that on the date of the accident alleged in your Complaint, Defendant, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, complied with and met the security requirements under Chapter 627.730 - 627.7405, Florida Statutes.

19.    Please admit that Plaintiff, KELLI SMITH, was **NOT** the title owner of the vehicle he/she was occupying at the time of the subject motor vehicle accident.

20.    Please admit that Plaintiff, KELLI SMITH, was partially responsible for the subject accident.

21.    Please admit that Plaintiff, KELLI SMITH, did **NOT** suffer a permanent injury as a result of the subject accident.

22.    Please admit that Plaintiff, KELLI SMITH, is claiming damages for medical expenses which were **NOT** legally caused by the subject accident.

23.    Please admit that Plaintiff, KELLI SMITH, did **NOT** incur past lost wages or loss of income as a result of the subject accident.

24. Please admit that Plaintiff, KELLI SMITH, did **NOT** suffer a loss of future earning capacity as a result of the subject accident.

25. Please admit that Plaintiff, KELLI SMITH, is claiming damages for past lost wages/income which were **NOT** legally caused by the subject accident.

26. Please admit that Plaintiff, KELLI SMITH, is **NOT** in need of any future medical treatment as a result of the subject accident.

27. Please admit that Plaintiff, KELLI SMITH, has pre-existing medical conditions which were **NOT** permanently aggravated as a result of the subject accident.

28. Please admit that Plaintiff, KELLI SMITH has pre-existing medical conditions which were **NOT** temporarily aggravated as a result of the subject accident.

I HEREBY CERTIFY that on the 24th day of February, 2014 a true and correct copy of the foregoing was electronically filed with the Florida Courts E-Filing Portal system which will send a notice of electronic filing to Adam M. Balkan, Esq., Balkan & Patterson, LLP, 1877 S. Federal Highway, Suite 100, Boca Raton, FL 33432 at adam@balkanpatterson.com; efile@balkanpatterson.com; tiffany@balkanpatterson.com; Allison B. Lane, Esq., Lane & Ducheine, PL, 433 Plaza Real, Suite 275, Boca Raton, FL 33432 at lane@rightstojustice.com.

**MIMI L. SMITH & ASSOCIATES**

BY: _____
_____
MICHAEL W. WHITAKER, ESQ.
Attorney for Defendant, State Farm
301 East Pine Street, Suite 700
Orlando, FL 32801
Telephone: (407) 872-2498
Facsimile: (407) 648-2291
Florida Bar No. 717843
**E-mail for service (FL R. Jud. Admin. 2.516):**
flor.law-mlslaw.172o19@statefarm.com

Attorneys and Staff of Mimi L. Smith & Associates are Employees of the Corporate Law Department of State Farm Mutual Automobile Insurance Company

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

CASE NO.: 2013 CA 015180

KELLI SMITH,

        Plaintiff,

vs.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

        Defendant.

---

## PLAINTIFF'S RESPONSE TO DEFENDANT'S REQUEST FOR ADMISSIONS

---

Plaintiff, KELLI SMITH, by and through undersigned counsel and files herewith her response to Defendant's Request for Admissions dated February 24, 2014, as follows:

1. Admitted.

2. Admitted.

3. Denied.

4. Denied.

5. Admitted.

6. Admitted.

7. Denied.

8. Denied.

9. Admitted.

10. Admitted.

11. Denied.

12. Admitted.

13. Admitted.

14. Denied.

15. Denied.

16. Admitted.

17. Denied.  Plaintiff was wearing her seatbelt.

18. Unable to admit or deny.

19. Admitted.

20. Denied.

21. Denied.

22. Denied.

23. Admitted.

24. Unable to admit or deny.

25. Denied.

26. Denied.

27. Denied.

28. Denied.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished via Email, pursuant to Rule 2.516(b)(1) to: MICHAEL WHITAKER, ESQ., Mimi L. Smith & Associates, flor.law-mlslaw.172o19@statefarm.com, this April 4, 2014.

**LANE & DUCHEINE, PL**
*Counsel for the Plaintiff*
433 Plaza Real, Suite 275
Boca Raton, Florida  33432
Telephone: (561) 962-4142
Fax:  (561) 218-4545
lane@rightstojustice.com

By: __/s/ Allison B. Lane____
    **ALLISON B. LANE**
    Florida Bar No: 36017

**BALKAN & PATTERSON, LLP**
*Counsel for the Plaintiff*
1877 S. Federal Highway, Suite 100
Boca Raton, FL 33432
Telephone: (561) 750-9191
Fax: (561) 750-1574
adam@balkanpatterson.com
tiffany@balkanpatterson.com
efile@balkanpatterson.com
**ADAM M. BALKAN**
Florida Bar No. : 0044880