Smith vs. Florida Gulf Coast University        Michael Martin        01/14/2025

**1**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

FORT MYERS DIVISION

CASE NO.: 2:23-cv-840

KELLI SMITH, an individual,

    Plaintiff,

v.

THE FLORIDA GULF COAST

UNIVERSITY BOARD OF TRUSTEES,

a political subdivision of the

State of Florida,

    Defendant.

_____/

DEPOSITION OF:    MICHAEL MARTIN

DATE TAKEN:       Tuesday, January 14, 2025

TIME:             9:08 a.m. to 10:53 a.m.

LOCATION:         Via Zoom Videoconference

TAKEN BY:         Counsel for Plaintiff

REPORTER:         Amy Marie Yarbrough, FPR-C

                  Notary Public, State of Florida

_____

FORT MYERS COURT REPORTING, LLC

2271 McGregor Boulevard, Suite 220

Fort Myers, Florida 33901

(239) 334-1411

fmreporting.com

Serving All of Southwest Florida

**2**

REMOTE APPEARANCES

ON BEHALF OF PLAINTIFF:

YORMAK EMPLOYMENT & DISABILITY LAW

27200 Riverview Center Boulevard

Suite 109

Bonita Springs, Florida  34134

byormak@yormaklaw.com

By:  BENJAMIN H. YORMAK, Esquire

ON BEHALF OF DEFENDANT:

BUSH GRAZIANO RICE & HEARING, P.A.

100 South Ashley Drive

Suite 1400

Tampa, Florida  33602

sdyson@bgrhlaw.com

By:  SACHA DYSON, Esquire

Also Present:  Kelli Smith, Plaintiff

- - -

**3**

TABLE OF CONTENTS

WITNESS: MICHAEL MARTIN                          Page

Direct Examination by Mr. Yormak . . . . . . . . .   4

Cross-Examination by Ms. Dyson . . . . . . .   69

Deposition Errata Sheet. . . . . . . . . . . . .   71

Certificate of Oath. . . . . . . . . . . . . .   72

Certificate of Reporter. . . . . . . . . . . .   73

- - -

PLAINTIFF'S EXHIBIT INDEX

Exhibit No. 1          Email                42

- - -

Reading/signing of the deposition transcript reserved.

- - -

**4**

1       THE REPORTER:  Mr. Martin, my understanding is

2  you are appearing from the state of Minnesota

3  today.  Do you agree to be placed under oath by a

4  Florida notary?

5       THE WITNESS:  Sure.

6       THE REPORTER:  Please raise your right hand to

7  be sworn.

8      Do you swear or affirm the testimony you will

9  give in this matter will be the truth, whole truth,

10  and nothing but the truth?

11      THE WITNESS:  I do.

12        MICHAEL MARTIN,

13  having been duly sworn remotely, testifies as follows:

14        DIRECT EXAMINATION

15  BY MR. YORMAK:

16    Q.  Good morning, Mr. Martin.  Can you please

17  state your name for the record.

18    A.  Michael Martin.

19    Q.  Do you have a middle name?

20    A.  V, Vernon.

21    Q.  Have you had your deposition taken before?

22    A.  Yes.

23    Q.  Approximately how many times?

24    A.  Twice.

25    Q.  When was the most recent time that you can

Smith vs. Florida Gulf Coast University             Michael Martin                          01/14/2025

5

1    recall?
2        A.   Oh, it's been ten years at least.  Yeah.  Ten
3    years.
4        Q.   All right.  Well, I will go over some ground
5    rules just to refresh your recollection on how this
6    process works.  This is sworn testimony, as you've been
7    placed under oath.  You understand that it has the same
8    effect as if you were testifying in court; correct?
9        A.   Yes.
10       Q.   So far so good, but you have to answer audibly
11   with yeses or nos, not the "uh-huh" or "huh-uh," because
12   our court reporter, Amy there, will have a devil of a
13   time trying to figure out what you actually said.  So if
14   I correct you, I mean no disrespect, but I'm just trying
15   to get a clear record.  Okay?
16            If you do not understand a question or if you
17   did not hear a question, please let me know.  I think
18   everybody in attendance wants to ensure that the
19   witnesses are answering questions that they understand,
20   so please don't hesitate.
21            I don't think that this is going to be any
22   kind of an endurance challenge here today.  I do expect
23   that we will be done with this deposition by lunchtime
24   at the latest.
25       A.   Okay.

6

1        Q.   But if you do need a break for some reason,
2    please just let me know.  I'm always happy to take
3    breaks.  The only thing that I would ask is that you
4    finish answering a question if it's pending.  Is that
5    fair?
6        A.   Uh-huh.  Yes.
7        Q.   There you go.  Caught you on the first one.
8    Good catch, though.
9            Have you done anything to prepare for today's
10   deposition?  And in answering this question, I do not
11   want you to disclose anything that you may have
12   communicated with Counsel about.
13       A.   Yes.  I did have a chat yesterday with
14   Counsel.
15       Q.   Okay.  Did you review any documents to prepare
16   for today's deposition?
17       A.   I did not have an opportunity to do that.
18       Q.   And I think I heard before we went on the
19   record you are testifying from your residence in cold
20   Minnesota?
21       A.   Yes, that's correct.
22       Q.   Is anybody else present in the residence with
23   you?
24       A.   No.
25       Q.   Do you have any documents in front of you that

7

1    you may be referring to?
2        A.   No, I do not.
3        Q.   I just want to get a little bit of background.
4    You were formerly employed at FGCU; correct?
5        A.   Correct.
6        Q.   What positions did you occupy at FGCU?
7        A.   I was the president.
8        Q.   When did you become president?
9        A.   2017.
10       Q.   Was that the only position that you held?
11       A.   Yes.
12       Q.   Can you just briefly describe what the
13   president's job duties were at FGCU?  I'm sure it's
14   quite broad, but if you could just give us a sense of
15   what you did day-to-day.
16       A.   Well, the president is effectively the CEO,
17   and that means you had the ultimate responsibility for
18   academic as well as support functions on campus, dealt
19   with board members at two levels, interacted with
20   donors, represented the institution in the community.
21   That, you know, pretty much broadly covers it.  Kind of
22   the principal spokesperson for the institution at the
23   legislature, and other duties as they arose.
24       Q.   And prior to joining FGCU, where were you
25   employed?

8

1        A.   Colorado State University.
2        Q.   What led you to come to FGCU?
3        A.   I was effectively recruited by the founding
4    father, Ben Hill Griffin.  I had retired from CSU, or
5    planned to retire.  The first presidential search at
6    that time failed.  The then founding father, Ben Hill,
7    who I had known in another life, called me up and asked
8    if I would be willing to be a candidate.  I decided to
9    give it a shot.  The next thing I know, I was the
10   president of the university.
11       Q.   When did you cease being president of the
12   university?
13       A.   2023.
14       Q.   And what led to the separation from
15   employment?
16       A.   Retired.  I'm a pretty old guy, and I've
17   unretired one more time, but it won't last long.  This
18   was time to retire and I have a shorter-term gig right
19   now, but that was effectively the end of a long career.
20       Q.   What's the shorter-term gig you're referring
21   to?
22       A.   I'm the interim chancellor at the University
23   of Wisconsin - River Falls.
24       Q.   Good hockey program there, if I remember
25   correctly.

9

1    A.   National champion, women D-III.
2    Q.   All right.  So in 2023 you retired from FGCU?
3    A.   Correct.
4    Q.   Did anybody ask you to retire, or was that
5  your own choice?
6    A.   That was entirely my choice.
7    Q.   I want to talk a little bit about the
8  organizational structure of the university.  Where does
9  the police department fall in terms of who supervises
10 it?  I mean above the chief.
11        MS. DYSON:  Object to the form.
12        MR. YORMAK:  I was remiss in saying this
13        before, but if Sacha -- excuse me -- Ms. Dyson
14        objects, then you still answer unless she tells
15        you, "Don't answer."
16        THE WITNESS:  So what are you telling me,
17        Sacha?
18        MS. DYSON:  I'm just objecting to the form of
19        the question.  You can go ahead and answer if you
20        can.
21        THE WITNESS:  Okay.
22    A.   The university is divided into sort of three
23 big components: academics, student support, and
24 operations.  And the police department and the chief are
25 under the operations side of the university, which means

10

1  that the senior administrator for that group is the vice
2  president for finance and administration.  And that's
3  the primary direct report.
4    Q.   And does the VP of finance and administration
5  report to the president?
6    A.   Yes.
7    Q.   During your time at FGCU, did the same person
8  hold the role of VP of finance and administration, or
9  were there multiple that held that role?
10    A.   There were two.
11    Q.   And who were they?
12    A.   Steve Magiera followed by David Vazquez.
13    Q.   How would you describe the job duties of the
14  VP of finance and admin?
15    A.   Well, to make sure the campus functions in an
16  efficient and effective way.  That includes everything
17  from facilities management, maintaining the grounds,
18  campus security, all the things that make the campus
19  function and support the academic programs of the
20  institution.  And to maintain control over the financial
21  considerations that we have, both in terms of reporting
22  to the state and following federal rules.  There's a
23  whole variety of things in terms of finances as well.
24    Q.   So the chief of police reported directly to
25  the VP of finance and admin?

11

1        MS. DYSON:  Object to the form.
2    A.   Yes.  And as well we had included within that
3  office the director of human resources.  And they were
4  sort of co-responsible for that position and several
5  others on campus.
6    Q.   I would imagine the director of HR would have
7  involvement in all three areas.  Is that right?
8    A.   Exactly.  Correct.
9    Q.   So is it fair to say that HR kind of is
10  separate from those three areas as far as -- maybe not
11  separate, but fair to say that the director of HR is
12  going to have involvement in all things human
13  resources-related within those three divisions?
14    A.   Correct.
15        MS. DYSON:  Form.
16    Q.   And during your time at FGCU, can you give me
17  the names of the people that held the role of director
18  of human resources?
19    A.   I can't think of the one who was there when I
20  first started.  It's now Sara Stensrud, and she was
21  there for most of my time.  There had been a little
22  chaos in that office prior to Sara, and she came in and
23  brought some stability to it.
24    Q.   Okay.  So if we start with the chief of
25  police, who would the chief of police immediately report

12

1  to?
2        MS. DYSON:  Object to the form.
3    A.   Well, I think immediately David Vazquez, the
4  vice president.  Sara certainly conditioned some of that
5  relationship, but ultimately David's office and David
6  was responsible for the functioning of the campus police
7  department, including the role of the chief.
8    Q.   So you're familiar with Kelli Smith; correct?
9    A.   I am.
10    Q.   How do you know Ms. Smith?
11    A.   She served for a while as chief of police, and
12  in that role I interacted with her.  I was part of the
13  process at least of interviewing candidates, though my
14  role was to make a recommendation or share my view with
15  David and allow David and company to determine who got
16  the job after Steve Moore retired.  And so it's a small
17  campus.  Not only do you have official reporting lines,
18  but you have a number of informal interactions that make
19  the place work.
20    Q.   Who made the ultimate decision to hire
21  Ms. Smith?
22    A.   I think it was a collective decision.  I think
23  the recommendations came in to David.  You have to
24  understand, we have a cabinet, and that cabinet is made
25  up of the vice presidents and some others.  And

13

1  ultimately, we try to pass every major decision through
2  the cabinet. So nothing is a singular decision. It's a
3  collective decision based on the input from the various
4  segments of the university that are served by someone
5  like the chief of police.
6          So, yes, the appointment, I suspect, if you
7  looked at the documents, were signed by David but it
8  wasn't a singular decision. The general counsel weighed
9  in. The director of compliance weighed in. The other
10 vice presidents weighed in. And that's how we arrived
11 at almost every decision on campus. It's a board of
12 directors' decision.
13     Q.    Did you personally recommend hiring Ms. Smith?
14     A.    I concluded that we had two fine candidates,
15 either one could function, and I left it to others to
16 weigh in on their preferences as well.
17     Q.    Was Ms. Smith one of those two candidates?
18     A.    Yes.
19     Q.    Who was the other candidate?
20     A.    I don't recall her name. I'm sure it's in the
21 record somewhere. But we had two, I thought, qualified
22 candidates and said to the cabinet, "Let's debate it and
23 at the end of the day let's make a decision." That
24 decision was shared and David concurred, as did Sara,
25 and we moved ahead.

14

1      Q.    And that decision was to hire Ms. Smith?
2      A.    Correct.
3      Q.    Do you recall how many total applicants there
4  were for the chief of police job?
5      A.    I do not know.
6      Q.    In making this hiring decision at this time,
7  what were the most important factors that you
8  considered?
9      A.    Well, I think background, experience. A
10 campus is a community, and therefore a sense that the
11 individual fit in that community not only in an official
12 capacity but in a collegial capacity. A university is a
13 community of colleagues, including the students as
14 colleagues, and so it's a combination of having
15 technical expertise, appropriate background and
16 experience to be credible, and having a style that we
17 considered would fit to the particular culture of this
18 campus.
19     Q.    And did you believe that Ms. Smith possessed
20 those qualities?
21     A.    Based on the interviews, seemed to be
22 appropriate, yes.
23     Q.    Now, at the time that the previous chief
24 retired -- let me back up for a second.
25          Did the previous chief retire?

15

1      A.    Yes.
2      Q.    Was he asked to retire?
3      A.    No. He was asked to stay, and he chose to
4  retire.
5      Q.    Did you observe or feel there were any
6  problems within the university police department at the
7  time of him retiring?
8      A.    Not that I was aware of or sensitive to. I
9  thought they functioned pretty successfully. It was an
10 interesting collection of officers and functions. And
11 so my sense was -- and this isn't the first time I've
12 dealt with a campus police department, believe me --
13 that it was a pretty efficient and effective
14 organization. I, just to know, believed and shared, and
15 shared with candidates when I had an opportunity to
16 interact with them, that the police department and a
17 chief on a campus is different than a community because
18 you're also part of the educational process.
19          It's certainly campus security and safety,
20 but it's also being party to the transformation of young
21 people into adults. And so I think it's a special
22 challenge, and I continually monitored that and I
23 thought our crew and the leadership did a good job when
24 I was coming into the organization.
25     Q.    Did you ever tell Ms. Smith that the

16

1  reputation of the police department was poor during her
2  interview?
3      A.    Not that I did, no, because I don't believe
4  that. I think the reputation was solid. I
5  think -- just to know, I think like everything else at a
6  university, you always pursue excellence. It's a
7  journey, and you always try to get better at what you
8  do. But I had no serious problems with the functioning
9  of the police department under the prior leadership or
10 at the time that we made the change.
11     Q.    You thought the culture was good?
12     A.    I thought the culture was sound. I thought
13 people fit into the campus. The students found the
14 fact -- the police department engaging rather than
15 simply overlording, and I thought that was an important
16 thing. We always consulted the student leadership on
17 all of these decisions as well, because it's their chief
18 of police as well and their police department.
19     Q.    How many applicants did you personally
20 interview for the chief of police?
21     A.    I think I only interviewed the last two.
22     Q.    And that was Ms. Smith and the other female
23 finalist?
24     A.    Yes.
25     Q.    What impressions did you get of Ms. Smith from



Smith vs. Florida Gulf Coast University          Michael Martin                                    01/14/2025

17

1  her interview?
2      A.   She seemed like a competent, experienced
3  professional, and that was the primary thing we were
4  looking for.  She'd had some campus experience, so that
5  was a benefit, and my view was that she could step into
6  the role like everyone else, adapt to the unique culture
7  and the unique needs of this particular campus, but that
8  was the impression I had.
9      Q.   Did you check her references at all?
10     A.   I think they were shared with me.  I wouldn't
11 say I went out of my way to check, but I think the
12 references were shared, who they came from, what the
13 general tenor was, yes.
14     Q.   Do you recall who the references came from?
15     A.   I think that there was at least one from a
16 campus in Arizona, as I recall, and I don't remember if
17 I saw one from Central Florida or not.  It's been a
18 while.
19     Q.   Who would have checked her references?
20     A.   Well, first of all, I think that the search
21 committee would have made sure that she had sufficient
22 references.  All of this is done by a search committee,
23 obviously.  And I'm certain that David and others and
24 Sara ensured that the references were solid, and you
25 count on people to do that because that's their role.

18

1      Q.   Did you obtain any other background on
2  Ms. Smith prior to her being hired?
3      A.   I did not.
4      Q.   Who made the -- strike that.
5          Who made the -- I think you've kind of
6  actually answered that, but is there any one person on
7  that committee who is vested with the authority to make
8  the hiring decision for the chief of police?
9          MS. DYSON:  Objection.
10     A.   No single individual at a university.  As I
11 say, we function as a group of colleagues.  Ultimately
12 someone signs off on it, but it isn't based strictly and
13 singularly on their perspective.  That's true of every
14 position, faculty and otherwise.
15     Q.   When the decision was made to hire Ms. Smith,
16 did the university communicate any goals for her in her
17 role?
18     A.   I can't speak specifically to that.  I think
19 there's some obvious intuitive goals.  One is to keep
20 the campus safe; right?  Another is to establish a
21 stable group of professionals in the police department.
22 Another is to effectively interact with other law
23 enforcement agencies in the region, particularly the Lee
24 County Sheriff's Office.  There's also the expectation
25 that you'll be part of the larger community and be able

19

1  to represent campus safety and security to the student
2  leadership and to the faculty leadership and to the
3  staff leadership.  So it's a multiple set of
4  expectations, but they -- anyone who has been on a
5  campus, make it pretty obvious.
6      Q.   After hiring Chief Smith, did you ever believe
7  that anything in her background was inaccurate?
8      A.   Not that I saw.
9      Q.   Would you agree that in her role as chief of
10 police her primary job duty was to enforce local, state,
11 and federal law?
12         MS. DYSON:  Object to the form.
13     A.   That's one of several job duties.
14     Q.   Would you agree that that's a very important
15 job duty?
16         MS. DYSON:  Object to the form.
17     A.   I believe it's one of several important job
18 duties.
19     Q.   Prior to hiring Ms. Smith, had FGCU ever been
20 audited for failing to enforce any laws or reporting
21 requirements?
22         MS. DYSON:  Object to the form.
23     A.   I think that there had been, yeah.  I think
24 we're always audited regularly on all kinds of things on
25 campus, both at the state and federal level.  That's a

20

1  natural part of functioning at a university.  And yes, I
2  believe there probably were some audits.  I don't recall
3  them all, but I also don't recall any serious findings
4  of failed operations.  So an audit is like everything
5  else.  It informs you on where you are and gives you
6  indications of where you can get better.  So we get
7  audited financially regularly, and that's all part of
8  operating a public agency.
9      Q.   Do you ever recall that there was an audit
10 conducted after a student was abducted and sexually
11 assaulted by like an Uber driver?
12     A.   Yeah, I remember that one pretty well.  I
13 don't remember the actual audit finding, but I do
14 remember that in general, the sense was across both the
15 auditing function and others it was handled pretty well.
16 The individual was arrested quite shortly thereafter and
17 is now doing, I think, 30 years somewhere in the state.
18 And so, yes, I think as always when you have an incident
19 like that, if not a formal audit, you do a review of how
20 you performed.
21     Q.   Did that incident occur prior to Ms. Smith
22 being hired?
23     A.   Yes.
24     Q.   Did you ever talk to Ms. Smith about that
25 incident?



Smith vs. Florida Gulf Coast University          Michael Martin          01/14/2025

---

21

1      A.   I don't recall talking to her, but could have.
2      Q.   Do you recall whether the audit made any
3  conclusions about whether the police department properly
4  reported the incident?
5      A.   I don't recall that, but I think had we had a
6  negative finding, it would have been pretty obvious, and
7  I don't recall that.
8      Q.   Talking more broadly just about how the police
9  department is made up, if you had to put a percentage on
10 the gender distribution of the police department
11 employees, what would you put it at?
12     MS. DYSON:  Object to the form.
13     A.   I don't know that I can tell you that, because
14 I'm not sure I know all of the players within the
15 department.  There are the officers.  There's others who
16 work in various other components of the department, and
17 now there's a victim's advocate.  There are people who
18 interact with the department regularly in terms of our
19 compliance officers as well.  So I couldn't tell you
20 that.  It's probably 70/30, 60/40.
21     Q.   A little bit more on the male side?
22     A.   Yes, and I think partly because a number of
23 the officers are retirees from northern -- generally
24 northern police departments, and they had largely been
25 dominated by males.  And so the population of retirees

---

22

1  from like the New York City Police Department tended to
2  be male officers and they brought greater experience, to
3  be candid with you, at a relatively low price.
4      Q.   When Ms. Smith was hired, had there been a
5  female chief of police before?
6      A.   I don't believe so.  I think Steve Moore had
7  been there a long time, and I don't know that I know who
8  preceded him.  But probably no.
9      Q.   Did you have any hesitations about hiring a
10 female chief of police?
11     A.   Not at all.  I haven't had any hesitations
12 about hiring a solid professional, no matter their
13 gender, for important roles.  And you look at the
14 cabinet that we had; you can see that.
15     Q.   Who was on that cabinet?
16     A.   The vice president for finance administration,
17 the provost and executive vice president, the vice
18 president for student affairs, the vice president for
19 philanthropy.  That's Kitty Smith -- or Kitty Green.
20 The general counsel.  Oftentimes the compliance officer.
21 Sara, HR, sat in on many of the meetings as part of the
22 process.  We didn't need her all the time because
23 sometimes the topics had nothing to do with human
24 resources.
25     I'm trying to think of who else.  That's

---

23

1  pretty much the core cabinet.  It was elastic in the
2  sense that on days when we needed some specific
3  expertise or some specific insight or some specific
4  follow-up, we included people like our legislative
5  liaison, Jen Goen.
6      And so the cabinet was made up of a core group
7  of people.  I think you know that the general counsel is
8  an African American woman, the director of compliance is
9  an African American woman, the vice president for
10 philanthropy is a white woman.  We had a pretty diverse
11 group.  We also had -- let's see -- two Hispanics.  So
12 we didn't set out necessarily to pursue diversity.  We
13 set out to pursue good solid people who could serve the
14 institution, and it turned out that way, and I thought
15 that was a benefit to us.
16     Q.   Of the law enforcement officers, what's the
17 racial makeup there, in your opinion?  Is it pretty even
18 or is it more --
19     A.   No.  It's more white.
20     MS. DYSON:  Object to the form.
21     Q.   Okay.  I think you said it's more white?
22     A.   Yeah.
23     MS. DYSON:  Object to the form.
24     THE WITNESS:  Yes.
25     Q.   Did you think that Chief Smith might encounter

---

24

1  some difficulty or pushback from any of these officers
2  at the time that she was hired?
3      A.   I did not.  They were represented on the
4  search committee, and the search committee was
5  supportive.
6      Q.   Did anybody in the search committee express
7  that there could be some resistance to having a female
8  chief of police?
9      A.   I never heard it.  It's worth noting that the
10 university now has a female president and there's no
11 objection to that either.
12     Q.   Well, you're not on campus, so I'm not sure
13 that you would know.  Right?
14     A.   Well, I hired her in a role to be on the
15 cabinet, and I have followed it quite seriously.  So
16 since I was the one who brought her on campus, I have
17 continued to watch her career, and she is deeply
18 well-received.
19     Q.   At least through the sources that you're
20 getting reports from; correct?
21     MS. DYSON:  Object to the form.
22     A.   Well, from many sources.  From the members of
23 the board of trustees, who I stay in touch with; from
24 the leadership of the faculty, who I have a beer with
25 every time I'm back in town.  Listen, I remain plugged

---



---

25

1  in because I'm an emeritus president, and that's a role
2  I still take seriously.  And I still provide some
3  counsel and advice to the president and others when they
4  ask for it.
5      Q.   You touched on it a little bit there, but what
6  are the duties of an emeritus president?
7      A.   Well, emeritus is a stature that makes you a
8  continued member of the community.  And particularly in
9  this case where there haven't been very many
10 presidents -- I was the fourth -- you become still part
11 of the community.
12          You know, I could well have taken a faculty
13 position in the college of business.  I chose not to do
14 that, but I still serve on a couple of internal advisory
15 committees.  And I still have interactions with the
16 larger community regularly, because when I left the
17 presidency, I took a short-term role as the CEO of the
18 community foundation, which gave me the opportunity to
19 continue to stay connected with those who represented
20 the university and how they were perceived in the larger
21 community.
22     Q.   When Ms. Smith was hired, was her gender
23 considered a positive factor?
24          MS. DYSON:  Object to the form.
25     A.   I don't think it was positive or negative.  I

---

26

1  think it was we hire good professionals and we try to
2  make good professionals successful when we hire them,
3  whatever their gender.  And so I don't think we set out
4  necessarily to hire a female chief, nor did we ever
5  consider that hiring one wouldn't be a positive
6  contribution to the campus.  But that's true across
7  everything we've done.
8      Q.   When you were president, do you recall whether
9  or not FGCU had a progressive discipline policy when it
10 came to its employees?
11     A.   I don't think I would call it progressive
12 discipline.  I think we always try to create an
13 environment in which people would continue to grow and
14 advance in service to the institution, and if that
15 didn't work out, we would try to create interventions
16 that either corrected or recognized that it was
17 uncorrectable and make a change.
18          There's a very strong responsibility here
19 because the entire university is funded from two
20 sources, students and taxpayers, and we owe it to them
21 to get the very best we can from the investments they
22 make in the institution.  And so we tried always to make
23 sure the people we put in important positions had the
24 opportunity to succeed on behalf of those who were
25 funding them and the students and citizens we served.

---

27

1  Sometimes it worked and sometimes it didn't, and we had
2  to make some hard choices.  And to be candid with you, I
3  made some hard choices early on.
4      Q.   And I'm sorry.  It froze on my end.  "And
5  sometimes we had to make some hard"?
6      A.   Choices.  And I made some because in my
7  judgment and the role that I had and my responsibility
8  to the institution and those who funded it, I did not
9  believe that they, for whatever set of reasons, were in
10 the appropriate role to advance the institution in that
11 service.  That's what you do.
12     Q.   How long did it take to fill the chief of
13 police position after the former chief retired?
14     A.   I don't know that for sure.  I don't recall
15 when it all kicked off and when it was concluded.  I
16 don't think it was a huge window of time, but I couldn't
17 give you great specifics.
18     Q.   Is it a big undertaking to hire a chief of
19 police at a university like this?
20     A.   It's a big undertaking to hire any important
21 role at a big university like this.  And we do it
22 carefully, but we do it expeditiously.
23     Q.   How important would you say the chief of
24 police is at FGCU?
25          MS. DYSON:  Object to form.

---

28

1      A.   I think it's a critical and important role
2  along with several dozen others.  I will be honest with
3  you, and I think I shared this with Counsel.  I had
4  contemplated reorganizing the department before we
5  launched the search.  What I had contemplated was a
6  model that I had in another university, which was
7  effectively to outsource the police department to the
8  county sheriff.  But I concluded in the end that it
9  would be still in our best interest to have our own
10 campus police force, and we proceeded with the search.
11     Q.   Why did you contemplate outsourcing the police
12 services to the sheriff's office?
13     A.   Because I thought we could get a fairly good
14 service at a much lower cost.  There's a thing in this
15 business and all businesses called economies of size,
16 and I had contemplated the economies of size.  And I
17 actually had a conversation with the board chair, and to
18 be honest with you, the board chair and I had a
19 conversation with the sheriff.
20          But at the end of the day, I felt that the
21 educational component and the human interaction
22 component of a campus police department was still fairly
23 significant on the campus.  And I feared a little bit
24 that there was an overemphasis strictly on law
25 enforcement in the county sheriff's office and did not

---



Smith vs. Florida Gulf Coast University          Michael Martin                    01/14/2025

---

29

1  fully appreciate the interactive nature of the police
2  department, particularly with our students.
3      Q.  We'll get into everything that's in between
4  here, but Ms. Smith was ultimately terminated; correct?
5      A.  Correct.
6      Q.  Prior to her termination, do you recall
7  whether she was issued any kind of discipline or
8  corrective action?
9      A.  I don't know that for sure.  I mean, I didn't
10 take her to be so inexperienced that that would become
11 an issue.  So I don't know all of those interactions.
12     Q.  Just so the record is maybe a little bit more
13 clear, you didn't issue her any written discipline or
14 counseling prior to termination?
15     A.  I did not and I would not have, because,
16 again, that falls to the role of her direct supervisor.
17 That direct supervisor may or may not have solicited or
18 received input from others if that occurred, but I
19 didn't do that and I would not have done that.  I would
20 have been certain that it went through two sources:
21 through the vice president of finance administration and
22 fully compliant with our own human resources policies.
23     Q.  Did you ever direct someone else to issue any
24 written discipline to Ms. Smith?
25     A.  I don't believe so.

---

30

1      Q.  While she was chief of police, how often would
2  you be interacting with her?
3      A.  Formally and informally, probably once every
4  couple weeks.
5      Q.  Did you ever schedule weekly meetings or have
6  any regularly scheduled meetings?
7      A.  I can't recall.  During COVID, we met
8  regularly with the chief.  At that time it was more, but
9  I don't think we had any of those similar meetings
10 post-COVID.
11     Q.  Did you ever speak with Ms. Smith prior to her
12 termination about any kind of performance deficiencies
13 she may have?
14     A.  Not that I recall, but I would not deny it if
15 there was some evidence I did.  I just don't recall.
16     Q.  So sitting here today, nothing sticks out in
17 your mind?
18     A.  No.  And I would have always engaged her
19 direct report in any of those conversations.  We always
20 have informal functions on a campus.  You bump into
21 people.  And I was very, very much engaged day-to-day in
22 the campus life.  I was out there chatting with the
23 people who clean the student union and the people who
24 fixed the HVAC, because I wanted them to feel part of
25 the community.  And so we may have had those kind of

---

31

1  interactions regularly, and I did -- I think I knew
2  every officer, and I knew a little bit about a few of
3  them a little more deeply.
4          So there's this kind of balance between
5  formal interactions that would be a disciplinary thing
6  and just general conversation with a colleague on campus
7  that you bump into.  And that's actually the most
8  productive part of a campus.  The more formal it gets,
9  the less collegial it is and you lose the culture of a
10 campus.  And as I say, I'm in my fifth stop as a CEO.  I
11 oversaw a very large, large police department at LSU, 78
12 officers.  I understood what they did and I interacted
13 with them, but it was not in always a formal way.
14     Q.  Did you approve Ms. Smith getting a raise at
15 some point during her tenure?
16     A.  I don't think I directly approved it.  I think
17 we had some market adjustments for a number of people,
18 and I think she may well have -- the chief, not her, but
19 the chief may have had that adjustment made because we
20 were constantly trying to be as consistent with the
21 market as we possibly could be.  And that had regular
22 assessments of are we treating people fairly relative to
23 the market, and that was an important recognition, both
24 for them and to send a message to the campus that this
25 is a fair place to work.

---

32

1      Q.  You said the chief and not her would have
2  received that raise.  Can you just be a little bit more
3  clear on what you mean by that?
4      A.  I think we were -- I don't know all the
5  details on this.  I think the assessment was that our
6  chief was underpaid relative to others on other campuses
7  and other law enforcement leaders in the community.
8      Q.  Do you recall who made the recommendation to
9  increase the salary?
10     A.  It probably came partially out of David's
11 office, though I would suspect that both compliance and
12 the general counsel and HR weighed in on it.
13     Q.  At that time, was Sara Stensrud the chief of
14 HR?
15     A.  Yes, I believe so.  Yeah, I'm sure of it.
16     Q.  And I didn't ask this before.  Was
17 Ms. Stensrud on the search committee in the hiring for
18 the role that Ms. Smith held?
19     A.  I doubt it.  I don't remember the whole search
20 committee, but I doubt it.  Usually the HR director acts
21 as staff to that committee but not a member of it.
22     Q.  Do you recall whether Ms. Stensrud recommended
23 hiring Ms. Smith?
24     A.  I don't recall.
25     Q.  I'm not sure we got the date clarified but I

---



33

1 think she was hired -- and the "she" being Ms. Smith --
2 was hired back in May 2021.  Does that sound about
3 right?
4  A. Could be, yes.  She more served through the
5 pandemic, and so that was post-pandemic.  So, yes, that
6 seems about right.
7  Q. Were you aware of whether Ms. Smith had
8 proposed separating the chief of police and the Clery
9 coordinator positions at some point?
10  A. I don't recall.
11  Q. Do you recall whether Ms. Smith ever expressed
12 concerns about the university's Clery reporting?
13  A. I don't recall specifics.  I think we were
14 always attuned to making sure that we were
15 Clery-compliant and we had solid people managing that,
16 but I don't recall a specific circumstance or
17 communication or observation.
18  Q. Do you recall you speaking with her ever about
19 Clery compliance?
20  A. I don't.  Could have, but I don't.
21  Q. After Ms. Smith was terminated, did the
22 university ever split the role of chief of police and
23 Clery coordinator?
24  MS. DYSON:  Object to form.
25  A. I don't know that for sure.  I don't know.

34

1  Q. Did Ms. Stensrud ever recommend that Ms. Smith
2 be terminated?
3  A. I don't recall that either.  I think there
4 were a number of people who had some serious concerns
5 after she had been on campus a while, and it may well
6 have come through Sara.  I'm not entirely sure.  But
7 there was a good deal of feedback from across the campus
8 that I'm sure ended up in HR and many other places on
9 campus.  And so it's not unlikely that that came up, but
10 I don't recall it specifically.
11  Q. So you don't recall any kind of conversation
12 with Ms. Stensrud where she said to you that she would
13 recommend that Ms. Smith be terminated?
14  A. I don't recall that, though, again, it's
15 possible.
16  Q. Did you make the ultimate decision to
17 terminate Ms. Smith's employment?
18  A. I concurred with a recommendation that it
19 terminate.
20  Q. Who made the recommendation?
21  A. I think it came from the general counsel and
22 our compliance officer, and there may have been several
23 others involved as well.
24  Q. And who's the compliance officer?
25  A. Precious Gunter.

35

1  Q. And the GC was Vee at that time?  Sorry --
2  A. Vee Leonard.
3  Q. As for the termination, you were the ultimate
4 decision-maker, though; correct?
5  A. Yeah.  At the end of the day, everything --
6 everything ultimately is the responsibility of the
7 president.  You empower people to make decisions or
8 recommendations with which you can concur or object.  In
9 this case, I concurred with the recommendations coming
10 from a number of people within the university.  So, yes,
11 I take responsibility for that particular decision
12 because it came to me from very credible sources, and I
13 understood -- and I had heard directly from some folks
14 about concerns.
15  That's the reason we have a probationary
16 period and a chance to try people out and them to try us
17 out, and many times in an organization as large as a
18 university, one side or the other just doesn't feel the
19 fit is right.
20  Q. What were all the reasons that you approved
21 the termination of Ms. Smith?
22  A. Well, the first is it came from people who had
23 a very deep understanding of the institution, had --
24 were well-informed about the campus climate and the
25 campus culture, who are credible professionals, and

36

1 whose principal concern was the quality of service we
2 provided the students and others who occupied the
3 university's campus and its community.  And so that was
4 a very large part of it.
5  I heard directly from some people who had --
6 excuse the terminology -- serious heartburn over the way
7 the department was being led and interacted.  But I also
8 wanted to hear from others to make sure that what I was
9 hearing was being heard broadly and interpreted
10 appropriately.  And that's the way it came down.
11  Q. When you heard these reports, did you take any
12 steps to independently investigate?
13  A. Well, I did ask one of our faculty members,
14 who is also a retired police officer who on many
15 occasions I turned to for advice on campus security,
16 named David Thomas, to give me a sense of where the
17 department was, what the culture was, what the morale
18 and mood was, and what we could over time to continue
19 to make it a better and better organization on campus.
20  So, yeah, I did have a conversation -- I did
21 engage David in doing some assessment for us.  And this
22 was also part of my ongoing consideration of outsourcing
23 to the sheriff's office.  And so it's a combination of
24 things and factors I wanted to include in what we did
25 long-term with campus security.



37

1    One of the concerns I had -- just
2 parenthetically, one of my good friends in this business
3 who is no longer with us was the president of Virginia
4 Tech, who had several -- at least two dozen students
5 were killed in the classroom.  That alerted us all to
6 what could happen.
7    So I was constantly trying to determine what's
8 the best way to both engage the community and law
9 enforcement on campus as part of their education growing
10 up as well as maintaining full security.  And I
11 oftentimes turned to Dave formally or informally to get
12 his take.  So in that regard, I did consult with Dave
13 Thomas, and I consulted with the sheriff and a number of
14 other people to continue to ask the question, "How do we
15 keep this safe, but how do we not make it look like a
16 fortress."
17    Q.    You've mentioned a couple of times that you've
18 spoken with David Thomas.  What was Mr. Thomas's title?
19    A.    Professor, I think in the department of
20 criminal -- in a unit called criminal justice in the
21 college of arts and sciences, and a former police
22 officer in Gainesville, Florida.
23    Q.    And when these concerns were brought to your
24 attention, it's your testimony that you consulted then
25 with Mr. Thomas; right?

38

1    MS. DYSON:  Object to the form.
2    A.    Yes.  Well, I consulted with Dave with some
3 regularity, particularly in light of what's happened on
4 campuses around the country, and so yes.  And I'm sure
5 that there -- I did indeed consult with Dave as we were
6 thinking about whether or not the department was
7 performing and was stable in the sense of keeping the
8 campus safe but also keeping the people on the campus
9 engaged.
10    Q.    Did you consult with him regarding any
11 complaints about Ms. Smith?
12    A.    I may have.  One of the things I always want
13 to ask from Dave is, "Is this typical in a police
14 department?  Is this typical in a community?  You've
15 been there.  Tell me what is just the normal buzz and
16 what is unique and unusual."
17    The same incident is true with an athletic
18 department.  I consulted with outside people about the
19 athletic department because we were going through some
20 changes there, and I wanted to know is this typical and
21 should this just be part of what we expect, or is this
22 an unusual thing?  So I did that often.
23    And Dave was a very important -- remains a
24 very important to me -- consultant to the campus, both
25 from the academic side but from his own experience.  And

39

1 those -- that's a valuable commodity to have on campus.
2    Q.    Did Mr. Thomas ever express an opinion as to
3 whether the complaints about Ms. Smith were normal?
4    A.    I think he expressed an opinion to me once
5 that there were more than he expected.
6    Q.    Did Mr. Thomas ever conduct any kind of an
7 investigation into the police department culture?
8    A.    I wouldn't call it an investigation.  He
9 conducted an assessment.  I don't think it was -- I
10 would make that more the case.  We don't investigate on
11 campus so much as we assess, and I think that's exactly
12 what he did.
13    Q.    Did you ask him to perform an assessment?
14    A.    I did.
15    Q.    And what were the results of that assessment?
16    A.    I don't recall all the details.  I think among
17 the things he continued to recommend is we retain our
18 own department but that we needed to be sensitive to the
19 fact that the way the department and the members of it
20 were perceived and responded to on campus is an
21 incredibly important part of what they do, and therefore
22 it's important that the department be seen as part of
23 the university and not separate from it.
24    Q.    Did you make the decision to terminate
25 Ms. Smith before or after Mr. Thomas's assessment?

40

1    A.    Well, again, I come back to the notion that I
2 didn't make a singular decision.  I concurred with some
3 recommendations, but I believe it was after Dave's
4 report.
5    Q.    Did Mr. Thomas ever advise you not to make any
6 rash decisions when it came to the police department?
7    A.    Particularly don't make a rash decision to
8 outsource it.  That was the principal thing that both he
9 and I think Dave Vazquez continued to remind me of, and
10 I didn't intend to.  But I think that there was some
11 heartburn that we might do an -- I was chancellor of the
12 Colorado state system, and one of our campuses had
13 outsourced their campus police to the local sheriff's
14 office, and I went back and assessed that relationship,
15 and people knew I was doing it.  And I engaged the chair
16 of our board of trustees in those conversations as well.
17    But people were, I think, maybe legitimately
18 concerned that we would draw on fire before -- to use a
19 bad pun here -- to draw on fire before we would have a
20 chance to seriously think about the consequences.  And
21 that's why I engaged Dave Thomas and others in these
22 conversations.
23    Q.    I'm going to show you a document.  Let me know
24 if you can see it on your screen.
25    A.    Yes.



41

1    Q.   Is it big enough?
2    A.   Yeah, I think so.
3         MS. DYSON:  Mr. Yormak, does this document
4    have a Bates stamp number on it that can be
5    referred to in the record?  Are you attaching it?
6         MR. YORMAK:  It does not, but it was part of
7    our response to the RFP.  We'll mark it as 1.
8         MS. DYSON:  Okay.
9         (Plaintiff's Exhibit No. 1 marked.)
10   Q.   Have you had an opportunity to read that?
11   A.   Yeah.  And I notice that he uses the same term
12   I do, an assessment.
13   Q.   All right.  So this is an email that you
14   received personally; correct?
15   A.   I believe so, yeah.  Yes.
16   Q.   Why would this have been sent to your personal
17   Gmail account as opposed to your FGCU account?
18   A.   I think it's just an accident.  I'm not a
19   technological guy, but things end up in one or the
20   other, and I never quite know why.  But it's a public
21   record, as you know, because I made all of my emails
22   from every email account I have publicly available.
23   Q.   Do you know why he would write, "I used your
24   personal email so we could communicate freely"?
25   A.   I have no idea.  I don't know what he meant by

42

1    that, but he may have felt more comfortable.  But the
2    bottom line is here it is.
3    Q.   He seems to indicate, quote, "The complaints
4    from the officers are not unusual.  I see it everywhere
5    I go, so don't make any rash decisions."
6         Do you see that?
7    A.   Yes.
8    Q.   In this communication that you had been having
9    with Mr. Thomas, when he's referencing complaints from
10   the officers --
11   A.   Correct.
12   Q.   -- do you understand that to mean complaints
13   from the officers about Ms. Smith?
14   A.   Yes, in part, I believe that's so.
15   Q.   And he writes, "I see it everywhere I go, so
16   don't make any rash decisions."
17        What did you interpret the "rash decisions" to
18   be referencing?
19   A.   Well, I think the primary rash decision was to
20   decide that we would restructure and utilize the
21   sheriff's office.  I think that he and I talked about
22   that.  But he may have also been referencing a change in
23   the chief position, including dismissing Chief Smith.
24        And maybe I'm going beyond the scope of your
25   question, but the challenge we had was that the

43

1    complaints coming were actually louder from outside the
2    police department than from in.  So I understood what he
3    was saying about officers and I got that as kind of a
4    routine.  The problem we had is that many others across
5    campus were also complaining as well.
6    Q.   Okay.  And what were those complaints?
7    A.   Style.
8    Q.   What about it?
9    A.   Sort of an in-your-face, "I'm an expert.
10   You're not.  I don't need to hear from you.  I'm going
11   to do this my way" kind of attitude.  And two problems
12   with that.  As I suggested earlier, we're colleagues
13   here, and that's not a particularly good position to
14   take.  And so that was one part of the issue; right?
15        And the other is that this is -- you have to
16   understand when I took this job on at FGCU, the
17   university was 20 years old.  It's now 27 years old.
18   Many of the people there were the founding people of the
19   university and they had their own sort of culture and
20   club, and you really needed to fit in with them if you
21   wanted to be effective, and the sense was that Chief
22   Smith never did, and that, I think, hurt her
23   relationships on campus, and in turn I think hurt the
24   credibility and the effectiveness of the police
25   department.

44

1         So there was certainly internal issues being
2    raised, but they weren't singular.  This came from many
3    sources, and that's why when Vee and Precious came to
4    me, they were not only reflecting what they heard from
5    inside the department; they were reflecting what you
6    hear regularly on any campus in which you are engaged
7    daily.
8    Q.   Was there any one kind of criticism that you
9    heard about Ms. Smith that was more concerning than
10   another?
11   A.   If I could characterize it -- and I don't
12   remember them all -- but a very authoritarian style of
13   interacting.  And therefore in some people's eyes, a
14   disrespectful style of interacting.
15   Q.   Is the police department organized as a
16   paramilitary organization in terms of structure?
17   A.   A little bit, yes.  I mean, there's a
18   hierarchy with, you know, ranks and therefore various
19   levels of authority up to the chief.  Yeah.  Yes.  But
20   that's not the only part of the role of the chief, to
21   run that as I suggested.  This is a community.  This is
22   a culture of collaboration and collegiality and a
23   respect across the lines of what people do on a campus,
24   and that's a very important part of making it effective.
25   And if that kind of relationship gets fractured, the

Smith vs. Florida Gulf Coast University          Michael Martin                    01/14/2025

45

1  capacity of any unit to function on behalf of a larger
2  university is damaged, and that seems to be what
3  happened.
4      Q.   Do you know what a position statement is in
5  response to a charge of discrimination?
6          MS. DYSON:  Object to form.
7      A.   No, I do not.
8      Q.   Okay.  I will represent to you that in this
9  case Ms. Smith filed a charge of discrimination with the
10 United States Equal Employment Opportunity Commission,
11 and the university responded on February 15th, 2023, to
12 that charge.  I will also represent to you that it was
13 signed by Precious Green Gunter, and she was the chief
14 equity, ethics, and compliance and Title IX coordinator;
15 right?
16     A.   Yes.
17         MS. DYSON:  Object to form.
18     Q.   She needs extra-wide business cards, I think.
19         One of the things that Ms. Gunter wrote, and
20 I'm going to quote this, "Due to the continued emergence
21 of the aforementioned issues, multiple departments
22 deemed the complainant, Ms. Smith, difficult to work
23 with."
24         Do you know which departments would have
25 deemed Ms. Smith difficult to work with?

46

1          MS. DYSON:  Object to the form.
2      A.   Well, of course, I wasn't there when she wrote
3  that.  I was now retired.  I will tell you that I heard
4  from student affairs, from the academic core of the
5  university, from people in facilities, from people in
6  various colleges, and so I think it was pretty
7  broad-based.  I don't know them all, but the buzz on
8  campus was pretty clear.
9      Q.   You say the buzz on campus was clear.  Other
10 than through Ms. Leonard and Ms. Gunter, did you hear
11 similar reports?
12         MS. DYSON:  Object to the form.
13     A.   Yes.
14     Q.   From who?
15     A.   As I suggested, the leadership in student
16 affairs in particular.  There was some conversation
17 about us reorganizing and moving the police department
18 to student affairs and out of finance administration.
19 We talked about that, and I think through all of those,
20 there was serious concern about the style and the
21 interactions and, to be honest with you, arrogance that
22 seemed to be exhibited in many interactions that should
23 not have had to have that occur.
24         And so as I said, I got out on campus a lot.
25 I had coffee every morning at 7:30 at the student union,

47

1  and people knew they could come by and tell me whatever
2  was on their mind, and they did: students, the janitor,
3  members of the public.  So I was very open to hearing
4  from people, and I heard many conversations around that
5  having coffee at the student union on several occasions,
6  because that's the way I managed.  Now, I did not take
7  them all seriously and I always referred them back or
8  frequently referred them back to the people who were
9  really in charge of what it was they were complaining
10 about.
11         For instance, on every campus that I've ever
12 been on, students complain about not enough parking.
13 That's a standard complaint; right?  And my reference
14 always was, "Well, take that up."  First of all, I
15 pointed out that if you drive around campus, you'll
16 discover there's plenty of parking; it's just not where
17 you want it to be.  But having said that, this is
18 something that your student government leadership can
19 bring to the facilities people to consider whether or
20 not there are alternative options.
21         So that's the way I functioned.  7:30 to about
22 8:20 every morning, every morning that I was on campus
23 at the student union.  And that's where you hear how the
24 campus functions.
25     Q.   During those 7:30 coffee times, did you hear

48

1  complaints about Ms. Smith?
2      A.   Yeah.  Yes, yes.
3      Q.   Do you recall any one individual making a
4  complaint?
5      A.   No, I don't recall an individual, but I recall
6  that there was more than a trivial number of people who
7  had concerns.
8      Q.   These people, were they students or employees?
9      A.   Both.
10     Q.   Let's talk about the student complaints.  Do
11 you recall what those consisted of?
12     A.   I think it was, again, the style of kind of
13 not being receptive to a more constructive conversation
14 but sort of a one-sided "Here is how we do it.  You'll
15 just have to accept that."
16     Q.   When was the first time you recall receiving
17 any kind of negative feedback about Ms. Smith?
18     A.   I couldn't put a date on it.  I really can't.
19 Those were a long six years of conversations around a
20 table in Einstein's.  I couldn't put a date on it.
21     Q.   I'm not -- I think you've limited the scope
22 maybe a little bit.  I'm asking more broadly.  When was
23 the first time you heard any kind of negative feedback
24 from anybody at any time about Ms. Smith?
25     A.   Probably two or three months into her service.



49

1   Q.   What do you recall those initial complaints to
2   consist of?
3       A.   I come back to the single notion of style and
4   collegiality, that it was not well-exhibited, and
5   perhaps there was some challenge because Steve Moore was
6   very good at it.  Steve Moore was not only the chief of
7   police; he was kind of a constructive member of the
8   community that transcended just the role of police
9   chief.  And that's what we expect.  We expect faculty to
10  be not only good psychologists but also mentors and
11  examples and role models.
12       And that's the nature of a holistic education
13  institution, and Steve was very good at it because he
14  had a style that caused people to approach him and feel
15  comfortable and bringing to him their issues in an
16  informal way and feeling as though they were taken
17  seriously.  And that was both for students and for
18  employees.
19       Q.   When Ms. Smith was hired, did you ever explain
20  that to her?
21       A.   I presumed she knew, because she had been at
22  at least one or two other universities, and that was the
23  reason why the experience mattered.
24       Q.   So I think the answer would be no, you didn't
25  explain that to her?

50

1       A.   I did not specifically that I recall.
2       Q.   Did you ever have a conversation with her
3   about any of these complaints?
4       A.   Again, I tried always to respect the
5   relationships between direct supervisor and the
6   supervisors -- supervisees, whatever the term is, and so
7   I may have shared with David and others the concern and
8   hope that that would be translated into direct
9   conversations.  And I think maybe Sara had some.  I
10  don't know for sure.
11       But, again, if you look at the holistic
12  nature of my communications on campus, I wrote publicly
13  to the campus frequently about what I thought a campus
14  community was about.  And anyone who was paying
15  attention would know at least what I believe, whether or
16  not they were in the police department or in the English
17  department or in the athletic department or in the
18  grounds maintenance department.  And I said that
19  repeatedly on campus, so at least my own philosophy, I
20  think, was very well-known.  So I didn't think we had to
21  have individual conversations about how it worked,
22  particularly if you'd worked in this environment before.
23       Q.   So just kind of bringing your answer back to
24  what my question was, though --
25       A.   No.

51

1       Q.   -- do you recall having any conversations with
2   Ms. Smith about these complaints?
3       A.   I do not.
4       MS. DYSON:  Object to form.
5       Q.   Okay.  Why wouldn't you have approached her
6   more directly if the campus is such an open, collegial
7   environment and you're very approachable?
8       MS. DYSON:  Object to form.
9       A.   I didn't think it was necessary.  Again, I
10  wasn't monitoring -- I don't monitor everybody all the
11  time.  I wanted to make sure that the people who had
12  supervisory responsibilities didn't think I was
13  end-running them any more than I would go to an
14  assistant professor in the economics department to give
15  them advice from the president.  I think that that also
16  comes across as a little heavy-handed.
17       So we try to make it work through the
18  mechanisms you have and in an informal way as possible.
19  But I did not believe that was an appropriate role,
20  other than maybe in some casual conversation to say,
21  "You may want to be sensitive to."  And I may have.  I
22  don't know.  I just don't recall all those
23  conversations.
24       Q.   Where I'm struggling a little bit is that
25  ultimately the decision is made to end Ms. Smith's

52

1   employment based on what would be serious concerns;
2   right?
3       MS. DYSON:  Object to the form.
4       A.   Yes.
5       Q.   But I'm not seeing that you took any steps
6   between getting this negative feedback and ultimately a
7   termination decision being made, and I'm struggling to
8   understand why you wouldn't have just casually
9   approached her and said, "Hey, this isn't how we do
10  things at FGCU.  Maybe you need to change this or change
11  that."  Why is that?
12       MS. DYSON:  Object to the form.
13       A.   I'm not sure I did or did not.  I probably did
14  not.  But I did want to make sure that that was -- I
15  think everybody around the cabinet table, and it came up
16  at the cabinet, understood that the messages needed to
17  be appropriately sent to the appropriate channels,
18  particularly during a probationary period of time.  And
19  so we tried to stick to the protocol while also
20  providing wherever we could feedback.
21       But the bottom line is a great professional
22  seeks feedback as well, and I don't ever remember
23  being -- Chief Smith ever seeking any feedback, at least
24  not as far as I was concerned.  And I don't know about
25  others, but I've been at this 54 years and I still seek



53

1 feedback to see if I can get better tomorrow than I am
2 today. That's the nature, at least to me, of
3 professionalism on campus.
4    Q.   Do you recall ever directing any of your
5 subordinates to have discussions with Ms. Smith about
6 her approach?
7    A.   Directing?  I don't think I directed.  I
8 expected that those conversations were going on because
9 they go on all the time.  We evaluate faculty.  We
10 evaluate each other, sure.
11    Q.   And just to kind of fine-tune this a little
12 bit more, what I'm asking is after you received negative
13 feedback in regard to Ms. Smith, can you tell me every
14 instance, to the best of your recollection, when you
15 spoke to one of your subordinates and suggested that
16 perhaps they may want to speak, counsel, or otherwise
17 communicate with Ms. Smith about it?
18         MS. DYSON:  Object to the form.
19    A.   I don't know if I understand the question.  We
20 had numerous conversations.  Well, maybe "numerous" is
21 even an overstatement.  We had several conversations
22 around both the formal conversations at the regular
23 cabinet meetings and at other engagements in which
24 concern was expressed through the people who supervised
25 the police department about the way it was being led and

54

1 the way the leader was interacting on campus with the
2 expectation that supervisors would supervise.
3         And I did not recall a direct conversation
4 with Chief Smith, but there were conversations that
5 should well have gotten to her.  But again, that's why
6 we have a probationary period of time for these roles;
7 right?  To make sure that people fit.  It isn't just a
8 matter of expertise.  It's do you fit into this
9 particular institution at this particular time.  And so
10 that conversation goes on at every level.
11         And you will note, as I'm sure you may have
12 noted, we made some personnel changes for people that
13 did not fit.  Four months into my time, I changed out
14 the provost, and it wasn't a fun thing to do, but it was
15 in the best interest of the institution.  Because the
16 provost reported directly to me.  And those are the kind
17 of changes you make directly, but you allow the other
18 direct supervisors to manage those relationships and not
19 end-run the system so that anyone gets mixed messages
20 from the administration.
21    Q.   Other than these cabinet meetings, can you
22 recall any instances where you spoke to, say,
23 Mr. Vazquez, Ms. Stensrud, Ms. Gunter, or Ms. Leonard
24 about needing to talk to Ms. Smith or counsel her about
25 her approach?

55

1         MS. DYSON:  Object to form.
2    A.   I don't know if I'd put it that way.  I had
3 regular meetings with each of those -- every direct
4 report to me, we met with some regularity one-on-one,
5 and we always had conversations about challenges on
6 campus.  And there were always numerous challenges
7 because it's a place where -- it's a town where 25,000
8 people show up every day, and you're always going to
9 have some of those challenges.  So, yes, I'm sure I had
10 conversations outside the cabinet, because we had those
11 conversations one-on-one.  That's the way it worked.
12         And how it was related back, I could not tell
13 you, but I think the concerns were legitimate and I'm
14 confident that messages should or were sent that either
15 were received or not.  I don't know for sure.  But yes.
16 The answer to your question is yes.  I had numerous
17 conversations with every member of the cabinet, because
18 they were direct reports, and a few others.
19    Q.   And what do you recall the substance of those
20 communications to have been --
21         MS. DYSON:  Object to the form.
22 BY MR. YORMAK:
23    Q.   -- regarding Ms. Smith?
24    A.   I don't recall specifics.  I think it was
25 sharing the notion that things weren't working very

56

1 well.
2    Q.   One of the things that's also written in the
3 position statement that I referenced earlier is, quote,
4 "Multiple police officers met with the university
5 president and threatened to quit and/or retire based on
6 the complainant's antagonistic attitude and behavior."
7         First off, is that an accurate statement?
8         MS. DYSON:  Objection to form.
9    A.   That is an accurate statement.
10    Q.   Who were the police officers that you met
11 with?
12    A.   I don't recall them all.  I think there were
13 five.  I think Foley was one of them.  Kittleson was one
14 of them.  Probably Anderson was one of them.  There was
15 a young man whose last name I can't recall named
16 Chris -- who has since moved on to another role -- was
17 one of them.  And there may have been one more or two
18 more, but I don't recall exactly who they were.  It's
19 been a while.
20    Q.   Were they male or female?
21    A.   They were male.
22    Q.   And what negative feedback did they provide in
23 regard to Ms. Smith?
24    A.   I think you just read what they provided.  And
25 I think I recall -- I think there's a case where they



57

1  actually made it more formal.  Because my advice to them
2  was have a direct conversation with your boss, and if
3  that doesn't work or you're not comfortable doing that,
4  then you need to make it a more formal complaint.  So I
5  let them be -- I let them vent a bit, and then I said,
6  "There is a process.  Use the process."
7          The kind of shocking thing that -- the thing
8  that surprised me about the conversation was, as far as
9  I knew, all of these people were supportive of the hire.
10 I think Russ Foley may have actually been on the search
11 committee, but I don't recall.  So it wasn't as though
12 they weren't supportive at the outset, but they
13 obviously discovered something in the relationship that
14 didn't work.
15     Q.   When did these officer complaints come in?
16 Strike that.  It's about to be a bad and confusing
17 question.
18          Had you already received complaints about
19 Ms. Smith prior to the officers coming to you, or did
20 the officers' complaints alert you that there could be a
21 problem?
22     A.   I had heard, as I said, informally at coffee
23 and elsewhere on campus concerns expressed prior to
24 that, but not by members of the department, more by
25 people who had just in various ways interacted.

58

1      Q.   With those concerns from the people that had
2  interacted, did you create any notes or other kind of
3  written record of those complaints?
4      A.   No, I did not.
5      Q.   Are there any notes or written records in
6  regard to the communications from these police officers
7  that you met with?
8      A.   I don't believe so.
9      Q.   Do you recall whether or not there was any
10 kind of a complaint about Ms. Smith possibly violating
11 labor laws by communicating with hourly employees when
12 they were off the clock?
13     A.   I don't know about that one.  I hadn't heard
14 that one.
15     Q.   Was there any one factor that led you to
16 conclude that terminating Ms. Smith was in the best
17 interest of the university?
18          MS. DYSON:  Object to the form.
19     A.   No one factor.
20     Q.   Tell me all of the reasons why you believed
21 terminating Ms. Smith was in the best interest of the
22 university.
23          MS. DYSON:  Object to the form.
24     A.   I'm not sure I can put it in those terms.  I
25 think it was a composite of concerns.  But I would

59

1  suggest, again, it was largely style and personal
2  interactions, the sense that there was not a respectful
3  relationship emanating from the interactions by the
4  chief.  And, as I say, it sort of -- it violates the
5  collegiality of the culture of the university.
6          And I have worked with chiefs at other places,
7  and so I came to understand how important that kind of
8  relationship is to the credibility and the effectiveness
9  of the police department.  And so when you fracture
10 relationships with the other major leaders across the
11 campus, I just don't believe you can be as effective.
12 And when you can't be optimally effective, you can no
13 longer fully serve the mission and the people of the
14 institution, and that's where it came down in the end.
15     Q.   Do you believe that Ms. Smith would be
16 successful possibly at another university?
17     A.   Yeah, it's certainly possible.
18     Q.   Do you believe she possessed the tools to be
19 an effective chief of police at a university?
20     A.   I think strictly from a law enforcement
21 perspective, probably yes.
22     Q.   How long is -- well, strike that.
23          In regard to Ms. Smith, you referenced
24 something about a probationary period.  How long of a
25 probationary period was applicable to Ms. Smith?

60

1      A.   I don't recall exactly, but I know that we
2  were within the boundaries of it.  You know, in the case
3  of faculty -- well, not at FGCU, but in other
4  institutions, there's sort of a probationary period that
5  lasts five years with faculty, because that's the tenure
6  cutoff.  We don't have tenure at FGCU.
7          So everyone has that kind of relationship --
8  whether it's official or not -- that you know that
9  there's a period of time in which you have a chance,
10 both sides, to test whether this is an appropriate,
11 comfortable, and effective relationship, and we were in
12 that period of time.
13     Q.   And I think you said that the recommendation
14 came from Vee Leonard and Precious Gunter.  Do you
15 recall anybody else recommending the termination of
16 Ms. Smith?
17     A.   I remember the specific on that one.  I also
18 heard around the table at the cabinet several people who
19 concluded it wasn't working and wasn't going to work.
20 And so it wasn't those two specifically.  I think when
21 there was a formal complaint filed, that caused Vee and
22 Precious to come to me to say, "This is the
23 recommendation.  We've talked about it before.  We've
24 concluded that it's substantive and a change needs to be
25 made."



Smith vs. Florida Gulf Coast University                Michael Martin                                01/14/2025

61

1        And I said, "I agree.  Make the change."
2    Q.   Who did the formal complaint come from?
3    A.   I don't know.  I don't recall.
4    Q.   Do you recall the substance of the formal
5  complaint at all?
6    A.   I think it was pretty much what you just said
7  about the attitude that was reflected and Precious's
8  response about the way the officers were being treated
9  and the way they perceived that the department was being
10 managed.  I think that's where it came from, and I think
11 Precious captured it in her response to the EEOC.
12   Q.   Just getting -- I want to get back to the
13 question I asked before, though.  Other than Ms. Leonard
14 and Ms. Gunter, did anybody else in university
15 administration recommend that Ms. Smith be terminated?
16       MS. DYSON:  Object to the form.
17   A.   I'll come back again.  The recommendation
18 concerns were raised around the table at the cabinet.
19 And several voices made the same case, and the case was
20 this --
21   Q.   I get that, sir, but I'm trying to get the
22 names.  I'm just trying to get who.
23   A.   Well, I don't recall every conversation around
24 every table, but I told you who was there, so you can
25 pretty much figure out that it was David.  It was

62

1  probably Mark Rieger, the provost.  It could well have
2  been Kitty Green.  I mean, there was a conversation, and
3  no one around the table that I recall objected and said,
4  "No, you have it wrong."
5        There was a broad consensus that things were
6  not working well, and that came from the leaders of the
7  core units across the campus that in total managed the
8  campus.  Mitch Cordova, vice president for student
9  success and enrollment management.  The people who
10 occupied that table, about eight of us.
11   Q.   During those meetings, did anybody express any
12 kind of sentiment that maybe termination wasn't right,
13 that maybe counseling or corrective action would be more
14 appropriate?
15   A.   I don't recall hearing that.  I think the
16 question is can this work and the answer seemed to be
17 no, it's not working.  And I would share with you a
18 couple of decisions made, I also heard pushback from
19 students and the student leadership.
20       There was, I believe, under Chief Smith's
21 decision to take Myles Kittleson out of the role of
22 community liaison.  And the students loved Myles
23 Kittleson.  He was both one of them and a police
24 officer.  And that did some serious damage.  And I think
25 when the students and the student leadership said, "Hold

63

1  it.  We had a person we could interact with and feel
2  comfortable with who represented the police department
3  but understood who we were, and now he is no longer in
4  power to do that," I think that was a really bad
5  decision.  And I don't know if anyone was consulted on
6  it in advance.
7        I will quote myself when I made this point to,
8  I think, Sara.  Taking Myles out of that role was the
9  equivalent of peeing on Santa Claus.  It's not going to
10 go down well.  So when the student leadership comes in
11 and said, "This is our police department too and we
12 would like to be consulted on how we relate to it, and
13 we were not," that's not a good thing, because those are
14 the very people whose lives we're trying to change.
15       So if you understand how it works, that was a
16 decision that I don't know where it came from to this
17 day, but it reflected a lack of understanding about how
18 the unit was perceived on the campus, particularly by
19 the students we serve.
20   Q.   Do you recall there ever being any kind of
21 complaints about the former chief, Moore?
22   A.   I never received a complaint about Steve.
23 Now, that doesn't suggest there wasn't one, but I never
24 received a complaint about Steve.
25   Q.   You don't recall Ms. Gunter ever making a

64

1  complaint about Chief Moore and how the police
2  department communicated with the Title IX office?
3    A.   I don't recall it.  It's possible.
4    Q.   Now, you had mentioned I think before, at the
5  very beginning of your deposition, that you have been
6  deposed before, and I was remiss in not asking in what
7  kind of a context.
8    A.   I was deposed in a lawsuit by two faculty
9  members who were denied tenure at New Mexico State
10 University while I was the president of New Mexico
11 State.
12   Q.   What was the nature of the allegations?
13   A.   The allegation is that they were discriminated
14 against in the policy of being promoted, and they did
15 not become tenured faculty because of it.
16   Q.   What was your role in that case?
17   A.   Well, I guess maybe I was the final level of
18 appeal.  The decision was made in the university by the
19 chief academic officer based on a recommendation from
20 the dean, based on a recommendation from the internal
21 promotion and tenure committee in that college.  And so
22 because at the end of the day I was the final level of
23 appeal, which I had concurred with the decision of the
24 provost, I was deposed.
25   Q.   You weren't a party, though?



Smith vs. Florida Gulf Coast University          Michael Martin                              01/14/2025

65

1    A.    The lawsuit was primarily against, I think,
2    the board of regents.  I was named initially and then
3    dismissed.
4    Q.    What was the result of that case, if you
5    recall?
6    A.    Oh, I recall well.  Neil Gorsuch at the time
7    with the Tenth Circuit wrote a 66-page finding telling
8    the faculty, quote, they're effectively full of shit.
9    So he blew them out of the water, if you want to read a
10   neat piece of writing by the now Supreme Court Justice
11   Neil Gorsuch.  So it got that far, and he savaged them
12   quite seriously.
13   Q.    Okay.  And I don't believe he used such
14   colorful language in his 60-plus pages.  Did he?
15   A.    No, he did not, but you could read it pretty
16   clearly between the lines.  I mean, this was not a
17   subtle finding, and so it took a long time.  There were
18   those who had been outspoken defenders of the two
19   faculty members, and I think when they read it, many of
20   them saw a little bit more of the light.  So that was
21   the primary one.
22         There was another case, but I don't recall
23   it.  It was quite some time ago.  It was a very short
24   deposition, more just to gain factual information, and I
25   can't remember what institution I was at the time, to

66

1    be honest with you.  The big one was the New Mexico
2    State one because that one lasted a long time and went
3    all the way to -- I think it's the Tenth Circuit court
4    at the time.
5    Q.    When you were at LSU, was there any kind of an
6    action you recall being brought by a Helen Haire?
7    A.    Yes, vaguely, and I kind of remember that one.
8    There was another one there as well there by -- I can't
9    think of his name.  He was a soil scientist, I believe.
10   But I don't remember them well.
11   Q.    When you were at LSU and there was this case
12   by Ms. Haire, what role did you occupy at the
13   university?
14   A.    I was the chancellor of the Baton Rouge campus
15   within the LSU system.
16   Q.    Was there any allegation that you did
17   something wrong?
18   A.    As I recall, I think what I was accused of was
19   not overriding a decision by someone else.
20   Q.    Were you previously at the University of
21   Florida as well?
22   A.    I was a senior VP at Florida between about '97
23   or '98 and 2003 or '02.
24   Q.    Do you recall being named in that case as
25   somebody who may have engaged in some kind of

67

1    discriminatory conduct?
2    A.    I don't recall it.
3          MS. DYSON:  Objection.
4    Q.    You don't recall?
5    A.    I don't recall.
6    Q.    Was there ever any litigation that you were
7    involved with at Colorado State Pueblo?
8    A.    Litigation?  I don't --
9    Q.    I think it might have been a First Amendment
10   issue.
11   A.    Could be.  Yeah, that may be right.  I think
12   the accusation was against the campus president, but I
13   think I was accused of supporting her, and I did, and
14   she was right, at least in my judgment.  I was one step
15   away from campus there.  I was a system guy, and as a
16   result -- most of the tensions were on the campuses, but
17   I got drawn into it because I had to make decisions
18   about whether or not I thought the campus leadership was
19   correct.  And Pueblo was quite a caldron of controversy.
20   Q.    Back to FGCU, do you recall whether or not
21   there were staff shortages for the patrol of the police
22   department?
23   A.    There were staff shortages across the campus
24   always.  I don't think we ever had enough of anything,
25   but you get by.  The State of Florida is not

68

1    particularly generous to public or wasn't to public, our
2    education, though they were pretty generous to the
3    campus in a very directed way.  So, yeah, it's possible.
4    What were there, maybe 22 officers or so?  And it's a
5    difficult campus to manage because it's large and it's
6    blended into a community.  But I never felt that there
7    were critical shortages.  But I will guarantee you that
8    there was not a leader on campus who didn't believe they
9    deserved more to lead their unit.
10   Q.    Do you know whether or not Kittleson was
11   removed from that former position because of patrol
12   shortages and needing to fill in on patrol?
13   A.    I do not know that.
14   Q.    And do you know whether or not Ms. Smith was
15   subject to a six-month probationary period?
16   A.    I don't know that for sure, but that seems
17   like that could be right.  I'm not sure about every one
18   of the classifications and where they are in that
19   spectrum.
20         MR. YORMAK:  Let's take about two or
21   three minutes.  I just want to review my notes
22   here.  We may be at or near completion.
23         (Pause in proceedings)
24   BY MR. YORMAK:
25   Q.    Mr. Martin, are there any answers that you've



**69**

1   given previously that you feel need to be revisited or
2   changed in any way?
3       A.   I don't think so.  I think you have the best I
4   can give you under the circumstances.  It's been a
5   while.  I'm no kid, so I occasionally forget where I
6   parked my car, so --
7            MR. YORMAK:  Well, if parking was closer, you
8       wouldn't have a problem.
9            All right.  I appreciate your time this
10      morning, sir, and stay warm in Minnesota.  I don't
11      have any further questions.
12           THE WITNESS:  Thank you very much.
13                CROSS-EXAMINATION
14  BY MS. DYSON:
15      Q.   I just have one follow-up question.  Good
16  morning, Dr. Martin.  In direct examination you were
17  asked whether you had received the assessment from
18  Dr. Thomas before the decision was made to terminate
19  Ms. Smith.  Do you recall that question?
20      A.   I recall the question, yes.
21      Q.   And with the documentation of the assessment
22  and her termination letter, they haven't been put in
23  front of you this morning; correct?
24      A.   I have not seen that, no.
25      Q.   Would you rely on the dates of those documents

**70**

1   to reflect the order --
2       A.   Yeah.
3       Q.   -- in which they happened?
4       A.   Yes, that would be helpful.
5            MS. DYSON:  I have no further questions.
6            MR. YORMAK:  No redirect.
7            Sir, you've got the right to read the
8       deposition before it is transcribed, or you can
9       waive that right.  Ms. Dyson can counsel you
10      further on that.
11           MS. DYSON:  We'll read.
12           (Deposition concluded 10:53 a.m.)
13                - - -
14
15
16
17
18
19
20
21
22
23
24
25

**71**

                    ERRATA SHEET
        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
Deponent:             MICHAEL MARTIN
In Re:                KELLI SMITH v. FGCU BOARD OF TRUSTEES
Case No.:             2:23-cv-840
Taken:                January 14, 2025
PAGE & LINE       CHANGE        REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
Under penalties of perjury, I declare that I have read
my deposition and that it is true and correct, subject
to any changes in form or substance entered here.
Dated:_____Signed:_____
                    MICHAEL MARTIN

**72**

                 CERTIFICATE OF OATH
STATE OF FLORIDA      )
REMOTE PROCEEDING     )
     I, AMY MARIE YARBROUGH, Notary Public, State of
Florida, do hereby certify that MICHAEL MARTIN appeared
before me by videoconference on January 14, 2025;
produced identification; agreed to be placed under oath
by a Florida notary; and was duly sworn remotely.
     Digitally signed _____ day of February, 2025.

                    Amy Marie Yarbrough, FPR-C
                    Notary Public - State of Florida
                    My Commission No.: HH378205
                    Expires: June 29, 2027
*    *    *    *    *    *    *    *    *    *    *
STATE OF FLORIDA  )
COUNTY OF LEE     )
     I,_____, production manager, do
hereby certify that MICHAEL MARTIN was notified via U.S.
mail, email, and/or telephone that the transcript of the
deposition was available for reading and signing; that
as of this date the deponent has not read and signed the
transcript for the following reason:
_____
Dated this _____ day of _____, 2025.
                    _____
                    Production Manager

Smith vs. Florida Gulf Coast University      Michael Martin      01/14/2025

73

CERTIFICATE OF REPORTER

STATE OF FLORIDA        )

                           )

REMOTE PROCEEDING    )

      I, AMY MARIE YARBROUGH, Florida Professional

Reporter and Notary Public, State of Florida, certify

that I was authorized to and did stenographically report

the remote deposition of MICHAEL MARTIN; that a review

of the transcript was requested; and that the foregoing

transcript is a true and accurate record of the

proceedings.

      I further certify that I am not a relative,

employee, attorney or counsel of any of the parties, nor

am I a relative or employee of any of the parties'

attorneys or counsel connected with the action, nor am I

financially interested in the action.

      This transcript has been digitally signed.

      DATED this 21st day of February, 2025.

                 AMY MARIE YARBROUGH, FPR-C

**Exhibits**

**Exhibit 1 Email to Michael Martin From Thomas**
3:0 41:9

**0**

**02**
66:23

**1**

**1**
41:7,9

**15th**
45:11

**2**

**20**
43:17

**2003**
66:23

**2017**
7:9

**2021**
33:2

**2023**
8:13 9:2 45:11

**22**
68:4

**25,000**
55:7

**27**
43:17

**3**

**30**
20:17

**5**

**54**
52:25

**6**

**60-plus**
65:14

**60/40**
21:20

**66-page**
65:7

**7**

**70/30**
21:20

**78**
31:11

**7:30**
46:25 47:21,25

**8**

**8:20**
47:22

**9**

**97**
66:22

**98**
66:23

**A**

**abducted**
20:10

**academic**
7:18 10:19 38:25 46:4 64:19

**academics**
9:23

**accept**
48:15

**accident**
41:18

**account**
41:17,22

**accurate**
56:7,9

**accusation**
67:12

**accused**
66:18 67:13

**action**
29:8 62:13 66:6

**acts**
32:20

**actual**
20:13

**adapt**
17:6

**adjustment**
31:19

**adjustments**
31:17

**admin**
10:14,25

**administration**
10:2,4,8 22:16 29:21 46:18 54:20 61:15

**administrator**
10:1

**adults**
15:21

**advance**
26:14 27:10 63:6

**advice**
25:3 36:15 51:15 57:1

**advise**
40:5

**advisory**
25:14

**advocate**
21:17

**affairs**
22:18 46:4,16,18

**affirm**
4:8

**aforementioned**
45:21

**African**
23:8,9

**agencies**
18:23

**agency**
20:8

**agree**
4:3 19:9,14 61:1

**ahead**
9:19 13:25

**alert**
57:20

**alerted**
37:5

**allegation**
64:13 66:16

**allegations**
64:12

**alternative**
47:20

**Amendment**
67:9

**American**
23:8,9

**Amy**
5:12

**and/or**
56:5

**Anderson**
56:14

**answering**
5:19 6:4,10

**answers**
68:25

**antagonistic**
56:6

**appeal**
64:18,23

**appearing**
4:2

**applicable**
59:25

**applicants**
14:3 16:19

**appointment**
13:6

**approach**
49:14 53:6 54:25

**approachable**
51:7

**approached**
51:5 52:9

**appropriately**
36:10 52:17

**approve**
31:14

**approved**
31:16 35:20

**Approximately**
4:23

**areas**
11:7,10

**Arizona**
17:16

**arose**
7:23

**arrested**
20:16

**arrived**
13:10

**arrogance**
46:21

**arts**
37:21

**assaulted**
20:11

**assess**
39:11

**assessed**
40:14

**assessment**
32:5 36:21 39:9, 13,15,25 41:12

**assessments**
31:22

**assistant**
51:14

**athletic**
38:17,19 50:17

**attaching**
41:5

**attendance**
5:18

**attention**
37:24 50:15

**attitude**
43:11 56:6 61:7

**attuned**
33:14

**audibly**
5:10

**audit**
20:4,9,13,19 21:2

**audited**
19:20,24 20:7

**auditing**
20:15

**audits**
20:2

**authoritarian**
44:12

authority
  18:7 44:19
aware
  15:8 33:7

**B**

back
  14:24 24:25 33:2
  40:1,14 47:7,8
  49:3 50:23 55:12
  61:12,17 67:20
background
  7:3 14:9,15 18:1
  19:7
bad
  40:19 57:16 63:4
balance
  31:4
based
  13:3 14:21 18:12
  52:1 56:5 64:19,
  20
Bates
  41:4
Baton
  66:14
beer
  24:24
beginning
  64:5
behalf
  26:24 45:1
behavior
  56:6
believed
  15:14 58:20
Ben
  8:4,6
benefit
  17:5 23:15
big
  9:23 27:18,20,21
  41:1 66:1
bit
  7:3 9:7 21:21
  25:5 28:23 29:12
  31:2 32:2 44:17
  48:22 51:24
  53:12 57:5 65:20

blended
  68:6
blew
  65:9
board
  7:19 13:11 24:23
  28:17,18 40:16
  65:2
boss
  57:2
bottom
  42:2 52:21
boundaries
  60:2
break
  6:1
breaks
  6:3
briefly
  7:12
bring
  47:19
bringing
  49:15 50:23
broad
  7:14 62:5
broad-based
  46:7
broadly
  7:21 21:8 36:9
  48:22
brought
  11:23 22:2 24:16
  37:23 66:6
bump
  30:20 31:7
business
  25:13 28:15 37:2
  45:18
businesses
  28:15
buzz
  38:15 46:7,9

**C**

cabinet
  12:24 13:2,22
  22:14,15 23:1,6
  24:15 52:15,16

53:23 54:21
  55:10,17 60:18
  61:18
caldron
  67:19
call
  26:11 39:8
called
  8:7 28:15 37:20
campus
  7:18 10:15,18
  11:5 12:6,17
  13:11 14:10,18
  15:12,17,19
  16:13 17:4,7,16
  18:20 19:1,5,25
  24:12,16 26:6
  28:10,22,23
  30:20,22 31:6,8,
  10,24 34:5,7,9
  35:24,25 36:3,15,
  19,25 37:9 38:8,
  24 39:1,11,20
  40:13 43:5,23
  44:6,23 46:8,9,24
  47:11,15,22,24
  50:12,13,19 51:6
  53:3 54:1 55:6
  57:23 59:11 62:7,
  8 63:18 66:14
  67:12,15,18,23
  68:3,5,8
campuses
  32:6 38:4 40:12
  67:16
candid
  22:3 27:2
candidate
  8:8 13:19
candidates
  12:13 13:14,17,
  22 15:15
capacity
  14:12 45:1
captured
  61:11
cards
  45:18
career
  8:19 24:17

carefully
  27:22
case
  25:9 35:9 39:10
  45:9 56:25 60:2
  61:19 64:16 65:4,
  22 66:11,24
casual
  51:20
casually
  52:8
catch
  6:8
Caught
  6:7
caused
  49:14 60:21
cease
  8:11
Central
  17:17
CEO
  7:16 25:17 31:10
chair
  28:17,18 40:15
challenge
  5:22 15:22 42:25
  49:5
challenges
  55:5,6,9
champion
  9:1
chance
  35:16 40:20 60:9
chancellor
  8:22 40:11 66:14
change
  16:10 26:17
  42:22 52:10
  60:24 61:1 63:14
changed
  54:13
channels
  52:17
chaos
  11:22
characterize
  44:11
charge

45:5,9,12 47:9
chat
  6:13
chatting
  30:22
check
  17:9,11
checked
  17:19
chief
  9:10,24 10:24
  11:24,25 12:7,11
  13:5 14:4,23,25
  15:17 16:17,20
  18:8 19:6,9 22:5,
  10 23:25 24:8
  26:4 27:12,13,18,
  23 30:1,8 31:18,
  19 32:1,6,13
  33:8,22 42:23
  43:21 44:19,20
  45:13 49:6,9
  52:23 54:4 59:4,
  19 62:20 63:21
  64:1,19
chiefs
  59:6
choice
  9:5,6
choices
  27:2,3,6
chose
  15:3 25:13
Chris
  56:16
Circuit
  65:7 66:3
circumstance
  33:16
citizens
  26:25
City
  22:1
clar
  32:25
classifications
  68:18
classroom
  37:5

**Claus**
63:9

**clean**
30:23

**clear**
5:15 29:13 32:3
46:8,9

**Clery**
33:8,12,19,23

**Clery-compliant**
33:15

**climate**
35:24

**clock**
58:12

**club**
43:20

**co-responsible**
11:4

**coffee**
46:25 47:5,25
57:22

**cold**
6:19

**collaboration**
44:22

**colleague**
31:6

**colleagues**
14:13,14 18:11
43:12

**collection**
15:10

**collective**
12:22 13:3

**college**
25:13 37:21
64:21

**colleges**
46:6

**collegial**
14:12 31:9 51:6

**collegiality**
44:22 49:4 59:5

**Colorado**
8:1 40:12 67:7

**colorful**
65:14

**combination**
14:14 36:23

**comfortable**
42:1 49:15 57:3
60:11 63:2

**Commission**
45:10

**committee**
17:21,22 18:7
24:4,6 32:17,20,
21 57:11 64:21

**committees**
25:15

**commodity**
39:1

**communicate**
18:16 41:24
53:17

**communicated**
6:12 64:2

**communicating**
58:11

**communication**
33:17 42:8

**communications**
50:12 55:20 58:6

**community**
7:20 14:10,11,13
15:17 18:25 25:8,
11,16,18,21
30:25 32:7 36:3
37:8 38:14 44:21
49:8 50:14 62:22
68:6

**company**
12:15

**competent**
17:2

**complain**
47:12

**complainant**
45:22

**complainant's**
56:6

**complaining**
43:5 47:9

**complaint**
47:13 48:4 57:4
58:10 60:21 61:2,
5 63:22,24 64:1

**complaints**
38:11 39:3 42:3,
9,12 43:1,6 48:1,
10 49:1 50:3 51:2
57:15,18,20 58:3
63:21

**completion**
68:22

**compliance**
13:9 21:19 22:20
23:8 32:11 33:19
34:22,24 45:14

**compliant**
29:22

**component**
28:21,22

**components**
9:23 21:16

**composite**
58:25

**concern**
36:1 46:20 50:7
53:24

**concerned**
40:18 52:24

**concerns**
33:12 34:4 35:14
37:1,23 48:7 52:1
55:13 57:23 58:1,
25 61:18

**conclude**
58:16

**concluded**
13:14 27:15 28:8
60:19,24

**conclusions**
21:3

**concur**
35:8

**concurred**
13:24 34:18 35:9
40:2 64:23

**conditioned**
12:4

**conduct**
39:6 67:1

**conducted**
20:10 39:9

**confident**
55:14

**confusing**
57:16

**connected**
25:19

**consensus**
62:5

**consequences**
40:20

**consideration**
36:22

**considerations**
10:21

**considered**
14:8,17 25:23

**consist**
49:2

**consisted**
48:11

**consistent**
31:20

**constantly**
31:20 37:7

**constructive**
48:13 49:7

**consult**
37:12 38:5,10

**consultant**
38:24

**consulted**
16:16 37:13,24
38:2,18 63:5,12

**contemplate**
28:11

**contemplated**
28:4,5,16

**context**
64:7

**continually**
15:22

**continue**
25:19 26:13
36:18 37:14

**continued**
24:17 25:8 39:17
40:9 45:20

**contribution**
26:6

**control**
10:20

**controversy**
67:19

**conversation**
28:17,19 31:6
34:11 36:20
46:16 48:13 50:2
51:20 54:3,10
57:2,8 61:23 62:2

**conversations**
30:19 40:16,22
47:4 48:19 50:9,
21 51:1,23 53:8,
20,21,22 54:4
55:5,10,11,17

**coordinator**
33:9,23 45:14

**Cordova**
62:8

**core**
23:1,6 46:4 62:7

**correct**
5:8,14 6:21 7:4,5
9:3 11:8,14 12:8
14:2 24:20 29:4,5
35:4 41:14 42:11
67:19

**corrected**
26:16

**corrective**
29:8 62:13

**correctly**
8:25

**cost**
28:14

**counsel**
6:12,14 13:8
22:20 23:7 25:3
28:3 32:12 34:21
53:16 54:24

**counseling**
29:14 62:13

**count**
17:25

**country**
38:4

**county**
18:24 28:8,25

**couple**
25:14 30:4 37:17
62:18

**court**
  5:8,12 65:10 66:3
**covers**
  7:21
**COVID**
  30:7
**create**
  26:12,15 58:2
**credibility**
  43:24 59:8
**credible**
  14:16 35:12,25
**crew**
  15:23
**criminal**
  37:20
**critical**
  28:1 68:7
**criticism**
  44:8
**CSU**
  8:4
**culture**
  14:17 16:11,12
  17:6 31:9 35:25
  36:17 39:7 43:19
  44:22 59:5
**cutoff**
  60:6

**D**

**D-III**
  9:1
**daily**
  44:7
**damage**
  62:24
**damaged**
  45:2
**date**
  32:25 48:18,20
**Dave**
  37:11,12 38:2,5,
  13,23 40:9,21
**Dave's**
  40:3
**David**
  10:12 12:3,5,15,
  23 13:7,24 17:23

**36:16,21 37:18**
  50:7 61:25
**David's**
  12:5 32:10
**day**
  13:23 28:20 35:5
  55:8 63:17 64:22
**day-to-day**
  7:15 30:21
**days**
  23:2
**deal**
  34:7
**dealt**
  7:18 15:12
**dean**
  64:20
**debate**
  13:22
**decide**
  42:20
**decided**
  8:8
**decision**
  12:20,22 13:1,2,
  3,8,11,12,23,24
  14:1,6 18:8,15
  34:16 35:11
  39:24 40:2,7
  42:19 51:25 52:7
  62:21 63:5,16
  64:18,23 66:19
**decision-maker**
  35:4
**decisions**
  16:17 35:7 40:6
  42:5,16,17 62:18
  67:17
**deemed**
  45:22,25
**deep**
  35:23
**deeply**
  24:17 31:3
**defenders**
  65:18
**deficiencies**
  30:12
**denied**
  64:9

**deny**
  30:14
**department**
  9:9,24 12:7 15:6,
  12,16 16:1,9,14,
  18 18:21 21:3,9,
  10,15,16,18 22:1
  28:4,7,22 29:2
  31:11 36:7,17
  37:19 38:6,14,18,
  19 39:7,18,19,22
  40:6 43:2,25
  44:5,15 46:17
  50:16,17,18
  51:14 53:25
  57:24 59:9 61:9
  63:2,11 64:2
  67:22
**departments**
  21:24 45:21,24
**deposed**
  64:6,8,24
**deposition**
  4:21 5:23 6:10,16
  64:5 65:24
**describe**
  7:12 10:13
**deserved**
  68:9
**details**
  32:5 39:16
**determine**
  12:15 37:7
**devil**
  5:12
**difficult**
  45:22,25 68:5
**difficulty**
  24:1
**direct**
  4:14 10:3 29:16,
  17,23 30:19 50:5,
  8 54:3,18 55:3,18
  57:2
**directed**
  53:7 68:3
**directing**
  53:4,7
**directly**
  10:24 31:16

**35:13 36:5 51:6**
  54:16,17
**director**
  11:3,6,11,17 13:9
  23:8 32:20
**directors'**
  13:12
**disciplinary**
  31:5
**discipline**
  26:9,12 29:7,13,
  24
**disclose**
  6:11
**discover**
  47:16
**discovered**
  57:13
**discriminated**
  64:13
**discrimination**
  45:5,9
**discriminatory**
  67:1
**discussions**
  53:5
**dismissed**
  65:3
**dismissing**
  42:23
**disrespect**
  5:14
**disrespectful**
  44:14
**distribution**
  21:10
**diverse**
  23:10
**diversity**
  23:12
**divided**
  9:22
**divisions**
  11:13
**document**
  40:23 41:3
**documents**
  6:15,25 13:7

**dominated**
  21:25
**donors**
  7:20
**doubt**
  32:19,20
**dozen**
  28:2 37:4
**draw**
  40:18,19
**drawn**
  67:17
**drive**
  47:15
**driver**
  20:11
**Due**
  45:20
**duly**
  4:13
**duties**
  7:13,23 10:13
  19:13,18 25:6
**duty**
  19:10,15
**Dyson**
  9:11,13,18 11:1,
  15 12:2 18:9
  19:12,16,22
  21:12 23:20,23
  24:21 25:24
  27:25 33:24 38:1
  41:3,8 45:6,17
  46:1,12 51:4,8
  52:3,12 53:18
  55:1,21 56:8
  58:18,23 61:16
  67:3

**E**

**earlier**
  43:12 56:3
**early**
  27:3
**economics**
  51:14
**economies**
  28:15,16
**education**
  37:9 49:12 68:2

educational
 15:18 28:21
EEOC
 61:11
effect
 5:8
effective
 10:16 15:13
 43:21 44:24
 59:11,12,19
 60:11
effectively
 7:16 8:3,19 18:22
 28:7 65:8
effectiveness
 43:24 59:8
efficient
 10:16 15:13
Einstein's
 48:20
elastic
 23:1
email
 41:13,22,24
emails
 41:21
emanating
 59:3
emergence
 45:20
emeritus
 25:1,6,7
employed
 7:4,25
employees
 21:11 26:10 48:8
 49:18 58:11
employment
 8:15 34:17 45:10
 52:1
empower
 35:7
encounter
 23:25
end
 8:19 13:23 27:4
 28:8,20 35:5
 41:19 51:25
 59:14 64:22

end-run
 54:19
end-running
 51:13
ended
 34:8
endurance
 5:22
enforce
 19:10,20
enforcement
 18:23 23:16
 28:25 32:7 37:9
 59:20
engage
 36:21 37:8
engaged
 30:18,21 38:9
 40:15,21 44:6
 66:25
engagements
 53:23
engaging
 16:14
English
 50:16
enrollment
 62:9
ensure
 5:18
ensured
 17:24
entire
 26:19
environment
 26:13 50:22 51:7
Equal
 45:10
equity
 45:14
equivalent
 63:9
establish
 18:20
ethics
 45:14
evaluate
 53:9,10

evidence
 30:15
EXAMINATION
 4:14
examples
 49:11
excellence
 16:6
excuse
 9:13 36:6
executive
 22:17
Exhibit
 41:9
exhibited
 46:22
expect
 5:22 38:21 49:9
expectation
 18:24 54:2
expectations
 19:4
expected
 39:5 53:8
expeditiously
 27:22
experience
 14:9,16 17:4 22:2
 38:25 49:23
experienced
 17:2
expert
 43:9
expertise
 14:15 23:3 54:8
explain
 49:19,25
express
 24:6 39:2 62:11
expressed
 33:11 39:4 53:24
 57:23
extra-wide
 45:18
eyes
 44:13

**F**

facilities
 10:17 46:5 47:19
fact
 16:14 39:19
factor
 25:23 58:15,19
factors
 14:7 36:24
factual
 65:24
faculty
 18:14 19:2 24:24
 25:12 36:13 49:9
 53:9 60:3,5 64:8,
 15 65:8,19
failed
 8:6 20:4
failing
 19:20
fair
 6:5 11:9,11 31:25
fairly
 28:13,22 31:22
fall
 9:9
falls
 8:23 29:16
familiar
 12:8
father
 8:4,6
feared
 28:23
February
 45:11
federal
 10:22 19:11,25
feedback
 34:7 48:17,23
 52:6,20,22,23
 53:1,13 56:22
feel
 15:5 30:24 35:18
 49:14 63:1
feeling
 49:16

felt
 28:20 42:1 68:6
female
 16:22 22:5,10
 24:7,10 26:4
 56:20
FGCU
 7:4,6,13,24 8:2
 9:2 10:7 11:16
 19:19 26:9 27:24
 41:17 43:16
 52:10 60:3,6
 67:20
figure
 5:13 61:25
filed
 45:9 60:21
fill
 27:12 68:12
final
 64:17,22
finalist
 16:23
finance
 10:2,4,8,14,25
 22:16 29:21
 46:18
finances
 10:23
financial
 10:20
financially
 20:7
finding
 20:13 21:6 65:7,
 17
findings
 20:3
fine
 13:14
fine-tune
 53:11
finish
 6:4
fire
 40:18,19
fit
 14:11,17 16:13
 35:19 43:20 54:7,
 8,13

**fixed**
30:24

**Florida**
4:4 17:17 37:22
66:21,22 67:25

**Foley**
56:13 57:10

**folks**
35:13

**follow-up**
23:4

**force**
28:10

**form**
9:11,18 11:1,15
12:2 19:12,16,22
21:12 23:20,23
24:21 25:24
27:25 33:24 38:1
45:6,17 46:1,12
51:4,8 52:3,12
53:18 55:1,21
56:8 58:18,23
61:16

**formal**
20:19 31:5,8,13
53:22 57:1,4
60:21 61:2,4

**formally**
30:3 37:11

**fortress**
37:16

**found**
16:13

**foundation**
25:18

**founding**
8:3,6 43:18

**fourth**
25:10

**fracture**
59:9

**fractured**
44:25

**freely**
41:24

**frequently**
47:8 50:13

**friends**
37:2

**front**
6:25

**froze**
27:4

**full**
37:10 65:8

**fully**
29:1,22 59:13

**fun**
54:14

**function**
10:19 13:15
18:11 20:15 45:1

**functioned**
15:9 47:21

**functioning**
12:6 16:8 20:1

**functions**
7:18 10:15 15:10
30:20 47:24

**funded**
26:19 27:8

**funding**
26:25

---
**G**
---

**gain**
65:24

**Gainesville**
37:22

**gave**
25:18

**GC**
35:1

**gender**
21:10 22:13
25:22 26:3

**general**
13:8 17:13 20:14
22:20 23:7 31:6
32:12 34:21

**generally**
21:23

**generous**
68:1,2

**gig**
8:18,20

**give**
4:9 7:14 8:9

11:16 27:17
36:16 51:14

**Gmail**
41:17

**goals**
18:16,19

**Goen**
23:5

**good**
4:16 5:10 6:8
8:24 15:23 16:11
23:13 26:1,2
28:13 34:7 37:2
43:13 49:6,10,13
63:13

**Gorsuch**
65:6,11

**government**
47:18

**great**
22:2 27:17 52:21

**Green**
22:19 45:13 62:2

**Griffin**
8:4

**ground**
5:4

**grounds**
10:17 50:18

**group**
10:1 18:11,21
23:6,11

**grow**
26:13

**growing**
37:9

**guarantee**
68:7

**guess**
64:17

**Gunter**
34:25 45:13,19
46:10 54:23
60:14 61:14
63:25

**guy**
8:16 41:19 67:15

---
**H**
---

**Haire**
66:6,12

**hand**
4:6

**handled**
20:15

**happen**
37:6

**happened**
38:3 45:3

**happy**
6:2

**hard**
27:2,3,5

**hear**
5:17 36:8 43:10
44:6 46:10 47:23,
25

**heard**
6:18 24:9 35:13
36:5,9,11 44:4,9
46:3 47:4 48:23
57:22 58:13
60:18 62:18

**hearing**
36:9 47:3 62:15

**heartburn**
36:6 40:11

**heavy-handed**
51:16

**held**
7:10 10:9 11:17
32:18

**Helen**
66:6

**hesitate**
5:20

**hesitations**
22:9,11

**Hey**
52:9

**hierarchy**
44:18

**Hill**
8:4,6

**hire**
12:20 14:1 18:15

26:1,2,4 27:18,20
57:9

**hired**
18:2 20:22 22:4
24:2,14 25:22
33:1,2 49:19

**hiring**
13:13 14:6 18:8
19:6,19 22:9,12
26:5 32:17,23

**Hispanics**
23:11

**hockey**
8:24

**hold**
10:8 62:25

**holistic**
49:12 50:11

**honest**
28:2,18 46:21
66:1

**hope**
50:8

**hourly**
58:11

**HR**
11:6,9,11 22:21
32:12,14,20 34:8

**huge**
27:16

**huh-uh**
5:11

**human**
11:3,12,18 22:23
28:21 29:22

**hurt**
43:22,23

**HVAC**
30:24

---
**I**
---

**idea**
41:25

**ified**
32:25

**imagine**
11:6

**immediately**
11:25 12:3

Case 2:23-cv-00840-JES-KCD    Document 38    Filed 03/28/25    Page 26 of 33 PageID 989

Smith vs. Florida Gulf Coast University    Michael Martin    01/14/2025 Index: important..level

**important**
14:7 16:15 19:14,
17 22:13 26:23
27:20,23 28:1
31:23 38:23,24
39:21,22 44:24
59:7

**impression**
17:8

**impressions**
16:25

**in-your-face**
43:9

**inaccurate**
19:7

**incident**
20:18,21,25 21:4
38:17

**include**
36:24

**included**
11:2 23:4

**includes**
10:16

**including**
12:7 14:13 42:23

**increase**
32:9

**incredibly**
39:21

**independently**
36:12

**indications**
20:6

**individual**
14:11 18:10
20:16 48:3,5
50:21

**inexperienced**
29:10

**informal**
12:18 30:20
49:16 51:18

**informally**
30:3 37:11 57:22

**information**
65:24

**informs**
20:5

**initial**
49:1

**initially**
65:2

**input**
13:3 29:18

**inside**
44:5

**insight**
23:3

**instance**
47:11 53:14

**instances**
54:22

**institution**
7:20,22 10:20
23:14 26:14,22
27:8,10 35:23
49:13 54:9,15
59:14 65:25

**institutions**
60:4

**intend**
40:10

**interact**
15:16 18:22
21:18 63:1

**interacted**
7:19 12:12 31:12
36:7 57:25 58:2

**interacting**
30:2 44:13,14
54:1

**interaction**
28:21

**interactions**
12:18 25:15
29:11 31:1,5
46:21,22 59:2,3

**interactive**
29:1

**interest**
28:9 54:15 58:17,
21

**interesting**
15:10

**interim**
8:22

**internal**
25:14 44:1 64:20

**interpret**
42:17

**interpreted**
36:9

**interventions**
26:15

**interview**
16:2,20 17:1

**interviewed**
16:21

**interviewing**
12:13

**interviews**
14:21

**intuitive**
18:19

**investigate**
36:12 39:10

**investigation**
39:7,8

**investments**
26:21

**involved**
34:23 67:7

**involvement**
11:7,12

**issue**
29:11,13,23
43:14 67:10

**issued**
29:7

**issues**
44:1 45:21 49:15

**IX**
45:14 64:2

**J**

**janitor**
47:2

**Jen**
23:5

**job**
7:13 10:13 12:16
14:4 15:23 19:10,
13,15,17 43:16

**joining**
7:24

**journey**
16:7

**judgment**
27:7 67:14

**justice**
37:20 65:10

**K**

**keeping**
38:7,8

**Kelli**
12:8

**kicked**
27:15

**killed**
37:5

**kind**
5:22 7:21 11:9
18:5 29:7 30:12,
25 31:4 34:11
39:6 43:3,11
44:8,25 48:12,17,
23 49:7 50:23
53:11 54:16 57:7
58:2,10 59:7 60:7
62:12 63:20 64:7
66:5,7,25

**kinds**
19:24

**Kittleson**
56:13 62:21,23
68:10

**Kitty**
22:19 62:2

**knew**
31:1,2 40:15 47:1
49:21 57:9

**L**

**labor**
58:11

**lack**
63:17

**language**
65:14

**large**
31:11 35:17 36:4
68:5

**largely**
21:24 59:1

**larger**

**18:25** 25:16,20
45:1

**lasted**
66:2

**lasts**
60:5

**latest**
5:24

**launched**
28:5

**law**
18:22 19:11
23:16 28:24 32:7
37:8 59:20

**laws**
19:20 58:11

**lawsuit**
64:8 65:1

**lead**
68:9

**leader**
54:1 68:8

**leaders**
32:7 59:10 62:6

**leadership**
15:23 16:9,16
19:2,3 24:24
46:15 47:18
62:19,25 63:10
67:18

**led**
8:2,14 36:7 53:25
58:15

**Lee**
18:23

**left**
13:15 25:16

**legislative**
23:4

**legislature**
7:23

**legitimate**
55:13

**legitimately**
40:17

**Leonard**
35:2 46:10 54:23
60:14 61:13

**level**

19:25 54:10
64:17,22

**levels**
7:19 44:19

**liaison**
23:5 62:22

**life**
8:7 30:22

**light**
38:3 65:20

**limited**
48:21

**lines**
12:17 44:23
65:16

**Listen**
24:25

**litigation**
67:6,8

**lives**
63:14

**local**
19:10 40:13

**long**
8:17,19 22:7
27:12 48:19
59:22,24 65:17
66:2

**long-term**
36:25

**longer**
37:3 59:13 63:3

**looked**
13:7

**lose**
31:9

**lot**
46:24

**louder**
43:1

**loved**
62:22

**low**
22:3

**lower**
28:14

**LSU**
31:11 66:5,11,15

**lunchtime**
5:23

---

## M

**made**
12:20,24 16:10
17:21 18:4,5,15
21:2,9 23:6 27:3,
6 31:19 32:8
34:20 41:21
51:25 52:7 54:12
57:1 60:25 61:19
62:18 63:7 64:18

**Magiera**
10:12

**maintain**
10:20

**maintaining**
10:17 37:10

**maintenance**
50:18

**major**
13:1 59:10

**make**
10:15,18 12:14,
18 13:23 18:7
19:5 26:2,17,22
27:2,5 34:16 35:7
36:8,19 37:15
39:10,24 40:2,5,7
42:5,16 51:11,17
52:14 54:7,17
57:4 61:1 67:17

**makes**
25:7

**makeup**
23:17

**making**
14:6 33:14 44:24
48:3 63:25

**male**
21:21 22:2 56:20,
21

**males**
21:25

**man**
56:15

**manage**
54:18 68:5

**managed**
47:6 61:10 62:7

**management**
10:17 62:9

**managing**
33:15

**mark**
41:7 62:1

**marked**
41:9

**market**
31:17,21,23

**Martin**
4:1,12,16,18
68:25

**matter**
4:9 22:12 54:8

**mattered**
49:23

**means**
7:17 9:25

**meant**
41:25

**mechanisms**
51:18

**meetings**
22:21 30:5,6,9
53:23 54:21 55:3
62:11

**member**
25:8 32:21 49:7
55:17

**members**
7:19 24:22 36:13
39:19 47:3 57:24
64:9 65:19

**mentioned**
37:17 64:4

**mentors**
49:10

**message**
31:24

**messages**
52:16 54:19
55:14

**met**
30:7 55:4 56:4,10
58:7

**Mexico**

64:9,10 66:1

**Michael**
4:12,18

**middle**
4:19

**mind**
30:17 47:2

**Minnesota**
4:2 6:20

**minutes**
68:21

**mission**
59:13

**Mitch**
62:8

**mixed**
54:19

**model**
28:6

**models**
49:11

**monitor**
51:10

**monitored**
15:22

**monitoring**
51:10

**months**
48:25 54:13

**mood**
36:18

**Moore**
12:16 22:6 49:5,6
63:21 64:1

**morale**
36:17

**morning**
4:16 46:25 47:22

**moved**
13:25 56:16

**moving**
46:17

**multiple**
10:9 19:3 45:21
56:4

**Myles**
62:21,22 63:8

---

## N

**named**
36:16 56:15 65:2
66:24

**names**
11:17 61:22

**National**
9:1

**natural**
20:1

**nature**
29:1 49:12 50:12
53:2 64:12

**neat**
65:10

**necessarily**
23:12 26:4

**needed**
23:2 39:18 43:20
52:16

**needing**
54:24 68:12

**negative**
21:6 25:25 48:17,
23 52:6 53:12
56:22

**Neil**
65:6,11

**normal**
38:15 39:3

**northern**
21:23,24

**nos**
5:11

**notary**
4:4

**note**
54:11

**noted**
54:12

**notes**
58:2,5 68:21

**notice**
41:11

**noting**
24:9

**notion**
40:1 49:3 55:25

**number**
12:18 21:22
31:17 34:4 35:10
37:13 41:4 48:6

**numerous**
53:20 55:6,16

---

**O**

**oath**
4:3 5:7

**object**
9:11 11:1 12:2
19:12,16,22
21:12 23:20,23
24:21 25:24
27:25 33:24 35:8
38:1 45:6,17
46:1,12 51:4,8
52:3,12 53:18
55:1,21 58:18,23
61:16

**objected**
62:3

**objecting**
9:18

**objection**
18:9 24:11 56:8
67:3

**objects**
9:14

**observation**
33:17

**observe**
15:5

**obtain**
18:1

**obvious**
18:19 19:5 21:6

**occasions**
36:15 47:5

**occupied**
36:2 62:10

**occupy**
7:6 66:12

**occur**
20:21 46:23

**occurred**
29:18

**office**
11:3,22 12:5

18:24 28:12,25
32:11 36:23
40:14 42:21 64:2

**officer**
22:20 31:2 34:22,
24 36:14 37:22
57:15 62:24
64:19

**officers**
15:10 21:15,19,
23 22:2 23:16
24:1 31:12 42:4,
10,13 43:3 56:4,
10 57:19 58:6
61:8 68:4

**officers'**
57:20

**official**
12:17 14:11 60:8

**oftentimes**
22:20 37:11

**one-on-one**
55:4,11

**one-sided**
48:14

**ongoing**
36:22

**open**
47:3 51:6

**operating**
20:8

**operations**
9:24,25 20:4

**opinion**
23:17 39:2,4

**opportunity**
6:17 15:15 25:18
26:24 41:10
45:10

**opposed**
41:17

**optimally**
59:12

**options**
47:20

**organization**
15:14,24 35:17
36:19 44:16

**organizational**
9:8

**organized**
44:15

**outset**
57:12

**outsource**
28:7 40:8

**outsourced**
40:13

**outsourcing**
28:11 36:22

**outspoken**
65:18

**overemphasis**
28:24

**overlording**
16:15

**overriding**
66:19

**oversaw**
31:11

**overstatement**
53:21

**owe**
26:20

---

**P**

**pages**
65:14

**pandemic**
33:5

**paramilitary**
44:16

**parenthetically**
37:2

**parking**
47:12,16

**part**
12:12 15:18
18:25 20:1,7
22:21 25:10
30:24 31:8 36:4,
22 37:9 38:21
39:21,22 41:6
42:14 43:14
44:20,24

**partially**
32:10

**partly**
21:22

**party**
15:20 64:25

**pass**
13:1

**patrol**
67:21 68:11,12

**pause**
68:23

**paying**
50:14

**peeing**
63:9

**pending**
6:4

**people**
10:9 11:17 15:21
16:13 17:25
21:17 23:4,7,13
26:13,23 30:21,
23 31:17,22
33:15 34:4 35:7,
10,16,22 36:5
37:14 38:8,18
40:15,17 43:18
44:23 46:5 47:1,
4,8,19 48:6,8
49:14 51:11
53:24 54:7,12
55:8 57:9,25 58:1
59:13 60:18 62:9
63:14

**people's**
44:13

**perceived**
25:20 39:20 61:9
63:18

**percentage**
21:9

**perform**
39:13

**performance**
30:12

**performed**
20:20

**performing**
38:7

**period**
35:16 52:18 54:6
59:24,25 60:4,9,
12 68:15

**person**
10:7 18:6 63:1

**personal**
41:16,24 59:1

**personally**
13:13 16:19
41:14

**personnel**
54:12

**perspective**
18:13 59:21

**philanthropy**
22:19 23:10

**philosophy**
50:19

**piece**
65:10

**place**
12:19 31:25 55:7

**places**
34:8 59:6

**plaintiff's**
41:9

**planned**
8:5

**players**
21:14

**plenty**
47:16

**plugged**
24:25

**point**
31:15 33:9 63:7

**pointed**
47:15

**police**
9:9,24 10:24
11:25 12:6,11
13:5 14:4 15:6,
12,16 16:1,9,14,
18,20 18:8,21
19:10 21:3,8,10,
24 22:1,5,10 24:8
27:13,19,24 28:7,
10,11,22 29:1
30:1 31:11 33:8,
22 36:14 37:21
38:13 39:7 40:6,
13 43:2,24 44:15
46:17 49:7,8

| | | | | |
|---|---|---|---|---|
| 50:16 53:25 56:4, 10 58:6 59:9,19 62:23 63:2,11 64:1 67:21 | 10:2,5 12:4 22:16,17,18 23:9 24:10 25:1,3,6 26:8 29:21 35:7 37:3 51:15 56:5 62:8 64:10 67:12 | **proceedings** 68:23 | **Pueblo** 67:7,19 | **reason** 6:1 35:15 49:23 |

**policies**
29:22

**policy**
26:9 64:14

**poor**
16:1

**population**
21:25

**position**
7:10 11:4 18:14 25:13 27:13 42:23 43:13 45:4 56:3 68:11

**positions**
7:6 26:23 33:9

**positive**
25:23,25 26:5

**possessed**
14:19 59:18

**possibly**
31:21 58:10 59:16

**post-covid**
30:10

**post-pandemic**
33:5

**power**
63:4

**preceded**
22:8

**Precious**
34:25 44:3 45:13 60:14,22 61:11

**Precious's**
61:7

**preferences**
13:16

**prepare**
6:9,15

**present**
6:22

**presidency**
25:17

**president**
7:7,8,16 8:10,11

**president's**
7:13

**presidential**
8:5

**presidents**
12:25 13:10 25:10

**presumed**
49:21

**pretty**
7:21 8:16 15:9,13 19:5 20:12,15 21:6 23:1,10,17 46:6,8 61:6,25 65:15 68:2

**previous**
14:23,25

**previously**
66:20

**price**
22:3

**primarily**
65:1

**primary**
10:3 17:3 19:10 42:19 65:21

**principal**
7:22 36:1 40:8

**prior**
7:24 11:22 16:9 18:2 19:19 20:21 29:6,14 30:11 57:19,23

**probationary**
35:15 52:18 54:6 59:24,25 60:4 68:15

**problem**
43:4 57:21

**problems**
15:6 16:8 43:11

**proceeded**
28:10

**process**
5:6 12:13 15:18 22:22 57:6

**productive**
31:8

**professional**
17:3 22:12 52:21

**professionalism**
53:3

**professionals**
18:21 26:1,2 35:25

**professor**
37:19 51:14

**program**
8:24

**programs**
10:19

**progressive**
26:9,11

**promoted**
64:14

**promotion**
64:21

**properly**
21:3

**proposed**
33:8

**protocol**
52:19

**provide**
25:2 56:22

**provided**
36:2 56:24

**providing**
52:20

**provost**
22:17 54:14,16 62:1 64:24

**psychologists**
49:10

**public**
20:8 41:20 47:3 68:1

**publicly**
41:22 50:12

**pun**
40:19

**pursue**
16:6 23:12,13

**pushback**
24:1 62:18

**put**
21:9,11 26:23 48:18,20 55:2 58:24

**Q**

**qualified**
13:21

**qualities**
14:20

**quality**
36:1

**question**
5:16,17 6:4,10 9:19 37:14 42:25 50:24 53:19 55:16 57:17 61:13 62:16

**questions**
5:19

**quit**
56:5

**quote**
42:3 45:20 56:3 63:7 65:8

**R**

**racial**
23:17

**raise**
4:6 31:14 32:2

**raised**
44:2 61:18

**ranks**
44:18

**rash**
40:6,7 42:5,16, 17,19

**read**
41:10 56:24 65:9, 15,19

**pun**
40:19

**reasons**
27:9 35:20 58:20

**recall**
5:1 13:20 14:3 17:14,16 20:2,3,9 21:1,2,5,7 26:8 27:14 29:6 30:7, 14,15 32:8,22,24 33:10,11,13,16, 18 34:3,10,11,14 39:16 48:3,5,11, 16 49:1 50:1 51:1,22 53:4 54:3,22 55:19,24 56:12,15,18,25 57:11 58:9 60:1, 15 61:3,4,23 62:3,15 63:20,25 64:3 65:5,6,22 66:6,18,24 67:2, 4,5,20

**received**
29:18 32:2 41:14 53:12 55:15 57:18 63:22,24

**receiving**
48:16

**recent**
4:25

**receptive**
48:13

**recognition**
31:23

**recognized**
26:16

**recollection**
5:5 53:14

**recommend**
13:13 34:1,13 39:17 61:15

**recommendation**
12:14 32:8 34:18, 20 60:13,23 61:17 64:19,20

**recommendations**
12:23 35:8,9 40:3

**recommended**
32:22

Smith vs. Florida Gulf Coast University     Michael Martin     01/14/2025Index: recommending..served

**recommending**
60:15
**record**
4:17 5:15 6:19
13:21 29:12 41:5,
21 58:3
**records**
58:5
**recruited**
8:3
**reference**
47:13
**referenced**
56:3 59:23
**references**
17:9,12,14,19,22,
24
**referencing**
42:9,18,22
**referred**
41:5 47:7,8
**referring**
7:1 8:20
**reflected**
61:7 63:17
**reflecting**
44:4,5
**refresh**
5:5
**regard**
37:12 53:13
56:23 58:6 59:23
**regents**
65:2
**region**
18:23
**regular**
31:21 53:22 55:3
**regularity**
38:3 55:4
**regularly**
19:24 20:7 21:18
25:16 30:6,8 31:1
44:6
**relate**
63:12
**related**
55:12
**relationship**

12:5 40:14 44:25
57:13 59:3,8
60:7,11
**relationships**
43:23 50:5 54:18
59:10
**relative**
31:22 32:6
**remain**
24:25
**remains**
38:23
**remember**
8:24 17:16 20:12,
13,14 32:19
44:12 52:22
60:17 65:25 66:7,
10
**remind**
40:9
**remiss**
9:12 64:6
**remotely**
4:13
**removed**
68:11
**reorganizing**
28:4 46:17
**repeatedly**
50:19
**report**
10:3,5 11:25
30:19 40:4 55:4
**reported**
10:24 21:4 54:16
**reporter**
4:1,6 5:12
**reporting**
10:21 12:17
19:20 33:12
**reports**
24:20 36:11
46:11 55:18
**represent**
19:1 45:8,12
**represented**
7:20 24:3 25:19
63:2
**reputation**
16:1,4

**requirements**
19:21
**residence**
6:19,22
**resistance**
24:7
**resources**
11:3,18 22:24
29:22
**resources-related**
11:13
**respect**
44:23 50:4
**respectful**
59:2
**responded**
39:20 45:11
**response**
41:7 45:5 61:8,11
**responsibilities**
51:12
**responsibility**
7:17 26:18 27:7
35:6,11
**responsible**
12:6
**restructure**
42:20
**result**
65:4 67:16
**results**
39:15
**retain**
39:17
**retire**
8:5,18 9:4 14:25
15:2,4 56:5
**retired**
8:4,16 9:2 12:16
14:24 27:13
36:14 46:3
**retirees**
21:23,25
**retiring**
15:7
**review**
6:15 20:19 68:21
**RFP**
41:7

**Rieger**
62:1
**River**
8:23
**role**
10:8,9 11:17
12:7,12,14 17:6,
25 18:17 19:9
24:14 25:1,17
27:7,10,21 28:1
29:16 32:18
33:22 44:20 49:8,
11 51:19 56:16
62:21 63:8 64:16
66:12
**roles**
22:13 54:6
**Rouge**
66:14
**routine**
43:4
**rules**
5:5 10:22
**run**
44:21
**Russ**
57:10

**S**

**Sacha**
9:13,17
**safe**
18:20 37:15 38:8
**safety**
15:19 19:1
**salary**
32:9
**Santa**
63:9
**Sara**
11:20,22 12:4
13:24 17:24
22:21 32:13 34:6
50:9 63:8
**sat**
22:21
**savaged**
65:11
**schedule**
30:5

**scheduled**
30:6
**sciences**
37:21
**scientist**
66:9
**scope**
42:24 48:21
**screen**
40:24
**search**
8:5 17:20,22
24:4,6 28:5,10
32:17,19 57:10
**security**
10:18 15:19 19:1
36:15,25 37:10
**seek**
52:25
**seeking**
52:23
**seeks**
52:22
**segments**
13:4
**send**
31:24
**senior**
10:1 66:22
**sense**
7:14 14:10 15:11
20:14 23:2 36:16
38:7 43:21 59:2
**sensitive**
15:8 39:18 51:21
**sentiment**
62:12
**separate**
11:10,11 39:23
**separating**
33:8
**separation**
8:14
**serve**
23:13 25:14
59:13 63:19
**served**
12:11 13:4 26:25
33:4

service
26:14 27:11
28:14 36:1 48:25

services
28:12

set
19:3 23:12,13
26:3 27:9

sexually
20:10

share
12:14 62:17

shared
13:24 15:14,15
17:10,12 28:3
50:7

sharing
55:25

She'd
17:4

sheriff
28:8,19 37:13

sheriff's
18:24 28:12,25
36:23 40:13
42:21

shit
65:8

shocking
57:7

short
65:23

short-term
25:17

shortages
67:21,23 68:7,12

shorter-term
8:18,20

shortly
20:16

shot
8:9

show
40:23 55:8

side
9:25 21:21 35:18
38:25

sides
60:10

signed
13:7 45:13

significant
28:23

signs
18:12

similar
30:9 46:11

simply
16:15

single
18:10 49:3

singular
13:2,8 40:2 44:2

singularly
18:13

sir
61:21

sitting
30:16

six-month
68:15

size
28:15,16

small
12:16

Smith
12:8,10,21 13:13,
17 14:1,19 15:25
16:22,25 18:2,15
19:6,19 20:21,24
22:4,19 23:25
25:22 29:4,24
30:11 31:14
32:18,23 33:1,7,
11,21 34:1,13
35:21 38:11 39:3,
25 42:13,23
43:22 44:9 45:9,
22,25 48:1,17,24
49:19 51:2 52:23
53:5,13,17 54:4,
24 55:23 56:23
57:19 58:10,16,
21 59:15,23,25
60:16 61:15
68:14

Smith's
34:17 51:25
62:20

soil
66:9

solicited
29:17

solid
16:4 17:24 22:12
23:13 33:15

sort
9:22 11:4 43:9,19
48:14 59:4 60:4

sound
16:12 33:2

sources
24:19,22 26:20
29:20 35:12 44:3

speak
18:18 30:11
53:16

speaking
33:18

special
15:21

specific
23:2,3 33:16
60:17

specifically
18:18 34:10 50:1
60:20

specifics
27:17 33:13
55:24

spectrum
68:19

split
33:22

spoke
53:15 54:22

spoken
37:18

spokesperson
7:22

stability
11:23

stable
18:21 38:7

staff
19:3 32:21 67:21,
23

stamp

41:4

standard
47:13

start
11:24

started
11:20

state
4:2,17 8:1 10:22
19:10,25 20:17
40:12 64:9,11
66:2 67:7,25

statement
45:4 56:3,7,9

States
45:10

stature
25:7

stay
15:3 24:23 25:19

Stensrud
11:20 32:13,17,
22 34:1,12 54:23

step
17:5 67:14

steps
36:12 52:5

Steve
10:12 12:16 22:6
49:5,6,13 63:22,
24

stick
52:19

sticks
30:16

stop
31:10

strictly
18:12 28:24
59:20

strike
18:4 57:16 59:22

strong
26:18

structure
9:8 44:16

struggling
51:24 52:7

student

9:23 16:16 19:1
20:10 22:18
30:23 46:4,15,18,
25 47:5,18,23
48:10 62:8,19,25
63:10

students
14:13 16:13
26:20,25 29:2
36:2 37:4 47:2,12
48:8 49:17 62:19,
22,25 63:19

style
14:16 43:7 44:12,
14 46:20 48:12
49:3,14 59:1

subject
68:15

subordinates
53:5,15

substance
55:19 61:4

substantive
60:24

subtle
65:17

succeed
26:24

success
62:9

successful
26:2 59:16

successfully
15:9

sufficient
17:21

suggest
59:1 63:23

suggested
43:12 44:21
46:15 53:15

supervise
54:2

supervised
53:24

supervisees
50:6

supervises
9:9

**supervisor**
29:16,17 50:5

**supervisors**
50:6 54:2,18

**supervisory**
51:12

**support**
7:18 9:23 10:19

**supporting**
67:13

**supportive**
24:5 57:9,12

**Supreme**
65:10

**surprised**
57:8

**suspect**
13:6 32:11

**swear**
4:8

**sworn**
4:7,13 5:6

**system**
40:12 54:19
66:15 67:15

**— T —**

**table**
48:20 52:15
60:18 61:18,24
62:3,10

**Taking**
63:8

**talk**
9:7 20:24 48:10
54:24

**talked**
42:21 46:19
60:23

**talking**
21:1,8

**taxpayers**
26:20

**Tech**
37:4

**technical**
14:15

**technological**
41:19

**telling**
9:16 65:7

**tells**
9:14

**ten**
5:2

**tended**
22:1

**tenor**
17:13

**tensions**
67:16

**Tenth**
65:7 66:3

**tenure**
31:15 60:5,6
64:9,21

**tenured**
64:15

**term**
41:11 50:6

**terminate**
34:17,19 39:24

**terminated**
29:4 33:21 34:2,
13 61:15

**terminating**
58:16,21

**termination**
29:6,14 30:12
35:3,21 52:7
60:15 62:12

**terminology**
36:6

**terms**
9:9 10:21,23
21:18 44:16
58:24

**test**
60:10

**testifies**
4:13

**testifying**
5:8 6:19

**testimony**
4:8 5:6 37:24

**thing**
6:3 8:9 16:16
17:3 28:14 31:5

**things**
10:18,23 11:12
19:24 36:24
38:12 39:17
41:19 45:19
52:10 55:25 56:2
62:5

**thinking**
38:6

**Thomas**
36:16 37:13,18,
25 39:2,6 40:5,21
42:9

**Thomas's**
37:18 39:25

**thought**
13:21 15:9,23
16:11,12,15
23:14 28:13
50:13 67:18

**threatened**
56:5

**time**
4:25 5:13 8:6,17,
18 10:7 11:16,21
14:6,23 15:7,11
16:10 22:7,22
24:2,25 27:16
30:8 32:13 35:1
36:18 48:16,23,
24 51:11 52:18
53:9 54:6,9,13
60:9,12 65:6,17,
23,25 66:2,4

**times**
4:23 35:17 37:17
47:25

**title**
37:18 45:14 64:2

**today**
4:3 5:22 30:16
53:2

**today's**
6:9,16

**told**
61:24

**tomorrow**
53:1

**tools**
59:18

**topics**
22:23

**total**
14:3 62:7

**touch**
24:23

**touched**
25:5

**town**
24:25 55:7

**transcended**
49:8

**transformation**
15:20

**translated**
50:8

**treated**
61:8

**treating**
31:22

**trivial**
48:6

**true**
18:13 26:6 38:17

**trustees**
24:23 40:16

**truth**
4:9,10

**turn**
43:23

**turned**
23:14 36:15
37:11

**typical**
38:13,14,20

**— U —**

**Uber**
20:11

**uh-huh**
5:11 6:6

**ultimate**
7:17 12:20 34:16
35:3

**ultimately**
12:5 13:1 18:11
29:4 35:6 51:25

52:6

**uncorrectable**
26:17

**underpaid**
32:6

**understand**
5:7,16,19 12:24
42:12 43:16 52:8
53:19 59:7 63:15

**understanding**
4:1 35:23 63:17

**understood**
31:12 35:13 43:2
52:16 63:3

**undertaking**
27:18,20

**union**
30:23 46:25 47:5,
23

**unique**
17:6,7 38:16

**unit**
37:20 45:1 63:18
68:9

**United**
45:10

**units**
62:7

**universities**
49:22

**university**
8:1,10,12,22 9:8,
22,25 13:4 14:12
15:6 16:6 18:10,
16 20:1 24:10
25:20 26:19
27:19,21 28:6
33:22 35:10,18
39:23 43:17,19
45:2,11 46:5 56:4
58:17,22 59:5,16,
19 61:14 64:10,
18 66:13,20

**university's**
33:12 36:3

**unretired**
8:17

**unusual**
38:16,22 42:4

utilize
42:20

**V**

vaguely
66:7

valuable
39:1

variety
10:23

Vazquez
10:12 12:3 40:9
54:23

Vee
35:1,2 44:3
60:14,21

vent
57:5

Vernon
4:20

vested
18:7

vice
10:1 12:4,25
13:10 22:16,17,
18 23:9 29:21
62:8

victim's
21:17

view
12:14 17:5

violates
59:4

violating
58:10

Virginia
37:3

voices
61:19

VP
10:4,8,14,25
66:22

**W**

wanted
30:24 36:8,24
38:20 43:21
51:11

watch
24:17

water
65:9

ways
57:25

weekly
30:5

weeks
30:4

weigh
13:16

weighed
13:8,9,10 32:12

well-exhibited
49:4

well-informed
35:24

well-known
50:20

well-received
24:18

white
23:10,19,21

window
27:16

Wisconsin
8:23

witnesses
5:19

woman
23:8,9,10

women
9:1

work
12:19 21:16
26:15 31:25
45:22,25 51:17
57:3,14 60:19
62:16

worked
27:1 50:21,22
55:11 59:6

working
55:25 60:19 62:6,
17

works
5:6 63:15

worth

24:9

write
41:23

writes
42:15

writing
65:10

written
29:13,24 56:2
58:3,5

wrong
62:4 66:17

wrote
45:19 46:2 50:12
65:7

**Y**

years
5:2,3 20:17 43:17
48:19 52:25 60:5

yeses
5:11

yesterday
6:13

York
22:1

Yormak
4:15 9:12 41:3,6
55:22 68:20,24

young
15:20 56:15