UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

KELLI SMITH, an individual,

      Plaintiff,

v.                              Case No: 2:23-cv-840-JES-KCD

THE FLORIDA GULF COAST
UNIVERSITY BOARD OF
TRUSTEES, a political
subdivision of the State of
Florida,

      Defendant.

_____

## OPINION AND ORDER

This matter comes before the Court on a Motion for Summary Judgment (Doc. #36) filed by Defendant the Florida Gulf Coast University Board of Trustees (Defendant or FGCU Board) on March 28, 2025. Plaintiff Kelli Smith (Plaintiff or Smith) filed a Response (Doc. #45) on May 2, 2025. Defendant filed a Reply to Plaintiff's Response (Doc. #48) on May 30, 2025.

In May 2021, Smith was hired by Florida Gulf Coast University (FGCU) as its chief of police pursuant to an at-will contract. FGCU asserts that over the course of less than a year it determined that Smith was not a good fit for the position due to her acerbic management and communication style. FGCU terminated Smith's employment without cause, providing her with all the contractual benefits required for such a termination.

Smith sued the FGCU Board asserting several claims of employment discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964 (Title VII), the Florida Civil Rights Act of 1992 (FCRA), and/or Title IX of the Education Amendments of 1972 (Title IX).  The FGCU Board now seeks summary judgment on all counts because "Plaintiff cannot marshal sufficient evidence to create any genuine dispute of material fact..." as to any count. (Doc. #36 at 1.)  Smith asserts there are sufficient facts to allow three of the five counts to be decided by a jury.  For the reasons set forth below, the motion for summary judgment is granted in part and denied in part.

**I.**

Summary judgment is appropriate only when a movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists when the evidence is such that a reasonable trier of fact could return a verdict for the non-moving party.  McCreight v. AuburnBank, 117 F.4th 1322, 1329 (11th Cir. 2024) (citation omitted).  A fact is "material" if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A court must decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"

Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th
Cir. 2004) (quoting Anderson, 477 U.S. at 251).

In ruling on a motion for summary judgment, a court views all
evidence and draws all reasonable inferences in favor of the non-
moving party. Scott v. Harris, 550 U.S. 372, 378 (2007); Tana v.
Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010). Even if facts are
undisputed, a court should deny summary judgment if reasonable
minds might differ on inferences arising from those facts. St.
Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d
815, 819 (11th Cir. 1999). "If a reasonable fact finder evaluating
the evidence could draw more than one inference from the facts,
and if that inference introduces a genuine issue of material fact,
then the court should not grant summary judgment." Allen v. Bd.
of Pub. Educ. Of Bibb County, 495 F.3d 1306, 1315 (11th Cir. 2007).

While it has not always been so, "the summary judgment rule
applies in job discrimination cases just as in other cases."
Chapman v. AI Transp., 229 F.3d 1012, 1026 (11th Cir. 2000) (en
banc). An employee may prove discrimination or retaliation with
direct or circumstantial evidence. Desert Palace, Inc. v. Costa,
539 U.S. 90, 99 (2003); Jefferson v. Sewon Am., Inc., 891 F.3d
911, 921 (11th Cir. 2018). An employee opposing summary judgment
with circumstantial evidence must present enough to create a
triable issue of material fact. Smith v. Lockheed-Martin Corp.,
644 F.3d 1321, 1328 (11th Cir. 2011). A triable issue exists if

the evidence, viewed in the light most favorable to the employee, would allow a reasonable jury to infer that the employer has engaged in intentional discrimination or retaliation. Lewis v. City of Union City, 934 F.3d 1169, 1185 (11th Cir. 2019).

**II.**

Unless otherwise stated, the following material facts are derived from the Statement of Material Facts (Doc. #36, pp. 3-16), the Response to Statement of Material Facts (Doc. #45, pp. 3-7), and specified depositions. Additional facts will be discussed later as necessary for specific issues.

In January or February 2021, Smith applied for the position of chief of police at FGCU to replace its retiring chief. (Doc. #37, pp. 60, 63-64.) FGCU formed a search committee which ultimately interviewed six applicants, three males and three females. The search committee recommended two finalists, Smith and another female, who were interviewed by FGCU President Michael Martin (President Martin), the final decisionmaker. President Martin offered Smith the position as the FGCU Chief of Police. Smith asked for a $135,000 salary, which was greater than the $125,000 top end of the advertised salary range and was the equivalent of the retiring chief's salary. (Doc. #37 at 79.) Smith had only three years' experience as a police chief. FCGU hired Smith at the $125,000. (Id. at 79-80.)

On May 3, 2021, Smith started her employment as the police

chief at FGCU pursuant to an at-will contract under which she served at the pleasure of the FGCU President. Smith's first year of employment was a probationary period during which she could be separated without cause and would receive one-month of severance pay.

Smith understood that the chief of police position required fostering an environment of collaboration, outreach, and professional services for the community, and building relationships throughout the University. Smith also understood that having a collaborative leadership style was important to her role as police chief. Smith recognized she would be accountable for failing to meet job requirements and knew she could be terminated based on management and communication style.

Smith concedes that her management and communication style was different than the lower-key style of the retiring chief of police but nonetheless viewed herself as being collaborative and a good partner. Smith was not aware if others viewed her as difficult to work with and was not aware of a tense relationship with other administrators or staff. (Doc. #37 at 211, 214.) However, President Martin received complaints from a broad range of persons – students, faculty, and police officers within the department - about Smith's management and communication style.

On March 9, 2022, President Martin met with five FGCU police officers at his weekly open-door meetings protocol. Smith believes

it included Kittleson, Rispoli, Anderson, Jones, and Slapp.  (Doc #37 at 229.)  The officers complained about Smith's management and communication style.  After this meeting, Smith's supervisor and the supervisor's supervisor met with Smith regarding the low morale in the university's police department. Smith asserts that she was told during a meeting with human resources on a five-year plan that there were complaints about low morale in the department but was also told not to worry.  Smith thought there was a concern and that she was in trouble and could be terminated. (Id. at 164-167.) Nonetheless, Smith did not make any changes to her management or communication style.

In March 2022, Smith was given a $10,000 pay increase.  The increase, as Smith understood it, was for performance and for being assigned parking services as an additional division to run.  (Doc. #37 at 80, 219.)

On March 28, 2022, another complaint about Smith was submitted, this time to the university's hotline.  This complaint asserted that Smith's management style remained unchanged, and that the police department's environment was toxic.  It was reported that approximately forty percent of the department's officers were considering leaving or retiring.

The university's female general counsel and its female Title IX coordinator brought the March 28, 2022, complaint to President Martin's attention.  Both recommended that President Martin, the

final decisionmaker, terminate Smith's employment without cause and without a formal investigation. President Martin agreed with the recommendation and terminated Smith without cause. President Martin explained the reasons for termination of Smith's employment as being in the best interests of FGCU:

> It was largely style and personal interactions, the sense that there was not a respectful relationship meaning from the interactions by the chief. And, as I say, it sort of - it violates the collegiality of the culture of the university. And I have worked with chiefs at other places, and so I came to understand how important that kind of relationship is to the credibility and the effectiveness of the police department. And so when you fracture relationships with the other major leaders across the campus, I just don't believe you can be as effective. And when you can't be optimally effective, you can no longer fully serve the mission and the people of the institution, and that's where it came down in the end.

(Doc. #36 at ¶ 31) (quoting Martin deposition). Because Smith's employment termination was without cause, she received severance pay and remained eligible for rehire. (Doc. #37 at 26-27, 29-30, 135.)

### III.

Smith filed a five-count Complaint (Doc. #1) against the FGCU Board based on the termination of her employment. Count I alleges disparate treatment based on gender in violation of Title VII; Count II alleges disparate treatment based on gender in violation of the Florida Civil Rights Act (FCRA); Count III alleges

retaliation for protected activity in violation of Title VII; Count IV alleges retaliation for protected activity in violation of the FCRA; and Count V alleges retaliation for protected activity in violation of Title IX.

FGCU seeks summary judgment on all five counts for various reasons.  The Court discusses each claim.

**A. FCRA Claims Barred by Eleventh Amendment**

Counts II and IV allege that FGCU violated the FCRA when it terminated Smith's employment.  The FGCU Board argues that the FCRA claims are barred by the sovereign immunity provided by the Eleventh Amendment to the United States Constitution.  (Doc. #36, p. 17.)  Plaintiff agrees that the Eleventh Amendment bars the FCRA claims and that dismissal of Counts II and IV is appropriate. (Doc. #45, p. 7 n.2.)  The Court agrees with the parties.

The Eleventh Circuit has found that Florida colleges and universities act as arms of the State.  Univ. of S. Fla. Bd. of Trs. v. CoMentis, Inc., 861 F.3d 1234, 1235-37 (11th Cir. 2017); Williams v. Dist. Bd. of Trs. of Edison Cmty. Coll., Fla., 421 F.3d 1190, 1194-95 (11th Cir. 2005); Crisman v. Fla. Atl. Univ. Bd. of Trs., 572 F. App'x 946, 949 (11th Cir. 2014).  The Board of Trustees of FGCU is an arm of the State of Florida entitled to Eleventh Amendment immunity.  The Middle District of Florida has frequently held that the FGCU Board of Trustees is an arm of the state.  See Doe v. Florida Gulf Coast Univ. Bd. of Trustees, No.

2:23-CV-245-SPC-KCD, 2023 WL 5834865, at *2 (M.D. Fla. Sept. 8, 2023); <u>Wells v. Bd. of Trustees of Florida Gulf Coast Univ.</u>, No. 2:19-CV-859-JLB-NPM, 2021 WL 883333, at *2 (M.D. Fla. Feb. 8, 2021), <u>report and recommendation adopted</u>, No. 2:19-CV-859-JLB-NPM, 2021 WL 878879 (M.D. Fla. Mar. 9, 2021); <u>Parfitt v. Florida Gulf Coast Univ.</u>, No. 2:19-CV-727-FTM-38NPM, 2020 WL 1873585, at *2-3 (M.D. Fla. Apr. 15, 2020); <u>Brown v. Fla. Gulf Coast Univ. Bd. of Trs.,</u> No. 2:18-cv-157-FtM-29MRM, 2019 WL 2084522, at *3 (M.D. Fla. May 13, 2019); <u>Brown v. Florida Gulf Coast Univ. Bd. of Trustees</u>, No. 2:18-CV-157-FTM-29MRM, 2018 WL 5971661, at *3-4 (M.D. Fla. Nov. 14, 2018).  Accordingly, the FGCU Board is entitled to Eleventh Amendment sovereign immunity as to Smith's FCRA claims in Counts II and IV.  Summary judgment in favor of the FGCU Board is granted, and these two FCRA counts are dismissed without prejudice.

**B. Title VII Sex Discrimination Claim**

Count I of the Complaint sets forth a claim of sex (gender) discrimination in violation of Title VII.  Under Title VII, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Count I of the Complaint asserts that FGCU discriminated against Smith based on gender when it terminated her employment as chief of police. (Doc.

#1, ¶¶ 53-62.)

FGCU seeks summary judgment on Count I. (Doc. #36, pp. 17-21.)[1] FGCU argues that Smith has not presented any direct evidence of discrimination and therefore must satisfy the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, (1973). FGCU continues that Smith has not established a prima facie case of discrimination; that even if Smith has done so, FGCU has articulated a legitimate business reason for the termination, i.e., President Martin's belief that Smith had an ineffective management and communication style; and that Smith was therefore required to establish that this reason was a pretext for discrimination, which she has not done. Additionally, FGCU argues Smith has not adduced sufficient evidence to infer sex discrimination.

### (1)   Title VII Discrimination Principles

Title VII claims of employment discrimination are typically analyzed according to the evidentiary framework set out in McDonnell Douglas, which shifts the burden of production between the parties to determine the true reason for an adverse employment action. This framework is not, however, a set of elements that the employee must prove to survive summary judgment or prevail at

---

[1] While the three sections of the FGCU Board's Motion are captioned that Smith "Cannot State" the specific claim being discussed (Doc. #36, pp. 17, 21, 24), the arguments do not address the sufficiency of the pleading but the sufficiency of the evidence.

trial. Tynes v. Fla. Dep't of Juv. Just., 88 F.4th 939, 941 (11th Cir. 2023).

The McDonnell Douglas framework first requires plaintiff to show a prima facie case of discrimination, which requires: (1) membership in a protected class; (2) adverse employment action; (3) qualification for the job; and (4) "that [the] employer treated 'similarly situated' employees outside [the plaintiff's] class more favorably." Lewis v. City of Union City, 918 F.3d 1213, 1220-21 (11th Cir. 2019) (en banc). If plaintiff meets that burden, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Id. at 1221. If the employer carries that burden, then the burden shifts back to the plaintiff to "demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination." Id.

In evaluating pretext, the Court considers all the evidence and determines whether plaintiff has created sufficient doubt to allow a reasonable jury to determine that defendant's legitimate reason was not "what actually motivated its conduct." Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1258 (11th Cir. 2001). "To show pretext, the employee must confront the employer's seemingly legitimate reason ... head on and rebut it." Kidd v. Mando Am. Corp., 731 F.3d 1196, 1206 (11th Cir. 2013) (citation omitted). "A reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real

reason." Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original)). It is important to keep in mind that an employer may make an employment decision "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Phillips v. Legacy Cabinets, 87 F.4th 1313, 1325 (11th Cir. 2023) (internal quotation marks and citation omitted).

Complying with McDonnell Douglas, however, "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). Plaintiff may defeat a summary judgment motion by presenting a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Id. (quotation marks and citation omitted). "[T]he McDonnell Douglas framework and the convincing mosaic approach are two paths to the same destination—the ordinary summary judgment standard." McCreight v. AuburnBank, 117 F.4th 1322, 1335 (11th Cir. 2024) (citing Tynes, 88 F.4th at 943-47). The convincing mosaic approach is simply a metaphor for the summary judgment standard and is "a helpful reminder that McDonnell Douglas is not the only game in town" for employees who lack comparator evidence

but can provide other circumstantial evidence of discriminatory animus. Id. (citations omitted). Plaintiff must, however, present enough evidence for a reasonable jury to infer intentional discrimination.

A plaintiff may prove a Title VII gender discrimination claim under either a single-motive standard or a mixed-motive standard. The single-motive standard requires plaintiff to prove that bias against a protected class was the true reason for the adverse employment action, while the mixed-motive standard requires plaintiff to prove that bias against a protected class was a motivating factor for an adverse employment action even though other factors also motivated the action. Akridge v. Alfa Ins. Companies, 93 F.4th 1181, 1193 n.6 (11th Cir. 2024) (citing Quigg v. Thomas Cnty. Sch. Dist., 814 F.3d 1227, 1235 (11th Cir. 2016)); Breeding v. Integrated Behav. Health Inc., No. 22-10374, 2023 WL 3735341, at *2 (11th Cir. May 31, 2023); 42 U.S.C. § 2000e-2(m). "[S]ingle-motive claims—which are also known as "pretext" claims—require a showing that bias was the true reason for the adverse action." Quigg, 814 F.3d at 1235 (citation omitted). On the other hand, "[a]n employee can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated" the action.' Id. (citations omitted).

**(2)  Application of Title VII Discrimination Principles**

Smith satisfies some, but not all, of the prima facie elements for a Title VII discrimination claim.  It is undisputed that Smith, as a female, is a member of a protected class.  There was clearly an adverse employment action – Smith's employment as police chief was terminated. It is undisputed that Smith was qualified for the job – FGCU has never challenged her qualifications nor asserted that she was not qualified to be police chief.  It is also sufficiently established that President Martin had terminated male administrators for the same reasons Smith was terminated.  Smith therefore can satisfy the first three elements of a prima facie case, but not the fourth element.

Whether or not Smith had established a prima facie case, FGCU articulated a legitimate reason for Smith's termination of employment.  Deciding that a new employee is not a good fit and is not working out at the position is a legitimate, non-gender-based reason to terminate employment.  Under the McDonnell Douglas framework, this shifts the burden to Smith to show the reason for termination was a pretext for gender discrimination.

At this point, the McDonnell Douglas framework and the convincing mosaic standard merge with the usual summary judgment standard.  "This final question of pretext 'merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination.' [] In other

words, the pretext prong of McDonnell Douglas is just the ordinary summary judgment standard." McCreight, 117 F.4th at 1335 (citations omitted). Smith may defeat the summary judgment motion if she has established sufficient evidence for a reasonable jury to infer intentional discrimination. "A plaintiff proving her case through the convincing mosaic standard may point to any relevant and admissible evidence." Tynes, 88 F.4th at 946 n.2.

Smith cites a litany of facts which she argues both establish pretext and create a basis to reasonably infer gender discrimination. For example, Smith points to her lack of any prior disciplinary record, her receipt of a $10,000 performance-based raise just 23-days before termination, her exceptional performance appraisal by a university vice president, who stated Smith was "100% the right person for the job" just days before termination, and Dr. Thomas's warning against "rash" decisions. Additionally, Smith argues that there are multiple instances where she was treated less favorably than her male counterparts, thus allowing an inference of intentional discrimination: (1) she was hired at a lower salary than her male predecessor; (2) male administrators received progressive discipline and coaching opportunities, while she did not; (3) five male officers bypassed the all-female police department chain of command to complain directly to President Martin; (4) she experienced targeted harassment after initiating an internal investigation of two male officers; (5) after her

termination, four of the five male officers who complained received
favorable treatment; (6) she was replaced by a male with no prior
experience as a police chief; (7) a male administrator remained
employed despite numerous complaints, while she was terminated
after receiving a raise and getting positive performance reviews;
and (8) her supervisor stated that the termination was highly
unusual.  (Doc. #45, pp. 10-12.)

The Court's function at this stage of the proceedings does
not include weighing whether the evidence is sufficient to prove
plaintiff's case.  The Court must simply decide whether Smith has
pointed to enough relevant and admissible evidence which, when
viewed in her favor, allows a reasonable jury to infer intentional
discrimination.  Tynes, 88 F.4th at 946 n.2.  The Court finds that
collectively this evidence is sufficient to survive a summary
judgment motion as to the Title VII discrimination claim.  The
motion is therefore denied as to Count I.

### C. Title VII Retaliation Claim

Count III of the Complaint (Doc. #1, ¶¶ 73-85) sets forth a
claim of retaliation in violation of Title VII.  In relevant part,
Title VII makes it unlawful for an employer to retaliate against
an employee "because [she] has opposed any ... unlawful employment
practice." 42 U.S.C. § 2000e-3(a).  Smith asserts that her
employment as police chief was terminated in retaliation for her
complaints to the FGCU administration about discrimination based

on gender.

The FGCU Board seeks summary judgment on this claim. (Doc. #36, pp. 21-24.) FGCU argues that Smith did not show she engaged in any protected activity; did not establish causation between her identified activities and her termination of employment; did not establish that FGCU's reasons for termination were pretextual; and did not show any other evidence from which retaliation may properly be inferred. Smith sees it otherwise on all points.

**(1)    Title VII Retaliation Principles**

A Title VII retaliation claim based on circumstantial evidence is analyzed under the same McDonnell Douglas burden-shifting framework and convincing mosaic approach discussed earlier. Tolar v. Bradley Arant Boult Commings, LLP, 997 F.3d 1280, 1289 (11th Cir. 2021); Berry v. Crestwood Healthcare LP, 84 F.4th 1300, 1313 (11th Cir. 2023). A prima facie case of retaliation under the McDonnell Douglas framework requires showing that: (1) plaintiff engaged in statutorily protected conduct -- that is, conduct protected by Title VII; (2) she suffered an adverse action; and (3) 'there is some causal relationship between the two events.'" Tolar, 997 F.3d at 1289 (citing Johnson v. Miami-Dade Cnty., 948 F.3d 1318, 1325 (11th Cir. 2020)). "If the plaintiff can establish that, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason or reasons for the retaliation. [] If the employer does, the plaintiff must show

that each reason is merely a pretext and that the real reason was retaliation." Patterson v. Georgia Pac., LLC, 38 F.4th 1336, 1345 (11th Cir. 2022) (internal citations omitted).

The first requirement is that plaintiff establish that she engaged in conduct protected by Title VII. To establish that she engaged in statutorily protected activity, plaintiff "must show that [she] had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311–12 (11th Cir. 2002) (citation and internal quotation marks omitted). Title VII does not, however, protect against retaliation resulting from complaints about non-employment related practices. Logan v. City of Chicago, 4 F.4th 529, 539 (7th Cir. 2021) ("Title VII is not a general bad acts statute rather, the conduct it prohibits is specially set forth." (citation and internal quotation marks omitted)). See Shed v. Univ. of S. Florida Bd. of Trustees, No. 23-13746, 2025 WL 1540573, at *4 (11th Cir. May 30, 2025) (Title VII is limited to protecting employees from the unlawful actions of employers).

The second requirement is that plaintiff has suffered an adverse action. Termination of employment is clearly an adverse action under the retaliation provision of Title VII.

Finally, plaintiff must establish there is a sufficient causal relationship between the protected activity and the adverse action. Plaintiff must show that the decisionmaker actually knew

about the employee's protected conduct, <u>Martin v. Fin. Asset Mgmt. Sys., Inc.</u>, 959 F.3d 1048, 1053 (11th Cir. 2020), although this may be established by circumstantial evidence, <u>Clover v. Total Sys. Servs., Inc.</u>, 176 F.3d 1346, 1354 (11th Cir. 1999) (citing <u>Goldsmith v. City of Atmore</u>, 996 F.2d 1155, 1163 (11th Cir. 1993)). Plaintiff may demonstrate a causal relationship "'by showing close temporal proximity between the statutorily protected activity and the adverse employment action.'" <u>Martin</u>, 959 F.3d at 1054 (quoting <u>Thomas v. Cooper Lighting, Inc.</u>, 506 F.3d 1361, 1364 (11th Cir. 2020)). But without additional evidence, mere temporal proximity must be very close to establish causation. <u>See</u> <u>Jefferson v. Sewon Am., Inc.</u>, 891 F.3d 911, 926 (11th Cir. 2018) (citing <u>Thomas</u> at 1364 ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."); <u>Johnson</u>, 948 F.3d at 1328 (a two-week disparity can be evidence but the proximity is "'probably insufficient to establish pretext by itself.'") (quoting <u>Hurlbert v. St. Mary's Health Care Sys., Inc.</u>, 439 F.3d 1286, 1298 (11th Cir. 2006))).

Unlike a Title VII discrimination claim, a mixed-motive theory does not apply to Title VII retaliation claims. <u>Yelling v. St. Vincent's Health Sys.</u>, 82 F.4th 1329, 1338 (11th Cir. 2023) (citing <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 570 U.S. 338, 360 (2013)). Rather, plaintiff must show that her "'protected activity was a but-for cause'" of the termination. <u>Id.</u> (quoting <u>Nassar</u> at

362).

**(2)  Application of Title VII Retaliation Principles**

It is undisputed that Smith suffered an adverse employment action – she was terminated from her position as police chief. The parties disagree, however, as to whether the other two elements for a prima facie case are sufficiently alleged.

**(a)  Protected Activity**

In the Complaint, Smith alleges that she complained about "gender discrimination and retaliation," and defendant "clearly observed her growing discomfort concerning the same." (Doc. #1 at ¶ 77.)  Plaintiff's position in her Response to Defendant's First Set of Interrogatories was that her countless "demands for Clery Act compliance and complaints of gender discrimination caused the [defendant] to terminate [her] employment and was fueled by an institutional history of gender discrimination in an environment dominated by white males." (Doc. #37-8, Exh. 77 at 104.)

FGCU argues that Smith did not show she engaged in protected activity because her concerns about Clery Act compliance were not protected under Title VII and, in any event, her complaints were too vague and general to establish protected activity.  In her Response (Doc. #45, pp. 14-20) to the summary judgment motion, Smith argues that she "consistently advocated for female safety and institutional compliance throughout her tenure at the university." (Id. at 14.)  Smith identifies specific events which

she asserts constituted protected activity under Title VII.  (Doc.
#45, pp. 14-16.)  The Court discusses each in turn:

(1)  When Smith began her employment as FGCU chief of police,
she had one-on-one conversations with all university
police department staff.  During her conversation with
communications manager Dianna Sandora (Sandora), Sandora
reported that male officers routinely disrespected
female dispatchers and staff.  Smith advised Sandora of
the ability to address the matter under Title IX and
other resources.  (Doc. #37 at 122.)  Smith reported
this to her supervisor Sara Strensrud (Strensrud), but
there was no other complaint or follow up.  (Id. at 122-
123, 124.)  Reporting Sandora's information to Strensrud
was clearly protected activity under Title VII.

(2)  Smith identified a pattern of sexual assaults targeting
female students at fraternity events between August and
October 2021.  Smith reported these incidents through
"proper channels," Doc. #45, pp. 14-15, expressing
concern that FGCU's inadequate response created ongoing
safety risks for students.  (Doc. #45-1 at ¶ 3.)  FGCU
asserts that the treatment of students is not an
employment practice and therefore does not constitute
protected activity under Title VII. See Shed v. Univ. of
S. Florida Bd. of Trustees, No. 23-13746, 2025 WL

1540573, at *4 (11th Cir. May 30, 2025) ("See Edwards v. Ambient Healthcare of Ga., Inc., 674 F. App'x 926, 930 (11th Cir. 2017) (per curiam) ('The driver's alleged actions toward non-employee patients of Ambient and their caregivers (while reprehensible) is not an employment practice made unlawful by Title VII.') (citation and internal quotation marks omitted); Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1006 n.16 (11th Cir. 1997) (noting that employees' retaliation claim based on opposition to unlawful discrimination against motel customers 'could not proceed under the familiar Title VII retaliation statute' because the plaintiffs did not allege that they were discriminated against for 'opposing an unlawful employment practice.') (emphasis removed)").  Smith was not engaged in Title VII protected activity by expressing a general concern about female students.

(3)  In a November 19, 2021, meeting with university leadership, Smith "connected" Clery Act non-compliance to Title IX violations and sexual harassment and assault prevention. (Doc. #45-1 at ¶ 5.)  Smith expressed "concerns" during the meeting about non-compliance and how FGCU was not doing enough.  (Id.)  Smith was not engaged in Title VII protected activity when she did so.

(4)    In November 2021, after Captain Rispoli was assigned to conduct an internal investigation of two male officers (Palmer and Winning) and the officers were notified they were under investigation, she began experiencing harassment during the shift rotation of the same two officers. (Doc. #45-1 at ¶ 8.) Specifically, Smith found feces and urine in the women's restroom, while the men's restroom was always found clean. Smith reported this to Stensrud and purchased cleaning supplies to address the issue. (Id.) Reporting the condition of her restroom was at least plausibly a protected activity under Title VII.

(5)    Smith received information from Dr. April Palmer that her colleague Deontre Whitaker (from student conduct) had identified patterns of discriminatory treatment by FGCU officers. Whitaker stated that officers would "elect to send attractive white female students through university conduct (administrative rather than criminal) for the same offenses that males would commit." (Doc. #45-1 at ¶ 9.) Whitaker reported about officers using gender, attractiveness, and race for disparate treatment. Whitaker refused to provide any information when contacted and Dr. Palmer resigned. (Doc. #37 at 128-129.) As discussed earlier, the officers'

interaction with students is not an employment practice within the meaning of Title VII, so Smith was not engaging in protected activity when she reported it to Stensrud.

(6)   In early December 2021, Smith expressed concerns to Stensrud about implicit bias at the highest ranks of FGCU police department after Captain Rispoli made an insensitive comment about a Dominican male officer "looking like a landscaper" and the captain was disciplined. Smith also connected her implicit bias concern to the women's restroom incidents. (Doc. #45-1 at ¶ 8.)   Reporting such concerns was a protected activity under Title VII.

(7)   On January 21, 2022, Smith recommended bringing in an external Clery Compliance Subject Matter Expert to address systematic deficiencies at FGCU. On March 22, 2022, Smith presented her Clery Act compliance concern at a formal meeting of FGCU administrators, asserting there was a disparate impact based on gender.   (Doc. #45-1 at ¶ 6.)   As discussed above, discussing Clery Act compliance was not a protected activity under Title VII.

(8)   In March 2022, five male officers bypassed Smith and Stensrud to complain directly to President Martin during one of his open-door time periods. Smith was notified of

the meeting and advised that it was part of the "all boys club". Stensrud offered to be a resource to assist with leadership coaching. (Doc. #37 at 164; Doc. #45-1 at ¶ 7.) Smith does not state that she reported the activity, but rather just that she found out about the meeting. Therefore, this cannot be a protected activity.

**(b)  Causation**

FGCU also argues that Smith failed to establish that her activities, even if protected, were the "but-for-cause" of her employment termination. FGCU argues that it had a legitimate, non-pretextual reason for the termination, and the retaliation claim lacks temporal proximity because the termination of employment on March 29, 2022, occurred more than three months after the last alleged protected activity in December 2021, as noted above. There is no evidence that plaintiff's gender was the but-for cause for the termination. Smith herself states that she never connected any of the events reported to her sex until after her termination.

There is no temporal proximity to the report by the dispatcher Sandora, the comments by Rispoli, or the incident in the woman's bathroom to her eventual termination by President Martin. Summary judgment will be granted as to Count III for retaliation under Title VII.

### D. Title IX Retaliation Claim

Count V of the Complaint (Doc. #1, ¶¶ 99-110) sets forth a claim of retaliation under Title IX.  Smith alleges that the termination of her employment was retaliation for her complaints about FGCU's compliance with the Clery Act.

The FGCU Board seeks summary judgment as to the Title IX claim.  FGCU argues that a Title IX retaliation claim must be linked to a complaint of sex discrimination against a student, which Smith failed to do.  Rather, FGCU argues, Smith complained about FGCU's compliance with the Clery Act, which is not a complaint of sex discrimination and is precluded from consideration as such by statute.  20 U.S.C. § 1092(f)(14)(A). Additionally, FGCU argues there is no proof of retaliation since another employee raised the issue of Clery Act compliance and her employment was not terminated.  (Doc. #36, pp. 24-25.)  Smith argues that she consistently tied her Clery Act compliance concerns to gender-based discrimination and violence against female students and that "[h]er advocacy for proper reporting and response to sexual assaults falls squarely within Title IX's scope of protected activity."  (Doc. #45 at 15 n.5.)  Smith responds that there is sufficient evidence to survive a summary judgment motion.

### (1) Title IX Retaliation Principles

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under
any education program or activity receiving Federal financial
assistance…."  20 U.S.C. § 1681(a).   It is undisputed that FGCU
receives Federal financial assistance and therefore is subject to
the mandates of Title IX.

Title IX does not expressly permit private enforcement suits,
but the Supreme Court has found an implied private right of action
for some individuals to enforce Title IX, Cannon v. Univ. of Chi.,
441 U.S. 677, 717 (1979); Alexander v. Sandoval, 532 U.S. 275, 280
(2001), and to obtain monetary damages, Franklin v. Gwinnett County
Pub. Sch., 503 U.S. 60, 76, (1992).  While Title IX "provides an
implied right of action for students —who would otherwise have no
statutory remedy to enforce their substantive right under Title
IX— the terms of the statute do not embrace a private right of
action for employees."  Joseph v. Bd. of Regents of the Univ. Sys.
of Ga., 121 F.4th 855, 868 (11th Cir. 2024).  In other words, Title
IX does not "create an implied right of action for sex
discrimination in employment" or an end-run around the
requirements imposed by Title VII.  Id. at 869.  See also Joseph
v. Bd. of Regents of Univ. Sys. of Ga., 133 F.4th 1284, 1285 (11th
Cir. 2025) ("Title IX does not provide a duplicative implied
private right of action for sex discrimination against employees."
(emphasis in original)).  Nonetheless, Title IX does provide a
cause of action of retaliation for complaining about sex

discrimination against *students*.  Id.; Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005).

Where Title IX provides a claim for retaliation, the claims "are analyzed under the framework for claims under Title VII of the Civil Rights Act of 1964 ("Title VII")." Kocsis v. Fla. State Univ. Bd. of Trs., 788 F. App'x 680, 686 (11th Cir. 2019). Examples of protected activity for a Title IX retaliation claim include where a principal sexually harasses a student and a teacher complains to the school board that is indifferent, or the unequal treatment of the girls' basketball team. Yegidis v. Bd. of Trs. of Fla. Gulf Coast Univ., No. 2:09-CV-353-FTM-36DNF, 2011 WL 13294516, at *6 (M.D. Fla. Jan. 21, 2011) (collecting cases). "Where the retaliation occurs because the complainant speaks out about sex discrimination, the "on the basis of sex" requirement is satisfied." Jackson, 544 U.S. at 179.

The Clery Act is "a federal statute that requires American colleges and universities to disclose statistics and information relating to crime in and around their campuses. Under the Act, colleges and universities are required to publish and distribute annual campus crime reports to students and employees, keep logs of reported crimes and records of crime statistics, and provide timely warnings to students and employees of recent crimes that represent a threat to the safety of students or employees." Emery v. Talladega Coll., 688 F. App'x 727, 729 (11th Cir. 2017).

"[T]he Clery Act expressly does not contain a private cause of action against educational institutions, and courts prohibit private litigants from attempting to enforce the Clery Act through other causes of action…." Doe v. Emory Univ., Inc., No. 1:21-CV-4859-TWT, 2022 WL 17419555, at *7 n.3 (N.D. Ga. Dec. 5, 2022) (collecting cases). See also Emory, 688 F. App'x at 730 n.1 (collecting cases).

**(2)  Application of Title IX Principles**

It is undisputed that Smith suffered an adverse employment action – she was terminated from her position as police chief. Applying the same framework for claims under Title VII, the Court considers whether there was protected activity and causation.

**(a)  Protected Activity**

FGCU had a sexual harassment under Title IX policy in effect during plaintiff's employment. (Doc. #37 at 109.) Plaintiff never used any of the methods available to report sexual harassment. (Id. at 110.) Plaintiff did not report discrimination to President Martin, or Vee Leonard, or about Clery compliance. (Id. at 173.) Plaintiff was not aware if President Martin had knowledge about plaintiff's concern regarding Clery compliance. (Id. at 173-174.) President Martin also confirmed no knowledge of any claims of discrimination. (Doc. #39 at 2.) Complaints were made to Sara Stensrud, and it is unknown what if anything was passed along to President Martin.

- 29 -

When Smith started her employment, FGCU had already had an audit in 2019 by the Department of Education regarding non-compliance with the Clery Act, and Smith immediately started expressing concern. (Doc. #45-1 at ¶ 3.) Between August and October 2021, there were several off campus sexual assault reports alleging members of fraternities were drugging female students and sexually assaulting them. In most instances, Title IX staff were aware but did not notify the Police Department or the Division of Children and Family Services. (Id.; Doc. #37-8 at 94.)

(1) At a meeting held on November 19, 2021, Smtih expressed concerns about FGCU's Clery non-compliance with leadership, but her concerns were dismissed. (Doc. #37 at 204.) The failure to report cases of sexual harassment, including assault and domestic violence, placed FGCU in on-compliance with federal mandates. Internally, Smith still required staff to become more compliance focused and to document. (Doc. #37-8 at 94-95.) Again, expressing concern about compliance with the Clery Act does not fall under the protected activity of Title IX.

(2) On January 21, 2022, Stensrud sent an email to General Counsel and Cabinet Member Vee Leonard explaining Smith's recommendation of an external Clery compliance expert for training, and Smith continued to advocate for

training and compliance until her termination. Smith included Clery compliance in her final formal agenda on March 22, 2022, but FGCU refused stating "we all know about the 2019 audit and it's old news." Smith expressed concern that it was placing female students and employees at risk in violation of Title IX. (Doc. #45-1 at ¶ 6.) Leonard was angry that someone was contacted outside of her authorization regarding Clery compliance training and Smith was advised about overstepping bounds without consent. (Doc. #37-8 at 102.) This arguably was protected activity under Title IX.

(3)    Smith participated in a March 28, 2022, Title IX training that revealed a significant increase in discrimination/harassment complaints at FGCU between 2016 and 2020. Smith was terminated the next day. (Doc. #45-1 at ¶¶ 12-13). A slide show showed a 200% increase in 4 years. (Doc. #37-8 at 105.) There was no protected activity by Smith by her participation in the training.

**(b)    Causation**

Smith knew she had to review and follow FGCU policies and procedures, as well as enforce them. (Doc. #37 at 86-87.) Smith requested that the University hire a Clery Act compliance coordinator. The request was granted even though it had been denied under the previous chief police. Diania Tsenekos was hired

as the Clery compliance coordinator, and Tsenekos also raised
concerns about Clery compliance. Tsenekos continued to be employed
by the University and no action was taken against her employment.
(Doc. #37 at 201-202.)   A Clery Act policy was created by FGCU
after Smith's termination, signed on June 14, 2022. (Id. at 116.)
President Martin signed a Clery Act policy on December 7, 2022.
(Doc. #37-3 at 59-64.)

Defendant's argument that Smith's Clery Act complaints about
FGCU's compliance were not Title IX protected activity ignores the
substantial overlap between Clery requirements and Title IX
obligations regarding sexual assault reporting. Smith consistently
tied her Clery compliance concerns to gender-based discrimination
and violence against female students. Her advocacy for proper
reporting and response to sexual assaults falls squarely within
Title IX's scope of protected activity.

While Smith can show some protected activity and some temporal
proximity, there remains no factual showing of causal connection
to the adverse action by President Martin.  Summary judgment will
be granted as to Count V for retaliation under Title IX.

Accordingly, it is now

**ORDERED:**

1. Defendant's Motion for Summary Judgment (Doc. #36) is
   **GRANTED IN PART AND DENIED IN PART.**

2. The Motion for Summary Judgment is denied as to Count I of

the Complaint.

3. The Motion for Summary Judgment is granted as to Counts II
   and IV of the Complaint, which are dismissed without
   prejudice.

4. The Motion for Summary Judgment is granted as to Counts
   III and V of the Complaint, and judgment will be entered
   in favor of Defendant The Florida Gulf Coast University
   Board of Trustees and against Plaintiff Kelli Smith, who
   shall take nothing as to these counts.

5. The Clerk of the Court shall delay entry of judgment until
   the conclusion of the case.

**DONE AND ORDERED** at Fort Myers, Florida, this __22nd__ day of
September 2025.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:  Parties of record

– 33 –